UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

In Re:

     ANCHOR BANCORP WISCONSIN INC.,          Case No. _ -13- _____-rdm

         Debtor.

---

**DISCLOSURE STATEMENT WITH RESPECT TO PREPACKAGED PLAN OF
REORGANIZATION OF ANCHOR BANCORP WISCONSIN INC.**

---

KERKMAN DUNN SWEET DeMARB
Rebecca R. DeMarb
WI State Bar No. 1026221
James D. Sweet
WI State Bar No. 1017557
121 S. Pinckney Street, Suite 525
Madison, WI 53703
Telephone: (608) 310-5502
Facsimile: (414) 277-0100
rdemarb@kerkmandunn.com

General Bankruptcy Counsel to Anchor BanCorp Wisconsin Inc.

-and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Van C. Durrer II
Ramon M. Naguiat
Annie Li
300 S. Grand Ave., Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Facsimile: (213) 687-5600
van.durrer@skadden.com

Special Counsel to Anchor BanCorp Wisconsin Inc.

Dated: July 31, 2013

On the Petition Date, Anchor BanCorp Wisconsin Inc. ("Anchor BanCorp" or the "Debtor") intends to file a petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Western District of Wisconsin, subject to receiving in advance requisite acceptances of the Prepackaged Plan of Reorganization of Anchor BanCorp Wisconsin Inc.  (the "Plan"). Capitalized terms used but not defined in this disclosure statement (the "Disclosure Statement") shall have the meanings ascribed to them in the Plan.  If a bankruptcy petition is filed, the Debtor will seek confirmation of the Plan as soon as practicable.  A copy of the Plan which the Debtor intends to file is attached to this Disclosure Statement as Exhibit A.

The Debtor is distributing this Disclosure Statement in connection with its solicitation of votes on the Plan.  All holders of Claims against, Interests in, and Warrants relating to the Debtor are urged to read the Disclosure Statement and the Plan in full.  The board of directors and the management of the Debtor believe that the Plan is in the best interests of holders of Claims against and Interests in the Debtor.  Accordingly, holders of Bank Claims and TARP Interests are urged to vote in favor of the Plan.

No person has been authorized to give any information or to make any representation about the Plan not contained in this Disclosure Statement.  The statements in this Disclosure Statement are made as of the date hereof.  Neither the Disclosure Statement's distribution nor the Plan's consummation will, under any circumstance, create any implication that the information herein is correct at any time after the date hereof. All summaries herein are qualified by reference to the Plan as a whole.  In any contested matter or adversary proceeding, this Disclosure Statement shall not constitute an admission of any fact or liability but shall be deemed a statement made in settlement negotiations.  Unless otherwise indicated, the Debtor's management has provided the factual information in this Disclosure Statement.  The Debtor believes that the information herein is accurate but is unable to warrant that it is without any inaccuracy or omission.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(c) and not necessarily in accordance with federal or state securities laws or other laws governing disclosure outside the context of Chapter 11.  This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "SEC"), nor has the SEC passed upon the accuracy or adequacy of the statements contained herein.

In making a decision in connection with the Plan, holders of Bank Claims and TARP Interests must rely on their own examinations of the Debtor and the terms of the Plan, including the merits and risks involved.  They should not construe the contents of this Disclosure Statement as providing any legal, business, financial, or tax advice and each holder should consult its own advisors with respect to those matters.

## SECURITIES LAW MATTERS

The Debtor is relying on section 1145(a)(1) of the Bankruptcy Code to exempt the exchange, issuance, and distribution of the Anchor BanCorp stock from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act") and state securities and "blue sky" laws insofar as (i) the securities are issued by a debtor, an affiliate of the debtor, or a successor to a debtor under a plan approved by a bankruptcy court; (ii) the recipients of securities hold a claim against, an interest in, or a claim for an administrative expense in the case concerning the debtor or such affiliate; and (iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" in exchange for cash or property.

The Debtor also believes that the issuance and distribution of the Anchor BanCorp stock will be exempt from the registration requirements of the Securities Act, and any state or local laws requiring registration, by reason of one or more exemptions therefrom, including section 4(2) of the Securities Act as a transaction not involving any public offering.  Persons who receive stock under the Plan are urged to consult their own legal advisors with respect to restrictions applicable under the Securities Act and any appropriate rules and the circumstances under which securities may be sold in reliance upon any such rules.

## FORWARD-LOOKING STATEMENTS

The information presented in this Disclosure Statement includes forward-looking statements in addition to historical information.  These statements involve known and unknown risks and relate to future events, our future financial performance, or our projected business results.  In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "believes," "estimates," "predicts," "targets," "potential," or "continue" or the negative of these terms or other comparable terminology.  Forward-looking statements are only predictions.  Actual events or results may differ materially from any forward-looking statement as a result of various factors, including those contained in the section entitled "Risk Factors" and other sections of this Disclosure Statement, including the documents incorporated by reference herein.  Although the Debtor believes that the expectations reflected in the forward-looking statements are reasonable, the Debtor cannot guarantee future results, events, levels of activity, performance, or achievements.  The Debtor expressly disclaims a duty to update any of the forward-looking statements.

## TABLE OF CONTENTS

Page

I.     INTRODUCTION .................................................................................................................. 1

    A.     Notice to Holders of Claims, Interests, and Warrants ............................................... 1

    B.     Voting Procedures, Ballots, and Voting Deadline ..................................................... 2

    C.     Record Date ................................................................................................................ 3

    D.     Confirmation Hearing and Deadline for Objections .................................................. 3

II.    PLAN SUMMARY ............................................................................................................... 4

III.   HISTORY OF THE DEBTOR ............................................................................................. 8

    A.     Overview of Business Operations .............................................................................. 8

    B.     Corporate Structure .................................................................................................... 9

    C.     Capital Structure of the Debtor .................................................................................. 9

    D.     Events Leading to the Chapter 11 Filings ............................................................... 10

    E.     Proposed Recapitalization Transactions .................................................................. 11

IV.    TIMING OF THE CHAPTER 11 CASE ........................................................................... 12

V.     THE PLAN .......................................................................................................................... 12

    A.     Overall Structure of the Plan .................................................................................... 12

    B.     Classification and Treatment of Claims, Interests, and Warrants ............................ 12

    C.     Means for Implementation of the Plan ..................................................................... 17

    D.     Provisions Governing Distributions ......................................................................... 20

    E.     Treatment of Executory Contracts and Unexpired Leases ....................................... 21

    F.     Conditions Precedent to the Plan's Confirmation and Effective Date ..................... 22

    G.     Modification; Withdrawal ......................................................................................... 22

    H.     Retention of Jurisdiction .......................................................................................... 22

    I.     Effects of Confirmation ............................................................................................ 23

    J.     Miscellaneous Provisions ......................................................................................... 25

    K.     Governing Law .......................................................................................................... 26

VI.    CERTAIN RISK FACTORS TO BE CONSIDERED ........................................................ 26

    A.     Failure to Confirm the Plan ...................................................................................... 27

    B.     Potential Adverse Effects of Chapter 11 .................................................................. 27

i

C.      Absence of Public Market; Restriction on Transferability ..................................................... 27

D.      Dividends ................................................................................................................................ 27

E.      Regional Concentration .......................................................................................................... 27

F.      Regulatory Matters ................................................................................................................. 27

VII.    CONFIRMATION OF THE PLAN ................................................................................................ 28

A.      Voting Requirements .............................................................................................................. 28

B.      Section 1111(b) Election ........................................................................................................ 29

C.      Feasibility of the Plan ............................................................................................................ 29

D.      Best Interests Test .................................................................................................................. 29

E.      Confirmation Without Acceptance of All Impaired Classes – "Cramdown" ......................... 30

VIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................... 31

IX.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .............. 32

A.      Certain United States Federal Income Tax Consequences to the Debtor ............................... 33

B.      Certain United States Federal Income Tax Consequences to Holders of Claims or
        Interests .................................................................................................................................. 34

C.      Importance of Obtaining Professional Tax Assistance .......................................................... 34

X.      OTHER MATTERS ....................................................................................................................... 34

XI.     RECOMMENDATION AND CONCLUSION ................................................................................ 36

THE PLAN ................................................................................................................................. EXHIBIT A

ANNUAL REPORT FOR THE FISCAL YEAR ENDED MARCH 31, 2013 (FORM 10-K) .................. EXHIBIT B

FORM OF INVESTOR AGREEMENT (4.9% INVESTOR) ..................................................... EXHIBIT C

FORM OF INVESTOR AGREEMENT(9.9% INVESTOR) ..................................................... EXHIBIT D

LIQUIDATION ANALYSIS ..................................................................................................... EXHIBIT E

## I.      INTRODUCTION

The Debtor hereby transmits this Disclosure Statement in accordance with section 1125 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), for use in the solicitation of votes to accept the Plan.  A copy of the Plan is attached to this Disclosure Statement as Exhibit A.  It is the judgment of the Debtor's board of directors, management, and advisors, and a majority of the holders of Bank Claims, that the Plan and the transactions contemplated by the Plan afford the best opportunity for a restructuring that will maximize value for stakeholders under the circumstances.

The Plan provides for a recapitalization and restructuring of the Debtor's capital structure in a manner designed to maximize recoveries for creditors and to enhance the financial stability of the Reorganized Debtor.  Under the Plan, the Debtor will pay a total of $49 million in cash to satisfy the approximately $183,000,000.00 in obligations (including with respect to unpaid principal balance, accrued but unpaid interest thereon, and all administrative and other fees or penalties) under the Credit Agreement owed to holders of the Bank Claims.  The holders of approximately 83% in amount and a majority in number of the Bank Claims have indicated that they agree to the proposed treatment of their Claims under the Plan.  The Plan leaves unimpaired the rights of all creditors other than the Bank Claim holders.

The Plan also contemplates the issuance of 60,000,000 shares of New Common Stock in exchange for the TARP Interests, which comprise 110,000 shares of Fixed Rate Cumulative Perpetual Preferred Stock, Series B, of the Debtor that were acquired by the U.S. Treasury in connection with TARP.  To the extent that holders of TARP Interests agree to sell the New Common Stock after the Effective Date,  the Debtor may facilitate such sale or sales to one or more third-party purchasers.  The Debtor anticipates that any such sales would be consistent with the pricing of New Common Shares under the Investment Agreements.

All Common Stock will be cancelled.  All  warrants, options, and contractual rights to purchase or acquire any equity interest in the Debtor, including the warrant to purchase 7,399,103 shares of common stock at an exercise price of $2.23 per share that was acquired by the U.S. Treasury in connection with TARP, will be cancelled.

The Debtor will fund its reorganization, recapitalization, and operations using the cash proceeds of a $175 million New Investment, which reflects private investments in New Common Stock of the Debtor.  The Debtor has already obtained executed subscription agreements substantially in the forms attached as Exhibits C and D hereto in the amount of $175 million, subject to the terms of the applicable Investment Agreements.  In addition, the Plan contemplates that the Reorganized Debtor may borrow up to $30 million.

This Disclosure Statement, among other things, (i) contains certain information regarding the Debtor's prepetition history, (ii) describes the Plan, alternatives to the Plan, effects of confirmation of the Plan, and distributions under the Plan, and (iii) discusses the confirmation process and voting procedures that holders of Bank Claims and TARP Interests must follow for their votes to be counted.  Holders of the Bank Claims and the TARP Interests are the only whose votes on the Plan will be solicited.  Other creditors' claims will be fully honored in the ordinary course; those creditors are therefore deemed to accept the Plan and their votes will not be solicited.  Because the Plan provides that Non-TARP Interests will be cancelled, the holders of Non-TARP Interests will be deemed to reject the Plan.

Although the Debtor diligently pursued an out-of-court restructuring, it anticipates not being able to obtain the support of a single, holdout Bank Claim holder, whose reasons for holding out remain unclear.  As discussed in this Disclosure Statement, the Bankruptcy Code allows the Plan to bind, and be confirmed without the consent of, the holdout.  Given the value for stakeholders offered by the Plan, as well as the support of holders of 83% in amount and a majority in number of the Bank Claims, addressing this holdout is a primary motivating factor for the Debtor's pursuit of its restructuring through the Plan and a bankruptcy case.

### A.      Notice to Holders of Claims, Interests, and Warrants

This Disclosure Statement is being transmitted to certain holders of Claims, Interests, and Warrants for the purpose of soliciting votes on the Plan and for informational purposes.  The primary purpose of this Disclosure Statement is to provide adequate information to enable those voting on the Plan to make a reasonably informed decision with respect to the Plan prior to exercising their rights to vote to accept or to reject the Plan.  Subject to

receiving requisite acceptances of the Plan, the Debtor expects to file a Chapter 11 petition as promptly as practicable.  As soon as practicable after commencement of the bankruptcy case, the Debtor will request Bankruptcy Court approval of this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the parties voting on the Plan to make an informed judgment about the Plan.  The Debtor simultaneously will request that the Bankruptcy Court confirm the Plan.

WHEN AND IF CONFIRMED BY THE COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, INTERESTS IN, AND WARRANTS RELATING TO THE DEBTOR, WHETHER OR NOT THEY ARE ENTITLED TO VOTE OR DID VOTE ON THE PLAN AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN.  THUS, YOU ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY.  IN PARTICULAR, HOLDERS OF BANK CLAIMS AND TARP INTERESTS WHO ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS TO THE PLAN AND DISCLOSURE STATEMENT CAREFULLY AND IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR TO REJECT THE PLAN.  ONLY THE HOLDERS OF BANK CLAIMS AND TARP INTERESTS AS OF THE RECORD DATE SHALL BE ALLOWED TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT IS THE PRIMARY DOCUMENT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN.  NO SOLICITATION OF VOTES MAY BE MADE UNTIL DISTRIBUTION OF THIS DISCLOSURE STATEMENT, AND NO PERSON HAS BEEN AUTHORIZED TO DISTRIBUTE ANY INFORMATION CONCERNING THE DEBTOR OTHER THAN THE INFORMATION CONTAINED HEREIN.

**B.       Voting Procedures, Ballots, and Voting Deadline**

Accompanying this Disclosure Statement and forming a part of the solicitation package (the "Solicitation Package") are copies of (i) the Plan (Exhibit A); and (ii) for holders of Bank Claims and TARP Interests who are entitled to vote on the Plan (such holders, the "Voting Entities"), one or more ballots.  If you did not receive a ballot in your package and believe that you are entitled to vote on the Plan, please contact the Voting Agent (defined below) at the addresses and telephone numbers set forth on the cover of this Disclosure Statement and below.

After carefully reviewing the Plan, this Disclosure Statement, and the instructions on the enclosed ballots, (1) each holder of a Bank Claim should indicate, by checking the appropriate box on the applicable ballot, (a) whether it votes in favor of Class 1 making the Section 1111(b) Election, (b) whether it votes its Bank Claim in Class 1 in acceptance or rejection of the Plan, and (c) if the Section 1111(b) Election is not made, whether it votes its Unsecured Deficiency Claim in Class 5 in acceptance or rejection of the Plan, and (2) each holder of a TARP Interest should indicate, by checking the appropriate box on the ballot, whether it votes its TARP Interest in Class 6 in acceptance or rejection of the Plan.  The Voting Entities must complete and sign their ballots and return them so that they are RECEIVED by the Voting Deadline (as defined below).

IN PARTICULAR, IF YOU ARE A HOLDER OF A BANK CLAIM OR A TARP INTEREST, FOR YOUR VOTE TO BE COUNTED, YOU MUST PROPERLY COMPLETE AND DELIVER YOUR BALLOT SO THAT YOUR VOTE IS RECEIVED BY THE FOLLOWING VOTING AGENT (THE "VOTING AGENT") NO LATER THAN **4:00 P.M. (EASTERN TIME) ON AUGUST 2, 2013 (THE "VOTING DEADLINE")**.  IN ORDER TO PROMPTLY TRANSMIT YOUR BALLOT, YOU MUST **SEND IT VIA FAX, EMAIL, OR OVERNIGHT DELIVERY** TO THE FOLLOWING:

> Rebecca R. DeMarb
> Kerkman Dunn Sweet DeMarb
> 121 South Pinckney Street, Suite 525
> Madison, WI 53703
> Telephone: (608) 310-5502
> Facsimile: (414) 277-0100
> E-mail:  rdemarb@kerkmandunn.com

You may obtain additional copies of the Plan, Disclosure Statement, or other material in this Solicitation Package from the Voting Agent.

### C.    Record Date

Only the holders of Claims and Interests as of the Record Date, in the Classes entitled to vote on the Plan, shall be allowed to vote on the Plan.  In addition, distributions to be made under the Plan shall be made only the holders of Allowed Claims and Allowed Interests as of the Record Date.

### D.    Confirmation Hearing and Deadline for Objections

The Debtor will ask the Bankruptcy Court to consider the adequacy of this Disclosure Statement and confirmation of the Plan at a hearing (the "Confirmation Hearing") to be held as early as **August 14, 2013** at **9:00 a.m., prevailing Central Time**, or as soon as practicable at such other time that the Bankruptcy Court may allow, before the United States Bankruptcy Court for the Western District of Wisconsin, Madison Division, 120 North Henry Street, Room 340, Madison, Wisconsin 53703.  At the Confirmation Hearing, the Debtor will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. See "Confirmation of the Plan Confirmation Without Acceptance of All Impaired Classes – 'Cramdown.'"  The Debtor may modify the Plan, to the extent permitted by section 1127(a) of the Bankruptcy Code and Bankruptcy Rule 3019, as necessary to confirm the Plan.

Notice of the Confirmation Hearing and the time to present objections will be provided in accordance with the instructions to be provided by the Bankruptcy Court.  The Debtors will request that the Bankruptcy Court, among other things, require that any objections to confirmation of the Plan or related matters be filed with the Bankruptcy Court and served so that they are RECEIVED on or before the objection deadline fixed by the Bankruptcy Court by the following:

**The Debtor**

Anchor BanCorp Wisconsin Inc.
25 West Main Street
Madison, Wisconsin 53703
Telephone:  (608) 252-8784
Facsimile:  (608) 252-8783
Attn:  Mark D. Timmerman (mtimmerman@anchorbank.com)

- and -

**General Bankruptcy Counsel to the Debtor:**

Kerkman Dunn Sweet DeMarb
121 South Pinckney Street, Suite 525
Madison, WI 53703
Telephone: (608) 310-5502
Facsimile: (414) 277-0100
Attn: Rebecca R. DeMarb (rdemarb@kerkmandunn.com)

- and -

**Special Counsel to the Debtor:**

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071-3144
Telephone:  (213) 687-5000
Facsimile:  (213) 687-5600
Attn:     Van C. Durrer II (van.durrer@skadden.com)
          Ramon M. Naguiat (ramon.naguiat@skadden.com)
          Annie Li (annie.li@skadden.com)

- and -

**Counsel to the Administrative Agent:**

Katten Muchin Rosenman LLP
525 West Monroe Street
Chicago, IL 60661-3693
Telephone:  (312) 902-5366
Facsimile:  (312) 577-4662
Attn:     Kenneth J. Ottaviano (kenneth.ottaviano@kattenlaw.com)

- and -

**United States Trustee:**

Office of the United States Trustee
780 Regent Street
Suite 304
Madison, WI 53715
Telephone:  (608) 264-5522
Facsimile:  (608) 264-5182
Attn: Attorney Assigned to In re Anchor BanCorp Wisconsin Inc.


The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## II.   PLAN SUMMARY

The following table summarizes the classification and treatment under the Plan of the Claims against, Interests in, and Warrants relating to the Debtor.  The summary contained in the table is qualified in its entirety by reference to the provisions of the Plan, a copy of which is attached hereto as Exhibit A, and by the balance of this Disclosure Statement.  The classification and treatment for all Classes of Claims, Interests, and Warrants are described in more detail elsewhere in this Disclosure Statement.  *See* "The Plan - Classification and Treatment of Claims, Interests, and Warrants."

| **Description of Claims, Interests, and Warrants** | **Treatment Under the Plan** |
| --- | --- |
| UNCLASSIFIED CLAIMS | |
| Administrative Claims......................................... | • *Unimpaired* – The rights of each holder of an Administrative Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of an Administrative Claim shall receive Cash equal to the unpaid portion of its Administrative Claim on the |

4

| **Description of Claims, Interests, and Warrants** | **Treatment Under the Plan** |
|---|---|
| | date on which its Administrative Claim becomes payable under applicable law or any agreement relating thereto. |
| | • *Estimated Recovery* – 100% |
| Priority Tax Claims ............................................ | • *Unimpaired* – The rights of each holder of a Priority Tax Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes payable under applicable law or any agreement relating thereto. |
| | • *Estimated Recovery* – 100% |
| CLASSIFIED CLAIMS | |
| Class 1 - Bank Claims ......................................... | • *Impaired* – Each holder of an Allowed Bank Claim is entitled to vote to accept or reject the Plan.  In the absence of a vote to accept or reject the Plan by any holder of an Allowed Bank Claim, such holder of an Allowed Bank Claim shall be deemed to reject the Plan.  The Bank Claims are Allowed Claims in the amounts set forth below.  Each holder of an Allowed Bank Claim holds a pro rata amount of such aggregate Allowed Bank Claim as set forth in Exhibit A to the Plan.  Each holder of an Allowed Bank Claim is also entitled to vote to have Class 1 make the Section 1111(b) Election.  On the Effective Date, each holder of an Allowed Bank Claim shall receive the treatment provided below, depending on whether Class 1 makes the Section 1111(b) Election. |
| | (1)  *Section 1111(b) Election Made.*  In the event that Class 1 makes the Section 1111(b) Election, the Allowed Bank Claims will be treated as Allowed Bank Secured Claims in the approximate aggregate amount of $183,000,000.00.  Each holder of an Allowed Bank Secured Claim shall receive its pro rata share of $49,000,000.00 in cash, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Secured Claim.  Such cash payment shall be made to the Administrative Agent, which shall be authorized and directed to make further distributions consistent with the terms and conditions of the Credit Agreement.  If such election is made, there will be no Unsecured Deficiency Claims. |
| | (2)  *Section 1111(b) Election Not Made.*  In the event that Class 1 does not make the Section 1111(b) Election, the Allowed Bank Claims will be treated as Allowed Bank Secured Claims in the aggregate amount of $48,000,000.00 and as |

| **Description of Claims, Interests, and Warrants** | **Treatment Under the Plan** |
|---|---|
| | Unsecured Deficiency Claims for the remaining approximately $135,000,000.00 balance of the Bank Claims.  Each holder of an Allowed Bank Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Secured Claim its pro rata share of $48,000,000.00 in cash.  Such cash payment shall be made to the Administrative Agent, who shall be authorized and directed to make further distributions consistent with the terms and conditions of the Credit Agreement.  The Unsecured Deficiency Claims will be treated as Class 5 Claims. |
| | • *Estimated Recovery* – Greater than in a liquidation. |
| Class 2 - Other Secured Claims........................... | • *Unimpaired* – Each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.  All Other Secured Claims are Allowed Claims.  On the Effective Date, each holder of an Allowed Other Secured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Other Secured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. |
| | • *Estimated Recovery* – 100%. |
| Class 3 - Other Priority Claims........................... | • *Unimpaired* – Each holder of an Other Priority Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.  All Other Priority Claims are Allowed Claims.  On the Effective Date, each holder of an Allowed Other Priority Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Other Priority Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. |
| | • *Estimated Recovery* – 100%. |
| Class 4 - General Unsecured Claims .................. | • *Unimpaired* – Each holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.  All General Unsecured |

| **Description of Claims, Interests, and Warrants** | **Treatment Under the Plan** |
|---|---|
| | Claims are Allowed General Unsecured Claims. On the Effective Date, each holder of an Allowed General Unsecured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed General Unsecured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. |
| | • *Estimated Recovery* – 100%. |
| Class 5 - Unsecured Deficiency Claims ............. | • *Impaired* – If Class 1 makes the Section 1111(b) Election, there will be no Unsecured Deficiency Claims. If Class 1 does not make such an election, Unsecured Deficiency Claims will be treated as follows. Each holder of an Allowed Unsecured Deficiency Claim is entitled to vote to accept or reject the Plan. All Unsecured Deficiency Claims are Allowed Claims. On the Effective Date, each holder of an Allowed Unsecured Deficiency Claim shall receive its pro rata share of $1,000,000.00 in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Unsecured Deficiency Claim. Such cash payment shall be made to the Administrative Agent, which shall be authorized and directed to make further distributions consistent with the terms and conditions of the Credit Agreement. |
| | • *Estimated Recovery* – Not applicable if Class 1 makes the Section 1111(b) Election; if the Section 1111(b) Election is not made, approximately 0.007%. |
| Class 6 – TARP Interests.................................... | • *Impaired* – Each holder of an Allowed TARP Interest is entitled to vote to accept or reject the Plan. In the absence of any vote to accept or reject the Plan, Class 6 shall be deemed to reject the Plan. All TARP Interests are Allowed Interests. On the Effective Date, the holders of Allowed TARP Interests shall receive their pro rata shares of 60,000,000 shares of New Common Stock in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Allowed TARP Interests. |
| | • *Estimated Recovery* – Pro rata shares of 60,000,000 shares of New Common Stock |
| Class 7 - Non-TARP Interests ............................ | • *Impaired* – Each holder of an Allowed Non-TARP Interest shall be deemed to reject the Plan. Each holder of an Allowed Non-TARP Interest shall not receive or retain any property under the Plan on account of such Interests, any obligation of the |

| **Description of Claims, Interests, and Warrants** | **Treatment Under the Plan** |
|---|---|
| | Debtor on account of such Interests shall be discharged, and its Common Stock will be cancelled. |
| | • *Estimated Recovery* – Nothing. |
| Class 8 – Warrants.............................................. | • *Impaired* – Each holder of an Allowed Warrant shall be deemed to reject the Plan. All Warrants, including, without limitation, the TARP Warrant, will be cancelled. |
| | • *Estimated Recovery*  – Nothing. |

## III.    HISTORY OF THE DEBTOR

### A.    Overview of Business Operations

The Debtor is a registered savings and loan holding company incorporated under the laws of the State of Wisconsin. It is engaged in the banking business through its wholly owned banking subsidiary, AnchorBank, fsb ("AnchorBank"). AnchorBank was organized in 1919 as a Wisconsin chartered savings institution and converted to a federally chartered savings institution in 2000. AnchorBank is the third largest depository institution headquartered in the State of Wisconsin and the largest thrift in terms of assets. AnchorBank's deposits are insured up to the maximum allowable amount by the Federal Deposit Insurance Corporation. AnchorBank is a member of the Federal Home Loan Bank of Chicago. As of July 21, 2011, regulation of AnchorBank was assumed by the Office of the Comptroller of the Currency, and the Federal Reserve became the primary regulator for the Debtor. The Debtor is regulated as a savings and loan holding company and is subject to the periodic reporting requirements of the SEC under the Securities Exchange Act of 1934, as amended.

AnchorBank has approximately 700 employees and 54 branch locations, including one loan origination office. AnchorBank offers checking, savings, money market accounts, mortgages, home equity and other consumer loans, credit cards, annuities, investment products and related consumer financial services. AnchorBank also provides banking services to businesses, including checking accounts, lines of credit, secured loans and commercial real estate loans. AnchorBank's branch network serves as the primary vehicle through which it offers products, cross sells additional products to existing customers, and generates new customer relationships. In addition to its branch network, AnchorBank provides products and services online via its WebBranch™ online banking system and its Speed e-App™ online mortgage application tool.

The Debtor also has a non-banking subsidiary, Investment Directions, Inc. ("IDI"), a Wisconsin corporation which has historically invested in real estate partnerships. During 2010, IDI sold substantially all of its assets and its investment activities have been significantly curtailed.

AnchorBank has one wholly-owned subsidiary: ADPC Corporation, a Wisconsin corporation, holds and develops certain of AnchorBank's foreclosed properties. In November 2011, Anchor Investment Corporation ("AIC"), a former subsidiary of AnchorBank, was dissolved and the remaining assets were transferred to AnchorBank. AIC was a Nevada Corporation that managed a portion of AnchorBank's investment portfolio (primarily mortgage related securities).

Additional information about the Debtor and AnchorBank, including, among other things their operations, their finances, and applicable regulatory regimes and requirements is set forth in the Annual Report for the Fiscal Year Ended March 31, 2013 (Form 10-K) (the "2013 Annual Report"), which is attached hereto as Exhibit B.

B.        **Corporate Structure**



C.        **Capital Structure of the Debtor**

The Debtor is the borrower under the Amended and Restated Credit Agreement, dated as of June 9, 2008 (as amended from time to time, the "Credit Agreement"), among the Debtor, U.S. Bank National Association, as administrative agent ("U.S. Bank"), and the lenders from time to time party thereto (collectively with U.S. Bank, the "Lenders").  Although the Administrative Agent, with the consent of the requisite Lenders, has extended the maturity of the Credit Agreement obligations from time to time, the most recent extension of the applicable June 30, 2013 maturity date by sixty days was not approved by the Federal Reserve Bank.  Thus, as of June 30, 2013, the Credit Agreement had fully matured and was in default.  As of the Petition Date, approximately $183,000,000 in obligations was outstanding under the Credit Agreement.  These obligations are secured by liens on the Debtor's ownership interests in AnchorBank and IDI.

Given that most of the business of the Debtor's corporate enterprise is conducted by its subsidiary AnchorBank, the Debtor incurs few expenses other than, for example, those expenses, including interest, arising in connection with the Credit Agreement, and expenses arising in connection with the Debtor's efforts to reorganize. The Debtor likewise has no employees, owns no real property, and has no material contracts other than those contracts which have previously been attached to or otherwise incorporated into the Debtor's quarterly reports, annual reports, and other public filings submitted to the United State Securities and Exchange Commission.  In addition, the Debtor is current with all of its tax obligations.  To the extent that the Debtor has any non-Lender creditors, the Debtor will satisfy the applicable claims in full in the ordinary course of business.

Pursuant to the Emergency Economic Stabilization Act of 2008, TARP was established and the U.S. Treasury was given authority to take certain actions to restore liquidity and stability to the U.S. banking markets. Under the Capital Purchase Program (the "CPP"), the U.S. Treasury acquired preferred stock, along with warrants to purchase common stock, from certain financial institutions.  On January 30, 2009, in connection with the CPP, the Debtor issued to the U.S. Treasury 110,000 shares of the Corporation's Fixed Rate Cumulative Perpetual Preferred Stock, Series B (the "Preferred Stock"), having a liquidation amount per share of $1,000, for a total purchase price of $110,000,000.  The Preferred Stock paid cumulative compounding dividends at a rate of 5% per year for the first five years following issuance and 9% per year thereafter.  In addition, the Debtor issued and sold to the U.S. Treasury a warrant (the "Warrant") to purchase up to 7,399,103 shares of the Debtor's Common Stock, at an initial per share exercise price of $2.23, for an aggregate purchase price of approximately $16.5 million.  The term of the Warrant is ten years.  The Debtor invested the proceeds of the sale of Preferred Stock and Warrant in AnchorBank. All dividends on the Preferred Stock have been deferred since January 2009.  At March 31, 2013, the cumulative amount of dividends in arrears not declared, along with compounding at 5% per annum on the unpaid dividends was $25.3 million.

The Debtor was de-listed from NASDAQ in 2011.  The Debtor's common stock currently is traded in the over-the-counter market under the symbol "ABCW.PK."  As of April 30, 2013, 21,247,225 shares of the Debtor's common stock were outstanding and there were approximately 2,600 holders of record.

### D.      Events Leading to the Chapter 11 Filings

In the fall of 2008, the United States economy suffered one of the worst financial crises on record.  What came to be known as the "Great Recession" had worldwide implications and brought with it a tremendous loss of value in the United States real estate market, among other areas.  Unemployment reached its highest levels in decades, and consumers as well as commercial borrowers began to default on credit obligations in record numbers.

AnchorBank and, consequently, the Debtor, likewise suffered significant losses since 2008.  To complicate matters, the Debtor's obligations under the Credit Agreement originally were scheduled to mature on September 30, 2008.  The Debtor was successful in negotiating a 15-month extension of the Credit Agreement maturity through 2009.  No payments have been made on the Bank Claims since March 2009, when the Debtor deposited a reserve sufficient to pay interest through April 2010.  In addition, the Debtor took further necessary steps to improve its capital ratio by participating in TARP (as described in Section III.C above).  Without the injection of TARP funds in January 2009, AnchorBank's core capital ratio was projected to fall below 2% as of September 2009 which is considered "critically undercapitalized" and would create an imminent risk that AnchorBank would be seized by the Federal Deposit Insurance Corporation (the "FDIC").  Notwithstanding these measures, the difficulties faced by the Debtor and AnchorBank remained.  As a consequence of the financial crisis and related challenges, on June 26, 2009, the Debtor and AnchorBank each were compelled to consent to the issuance of Orders to Cease and Desist (the "C&D Orders") by the Office of Thrift Supervision (the "OTS").

In July 2009, following issuance of the C&D Orders, a new senior management team was brought in, under the leadership of Chris M. Bauer, who joined AnchorBank as its new Chief Executive Officer.  The new management team led AnchorBank's turnaround efforts, focusing its efforts on stabilizing AnchorBank and removing the imminent threat of AnchorBank's failure, and was ultimately able to achieve compliance with every task set forth in the C&D Orders except the capital ratio requirements, as further discussed below.

Among other things, the C&D Orders required that, no later than December 31, 2009, AnchorBank meet and maintain both a tier 1 (core) capital ratio equal to or greater than 8% and a total risk-based capital ratio equal to or greater than 12%.  The C&D Orders also required AnchorBank to submit a Capital Restoration Plan, along with a revised business plan.  AnchorBank submitted a Revised Capital Restoration Plan (the "Restoration Plan") on July 23, 2010.  On August 31, 2010, the OTS approved the Restoration Plan, although the approval was accompanied by a Prompt and Corrective Action Directive (the "PCA Directive").

During the entire time period from the submission of the Restoration Plan to the present, the Debtor and AnchorBank have been diligently pursuing alternative solutions to meet the required capital ratios and otherwise satisfy the obligations of the Restoration Plan and the PCA Directive.[1]  These alternatives have included raising outside capital with the assistance of AnchorBank's legal and financial advisors.  The Debtor has also focused its efforts on improving the overall financial performance and efficiency of AnchorBank.

While the Debtor has been reasonably successful in stabilizing the financial condition of AnchorBank from an operational standpoint, the Debtor has not been successful in raising outside capital needed not only to meet the required capital ratios but also to repay the amounts owing under the Credit Agreement.  The primary obstacle that the Debtor faced in its capital-raising efforts was the existence of  $185.9 million in principal, interest, and fees owing under the Credit Agreement with additional interest accruing at 17% per annum, and $138.8 million in TARP-related preferred-stock investments, including accrued unpaid dividends.  This capital structure made it virtually impossible for the Debtor to incur debt or raise equity to address its capital requirements.

---

[1]      As a result of the new management team's efforts,  as of March 31, 2012, the Debtor and AnchorBank had complied with all aspects of the C&D Orders and the PCA Directive, except with respect to the required capital ratios.  However, management has been successful in improving AnchorBank's capital ratios for at least three consecutive years.

However, despite this obstacle, over the three years that the Debtor has been working with its financial advisor, each of the Debtor and the Lenders have, independently of each other, received proposals from third parties to acquire control of AnchorBank. None of these proposals provided nearly as much cash consideration for the Lenders under the Credit Agreement as is offered through the Plan. The Debtor's financial advisor has continued to field alternative proposals but no proposals offering more value that are capable of consummation have been forthcoming. The Debtor is informed that the Lenders and their advisors have also continued their efforts to achieve better value. It has been commonly known within the industry for some time that AnchorBank requires substantial additional capital, as reflected in a number of public references highlighting such capital needs, including in AnchorBank's press releases and in publications such as the <u>Wisconsin State Journal</u>, the <u>Milwaukee Journal Sentinel</u>, the <u>Milwaukee Business Journal</u>, and in <u>American Banker</u> which noted such capital needs as recently as July 23, 2013. Despite the high profile nature of AnchorBank's need for a solution, and notwithstanding the continued diligence of the Debtor, the Lenders, and their respective advisors, no other proposed transaction offering comparable value to the Debtor's stakeholders has materialized.

Further reductions in operating expenses and other cost-cutting measures will not be sufficient to maintain or bolster AnchorBank's capital ratios at or to the appropriate levels. For the foreseeable future, the Debtor is likely to suffer further losses as (i) default interest owing under the Credit Agreement continues to accrue, and (ii) the cumulative compounding dividend rate owed on the preferred shares constituting the TARP Interests sharply increases from 5% to 9% beginning in January 2014. Additionally, external market pressures will further, and may even accelerate, AnchorBank's decline, as (i) income attributable to interest continues to erode as a result of AnchorBank's decreasing size, and (ii) income from mortgage originations and refinancings dwindles as interest rates rise. Furthermore, AnchorBank's inability to attract capital has hindered its efforts to recruit and retain commercial lending officers and thereby hampered the rebuilding of its commercial loan business, the success of which business is critical to the AnchorBank's ability to achieve the requisite capital ratios. Therefore, absent the consummation of the restructuring transactions contemplated by this Plan, AnchorBank's health will continue to deteriorate over time, making AnchorBank even less attractive to investors and further impeding the Debtor's capital-raising efforts. In fact, for all these reasons, it is imperative that the Debtor consummate its recapitalization as promptly as possible.

### E.        Proposed Recapitalization Transactions

Accordingly, the Debtor and its advisors negotiated with the Administrative Agent and other Lenders, and with the U.S. Treasury, for a mutually satisfactory settlement of the Debtor's outstanding obligations for the benefit of all of the Debtor's stakeholders. During the time period from approximately the end of 2009 through June 30, 2013, the Administrative Agent (and requisite Lenders) agreed, from time to time, to extend the maturity of the Credit Agreement obligations while these negotiations and the Debtor's capital-raising efforts were ongoing, and the Debtor also received requisite regulatory approval for such extensions.

In recent weeks, the Debtor was successful in obtaining the agreement in principle of the majority of the Lenders under the Credit Agreement to accept a discounted payment of $49 million in satisfaction of the Credit Agreement obligations. This paved the way for a largely consensual recapitalization of AnchorBank as well, particularly if the Debtor could obtain the consent of the remaining Lender under the Credit Agreement, as the terms of the Credit Agreement required unanimous consent of the Lenders for the proposed consensual restructuring. To facilitate pursuit of the unanimous consent of the Lenders and the efforts to raise sufficient capital to consummate the recapitalization, the Administrative Agent agreed to further extend the June 30, 2013 maturity of the Credit Agreement by sixty days. Unfortunately, two events occurred that not only required the filing of this chapter 11 case, but also hastened such bankruptcy filing. First, the remaining Lender made clear that it was not prepared to consent to the Debtor's proposed consensual transaction. Second, the Federal Reserve declined to approve the sixty-day extension afforded by the Administrative Agent, rendering the Credit Agreement fully matured and in default as of June 30, 2013.

Given these circumstances, the Debtor and the Lenders who had consented in principle to the out-of-court proposal concluded that the proposed restructuring should be implemented through a prepackaged plan of reorganization according to the terms described in this Disclosure Statement and embodied in the Plan. Accordingly, the Debtor finalized the terms of the recapitalization, including obtaining commitments for more than 100% of the funds necessary to close the transaction, and solicited votes for its prepackaged plan of reorganization to consummate the recapitalization.

IV.      **TIMING OF THE CHAPTER 11 CASE**

Subject to receiving the requisite acceptances on the Plan, the Debtor intends to commence its Chapter 11 Case as promptly as practicable.  The Debtor has no debtor-in-possession financing and limited cash available.  The Debtor therefore does not expect the Chapter 11 Case to be protracted.  **In fact, the Debtor will request that the Bankruptcy Court confirm the Plan as early as the Bankruptcy Court will allow and is practicable.** Specifically, the Debtor will request that the hearing to consider the adequacy of the Disclosure Statement and confirmation of the Plan occur on **August 14, 2013** or as soon as practicable at such other time that the Bankruptcy Court may allow.  The Plan provides that the Effective Date will be the first Business Day (i) on which all conditions to the Plan's confirmation in Article VIII.B of the Plan have been satisfied and (ii) that is the date on which the Plan is consummated.  *See* "The Plan – Conditions Precedent to the Plan's Confirmation and Effective Date" below.

The Debtor believes it is important that the length of its stay in Chapter 11 be as short as practicable.  One reason is that Chapter 11 poses serious risks to banking businesses such as the Debtor's, which is affected by the public's and government agencies' confidence in the Debtor's financial stability and ability to performs services and obligations going forward.  It therefore is critical that the restructuring and recapitalization contemplated by the Plan be effectuated as expeditiously as possible.

V.      **THE PLAN**

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMEN-TATION OF THE PLAN AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS, INTERESTS, AND WARRANTS UNDER THE PLAN.  IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT A.

THE SUMMARIES OF THE PLAN AND OF OTHER DOCUMENTS REFERRED TO HEREIN DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL OF THE TERMS AND PROVISIONS OF THOSE DOCUMENTS, AND REFERENCE IS MADE TO THE PLAN AND THE OTHER DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF THEIR TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST, INTERESTS IN, AND WARRANTS RELATING TO THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST, INTERESTS IN, AND WARRANTS RELATING TO THE DEBTOR AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN OR THE OTHER OPERATIVE DOCUMENT WILL CONTROL.

A.      **Overall Structure of the Plan**

Under the Plan, Claims against, Interests in, and Warrants relating to the Debtor are divided into Classes according to their relative seniority and other criteria.  If the Plan is confirmed by the Bankruptcy Court and consummated, every Class of Claims will receive distributions in the ordinary course equal to the full amount of the Claims, with the exception that the Bank Claims will be compromised as described herein and in the Plan.  Holders of approximately 83% in amount and a majority in number of the Bank Claims have indicated that they agree to the proposed treatment of their Claims under the Plan.

B.      **Classification and Treatment of Claims, Interests, and Warrants**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and interest holders.  In accordance with section 1123, the Plan divides Claims, Interests, and Warrants into Classes and sets forth the treatment for each Class (other than Administrative Claims and Priority Tax Claims which, pursuant to section 1123(a)(1), need not be and have not been classified).  Under section 1122 of the Bankruptcy Code, the Debtor is required to classify Claims against, Interests in, and Warrants relating to the Debtor into Classes which contain Claims, Interests, and Warrants that are substantially similar to the other Claims, Interests, and Warrants in such Class.

The Debtor believes that the Plan has classified all Claims, Interests, and Warrants in compliance with the provisions of section 1122; however, it is possible that a holder of a Claim, an Interest, or a Warrant may challenge the Debtor's classification of Claims, Interests, and Warrants and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received in this solicitation for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.  Furthermore, a reclassification of a Claim, Interest, or Warrant after approval of the Plan could necessitate a re-solicitation of acceptances of the Plan.

## 1.    Unclassified Claims

### (a)    Administrative Claims

Administrative Claims are Claims for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtor's Estate and operating its business, including wages, salaries, or commissions for services rendered, and (b) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code.  The rights of each holder of an Administrative Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of an Administrative Claim shall receive Cash equal to the unpaid portion of its Administrative Claim on the date on which its Administrative Claim becomes payable under applicable law or any agreement relating thereto.

Given that most of the business of the Debtor's corporate enterprise is conducted by its subsidiary AnchorBank, the Debtor expects the Administrative Claims will comprise mostly professional fees and expenses and, in any case, be relatively minimal.  The Debtor will satisfy the Administrative Claims in full in the ordinary course of business and in accordance with the Plan.

Any requests for payment of Administrative Claims must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order no later than the Administrative Claims Bar Date. Holders of Administrative Claims that do not file and serve a request for payment of Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtor, the Reorganized Debtor, the Estate, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Any objections to requests for payment of Administrative Claims must be filed and served on the requesting party within thirty-five (35) days after the Administrative Claims Bar Date.  Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice to the Reorganized Debtor of such hearing to the Reorganized Debtor.

### (b)    Priority Tax Claims

Priority Tax Claims are a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code. The rights of each holder of a Priority Tax Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes payable under applicable law or any agreement relating thereto.

### (c)    Professional Fees

Except as otherwise provided herein or in the Plan, each professional requesting compensation and/or expense reimbursement pursuant to sections 330, 331, or 503(b) of the Bankruptcy Code for services rendered in connection with the Chapter 11 Case prior to the Effective Date shall file with the Bankruptcy Court an application for allowance of final compensation and reimbursement of expenses in the Chapter 11 Case on or before the 35th day following the Effective Date.  Without limiting the foregoing, the Reorganized Debtor may pay the charges incurred by the Reorganized Debtor on and after the Confirmation Date for any professional's fees, disbursements, expenses, or related support services, without application to or approval by the Bankruptcy Court.

2.    **Classified Claims, Interests, and Warrants**

(a)    Class 1 - Bank Claims

Bank Claims are Claims arising from or related to the Credit Agreement. Class 1 is Impaired by the Plan. Each holder of an Allowed Bank Claim is entitled to vote to accept or reject the Plan. In the absence of a vote to accept or reject the Plan by any holder of an Allowed Bank Claim, such holder of an Allowed Bank Claim shall be deemed to reject the Plan. The Bank Claims are Allowed Claims in the approximate aggregate amount of $183,000,000.00. Each holder of an Allowed Bank Claim holds a pro rata amount of such aggregate Allowed Bank Claim as set forth in Exhibit A to the Plan. The obligations under the Credit Agreement constitute a syndicated facility whereby each Lender, as defined in the Credit Agreement, has a several relationship with the Debtor. Specifically, the Debtor has executed separate promissory notes in favor of each of the Lenders, and each Lender has made loans severally to the Debtor in the amount of their respective percentage of the aggregate commitments to make loans under the Credit Agreement, as reflected in Exhibit A to the Plan and consistent with the provisions of section 2.1 of the Credit Agreement. The Credit Agreement also preserves certain rights and remedies of the individual Lenders. Consequently, each Lender, as a holder of an Allowed Bank Claim has an individual, independent Bank Claim equal to the pro rata amount of such aggregate Allowed Bank Claim and may vote such Allowed Bank Claim individually and independently from the holders of the other Allowed Bank Claims.

Each holder of an Allowed Bank Claim is also entitled to vote to have Class 1 make the Section 1111(b) Election. Votes by holders of Allowed Bank Claims in favor of Class 1 making the Section 1111(b) Election are valid, enforceable, and applicable solely with respect to this Plan. Such votes by holders of Allowed Bank Claims in favor of Class 1 making the Section 1111(b) Election are null and void with respect to any other plan that might be proposed, absent the consent of the applicable holder of the Allowed Bank Claims voting in favor of Class 1 making the Section 1111(b) Election. In the event that there is any material change to the treatment of Bank Claims under this Plan, holders of the Allowed Bank Claims that have voted in favor of having Class 1 make the Section 1111(b) Election may revoke such votes in favor of Class 1 making the Section 1111(b) Election. Notwithstanding the foregoing, no revocation of a vote in favor of Class 1 making the Section 1111(b) Election shall change any vote to accept or reject the Plan. In the absence of a vote to accept or reject the Plan by any holder of an Allowed Bank Claim, such holder of an Allowed Bank Claim shall be deemed to reject the Plan.

On the Effective Date, each holder of an Allowed Bank Claim shall receive the treatment provided below, depending on whether Class 1 makes the Section 1111 Election. Notwithstanding anything to the contrary in the Plan, there shall be no setoff with respect to any distributions to be made under the Plan on account of the Bank Claims, including the Bank Secured Claims.

Each holder of a Bank Claim may vote, individually and separately from other holders of Bank Claims, (i) in favor of Class 1 making the Section 1111(b) Election, and (ii) to accept or reject the Plan.

(1)    *Section 1111(b) Election Made*. In the event that Class 1 makes the Section 1111(b) Election, the Allowed Bank Claims will be treated as Allowed Bank Secured Claims in the approximate aggregate amount of $183,000,000.00. If the Section 1111(b) Election is made, there will be no Unsecured Deficiency Claims. Each holder of an Allowed Bank Secured Claim shall receive its pro rata share of $49,000,000.00 in cash, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Secured Claim. Such cash payment shall be made to the Administrative Agent, which shall be authorized and directed to make further distributions consistent with the terms and conditions of the Credit Agreement. In addition, the Administrative Agent shall receive the Administrative Agent Fees in an amount consistent with the terms of the Credit Agreement, and the Reorganized Debtor is authorized to pay such Administrative Agent Fees without the need for further Bankruptcy Court approval. Collectively, the distributions of payments to the holders of Bank Claims and of the Administrative Agent Fees to the Administrative Agent in accordance with the terms of the Plan shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, any and all outstanding obligations under the Credit Agreement.

(2)    *Section 1111(b) Election Not Made*. In the event that the Section 1111(b) Election is not made, the Allowed Bank Claims will be treated as Allowed Bank Secured Claims

in the aggregate amount of $48,000,000.00 and as Unsecured Deficiency Claims for the remaining approximately $135,000,000.00 balance of the Bank Claims. Each holder of an Allowed Bank Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Secured Claim its pro rata share of $48,000,000.00 in cash. Such cash payment shall be made to the Administrative Agent, which shall be authorized and directed to make further distributions consistent with the terms and conditions of the Credit Agreement. In addition, the Administrative Agent shall receive the Administrative Agent Fees in an amount consistent with the terms of the Credit Agreement, and the Reorganized Debtor is authorized to pay such Administrative Agent Fees without the need for further Bankruptcy Court approval. Collectively, the distributions of payments to the holders of Bank Claims and of the Administrative Agent Fees to the Administrative Agent in accordance with the terms of the Plan shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, any and all outstanding obligations under the Credit Agreement. The Unsecured Deficiency Claims will be treated as Class 5 Claims, as set forth under Article III.B(v) of the Plan.

(b)    Class 2 - Other Secured Claims

Other Secured Claims are Secured Claims against the Debtor other than the Bank Claims. Class 2 is not Impaired by the Plan. All Other Secured Claims are Allowed Claims. On the Effective Date, each holder of an Allowed Other Secured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Other Secured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. Each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(c)    Class 3 - Other Priority Claims

Other Priority Claims are Claims entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim. Class 3 is not Impaired by the Plan. All Other Priority Claims are Allowed Claims. On the Effective Date, each holder of an Allowed Other Priority Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Other Priority Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. Each holder of an Other Priority Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

(d)    Class 4 - General Unsecured Claims

General Unsecured Claims are Claims that are not an Administrative Claim, Bank Claim, Unsecured Deficiency Claim, or Priority Tax Claim. Class 4 is not Impaired by the Plan. All General Unsecured Claims are Allowed General Unsecured Claims. On the Effective Date, each holder of an Allowed General Unsecured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed General Unsecured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing. Each holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.

Given that the majority of the Debtor's operating expenses are satisfied by AnchorBank, the Debtor has few, if any, creditors other than the Lenders. To the extent that the Debtor has any non-Lender creditors, the Debtor will satisfy the applicable General Unsecured Claims in full in the ordinary course of business and in accordance with the Plan.

(e)    Class 5 - Unsecured Deficiency Claims

Unsecured Deficiency Claims are unsecured Claims in amounts equal to the difference, if any, between the holder of a Class 1 Claim's pro rata share of the Allowed Bank Secured Claim and such holder's pro rata share of the Allowed Bank Claim.  If the Section 1111(b) Election is made, there will be no Unsecured Deficiency Claims.  If Class 1 does not make such an election, Unsecured Deficiency Claims will be treated as follows.  Each holder of an Unsecured Deficiency Claim may vote, individually and separately from other holders of Unsecured Deficiency Claims, to accept or reject the Plan.

Class 5 is Impaired by the Plan.  All Unsecured Deficiency Claims are Allowed Claims.  On the Effective Date, each holder of an Allowed Unsecured Deficiency Claim shall receive its pro rata share of $1,000,000.00 in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Unsecured Deficiency Claim.  Such cash payment shall be made to the Administrative Agent, which shall be authorized and directed to make further distributions consistent with the terms and conditions of the Credit Agreement.  Notwithstanding anything to the contrary in the Plan, there shall be no setoff with respect to any distributions to be made under the Plan on account of the Unsecured Deficiency Claims.  Each holder of an Allowed Unsecured Deficiency Claim is entitled to vote to accept or reject the Plan.

(f)        Class 6 – TARP Interests

TARP Interests are the 110,000 shares of Fixed Rate Cumulative Perpetual Preferred Stock, Series B, of the Debtor that were acquired by the U.S. Treasury in connection with TARP.  Class 6 is Impaired by the Plan.  On the Effective Date, the holders of Allowed TARP Interests shall receive their pro rata shares of 60,000,000 shares of New Common Stock in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Allowed TARP Interests.  Each holder of an Allowed TARP Interest is entitled to vote to accept or reject the Plan.  In the absence of any vote to accept or reject the Plan, Class 6 shall be deemed to reject the Plan.

To the extent that holders of TARP Interests agree to sell the New Common Stock after the Effective Date, the Debtor may facilitate such sale or sales to one or more third-party purchasers.  The Debtor anticipates that any such sales would be consistent with the pricing of New Common Shares under the Investment Agreements.

(g)        Class 7 – Non-TARP Interests

Non-TARP Interests are Interests in the Debtor other than the TARP Interests.  Class 7 is Impaired by the Plan.  Each holder of an Allowed Non-TARP Interest shall not receive or retain any property under the Plan on account of such Interests, any obligation of the Debtor on account of such Interests shall be discharged, and its Common Stock will be cancelled.  Each holder of an Allowed Non-TARP Interest shall be deemed to reject the Plan.

(h)        Class 8 – Warrants

Warrants are any warrant, option, or contractual right (including any rights under registration agreements or equity incentive agreements) to purchase or acquire any equity interest in the Debtor as defined in section 101(16) of the Bankruptcy Code, at any time, and all rights arising with respect to such warrants, options, or contractual rights.  Class 8 is Impaired by the Plan.  All Warrants, including, without limitation, the TARP Warrant (which is a Warrant to purchase 7,399,103 shares of Common Stock at an exercise price of $2.23 per share that was acquired by the U.S. Treasury in connection with TARP), will be cancelled.  Each holder of an Allowed Warrant shall be deemed to reject the Plan.

**3.        Full Satisfaction**

The Reorganized Debtor shall make, and each holder of a Claim, Interest, or Warrant shall receive, the distributions or treatment provided for in the provisions of Article III of the Plan in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all Claims against, Interests in, and Warrants relating to the Debtor.

**4.        Alternative Treatment**

Notwithstanding any provision in the Plan to the contrary, consistent with section 1123(a)(4) of the Bankruptcy Code, any holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled under the Plan, any other distribution or treatment to which it and the Debtor may agree in writing.

**C.      Means for Implementation of the Plan**

**1.      Continued Corporate Existence**

The Reorganized Debtor shall continue to exist as a corporate entity, though its state of incorporation shall be amended to reflect its Conversion from a Wisconsin corporation to a Delaware corporation, under its certificates of incorporation and by-laws in effect before the Effective Date, except as its certificates of incorporation and by-laws are amended by the Plan.  The certificates of incorporation and by-laws of the Reorganized Debtor will be amended to reflect (i) an increase in the number of authorized shares in order to allow the Debtor to complete the common equity capital raise in connection with the New Investment and the issuance of New Common Stock to the holders of TARP Interests as contemplated by the Plan, (ii) declassification of the board of directors of the Reorganized Debtor, and (iii) transfer restrictions intended to preserve the Debtor's NOLs (as defined below) and certain other deferred tax assets under Section 382 of the Tax Code (as defined below).  Each share of common stock of the Reorganized Debtor as a Wisconsin corporation as a result of the Conversion will be deemed to be exchanged on a one-for-one basis for a share of common stock of the Reorganized Debtor as a Delaware corporation.  Such Conversion may occur at least one Business Day before the Effective Date.

**2.      Certificate of Incorporation and By-laws**

The certificate of incorporation and by-laws of the Reorganized Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code, and shall be in a customary form in the discretion of the Debtor.

**3.      Sources of Consideration for Plan Distributions**

(a)      New Investment

On the Effective Date, the Debtor will receive certain cash consideration from the New Investors in the form of the New Investment, and the New Investment will be utilized (a) to make payments required to be made under the Plan, (b) to recapitalize the Debtor's subsidiary, the Bank, and (c) in the Reorganized Debtor's operations.  The Investment Agreements are substantially in the forms attached hereto as Exhibits C and D.

The Debtor shall be deemed to have assumed the Investment Agreements as of the Effective Date.  To the extent that that the Debtor has entered into Investment Agreements postpetition subject to confirmation of the Plan, such postpetition Investment Agreement shall be approved, and the Debtor shall be authorized to perform thereunder, as of the Effective Date.

Certain continuing directors and officers of the Debtor and/or AnchorBank may be participating in the New Investment.  Such insiders will be participating at the same pricing and will be subject to the same restrictions on trading that apply to the largest among the New Investors.  Independent directors of the Debtor who are not participating in the New Investment have reviewed these potential insider investments in the context of their consideration of approval of the transactions contemplated by the Plan.

(b)      New Common Stock

On the Effective Date, the Reorganized Debtor shall (A) issue shares of New Common Stock to the New Investors on account of the New Investment in accordance with the terms of the Investment Agreements; and (B) immediately following the issuance described in IV.C.ii.A above, issue 60,000,000 shares of New Common Stock to the holders of TARP Interests.  All the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and nonassessable.

(c)      New Debt

Under the terms of the Plan, the Debtor may borrow up to $30,000,000.00, on market terms.

4.        **Restructuring Transactions**

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtor and/or the Reorganized Debtor shall enter into the restructuring transactions described herein and in the Plan and any ancillary documents.  The Debtor and/or the Reorganized Debtor shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtor's business or the overall organization structure of the Reorganized Debtor.  The restructuring transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtor to be necessary or appropriate.  The actions taken by the Debtor and/or the Reorganized Debtor to effect the restructuring transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion pursuant to applicable state law, including but not limited to the amended certificate of incorporation and by-laws; (iv) the cancellation of shares and Warrants; and (v) all other actions that the Debtor and/or the Reorganized Debtor determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the restructuring transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the restructuring transactions.

Without limiting the generality of the foregoing, the Debtor is authorized to (i) convert from a Wisconsin corporation to a Delaware corporation, and (ii) amend and restate the Articles of Incorporation in order to, among other things, (A) increase the number of authorized shares of Common Stock to at least 2,000,000,000 shares or such larger number as the board of directors of the Debtor or the Reorganized Debtor determines is necessary to effectuate the restructuring transactions contemplated in the Plan, (B) adopt certain restrictions on acquisitions and dispositions of securities, and (C) make certain other changes consistent with the Plan.

The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice-president or senior vice-president, or any other appropriate officer of the Debtor and of the Reorganized Debtor, as the case may be, shall each be authorized to execute, deliver, file, or record any such agreements, instruments, or documents referenced in the Plan, including but not limited to those items referenced in Article IV.D of the Plan, and shall each be further authorized to take such other actions as may be necessary, desirable, or appropriate to effectuate and further evidence the terms and conditions of the Plan and the restructuring transactions contemplated in the Plan.  The secretary or assistant secretary of the Debtor and of the Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

5.        **Cancellation of Securities**

All indentures, notes, bonds, instruments, guarantees, certificates, agreements (including registration rights agreements), and other documents evidencing the existing preferred (including the TARP Interests), common, and/or other stock of the Debtor, including but not limited to Warrants, will be cancelled, and any obligations of the Debtor thereunder or in any way related thereto shall be fully satisfied, released, and discharged.

6.        **Section 1145 Exemption**

The issuance of the New Common Stock, under the terms of the Plan, to holders of TARP Interests on account of their TARP Interests shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by the provision of the relevant corporate documents or applicable law, regulation, order or rule, and shall thereby be exempt from the requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local laws requiring registration for the offer and sale of a security; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or related documents.

7.        **Debt Issuance**

On the Effective Date, the Debtor is authorized to borrow, on market terms, up to $30,000,000.00.  In connection therewith, the Debtor and the Reorganized Debtor shall be authorized to: (i) execute, deliver, adopt, and/or amend appropriate agreements or other documents in connection with a loan transaction or a debt issuance containing terms that are consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) execute, deliver, adopt, and/or amend appropriate instruments of transfer, pledge, guaranty, assignment, or delegation of any asset, property, or right on terms consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and having other terms for which the applicable parties may agree; (iii) take any and all other actions that the Debtor and/or the Reorganized Debtor determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the loan transaction or debt issuance, including making filings or recordings that may be required by applicable state law in connection with such transactions.

### 8.      Directors and Officers

On the Effective Date, the board of directors of the Reorganized Debtor shall comprise the following eight individuals: (i) Chris Bauer, (ii) independent directors (a) Dave Omachinski, (b) Richard Bergstrom, (c) Pat Richter, and (d) Holly Birkenstadt, and (iii) three directors selected by New Investors consistent with the terms of the Investment Agreements.  If an investor-selected director has not received requisite regulatory approval or non-objection prior to the Effective Date, then such investor-selected director shall become a director as soon as practical following the Effective Date upon receipt of such approval.  In the absence of such approval with respect to an investor-selected director or a vacancy in any director position, the applicable director position will be filled in accordance with the Reorganized Debtor's by-laws.  The officers of the Debtor shall continue as officers of the Reorganized Debtor.   The Reorganized Debtor's directors and officers will receive compensation consistent with the Reorganized Debtor's policies and practices.

Certain continuing directors and officers of the Debtor and/or AnchorBank may be participating in the New Investment.  Such insiders will be participating at the same pricing and will be subject to the same restrictions on trading that apply to the largest among the New Investors.  Independent directors of the Debtor who are not participating in the New Investment have reviewed these potential insider investments in the context of their consideration of approval of the transactions contemplated by the Plan.

### 9.      Revesting of Assets

The property of the Debtor's Estate, together with any property of the Debtor that is not property of the Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims, Interests, and Warrants, except as specifically provided in the Plan or the Confirmation Order.  Without limiting the generality of the foregoing, the Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay professional fees and expenses incurred after the Confirmation Date.

### 10.      Preservation of Rights of Action

Except as otherwise provided in the Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights, or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or the Estate may hold against any Person or entity.  The Reorganized Debtor or its successor(s) may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights. Notwithstanding the foregoing, the Debtor hereby releases any claims, causes of action, or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code.

### 11.      Exemption from Certain Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers or mortgages from or by a Debtor to a Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### 12.    Further Transactions

If the conditions to occurrence of the Effective Date set forth in Article VIII of the Plan are not satisfied on or before October 31, 2013 (the "Consummation Deadline"), the Debtor shall not be authorized to proceed to consummate the Plan.  Subject to the prior written consent of at least two-thirds in amount and one-half in number of the holders of Allowed Bank Claims that timely voted to accept the Plan, the Debtor may extend the Consummation Deadline from time to time in order to preserve the ability to consummate the Plan.

### D.    Provisions Governing Distributions

### 1.    Delivery of Distributions; Undeliverable or Unclaimed Distributions

(a)    Delivery of Distributions in General

The Reorganized Debtor shall make distributions to each holder of an Allowed Claim and an Allowed Interest at the address for each such holder reflected in the books and records of the Debtor.  The Administrative Agent is authorized and directed to make further distributions to each holder of a Class 1 or Class 5 claim, as applicable, and to retain the Administrative Agent Fees, in each case consistent with the terms and conditions of the Credit Agreement.  Distributions under the Plan shall be made only to the holders of Allowed Claims and Allowed Interests as of the Record Date.  For the avoidance of doubt, the Reorganized Debtor is authorized to pay such Administrative Agent Fees owed pursuant to the Credit Agreement without the need for further Bankruptcy Court approval.

(b)    Undeliverable and Unclaimed Distributions

(i)    Holding of Undeliverable and Unclaimed Distributions

If any holder's distribution is returned as undeliverable, no further distributions to that holder shall be made unless and until the Reorganized Debtor receives notice of the holder's then-current address, at which time all outstanding distributions shall be made to the holder.  Undeliverable distributions made through the Reorganized Debtor shall be returned to the Reorganized Debtor until such distributions are claimed.  The Reorganized Debtor shall establish a segregated account to serve as the unclaimed distribution reserve, and all undeliverable and unclaimed distributions shall be deposited therein, for the benefit of all similarly situated Persons until such time as a distribution becomes deliverable, is claimed, or is forfeited under the terms of the Plan.

(ii)    Failure to Claim Undeliverable Distributions

Any undeliverable or unclaimed distribution under the Plan that does not become deliverable on or before the second anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Person otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefor against, or seeking to recover its distribution from, the Debtor, the Estate, the Reorganized Debtor, or their property.  After the second anniversary of the Effective Date, the Reorganized Debtor shall withdraw any amounts remaining in the unclaimed distribution reserve for distribution in accordance with the Plan.

### 2.    Calculation Of Distribution Amounts Of New Common Stock

No fractional shares of New Common Stock shall be issued or distributed under the Plan or by the Reorganized Debtor.  Each Person entitled to receive New Common Stock will  receive the total number of whole shares of New Common Stock to which such Person is entitled.

### 3. Withholding and Reporting Requirements

In connection with the Plan and all distributions hereunder, the Reorganized Debtor shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to those requirements. The Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with those withholding and reporting requirements. Notwithstanding any other provision of the Plan, (i) each holder of an Allowed Claim that is to receive a distribution of its pro rata share of New Common Stock shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (ii) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtor's satisfaction, established an exemption therefrom. Any distribution of shares of New Common Stock to be made pursuant to the Plan shall, pending the implementation of such arrangements, be treated as undeliverable pursuant to Article V.A thereof.

### 4. Setoffs

The Reorganized Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made in respect of such Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Claim's holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any claim that the Debtor or the Reorganized Debtor may have in connection with such Claim.

### E. Treatment of Executory Contracts and Unexpired Leases

### 1. Assumed Contracts and Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party unless such Executory Contract (other than the Investment Agreements) or Unexpired Lease: (1) was assumed or rejected previously by the Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is otherwise identified as an Executory Contract or Unexpired Lease to be rejected before the Effective Date. The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365 of the Bankruptcy Code approving the Executory Contract and Unexpired Lease assumptions as of the Effective Date.

All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtor, and be enforceable by the Reorganized Debtor in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or conditions such assumption, assignment or transfer. Any provision in the Assumed Agreements that purports to declare a breach or default based in whole or in part on commencement or continuance of this Chapter 11 Case is hereby deemed unenforceable, and the Assumed Agreements shall remain in full force and effect. Any provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtor based on the filing of the Chapter 11 Case or the financial condition of the Debtor shall be unenforceable.

The Debtor shall be deemed to have assumed the Investment Agreements as of the Effective Date. To the extent that that the Debtor has entered into Investment Agreements postpetition subject to confirmation of the Plan, the Debtor shall be authorized to perform under such postpetition Investment Agreement as of the Effective Date.

### 2. Payments Related to Assumption of Contracts and Leases

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure in the ordinary course of business.

3.        **Indemnification Obligations**

Except as otherwise specifically provided in the Plan, any obligations or rights of the Debtor to indemnify its present and former directors, officers, or employees under its certificate of incorporation, by-laws, or employee-indemnification policy, or under state law or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive and be unaffected by the Plan's confirmation, and remain an obligation of the Reorganized Debtor, regardless of whether the right to indemnification arose before or after the Petition Date.

4.        **Treatment of Change of Control Provisions**

The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control of the Debtor.

F.    **Conditions Precedent to the Plan's Confirmation and Effective Date**

1.        **Conditions to Confirmation**

The Plan's Confirmation is subject to the satisfaction of each of the following conditions precedent:

(a)        The proposed Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor and the Administrative Agent.

2.        **Conditions to Effective Date**

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(a)        The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Debtor and the Administrative Agent, confirming the Plan, as the same may have been modified.

(b)        The Debtor shall have consummated the transactions contemplated by the Investment Agreements to be consummated on or prior to the Effective Date.

(c)        The Debtor shall have received all required regulatory approvals to consummate the transactions contemplated by the Investment Agreements and in the Plan, the Disclosure Statement, and any related ancillary documents.

(d)        The Debtor shall have delivered a copy of the KPMG Opinion (as defined below) to the Administrative Agent and the holders of Allowed Bank Claims in accordance with Section IX.A.2 below.

G.    **Modification; Withdrawal**

The Debtor reserves the right to modify the Plan either before or after Confirmation to the fullest extent permitted under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  The Debtor may withdraw the Plan at any time before the Effective Date.

H.    **Retention of Jurisdiction**

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Case and the Plan, to the fullest extent permitted by law, including jurisdiction to

1.        Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

2.　　　Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all contracts, instruments, and other agreements executed in connection with the Plan;

3.　　　Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

4.　　　Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

5.　　　Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

6.　　　Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

7.　　　Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

8.　　　Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code

9.　　　Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 330, 331, 503(b), and 1129(a)(4) of the Bankruptcy Code; provided, however, that from and after the Effective Date the payment of fees and expenses of the Reorganized Debtors, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; and

10.　　　Enter a final decree closing the Chapter 11 Case.

**I.**　　**Effects of Confirmation**

**1.**　　**Binding Effect**

The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims, Interests, and Warrants, and their respective successors and assigns, and all other parties in interest in this Chapter 11 Case.

**2.**　　**Discharge Of The Debtor**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, Warrants, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, Interests in, or Warrants relating to, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Interests, or Warrants, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a proof of claim or interest based upon such Claim, debt, right, Interest, or Warrant is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim, Interest, or Warrant based upon such Claim, debt, right, Interest, or Warrant is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim, Interest, or Warrant has accepted the Plan.  Except as otherwise provided in the Plan, any default by the Debtor with respect to any Claim, Interest, or Warrant that existed before or on account of the filing of the Chapter 11 Case shall be deemed cured on

23

the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims, Interests, and Warrants subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### 3.        Exculpation and Limitation of Liability

As of the Effective Date, except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action, or liability for any Exculpated Claim, except for any act or omission that is determined in a Final Order to have constituted gross negligence, intentional fraud, or willful misconduct, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtor and the Reorganized Debtor (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

Notwithstanding any provision of this Article or the Plan, the Plan shall not effect a release, discharge, exculpation, injunction against the exercise of, or other impairment or extinction of (i) any rights or claims of the New Investors or the Debtor under the Investment Agreements or (ii) any claims by the United States Government or any of its agencies, or any state or local authority, including, without limitation, any claim arising under applicable securities or banking laws or regulations.

### 4.        Releases by Debtor

Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, on the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated in the Plan, the Debtor shall provide a full discharge and release to each Released Party (and each such Released Party so released shall be deemed fully released and discharged by the Debtor) and their respective properties from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing as of the Effective Date in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtor, including, without limitation, those Causes of Action that the Debtor or the Reorganized Debtor would have been legally entitled to assert in its own right or that any holder of a Claim, an Interest, or a Warrant or other entity would have been legally entitled to assert on behalf of the Debtor or its Estate, and further including those Causes of Action in any way related to the Chapter 11 Case or the Plan; provided, however, that the foregoing release shall not operate to waive or release any Causes of Action of the Debtor arising from claims for gross negligence, intentional fraud, or willful misconduct by a Released Party.

Notwithstanding any provision of this Article or the Plan, the Plan shall not effect a release, discharge, exculpation, injunction against the exercise of, or other impairment or extinction of any rights or claims of the New Investors or the Debtor under the Investment Agreements.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing releases by the Debtor, and further, shall constitute the Bankruptcy Court's finding that the foregoing releases are: (i) in exchange for good and valuable consideration provided by the Released Parties, a good faith settlement, and compromise of the Claims released by such release; (ii) in the best interests of the Debtor and all holders of Claims, Interests, and Warrants; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtor or the Reorganized Debtor asserting any Claim released by such release against any of the Released Parties.

### 5.        Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, OR WARRANTS THAT HAVE BEEN DISCHARGED PURSUANT TO ARTICLE XI.B OF THE PLAN, RELEASED PURSUANT TO ARTICLE XI.D OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE XI.C OF THE PLAN, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS, INTERESTS, AND WARRANTS IN THE PLAN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS, INTERESTS, AND WARRANTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY, OR ESTATE.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED ON THE EFFECTIVE DATE, AND THE INTERESTS AND WARRANTS WILL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THE PLAN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED FROM AND AFTER THE EFFECTIVE DATE, AND ALL INTERESTS AND WARRANTS WILL BE CANCELLED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502 OF THE BANKRUPTCY CODE.  ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, THE REORGANIZED DEBTOR, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, AND EACH OF THEIR ASSETS AND PROPERTIES, ANY CLAIMS, INTERESTS, OR WARRANTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

**J.**      **Miscellaneous Provisions**

**1.**      **Payment of Statutory Fees**

All fees payable under Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid from funds otherwise available for distribution hereunder.

**2.**      **Severability of Plan Provisions**

If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void, or unenforceable, the Debtor, at its option, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

3.        **Successors and Assigns**

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person.

4.        **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the Reorganized Debtor has made all distributions contemplated by the Plan and the Bankruptcy Court has entered an order closing the Chapter 11 Case.

5.        **Payment of Advisory Fees and Expense Reimbursement Due in Connection with New Investment**

The Debtor is a party to certain engagement agreements with Sandler O'Neill & Partners, L.P. ("Sandler O'Neill"), which is the placement agent and/or financial advisor to the Debtor, AnchorBank, and/or their respective boards of directors. The Debtor has remained current on the amounts due from it to Sandler O'Neill under the applicable engagement agreements. At closing, Sandler O'Neill will be entitled to a fee of $9,300,000 under the engagement letter dated April 1, 2010, by and between the Debtor, AnchorBank, and Sandler O'Neill, as amended and supplemented. In addition, Sandler O'Neill will be entitled at closing to reimbursement of its applicable out-of-pocket costs and expenses. The applicable fees and expense reimbursement due to Sandler O'Neill shall be paid without any need for further Bankruptcy Court approval and as an Allowed Administrative Claim.

Sandler O'Neill specializes in the recapitalization of financial institutions, and has been invaluable to the Debtor in connection with raising the capital necessary to consummate the transactions contemplated by the Plan. In addition, the Debtor understands that the fees and other charges payable to Sandler O'Neill at closing are consistent with the market and are therefore reasonable, particularly where, as here, they are only payable at the closing or the Effective Date under the Plan.

The Debtor is informed that an affiliate of Sandler O'Neill might be an Investor, and that there are policies and procedures in place to prevent the sharing of information and communications relating to the transactions contemplated by the Plan between the individuals at Sandler O'Neill involved in financial advisory services provided to the Debtor, on the one hand, and the individuals at the affiliate of Sandler O'Neill involved in such affiliate's role as an Investor, on the other hand.

In addition to the amounts due to Sandler O'Neill described above, the Debtor is obligated to reimburse the Investors for all reasonable and documented out-of-pocket costs and expenses actually incurred by the Investor or its affiliates on the terms set forth in the Investment Agreements, at or promptly after closing thereunder. The Debtor believes that such expense-reimbursement to the Investors under the terms of the Investment Agreements complies with the requirements of the Bankruptcy Code as the Investment Agreements themselves require that the applicable costs and expenses are reasonable.

K.        **Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (i) the laws of the State of New York shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of the Debtor shall govern corporate governance matters with respect to the Debtor, in either case without giving effect to the principles of conflicts of law thereof.

VI.        **CERTAIN RISK FACTORS TO BE CONSIDERED**

Parties in interest should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), including the "Risk Factors" and other matters discussed in the 2013 Annual Report attached hereto, before deciding whether to vote to accept or to reject the Plan.

A.      **Failure to Confirm the Plan**

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to Chapter 7 for liquidation.  In fact, the Debtor believes that, absent confirmation of the Plan, the likely result may be liquidation.  If the conditions to occurrence of the Effective Date set forth in Article VIII are not satisfied on or before the Consummation Deadline, the Debtor shall not be authorized to proceed to consummate the Plan.  Subject to the prior written consent of at least two-thirds in amount and one-half in number of the holders of Allowed Bank Claims that timely voted to accept the Plan, the Debtor may extend the Consummation Deadline from time to time in order to preserve the ability to consummate the Plan.  In the event of a liquidation, holders of Bank Claims likely would receive fractions of the face amounts of their Claims, and all other creditors and stockholders likely would receive nothing.  *See* "Alternatives to Confirmation and Consummation of the Plan."

B.      **Potential Adverse Effects of Chapter 11**

While the Debtor will seek to its stay in Chapter 11 as brief as practicable so as to minimize any potential disruption to its operations, it is possible that, despite the belief and intent of the Debtor, the commencement of the Chapter 11 Case could materially adversely affect relationships between the Debtor and its customers and applicable regulatory agencies and bodies.

C.      **Absence of Public Market; Restriction on Transferability**

The shares of common stock to be issued to the holders of TARP Interests are securities for which there is no market.  Accordingly, there can be no assurance as to the development or liquidity of any market for the shares of the stock.  If a trading market does not develop or is not maintained, holders of the shares may experience difficulty in reselling such securities or may be unable to sell them at all.  If a market for the shares of the stock develops, any such market may be discontinued at any time.

The shares of the Reorganized Debtor's stock are being offered in reliance upon an exemption from registration under the Securities Act and applicable state securities laws.  Therefore, the shares may be transferred or resold only in a transaction registered under or exempt from the Securities Act and applicable state securities laws.  The liquidity of, and trading market for, the shares of such stock also may be adversely affected by general declines in the market or by declines in the market for similar securities.  Such declines may adversely affect such liquidity and trading markets independent of the financial performance of, and prospect for, the Reorganized Debtor.

D.      **Dividends**

The Debtor receives substantially all of its revenue from dividends from AnchorBank.  Those dividends are the principal source of funds to pay dividends on the Debtor's common stock and interest and principal on its debt.  Various federal and/or state laws and regulations limit the amount of dividends that AnchorBank and certain of its non-bank subsidiaries may pay the Debtor.  If earnings of the Debtor's subsidiaries are not sufficient to make dividend payments to the Debtor while maintaining adequate capital levels, the Debtor's ability to make dividend payments will be negatively impacted.  AnchorBank is currently precluded from paying dividends to the Debtor.  The Debtor does not anticipate that any dividends will be paid in the near term.

E.      **Regional Concentration**

The Debtor's regional concentration puts it particularly at risk for changes in economic conditions in its primary market of Wisconsin.  The Debtors is therefore particularly vulnerable to adverse changes in economic conditions in Wisconsin and the Midwest more generally.

F.      **Regulatory Matters**

The effectiveness of the Plan is conditioned on, among other things, the Debtor's receipt of all required regulatory approvals to consummate the restructuring transactions set forth in the Investment Agreements and in the Plan, the Disclosure Statement, and any related ancillary documents.  The Debtor and AnchorBank are heavily regulated by federal and state agencies under various programs and regimes.  If the Debtor cannot obtain the

required approvals, the Plan may fail and the Debtor may be forced to pursue liquidation or other alternatives, in which case the recoveries to stakeholders will almost certainly be less than the recoveries available under the Plan. Moreover, even if the Plan is successful, the inability of the Debtor and/or AnchorBank to comply on a going-forward basis with, and potential future changes or modifications to, applicable statutes, regulations, and regulatory policies, could adversely affect the Reorganized Debtor's and/or the Bank's operations, including, among other things, limiting the types of financial services and products that may be offered and/or increasing operating costs. In addition, any failure to comply with applicable laws, regulations, and policies, could subject the Debtor and/or AnchorBank to sanctions, reputational damage, and other harm.

## VII.    CONFIRMATION OF THE PLAN

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the technical requirements of Chapter 11, including, among other things, that (a) the Plan properly classifies Claims, Interests, and Warrants, (b) the Plan complies with applicable provisions of the Bankruptcy Code, (c) the Debtor has complied with applicable provisions of the Bankruptcy Code, (d) the Debtor has proposed the Plan in good faith and not by any means forbidden by law, (e) disclosure of "adequate information" as required by section 1125 of the Bankruptcy Code has been made, (f) the Plan has been accepted by the requisite votes of creditors (except to the extent that "cramdown" is available under section 1129(b) of the Bankruptcy Code), (g) the Plan is in the "best interests" of all holders of Claims, Interests, or Warrants in each Impaired Class, (h) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on the Effective Date, and (i) the Plan provides for the continuation after the Effective Date of any retiree benefits, as defined in section 1114 of the Bankruptcy Code, at the level established at any time before Confirmation in accordance with sections 1114(e)(1)(B) or 1114(g) of the Bankruptcy Code, for the duration of the period that the Debtor has obligated itself to provide such benefits.

### A.    Voting Requirements

Under the Bankruptcy Code, only Classes of Claims, Interests, and Warrants that are "impaired" (as that term is defined in section 1124 of the Bankruptcy Code) under the Plan are entitled to vote to accept or reject the Plan. A Class is Impaired if the Plan modifies the legal, equitable, or contractual rights of holders of Claims, Interests, or Warrants in the Class (other than by curing defaults and reinstating debt). Under section 1126(f) of the Bankruptcy Code, Classes of Claims, Interests, and Warrants that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan. Under section 1126(g) of the Bankruptcy Code, Classes of Claims, Interests, and Warrants whose holders will not receive or retain any property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

An Impaired Class of Claims, Interests, or Warrants shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims, Allowed Interests, or Allowed Warrants actually voting in the Class have voted to accept the Plan, and (ii) the holders of more than one-half in number of the Allowed Claims, Allowed Interests, or Allowed Warrants actually voting in the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

Ballots submitted by holders of Allowed Bank Claims, including Allowed Bank Secured Claims and Unsecured Deficiency Claims, shall be counted individually and separately from ballots submitted by other holders in determining whether Class 1 has accepted the Plan and made the Section 1111(b) Election. For the avoidance of doubt, Class 1 shall have accepted the Plan and made the Section 1111(b) Election if the holders of at least two-thirds in amount, and more than one-half in number, of the Bank Claims that timely submit ballots so vote. If Class 1 does not make the Section 1111(b) Election, the resulting Unsecured Deficiency Claims shall constitute Class 5 Claims as set forth in Article III of the Plan.

Only the holders of Claims and Interests as of the Record Date, in the Classes entitled to vote on the Plan, shall be allowed to vote on the Plan. In addition, distributions to be made under the Plan shall be made only the holders of Allowed Claims and Allowed Interests as of the Record Date.

Only Claims, Interests, or Warrants in Class 1, Class 5 (if applicable), Class 6, Class 7, and Class 8 are Impaired. Holders of Claims or Interests in Class 1, Class 5 (if applicable), and Class 6 as of the Record Date are entitled to vote to accept or reject the Plan. Holders of Interests in Class 7 will receive nothing under the Plan and is

therefore deemed to have rejected the Plan.  Holders of Warrants in Class 8 will not receive anything under the Plan and Class 8 is therefore deemed to have rejected the Plan.  By operation of law, Claims in Class 2, Class 3, and Class 4 are unimpaired, are deemed to have accepted the Plan and, therefore, holders of such Claims are not entitled to vote.

### B.      Section 1111(b) Election

Each holder of an Allowed Bank Claim is entitled to vote to have Class 1 make the Section 1111(b) Election.  As discussed in Article III.B.i.1, votes by holders of Allowed Bank Claims in favor of Class 1 making the Section 1111(b) Election (i) are valid, enforceable, and applicable solely with respect to this Plan, (ii) are null and void with respect to any other plan that might be proposed, absent the consent of the applicable holder of the Allowed Bank Claims voting in favor of Class 1 making the Section 1111(b) Election, and (iii) may be revoked in the event that there is any material change to the treatment of Bank Claims under this Plan.  Notwithstanding the foregoing, no revocation of a vote in favor of Class 1 making the Section 1111(b) Election shall change any vote to accept or reject the Plan.

### C.      Feasibility of the Plan

In connection with confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Bankruptcy Court find that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.  This is the so-called "feasibility" test.  The Debtor believes that the Reorganized Debtor should have sufficient funds, including from the New Investment, to make the payments required under the Plan on the Effective Date or as otherwise contemplated by the Plan, and to maintain operations on a going-forward basis.  Accordingly, the Debtor believes that the Plan complies with the standard of section 1129(a)(11) of the Bankruptcy Code.

The Debtor is a savings and loan holding company regulated by the Board of Governors of the Federal Reserve System.  The Debtor's subsidiary, AnchorBank, is a federal savings association regulated by the Office of the Comptroller of the Currency and the FDIC.  Aspects of the Plan are subject to approval or non-objection of one or more of these regulators under federal banking laws or the C&D Orders.  The principal objectives of the U.S. bank regulatory system are to ensure the safety and soundness of banking institutions, to protect depositors and other customers, and to avoid loss to the FDIC Deposit Insurance Fund.  Consummation of the Plan is consistent with these objectives.  As part of its ongoing supervisory relationship, the Debtor has been in regular communication with its regulators regarding its efforts to recapitalize and to pursue the Plan.  The regulators have not raised any objection, and the Debtor believes that it will be able to obtain the requisite regulatory consents to proceed with consummation of the Plan.

The Debtor will fund its reorganization, recapitalization, and operations using the cash proceeds of the New Investment with respect to which the Debtor holds Investment Agreements, substantially in the forms attached hereto as Exhibits C and D, for $175 million.  In addition, the Plan contemplates that the Reorganized Debtor may borrow up to $30 million.

### D.      Best Interests Test

Even if the Plan were to be accepted by each class of holders of Claims, Interests, and Warrants, the Bankruptcy Code requires a Bankruptcy Court to find that the Plan is in the "best interests" of all holders of Claims or Interests that are impaired by the Plan and that have not accepted the Plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that (i) all members of an impaired class of claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each impaired class of holders of claims or interests if a debtor were liquidated under Chapter 7, a Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the

Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by the claims of secured creditors to the extent of the value of their collateral and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of a liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in the Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests. The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of unsecured claims.

Once the bankruptcy court ascertains the recoveries in liquidation of the secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

As shown in the liquidation analysis (the "Liquidation Analysis") attached hereto as Exhibit E to this Disclosure Statement, the Debtor believes that each member of each Class of Claims, Interests, and Warrants will receive at least as much, if not more, under the Plan as they would receive if the Debtor was liquidated in a Chapter 7 case. More specifically, a liquidation of the Debtor would significantly impair recoveries to all stakeholders and clearly is not in the best interests of estate constituencies. The Liquidation Analysis estimates that holders of Bank Claims likely would receive fractions of the face amounts of their Claims, and that all other creditors and stockholders would receive virtually nothing, in a liquidation. By contrast, under the Plan, the holders of the Bank Claims will receive at least $49,000,000 on account of such claims, and all other creditors stand to be paid in full. Accordingly, it is clear that stakeholders will fare much better under the Plan than in a liquidation. The Plan therefore satisfies the best interests test.

E.      **Confirmation Without Acceptance of All Impaired Classes – "Cramdown"**

The Debtor will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they reserve the right to modify the Plan to the extent, if any, that confirmation in accordance with section 1129(b) of the Bankruptcy Code requires modification. Under section 1129(b) of the Bankruptcy Code, the Court may confirm a plan over the objection of a rejecting class, if, among other things, (a) at least one impaired class of claims has accepted the plan (not counting the votes of any "insiders" as defined in the Bankruptcy Code) and (b) if the plan "does not discriminate unfairly" against and is "fair and equitable" to each rejecting class.

A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a rejecting impaired class is treated equally with respect to other classes of equal rank. A plan is fair and equitable as to a class of secured claims that rejects the plan if, among other things, the plan provides (a) (i) that the holders of claims in the rejecting class retain the liens securing those claims (whether the property subject to those liens is retained by the debtor or transferred to another entity) to the extent of the allowed amount of such claims and (ii) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, of at least the value of the holder's interest in the estate's interest in such property; (b) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (a) or (c) of this paragraph; or (c) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan, if, among other things, the plan provides that (a) each holder of a claim in the rejecting class will receive or retain on account of its claim

property that has a value, as of the effective date of the plan, equal to the allowed amount of the claim; or (b) no holder of a claim or interest that is junior to the claims of the rejecting class will receive or retain under the plan any property on account of such junior claim or interest.

A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides, among other things that (a) each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (b) that no holder of an interest that is junior to the interests of such class will receive or retain under the plan any property on account of such junior interest.

The Debtor has been advised that Class 1 (which comprises the Bank Claims) and, in the event that Class 1 does not make the Section 1111(b) Election, Class 5 (which comprises Unsecured Deficiency Claims) intend to accept the Plan. Thus, the cramdown provisions of section 1129(b) do not apply to those classes. Each of the Claims in Class 2 (Other Secured Claims), Class 3 (Other Priority Claims), and Class 4 (General Unsecured Claims) are Unimpaired under the Plan. Thus, the cramdown provisions of section 1129(b) also do not apply to these classes.

In the event that Class 6 rejects the Plan, the Debtor will seek cramdown under section 1129(b)(2)(C)(ii) of the Bankruptcy Code with respect to Class 6. Such cramdown is justified because no junior class of stakeholders will receive any recovery under the Plan—holders of Non-TARP Interests in Class 7 shall not receive or retain any property under the Plan on account of such Non-TARP Interests and holders of Warrants in Class 8 shall not receive or retain any property under the Plan on account of such Warrants.

The Debtor will seek cramdown under section 1129(b)(2)(C)(ii) of the Bankruptcy Code with respect to Class 7 and Class 8, which are deemed to reject the Plan. Such cramdown is justified because no junior class of stakeholders will receive any recovery under the Plan—no holders of junior Interests or Warrants will receive anything on account of such Interests or Warrants.

## VIII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

While the Debtor and the consenting Lenders under the Credit Agreement (which include all Lenders but one lone dissenter) believe that an out-of-court restructuring is the preferred approach to resolving the Debtor's capital requirements and balance-sheet restructuring, the Debtor believes that the Plan affords the next best alternative for maximizing the prospects of a successful turnaround and value for all stakeholders and, therefore, is in the best interests of all constituencies. If the Plan is not confirmed, the realistic alternatives likely will be either a liquidation of the Debtor's assets through a sale or sales under section 363 of the Bankruptcy Code if the Debtor continues in Chapter 11 or a liquidation under Chapter 7.

As explained above, the Debtor does not believe that a traditional Chapter 11 process, under which some different plan is developed and proposed post-petition, is viable here. While a more traditional Chapter 11 is not a realistic alternative, the Debtor and its advisors did consider the possibility of a sale of the Debtor's assets or other transaction under section 363 of the Bankruptcy Code and alternative structures that theoretically would allow an infusion of cash from an outside source. However, following a thorough marketing effort by the Debtor's financial advisors, the maximum expression of interest that the Debtor obtained for the sale of AnchorBank was many millions of dollars less than the consideration to be paid under the Plan to the Lenders in satisfaction of the Bank Claims under the Credit Agreement. Moreover, the Debtor believes that, in a sale transaction under section 363 of the Bankruptcy Code, the U.S. Treasury and other stakeholders would receive no recovery at all. In addition, the regulatory process that must be pursued in connection with a section 363 transaction is more lengthy and intensive than the process which applies under the Plan, creating additional risk for stakeholders.

Given the recent action of the Federal Reserve Bank, the Debtor believes that, absent a prompt transaction, AnchorBank will continue its current course of financial distress, which eventually may occasion further action by regulators and possibly a Chapter 7 liquidation. The Debtor believes that, in a liquidation under Chapter 7, before creditors would receive any distributions, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtor's Estate. The assets available for distribution to creditors would be

reduced by such additional expenses, as well as by certain Claims that may be entitled to priority in the context of a liquidation and/or might arise by reason of the liquidation.

The Liquidation Analysis prepared by the Debtor is attached hereto as Exhibit E.  In short, it demonstrates that a Chapter 7 liquidation would be an unmitigated disaster.  The Lenders under the Credit Agreement would receive pennies on the dollar on account of their senior secured Bank Claims, while other creditors would receive nothing on account of their claims.  Under the Plan, however, all Claims other than the Bank Claims will be paid in full, and the U.S. Treasury will receive some recovery.

**THE DEBTOR THEREFORE BELIEVES THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO CREDITORS THAN WOULD ANY OTHER ALTERNATIVE AND THAT IT SHOULD BE CONFIRMED PROMPTLY.**

**IX.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS OR INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

A summary description of certain United States federal income tax consequences of the Plan is provided below.  This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  Only United States federal income tax consequences of the Plan to the Debtor and certain holders of Claims or Interests are described below.  Except as described below, no opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service ("IRS") or any other tax authorities have been or will be sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation or implementation of the Plan as to any holder of a Claim or Interest.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date hereof and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to Non-U.S. Holders (as defined below) and all aspects of United States federal income taxation applicable to special classes of taxpayers (e.g., banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders of Claims or Interests who are, or who hold their Claims or Interests through, pass-through entities, persons whose functional currency is not the United States dollar, dealers in securities or foreign currency, persons holding Claims or Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction and persons who acquired their Claims or Interests pursuant to the exercise of employee stock options or otherwise as compensation).  The following discussion assumes that holders of Claims or Interests (other than Allowed Bank Secured Claims) hold their Claims or Interests as capital assets for United States federal income tax purposes.  Furthermore, the following discussion does not address United States federal taxes other than income taxes.

For purposes of this discussion, a "Non-U.S. Holder" is a beneficial owner of a Claim or Interest that is neither a partnership (or other entity treated as a partnership for United States federal income tax purposes) nor (1) an individual who is a citizen or resident of the United States, (2) a corporation created or organized under the laws of the United States or any state or political subdivision thereof, (3) an estate, the income of which is subject to federal income taxation regardless of its source, or (4) a trust that (i) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (ii) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

If a partnership (including any entity treated as a partnership for United States federal income tax purposes) holds Claims or Interests, the United States federal income tax consequences to the partners of such partnership will depend on the activities of the partnership and the status of the partners. A partnership considering participating in the Plan should consult its tax advisor regarding the consequences to the partnership and its partners of the Plan.

**Each holder of a Claim or Interest should consult its tax advisor regarding the United States federal, state, local and any foreign tax consequences of the transactions described herein or in the Plan.**

A.      **Certain United States Federal Income Tax Consequences to the Debtor**

1.      **Cancellation of Indebtedness Income**

Under the Plan, the Debtor will pay a total of $49 million in cash to satisfy outstanding obligations of approximately $183 million to holders of Allowed Bank Secured Claims. Under general United States federal income tax principles, the Debtor will realize cancellation of indebtedness ("COD") income to the extent that its obligation to a holder is discharged pursuant to the Plan for an amount less than the adjusted issue price (in most cases, the amount the Debtor received upon incurring the obligation, with certain adjustments) of such holder's claim. For this purpose, the amount paid to a holder in discharge of its Bank Claim will equal the amount of cash paid to such holder. Where the Debtor joins in the filing of a consolidated United States federal income tax return, applicable Treasury regulations require, in certain circumstances, that certain tax attributes of the consolidated subsidiaries of the Debtor and other members of the group be reduced. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined (i.e., such attributes may be available to offset taxable income, if any, that is generated between the date of discharge and the end of the debtor's tax year and/or may be carried back to prior years).

Because the Debtor will be a debtor in a bankruptcy case at the time it realizes COD income, the Debtor will not be required to include such COD income in its gross income, but rather it will be required to reduce certain of its tax attributes by the amount of COD income so excluded. Generally, the required attribute reduction will be applied to reduce the Debtor's net operating losses and net operating loss carryforwards (collectively, "NOLs").

2.      **Utilization of Net Operating Losses (NOLs)**

If a corporation experiences an "ownership change" (within the meaning of Section 382 of the Tax Code), the corporation's ability to utilize its NOLs and certain other tax attributes to offset future taxable income generally will be subject to certain limitations. Section 382 of the Tax Code may also limit a corporation's ability to use certain "net unrealized built-in losses" existing on the date of the ownership change but recognized within five years of the ownership change to offset future taxable income.

Prior to the consummation of the Plan, (a) KPMG LLP will deliver an opinion to the effect that the consummation of the restructuring transactions pursuant to the Plan should not cause the Debtors to experience an "ownership change" within the meaning of Section 382 of the Tax Code (the "KPMG Opinion"), and (b) following the Debtor's receipt of the KPMG Opinion, the Debtor shall promptly deliver a copy of the KPMG Opinion (including all exhibits and attachments thereto) to the Administrative Agent and the holders of Allowed Bank Claims (subject to such customary non-reliance agreements as determined by KPMG in its sole discretion). KPMG LLP's opinion will be based on the most current information available prior to the consummation of the Plan, as provided by the Debtor to KPMG LLP, and the accuracy of certain representations, covenants and assumptions, the inaccuracy of which could have a material effect on KPMG LLP's conclusions.

### 3.    Conversion of the Debtor to a Delaware Corporation

The Conversion is expected to qualify as a "reorganization" within the meaning of Section 368 of the Tax Code.  Assuming the Conversion so qualifies, the Debtor should not recognize any gain or loss as a result of the Conversion.

### 4.    Alternative Minimum Tax

A corporation may incur alternative minimum tax liability even in the case that NOL carryovers and other tax attributes are sufficient to eliminate its taxable income as computed under the regular corporate income tax.  It is possible that the Debtor may be liable for the alternative minimum tax as a result of the consummation of the restructuring transactions pursuant to the Plan.

### B.    Certain United States Federal Income Tax Consequences to Holders of Claims or Interests

The following is a summary description of the United States federal income tax consequences of the transactions contemplated by the Plan to certain holders of Claims or Interests; however, no assurance can be given as to the treatment of such transactions by the IRS or as to whether such treatment will be sustained by a court if challenged.  Therefore, holders of Claims or Interests should consult their tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to them of the transactions contemplated by the Plan.

### 1.    Holders of Class 1 Allowed Bank Secured Claims

The Conversion is not expected to result in gain or loss to the holders of Allowed Bank Secured Claims.

The receipt by holders of an Allowed Bank Secured Claim of their *pro rata* share of $49 million in cash in exchange for their Allowed Bank Secured Claims pursuant to the Plan should be treated as a taxable transaction.  Accordingly, each holder of an Allowed Bank Secured Claim should generally recognize gain (taxable as ordinary income) or loss for United States federal income tax purposes in an amount equal to the difference between the amount of cash received pursuant to the Plan in exchange for such holder's Allowed Bank Secured Claim and such holder's adjusted tax basis in such Claim.  A holder of an Allowed Bank Secured Claim that recognizes a loss as a result of the Plan could be entitled to a bad debt deduction, either in the taxable year that includes the Effective Date or a prior taxable year.

### 2.    Holders of Class 7 Allowed Non-TARP Interests

Each holder of an Allowed Non-TARP Interest will not receive or retain any property under the Plan on account of such Interests, and such holder's Common Stock will be cancelled.  Accordingly, holders of Allowed Non-TARP Interests should recognize a capital loss for United States federal income tax purposes in an amount equal to the holder's adjusted tax basis in its Common Stock.  The utilization of capital losses is subject to certain limitations under the Tax Code.

### C.    Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND DOES NOT CONSTITUTE TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY, HOLDERS OF CLAIMS OR INTERESTS SHOULD CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN.**

## X.    OTHER MATTERS

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure

Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact the Voting Agent.

## XI.    RECOMMENDATION AND CONCLUSION

THE DEBTOR BELIEVES THAT THE PLAN'S CONFIRMATION IS IN THE BEST INTERESTS OF THE DEBTOR, ITS ESTATE, AND ITS CREDITORS.  FOR THESE REASONS, THE DEBTOR URGES ALL HOLDERS OF BANK CLAIMS AND TARP INTERESTS TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE THEIR ACCEPTANCE BY DULY COMPLETING AND RETURNING THEIR BALLOTS SO THAT THEY WILL ACTUALLY BE RECEIVED BY THE VOTING AGENT ON OR BEFORE 4:00 P.M. (EASTERN TIME) ON AUGUST 2, 2013.

Dated:   Madison, Wisconsin
         July 31, 2013

ANCHOR BANCORP WISCONSIN INC.

By:        /s/  Mark D. Timmerman
Name:      Mark D. Timmerman
Title:     Executive Vice President, Secretary
           and General Counsel

KERKMAN DUNN SWEET DeMARB

By:  /s/ Rebecca R. DeMarb
Rebecca R. DeMarb
WI State Bar No. 1026221
James D. Sweet
WI State Bar No. 1017557
121 S. Pinckney Street, Suite 525
Madison, WI  53703
Telephone:  (608) 310-5502
Facsimile:  (414) 277-0100
rdemarb@kerkmandunn.com

General Bankruptcy Counsel to Anchor BanCorp Wisconsin Inc.

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:  /s/ Van C. Durrer II
Van C. Durrer
Ramon M. Naguiat
Annie Li
300 S. Grand Ave., Suite 3400
Los Angeles, CA 90071
Telephone:  (213) 687-5000
Facsimile: (213) 687-5600
van.durrer@skadden.com

Special Counsel to Anchor BanCorp Wisconsin Inc.

36

**EXHIBIT A**

**PREPACKAGED PLAN OF REORGANIZATION OF ANCHOR BANCORP WISCONSIN INC.**

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

In Re:

     ANCHOR BANCORP WISCONSIN INC.,     Case No. _ -13- _____-rdm

     Debtor.

# PREPACKAGED PLAN OF REORGANIZATION
# OF ANCHOR BANCORP WISCONSIN INC.

KERKMAN DUNN SWEET DeMARB
Rebecca R. DeMarb
WI State Bar No. 1026221
James D. Sweet
WI State Bar No. 1017557
121 S. Pinckney Street, Suite 525
Madison, WI 53703
Telephone: (608) 310-5502
Facsimile: (414) 277-0100
rdemarb@kerkmandunn.com

General Bankruptcy Counsel to Anchor BanCorp Wisconsin Inc.

-and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Van C. Durrer II
Ramon M. Naguiat
Annie Li
300 S. Grand Ave., Suite 3400
Los Angeles, CA 90071
Telephone: (213) 687-5000
Facsimile: (213) 687-5600
van.durrer@skadden.com

Special Counsel to Anchor BanCorp Wisconsin Inc.

Dated:   July 31, 2013

# **TABLE OF CONTENTS**

Page

INTRODUCTION .................................................................................................1
ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION
    OF TIME.........................................................................................................1
    A.    Scope of Definitions; Rules of Construction ......................................1
    B.    Definitions.........................................................................................1
    C.    Rules of Interpretation ......................................................................6
    D.    Computation of Time ........................................................................7
ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ...................................7
    A.    Administrative Claims ......................................................................7
    B.    Priority Tax Claims ...........................................................................8
ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS, INTERESTS, and
    Warrants .......................................................................................................8
    A.    Introduction......................................................................................8
    B.    Summary and Treatment of Classes ..................................................8
    C.    Full Satisfaction .............................................................................11
    D.    Alternative Treatment .....................................................................12
ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN..........................12
    A.    Continued Corporate Existence ......................................................12
    B.    Certificate of Incorporation and By-laws ........................................12
    C.    Sources of Consideration for Plan Distributions ..............................12
    D.    Restructuring Transactions ..............................................................13
    E.    Cancellation of Securities ...............................................................14
    F.    Section 1145 Exemption .................................................................14
    G.    Debt Issuance .................................................................................14
    H.    Directors and Officers ....................................................................15
    I.    Revesting of Assets ........................................................................15
    J.    Preservation of Rights of Action......................................................15
    K.    Exemption from Certain Transfer Taxes ..........................................16
    L.    Further Transactions .......................................................................16
ARTICLE V PROVISIONS GOVERNING DISTRIBUTIONS ...............................16
    A.    Delivery of Distributions; Undeliverable or Unclaimed Distributions.................16
    B.    Calculation Of Distribution Amounts Of New Common Stock ............................17
    C.    Withholding and Reporting Requirements .......................................17
    D.    Setoffs ............................................................................................17
ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
    LEASES .......................................................................................................18
    A.    Assumed Contracts and Leases........................................................18
    B.    Payments Related to Assumption of Contracts and Leases ...............18
    C.    Indemnification Obligations ............................................................18
    D.    Treatment of Change of Control Provisions .....................................19
ARTICLE VII ACCEPTANCE OR REJECTION OF THE PLAN...........................19
    A.    Record Date ....................................................................................19

i

B.    Classes Entitled to Vote ........................................................................19
C.    Acceptance by Impaired Classes ...........................................................19
D.    Section 1111(b) Election.........................................................................19
E.    Cramdown................................................................................................20
ARTICLE VIII CONDITIONS PRECEDENT TO THE PLAN'S  CONFIRMATION
AND EFFECTIVE DATE .....................................................................................20
A.    Conditions to Confirmation ....................................................................20
B.    Conditions to Effective Date...................................................................20
ARTICLE IX MODIFICATION; WITHDRAWAL ..................................................21
ARTICLE X RETENTION OF JURISDICTION ......................................................21
ARTICLE XI EFFECTS OF CONFIRMATION ......................................................22
A.    Binding Effect..........................................................................................22
B.    Discharge of the Debtor ..........................................................................22
C.    Exculpation and Limitation of Liability .................................................22
D.    Releases by Debtor ..................................................................................23
E.    Injunction ................................................................................................24
ARTICLE XII MISCELLANEOUS PROVISIONS ..................................................25
A.    Payment of Statutory Fees ......................................................................25
B.    Severability of Plan Provisions...............................................................25
C.    Successors and Assigns............................................................................25
D.    Term of Injunctions or Stays...................................................................25
E.    Notices to Debtor .....................................................................................25
F.    Governing Law .........................................................................................26

TABLE OF EXHIBITS

| Exhibit | Name |
|---------|------|
| A | Bank Claim Holdings |

# INTRODUCTION

Anchor BanCorp Wisconsin Inc. (the "Debtor") hereby proposes this prepackaged reorganization plan (the "Plan"). The Debtor's Disclosure Statement (as defined below), distributed with this Plan, contains a discussion of the Debtor's history, businesses, and properties and a summary of the Plan and certain other matters relating to the Plan's confirmation. The Debtor urges all holders of Impaired Claims to review the Disclosure Statement and Plan in full.

# ARTICLE I

## DEFINITIONS, RULES OF INTERPRETATION, AND COMPUTATION OF TIME

**A.     Scope of Definitions; Rules of Construction**

Except as expressly provided or unless the context otherwise requires, capitalized terms not otherwise defined in this Plan shall have the meanings ascribed to them in this Article I. Any term used in the Plan that is not defined herein, but is defined in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning ascribed to it therein. Where the context requires, any definition applies to the plural as well as the singular number.

**B.     Definitions**

1.1     "Administrative Agent" means U.S. Bank National Association, as administrative agent under the Credit Agreement.

1.2     "Administrative Agent Fees" means the fees and expenses payable to the Administrative Agent, in its capacity as administrative agent, under the terms of the Credit Agreement.

1.3     "Administrative Claim" means a Claim for payment of an administrative expense of a kind specified in section 503(b) or section 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including (a) actual, necessary costs and expenses of preserving the Debtor's Estate and operating its business, including wages, salaries, or commissions for services rendered, and (b) all fees and charges assessed against the Estate under chapter 123 of title 28, United States Code.

1.4     "Administrative Claim Bar Date" means the date that is thirty-five (35) days after the Effective Date and by which any requests for payment of Administrative Claims must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order.

1.5     "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

1.6     "Allowed …" means the applicable Claim, Interest, Warrant, or any portion thereof that is specifically allowed in or under the terms of this Plan.

1

1.7    "Assumed Agreement" means an Executory Contract  or Unexpired Lease which has been assumed or deemed assumed by the Debtor.

1.8    "Bank Claim" means a Claim arising from or related to the Credit Agreement.

1.9    "Bank Secured Claim" means the secured Claim under the Bankruptcy Code arising from a Bank Claim as a result of whether Class 1 makes or does not make the Section 1111(b) Election.

1.10    "Bankruptcy Code" means title 11 of the United States Code, as now in effect or hereafter amended.

1.11    "Bankruptcy Court" means the United States Bankruptcy Court for the Western District of Wisconsin or any other court with jurisdiction over the Chapter 11 Case.

1.12    "Bankruptcy Rules" means, collectively, the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended, and the Federal Rules of Civil Procedure, as amended, as applicable to the Chapter 11 Case or proceedings therein.

1.13    "Business Day" means any day, excluding Saturdays, Sundays or "legal holidays" (as defined in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in New York, New York, and Madison, Wisconsin.

1.14    "Cash" means legal tender of the United States of America.

1.15    "Cause of Action" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Cause of Action also includes: (a) any right of setoff, counterclaim, or recoupment, and any claim on a contract or for a breach of duty imposed by law or in equity; (b) the right to object to Claims, Interests, or Warrants; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.16    "Chapter 11 Case" means the Chapter 11 case of the Debtor.

1.17    "Claim" means a claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtor.

1.18    "Class" means one of the classes of Claims, Interests, or Warrants listed in Article III of the Plan.

2

1.19    "Collateral" means any property or interest in property of the Debtor's Estate that is subject to a Lien to secure the payment or performance of a Claim.

1.20    "Common Stock" means shares of common stock of the Debtor that are authorized, issued, and outstanding prior to the Effective Date.

1.21    "Confirmation" means the entry by the Bankruptcy Court of the Confirmation Order subject to all conditions specified in Article VIII having been satisfied.

1.22    "Confirmation Date" means the date of entry by the Bankruptcy Court of the Confirmation Order on its docket, within the meanings of Bankruptcy Rules 5003 and 9021.

1.23    "Confirmation Hearing" means the hearing to consider confirmation of the Plan under section 1128 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.24    "Confirmation Order" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

1.25    "Conversion" means the amendment of the Reorganized Debtor's state of incorporation to reflect its conversion from a Wisconsin corporation to a Delaware corporation, under its certificates of incorporation and by-laws in effect before the Effective Date, except as its certificates of incorporation and by-laws are amended by the Plan.

1.26    "Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of June 9, 2008 (as amended from time to time) among the Debtor, the Administrative Agent, and the lenders from time to time party thereto.

1.27    "Cure" means the payment of Cash by the Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure defaults under an Executory Contract or Unexpired Lease of the Debtor that the Debtor may assume under section 365(a) of the Bankruptcy Code.

1.28    "Debtor" means Anchor BanCorp Wisconsin Inc., as debtor and debtor in possession under sections 1107 and 1108 of the Bankruptcy Code.

1.29    "Disclosure Statement" means the written disclosure statement that relates to the Plan, as amended, supplemented, or modified from time to time, and that is prepared and distributed in accordance with sections 1125 and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018.

1.30    "Effective Date" means the first Business Day (i) on which all conditions to the Plan's confirmation in Article VIII.B of the Plan have been satisfied and (ii) that is the date on which the Plan is consummated.

1.31    "Estate" means the estate of the Debtor in the Chapter 11 Case, as created under section 541 of the Bankruptcy Code.

1.32     "Exculpated Claim" means any claim related to any prepetition or postpetition act or omission in connection with, relating to, or arising out of the Debtor's in-court or out-of-court restructuring efforts, the Debtor's Chapter 11 Case, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of New Common Stock, the distribution of property under the Plan or any other related agreement, or any other prepetition or postpetition act or omission in connection with, relating to, arising out of, or in contemplation of the restructuring of the Debtor. For the avoidance of doubt, no Cause of Action, obligation or liability expressly set forth in or preserved by the Plan constitutes an Exculpated Claim.

1.33     "Exculpated Party" means each of the Debtor and the Reorganized Debtor, the U.S. Treasury, each holder of a Bank Claim, the Administrative Agent, and each New Investor, and their respective members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, partners, Affiliates, and representatives, in each case only in their capacities as such.

1.34     "Executory Contract" means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.35     "Final Order" means an order or judgment, entered by a court of competent jurisdiction, that has not been amended, modified, or reversed, and as to which no stay is in effect.

1.36     "General Unsecured Claim" means a Claim that is not an Administrative Claim, Bank Claim, Unsecured Deficiency Claim, or Priority Tax Claim.

1.37     "Impaired" refers to being impaired within the meaning of section 1124 of the Bankruptcy Code.

1.38     "Intercompany Claim" means any Claim by a Debtor or an Affiliate against another Debtor or an Affiliate.

1.39     "Interest" means any "equity security" in the Debtor as defined in section 101(16) of the Bankruptcy Code, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtor, but excluding Warrants.

1.40     "Investment Agreements" means those certain Stock Purchase Agreements entered into or to be entered into by the Debtor and the New Investors, at any time on and after July 15, 2013, substantially in the forms attached as Exhibits C and D to the Disclosure Statement.

1.41     "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

4

1.42     "New Common Stock" means common shares in the capital of the Reorganized Debtor authorized pursuant to the Plan.

1.43     "New Investment" means cash consideration received by the Debtor from the New Investors in connection with the transactions set forth in the Investment Agreements.

1.44     "New Investors" means the counterparties to the Investment Agreements who are providing the New Investment in connection with the Debtor's restructuring.

1.45     "Non-TARP Interest" means any Interest in the Debtor other than the TARP Interests.

1.46     "Other Priority Claim" means a Claim entitled to priority under section 507(a) of the Bankruptcy Code other than a Priority Tax Claim or an Administrative Claim.

1.47     "Other Secured Claims" means all Secured Claims against the Debtor other than the Bank Claims.

1.48     "Person" has the meaning set forth in section 101(41) of the Bankruptcy Code.

1.49     "Petition Date" means the date on which the Debtor filed its petition for relief commencing the Chapter 11 Case.

1.50     "Plan" has the meaning set forth in the Introduction.

1.51     "Priority Tax Claim" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.52     "pro rata" means, at any time, the proportion that the face amount of a Claim in a particular Class bears to the aggregate face amount of all Claims in that Class, unless the Plan provides otherwise.

1.53     "Record Date" means the date on which the solicitation of votes on the Plan is commenced.

1.54     "Reinstated" or "Reinstatement" means, with respect to the treatment of a Claim under this Plan, that the Claim will not be impaired, as that term is used in section 1124 of the Bankruptcy Code.

1.55     "Released Party" means each of the Debtor's present and former officers and directors, the U.S. Treasury, the Administrative Agent, each holder of a Bank Claim, and each New Investor, and their respective members, officers, directors, agents, financial advisors, accountants, investment bankers, consultants, attorneys, partners, Affiliates, and representatives, in each case only in their capacities as such.

1.56     "Reorganized Debtor" means the Debtor from and after the Effective Date.

5

1.57    "Section 1111(b) Election" means an election that Class 1 may make to apply section 1111(b)(2) of the Bankruptcy Code to the Allowed Bank Claims.

1.58    "Secured Claim" means a Claim that is secured by a Lien on property in which the Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.59    "TARP" means the Troubled Asset Relief Program, which was established pursuant to the Emergency Economic Stabilization Act of 2008.

1.60    "TARP Interests" means the 110,000 shares of Fixed Rate Cumulative Perpetual Preferred Stock, Series B, of the Debtor that were acquired by the U.S. Treasury in connection with TARP.

1.61    "TARP Warrant" means the Warrant to purchase 7,399,103 shares of Common Stock at an exercise price of $2.23 per share that was acquired by the U.S. Treasury in connection with TARP.

1.62    "U.S. Treasury" means the United States Department of the Treasury.

1.63    "Unexpired Lease" means a lease to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

1.64    "Unimpaired" means any Claim, Interest, or Warrant that is not designated as Impaired.

1.65    "Unsecured Deficiency Claim" means an unsecured Claim in an amount equal to the difference, if any, between the holder of a Class 1 Claim's pro rata share of the Allowed Bank Secured Claim and such holder's pro rata share of the Allowed Bank Claim.

1.66    "Warrant" means any warrant, option, or contractual right (including any rights under registration agreements or equity incentive agreements) to purchase or acquire any equity interest in the Debtor as defined in section 101(16) of the Bankruptcy Code, at any time, and all rights arising with respect to such warrants, options, or contractual rights.

## C.    Rules of Interpretation

(i)    General

In this Plan (a) any reference to a contract, instrument, release, or other agreement or document as being in a particular form or on particular terms and conditions means the agreement or document substantially in that form or on those terms and conditions, (b) any reference to an existing document or exhibit means that document or exhibit as it may have been or may be amended, modified, or supplemented, (c) unless otherwise specified, all references to Sections, Articles, Schedules, and Exhibits are references to Sections, Articles, Schedules, and Exhibits of or to the Plan, (d) the words "herein" and "hereto" refer to the Plan in its entirety

rather than to a particular portion of the Plan, (e) captions and headings to Articles and Sections are for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan, and (f) the rules of construction in section 102 of the Bankruptcy Code and in the Bankruptcy Rules shall apply.

> (ii)     "Including"

As used in this Plan, "including" means "including without limitation."

> (iii)     "On"

With reference to any distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

> (iv)     "Contra Proferentum" Rule Not Applicable

This Plan is the product of extensive discussions and negotiations between and among, inter alia, the Debtor, certain holders of Bank Claims, and others.  Each of the foregoing was represented by counsel who either participated in the formulation and documentation of, or was afforded the opportunity to review and provide comments on, the Plan, the Disclosure Statement, and the documents ancillary thereto.  Accordingly, the general rule of contract construction known as "contra proferentum" shall not apply to the interpretation of any provision of this Plan, the Disclosure Statement, or any agreement or document generated in connection herewith.

**D.     Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

**ARTICLE II**

**TREATMENT OF UNCLASSIFIED CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not classified and are not entitled to vote on the Plan.

**A.     Administrative Claims**

The rights of each holder of an Administrative Claim shall be Reinstated under, and shall not be Impaired by, the Plan.  Each holder of an Administrative Claim shall receive Cash equal to the unpaid portion of its Administrative Claim on the date on which its Administrative Claim becomes payable under applicable law or any agreement relating thereto.

Any requests for payment of Administrative Claims must be filed and served on the Reorganized Debtor pursuant to the procedures specified in the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that do not file and serve a request for payment of Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the

Debtor, the Reorganized Debtor, the Estate, or their property and such Administrative Claims shall be deemed discharged as of the Effective Date. Any objections to requests for payment of Administrative Claims must be filed and served on the requesting party within thirty-five (35) days after the Administrative Claims Bar Date. Any such objections that are not consensually resolved may be set for hearing on twenty-one (21) days' notice to the Reorganized Debtor of such hearing to the Reorganized Debtor.

**B.    Priority Tax Claims**

The rights of each holder of a Priority Tax Claim shall be Reinstated under, and shall not be Impaired by, the Plan. Each holder of a Priority Tax Claim shall receive Cash equal to the unpaid portion of its Priority Tax Claim on the date on which its Priority Tax Claim becomes payable under applicable law or any agreement relating thereto.

**ARTICLE III**

**CLASSIFICATION AND TREATMENT OF CLAIMS, INTERESTS, AND WARRANTS**

**A.    Introduction**

The Plan places all Claims, Interests, and Warrants except unclassified Claims provided for in Article II, in the Classes listed below. A Claim, Interest, or Warrant is placed in a particular Class only to the extent that it falls within the description of that Class, and is classified in other Classes to the extent that any portion thereof falls within the description of other Classes.

**B.    Summary and Treatment of Classes**

(i)    Class 1: Bank Claims.

1.    <u>Impairment and Voting</u>. Class 1 is Impaired by the Plan. Each holder of an Allowed Bank Claim is entitled to vote to accept or reject the Plan. In the absence of a vote to accept or reject the Plan by any holder of an Allowed Bank Claim, such holder of an Allowed Bank Claim shall be deemed to reject the Plan. The Bank Claims are Allowed Claims in the amounts set forth below. Each holder of an Allowed Bank Claim holds a pro rata amount of such aggregate Allowed Bank Claims as set forth in Exhibit A hereto.

Each holder of an Allowed Bank Claim is also entitled to vote to have Class 1 make the Section 1111(b) Election. Votes by holders of Allowed Bank Claims in favor of Class 1 making the Section 1111(b) Election are valid, enforceable, and applicable solely with respect to this Plan. Such votes by holders of Allowed Bank Claims in favor of Class 1 making the Section 1111(b) Election are null and void with respect to any other plan that might be proposed, absent the consent of the applicable holder of the Allowed Bank Claims voting in favor of Class 1 making the Section 1111(b) Election. In the event that there is any material change to the treatment of Bank Claims under this Plan, holders of the Allowed Bank Claims that have voted in favor of having Class 1 make the Section 1111(b) Election may revoke such votes in favor of

8

Class 1 making the Section 1111(b) Election.  Notwithstanding the foregoing, no revocation of a vote in favor of Class 1 making the Section 1111(b) Election shall change any vote to accept or reject the Plan.

      2.    <u>Distribution</u>.  On the Effective Date, each holder of an Allowed Bank Claim shall receive the treatment provided below, depending on whether Class 1 makes the Section 1111(b) Election.  Notwithstanding anything to the contrary in the Plan, there shall be no setoff with respect to any distributions to be made under the Plan on account of the Bank Claims, including the Bank Secured Claims.

      (1)    *Section 1111(b) Election Made*.  In the event that Class 1 makes the Section 1111(b) Election, the Allowed Bank Claims will be treated as Allowed Bank Secured Claims in the approximate aggregate amount of $183,000,000.00 for obligations (including with respect to unpaid principal balance, accrued but unpaid interest thereon, and all administrative and other fees or penalties) under the Credit Agreement.  If such election is made, there will be no Unsecured Deficiency Claims.  Each holder of an Allowed Bank Secured Claim shall receive its pro rata share of $49,000,000.00 in cash in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Secured Claim.  Such cash payment shall be made to the Administrative Agent, which shall be authorized and directed to make further distributions consistent with the terms and conditions of the Credit Agreement.  In addition, the Administrative Agent shall receive the Administrative Agent Fees in an amount consistent with the terms of the Credit Agreement, and the Reorganized Debtor is authorized to pay such Administrative Agent Fees without the need for further Bankruptcy Court approval.  Collectively, the distributions of payments to the holders of Bank Claims and of the Administrative Agent Fees to the Administrative Agent in accordance with the terms of the Plan shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, any and all outstanding obligations under the Credit Agreement.

      (2)    *Section 1111(b) Election Not Made*.  In the event that Class 1 does not make the Section 1111(b) Election, the Allowed Bank Claims will be treated as Allowed Bank Secured Claims in the aggregate amount of $48,000,000.00 and as Unsecured Deficiency Claims for the remaining approximately $135,000,000.00 balance of the Bank Claims.  Each holder of an Allowed Bank Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Bank Secured Claim its pro rata share of $48,000,000.00 in cash.  Such cash payment shall be made to the Administrative Agent, which shall be authorized and directed to make further distributions consistent with the terms and conditions of the Credit Agreement.  In addition, the Administrative Agent shall receive the Administrative Agent Fees in an amount consistent with the terms of the Credit Agreement, and the Reorganized Debtor is authorized to pay such Administrative Agent Fees without the need for further Bankruptcy Court approval.  Collectively, the distributions of payments to the holders of Bank Claims and of the Administrative Agent Fees to the Administrative Agent in accordance with the terms of the Plan shall be in full and final satisfaction, settlement, release, and discharge of, and in exchange for, any and all outstanding

obligations under the Credit Agreement.  The Unsecured Deficiency Claims will be treated as Class 5 Claims, as set forth under Article III.B(v) below.

(ii)     Class 2: Other Secured Claims.

1.     <u>Impairment and Voting</u>.  Class 2 is not Impaired by the Plan.  Each holder of an Other Secured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.  All Other Secured Claims are Allowed Claims.

2.     <u>Distribution</u>.  On the Effective Date, each holder of an Allowed Other Secured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Other Secured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing.

(iii)     Class 3: Other Priority Claims.

1.     <u>Impairment and Voting</u>.  Class 3 is not Impaired by the Plan.  Each holder of an Other Priority Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.  All Other Priority Claims are Allowed Claims.

2.     <u>Distribution</u>.  On the Effective Date, each holder of an Allowed Other Priority Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Priority Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed Other Priority Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing.

(iv)     Class 4: General Unsecured Claims.

1.     <u>Impairment and Voting</u>.  Class 4 is not Impaired by the Plan.  Each holder of an Allowed General Unsecured Claim is not entitled to vote to accept or reject the Plan and shall be conclusively deemed to have accepted the Plan.  All General Unsecured Claims are Allowed General Unsecured Claims.

2.     <u>Distribution</u>.  On the Effective Date, each holder of an Allowed General Unsecured Claim shall have its claim Reinstated, and shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim, (a) treatment that leaves unaltered the legal, equitable, and contractual rights to which such Allowed General Unsecured Claim entitles the holder of such Claim, or (b) such other treatment as to which the Debtor and such holder shall have agreed upon in writing.

(v)     Class 5: Unsecured Deficiency Claims.  If Class 1 makes the Section 1111(b) Election, there will be no Unsecured Deficiency Claims.  If Class 1 does not make such an election, Unsecured Deficiency Claims will be treated as follows:

1.     <u>Impairment and Voting</u>.  Class 5 is Impaired by the Plan.  Each holder of an Allowed Unsecured Deficiency Claim is entitled to vote to accept or reject the Plan. All Unsecured Deficiency Claims are Allowed Claims.

2.     <u>Distribution</u>.  On the Effective Date, each holder of an Allowed Unsecured Deficiency Claim shall receive its pro rata share of $1,000,000.00 in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Unsecured Deficiency Claim.  Such cash payment shall be made to the Administrative Agent, which shall be authorized and directed to make further distributions consistent with the terms and conditions of the Credit Agreement.  Notwithstanding anything to the contrary in the Plan, there shall be no setoff with respect to any distributions to be made under the Plan on account of the Unsecured Deficiency Claims.

(vi)     Class 6: TARP Interests.

1.     <u>Impairment and Voting</u>.  Class 6 is Impaired by the Plan.  Each holder of an Allowed TARP Interest is entitled to vote to accept or reject the Plan.  All TARP Interests are Allowed Interests.  In the absence of any vote to accept or reject the Plan, Class 6 shall be deemed to reject the Plan.

2.     <u>Distribution</u>.  On the Effective Date, the holders of Allowed TARP Interests shall receive their pro rata shares of 60,000,000 shares of New Common Stock in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Allowed TARP Interests.

(vii)     Class 7: Non-TARP Interests.

1.     <u>Impairment and Voting</u>.  Class 7 is Impaired by the Plan.  Each holder of an Allowed Non-TARP Interest shall be deemed to reject the Plan.

2.     <u>Distribution</u>.  Each holder of an Allowed Non-TARP Interest shall not receive or retain any property under the Plan on account of such Interests, any obligation of the Debtor on account of such Interests shall be discharged, and its Common Stock will be cancelled.

(viii)     Class 8: Warrants.

1.     <u>Impairment and Voting</u>.  Class 8 is Impaired by the Plan.  Each holder of an Allowed Warrant shall be deemed to reject the Plan.

2.     <u>Distribution</u>.  All Warrants, including, without limitation, the TARP Warrant, will be cancelled.

**C.     Full Satisfaction**

11

The Reorganized Debtor shall make, and each holder of a Claim, Interest, or Warrant shall receive, the distributions or treatment provided for in the foregoing provisions of this Article III in full and final satisfaction, settlement, release, and discharge of, and in exchange for, all Claims against, Interests in, and Warrants relating to the Debtor.

**D.   Alternative Treatment**

Notwithstanding any provision herein to the contrary, consistent with section 1123(a)(4) of the Bankruptcy Code, any holder of an Allowed Claim may receive, instead of the distribution or treatment to which it is entitled hereunder, any other distribution or treatment to which it and the Debtor may agree in writing.

**ARTICLE IV**

**MEANS FOR IMPLEMENTATION OF THE PLAN**

**A.   Continued Corporate Existence**

The Reorganized Debtor shall continue to exist as a corporate entity, though its state of incorporation shall be amended to reflect its Conversion from a Wisconsin corporation to a Delaware corporation, under its certificates of incorporation and by-laws in effect before the Effective Date, except as its certificates of incorporation and by-laws are amended by the Plan. The certificates of incorporation and by-laws of the Reorganized Debtor will be amended to reflect (i) an increase in the number of authorized shares in order to allow the Debtor to complete the common equity capital raise in connection with the New Investment and the issuance of New Common Stock to the holders of TARP Interests as contemplated by the Plan, (ii) declassification of the board of directors of the Reorganized Debtor, and (iii) transfer restrictions intended to preserve the Debtor's NOLs (as defined below) and certain other deferred tax assets under Section 382 of the Tax Code (as defined below).  Each share of common stock of the Reorganized Debtor as a Wisconsin corporation as a result of the Conversion will be deemed to be exchanged on a one-for-one basis for a share of common stock of the Reorganized Debtor as a Delaware corporation.  Such Conversion may occur at least one Business Day before the Effective Date.

**B.   Certificate of Incorporation and By-laws**

The certificate of incorporation and by-laws of the Reorganized Debtor shall be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code, and shall be in a customary form in the discretion of the Debtor.

**C.   Sources of Consideration for Plan Distributions**

(i)     New Investment

On the Effective Date, the Debtor will receive certain cash consideration from the New Investors in the form of the New Investment, and the New Investment will be utilized (a) to make payments required to be made under the Plan, (b) to recapitalize the Debtor's subsidiary, the Bank, and (c) in the Reorganized Debtor's operations.

12

The Debtor shall be deemed to have assumed the Investment Agreements as of the Effective Date.  To the extent that that the Debtor has entered into Investment Agreements postpetition subject to confirmation of the Plan, such postpetition Investment Agreement shall be approved, and the Debtor shall be authorized to perform thereunder, as of the Effective Date.

(ii)     New Common Stock

On the Effective Date, the Reorganized Debtor shall (A) issue shares of New Common Stock to the New Investors on account of the New Investment in accordance with the terms of the Investment Agreements; and (B) immediately following the issuance described in Article IV.C.ii.A above, issue 60,000,000 shares of New Common Stock to the holders of TARP Interests.  All the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and nonassessable.

(iii)     New Debt

Under the terms of the Plan, the Debtor may borrow up to $30,000,000.00, on market terms.

**D.**     **Restructuring Transactions**

Prior to, on, or after the Effective Date, and pursuant to the Plan, the Debtor and/or the Reorganized Debtor shall enter into the restructuring transactions described herein and in the Disclosure Statement and any ancillary documents.  The Debtor and/or the Reorganized Debtor shall take any actions as may be necessary or appropriate to effect a restructuring of the Debtor's business or the overall organization structure of the Reorganized Debtor.  The restructuring transactions may include one or more restructurings, conversions, or transfers as may be determined by the Debtor to be necessary or appropriate.  The actions taken by the Debtor and/or the Reorganized Debtor to effect the restructuring transactions may include: (i) the execution, delivery, adoption, and/or amendment of appropriate agreements or other documents of restructuring, conversion, disposition, or transfer containing terms that are consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) the execution, delivery, adoption, and/or amendment of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and having other terms for which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, or conversion pursuant to applicable state law, including but not limited to the amended certificate of incorporation and by-laws; (iv) the cancellation of shares and Warrants; and (v) all other actions that the Debtor and/or the Reorganized Debtor determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the Plan or the restructuring transactions contemplated hereby, including making filings or recordings that may be required by applicable state law in connection with the restructuring transactions.

Without limiting the generality of the foregoing, the Debtor is authorized to (i) convert from a Wisconsin corporation to a Delaware corporation, and (ii) amend and restate the Articles

of Incorporation in order to, among other things, (A) increase the number of authorized shares of Common Stock to at least 2,000,000,000 shares or such larger number as the board of directors of the Debtor or the Reorganized Debtor determines is necessary to effectuate the restructuring transactions contemplated herein, (B) adopt certain restrictions on acquisitions and dispositions of securities, and (C) make certain other changes consistent with the Plan.

The chairman of the board of directors, president, chief executive officer, chief financial officer, any executive vice-president or senior vice-president, or any other appropriate officer of the Debtor and of the Reorganized Debtor, as the case may be, shall each be authorized to execute, deliver, file, or record any such agreements, instruments, or documents referenced herein, including but not limited to those items referenced in Article IV.D above, and shall each be further authorized to take such other actions as may be necessary, desirable, or appropriate to effectuate and further evidence the terms and conditions of this Plan and the restructuring transactions contemplated herein.  The secretary or assistant secretary of the Debtor and of the Reorganized Debtor, as the case may be, shall be authorized to certify or attest to any of the foregoing actions.

**E.**      **Cancellation of Securities**

All indentures, notes, bonds, instruments, guarantees, certificates, agreements (including registration rights agreements), and other documents evidencing the existing preferred (including the TARP Interests), common, and/or other stock of the Debtor, including but not limited to Warrants, will be cancelled, and any obligations of the Debtor thereunder or in any way related thereto shall be fully satisfied, released, and discharged.

**F.**      **Section 1145 Exemption**

The issuance of the New Common Stock, under the terms of this Plan, to holders of TARP Interests on account of their TARP Interests shall be authorized under section 1145 of the Bankruptcy Code as of the Effective Date without further act or action by any person, unless required by the provision of the relevant corporate documents or applicable law, regulation, order or rule, and shall thereby be exempt from the requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local laws requiring registration for the offer and sale of a security; and all documents evidencing the same shall be executed and delivered as provided for in the Plan or related documents.

**G.**      **Debt Issuance**

On the Effective Date, the Debtor is authorized to borrow, on market terms, up to $30,000,000.00.  In connection therewith, the Debtor and the Reorganized Debtor shall be authorized to: (i) execute, deliver, adopt, and/or amend appropriate agreements or other documents in connection with a loan transaction or a debt issuance containing terms that are consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and that satisfy the applicable requirements of applicable state law and any other terms to which the applicable parties may agree; (ii) execute, deliver, adopt, and/or amend appropriate instruments of transfer, pledge, guaranty, assignment, or delegation of any asset, property, or right on terms consistent with the terms of the Plan, the Disclosure Statement, and any ancillary documents and

14

having other terms for which the applicable parties may agree; (iii) take any and all other actions that the Debtor and/or the Reorganized Debtor determines to be necessary, desirable, or appropriate to implement, effectuate, and consummate the loan transaction or debt issuance, including making filings or recordings that may be required by applicable state law in connection with such transactions.

## H.    Directors and Officers

On the Effective Date, the board of directors of the Reorganized Debtor shall comprise the following eight individuals: (i) Chris Bauer, (ii) independent directors (a) Dave Omachinski, (b) Richard Bergstrom, (c) Pat Richter, and (d) Holly Birkenstadt, and (iii) three directors selected by New Investors consistent with the terms of the Investment Agreements.  If an investor-selected director has not received requisite regulatory approval or non-objection prior to the Effective Date, then such investor-selected director shall become a director as soon as practical following the Effective Date upon receipt of such approval.  In the absence of such approval with respect to an investor-selected director or a vacancy in any director position, the applicable director position will be filled in accordance with the Reorganized Debtor's by-laws. The officers of the Debtor shall continue as officers of the Reorganized Debtor.   The Reorganized Debtor's directors and officers will receive compensation consistent with the Reorganized Debtor's policies and practices.

## I.    Revesting of Assets

The property of the Debtor's Estate, together with any property of the Debtor that is not property of the Estate and that is not specifically disposed of pursuant to the Plan, shall revest in the Reorganized Debtor on the Effective Date.  Thereafter, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  As of the Effective Date, all property of the Reorganized Debtor shall be free and clear of all Claims, Interests, and Warrants, except as specifically provided in the Plan or the Confirmation Order.  Without limiting the generality of the foregoing, the Reorganized Debtor may, without application to or approval by the Bankruptcy Court, pay professional fees and expenses incurred after the Confirmation Date.

## J.    Preservation of Rights of Action

Except as otherwise provided in this Plan or the Confirmation Order, or in any contract, instrument, release, or other agreement entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action, suits, and proceedings, whether in law or in equity, whether known or unknown, that the Debtor or the Estate may hold against any Person or entity.  The Reorganized Debtor or its successor(s) may pursue such retained claims, rights or causes of action, suits, or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtor or its successor(s) who hold such rights.  Notwithstanding the foregoing, the Debtor hereby releases any claims, causes of action, or rights arising under sections 510(c), 544, 545, 547, 548, 549, 550, and 551 of the Bankruptcy Code.

15

**K.**     **Exemption from Certain Transfer Taxes**

Pursuant to section 1146(c) of the Bankruptcy Code, any transfers or mortgages from or by a Debtor to a Reorganized Debtor or any other Person or entity pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

**L.**     **Further Transactions**

If the conditions to occurrence of the Effective Date set forth in Article VIII are not satisfied on or before October 31, 2013 (the "Consummation Deadline"), the Debtor shall not be authorized to proceed to consummate the Plan.  Subject to the prior written consent of at least two-thirds in amount and one-half in number of the holders of Allowed Bank Claims that timely voted to accept the Plan, the Debtor may extend the Consummation Deadline from time to time in order to preserve the ability to consummate the Plan.

## ARTICLE V

## PROVISIONS GOVERNING DISTRIBUTIONS

**A.**     **Delivery of Distributions; Undeliverable or Unclaimed Distributions**

(i)     Delivery of Distributions in General

The Reorganized Debtor shall make distributions to each holder of an Allowed Claim and an Allowed Interest at the address for each such holder reflected in the books and records of the Debtor.  The Administrative Agent is authorized and directed to make further distributions to each holder of a Class 1 or Class 5 claim, as applicable, and to retain the Administrative Agent Fees, in each case consistent with the terms and conditions of the Credit Agreement. Distributions under the Plan shall be made only to the holders of Allowed Claims and Allowed Interests as of the Record Date.  For the avoidance of doubt, the Reorganized Debtor is authorized to pay such Administrative Agent Fees owed pursuant to the Credit Agreement without the need for further Bankruptcy Court approval.

(ii)     Undeliverable and Unclaimed Distributions

1.     Holding of Undeliverable and Unclaimed Distributions

If any holder's distribution is returned as undeliverable, no further distributions to that holder shall be made unless and until the Reorganized Debtor receives notice of the holder's then-current address, at which time all outstanding distributions shall be made to the holder. Undeliverable distributions made through the Reorganized Debtor shall be returned to the Reorganized Debtor until such distributions are claimed.  The Reorganized Debtor shall establish a segregated account to serve as the unclaimed distribution reserve, and all undeliverable and

16

unclaimed distributions shall be deposited therein, for the benefit of all similarly situated Persons until such time as a distribution becomes deliverable, is claimed, or is forfeited under the terms of the Plan.

2.    Failure to Claim Undeliverable Distributions

Any undeliverable or unclaimed distribution under this Plan that does not become deliverable on or before the second anniversary of the Effective Date shall be deemed to have been forfeited and waived, and the Person otherwise entitled thereto shall be forever barred and enjoined from asserting its Claim therefor against, or seeking to recover its distribution from, the Debtor, the Estate, the Reorganized Debtor, or their property.  After the second anniversary of the Effective Date, the Reorganized Debtor shall withdraw any amounts remaining in the unclaimed distribution reserve for distribution in accordance with this Plan.

**B.    Calculation Of Distribution Amounts Of New Common Stock**

No fractional shares of New Common Stock shall be issued or distributed under the Plan or by the Reorganized Debtor.  Each Person entitled to receive New Common Stock will  receive the total number of whole shares of New Common Stock to which such Person is entitled.

**C.    Withholding and Reporting Requirements**

In connection with this Plan and all distributions hereunder, the Reorganized Debtor shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to those requirements.  The Reorganized Debtor shall be authorized to take all actions necessary or appropriate to comply with those withholding and reporting requirements. Notwithstanding any other provision of this Plan, (i) each holder of an Allowed Claim that is to receive a distribution of its pro rata share of New Common Stock shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such distribution, and (ii) no distribution shall be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtor for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtor's satisfaction, established an exemption therefrom.  Any distribution of shares of New Common Stock to be made pursuant to this Plan shall, pending the implementation of such arrangements, be treated as undeliverable pursuant to Article V.A hereof.

**D.    Setoffs**

The Reorganized Debtor may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made in respect of that Claim, claims of any nature whatsoever that the Debtor or the Reorganized Debtor may have against the Claim's holder, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor of any claim that the Debtor or the Reorganized Debtor may have in connection with such Claim.

## ARTICLE VI

## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

### A.    Assumed Contracts and Leases

Except as otherwise provided in the Plan, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, as of the Effective Date, the Debtor shall be deemed to have assumed each Executory Contract and Unexpired Lease to which it is a party unless such Executory Contract (other than the Investment Agreements) or Unexpired Lease: (1) was assumed or rejected previously by the Debtor; (2) expired or terminated pursuant to its own terms before the Effective Date; (3) is the subject of a motion to reject filed on or before the Effective Date; or (4) is otherwise identified as an Executory Contract or Unexpired Lease to be rejected before the Effective Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court under Section 365 of the Bankruptcy Code approving the Executory Contract and Unexpired Lease assumptions as of the Effective Date.

All Assumed Agreements shall remain in full force and effect for the benefit of the Reorganized Debtor, and be enforceable by the Reorganized Debtor in accordance with their terms notwithstanding any provision in such Assumed Agreement that prohibits, restricts or conditions such assumption, assignment or transfer.  Any provision in the Assumed Agreements that purports to declare a breach or default based in whole or in part on commencement or continuance of this Chapter 11 Case is hereby deemed unenforceable, and the Assumed Agreements shall remain in full force and effect.  Any provision of any agreement or other document that permits a person to terminate or modify an agreement or to otherwise modify the rights of the Debtor based on the filing of the Chapter 11 Case or the financial condition of the Debtor shall be unenforceable.

The Debtor shall be deemed to have assumed the Investment Agreements as of the Effective Date.  To the extent that that the Debtor has entered into Investment Agreements postpetition subject to confirmation of the Plan, the Debtor shall be authorized to perform under such postpetition Investment Agreement as of the Effective Date.

### B.    Payments Related to Assumption of Contracts and Leases

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure in the ordinary course of business.

### C.    Indemnification Obligations

Except as otherwise specifically provided herein, any obligations or rights of the Debtor to indemnify its present and former directors, officers, or employees under its certificate of incorporation, by-laws, or employee-indemnification policy, or under state law or any agreement with respect to any claim, demand, suit, cause of action, or proceeding, shall survive and be unaffected by this Plan's confirmation, and remain an obligation of the Reorganized Debtor, regardless of whether the right to indemnification arose before or after the Petition Date.

18

**D.      Treatment of Change of Control Provisions**

The entry of the Confirmation Order, consummation of the Plan, and/or any other acts taken to implement the Plan shall not constitute a "change in control" under any provision of any contract, agreement or other document which provides for the occurrence of any event, the granting of any right, or any other change in the then-existing relationship between the parties upon a change in control of the Debtor.

**ARTICLE VII**
**ACCEPTANCE OR REJECTION OF THE PLAN**

**A.      Record Date**

Only the holders of Claims and Interests as of the Record Date, in the Classes entitled to vote on the Plan, shall be allowed to vote on the Plan.  In addition, distributions to be made under the Plan shall be made only the holders of Allowed Claims and Allowed Interests as of the Record Date.

**B.      Classes Entitled to Vote**

Only Claims, Interests, or Warrants in Class 1, Class 5 (if applicable), Class 6, Class 7, and Class 8 are Impaired.  Holders of Claims or Interests in Class 1, Class 5 (if applicable), and Class 6 as of the Record Date are entitled to vote to accept or reject the Plan.  Holders of Interests in Class 7 may receive nothing under the Plan but, in any event, Class 7 is deemed to have rejected the Plan.  Holders of Warrants in Class 8 will not receive anything under the Plan and Class 8 is therefore deemed to have rejected the Plan.  By operation of law, Claims in Class 2, Class 3, and Class 4 are unimpaired, are deemed to have accepted the Plan and, therefore, holders of such Claims are not entitled to vote.

**C.      Acceptance by Impaired Classes**

An Impaired Class of Claims, Interests, or Warrants shall have accepted the Plan if (i) the holders of at least two-thirds in amount of the Allowed Claims, Allowed Interests, or Allowed Warrants actually voting in the Class have voted to accept the Plan, and (ii) the holders of more than one-half in number of the Allowed Claims, Allowed Interests, or Allowed Warrants actually voting in the Class have voted to accept the Plan, in each case not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

**D.      Section 1111(b) Election**

Each holder of an Allowed Bank Claim is entitled to vote to have Class 1 make the Section 1111(b) Election.  As discussed in Article III.B.i.1, votes by holders of Allowed Bank Claims in favor of Class 1 making the Section 1111(b) Election (i) are valid, enforceable, and applicable solely with respect to this Plan, (ii) are null and void with respect to any other plan that might be proposed, absent the consent of the applicable holder of the Allowed Bank Claims voting in favor of Class 1 making the Section 1111(b) Election, and (iii) may be revoked in the event that there is any material change to the treatment of Bank Claims under this Plan. Notwithstanding the foregoing, no revocation of a vote in favor of Class 1 making the Section

19

1111(b) Election shall change any vote to accept or reject the Plan.  If Class 1 does not make the Section 1111(b) Election, the resulting Unsecured Deficiency Claims shall constitute Class 5 Claims as set forth in Article III above.

**E.      Cramdown**

The Debtor will request that the Bankruptcy Court confirm the Plan under section 1129(b)(2)(C)(ii) of the Bankruptcy Code and, accordingly, will seek cramdown of Class 7 and Class 8.  Such cramdown is justified because no holders of junior Interests or Warrants will receive anything on account of such Interests or Warrants.

In the event that Class 6 rejects the Plan, the Debtor will also seek cramdown of Class 6 and request that the Bankruptcy Court confirm the Plan under section 1129(b)(2)(C)(ii) of the Bankruptcy Code.  Such cramdown is justified because in the event that Class 6 rejects the Plan, holders of Non-TARP Interests in Class 7 shall not receive or retain any property under the Plan on account of such Non-TARP Interests and, in any event, holders of Warrants in Class 8 shall not receive or retain any property under the Plan on account of such Warrants.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO THE PLAN'S CONFIRMATION AND EFFECTIVE DATE

**A.      Conditions to Confirmation**

The Plan's Confirmation is subject to the satisfaction of each of the following conditions precedent:

(i)      The proposed Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor and the Administrative Agent.

**B.      Conditions to Effective Date**

Effectiveness of the Plan is subject to the satisfaction of each of the following conditions precedent:

(i)      The Bankruptcy Court shall have entered the Confirmation  Order, in form and substance reasonably satisfactory to the Debtor and the Administrative Agent, confirming the Plan, as the same may have been modified.

(ii)      The Debtor shall have consummated the transactions contemplated by the Investment Agreements to be consummated on or prior to the Effective Date.

(iii)      The Debtor shall have received all required regulatory approvals to consummate the transactions contemplated by the Investment Agreements and in the Plan, the Disclosure Statement, and any related ancillary documents.

(iv)     The Debtor shall have delivered a copy of the KPMG Opinion to the Administrative Agent and the holders of Allowed Bank Claims.

## ARTICLE IX

## MODIFICATION; WITHDRAWAL

The Debtor reserves the right to modify the Plan either before or after Confirmation to the fullest extent permitted under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.  The Debtor may withdraw the Plan at any time before the Effective Date.

## ARTICLE X

## RETENTION OF JURISDICTION

Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of or related to the Chapter 11 Case and the Plan, to the fullest extent permitted by law, including jurisdiction to

A.     Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

B.     Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan and all contracts, instruments, and other agreements executed in connection with the Plan;

C.     Hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court;

D.     Issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

E.     Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

F.     Hear and determine any matters arising in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

G.     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

H.      Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

I.      Enter a final decree closing the Chapter 11 Case.

## ARTICLE XI

## EFFECTS OF CONFIRMATION

### A.      Binding Effect

The Plan shall be binding upon and inure to the benefit of the Debtor, all present and former holders of Claims, Interests, and Warrants, and their respective successors and assigns, and all other parties in interest in this Chapter 11 Case.

### B.      Discharge of the Debtor

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, Warrants, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, Interests in, or Warrants relating to, the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Interests, or Warrants, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (1) a proof of claim or interest based upon such Claim, debt, right, Interest, or Warrant is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim, Interest, or Warrant based upon such Claim, debt, right, Interest, or Warrant is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim, Interest, or Warrant has accepted the Plan.  Except as otherwise provided herein, any default by the Debtor with respect to any Claim, Interest, or Warrant that existed before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### C.      Exculpation and Limitation of Liability

**As of the Effective Date, except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim, obligation, cause of action, or liability for any Exculpated Claim, except for any act or omission that is determined in a Final Order to have constituted gross negligence, intentional fraud, or willful misconduct, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtor and the**

22

**Reorganized Debtor (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**Notwithstanding any provision of this Article or the Plan, the Plan shall not effect a release, discharge, exculpation, injunction against the exercise of, or other impairment or extinction of (i) any rights or claims of the New Investors or the Debtor under the Investment Agreements or (ii) any claims by the United States Government or any of its agencies, or any state or local authority, including, without limitation, any claim arising under applicable securities or banking laws or regulations.**

## D.     Releases by Debtor

Notwithstanding anything contained herein to the contrary, pursuant to section 1123(b) of the Bankruptcy Code and to the extent allowed by applicable law, on the Effective Date and effective as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated herein, the Debtor shall provide a full discharge and release to each Released Party (and each such Released Party so released shall be deemed fully released and discharged by the Debtor) and their respective properties from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing as of the Effective Date in law, at equity, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, arising from or related in any way to the Debtor, including, without limitation, those Causes of Action that the Debtor or the Reorganized Debtor would have been legally entitled to assert in its own right or that any holder of a Claim, an Interest, or a Warrant or other entity would have been legally entitled to assert on behalf of the Debtor or its Estate, and further including those Causes of Action in any way related to the Chapter 11 Case or the Plan; provided, however, that the foregoing release shall not operate to waive or release any Causes of Action of the Debtor arising from claims for gross negligence, intentional fraud, or willful misconduct by a Released Party.

Notwithstanding any provision of this Article or the Plan, the Plan shall not effect a release, discharge, exculpation, injunction against the exercise of, or other impairment or extinction of any rights or claims of the New Investors or the Debtor under the Investment Agreements.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the foregoing releases by the Debtor, and further, shall constitute the Bankruptcy Court's finding that the foregoing releases are: (i) in exchange for good and valuable consideration provided by the Released Parties, a good faith settlement, and compromise of the Claims released by such release; (ii) in the best interests of the Debtor and all

holders of Claims and Interests; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to the Debtor or the Reorganized Debtor asserting any Claim released by such release against any of the Released Parties.

**E.    Injunction**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, INTERESTS, OR WARRANTS THAT HAVE BEEN DISCHARGED PURSUANT TO ARTICLE XI.B, RELEASED PURSUANT TO ARTICLE XI.D, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE XI.C, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS:  (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, OR WARRANTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS, INTERESTS, AND WARRANTS HEREIN SHALL BE IN EXCHANGE FOR AND IN COMPLETE SATISFACTION OF ALL CLAIMS, INTERESTS, AND WARRANTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY, OR ESTATE.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED ON THE EFFECTIVE DATE, AND THE INTERESTS AND WARRANTS WILL BE CANCELLED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT HERETO, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED FROM AND AFTER THE EFFECTIVE DATE, AND ALL INTERESTS AND WARRANTS WILL BE CANCELLED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502 OF THE BANKRUPTCY CODE.  ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, THE REORGANIZED DEBTOR, EACH OF THEIR RESPECTIVE SUCCESSORS AND ASSIGNS,

AND EACH OF THEIR ASSETS AND PROPERTIES, ANY CLAIMS, INTERESTS, OR WARRANTS BASED UPON ANY DOCUMENTS, INSTRUMENTS, OR ANY ACT OR OMISSION, TRANSACTION, OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

### A.     Payment of Statutory Fees

All fees payable under Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.  All such fees that arise after the Effective Date but before the closing of the Chapter 11 Case shall be paid from funds otherwise available for distribution hereunder.

### B.     Severability of Plan Provisions

If, before Confirmation, the Bankruptcy Court holds that any provision of the Plan is invalid, void, or unenforceable, the Debtor, at its option, may amend or modify the Plan to correct the defect, by amending or deleting the offending provision or otherwise, or may withdraw the Plan.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been amended or modified in accordance with the foregoing, is valid and enforceable.

### C.     Successors and Assigns

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of that Person.

### D.     Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case, either by virtue of sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, shall remain in full force and effect until the Reorganized Debtor has made all distributions contemplated by this Plan and the Bankruptcy Court has entered an order closing the Chapter 11 Case.

### E.     Notices to Debtor

Any notice, request, or demand required or permitted to be made or provided to or upon a Debtor under the Plan shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

Anchor BanCorp Wisconsin Inc.
25 West Main Street
Madison, Wisconsin 53703
Attn:  Mark D. Timmerman
Phone:  (608) 252-8784
Facsimile:  (608) 252-8783

with copies to (which copies alone shall not constitute notice):

General Bankruptcy Counsel to the Debtor

Kerkman Dunn Sweet DeMarb
121 S. Pinckney Street, Suite 525
Madison, WI  53703
Attn:  Rebecca R. DeMarb/James D. Sweet
Telephone:  (608) 310-5502
Facsimile:  (414) 277-0100

- and -

Special Counsel to the Debtor

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071
Attn:  Van C. Durrer II, Esq.
Telephone:  (213) 687-5000
Facsimile:  (213) 687-5600

**F.      Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), (i) the laws of the State of New York shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan and (ii) the laws of the state of incorporation of the Debtor shall govern corporate governance matters with respect to the Debtor, in either case without giving effect to the principles of conflicts of law thereof.

[Remainder of page intentionally left blank]

26

Dated:  Madison, Wisconsin
       July 31, 2013

ANCHOR BANCORP WISCONSIN INC.

By:             /s/  Mark D. Timmerman
Name:      Mark D. Timmerman
Title:       Executive Vice President, Secretary
              and General Counsel

KERKMAN DUNN SWEET DeMARB

By:  /s/ Rebecca R. DeMarb
Rebecca R. DeMarb
WI State Bar No. 1026221
James D. Sweet
WI State Bar No. 1017557
121 S. Pinckney Street, Suite 525
Madison, WI  53703
Telephone:  (608) 310-5502
Facsimile:  (414) 277-0100
rdemarb@kerkmandunn.com

General Bankruptcy Counsel to Anchor BanCorp Wisconsin Inc.

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:  /s/ Van C. Durrer II
Van C. Durrer
Ramon M. Naguiat
Annie Li
300 S. Grand Ave., Suite 3400
Los Angeles, CA 90071
Telephone:  (213) 687-5000
Facsimile: (213) 687-5600
van.durrer@skadden.com

Special Counsel to Anchor BanCorp Wisconsin Inc.

721927-LACSR02A - MSW

**EXHIBIT A**

**BANK CLAIM HOLDINGS**

| Holder | Percentage Held |
|---|---|
| U.S. Bank National Association | 54.166666666% |
| Bank of America, N.A. | 29.166666667% |
| Associated Bank, N.A. | 16.666666667% |
| Total | 100% |

**EXHIBIT B**

**ANNUAL REPORT FOR THE FISCAL YEAR ENDED MARCH 31, 2013 (FORM 10-K)**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

# FORM 10-K

---

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended March 31, 2013**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____**

**Commission File Number 001-34955**

---

# ANCHOR BANCORP WISCONSIN INC.
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Wisconsin** | **39-1726871** |
| **(State or other jurisdiction of incorporation or organization)** | **(IRS Employer Identification No.)** |

**25 West Main Street**
**Madison, Wisconsin 53703**
**(Address of principal executive office)**

**Registrant's telephone number, including area code (608) 252-8700**

**Securities registered pursuant to Section 12 (b) of the Act:**

| | |
|---|---|
| **Common stock, par value $.10 per share** | **OTC Market** |
| **(Title of Class)** | **(Name of each exchange on which registered)** |

**Securities registered pursuant to Section 12 (g) of the Act:**
**Not Applicable**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    Yes ☐    No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.    Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).    Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 or Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of the Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☒ |

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Act).    Yes ☐    No ☒

As of September 30, 2012, the aggregate market value of the 21,247,225 outstanding shares of the Registrant's common stock deemed to be held by non-affiliates of the registrant was $8.0 million, based upon the closing price of $0.39 per share of common stock as reported by the OTC QB directory on such date. Although directors and executive officers of the Registrant and certain of its employee benefit plans were assumed to be "affiliates" of the Registrant for purposes of this calculation, the classification is not to be interpreted as an admission of such status.

As of April 30, 2013, 21,247,225 shares of the Registrant's common stock were outstanding.

**Documents Incorporated by Reference**

Portions of the definitive Proxy Statement for the Annual Meeting of Stockholders to be held on August 1, 2013 (Part III, Items 10 to 14).

Table of Contents

**ANCHOR BANCORP WISCONSIN INC.**
**FISCAL 2013 FORM 10-K ANNUAL REPORT**
**TABLE OF CONTENTS**

Page

**PART I**

| | | |
|---|---|---|
| Item 1. | BUSINESS | 1 |
| | General | 1 |
| | Market Area | 2 |
| | Competition | 2 |
| | Lending Activities | 3 |
| | Investment Securities | 8 |
| | Sources of Funds | 10 |
| | Subsidiaries | 12 |
| | Regulation and Supervision | 12 |
| | Taxation | 24 |
| Item 1A. | RISK FACTORS | 25 |
| Item 1B. | UNRESOLVED STAFF COMMENTS | 40 |
| Item 2. | PROPERTIES | 40 |
| Item 3. | LEGAL PROCEEDINGS | 40 |
| Item 4. | MINE SAFETY DISCLOSURES | 41 |

**PART II**

| | | |
|---|---|---|
| Item 5. | MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 42 |
| Item 6. | SELECTED FINANCIAL DATA | 44 |
| Item 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 46 |
| Item 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 78 |
| Item 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 80 |
| Item 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 144 |
| Item 9A. | CONTROLS AND PROCEDURES | 144 |
| Item 9B. | OTHER INFORMATION | 145 |

**PART III**

| | | |
|---|---|---|
| Item 10. | DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE | 146 |
| Item 11. | EXECUTIVE COMPENSATION | 146 |
| Item 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED SHAREHOLDER MATTERS | 146 |
| Item 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 147 |
| Item 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 147 |

**PART IV**

| | | |
|---|---|---|
| Item 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 147 |
| | SIGNATURES | 152 |

**Table of Contents**

## FORWARD-LOOKING STATEMENTS

In the normal course of business, we, in an effort to help keep our shareholders and the public informed about our operations, may from time to time issue or make certain statements, either in writing or orally, that are or contain forward-looking statements, as that term is defined in the U.S. federal securities laws. Generally, these statements relate to business plans or strategies, projected or anticipated benefits from acquisitions or dispositions made by or to be made by us, projections involving anticipated revenues, earnings, liquidity, profitability or other aspects of operating results or other future developments in our affairs or the industry in which we conduct business. Forward-looking statements may be identified by reference to a future period or periods or by the use of forward-looking terminology such as "anticipate," "believe," "project," "continue," "ongoing," "expect," "intend," "plan," "estimate" or similar expressions.

Although we believe that the anticipated results or other expectations reflected in our forward-looking statements are based on reasonable assumptions, we can give no assurance that those results or expectations will be attained. Forward-looking statements involve risks, uncertainties and assumptions (some of which are beyond our control), and as a result actual results may differ materially from those expressed in forward-looking statements due to several factors more fully described in Item 1A, "Risk Factors," as well as elsewhere in this Annual Report on Form 10-K. Factors that could cause actual results to differ from forward-looking statements include, but are not limited to, the following, as well as those discussed elsewhere herein:

- soundness of other financial institutions with which the Company and the Bank engage in transactions;
- competitive pressures could intensify and affect our profitability, including as a result of continued industry consolidation, the increased availability of financial services from non-banks, technological developments or bank regulatory reform;
- deterioration in commercial real estate, land and construction loan portfolios resulting in increased loan losses;
- uncertainties regarding our ability to continue as a going concern;
- our ability to address our own liquidity issues;
- demand for financial services, loss of customer confidence, and customer deposit account withdrawals;
- our ability to pay dividends;
- changes in the quality or composition of the Bank's loan and investment portfolios and allowance for loan losses;
- dilution of existing shareholders as a result of possible future transaction;
- uncertainties about the Company and the Bank's Cease and Desist Orders;
- uncertainties about our ability to raise sufficient new capital in a timely manner in order to increase the Bank's regulatory capital ratios;
- changes in the conditions of the securities markets, which could adversely affect, among other things, the value or credit quality of our assets, the availability and terms of funding necessary to meet our liquidity needs and our ability to originate loans;
- changes in accounting principles, policies or guidelines;
- uncertainties about market interest rates;
- security breaches of our information systems;
- environmental liability for properties to which we take title;
- expiration of our Amended and Restated Credit Agreement;
- the effects of any changes to the servicing compensation structure for mortgage servicers pursuant to the programs of government sponsored – entities;

**Table of Contents**

- uncertainties relating to the Emergency Economic Stabilization Act of 2008, the American Recovery and Reinvestment Act of 2009, the Dodd-Frank Act, the implementation by the U.S. Department of the Treasury and federal banking regulators of a number of programs to address capital and liquidity issues in the banking system and additional programs that will apply to us in the future, all of which may have significant effects on us and the financial services industry; and

- challenges relating to recruiting and retaining key employees.

You should not put undue reliance on any forward-looking statements. Forward-looking statements speak only as of the date they are made and we undertake no obligation to update them in light of new information or future events, except to the extent required by federal securities laws.

iii

Table of Contents

**PART I**

**Item 1.        Business**

**General**

We, Anchor BanCorp Wisconsin Inc. (the "Corporation," the "Company," "we," "our") are a registered savings and loan holding company incorporated under the laws of the State of Wisconsin. We are engaged in the savings and loan business through our wholly owned banking subsidiary, AnchorBank, fsb (the "Bank" or "Anchor Bank").

The Bank was organized in 1919 as a Wisconsin chartered savings institution and converted to a federally chartered savings institution in 2000. AnchorBank, fsb is the third largest depository institution headquartered in the State of Wisconsin and the largest thrift in terms of assets. The Bank's deposits are insured up to the maximum allowable amount by the Federal Deposit Insurance Corporation ("FDIC"). The Bank is a member of the Federal Home Loan Bank ("FHLB") of Chicago. The Bank is regulated by the Office of the Comptroller of the Currency ("OCC") and the Corporation is regulated by the Federal Reserve. The Corporation is regulated as a savings and loan holding company and is subject to the periodic reporting requirements of the Securities and Exchange Commission ("SEC") under the Securities Exchange Act of 1934, as amended ("Exchange Act"). See "Regulation and Supervision."

We offer checking, savings, money market accounts, mortgages, home equity and other consumer loans, credit cards, annuities, investment products and related consumer financial services. The Bank also provides banking services to businesses, including checking accounts, lines of credit, secured loans and commercial real estate loans. AnchorBank's branch network serves as the primary vehicle through which we offer our products, cross sell additional products to existing customers and generate new customer relationships.

In addition to our branch network, we provide products and services online via our WebBranch™ online banking system and our Speed e-App™ online mortgage application tool. During the fiscal year ending March 31, 2013, we saw a substantial increase in mortgage applications received through Speed e-App.

The Corporation also has a non-banking subsidiary, Investment Directions, Inc. ("IDI"), a Wisconsin corporation which has historically invested in real estate partnerships. During 2010, IDI sold substantially all of its assets and its investment activities have been significantly curtailed and the Company has no plans to resume activities at this point in time.

On June 25, 2010, the Corporation completed the sale of eleven branches located in Northwest Wisconsin to Royal Credit Union headquartered in Eau Claire, Wisconsin. The net gain on the sale was $5.0 million. On July 23, 2010, the Corporation completed the sale of four branches located in Green Bay, Wisconsin and surrounding communities to Nicolet National Bank headquartered in Green Bay, Wisconsin. The net gain on the sale was $2.3 million.

The Bank has one wholly-owned subsidiary: ADPC Corporation ("ADPC"), a Wisconsin corporation, which holds and develops certain of the Bank's foreclosed properties. In November 2011, Anchor Investment Corporation ("AIC") was dissolved and the remaining assets were transferred to the Bank. AIC was a Nevada corporation that managed a portion of the Bank's investment portfolio (primarily mortgage related securities).

As of March 31, 2013, the Corporation had 690 full-time equivalent employees. The Corporation promotes equal employment opportunity and considers employee relations to be excellent. The average tenure of AnchorBank employees is 11 years. None of the AnchorBank employees are represented by a collective bargaining group.

The Corporation maintains a website at www.anchorbank.com. All of the Corporation's filings under the Exchange Act are available through our website, free of charge, including copies of Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and amendments to those reports, on the date that the Corporation files those materials with, or furnishes them to, the SEC.

1

Table of Contents

**Market Area**

The Bank's primary market area consists of south-central, east-central and southeastern Wisconsin, as well as contiguous counties in Illinois. The Bank conducts business from its headquarters in Madison, Wisconsin, and services more than 118,000 households and businesses from 54 full-service branch locations, as well as one lending-only office in Lake Geneva. During the fiscal year ended March 31, 2013, two full-service branches located in Sussex and Appleton were closed.

AnchorBank's market area is concentrated in the greater Madison/Dane County, Suburban Milwaukee and Fox Valley areas. Together these areas account for nearly half of Wisconsin's population and provide a strong platform for long term growth, both locally and regionally. Within its market footprint AnchorBank exhibits a strong retail franchise with the third highest market share of both deposits and mortgage origination in the Madison area and with the seventh largest deposit and mortgage origination share in the state overall.

Our home office in Madison provides a strong base in a highly attractive market. Madison is home to both state and county governments as well as the University of Wisconsin. Madison has enjoyed steady population growth of 3.2 percent since 2010, a median household income 17.3 percent above the national average and relatively low unemployment at 5.1 percent (as of March 2013) versus the national average of 7.6 percent. Madison frequently ranks in the top 100 Places to Live in America by Money Magazine.

The Fox Valley, consisting primarily of the cities of Appleton and Oshkosh and their associated satellite communities is one of the state's fastest growing areas and also benefits from higher than national median household income levels at approximately $73,600. The Bank operates seven branches in the Fox Valley area.

In the Milwaukee area, AnchorBank operates seven branches, all located in suburban areas outside Milwaukee, Wisconsin's largest city. The Milwaukee metropolitan area is home to roughly 1.5 million and more than 70,000 businesses.

**Competition**

The Bank encounters strong competition in attracting both loan and deposit customers. Such competition includes other banks, savings institutions, mortgage banking companies, credit unions, finance companies, mutual funds, insurance companies and brokerage and investment banking firms. The Bank's market area includes branches of several commercial banks that are substantially larger in terms of loans and deposits. Furthermore, tax exempt credit unions operate in most of the Bank's market area and aggressively price their products and services to a large portion of the market. The Corporation's profitability depends upon the Bank's continued ability to successfully expand market share and mitigate credit losses.

Customer demand for loans secured by real estate has been reduced by a weak economy, an increase in unemployment and a decrease in real estate values. Low demand for real estate loans has decreased the Bank's income because alternative investments, such as securities, typically earn a lower return than real estate secured loans.

The principal factors that are used to attract deposit accounts and that distinguish one financial institution from another include rates of return, quality of service to the customers, types of accounts, service fees, convenience of office locations and hours, and other services. We offer a full array of deposit, savings and investment products to meet the needs of our consumer and business customers with features, high service levels, convenience and rates/fees structured to provide a competitive value proposition for our customers and prospective customers. In return, our customers have rewarded us with high levels of satisfaction and loyalty as proven by our recent rating by a well known agency which showed Anchor Bank to be one of the highest rated banks in the upper Midwest.

2

**Table of Contents**

The primary factors in competing for loans are interest rates, loan fee charges, and timeliness and quality of service to the borrower. Similar to the market for deposit and investment products, we focus on offering the best overall value to our loan customers. During the fiscal year ending March 31, 2013 we originated $899.0 million in single family "conforming" loans. While single family "conforming" loans are subsequently sold to investors, a key competitive difference is that AnchorBank retains servicing on our residential mortgages, thereby ensuring a high level of continuing customer service. AnchorBank currently has a servicing portfolio of approximately $2.91 billion.

**Lending Activities**

**General.** At March 31, 2013, the Bank's net loans held for investment totaled $1.67 billion, representing approximately 70.6% of its $2.37 billion of total assets at that date. Loans held for investment based on portfolio segment consist of single-family residential loans with an unpaid principal balance of $547.7 million, multi-family residential loans of $287.4 million, commercial real estate loans of $371.5 million, land and construction loans of $112.0 million, commercial and industrial loans of $30.6 million, and consumer loans of $414.0 million.

The Bank originates residential loans secured by properties located primarily in Wisconsin, with adjustable-rate loans generally being originated for inclusion in the Bank's loan portfolio and fixed-rate loans generally being originated for sale into the secondary market.

**Loan Portfolio Composition.** The following table presents the composition of loans held for investment at the dates indicated. During the fiscal year ended March 31, 2011, the Corporation began disaggregating its loans by portfolio segment, the level at which the Corporation has developed and documented its systematic method for determining its allowance for loan losses, and class of financing receivable, which is a disaggregation of portfolio segment in accordance with current accounting standards. For comparative purposes, the following table presents the loan portfolio according to the previous classifications.

| | | | | | March 31, | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2013** | | **2012** | | **2011** | | **2010** | | **2009** | |
| | Amount | Percent of Total | Amount | Percent of Total | Amount | Percent of Total | Amount | Percent of Total | Amount | Percent of Total |
| | | | | | (Dollars in thousands) | | | | | |
| Single-family residential | $ 546,699 | 31.01% | $ 569,584 | 26.03% | $ 652,237 | 24.31% | $ 765,312 | 22.27% | $ 843,482 | 20.52% |
| Multi-family residential | 320,586 | 18.18 | 425,084 | 19.43 | 499,645 | 18.62 | 614,930 | 17.89 | 662,483 | 16.12 |
| Commercial real estate | 350,931 | 19.90 | 477,550 | 21.83 | 645,683 | 24.07 | 842,905 | 24.53 | 1,020,981 | 24.84 |
| Construction | 15,755 | 0.90 | 29,772 | 1.36 | 52,014 | 1.94 | 108,486 | 3.16 | 267,375 | 6.51 |
| Land | 91,351 | 5.18 | 142,808 | 6.53 | 173,168 | 6.45 | 231,330 | 6.73 | 266,756 | 6.49 |
| Total mortgage loans | 1,325,322 | 75.17 | 1,644,798 | 75.17 | 2,022,747 | 75.39 | 2,562,963 | 74.58 | 3,061,077 | 74.48 |
| Residential – other | 233,996 | 13.27 | 253,922 | 11.60 | 268,264 | 10.00 | 352,795 | 10.27 | 394,708 | 9.61 |
| Education | 166,429 | 9.44 | 240,331 | 10.98 | 276,735 | 10.31 | 331,475 | 9.64 | 358,784 | 8.73 |
| Other | 13,081 | 0.74 | 15,094 | 0.70 | 18,345 | 0.69 | 24,990 | 0.73 | 56,302 | 1.37 |
| Total consumer loans | 413,506 | 23.45 | 509,347 | 23.28 | 563,344 | 21.00 | 709,260 | 20.64 | 809,794 | 19.71 |
| Commercial and industrial loans | 24,368 | 1.38 | 33,938 | 1.55 | 96,755 | 3.61 | 164,329 | 4.78 | 238,940 | 5.81 |
| Total loans receivable | 1,763,196 | 100.00% | 2,188,083 | 100.00% | 2,682,846 | 100.00% | 3,436,552 | 100.00% | 4,109,811 | 100.00% |
| Contras to loans: | | | | | | | | | | |
| Allowance for loan losses | (79,815) | | (111,215) | | (150,122) | | (179,644) | | (137,165) | |
| Undisbursed loan proceeds | (10,997) | | (16,034) | | (8,761) | | (23,334) | | (71,672) | |
| Unearned net loan fees | (1,838) | | (3,086) | | (3,476) | | (3,898) | | (4,441) | |
| Unearned interest | (3) | | (4) | | (115) | | (88) | | (84) | |
| Net discount on purchased loans | — | | — | | (5) | | (8) | | (10) | |
| Total contras to loans | (92,653) | | (130,339) | | (162,479) | | (206,972) | | (213,372) | |
| Loans receivable, net | $1,670,543 | | $2,057,744 | | $2,520,367 | | $3,229,580 | | $3,896,439 | |

3

**Table of Contents**

The following table presents, at March 31, 2013, the scheduled contractual maturities of gross loans held for investment, as well as the dollar amount of such loans which are scheduled to mature after one year which have fixed or adjustable interest rates disaggregated according to current classifications.

| | Residential | Commercial and Industrial | Commercial Real Estate (In thousands) | Consumer | Total |
|---|---|---|---|---|---|
| Amounts due: | | | | | |
| In one year or less | $ 17,692 | $ 14,387 | $ 373,925 | $ 25,774 | $ 431,778 |
| After one year through five years | 2,610 | 10,935 | 242,939 | 108,132 | 364,616 |
| After five years | 527,418 | 5,252 | 154,079 | 280,053 | 966,802 |
| | $ 547,720 | $ 30,574 | $ 770,943 | $413,959 | $1,763,196 |
| Interest rate terms on amounts due after one year: | | | | | |
| Fixed | $ 186,711 | $ 11,504 | $ 220,226 | $257,083 | $ 675,524 |
| Adjustable | 343,317 | 4,683 | 176,792 | 131,102 | 655,894 |

**Residential Loans**

At March 31, 2013, $547.7 million, or 31.1%, of the total loans unpaid principal balance receivable consisted of residential loans, substantially all of which were 1 to 4 family dwellings. Residential loans consist of both adjustable and fixed-rate first mortgage loans except for Express refinance loans which are included in the consumer loan category. The adjustable-rate loans currently in the portfolio have up to 30-year maturities and terms which provide for annual increases or decreases of the rate on the loans, based on a designated index. These rate changes are generally subject to a limit of 2% per adjustment and an aggregate 6% adjustment over the life of the loan. These loans are documented according to standard industry practices. The Corporation makes a limited number of interest-only loans which tend to have a shorter term to maturity and does not originate negative amortization and option payment adjustable rate mortgages.

Adjustable-rate loans decrease the risks associated with changes in interest rates but involve other risks, primarily because as interest rates rise, the payment by the borrower rises to the extent permitted by the terms of the loan, thereby increasing the potential for default. At the same time, the marketability of the underlying property may be adversely affected by higher interest rates. These risks, which have not had a material adverse effect to date, generally are less than the risks associated with holding fixed-rate loans in an increasing interest rate environment. Also, as interest rates decline, borrowers may refinance their mortgages into fixed-rate loans thereby prepaying the balance of the loan prior to maturity. At March 31, 2013, approximately $343.8 million, or 62.8%, of the held for investment residential loans unpaid principal balance consisted of loans with adjustable interest rates.

The Corporation continues to originate long-term, fixed-rate conventional mortgage loans. Current production of these loans with terms of 15 years or more are generally sold to institutional investors, while a portion of loan production is retained in the held for investment portfolio. In order to provide a full range of products to its customers, the Corporation also participates in the loan origination programs of Wisconsin Housing and Economic Development Authority ("WHEDA"), Wisconsin Department of Veterans Affairs ("WDVA") and the Federal Housing Administration ("FHA"). The right to service substantially all loans sold is retained.

At March 31, 2013, approximately $186.7 million, or 34.1%, of the held for investment residential loans unpaid principal balance consisted of loans with fixed rates of interest. Although these loans generally provide for repayments of principal over a fixed period of 10 to 30 years, because of prepayments and due-on-sale clauses, such loans generally remain outstanding for a shorter period of time.

4

Table of Contents

**Commercial and Industrial Loans**

The Corporation originates loans for commercial, corporate and business purposes, including issuing letters of credit. At March 31, 2013, the unpaid principal balance receivable of commercial and industrial loans amounted to $30.6 million, or 1.7%, of the total loans unpaid principal balance receivable. The commercial and industrial loan portfolio is comprised of loans funded for a variety of business purposes and generally are secured by equipment, machinery and other corporate assets. These loans generally have terms of seven years or less and interest rates that float in accordance with a designated published index. Substantially all such loans are secured and backed by the personal guarantees of the owners of the business.

**Commercial Real Estate Loans**

The Corporation originates commercial real estate loans which include land and construction, multi-family, retail/office and other commercial real estate. Such loans generally have adjustable rates and shorter terms than single-family residential loans, thus increasing the earnings sensitivity of the loan portfolio to changes in interest rates, as well as providing higher fees and rates than residential loans. At March 31, 2013, $770.9 million of loans unpaid principal balance receivable were secured by commercial real estate, which represented 43.7% of the total loans unpaid principal balance. The origination of such loans is generally limited to the Corporation's primary market area.

Commercial real estate loans are primarily secured by apartment buildings, office and industrial buildings, land, warehouses, small retail shopping centers and various special purpose properties, including community-based residential facilities and senior housing. Although terms vary, commercial real estate loans generally have fixed interest rates, amortization periods of 15 to 25 years, as well as balloon payments of two to seven years.

**Consumer Loans**

The Corporation offers consumer loans in order to provide a wider range of financial services to its customers. At March 31, 2013, $414.0 million, or 23.5%, of the total loans unpaid principal balance receivable consisted of consumer loans. Consumer loans typically have higher interest rates than mortgage loans but generally involve more risk than mortgage loans because of the type and nature of the collateral and, in certain cases, the absence of collateral.

The residential-other portfolio consists primarily of Express refinance first mortgage loans, second mortgage and home equity loans. Express refinance loans are available for owner occupied one- to two-family residential properties, with loan amounts up to $200,000, a fixed interest rate, up to 15 year amortization, low fees and rapid closing timeframes. The primary home equity loan product has an adjustable rate that is linked to the prime interest rate and is secured by a mortgage, either a primary or a junior lien, on the borrower's residence. New home equity lines do not exceed 90% of appraised value of the property at the loan origination date. A fixed-rate home equity second mortgage term product is also offered.

Approximately $166.4 million of the total loans unpaid principal balance receivable at March 31, 2013 consisted of education loans. These loans are generally made for a maximum of $3,500 per year for undergraduate studies and $8,500 per year for graduate studies and are placed in repayment status on an installment basis within nine months following graduation. Education loans generally have interest rates that adjust annually in accordance with a designated index. Both the principal amount of an education loan and interest thereon are generally guaranteed by the Great Lakes Higher Education Corporation up to 97% of the balance of the loan, which typically obtains reinsurance of its obligations from the U.S. Department of Education. The origination of student loans was discontinued beginning October 1, 2010 following the March 2010 law ending loan guarantees provided by the U. S. Department of Education. Although direct student loans, without a government guarantee, may be originated, risk-adjusted returns for these loans continue to be unattractive. Education loans may be sold to the U.S. Department of Education or to other investors. Proceeds from the sale of education loans totaled $24.3 million in fiscal 2011. No education loans were sold during the years ended March 31, 2013 and 2012.

5

**Table of Contents**

The other consumer loan portfolio consists of vehicle loans and other secured and unsecured loans made for a variety of consumer purposes. These include credit extended through credit cards issued by a third party, ELAN Financial Services (ELAN), pursuant to an agency arrangement under which the Corporation participates in outstanding balances, currently at 25% to 28%. The Corporation also shares 33% to 37% of annual fees, and 30% of late payment, over limit and cash advance fees, as well as 25% to 30% of interchange income from the underlying portfolio.

**Net Fee Income From Lending Activities.** Loan origination and commitment fees and certain direct loan origination costs are being deferred and the net amounts are amortized as an adjustment to the related loan's yield.

The Corporation also receives other fees and charges relating to existing residential and commercial loans, which include prepayment penalties, late charges and fees collected in connection with a change in borrower or other loan modifications. Other types of loans also generate fee income. These include annual fees assessed on credit card accounts, transactional fees relating to credit card usage and late charges on consumer loans.

**Origination, Purchase and Sale of Loans.** The Corporation's new loan production comes from a number of sources. Residential mortgage loan production is originated primarily from depositors, branch customers, the Corporation's website, non-compensated referrals from real estate brokers, builders and direct solicitations. Commercial real estate loan production is obtained by direct solicitations and referrals. Consumer loans are originated from branch customers, existing depositors and mortgagors, and direct solicitation.

Applications for all types of loans are taken at certain branch locations and one loan origination facility. Loans may be approved by designated underwriting/concurrence officers or the Senior Loan Committee, within pre-established limits, or by the Board of Directors.

The Corporation's general policy is to lend up to the lesser of 80% of the appraised value or purchase price of the property, whichever is less, securing a single-family residential loan (referred to as the loan-to-value ratio). The Corporation will lend more than 80% of the appraised value of the property, but will require that the borrower obtain when possible, private mortgage insurance in an amount intended to reduce exposure to 80% or less of the appraised value of the underlying property. At March 31, 2013, approximately $104.1 million of loans had original loan-to-value ratios of greater than 80% and did not have private mortgage insurance for the portion of the loans above such amount.

Property appraisals on the real estate and improvements securing single-family residential loans are made by the Corporation's staff or by independent appraisers, approved by the Bank's Board of Directors, during the underwriting process. Appraisals are performed in accordance with federal regulations and policies.

The Corporation's underwriting criteria generally require that multi-family residential and commercial real estate loans have loan-to-value ratios of 80% or less and debt coverage ratios of at least 115% or 120%, depending on the asset class. Personal guarantees are also obtained on its multi-family residential and commercial real estate loans from the principals of the borrowing entity, as well as appraisals of the collateral from independent appraisal firms.

The portfolio of commercial real estate and commercial and industrial loans is reviewed on a continuing basis to identify any potential risks that exist in regard to the property management, financial criteria of the loan, operating performance, competitive marketplace and collateral valuation. The relationship manager is responsible for identifying and reporting credit risk quantified through a loan rating system and making recommendations to mitigate credit risk in the portfolio. The risk management function provides an independent review of this activity. These and other underwriting standards are documented in written policy statements, which are periodically updated and approved by the Bank's Board of Directors.

6

Table of Contents

The Corporation encounters certain environmental risks in its lending activities. Under federal and state environmental laws, lenders may become liable for costs of cleaning up hazardous materials found on secured properties. Certain states may also impose liens with higher priorities than first mortgages on properties to recover funds used in such cleanup efforts. Although the foregoing environmental risks are more often associated with industrial and commercial loans, environmental risks may be substantial for residential lenders, since environmental contamination may render the secured property unsuitable for residential use. In addition, the value of residential properties may become substantially diminished by contamination of nearby properties. In accordance with the guidelines of Fannie Mae and Freddie Mac, appraisals for single-family homes include comments on environmental influences and conditions. The Corporation attempts to control its exposure to environmental risks with respect to loans secured by larger properties by monitoring available information on hazardous waste disposal sites and requiring environmental inspections of such properties prior to closing the loan. No assurance can be given, however, that the value of properties securing loans will not be adversely affected by the presence of hazardous materials or that future changes in federal or state laws will not increase the Corporation's exposure to liability for environmental cleanup.

The Corporation has been actively involved in the mortgage secondary market since the mid-1980s and generally originates single-family residential mortgage loans under terms, conditions and documentation which permit sale to investors. A significant portion of the fixed-rate, single-family residential loans with terms over 15 years originated are sold to investors. The volume of loans originated is dependent on a number of factors, but is most influenced by general interest rates. In periods of lower interest rates, demand for fixed-rate mortgages increases. In periods of higher interest rates, customer demand for fixed-rate mortgages declines. The Corporation attempts to limit any interest rate risk created by interest rate lock commitments by limiting the number of days between the commitment and closing, charging fees for commitments, and limiting the amounts of unhedged commitments at any one time. Forward sale contracts used to economically hedge closed loans and rate lock commitments to customers range from 70% to 100% of the closed and committed amounts.

The following table presents the activity in loans held for sale:

|  | Year Ended March 31, | | |
| --- | --- | --- | --- |
|  | 2013 | 2012 | 2011 |
|  |  | (In thousands) |  |
| Beginning balance | $ 39,332 | $ 7,538 | $ 19,484 |
| Originations | 898,960 | 961,947 | 780,100 |
| Sales | (920,234) | (930,153) | (792,046) |
| Ending balance | $ 18,058 | $ 39,332 | $ 7,538 |

The Corporation generally services all originated loans that have been sold to investors. This includes the collection of payments, the inspection of the secured property, and the disbursement of certain insurance and tax escrows on behalf of borrowers. Servicing fees are recognized when the related loan payments are received. At March 31, 2013, $2.91 billion of loans are serviced for others.

The Corporation is not an active purchaser of loans. At March 31, 2013, approximately $166.4 million of education loans, $7.6 million of purchased participation mortgage loans and $6.9 million of credit card loans were being serviced for the Corporation by others. Servicing of purchased loans or loan participations is performed by the seller, with a portion of the interest paid by the borrower retained by the seller to cover servicing costs.

**Delinquency Procedures.** Delinquent and problem loans are a normal part of any lending business. When a borrower fails to make a required payment by the 15th day after which the payment is due, internal collection procedures are instituted. The borrower is contacted to determine the reason for non-payment and attempts are made to cure the delinquency. Loan status, the condition of the property, and circumstances of the borrower are

7

**Table of Contents**

regularly reviewed. Based upon the results of its review, the Corporation may negotiate and accept a repayment program with the borrower, accept a voluntary deed in lieu of foreclosure, agree to the terms of a short sale or initiate foreclosure proceedings.

A decision as to whether and when to initiate foreclosure proceedings is based upon such factors as the amount of the outstanding loan in relation to the original indebtedness, the extent of delinquency, the value of the collateral, and the borrower's financial ability and willingness to cooperate in curing the deficiencies. If foreclosed on, the property is sold at a public sale and the Corporation will generally bid an amount reasonably equivalent to the fair value of the foreclosed property or the amount of judgment due.

Real estate acquired by foreclosure or by deed in lieu of foreclosure as well as other repossessed assets (OREO) are held for sale and are initially recorded at fair value less a discount for estimated selling costs at the date of foreclosure. Any write down to fair value less estimated selling costs is charged to the allowance for loan losses. If the discounted fair value exceeds the net carrying value of the loans, recoveries to the allowance for loan losses are recorded to the extent of previous charge-offs, with any excess, which is infrequent, recognized as a gain in non-interest income. Subsequent to foreclosure, valuations are periodically performed and a valuation allowance is established if the carrying value exceeds the fair value less estimated selling costs. Costs relating to the development and improvement of the property may be capitalized, generally those greater than $10,000; holding period costs and subsequent changes to the valuation allowance are charged to OREO expense, net included in non-interest expense. Incremental valuation adjustments may be recognized in the Statement of Operations if, in the opinion of management, additional losses are deemed probable.

For discussion of the Corporation's asset quality, see "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7. Also see Notes 1 and 5 to the Consolidated Financial Statements in Item 8.

**Investment Securities**

In addition to lending activities, the Corporation conducts other investing activities on an ongoing basis in order to diversify assets, limit interest rate and credit risk, and meet regulatory liquidity requirements. The Corporation invests in mortgage-related securities which are insured or guaranteed by Freddie Mac, Fannie Mae and Ginnie Mae; non-agency collateralized mortgage obligations ("CMOs"), and U.S. government agency obligations. Investment decisions are made by authorized officers in accordance with policies established by the Board of Directors.

Management determines the appropriate financial reporting classification of securities at the time of purchase. Debt securities may be classified as held to maturity when the Corporation has the intent and ability to hold the securities to maturity. Held to maturity securities are carried at amortized cost. Securities are classified as trading when the Corporation intends to actively buy and sell securities in order to make a profit. Trading securities are carried at fair value, with unrealized holding gains and losses included in earnings. There were no securities designated as trading during the three years ended March 31, 2013.

Securities not classified as held to maturity or trading are classified as available for sale. Available for sale securities are carried at fair value, with the unrealized gains and losses, net of tax (if any), reported as a separate component of stockholders' equity. For the years ended March 31, 2013 and 2012, this component of stockholders' equity increased $3.4 million and $20.1 million, respectively, to reflect net unrealized gains and losses on holding securities classified as available for sale.

The Corporation's policy does not permit investment in non-investment grade bonds. Permissible investments under OCC regulations, include U.S. Government obligations, municipal bonds, securities of various federal agencies, certain certificates of deposit of insured banks and savings institutions, certain bankers' acceptances, repurchase agreements and federal funds. Although the Corporation does not purchase non-investment grade securities, it does own $7.4 million, or 2.8% of the total investment security portfolio, of non-investment grade securities as a result of ratings downgrades subsequent to purchase.

**Table of Contents**

Agency-backed securities increase the quality of the Corporation's assets by virtue of the insurance or guarantees of federal agencies that back them, require less capital under risk-based regulatory capital requirements than non-insured or guaranteed mortgage loans, are more liquid than individual mortgage loans and may be used to collateralize borrowings or other obligations of the Corporation. At March 31, 2013, securities with a fair value of $259.1 million held by the Corporation are either AAA rated or are guaranteed by government sponsored agencies. At March 31, 2013, $187.2 million of the Corporation's securities available for sale were pledged to secure various obligations of the Corporation. No held to maturity securities were owned at March 31, 2013.

The table below sets forth information regarding the amortized cost and fair values of the Corporation's investment securities at the dates indicated.

| | March 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2013** | | **2012** | | **2011** | |
| | Amortized Cost | Fair Value | Amortized Cost | Fair Value | Amortized Cost | Fair Value |
| | | | (In thousands) | | | |
| **Available for sale:** | | | | | | |
| U.S. government sponsored and federal agency obligations | $ 3,444 | $ 3,504 | $ 3,556 | $ 3,531 | $ 4,037 | $ 4,126 |
| Corporate stock and other | 152 | 264 | 652 | 661 | 1,151 | 1,219 |
| Non-agency CMOs | 7,885 | 7,549 | 25,067 | 21,592 | 49,921 | 46,637 |
| Government sponsored agency mortgage-backed securities | 2,975 | 3,184 | 3,944 | 4,195 | 6,473 | 6,747 |
| GNMA mortgage-backed securities | 248,752 | 252,286 | 208,948 | 212,320 | 481,659 | 464,560 |
| | 263,208 | 266,787 | 242,167 | 242,299 | 543,241 | 523,289 |
| **Held to maturity:** | | | | | | |
| Government sponsored agency mortgage-backed securities | — | — | 20 | 20 | 27 | 28 |
| | — | — | 20 | 20 | 27 | 28 |
| Total investment securities | $ 263,208 | $ 266,787 | $ 242,187 | $ 242,319 | $ 543,268 | $ 523,317 |

The Corporation's mortgage-backed securities are made up of GNMA, government sponsored agency mortgage-backed securities, and non-agency mortgage-backed securities. At March 31, 2013, the Corporation had no held to maturity securities. The fair value of the mortgage-backed securities available for sale amounted to $263.0 million at the same date.

The following table sets forth the maturity and weighted average yield characteristics of investment securities at March 31, 2013, classified by term to maturity. The balance is at fair value for available for sale securities.

| | Less than Five Years | | Five to Ten Years | | Over Ten Years | | |
|---|---|---|---|---|---|---|---|
| | Balance | Weighted Average Yield | Balance | Weighted Average Yield | Balance | Weighted Average Yield | Total |
| | | | (Dollars in thousands) | | | | |
| **Available for sale:** | | | | | | | |
| U.S. government sponsored and federal agency obligations | $ 3,504 | 1.08% | $ — | — % | $ — | — % | $ 3,504 |
| Corporate stock and other | — | — | — | — | 264 | — | 264 |
| Non-agency CMOs | — | — | — | — | 7,549 | 5.62 | 7,549 |
| Government sponsored agency mortgage-backed securities | 232 | 5.01 | 313 | 5.45 | 2,639 | 3.08 | 3,184 |
| GNMA mortgage-backed securities | 370 | 5.16 | — | — | 251,916 | 1.87 | 252,286 |
| Total investment securities | $ 4,106 | 1.64% | $ 313 | 5.45% | $262,368 | 1.99% | $266,787 |

9

Table of Contents

Due to prepayments of the underlying loans, the actual maturities of certain investment securities are expected to be substantially earlier than the scheduled maturities.

For additional information regarding investment securities, see the Consolidated Financial Statements, including Note 4 thereto in Item 8.

**Sources of Funds**

**General.** Deposits are a major source of the Corporation's funds for lending and other investment activities. In addition to deposits, funds are derived from principal repayments and prepayments on loan and mortgage-related securities, maturities of investment securities, sales of loans and securities, interest payments on loans and securities, advances from the FHLB and, from time to time, repurchase agreements and other borrowings. Loan repayments and interest payments are a relatively stable source of funds, while deposit inflows and outflows and loan prepayments are significantly influenced by the general level of interest rates, economic conditions, the stock market and competition. Borrowings may be used on a short-term basis to compensate for reductions in the availability of funds from other sources. Borrowings may also be used on a longer term basis for general business purposes, including providing financing for lending and other investment activities and asset/liability management strategies.

**Deposits.** The Corporation's deposit products include passbook and statement savings accounts, non-interest bearing checking, interest bearing checking accounts, money market deposit accounts and certificates of deposit ranging in terms of 42 days to five years. Included among these deposit products are Individual Retirement Account certificates and Keogh retirement certificates, as well as negotiable-rate certificates of deposit with balances of $100,000 or more ("jumbo certificates").

Deposits are obtained primarily from residents of Wisconsin. The Corporation has entered into agreements with certain brokers that provide funds for a specified fee. While brokered deposits are a good source of funds, they are interest rate driven and thus inherently have more liquidity and interest rate risk. At March 31, 2013, brokered deposits totaled $100,000, or less than one percent, of the $2.03 billion of total deposits. At March 31, 2013, the Corporation is precluded from obtaining new or renewing existing brokered deposits. There were no out of network certificates of deposit at March 31, 2013. These deposits are opened via internet listing services and the balances are kept within FDIC insured limits.

The Corporation attracts deposits through a network of convenient office locations by utilizing a customer sales and service plan and by offering a wide variety of accounts and services, competitive interest rates and convenient customer hours. Deposit terms offered vary according to the minimum balance required, the time period the funds must remain on deposit and the interest rate, among other factors. In determining the characteristics of deposit accounts, consideration is given to the profitability and liquidity of the Corporation, matching terms of the deposits with loan products, the attractiveness to customers and the rates offered by competitors.

The following table sets forth the amount and maturities of certificates of deposit at March 31, 2013.

| Interest Rate | Three Months and Less | Over Three Months Through One Year | Over One Year Through Two Years | Over Two Years Through Three Years | Over Three Years | Total |
|---|---|---|---|---|---|---|
| | | | (In thousands) | | | |
| 0.00% to 0.99% | $ 126,493 | $ 290,395 | $ 88,796 | $ 8,384 | $ 5,841 | $ 519,909 |
| 1.00% to 1.99% | 16,196 | 19,756 | 5,870 | 4,579 | 45,763 | 92,164 |
| 2.00% to 3.99% | 4,149 | 5,936 | 8,308 | 5,566 | 6,102 | 30,061 |
| 4.00% and above | 112 | 16,730 | — | — | — | 16,842 |
| | $ 146,950 | $ 332,817 | $ 102,974 | $ 18,529 | $ 57,706 | $ 658,976 |

10

**Table of Contents**

At March 31, 2013, $109.5 million of certificates of deposit were greater than or equal to $100,000, of which $27.1 million are scheduled to mature in less than three months, $15.7 million in three to six months, $37.6 million in six to twelve months and $29.1 million in over twelve months.

**Borrowings.** From time to time the Corporation obtains advances from the FHLB, which generally are secured by capital stock of the FHLB and certain mortgage loans and investment securities. Such advances are made pursuant to several different credit programs, each of which has its own interest rate and range of maturities. The FHLB may prescribe the acceptable uses for these advances, as well as limitations on the size of the advances and repayment provisions.

The Corporation used a short-term line of credit in part to fund IDI's partnership interests and investments in real estate held for development and sale. This line of credit also funded other corporate needs. The final maturity of the line of credit was extended to June 30, 2013. At March 31, 2013 and 2012, the Corporation had drawn $116.3 million under this line of credit. The Corporation is currently in default and does not have available credit remaining on this line. See Note 10 to the Corporation's Consolidated Financial Statements in Item 8 for more information on borrowings.

The following table sets forth the outstanding balances and weighted average interest rates for borrowings at the dates indicated.

|  | March 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2013** | | **2012** | | **2011** | |
|  | **Balance** | **Weighted Average Rate** | **Balance** | **Weighted Average Rate** | **Balance** | **Weighted Average Rate** |
|  | | | (Dollars in thousands) | | | |
| FHLB advances | $197,500 | 3.06% | $357,500 | 2.49% | $478,479 | 2.57% |
| Credit agreement | 116,300 | 15.00 | 116,300 | 15.00 | 116,300 | 12.00 |
| Repurchase agreements | 3,425 | 0.14 | 2,303 | 0.21 | 4,226 | 0.56 |
| TLGP borrowing | — | — | — | — | 60,000 | 2.74 |
| Total | $317,225 | 7.41 | $476,103 | 5.53 | $659,005 | 3.99 |

The following table sets forth information relating to short-term borrowings with original maturities of one year or less for the periods indicated.

|  | March 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2013** | | **2012** | | **2011** | |
|  | **Balance** | **Weighted Average Rate** | **Balance** | **Weighted Average Rate** | **Balance** | **Weighted Average Rate** |
|  | | | (Dollars in thousands) | | | |
| Balance at end of period: | | | | | | |
| FHLB advances | $    — | — % | $ 10,000 | 4.12% | $ 40,000 | 0.20% |
| Credit agreement | 116,300 | 15.00 | 116,300 | 15.00 | 116,300 | 12.00 |
| Repurchase agreements | 3,425 | 0.14 | 2,303 | 0.21 | 4,226 | 0.56 |
| Maximum month-end balance: | | | | | | |
| FHLB advances | $    — | — % | $ 25,000 | 0.13% | $ 50,000 | 0.26% |
| Credit agreement | 116,300 | 15.00 | 116,300 | 15.00 | 116,300 | 12.00 |
| Repurchase agreements | 3,786 | 0.21 | 4,721 | 0.59 | 7,501 | 0.73 |
| Average balance: | | | | | | |
| FHLB advances | $    — | — % | $  4,167 | 0.13% | $ 11,500 | 0.26% |
| Credit agreement | 116,300 | 15.00 | 116,300 | 14.50 | 116,300 | 12.00 |
| Repurchase agreements | 2,914 | 0.14 | 3,683 | 0.40 | 4,937 | 0.68 |

11

Table of Contents

## Subsidiaries

*Investment Directions, Inc.* IDI is a wholly-owned, non-banking subsidiary of the Corporation that has invested in various limited partnerships and subsidiaries funded by borrowings from the Corporation. The assets at IDI totaling $831,000 at March 31, 2013 include cash, an equity interest in one commercial enterprise and one real estate development, along with various notes receivable.

At March 31, 2012 the Corporation had a loan of $4.2 million to IDI to fund various partnership and subsidiary investments which was paid off during the fiscal year ending March 31, 2013. The amount was eliminated in consolidation.

*ADPC Corporation.* ADPC is a wholly owned subsidiary of the Bank that holds certain of the Bank's foreclosed properties. The Bank's investment in ADPC at March 31, 2013 amounted to $15.2 million as compared to $15.4 million at March 31, 2012. ADPC had net income (loss) of ($153,000) for the year ended March 31, 2013 as compared to $758,000 for the year ended March 31, 2012 and $233,000 for the year ended March 31, 2011.

*Anchor Investment Corporation.* AIC was an operating subsidiary of the Bank incorporated in the State of Nevada and formed for the purpose of managing a portion of the Bank's investment portfolio (primarily mortgage-backed securities). In November 2011, AIC was dissolved and the remaining assets were transferred to the Bank. As an operating subsidiary, AIC's results of operations were combined with the Bank's for financial and regulatory purposes. At March 31, 2013 and 2012, the Bank had no remaining investment in AIC. AIC had net income of zero, $3.3 million and $6.5 million for the years ended March 31, 2013, 2012 and 2011, respectively.

## Regulation and Supervision

The business of the Corporation and the Bank is subject to extensive regulation and supervision under federal banking laws and other federal and state laws and regulations. In general, these laws and regulations are intended for the protection of depositors, the deposit insurance funds administered by the FDIC and the banking system as a whole, not for the protection of stockholders or creditors of insured institutions.

Set forth below are brief descriptions of selected laws and regulations applicable to the Corporation and Bank. These descriptions are not intended to be a comprehensive description of all laws and regulations to which the Corporation and the Bank are subject or to be complete descriptions of the laws and regulations discussed. The descriptions of statutory and regulatory provisions are qualified in their entirety by reference to the particular statutes and regulations. Changes in applicable statutes, regulations or regulatory policy may have a material effect on the Bank and our businesses.

*General.* The Corporation is registered as a savings and loan holding company under Section 10 of the Home Owners' Loan Act ("HOLA") and, as a result, is subject to the regulation, examination, supervision and reporting requirements of the Federal Reserve. The Corporation must file quarterly and annual reports with the Federal Reserve describing its financial condition.

The Bank is a federal savings bank organized under the laws of the United States and subject to regulation and examination by the Office of the Comptroller of the Currency ("OCC"). On July 21, 2011, the Office of Thrift Supervision, which had been the Bank's and Corporation's primary regulator, ceased operations pursuant to provisions of the Dodd-Frank Act. Regulation of the Bank was assumed by the OCC, with the Federal Reserve becoming the primary regulator for the Corporation. The full impact of the change in regulators on our operations is not yet known. The OCC regulates all areas of banking operations, including investments, reserves, lending, mergers, payment of dividends, interest rates, transactions with affiliates (including the Corporation), establishment of branches and other aspects of the Bank's operations. The Bank is subject to regular examinations by the OCC and is assessed amounts to cover the costs of such examinations.

12

**Table of Contents**

The Bank's deposits are insured by the FDIC to the maximum extent permitted by law, resulting in the Bank also being regulated by the FDIC. The major functions of the FDIC with respect to insured institutions include making assessments, if required, against insured institutions to fund the deposit insurance fund and preventing the continuance or development of unsafe and unsound banking practices.

*Activities Restrictions.* There are generally no restrictions on the activities of a savings and loan holding company, such as the Corporation, which controlled only one subsidiary savings association on or before May 4, 1999 (a "grandfathered holding company"). However, if the Director of the OCC determines that there is reasonable cause to believe that the continuation by a savings and loan holding company of an activity constitutes a serious risk to the financial safety, soundness or stability of its subsidiary savings association, the Director may impose such restrictions as it deems necessary to address such risk, including limiting (i) payment of dividends by the savings association; (ii) transactions between the savings association and its affiliates; and (iii) any activities of the savings association that might create a serious risk that the liabilities of the holding company and its affiliates may be imposed on the savings association. Notwithstanding the above rules as to permissible business activities of unitary savings and loan holding companies, if the savings association subsidiary of such a holding company fails to meet the qualified thrift lender ("QTL") test, then such unitary holding company also shall become subject to the activities restrictions applicable to multiple savings and loan holding companies and, unless the savings association re-qualifies as a QTL within one year thereafter, shall register as, and become subject to the restrictions applicable to, a bank holding company. Regulation as a bank holding company could be adverse to the Corporation's operations and impose additional and possibly more burdensome regulatory requirements on the Corporation. See "Qualified Thrift Lender Test" below.

If a savings and loan holding company acquires control of a second savings association and holds it as a separate institution, the holding company becomes a multiple savings and loan holding company. As a general rule, multiple savings and loan holding companies are subject to restrictions on their activities that are not imposed on a grandfathered holding company. They could not commence or continue any business activity other than: (i) those permitted for a bank holding company under section 4(c) of the Bank Holding Company Act (unless the Director of the OCC by regulation prohibits or limits such 4(c) activities); (ii) furnishing or performing management services for a subsidiary savings association; (iii) conducting an insurance agency or escrow business; (iv) holding, managing, or liquidating assets owned by or acquired from a subsidiary savings association; (v) holding or managing properties used or occupied by a subsidiary savings association; (vi) acting as trustee under deeds of trust; or (vii) those activities authorized by regulation as of March 5, 1987, to be engaged in by multiple savings and loan holding companies.

*Restrictions on Acquisitions.* Except under limited circumstances, savings and loan holding companies are prohibited from acquiring, without prior approval of the OCC:

•   control of any other savings institution or savings and loan holding company or all or substantially all the assets thereof; or

•   more than 5% of the voting shares of a savings institution or holding company of a savings institution which is not a subsidiary.

In evaluating an application by a holding company to acquire a savings association, the OCC must consider the financial and managerial resources and future prospects of the holding company and savings association involved, the risk of the acquisition to the insurance funds, the convenience and needs of the community and the effect of the acquisition on competition. Acquisitions which result in a savings and loan holding company controlling savings associations in more than one state are generally prohibited, except in supervisory transactions involving failing savings associations or based on specific state authorization of such acquisitions. Except with the prior approval of the OCC, no director or officer of a savings and loan holding company or person owning or controlling by proxy or otherwise more than 25% of such Corporation's voting stock, may acquire control of any savings institution, other than a subsidiary savings institution, or of any other savings and loan holding company.

13

**Table of Contents**

*Change of Control.* Federal law requires, with few exceptions, OCC approval (or, in some cases, notice and effective clearance) prior to any acquisition of control of the Corporation. Among other criteria, under OCC regulations, "control" is conclusively presumed to exist if a person or Corporation acquires, directly or indirectly, more than 25% of any class of voting stock of the savings association or holding company. Control is also presumed to exist, subject to rebuttal, if an acquiror acquires more than 10% of any class of voting stock (or more than 25% of any class of stock) and is subject to any of several "control factors," including, among other matters, the relative ownership position of a person, the existence of control agreements and board composition. The Dodd-Frank Act amends the Bank Holding Company Act in regard to bank holding company acquisitions of control of out-of-state banks, replacing the prior "adequately-capitalized" and "adequately-managed" standards by now requiring the acquiring bank holding company to be well-capitalized and well-managed. The Federal Deposit Insurance Act is similarly amended with respect to interstate merger transactions, now requiring that the resulting bank be well-capitalized and well-managed following the transaction.

*Change in Management.* As the Bank is considered in "troubled" condition, as defined in the OCC regulations, it is required to give 30 days' prior written notice to the OCC before adding or replacing a director, employing any person as a senior executive officer or changing the responsibility of any senior executive officer so that such person would assume a different senior executive position. The OCC would have the opportunity to disapprove any such appointment.

*Limitations on Dividends.* The Corporation is a legal entity separate and distinct from the Bank and its other subsidiaries. The Corporation's principal source of revenue consists of dividends from the Bank. The payment of dividends by the Bank is subject to various regulatory requirements, including a minimum of 30 days' advance notice to the OCC of any proposed dividend to the Corporation. The Corporation is currently precluded from paying dividends on common stock under provisions of TARP and on common and preferred stock under provisions of the OCC Order to Cease and Desist.

Other limitations may apply depending on the size of the proposed dividend and the condition of the Bank. See "Restrictions on Capital Distributions" below.

*Capital Requirements.* OCC regulations require that federal savings banks maintain: (i) tier 1 capital in an amount not less than 4.0% of adjusted total assets, (ii) tier 1 capital in an amount not less than 4.0% of risk weighted assets and (iii) total risk-based capital in an amount not less than 8.0% of risk-weighted assets.

Tier 1 capital includes common stockholders' equity (including common stock, additional paid in capital and retained earnings, but excluding any net unrealized gains or losses, net of related taxes, on certain securities available for sale), noncumulative perpetual preferred stock and any related surplus and non-controlling interests in the equity accounts of fully consolidated subsidiaries. Intangible assets generally must be deducted from tier 1 capital, other than certain servicing assets and purchased credit card relationships, subject to limitations. Total capital, for purposes of the risk-based capital requirement, equals the sum of tier 1 capital plus supplementary (tier 2) capital (which, as defined, includes the sum of, among other items, perpetual preferred stock not counted as tier 1 capital, limited life preferred stock, subordinated debt and general loan and lease loss allowances up to 1.25% of risk-weighted assets) less certain deductions. Risk-weighted assets are determined by multiplying certain categories of assets, including off-balance sheet equivalents, by an assigned risk weight of 0% to 100% based on the degree of credit risk associated with those assets as specified in OCC regulations.

As of March 31, 2013, the Bank met the standard minimum regulatory capital requirements noted above, with tier 1 leverage, tier 1 risk based capital and total risk-based capital ratios of 4.53%, 7.71% and 9.02%, respectively. Capital requirements higher than the generally applicable minimum requirement may be established for a particular savings association if the OCC determines that the institution's capital was or may become inadequate in view of its particular circumstances. In June 2009, the Bank consented to the issuance by the OTS of a Cease and Desist Order which requires, among other things, capital requirements in excess of the generally applicable minimum requirements. See Note 2 to the Consolidated Financial Statements included in Item 8.

14

**Table of Contents**

*Prompt Corrective Action.* Under Section 38 of the Federal Deposit Insurance Act ("FDIA"), each federal banking agency is required to take prompt corrective action to deal with depository institutions subject to their jurisdiction that fail to meet their minimum capital requirements or are otherwise in a troubled condition. The prompt corrective action provisions subject undercapitalized institutions to an increasingly stringent array of restrictions, requirements and prohibitions if their capital levels deteriorate and/or supervisory problems increase. If these corrective measures prove unsuccessful in recapitalizing the institution and correcting problems, the FDIA mandates that the institution be placed in receivership.

Pursuant to regulations promulgated under Section 38 of the FDIA, the corrective actions that the banking agencies either must or may take are tied primarily to an institution's capital levels. In accordance with the framework set forth in the FDIA, the federal banking agencies have developed a classification system, pursuant to which all banks and savings associations are placed into one of five categories: well capitalized, adequately capitalized, undercapitalized, significantly undercapitalized and critically undercapitalized. The capital thresholds established for each of the categories are as follows:

| Capital Category | Tier 1 Leverage Ratio | Tier 1 Risk-Based Capital Ratio | Total Risk-Based Capital Ratio |
|---|---|---|---|
| Well capitalized | 5% or above | 6% or above | 10% or above |
| Adequately capitalized | 4% or above(1) | 4% or above | 8% or above |
| Undercapitalized | Less than 4% | Less than 4% | Less than 8% |
| Significantly undercapitalized | Less than 3% | Less than 3% | Less than 6% |
| Critically undercapitalized | Less than 2% | — | — |

(1)    3% for banks with the highest supervisory rating.

The applicable federal banking agency also has authority, after providing an opportunity for a hearing, to downgrade an institution from "well capitalized" to "adequately capitalized" or to subject an "adequately capitalized" or "undercapitalized" institution to the supervisory actions applicable to the next lower category, for supervisory concerns.

Applicable laws and regulations also generally provide that no insured institution may make a capital distribution if it would cause the institution to become "undercapitalized." Capital distributions include cash (but not stock) dividends, stock purchases, redemptions and other distributions of capital to the owners of an institution. Moreover, only a "well capitalized" depository institution may accept brokered deposits without prior regulatory approval.

"Undercapitalized" depository institutions are subject to growth limitations and other restrictions and are required to submit a capital restoration plan. The federal banking agencies may not accept a capital plan without determining, among other things, that the plan is based on realistic assumptions and is likely to succeed in restoring the depository institution's capital. In addition, for a capital restoration plan to be acceptable, the depository institution's parent holding company must guarantee that the institution will comply with such capital restoration plan. The aggregate liability of the parent holding company is limited to the lesser of (i) an amount equal to 5% of the depository institution's total assets at the time it became "undercapitalized," and (ii) the amount which is necessary (or would have been necessary) to bring the institution into compliance with all capital standards applicable with respect to such institution at the time it failed to comply with the plan. If a depository institution fails to submit an acceptable plan, it is treated as if it is "significantly undercapitalized."

"Significantly undercapitalized" depository institutions may be subject to a number of requirements and restrictions, including orders to sell sufficient voting stock to become "adequately capitalized," requirements to reduce total assets and cessation of receipt of deposits from correspondent banks.

"Critically undercapitalized" institutions are subject to the appointment of a receiver or conservator.

15

Table of Contents

As of March 31, 2013, the Bank was "adequately capitalized" under standard PCA guidelines. Under these OCC requirements, a bank must have a total Risk-Based Capital Ratio of 8.0 percent or greater to be considered "adequately capitalized." The Bank continues to work toward the requirements of the previously issued Cease and Desist Order which requires a total Risk-Based Capital Ratio of 12.0 percent, which exceeds traditional capital levels for a bank. At March 31, 2013, the Bank had not yet met the elevated capital levels. See Note 13 to the Consolidated Financial Statements included in Item 8.

*Restrictions on Capital Distributions.* OCC regulations govern capital distributions by savings institutions, which include cash dividends, stock repurchases and other transactions charged to the capital account of a savings institution to make capital distributions. Under applicable regulations, a savings institution must file an application for approval of the capital distribution if:

- the total capital distributions for the applicable calendar year exceed the sum of the institution's net income for that year to date plus the institution's retained net income for the preceding two years;

- the institution would not be at least adequately capitalized following the distribution;

- the distribution would violate any applicable statute, regulation, agreement or OCC-imposed condition; or

- the institution is not eligible for expedited treatment of its filings with the OCC.

If an application is not required to be filed, savings institutions such as the Bank which are a subsidiary of a holding company (as well as certain other institutions) must still file a notice with the OCC at least 30 days before the board of directors declares a dividend or approves a capital distribution.

An institution that either before or after a proposed capital distribution fails to meet its then applicable minimum capital requirement or that has been notified that it needs more than normal supervision may not make any capital distributions without the prior written approval of the OCC. In addition, the OCC may prohibit a proposed capital distribution, which would otherwise be permitted by OCC regulations, if the OCC determines that such distribution would constitute an unsafe or unsound practice.

The FDIC prohibits an insured depository institution from paying dividends on its capital stock or interest on its capital notes or debentures (if such interest is required to be paid only out of net profits) or distributing any of its capital assets while it remains in default in the payment of any assessment due the FDIC. The Bank is currently not in default in any assessment payment to the FDIC.

*Qualified Thrift Lender Test.* A savings association can comply with the qualified thrift lender, or QTL, test set forth in the HOLA and implementing regulations of the OCC by either meeting the QTL test set forth therein or qualifying as a domestic building and loan association as defined in Section 7701(a)(19) of the Internal Revenue Code of 1986. The QTL test set forth in the HOLA requires a savings association to maintain 65% of portfolio assets in qualified thrift investments, or QTLs. Portfolio assets are defined as total assets less intangibles, property used by a savings association in its business and liquidity investments in an amount not exceeding 20% of assets. Generally, QTLs are residential housing related assets. At March 31, 2013, the amount of the Bank's assets which were invested in QTLs exceeded the percentage required to qualify the Bank under the QTL test.

Applicable laws and regulations provide that any savings association that fails to meet the definition of a QTL must either convert to a national bank charter or limit its future investments and activities (including branching and payments of dividends) to those permitted for both savings associations and national banks. Further, within one year of the loss of QTL status, a holding company of a savings association that does not convert to a bank charter must register as a bank holding company and be subject to all statutes applicable to bank holding companies. In order to exercise the powers granted to federally-chartered savings associations and maintain full access to FHLB advances, the Bank must continue to meet the definition of a QTL.

16

Table of Contents

*Safety and Soundness Standards.* The OCC and the other federal bank regulatory agencies have established guidelines for safety and soundness, addressing operational and managerial standards, as well as compensation matters for insured financial institutions. Institutions failing to meet these standards are required to submit compliance plans to their appropriate federal regulators. The OCC and the other agencies have also established guidelines regarding asset quality and earnings standards for insured institutions. The Bank believes it is in compliance with these guidelines and standards.

*Community Investment and Consumer Protection Laws.* In connection with the Bank's lending activities, the Bank is subject to a variety of federal laws designed to protect borrowers and promote lending to various sectors of the economy and population. Included among these are the federal Home Mortgage Disclosure Act, Real Estate Settlement Procedures Act, Truth-in-Lending Act, Truth-in-Savings Act, Fair Housing Act, Equal Credit Opportunity Act, Fair Credit Reporting Act, Bank Secrecy Act, Money Laundering Prosecution Improvements Act and Community Reinvestment Act.

The Community Reinvestment Act requires insured institutions to define the communities that they serve, identify the credit needs of those communities and adopt and implement a "Community Reinvestment Act Statement" pursuant to which they offer credit products and take other actions that respond to the credit needs of the community. The responsible federal banking regulator (the OCC in the case of the Bank) must conduct regular Community Reinvestment Act examinations of insured financial institutions and assign to them a Community Reinvestment Act rating of "outstanding," "satisfactory," "needs improvement" or "unsatisfactory." The record of a depository institution under the Community Reinvestment Act will be taken into account when applying for the establishment of new branches or mergers with other institutions. The Bank's current Community Reinvestment Act rating is "satisfactory."

The Bank attempts in good faith to ensure compliance with the requirements of the consumer protection statutes to which it is subject, as well as the regulations that implement the statutory provisions. The requirements are complex, however, and even inadvertent non-compliance could result in civil and, in some cases, criminal liability.

*Federal Deposit Insurance.* Deposits held by the Bank are insured by the Deposit Insurance Fund (the "DIF") as administered by the FDIC. The Dodd – Frank Act raised the standard maximum deposit insurance amount to $250,000 per depositor, per insured depository institution for each account ownership category. The change makes permanent the temporary coverage limit increase from $100,000 to $250,000 that had been in effect since October 2008.

The FDIC maintains the DIF by assessing each depository institution an insurance premium. The amount of the FDIC assessments paid by a DIF member institution is based on its relative risk of default as measured by the company's FDIC supervisory rating, and other various measures, such as the level of brokered deposits, secured debt and debt issuer ratings.

The DIF assessment base rate currently ranges from 12 to 45 basis points for institutions that do not trigger factors for brokered deposits and unsecured debt, and higher rates for those that do trigger those risk factors. In February 2011, the FDIC redefined the deposit insurance assessment base, and updated the assessment rates. Excluding any changes in the FDIC risk category due to other factors, the change in DIF assessment rates decreased the Corporation's FDIC insurance expense.

The Dodd – Frank Act effects further changes to the law governing deposit insurance assessments. There is no longer an upper limit for the reserve ratio designated by the FDIC each year, and the maximum reserve ratio may not be less than 1.35% of insured deposits, or the comparable percentage of the assessment base. Under prior law the maximum reserve ratio was 1.15%. The Dodd – Frank Act permits the FDIC until September 30, 2020 to raise the reserve ratio, which is currently negative, to 1.35%. The FDIC initial base rate is between .05% and .35% of assessable assets based on the risk category assigned to the Bank by the FDIC. Further adjustments may be made for unsecured debt or brokered deposits. See "Risk Factors – Recent changes have created regulatory

17

Table of Contents

uncertainty" and "Risk Factors – Current and future increases in FDIC insurance premiums, including FDIC special assessments imposed on all FDIC – insured institutions, will decrease our earnings." The Dodd – Frank Act also eliminates requirements under prior law that the FDIC pay dividends to member institutions if the reserve ratio exceeds certain thresholds, and the FDIC has proposed that in lieu of dividends, it will adopt lower rate schedules when the reserve ratio exceeds certain thresholds.

All FDIC-insured depository institutions are required to pay an annual assessment to provide funds for the payment on bonds issued by the Financing Corporation (FICO), a federal corporation charted under the authority of the Federal Housing Finance Board. The bonds were issued to capitalize the Federal Savings and Loan Insurance Corporation (FSLIC). Insured institutions paid between .66 and 1.00 cents per $100 of assessable assets in 2012, and between .64 and .66 cents during 2013.

*Brokered Deposits.* The FDIC restricts the use of brokered deposits by certain depository institutions. Under the FDIC and applicable regulations, (i) a "well capitalized insured depository institution" may solicit and accept, renew or roll over any brokered deposit without restriction, (ii) an "adequately capitalized insured depository institution" may not accept, renew or roll over any brokered deposit unless it has applied for and been granted a waiver of this prohibition by the OCC and (iii) an "undercapitalized insured depository institution" may not (x) accept, renew or roll over any brokered deposit or (y) solicit deposits by offering an effective yield that exceeds by more than 75 basis points the prevailing effective yields on insured deposits of comparable maturity in such institution's normal market area or in the market area in which such deposits are being solicited. The term "undercapitalized insured depository institution" is defined to mean any insured depository institution that fails to meet the minimum regulatory capital requirement prescribed by its appropriate federal banking agency. The OCC may, on a case-by-case basis and upon application by an adequately capitalized insured depository institution, waive the restriction on brokered deposits upon a finding that the acceptance of brokered deposits does not constitute an unsafe or unsound practice with respect to such institution.

The Corporation had $100,000 of outstanding brokered deposits at March 31, 2013. At March 31, 2013, the Bank is adequately capitalized under PCA guidelines although it is precluded from accepting, renewing or rolling over brokered deposits without prior approval of the OCC. Under OCC requirements, a bank must have a total risk-based capital ratio of 8.0 percent or greater to be considered "adequately capitalized." The Bank continues to work toward the requirements of the previously issued Cease and Desist Order which requires a total risk-based capital ratio of 12.0 percent, which exceeds traditional capital levels for a bank. At March 31, 2013, the Bank had not yet met the elevated capital levels. See Note 2 to the Consolidated Financial Statements included in Item 8.

*Federal Home Loan Bank System.* The FHLB System consists of twelve regional FHLBs, each subject to supervision and regulation by the Federal Housing Finance Board, or FHFB. The FHLBs provide a central credit facility for member savings associations. Collateral is required. The Bank is a member of the FHLB of Chicago. The maximum amount that the FHLB of Chicago will advance fluctuates from time to time in accordance with changes in policies of the FHFB and the FHLB of Chicago, and the maximum amount generally is reduced by borrowings from any other source. In addition, the amount of FHLB advances that a savings association may obtain is restricted in the event the institution fails to maintain its status as a QTL.

*Federal Reserve System.* The Federal Reserve Board has adopted regulations that require savings associations to maintain non-earning reserves against their transaction accounts (primarily regular checking accounts). These reserves may be used to satisfy liquidity requirements imposed by the OCC. Because required reserves must be maintained in the form of cash or a non-interest-bearing account at a Federal Reserve Bank, the effect of this reserve requirement is to potentially reduce the amount of the Bank's interest-earning assets if branch cash is not sufficient to meet the required reserve.

*Transactions With Affiliates Restrictions.* Transactions between savings associations and any affiliate are governed by Section 11 of the HOLA and Sections 23A and 23B of the Federal Reserve Act and regulations thereunder. An affiliate of a savings association generally is any company or entity which controls, is controlled by or is under common control with the savings association. In a holding company context, the parent holding

18

Table of Contents

company of a savings association (such as the Corporation) and any companies which are controlled by such parent holding company are affiliates of the savings association. Generally, Section 23A limits the extent to which the savings association or its subsidiaries may engage in "covered transactions" with any one affiliate to an amount equal to 10% of such association's capital stock and surplus, and contains an aggregate limit on all such transactions with all affiliates to an amount equal to 20% of such capital stock and surplus. Section 23B applies to "covered transactions" as well as certain other transactions and requires that all transactions be on terms substantially the same, or at least as favorable, to the savings association as those provided to a non-affiliate. The term "covered transaction" includes the making of loans to, purchase of assets from and issuance of a guarantee to an affiliate and similar transactions. Section 23B transactions also apply to the provision of services and the sale of assets by a savings association to an affiliate. In addition to the restrictions imposed by Sections 23A and 23B, Section 11 of the HOLA prohibits a savings association from (i) making a loan or other extension of credit to an affiliate, except for any affiliate which engages only in certain activities which are permissible for bank holding companies, or (ii) purchasing or investing in any stocks, bonds, debentures, notes or similar obligations of any affiliate, except for affiliates which are subsidiaries of the savings association.

In addition, Sections 22(g) and (h) of the Federal Reserve Act place restrictions on extensions of credit to executive officers, directors and principal stockholders. Under Section 22(h), loans to a director, an executive officer and to a greater than 10% stockholder of a savings association ("a principal stockholder"), and certain affiliated interests of either, may not exceed, together with all other outstanding loans to such person and affiliated interests, the savings association's loans to one borrower limit (generally equal to 15% of the institution's unimpaired capital and surplus). Section 22(h) also requires that loans to directors, executive officers and principal stockholders be made on terms substantially the same as offered in comparable transactions to other persons unless the loans are made pursuant to a benefit or compensation program that (i) is widely available to employees of the institution and (ii) does not give preference to any director, executive officer or principal stockholder, or certain affiliated interests of either, over other employees of the savings institution. Section 22(h) also requires prior board approval for certain loans. In addition, the aggregate amount of extensions of credit by a savings institution to all insiders cannot exceed the institution's unimpaired capital and surplus. Furthermore, Section 22(g) places additional restrictions on loans to executive officers.

The Dodd – Frank Act expands the 23A and 23B affiliate transaction rules. Among other things, the scope of the definition of "covered transaction" under 23A has been expanded, collateral requirements increased, and certain exemptions eliminated. At March 31, 2013, the Bank was in compliance with the above restrictions.

*Anti – Money Laundering.* Financial institutions must maintain anti – money laundering programs that include established internal policies, procedures, and controls; a designated compliance officer; an ongoing employee training program; and testing of the program by an independent audit function. We are prohibited from entering into specified financial transactions and account relationships and must meet enhanced standards for due diligence in dealings with foreign financial institutions and foreign customers. We also must take reasonable steps to conduct enhanced scrutiny of account relationships to guard against money laundering and to report any suspicious transactions. Recent laws provide law enforcement authorities with increased access to financial information maintained by banks. Anti – money laundering obligations have been substantially strengthened as a result of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "USA Patriot Act"), enacted in 2001, renewed in 2006 and extended, in part, in 2011. Bank regulators routinely examine institutions for compliance with these obligations and are required to consider compliance in connection with the regulatory review of applications.

The USA Patriot Act amended, in part, the Bank Secrecy Act and provides for the facilitation of information sharing among governmental entities and financial institutions for the purpose of combating terrorism and money laundering. The statute also creates enhanced information collection tools and enforcement mechanics for the U.S. government, including: (1) requiring standards for verifying customer identification at account opening; (2) promulgating rules to promote cooperation among financial institutions, regulators, and law enforcement entities in identifying parties that may be involved in terrorism or money laundering; (3) requiring reports by

19

**Table of Contents**

nonfinancial trades and businesses filed with the Treasury's Financial Crimes Enforcement Network for transactions exceeding $10,000; and (4) mandating the filing of suspicious activities reports if a bank believes a customer may be violating U.S. laws and regulations. The statute also requires enhanced due diligence requirements for financial institutions that administer, maintain, or manage private bank accounts or correspondent accounts for non – U.S. persons.

The Federal Bureau of Investigation may send bank regulatory agencies lists of the names of persons suspected of involvement in terrorist activities. We may be subject to a request for a search of its records for any relationships or transactions with persons on those lists and may be required to report any identified relationships or transactions. Furthermore, the Office of Foreign Assets Control ("OFAC") is responsible for helping to ensure that U.S. entities do not engage in transactions with certain prohibited parties, as defined by various Executive Orders and Acts of Congress. OFAC has sent, and will send, bank regulatory agencies lists of names of persons and organizations suspected of aiding, harboring or engaging in terrorist acts, known as Specially Designated Nationals and Blocked Persons. If we find a name on any transaction, account or wire transfer that is on an OFAC list, we must freeze such account, file a suspicious activity report and notify the appropriate authorities.

*Privacy Regulation.* The Corporation and the Bank are subject to numerous privacy-related laws and their implementing regulations, including but not limited to Title V of the Gramm-Leach-Bliley Act, the Fair Credit Reporting Act, the Electronic Funds Transfer Act, the Right to Financial Privacy Act, the Children's Online Privacy Protection Act and other federal and state privacy and consumer protection laws. Those laws and the regulations promulgated under their authority can limit, under certain circumstances, the extent to which financial institutions may disclose nonpublic personal information that is specific to a particular individual to affiliated companies and nonaffiliated third parties. Moreover, the Bank is required to establish and maintain a comprehensive Information Security Program in accordance with the Interagency Guidelines Establishing Standards for Safeguarding Customer Information. The program must be designed to:

- ensure the security and confidentiality of customer information;

- protect against any anticipated threats or hazards to the security or integrity of such information; and

- protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer.

In addition, the Federal Trade Commission has implemented a nationwide "do not call" registry that allows consumers to prevent unsolicited telemarketing calls. Millions of households have placed their telephone numbers on this registry.

*Regulatory Enforcement Authority.* The enforcement powers available to federal banking agencies are substantial and include, among other things, the ability to assess civil money penalties, to issue cease-and-desist or removal orders and to initiate injunctive actions against insured institutions and institution-affiliated parties. In general, these enforcement actions may be initiated for violations of laws and regulations and unsafe or unsound practices. Other actions or inactions may provide the basis for enforcement action, including misleading or untimely reports filed with regulatory authorities.

*Sarbanes-Oxley Act of 2002.* The Sarbanes-Oxley Act of 2002 (i) created a public company accounting oversight board; (ii) strengthened auditor independence from corporate management; (iii) heightened the responsibility of public company directors and senior managers for the quality of the financial reporting and disclosure made by their companies; (iv) adopted a number of provisions to deter wrongdoing by corporate management; (v) imposed a number of new corporate disclosure requirements; (vi) adopted provisions which generally seek to limit and expose to public view possible conflicts of interest affecting securities analysts; and (vii) imposed a range of new criminal penalties for fraud and other wrongful acts, as well as extended the period during which certain types of lawsuits can be brought against a company or its insiders.

*Overdraft Fees.* The Federal Reserve Board adopted amendments under Regulation E that impose restrictions on banks' abilities to charge overdraft fees. The rule prohibits financial institutions from charging fees for paying

20

Table of Contents

overdrafts on ATM and one-time debit card transactions, unless a consumer consents, or opts in, to the overdraft service for those types of transactions.

*Interchange Fees.* The Dodd-Frank Act, through a provision known as the Durbin Amendment, required the Federal Reserve Board to establish standards for interchange fees that are "reasonable and proportional" to the cost of processing the debit card transaction and imposes other requirements on card networks. Institutions like the Bank with less than $10 billion in assets are exempt. However, while Anchor is under the $10 billion level that caps income per transaction, we have been affected by Federal Regulation II which prohibits network exclusivity arrangements and routing restrictions. Essentially, issuers and networks must allow transaction processing through a minimum of two unaffiliated networks. As a result of these additional processing alternatives, interchange income from our PIN/point of sale network has seen a significant decline.

*Source of Strength Doctrine.* Federal Reserve policy requires bank holding companies to act as a source of financial and managerial strength to their subsidiary banks. The Dodd-Frank Act requires this Federal Reserve policy to be made law. Under this policy, the holding company is expected to commit resources to support its bank subsidiary, including at times when the holding company may not be in a financial position to provide it. Any capital loans by a bank holding company to its subsidiary bank are subordinate in right of payment to deposits and to certain other indebtedness of such subsidiary bank. In the event of a bank holding company's bankruptcy, any commitment by the bank holding company to a federal bank regulatory agency to maintain the capital of a bank subsidiary will be assumed by the bankruptcy trustee and entitled to priority of payment.

*Emergency Economic Stabilization Act of 2008.* On October 3, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008 ("EESA"), giving the United States Department of the Treasury ("Treasury") authority to take certain actions to restore liquidity and stability to the U.S. banking markets. Based upon its authority in the EESA, a number of programs to implement EESA have been announced. Adopted programs still in effect include the following:

- Capital Purchase Program ("CPP"). Pursuant to this program, Treasury, on behalf of the U.S. government, purchased preferred stock, along with warrants to purchase common stock, from certain financial institutions, including bank holding companies, savings and loan holding companies and banks or savings associations not controlled by a holding company. During the time Treasury holds securities issued pursuant to this program, participating financial institutions will be required to comply with certain provisions regarding executive compensation and corporate governance. Participation in this program also imposed certain restrictions upon a participating institution's dividends to common shareholders and stock repurchase activities. As described further herein, we elected to participate in the CPP and received $110 million pursuant to the program.

- Permanent increase in deposit insurance coverage. Pursuant to the EESA, the FDIC temporarily raised the basic limit on federal deposit insurance coverage from $100,000 to $250,000 per depositor. Dodd-Frank permanently raised the limit to $250,000.

*The American Recovery and Reinvestment Act of 2009.* On February 17, 2009, the American Recovery and Reinvestment Act of 2009 ("ARRA") was signed into law. Included among the many provisions in ARRA are restrictions affecting financial institutions who are participants in TARP, which are set forth in the form of amendments to EESA. These amendments provide that during the period in which any obligation under TARP remains outstanding (other than obligations relating to outstanding warrants), TARP recipients are subject to appropriate standards for executive compensation and corporate governance which were set forth in an interim final rule regarding TARP standards for Compensation and Corporate Governance, issued by Treasury and effective on June 15, 2009 (the "Interim Final Rule"). Among the executive compensation and corporate governance provisions included in ARRA and the Interim Final Rule are the following:

- an incentive compensation "clawback" provision to cover "senior executive officers" (defined in this instance and below to mean the "named executive officers" for whom compensation disclosure is provided in the company's proxy statement) and the next 20 most highly compensated employees;

21

[Table of Contents](#)

- a prohibition on certain golden parachute payments to cover any payment related to a departure for any reason (with limited exceptions) made to any senior executive officer (as defined above) and the next five most highly compensated employees;

- a limitation on incentive compensation paid or accrued to the five most highly compensated employees of the financial institution, subject to limited exceptions for pre – existing arrangements set forth in written employment contracts executed on or prior to February 11, 2009, and certain awards of restricted stock which may not exceed 1/3 of annual compensation, are subject to a two year holding period and cannot be transferred until Treasury's preferred stock is redeemed in full;

- a requirement that the Company's chief executive officer and chief financial officer provide in annual securities filings, a written certification of compliance with the executive compensation and corporate governance provisions of the Interim Final Rule;

- an obligation for the compensation committee of the board of directors to evaluate with the company's chief risk officer certain compensation plans to ensure that such plans do not encourage unnecessary or excessive risks or the manipulation of reported earnings;

- a requirement that companies adopt a company – wide policy regarding excessive or luxury expenditures; and

- a requirement that companies permit a separate, non – binding shareholder vote to approve the compensation of executives.

The Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") was established pursuant to Section 121 of EESA and has the duty, among other things, to conduct, supervise, and coordinate audits and investigations of the purchase, management and sale of assets by the Treasury under TARP and the CPP, including the shares of non-voting preferred shares purchased from the Corporation. Thus, the Corporation is now also subject to supervision, regulation and investigation by SIGTARP by virtue of its participation in the TARP CPP.

In addition, companies who have issued preferred stock to Treasury under TARP are now permitted to redeem such investments at any time, subject to consultation with banking regulators. Upon such redemption, the warrants may be immediately liquidated by Treasury.

### Homeowners Affordability and Stability Plan

In February 2009, the Administration also announced its Financial Stability Plan and Homeowners Affordability and Stability Plan ("HASP"). The Financial Stability Plan is the second phase of TARP, to be administered by the Treasury. Its four key elements include:

- the development of a public/private investment fund essentially structured as a government sponsored enterprise with the mission to purchase troubled assets from banks with an initial capitalization from government funds;

- the Capital Assistance Program under which the Treasury will purchase additional preferred stock available only for banks that have undergone a new stress test given by their regulator;

- an expansion of the Federal Reserve's term asset-backed liquidity facility to support the purchase of up to $1 trillion in AAA – rated asset backed securities backed by consumer, student, and small business loans, and possible other types of loans; and

- the establishment of a mortgage loan modification program with $50 billion in federal funds further detailed in the HASP.

The HASP is a program aimed to help seven to nine million families restructure their mortgages to avoid foreclosure. The plan also develops guidance for loan modifications nationwide. HASP provides programs and

**Table of Contents**

funding for eligible refinancing of loans owned or guaranteed by Fannie Mae or Freddie Mac, along with incentives to lenders, mortgage servicers, and borrowers to modify mortgages of "responsible" homeowners who are at risk of defaulting on their mortgage. The goals of HASP are to assist in the prevention of home foreclosures and to help stabilize falling home prices.

Beyond the Company's participation in certain programs, such as TARP, the Company will benefit from these programs if they help stabilize the national banking system and aid in the recovery of the housing market.

**Dodd-Frank Act**

On July 21, 2010, President Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), which significantly changes the regulation of financial institutions and the financial services industry. The Dodd-Frank Act includes provisions affecting both large and small financial institutions, including several provisions that will affect how community banks, thrifts, and smaller bank and thrift holding companies, such as the Corporation, will be regulated in the future. Among other things, these provisions abolish the OTS and transfer its functions to the other federal banking agencies, relax rules regarding interstate branching, allow financial institutions to pay interest on business checking accounts, change the scope of federal deposit insurance coverage, and impose new capital requirements on bank and thrift holding companies. The Dodd-Frank Act also establishes the Bureau of Consumer Financial Protection as an independent entity within the Federal Reserve, which will be given the authority to promulgate consumer protection regulations applicable to all entities offering consumer financial services or products, including banks. Additionally, the Dodd-Frank Act includes a series of provisions covering mortgage loan origination standards affecting, among other things, originator compensation, minimum repayment standards, appraisals and pre-payments. The Dodd-Frank Act contains numerous other provisions affecting financial institutions of all types, many of which may have an impact on the operating environment of the Corporation in substantial and unpredictable ways. Consequently, the Dodd-Frank Act is likely to affect our cost of doing business, may limit or expand our permissible activities, and may affect the competitive balance within the financial services industry and market areas. The nature and extent of future legislative and regulatory changes affecting financial institutions, including as a result of the Dodd-Frank Act, continues to be unpredictable at this time with portions of the implementing regulations remaining unwritten. The Corporation's management continues to monitor the provisions of the Dodd-Frank Act, many of which continue to be phased-in, and assess the probable impact on the business, financial condition and results of operations of the Corporation. However, the ultimate effect of the Dodd-Frank Act on the financial services industry in general, and the Corporation in particular, is uncertain at this time.

**Federal Housing Finance Agency**

In January 2011, the Federal Housing Finance Agency (FHFA) announced that it directed Fannie Mae and Freddie Mac to work on a joint initiative, in coordination with FHFA and HUD, to consider alternatives for future mortgage servicing structures and servicing compensation for their single-family mortgage loans. Not all aspects of the joint initiative have yet been implemented and it is as yet uncertain how the financial services industry in general and the Bank specifically will be affected by the final requirements.

**Legislative and Regulatory Proposals**

Proposals to change the laws and regulations governing the operations and taxation of, and federal insurance premiums paid by, savings banks and other financial institutions and companies that control such institutions are frequently raised in the U.S. Congress, state legislatures and before the FDIC, the OCC and other bank regulatory authorities. The likelihood of any major changes in the future and the impact such changes might have on us or our subsidiaries are impossible to determine. Similarly, proposals to change the accounting treatment applicable to savings banks and other depository institutions are frequently raised by the SEC, the federal banking agencies, the IRS and other appropriate authorities, including, among others, proposals relating to fair market value

23

**Table of Contents**

accounting for certain classes of assets and liabilities. The likelihood and impact of any additional future accounting rule changes and the impact such changes might have on us or our subsidiaries are impossible to determine at this time.

**Taxation**

*Federal.* The Corporation files a consolidated federal income tax return on behalf of itself, the Bank and its subsidiaries on a fiscal tax year basis.

The Small Business Job Protection Act of 1996 (the "Job Protection Act") repealed the "reserve method" of accounting for bad debts by most thrift institutions effective for the taxable years beginning after 1995. Larger thrift institutions such as the Bank are now required to use the "specific charge-off method." The Job Protection Act also granted partial relief from reserve recapture provisions, which are triggered by the change in method. This legislation did not have a material impact on the Bank's financial condition or results of operations.

*State.* Under current law, the state of Wisconsin imposes a corporate franchise tax of 7.9% on the separate taxable incomes of the members of the Corporation's consolidated income tax group.

24

**Table of Contents**

**Item 1A.       Risk Factors**

*Set forth below and elsewhere in this Annual Report on Form 10–K and in other documents we file with the SEC are risks and uncertainties that could cause actual results to differ materially from the results contemplated by the forward-looking statements contained in this Annual Report on Form 10–K. The risks described below are not the only ones facing our company. Additional risks not presently known to us or that we currently deem immaterial may also impair our business operations. Our business, financial condition, results of operations or prospects could be materially and adversely affected by any of these risks. The trading price of, and market for, shares of our common stock could decline due to any of these risks. This report, including the documents incorporated by reference herein, also contain forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those anticipated in these forward-looking statements as a result of certain factors, including the risks described below and in the documents incorporated by reference herein.*

**Risks Related to Our Industry**

***Our business may be adversely affected by the slow economic recovery, current conditions in the financial markets, the real estate market and economic conditions generally.***

The slow economic recovery has continued to result in decreased lending by some financial institutions to their customers and to each other. This has continued to result in lack of customer confidence, increased market volatility and a widespread reduction in general business activity. Competition among depository institutions for deposits continues to be high, and access to deposits or borrowed funds remains lower than average.

***The soundness of other financial institutions could negatively affect us.***

Our ability to engage in routine funding transactions could be adversely affected by the actions and commercial soundness of other financial institutions. Financial services institutions are interrelated as a result of trading, clearing, counterparty, or other relationships. As a result, defaults by, or even rumors or questions about, one or more financial services institutions, or the financial services industry generally, have led to market-wide liquidity problems and could lead to losses or defaults by us or by other institutions. Many of these transactions expose us to credit risk in the event of default of our counterparty or client. In addition, our credit risk may be exacerbated when the collateral held by us cannot be realized upon or is liquidated at prices not sufficient to recover the full amount of the financial instrument exposure due us. There is no assurance that any such losses would not materially and adversely affect our results of operations.

***Regulation by federal and state agencies could adversely affect our business, revenue, and profit margins.***

We are heavily regulated by federal and state agencies. This regulation is to protect depositors, the federal deposit insurance fund and the banking system as a whole. Congress and state legislatures and federal and state regulatory agencies continually review banking laws, regulations, and policies for possible changes. Changes to statutes, regulations, or regulatory policies, including interpretation or implementation of statutes, regulations, or policies, could affect us adversely, including limiting the types of financial services and products we may offer and/or increasing the ability of non-banks to offer competing financial services and products. Also, if we do not comply with laws, regulations, or policies, we could receive regulatory sanctions and damage to our reputation.

***Competition in the financial services industry is intense and could result in losing business or reducing margins.***

We operate in a highly competitive industry that could become even more competitive as a result of legislative, regulatory and technological changes, and continued consolidation. We face aggressive competition from other domestic and foreign lending institutions and from numerous other providers of financial services. The ability of non-banking financial institutions to provide services previously limited to commercial banks has intensified competition. Because non-banking financial institutions are not subject to the same regulatory restrictions as banks and bank holding companies, they can often operate with greater flexibility and lower cost structures.

25

**Table of Contents**

Securities firms and insurance companies that elect to become financial holding companies may acquire banks and other financial institutions. This may significantly change the competitive environment in which we conduct business. Some of our competitors have greater financial resources and/or face fewer regulatory constraints. As a result of these various sources of competition, we could lose business to competitors or be forced to price products and services on less advantageous terms to retain or attract clients, either of which would adversely affect our profitability.

*We continually encounter technological change.*

The financial services industry is continually undergoing rapid technological change with frequent introductions of new technology-driven products and services. The effective use of technology increases efficiency and enables financial institutions to better serve customers and to reduce costs. Our future success depends, in part, upon our ability to address the needs of our customers by using technology to provide products and services that will satisfy customer demands, as well as to create additional efficiencies in our operations. Many competitors have substantially greater resources to invest in technological improvements. We may not be able to effectively implement new technology-driven products and services or be successful in marketing these products and services to our customers. Failure to successfully keep pace with technological change affecting the financial services industry could have a material adverse impact on our business and, in turn, our financial condition, results of operations and cash flows.

**Risks Related to Our Business**

*We experienced a net loss in fiscal 2013 directly attributable to a substantial deterioration in our loan and OREO portfolios and the resulting provision for loan losses and valuation adjustments to owned properties.*

We realized a net loss of $34.2 million in fiscal 2013. The net loss is primarily the result of a $9.1 million provision to our credit loss reserve and valuation adjustments totaling $26.7 million on our portfolio of repossessed property. The credit loss reserve is the amount required to maintain the allowance for loan losses at an adequate level to absorb probable loan losses. The provision for credit losses is primarily attributable to our residential construction and residential land loan portfolios, which continue to experience deterioration in estimated collateral values and repayment abilities of some of our customers. Other reasons for the level of the provision for credit losses are attributable to the continued weak economic conditions and decline in real estate values in the markets served by the Corporation.

At March 31, 2013, our non-performing loans (consisting of loans past due more than 90 days, loans less than 90 days delinquent but placed on non-accrual status due to anticipated probable loss and non-accrual troubled debt restructurings) were $118.8 million compared to $224.9 million at March 31, 2012. For the year ended March 31, 2013, net charge-offs as a percentage of average loans were 1.97% compared to 3.14% for the corresponding period in 2012.

Despite the improvement in the State of Wisconsin unemployment rate from 7.5% at March 31, 2012 to 7.2% at March 31, 2013, the economy remains fragile. The deterioration in our land and construction loan portfolios has been caused primarily by the weakening economy and the slowdown in sales of the housing market. With many real estate projects requiring an extended time to market, some of our borrowers have exhausted their liquidity which may require us to place their loans into non-accrual status.

*Our auditors have expressed substantial doubt about our ability to continue as a going concern.*

Our auditors have expressed substantial doubt about our ability to continue as a going concern. Continued operations depend on our ability to meet our existing debt obligations and the financing or other capital required to do so may not be available or may not be available on reasonable terms. The Bank has low levels of capital, significant operating losses and significant deterioration in the quality of its assets. Further, we have become subject to enhanced regulatory scrutiny. The potential lack of sources of liquidity raises substantial doubt about our ability to continue as a going concern for the foreseeable future. Our Consolidated Financial Statements were

26

**Table of Contents**

prepared under the assumption that we will continue our operations on a going concern basis, which contemplates the realization of assets and the discharge of liabilities in the normal course of business. Our Consolidated Financial Statements do not include any adjustments that might be necessary if we are unable to continue as a going concern. If we cannot continue as a going concern, our shareholders will lose some or all of their investment.

We have been and continue to actively pursue a broad range of strategic alternatives in order to address any doubt related to the Corporation's ability to continue as a going concern. There can be no assurance that the pursuit of strategic alternatives will result in any transaction, or that any such transaction, if consummated, will allow the Corporation's shareholders to avoid a loss of all or substantially all of their investment in the Corporation. In addition, a transaction, which would likely involve equity financing, would result in substantial dilution to our current shareholders and could adversely affect the price of our common stock. The pursuit of strategic alternatives may also involve significant expenses and management time and attention.

*We reported material weaknesses in our internal control over financial reporting in the fiscal year ending March 2011 and if additional material weaknesses are discovered in the future, our stock price and investor confidence in us may be adversely affected.*

A material weakness is a control deficiency, or combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim consolidated financial statements will not be prevented or detected. In connection with management's assessments of our internal control over financial reporting in the fiscal year ending March 2011 and interim quarterly periods in that fiscal year, material weaknesses were identified in our internal control over financial reporting.

We believe we have taken the steps necessary to remediate certain material weaknesses identified during these periods. The controls implemented to remediate these material weaknesses were determined to be operating effectively as of March 31, 2012 and 2013.

We may, in the future, identify additional internal control deficiencies that could rise to the level of a material weakness or uncover errors in financial reporting. Material weaknesses in our internal control over financial reporting may cause investors to lose confidence in us, which could have an adverse effect on our business and stock price.

*The Bank may be subject to a federal conservatorship or receivership if it cannot comply with the Cease and Desist Order, the Capital Restoration Plan, or if its condition continues to deteriorate.*

In June 2009, the Bank voluntarily entered into a Cease and Desist Order with the OTS (now administered by the OCC) which required, among other things, capital requirements in excess of the generally applicable minimum requirements. The Bank was also required to create and implement a Capital Restoration Plan. The condition of the Bank's loan portfolio may continue to deteriorate in the current economic environment and thus continue to deplete the Bank's capital and other financial resources. Therefore, should the Bank fail to comply with the Cease and Desist Order, fail to fulfill the terms of its Capital Restoration Plan, fail to comply with capital and liquidity funding requirements, or suffer a continued deterioration in its financial condition, the Bank may be subject to being placed into a federal conservatorship or receivership by the OCC, with the FDIC appointed as conservator or receiver. If these events occur, the Corporation probably would suffer a complete loss of the value of its ownership interest in the Bank, and the Corporation subsequently may be exposed to significant claims by the FDIC and the OCC.

*Our business is subject to liquidity risk, and changes in our source of funds may adversely affect our performance and financial condition by increasing our cost of funds.*

Our ability to make loans is directly related to our ability to secure funding. Retail deposits and core deposits are our primary source of liquidity. We also rely on advances from the FHLB of Chicago as a funding source. We have also been granted access to Federal Reserve Bank of Chicago's discount window, but as of March 31, 2013

27

**Table of Contents**

we had no borrowings outstanding from this source. In addition, as of March 31, 2013, the Corporation had outstanding borrowings from the FHLB of $197.5 million, out of our maximum borrowing capacity from the FHLB at this time, based on collateral currently pledged, of $592.8 million.

Primary uses of funds include withdrawal of and interest payments on deposits, originations of loans and payment of operating expenses. Core deposits represent a significant source of low-cost funds. Alternative funding sources such as large balance time deposits or borrowings are a comparatively higher-cost source of funds. Liquidity risk arises from the inability to meet obligations when they come due or to manage unplanned decreases or changes in funding sources. Although we believe we can continue to pursue our core deposit funding strategy successfully, significant fluctuations in core deposit balances may adversely affect our financial condition and results of operations.

***Our liquidity is largely dependent upon our ability to receive dividends from the Bank, which accounts for most of our revenue and could affect our ability to pay dividends, and we may be unable to enhance liquidity from other sources.***

We are a separate and distinct legal entity from our subsidiaries, including the Bank. We receive substantially all of our revenue from dividends from the Bank. These dividends are the principal source of funds to pay dividends on our common stock and interest and principal on our debt. Various federal and/or state laws and regulations limit the amount of dividends that the Bank and certain of our non-bank subsidiaries may pay us. Additionally, if our subsidiaries' earnings are not sufficient to make dividend payments to us while maintaining adequate capital levels, our ability to make dividend payments to our preferred and common shareholders will be negatively impacted. The Bank is currently precluded from paying dividends to the Corporation.

***Additional increases in our level of non-performing assets would have an adverse effect on our financial condition and results of operations.***

Weakening conditions in the real estate sector have adversely affected, and may continue to adversely affect, our loan portfolio. Non-performing assets decreased by $110.6 million to $203.1 million, or 8.58% of total assets, at March 31, 2013 from $313.8 million, or 11.25% of total assets, at March 31, 2012. If loans that are currently non-performing further deteriorate, we may need to increase our allowance to cover additional charge-offs. If loans that are currently performing become non-performing, we may need to continue to increase our allowance for loan losses if additional losses are anticipated which would have an adverse impact on our financial condition and results of operations. The increased time and expense associated with the work out of non-performing assets and potential non-performing assets also could adversely affect our operations.

***Future equity financing will adversely affect the market price of the Corporation's common stock and dilute the Corporation's equity.***

We have been seeking additional equity financing to provide additional capital for the Corporation. Based on discussions with possible equity participants to date, we believe that any such financing is likely to be at a per share price significantly below the current market price, and as a result, the market price of the Corporation's common stock would decline significantly. In addition, we believe the issuance of additional capital stock would dilute the ownership interest of the Corporation's existing shareholders.

***Holders of our common stock have no preemptive rights and are subject to potential dilution.***

Our articles of incorporation do not provide any shareholder with a preemptive right to subscribe for additional shares of common stock upon any increase thereof. Thus, upon the issuance of any additional shares of common stock or other voting securities of the Company or securities convertible into common stock or other voting securities, shareholders may be unable to maintain their pro rata voting or ownership interest in the Corporation.

**Table of Contents**

***On June 26, 2009, the Corporation and the Bank each consented to the issuance of an Order to Cease and Desist by the Office of Thrift Supervision (now administered by the OCC and the Federal Reserve). If we do not raise additional capital, we may not be in compliance with the capital requirements of the Bank's Cease and Desist Order, which could have a material adverse effect upon us.***

The Cease and Desist Orders required that, no later than December 31, 2009, the Bank had to meet and maintain both a core capital ratio equal to or greater than eight percent and a total risk-based capital ratio equal to or greater than twelve percent. At March 31, 2013, the Bank and Corporation had complied with all aspects of the Cease and Desist Orders, except that the Bank, based upon presently available audited financial information, had tier 1 leverage (core) capital and total risk-based capital ratios of 4.53 percent and 9.02 percent, respectively, each below the required capital ratios set in the Cease and Desist Orders. Without a waiver by the OCC or an amendment or modification of the Orders, the Bank could be subject to further regulatory action.

All customer deposits remain fully insured to the highest limits set by the FDIC.

If the Bank is placed in conservatorship or receivership, it is highly likely that such action would lead to a complete loss of all value of the Company's ownership interest in the Bank. In addition, further restrictions could be placed on the Bank if it were determined that the Bank was significantly undercapitalized, or critically undercapitalized, with increasingly greater restrictions being imposed as any level of undercapitalization increased.

***Although the Bank is considered "adequately capitalized" under PCA guidelines for regulatory purposes, we will incur increased premiums for deposit insurance and will trigger acceleration of certain of our brokered deposits if we fall below the "adequately capitalized" threshold.***

In April 2011, the FDIC issued new base assessment rates dependent upon the risk category assigned to an institution. These rates range between twelve and 45 basis points. The revised assessment criteria is a risk-based determination, rather than solely based on capital levels. Higher insurance premiums may be assessed to institutions that fall in the higher risk categories, which would impact earnings.

***Our allowance for losses on loans may not be adequate to cover probable losses.***

Our level of non-performing loans decreased significantly in the fiscal year ended March 31, 2013, relative to the preceding year. Our provision for credit losses decreased by $24.5 million to $9.1 million for the fiscal year ended March 31, 2013 from $33.6 million for the fiscal year ended March 31, 2012. Our allowance for loan losses decreased by $31.4 million to $79.8 million, or 4.5% of total loans, at March 31, 2013 from $111.2 million, or 5.1% of total loans at March 31, 2012. Our allowance for loan and OREO losses was 57.0% at March 31, 2013, 42.6% at March 31, 2012 and 45.6% at March 31, 2011, respectively, of non-performing assets. There can be no assurance that any future declines in real estate market conditions and values, general economic conditions or changes in regulatory policies will not require us to increase our allowance for loan losses, which would adversely affect our results of operations.

***If our investment in the common stock of the Federal Home Loan Bank of Chicago is other than temporarily impaired, our financial condition and results of operations could be materially impaired.***

The Bank owns common stock of the Federal Home Loan Bank of Chicago ("FHLBC"). The common stock is held to qualify for membership in the Federal Home Loan Bank System and to be eligible to borrow funds under the FHLBC's advance program. The aggregate cost and fair value of our FHLBC common stock as of March 31, 2013 was $25.6 million, based on its par value. There is no market for the FHLBC common stock and, while redemptions may be requested, they are at the discretion of the FHLBC.

The Bank evaluates the FHLBC stock for impairment on a regular basis. The determination of whether FHLB stock is impaired depends on a number of factors and is based on an assessment of the ultimate recoverability of

29

**Table of Contents**

cost rather than changes in the book value of the shares. If our investment in the common stock of the Federal Home Loan Bank of Chicago were to become other than temporarily impaired, our financial condition and results of operations could be materially affected.

***We are not paying dividends on our common stock and are deferring distributions on our preferred stock, and are otherwise restricted from paying cash dividends on our common stock. The failure to resume paying dividends may adversely affect us.***

We historically paid cash dividends before suspending dividend payments on our common stock. The Federal Reserve, as a matter of policy, has indicated that bank holding companies should not pay dividends using funds from TARP CPP. There is no assurance that we will resume paying cash dividends. Even if we resume paying dividends, future payment of cash dividends on our common stock, if any, will be subject to the prior payment of all unpaid dividends and deferred distributions on our Series B Preferred Stock held by the U.S. Treasury. All dividends are declared and paid at the discretion of our board of directors and are dependent upon our liquidity, financial condition, results of operations, capital requirements and such other factors as our board of directors may deem relevant.

Further, dividend payments on our Series B Preferred Stock are cumulative and therefore unpaid dividends and distributions will accrue and compound on each subsequent dividend payment date. In the event of any liquidation, dissolution or winding up of the affairs of our company, holders of the Series B Preferred Stock shall be entitled to receive for each share of Series B Preferred Stock the liquidation amount plus the amount of any accrued and unpaid dividends. Upon deferring six quarterly dividend payments, whether or not consecutive, the Treasury obtained the right to appoint two directors to our board of directors until all accrued but unpaid dividends have been paid. We have deferred 16 dividend payments on the Series B Preferred Stock held by the Treasury as of March 31, 2013. On September 30, 2011, the Treasury exercised its right to appoint two directors to the Board of Directors of the Corporation. Treasury is the sole stockholder of the Corporation's Fixed Rate Cumulative Perpetual Preferred Stock, series B and as such has the right to appoint two directors.

***Maintaining or increasing market share depends on market acceptance and regulatory approval of new products and services.***

Our success depends, in part, on the ability to adapt products and services to evolving industry standards. There is increasing pressure to provide products and services at lower prices. This can reduce net interest income and noninterest income from fee-based products and services. In addition, the widespread adoption of new technologies could require us to make substantial capital expenditures to modify or adapt existing products and services or develop new products and services. We may not be successful in introducing new products and services in response to industry trends or development in technology or those new products may not achieve market acceptance. As a result, we could lose business, be forced to price products and services on less advantageous terms to retain or attract clients, or be subject to cost increases.

***Continued deterioration in the real estate markets or other segments of our loan portfolio could lead to additional losses, which could have a material negative effect on our financial condition and results of operations.***

The commercial real estate market continues to experience a variety of difficulties. As a result of increased levels of commercial and consumer delinquencies and declining real estate values, which reduce the customer's borrowing power and the value of the collateral securing the loan, we have experienced increasing levels of charge-offs and provisions for credit losses. Continued increases in delinquency levels or continued declines in real estate values, which cause our borrowers' loan-to-value ratios to increase, could result in additional charge-offs and provisions for credit losses. This could have a material negative effect on our business and results of operations.

30

**Table of Contents**

*Significant legal actions could subject us to substantial uninsured liabilities.*

We are from time to time subject to claims related to our operations. These claims and legal actions, including supervisory actions by our regulators, could involve large monetary claims and significant defense costs. Substantial legal liability or significant regulatory action against us could have material adverse financial effects or cause significant reputational harm to us, which in turn could seriously harm our business prospects. We may be exposed to substantial uninsured liabilities, which could adversely affect our results of operations and financial condition.

*While we attempt to manage the risk from changes in market interest rates, interest rate risk management techniques are not exact. In addition, we may not be able to economically hedge our interest rate risk. A rapid or substantial increase or decrease in interest rates could adversely affect our net interest income and results of operations.*

Our net income depends primarily upon our net interest income. Net interest income is income that remains after deducting, from total income generated by earning assets, the interest expense attributable to the acquisition of the funds required to support earning assets. Income from earning assets includes income from loans, investment securities and short-term investments. The amount of interest income is dependent on many factors, including the volume of earning assets, the general level of interest rates, the dynamics of changes in interest rates and the level of nonperforming loans. The cost of funds varies with the amount of funds required to support earning assets, the rates paid to attract and hold deposits, rates paid on borrowed funds and the levels of non-interest-bearing demand deposits and equity capital.

Different types of assets and liabilities may react differently, and at different times, to changes in market interest rates. We expect that we will periodically experience "gaps" in the interest rate sensitivities of our assets and liabilities. That means either our interest-bearing liabilities will be more sensitive to changes in market interest rates than our interest earning assets, or vice versa. When interest-bearing liabilities mature or reprice more quickly than interest earning assets, an increase in market rates of interest could reduce our net interest income. Likewise, when interest-earning assets mature or reprice more quickly than interest-bearing liabilities, falling interest rates could reduce net interest income. We are unable to predict changes in market interest rates which are affected by many factors beyond our control including inflation, recession, unemployment, money supply, domestic and international events and changes in the United States and other financial markets. Based on our net interest income simulation model, if market interest rates were to increase immediately by 100 or 200 basis points (a parallel and immediate shift of the yield curve) net interest income would be expected to increase by 7.3% and 6.4%, respectively, from what it would be if rates were to remain at March 31, 2013 levels. The actual amount of any increase or decrease may be higher or lower than that predicted by our simulation model. The amounts and assumptions used in the simulation model should not be viewed as indicative of expected actual results. Actual results will differ from simulated results due to the timing, magnitude and frequency of interest rate changes as well as changes in market conditions and management strategies. Net interest income is not only affected by the level and direction of interest rates, but also by the shape of the yield curve, credit spreads, relationships between interest sensitive instruments and key driver rates, balance sheet growth, client loan and deposit preferences and the timing of changes in these variables.

*An interruption in or breach in security of our information systems may result in a loss of customer business.*

We rely heavily on communications and information systems to conduct our business. Any failure or interruptions or breach in security of these systems could result in failures or disruptions in our customer relationship management, general ledger, deposits, servicing, or loan origination systems. The occurrence of any failures, interruptions or security breaches of information systems used to process customer transactions could damage our reputation, result in a loss of customer business, subject us to additional regulatory scrutiny, or expose us to civil litigation and possible financial liability, any of which could have a material adverse effect on our financial condition, results of operations and cash flows.

31

**Table of Contents**

Additionally, we outsource portions of our data processing to third parties. If our third party provider encounters difficulties or if we have difficulty in communicating with such third party, it will significantly affect our ability to adequately process and account for customer transactions, which would significantly affect our business operations. Furthermore, breaches of such third party's technology may also cause reimbursable loss to our consumer and business customers, through no fault of our own.

Management regularly reviews and updates our internal controls, disclosure controls and procedures, and corporate governance policies and procedures. Any system of controls, however well designed and operated, is based in part on certain assumptions and can provide only reasonable, not absolute, assurances that the objectives of the system are met. Any failure or circumvention of our controls and procedures or failure to comply with regulations related to controls and procedures could have a material adverse effect on our business, results of operations, cash flows and financial condition.

### *Severe weather, natural disasters, acts of war or terrorism and other external events could significantly impact our business.*

Severe weather, natural disasters, acts of war or terrorism and other adverse external events could have a significant impact on our ability to conduct business. Such events could affect the stability of our deposit base; impair the ability of borrowers to repay outstanding loans, impair the value of collateral securing loans, cause significant property damage, result in loss of revenue and/or cause us to incur additional expenses. Although management has established disaster recovery policies and procedures and is insured for these situations, the occurrence of any such event could have a material adverse effect on our business, which, in turn, could have a material adverse effect on our financial condition, results of operations and cash flows.

### *The Corporation is exposed to risk of environmental liabilities with respect to properties to which we take title.*

In the course of our business, we may own or foreclose and take title to real estate, and could be subject to environmental liabilities with respect to these properties. We may be held liable to a governmental entity or to third parties for property damage, personal injury, investigation and clean-up costs incurred by these parties in connection with environmental contamination, or may be required to investigate or clean up hazardous or toxic substances, or chemical releases at a property. The costs associated with investigation or remediation activities could be substantial. In addition, as the owner or former owner of a contaminated site, we may be subject to common law claims by third parties based on damages and costs resulting from environmental contamination emanating from the property. If we ever become subject to significant environmental liabilities, our business, financial condition, cash flows, liquidity and results of operations could be materially and adversely affected.

### *Our regional concentration makes us particularly at risk for changes in economic conditions in our primary market.*

Our business is primary located in Wisconsin. Thus, we are particularly vulnerable to adverse changes in economic conditions in Wisconsin and the Midwest more generally.

### *Our asset valuations include observable inputs and may include methodologies, estimations and assumptions that are subject to differing interpretations and could result in changes to asset valuations that may materially adversely affect our results of operations or financial condition.*

We must use estimates, assumptions and judgments when financial assets and liabilities are measured and reported at fair value. Assets and liabilities carried at fair value inherently result in a higher degree of financial statement volatility. Fair values and the information used to record valuation adjustments for certain assets and liabilities are based on quoted market prices and/or other observable inputs provided by independent third – party sources, when available. When such third – party information is not available, we estimate fair value primarily by using cash flows and other financial modeling techniques utilizing assumptions such as credit quality, liquidity,

32

**Table of Contents**

interest rates and other relevant inputs. Changes in underlying inputs, factors, assumptions or estimates in any of the areas underlying our estimates could materially impact our future financial condition and results of operations.

During periods of market disruption, including periods of significantly rising or high interest rates, rapidly widening credit spreads or illiquidity, it may be more difficult to value certain of our assets if trading becomes less frequent and/or market data becomes less observable. There may be certain asset classes that were in active markets with significant observable data that become illiquid due to the current financial environment. In such cases, certain asset valuations may require more subjectivity and management judgment. As such, valuations may include inputs and assumptions that are less observable or require greater estimation. Further, rapidly changing and unprecedented credit and equity market conditions and interest rates could materially impact the valuation of assets as reported within our consolidated financial statements, and the period – to – period changes in value could vary significantly.

***Lenders may be required to repurchase mortgage loans or indemnify mortgage loan purchasers as a result of breaches of representations and warranties, borrower fraud, or certain borrower defaults, which could harm our liquidity, results of operations and financial condition.***

When we sell mortgage loans, whether as whole loans or pursuant to a securitization, we are required to make customary representations and warranties to the purchaser about the mortgage loans and the manner in which they were originated. Our whole loan sale agreements require us to repurchase or substitute mortgage loans in the event we breach any of these representations or warranties. In addition, we may be required to repurchase mortgage loans as a result of borrower fraud. Likewise, we are required to repurchase or substitute mortgage loans if we breach a representation or warranty in connection with our securitizations. While we have taken steps to enhance our underwriting policies and procedures, there can be no assurance that these steps will be effective or reduce risk associated with loans sold in the past. Historically, the volume of repurchases has been insignificant although has increased in fiscal year ending March 31, 2013. If the level of repurchase and indemnity activity becomes material, our liquidity, results of operations and financial condition will be adversely affected.

***Our Shareholder Rights Plan limits our likelihood of being acquired in a manner not approved by our Board.***

On November 5, 2010 we entered into a shareholder rights plan designed to reduce the likelihood that we will experience an "ownership change" under U.S. federal income tax laws. The existence of the rights plan may make it more difficult, delay, discourage, prevent or make it more costly to acquire or effect a change-in-control that is not approved by our Board, which in turn could prevent our shareholders from recognizing a gain in the event that a favorable offer is extended and could materially and negatively affect the market price of our common stock.

### Risks Related to Our Credit Agreement

***We are party to a credit agreement that requires us to observe certain covenants that limit our flexibility in operating our business.***

We are party to a credit agreement, dated as of June 9, 2008, by and among the Corporation, the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders, as amended (the "Credit Agreement"). The most recent amendment, Amendment No. 9 to the Amended and Restated Credit Agreement is dated November 30, 2012. The Credit Agreement requires us to comply with affirmative and negative covenants customary for restricted indebtedness. These covenants limit our ability to, among other things:

- incur additional indebtedness or issue certain preferred shares;

- pay dividends on, repurchase or make distributions in respect of our capital stock or make other restricted payments;

33

Table of Contents

- make certain investments;

- sell certain assets; and

- consolidate, merge, sell or otherwise dispose of all or substantially all of the Corporation's assets.

The Credit Agreement provides that the Bank must attain and maintain certain capital ratios and requires us to retain a financial consultant, as well as other customary representations, warranties, conditions and events of default for agreements of such type. The Agent and the lenders have certain rights, including the right to accelerate the maturity of the borrowings if all covenants are not complied with. Further, the Agent or the lenders have agreed to forbear from exercising their rights and remedies until the earlier of (i) the occurrence of an event of default, as that term is defined in the Amendment, other than failure to make principal payments, or (ii) June 30, 2013.

If the lenders under the secured credit facilities accelerate the repayment of borrowings, we may not have sufficient assets to make the payments when due.

Accordingly, this creates significant uncertainty related to the Corporation's operations.

***We must pay in full the outstanding balance under the Credit Agreement by the earlier of June 30, 2013 or the receipt of net proceeds of a financing transaction from the sale of equity securities.***

As of March 31, 2013, the total revolving loan commitment under the Credit Agreement was $116.3 million and aggregate borrowings under the Credit Agreement were $116.3 million plus accrued interest and amendment fees payable of $53.3 million and $6.9 million, respectively. We must pay in full the outstanding balance under the Credit Agreement by the earlier of June 30, 2013 or the receipt of net proceeds of a financing transaction from the sale of equity securities of not less than $116.3 million. If the net proceeds are received from the U.S. Department of the Treasury and the terms of such investment prohibit the use of the investment proceeds to repay senior debt, then no payment is required from the Treasury investment. As of the date of this filing, we do not have sufficient cash on hand to reduce our outstanding borrowings and probably cannot raise sufficient capital or have sufficient cash on hand to reduce our outstanding borrowings to zero by June 30, 2013, which may limit our ability to fund ongoing operations.

Unless the maturity date is extended, our outstanding borrowings under our Credit Agreement are due on June 30, 2013. The Credit Agreement does not include a commitment to refinance the remaining outstanding balance of the loans when they mature and there is no guarantee that our lenders will renew their loans at that time. Refusal to provide us with renewals or refinancing opportunities would cause our indebtedness to become immediately due and payable upon the contractual maturity of such indebtedness, which could result in our insolvency if we are unable to repay the debt.

If the Agent or the lenders decided not to refinance the remaining outstanding balance of the loans then at the earlier of (i) the occurrence of an event of default under the Amendment (other than a failure to make principal payments), or (ii) June 30 2013, the agent, on behalf of the lenders may, among other remedies, seize the outstanding shares of the Bank's capital stock held by the Corporation or other securities or assets of the Corporation's subsidiaries which have been pledged as collateral for borrowings under the Credit Agreement. If the Agent were to take one or more of these actions, it could have a material adverse affect on our reputation, operations and ability to continue as a going concern, and the common shareholders could lose all of their investment.

If we are unable to renew, replace or expand our sources of financing on acceptable terms, it may have an adverse effect on our business and results of operations and our ability to make distributions to shareholders. Upon liquidation, holders of our debt securities and lenders with respect to other borrowings will receive, and any holders of preferred stock that is currently outstanding and that we may issue in the future may receive, a

Table of Contents

distribution of our available assets prior to holders of our common stock. The decisions by investors and lenders to enter into equity and financing transactions with us will depend upon a number of factors, including our historical and projected financial performance, compliance with the terms of our current credit arrangements, industry and market trends, the availability of capital and our investors' and lenders' policies and rates applicable thereto, and the relative attractiveness of alternative investment or lending opportunities.

**Risks Related to Recent Market, Legislative and Regulatory Events**

***We are highly dependent upon programs administered by Fannie Mae, Freddie Mac and Ginnie Mae. Changes in existing U.S. government – sponsored mortgage programs or servicing eligibility standards could materially and adversely affect our business, financial position, results of operations or cash flows.***

Our ability to generate revenues through mortgage loan sales to institutional investors in the form of mortgage – backed securities depends to a significant degree on programs administered by Fannie Mae, Freddie Mac, Ginnie Mae and others that facilitate the issuance of mortgage – backed securities in the secondary market. These entities play a powerful role in the residential mortgage industry, and we have significant business relationships with them. Our status as a Fannie Mae and Freddie Mac approved seller/servicer is subject to compliance with each entity's respective selling and servicing guides.

During fiscal 2013, 92% of our mortgage loan sales were sold to, or were sold pursuant to programs sponsored by, Fannie Mae or Freddie Mac. We also derive other material financial benefits from our relationships with Fannie Mae and Freddie Mac, including the assumption of credit risk by these entities on loans included in mortgage – backed securities in exchange for our payment of guarantee fees and the ability to avoid certain loan inventory finance costs through streamlined loan funding and sale procedures. Any discontinuation of, or significant reduction or material change in, the operation of these entities or any significant adverse change in the level of activity in the secondary mortgage market or the underwriting criteria of these entities would likely prevent us from originating and selling most, if not all, of our mortgage loan originations.

In addition, we service loans on behalf of Fannie Mae and Freddie Mac, as well as loans that have been securitized pursuant to securitization programs sponsored by Fannie Mae and Freddie Mac in connection with the issuance of agency guaranteed mortgage – backed securities and a majority of our mortgage servicing rights relate to these servicing activities. These entities establish the base service fee in which to compensate us for servicing loans. In January 2011, the Federal Housing Finance Agency directed Fannie Mae and Freddie Mac to develop a joint initiative to consider alternatives for future mortgage servicing structures and compensation. Under this proposal, the GSEs are considering potential structures in which the minimum service fee would be reduced or eliminated altogether. The GSEs are also considering different pricing options for non – performing loans to better align servicer incentives with MBS investors and provide the loan guarantor the ability to transfer non – performing servicing. These proposals, if adopted, could result in changes that impact the entire mortgage industry, possibly reducing capital requirements and increasing competition by lowering barriers to entry on mortgage originations and increasing the concentration of performing loans with larger servicers.

The potential changes to the government – sponsored mortgage programs, and related servicing compensation structures, could require us to fundamentally change our business model in order to effectively compete in the market. Our inability to make the necessary changes to respond to these changing market conditions or loss of our approved seller/servicer status with any of these entities, would have a material adverse effect on our overall business and our consolidated financial position, results of operations and cash flows.

***The TARP CPP and the ARRA impose certain executive compensation and corporate governance requirements that may adversely affect us and our business, including our ability to recruit and retain qualified employees.***

The purchase agreement we entered into in connection with our participation in the TARP CPP required us to adopt the Treasury's standards for executive compensation and corporate governance while the Treasury holds the equity issued pursuant to the TARP CPP, including the common stock which may be issued pursuant to the

35

**Table of Contents**

warrant to purchase 7,399,103 shares of common stock. These standards generally apply to our chief executive officer, chief financial officer and the three next most highly compensated senior executive officers. The standards include:

- ensuring that incentive compensation for senior executives does not encourage unnecessary and excessive risks that threaten the value of the financial institution;

- requiring clawbacks of any bonus or incentive compensation paid to a senior executive based on statements of earnings, gains or other criteria that are later proven to be materially inaccurate;

- prohibiting golden parachute payments to senior executives; and

- agreeing not to deduct for tax purposes executive compensation in excess of $500,000 for each senior executive.

In particular, the change to the deductibility limit on executive compensation may increase the overall cost of our compensation programs in future periods.

ARRA imposed further limitations on compensation during the TARP assistance period including:

- a prohibition on making any golden parachute payment to a senior executive officer or any of our next five most highly compensated employees;

- a prohibition on any compensation plan that would encourage manipulation of the reported earnings to enhance the compensation of any of its employees; and

- a prohibition of the five highest paid executives from receiving or accruing any bonus, retention award, or incentive compensation, or bonus except for long-term restricted stock with a value not greater than one-third of the total amount of annual compensation of the employee receiving the stock.

The prohibition may expand to other employees based on increases in the aggregate value of financial assistance that we receive in the future.

The Treasury released an interim final rule on TARP standards for compensation and corporate governance on June 10, 2009, which implemented and further expanded the limitations and restrictions imposed on executive compensation and corporate governance by the TARP CPP and ARRA. The new Treasury interim final rules also prohibit any tax gross-up payments to senior executive officers and the next 20 highest paid executives. The rule further authorizes the Treasury to establish the Office of the Special Master for TARP Executive Compensation with broad powers to review compensation plans and corporate governance matters of TARP CPP recipients.

These provisions and any future rules issued by the Treasury could adversely affect our ability to attract and retain management capable and motivated sufficiently to manage and operate our business through difficult economic and market conditions. If we are unable to attract and retain qualified employees to manage and operate our business, we may not be able to successfully execute our business strategy.

***TARP lending goals may not be attainable.***

Congress and the bank regulators have encouraged recipients of TARP CPP capital to use such capital to make loans and it may not be possible to safely, soundly and profitably make sufficient loans to creditworthy persons in the current economy to satisfy such goals. Congressional demands for additional lending by TARP CPP recipients, and regulatory demands for demonstrating and reporting such lending are increasing. On November 12, 2008, the bank regulatory agencies issued a statement encouraging banks to, among other things, "lend prudently and responsibly to creditworthy borrowers" and to "work with borrowers to preserve homeownership and avoid preventable foreclosures." We continue to lend and have expanded our mortgage loan originations, and to report our lending to the Treasury. The future demands for additional lending are unclear and uncertain, and we could be forced to make loans that involve risks or terms that we would not otherwise find

36

**Table of Contents**

acceptable or in our shareholders' best interest. Such loans could adversely affect our results of operation and financial condition, and may be in conflict with bank regulations and requirements as to liquidity and capital. The profitability of funding such loans using deposits may be adversely affected by increased FDIC insurance premiums.

***The Company and the Bank are subject to extensive regulation, supervision and examination by federal banking authorities.***

Changes in applicable regulations or legislation could have a substantial impact on our operations. Additional legislation and regulations that could significantly affect our powers, authority and operations may be enacted or adopted in the future, which could have a material adverse effect on our financial condition and results of operations. In that regard, proposals for legislation restructuring the regulation of the financial services industry are currently under consideration. Adoption of such proposals could, among other things, increase the overall costs of regulatory compliance. Further, regulators have significant discretion and authority to prevent or remedy unsafe or unsound practices or violations of laws or regulations by financial institutions and holding companies in the performance of their supervisory and enforcement duties. These powers recently have been utilized more frequently due to the serious national, regional and local economic conditions that we and other financial institutions are facing. The exercise of regulatory authority may have a negative impact on our financial condition and results of operations. We cannot predict the actual effects of various governmental, regulatory, monetary and fiscal initiatives, which have been and may be enacted on the financial markets. The terms and costs of these activities, or the failure of these actions to help stabilize the financial markets, asset prices, market liquidity, and a continuation or worsening of current financial market and economic conditions could materially and adversely affect our business, financial condition, results of operations, and the trading price of our common stock. In addition, failure or the inability to comply with these various requirements can lead to diminished reputation and investor confidence, reduced franchise value, loss of business, curtailment of expansion opportunities, fines and penalties, intervention or sanctions by regulators and costly litigation or expensive additional controls and systems.

***There can be no assurance that enacted legislation or any proposed federal programs will stabilize the U.S. financial system and such legislation and programs may adversely affect us.***

There has been much legislative and regulatory action in response to the financial crises affecting the banking system and financial markets and threats to investment banks and other financial institutions**.** There can be no assurance, however, as to the actual impact that the legislation and its implementing regulations or any other governmental program will have on the financial markets. The failure of the actions by the legislators, the regulatory bodies or the U.S. government to stabilize the financial markets and a continuation or worsening of current financial market conditions could materially and adversely affect our business, financial condition, results of operations, and access to credit or the trading price of our common shares.

Contemplated and proposed legislation, state and federal programs, and increased government control or influence may adversely affect us by increasing the uncertainty in our lending operations and expose us to increased losses, including legislation that would allow bankruptcy courts to permit modifications to mortgage loans on a debtor's primary residence, moratoriums on a mortgagor's right to foreclose on property, and requirements that fees be paid to register other real estate owned property. Statutes and regulations may be altered that may potentially increase our costs to service and underwrite mortgage loans. Additionally, federal intervention and operation of formerly private institutions may adversely affect our rights under contracts with such institutions and the way in which we conduct business in certain markets.

***The fiscal and monetary policies of the federal government and its agencies could have a material adverse effect on our earnings.***

The Board of Governors of the Federal Reserve System regulates the supply of money and credit in the United States. Its policies determine in large part the cost of funds for lending and investing and the return earned on those loans and investments, both of which affect the net interest margin. The resultant changes in interest rates

37

**Table of Contents**

can also materially decrease the value of certain financial assets we hold, such as debt securities. Its policies can also adversely affect borrowers, potentially increasing the risk that they may fail to repay their loans. Changes in Federal Reserve Board policies are beyond our control and difficult to predict; consequently, the impact of these changes on our activities and results of operations is difficult to predict.

***Management's ability to retain key officers and employees may change.***

Our future operating results depend substantially upon the continued service of its executive officers and key personnel. Our future operating results also depend in significant part upon its ability to attract and retain qualified management, financial, technical, marketing, sales and support personnel. Competition for qualified personnel is intense, and we cannot ensure success in attracting or retaining qualified personnel. There may be only a limited number of persons with the requisite skills to serve in these positions, and it may be increasingly difficult for us to hire personnel over time.

Our ability to retain key officers and employees may be further impacted by legislation and regulation affecting the financial services industry. For example, Section 7001 of the ARRA which amended Section 111 of the EESA in its entirety, as well as the final interim regulations issued by the U.S. Treasury, significantly expanded the executive compensation restrictions. Such restrictions applied to us as a participant in the TARP CPP and generally continued to apply for as long as any Treasury owned shares were outstanding. These ARRA restrictions shall not apply to us during such time when the federal government only holds warrants to purchase common shares. Such restrictions and standards may further impact management's ability to compete with financial institutions that are not subject to the ARRA limitations on executive compensation.

Our business, financial condition, or results of operations could be materially adversely affected by the loss of any of its key employees, or our inability to attract and retain skilled employees.

***We are subject to various reporting requirements that increase compliance costs, and failure to comply timely could adversely affect our reputation and the value of our common stock.***

We are required to comply with various corporate governance and financial reporting requirements under the Sarbanes-Oxley Act of 2002, as well as rules and regulations adopted by the Securities and Exchange Commission, the Public Corporation Accounting Oversight Board and NASDAQ. In particular, we are required to include management and independent auditor reports on internal controls as part of our Annual Report on Form 10-K pursuant to Section 404 of the Sarbanes-Oxley Act. We expect to continue to spend significant amounts of time and money on compliance with these rules. In addition, pursuant to our Cease and Desist Order with OTS (now administered by the OCC), we must prepare and submit various reports and may face further reporting obligations in the future depending upon our financial condition. Compliance with various regulatory reporting requires significant commitments of time from management and our directors, which reduces the time available for the performance of their other responsibilities. Our failure to track and comply with the various rules may materially adversely affect our reputation, ability to obtain the necessary certifications to financial statements, lead to additional regulatory enforcement actions, and could adversely affect the value of our common stock.

***Non-compliance with USA PATRIOT Act, Bank Secrecy Act, or other laws and regulations could result in fines or sanctions, and curtail expansion opportunities.***

Financial institutions are required under the USA PATRIOT and Bank Secrecy Acts to develop programs to prevent financial institutions from being used for money laundering and terrorist activities. Financial institutions are also obligated to file suspicious activity reports with the U.S. Treasury's office of Financial Crimes Enforcement Network if such activities are detected. These rules also require financial institutions to establish procedures for identifying and verifying the identity of customers seeking to open new financial accounts. Failure or the inability to comply with these regulations could result in fines or penalties, curtailment of expansion

38

Table of Contents

opportunities, intervention or sanctions by regulators and costly litigation or expensive additional controls and systems. During the last few years, several banking institutions have received large fines for non-compliance with these laws and regulations. We have developed policies and continue to augment procedures and systems designed to assist in compliance with these laws and regulations.

***The full impact of the recently enacted Dodd-Frank Act is currently unknown given that many of the details and substance of the new laws will be implemented through agency rulemakings.***

On July 21, 2010, the Dodd-Frank Act was signed into law. The Dodd-Frank Act represents a significant overhaul of the financial services industry within the United States and requires federal agencies to adopt nearly 250 new rules and conduct more than 60 studies over the course of the next few years, ensuring that the federal regulations and implementing policies in these areas will continue to develop for the foreseeable future.

- dissolved the Office of Thrift Supervision, transferring regulation of the Bank to the Office of the Comptroller of Currency and of the Corporation to the Federal Reserve effective July 21, 2011;

- is changing the capital requirements for bank holding companies and would require less favorable capital treatment for future issuances of trust preferred (although our existing trust preferred are grandfathered and therefore not subject to the new rules);

- raises prudential standards by requiring, for instance, annual internal stress testing and establishment of independent risk committees for banks with $10 billion or more in assets;

- grants the FDIC back-up supervisory authority with respect to depository institution holding companies that engage in conduct that poses a foreseeable and material risk to the Deposit Insurance Fund, and heightens the Federal Reserve's authority to examine, prescribe regulations and take action with respect to all subsidiaries of a bank holding company;

- prohibits insured state-chartered banks from engaging in derivatives transactions unless the chartering state's lending limit laws take into consideration credit exposure to derivative transactions;

- specifies that a bank holding company may acquire control of an out-of-state bank only if it is well – capitalized and well – managed, and does not allow interstate merger transactions unless the resulting bank would be well – capitalized and well – managed after the transaction;

- changes how the FDIC calculates deposit insurance assessments and effectively requires increases in deposit insurance fees that will be borne primarily by institutions with assets of greater than $10 billion;

- subjects both large and small financial institutions to data and information gathering by a newly created Office of Financial Research;

- requires retention of 5% of the credit risk in assets transferred, sold or conveyed through issuances of asset-backed securities, with the risk-retention obligation spread between securitizers and originators;

- creates a new Consumer Bureau given rulemaking, examination and enforcement authority over consumer protection matters, imposes limits on debit card interchange fees that may be charged by card issuers with $10 billion or more in assets and contains provisions on mortgage-related matters such as steering incentives, determinations as to a borrowers' ability to repay and prepayment penalties; and

- mandates and allows certain changes regarding corporate governance and executive compensation such as shareholder proxy access for publicly traded banks' director nominations, clawback of incentive-based compensation from executive officers and increased disclosure on compensation arrangements.

Based on the text of the Dodd-Frank Act and the implementing regulations (both published and yet-to-be-published), it is anticipated that the costs to banks and their holding companies may increase or fee income may decrease significantly which could adversely affect the Corporation's results of operations, financial condition or liquidity. Moreover, compliance obligations will expose us to additional noncompliance risk and could divert management's focus from the business of banking.

Table of Contents

*We may be subject to more stringent capital requirements.*

As discussed above, the Dodd – Frank Act would require the federal banking agencies to establish stricter risk-based capital requirements and leverage limits to apply to banks and bank holding companies. In addition, the "Basel III" standards recently announced by the Basel Committee on Banking Supervision (the "Basel Committee"), if adopted, could lead to significantly higher capital requirements, higher capital charges and more restrictive leverage and liquidity ratios. The standards would, among other things, impose more restrictive eligibility requirements for Tier 1 and Tier 2 capital; increase the minimum Tier 1 common equity ratio to 4.5%, net of regulatory deductions, and introduce a capital conservation buffer of an additional 2.5% of common equity to risk-weighted assets, raising the target minimum common equity ratio to 7%; increase the minimum Tier 1 capital ratio to 8.5% inclusive of the capital conservation buffer; increase the minimum total capital ratio to 10.5% inclusive of the capital buffer; and introduce a countercyclical capital buffer of up to 2.5% of common equity or other fully loss absorbing capital for periods of excess credit growth. Basel III also introduces a non-risk adjusted Tier 1 leverage ratio of 3%, based on a measure of total exposure rather than total assets, and new liquidity standards.

The new Basel III capital standards will be phased in through January 1, 2019, and it is not yet known how these standards will be implemented by U.S. regulators generally or how they will be applied to financial institutions of our size. Implementation of these standards, or any other new regulations, may adversely affect our ability to pay dividends, or require us to restrict growth or raise capital, including in ways that may adversely affect our results of operations or financial condition.

### Item 1B.    Unresolved Staff Comments.

None

### Item 2.    Properties

At March 31, 2013, the Corporation conducts business from its main office headquarters at 25 West Main Street, Madison, Wisconsin and 53 other full-service offices and one loan origination office. The Bank owns 34 of its full-service offices, leases the land on which four such offices are located, and leases the remaining 16 full-service offices. The Bank also owns its headquarters building, adjacent surface parking lot and parking garage. In addition, the Bank leases one loan-origination facility. The leases expire between 2013 and 2030. The aggregate net book value at March 31, 2013 of the properties owned or leased, including headquarters, properties and leasehold improvements, was $20.5 million. See Note 7 to the Corporation's Consolidated Financial Statements included in Item 8, for information regarding premises and equipment. We believe that our current facilities are adequate to meet present needs.

### Item 3.    Legal Proceedings

The Corporation is involved in routine legal proceedings occurring in the ordinary course of business which, in the aggregate, are believed to be immaterial to the financial condition and results of operations.

On February 21, 2013, the Company received a "Wells Notice" ("Notice") from the staff ("Staff") of the Securities and Exchange Commission ("Commission") indicating its intent to recommend to the Commission that it bring a civil injunctive action against the Company alleging that it violated Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 and Rules 10b-5, 12b-20 and 131-13 thereunder.

A Wells Notice by the Staff is neither a formal allegation of wrongdoing nor a determination of wrongdoing. A Wells Notice indicates that the Commission has determined it may bring a civil action and provides the Company with an opportunity to provide the Commission with information as to why such action should not be brought.

**Table of Contents**

The Company cannot predict the outcome of a matter with the Commission, including whether a lawsuit will be filed or the term of any settlement that may be reached. The Company has had initial communications with the Staff and submitted a formal response to the Wells Notice on April 25, 2013, and believes there is a reasonable likelihood that it can reach a satisfactory resolution with the Commission. The Company will determine how to proceed based on further consultation with its legal counsel.

At this time, the Company does not expect the Notice to materially interfere with its day-to-day operations.

**Item 4.**      **Mine Safety Disclosures**

Not applicable.

41

Table of Contents

**PART II**

**Item 5.        Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Common Stock**

The Corporation's common stock is traded in the OTC Market under the symbol "ABCW". At April 30, 2013, there were approximately 2,600 shareholders of record. That number does not include shareholders holding their stock in street or nominee name.

**Quarterly Stock Price and Dividend Information**

The table below presents the reported high and low sale prices of common stock and cash dividends paid per share of common stock during the periods indicated in fiscal years 2013 and 2012.

| Quarter Ended | High | Low | Cash Dividend |
|---|---|---|---|
| March 31, 2013 | $0.72 | $0.38 | $ — |
| December 31, 2012 | 0.43 | 0.33 | — |
| September 30, 2012 | 0.54 | 0.36 | — |
| June 30, 2012 | 1.00 | 0.40 | — |
| March 31, 2012 | $1.00 | $0.22 | $ — |
| December 31, 2011 | 0.53 | 0.16 | — |
| September 30, 2011 | 0.73 | 0.49 | — |
| June 30, 2011 | 0.99 | 0.61 | — |

For information regarding restrictions on the payments of dividends by the Bank to the Corporation, see "Item 1. Business – Regulation and Supervision – The Bank – Restrictions on Capital Distributions," "Item 1A. Risk Factors – Risks Related to Our Business" and "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Liquidity and Capital Resources" of this Form 10-K.

**Repurchases of Common Stock**

As of March 31, 2013, the Corporation does not have a stock repurchase plan in place.

42

Table of Contents

**Performance Graph**

The following graph compares the yearly cumulative total return on the Corporation's common stock over a five-year measurement period since March 31, 2008 with (i) the yearly cumulative total return on the stocks included in the Nasdaq Stock Market Index (for United States companies) and (ii) the yearly cumulative total return on the stocks included in the Morningstar, Inc. index. All of these cumulative returns are computed assuming the reinvestment of dividends at the frequency with which dividends were paid during the applicable years.



43

Table of Contents

**Item 6.      Selected Financial Data**

The following information at and for the years ended March 31, 2013, 2012, 2011, 2010 and 2009 has been derived primarily from the Corporation's historical audited consolidated financial statements for those years.

| | 2013 | 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|
| | | | At or For Year Ended March 31, | | |
| | | | (Dollars in thousands – except per share amounts) | | |
| **Operations:** | | | | | |
| Interest income | $    99,882 | $    127,253 | $    166,467 | $    217,103 | $    260,360 |
| Interest expense | 37,399 | 55,329 | 81,383 | 132,123 | 135,472 |
| Provision for credit losses | 9,125 | 33,578 | 51,198 | 161,926 | 205,719 |
| Non-interest income | 45,901 | 49,261 | 59,260 | 57,364 | 46,363 |
| Non-interest expense | 133,612 | 124,335 | 134,160 | 158,832 | 226,445 |
| Loss before income taxes | (34,353) | (36,728) | (41,014) | (178,414) | (260,913) |
| Income tax expense (benefit) | (181) | 10 | 164 | (1,500) | (30,098) |
| Net loss | (34,172) | (36,738) | (41,178) | (176,914) | (230,815) |
| Income attributable to non-controlling interest in real estate partnerships | — | — | — | — | 148 |
| Preferred stock dividends in arrears [1] | (6,560) | (6,278) | (5,934) | (5,648) | (925) |
| Preferred stock discount accretion | (7,412) | (7,413) | (7,412) | (7,411) | (1,247) |
| Net loss available to common equity | (48,144) | (50,429) | (54,524) | (189,973) | (232,839) |
| **Per Common Share:** | | | | | |
| Basic loss | $    (2.27) | $    (2.37) | $    (2.57) | $    (8.97) | $    (11.05) |
| Diluted loss | (2.27) | (2.37) | (2.57) | (8.97) | (11.05) |
| Book value | (7.99) | (6.57) | (5.80) | (3.19) | 5.10 |
| Dividends | — | — | — | — | 0.29 |
| **Financial Condition:** | | | | | |
| Total assets | $ 2,367,583 | $ 2,789,452 | $ 3,394,825 | $ 4,416,265 | $ 5,272,110 |
| Investment securities available for sale | 266,787 | 242,299 | 523,289 | 416,203 | 484,985 |
| Loans held for investment, net | 1,670,543 | 2,057,744 | 2,520,367 | 3,229,580 | 3,896,439 |
| Deposits | 2,025,025 | 2,264,901 | 2,699,433 | 3,536,696 | 3,898,795 |
| Other borrowed funds | 317,225 | 476,103 | 659,005 | 796,832 | 1,088,063 |
| Stockholders' equity (deficit) | (59,864) | (29,550) | (13,171) | 42,214 | 217,770 |
| Common shares outstanding | 21,247,225 | 21,247,725 | 21,247,725 | 21,256,056 | 21,139,916 |
| **Other Financial Data:** | | | | | |
| Yield on interest-earning assets | 3.96% | 4.34% | 4.59% | 4.74% | 5.63% |
| Cost of funds | 1.45 | 1.79 | 2.16 | 2.83 | 2.95 |
| Interest rate spread | 2.51 | 2.55 | 2.43 | 1.91 | 2.68 |
| Net interest margin [2] | 2.48 | 2.45 | 2.34 | 1.86 | 2.70 |
| Return on average assets [3] | (1.30) | (1.17) | (1.07) | (3.66) | (4.65) |
| Average equity (deficit) to average assets | (1.32) | (0.49) | 0.65 | 2.50 | 6.15 |

(1)    Including compounding.

(2)    Net interest margin represents net interest income as a percentage of average interest-earning assets.

(3)    Return on average assets represents net loss including income attributable to non-controlling interest as a percentage of average total assets.

44

Table of Contents

The following table sets forth selected quarterly financial data:

| | Mar 31, 2013 | Dec 31, 2012 | Sep 30, 2012 | Jun 30, 2012 | Mar 31, 2012 | Dec 31, 2011 | Sep 30, 2011 | Jun 30, 2011 |
|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands, except per share data) | | | | |
| Interest income: | | | | | | | | |
| Loans | $ 21,188 | $ 22,545 | $ 24,314 | $25,288 | $26,559 | $ 28,324 | $ 29,937 | $32,109 |
| Investment securities and FHLB stock | 1,434 | 1,394 | 1,535 | 1,549 | 1,427 | 1,395 | 2,960 | 3,956 |
| Interest-earning deposits | 94 | 191 | 196 | 154 | 179 | 257 | 98 | 52 |
| Total interest income | 22,716 | 24,130 | 26,045 | 26,991 | 28,165 | 29,976 | 32,995 | 36,117 |
| Interest expense: | | | | | | | | |
| Deposits | 1,710 | 2,067 | 2,956 | 3,591 | 4,869 | 6,047 | 6,727 | 7,319 |
| Other borrowed funds | 6,186 | 6,858 | 7,030 | 7,001 | 7,406 | 7,915 | 7,768 | 7,278 |
| Total interest expense | 7,896 | 8,925 | 9,986 | 10,592 | 12,275 | 13,962 | 14,495 | 14,597 |
| Provision for credit losses | 830 | 4,660 | 5,351 | (1,716) | 4,601 | 8,380 | 17,115 | 3,482 |
| Net impairment losses recognized in earnings | (83) | (115) | (146) | (64) | (231) | (156) | (123) | (58) |
| Loan servicing income (loss), net of amortization | 55 | (951) | (590) | (406) | (529) | (1,555) | 488 | 807 |
| Service charges on deposits | 2,369 | 2,691 | 2,693 | 2,682 | 2,489 | 2,746 | 2,754 | 2,600 |
| Investment and insurance commissions | 952 | 952 | 958 | 1,032 | 944 | 910 | 917 | 1,037 |
| Net gain on sale of loans | 3,030 | 7,153 | 7,176 | 5,836 | 6,437 | 6,040 | 4,010 | 1,193 |
| Net gain (loss) on sale and call of investment securities | (200) | (120) | 11 | 62 | 217 | 20 | 5,206 | 1,136 |
| Net gain on sale of OREO | 1,337 | 767 | 1,600 | 3,172 | 1,941 | 1,273 | 1,659 | 1,245 |
| Other | 43 | 1,467 | 1,354 | 1,184 | 1,709 | 1,490 | 1,525 | 1,120 |
| Total non-interest income | 7,503 | 11,844 | 13,056 | 13,498 | 12,977 | 10,768 | 16,436 | 9,080 |
| Compensation and benefits | 10,142 | 10,088 | 10,036 | 10,470 | 10,758 | 10,678 | 9,749 | 10,077 |
| Occupancy | 2,311 | 2,060 | 1,929 | 1,833 | 1,971 | 2,070 | 1,925 | 1,980 |
| Furniture and equipment | 762 | 943 | 1,346 | 1,512 | 1,277 | 1,396 | 1,531 | 1,461 |
| Federal deposit insurance premiums | 1,354 | 1,442 | 1,561 | 1,564 | 1,654 | 1,828 | 1,774 | 1,933 |
| Data processing | 1,862 | 1,337 | 1,639 | 1,385 | 1,603 | 1,665 | 1,608 | 1,383 |
| Communications | 412 | 456 | 527 | 445 | 570 | 481 | 550 | 480 |
| Marketing | 506 | 226 | 365 | 248 | 583 | 149 | 429 | 305 |
| OREO expense, net | 12,259 | 10,190 | 8,110 | 7,012 | 6,633 | 7,451 | 5,823 | 8,777 |
| Investor loss reimbursement | 3,080 | 959 | 265 | 226 | 157 | — | — | — |
| Mortgage servicing rights impairment (recovery) | (2,190) | (1,570) | 2,100 | 1,257 | (1,895) | (985) | 5,069 | 221 |
| Legal services | 1,100 | 1,143 | 1,415 | 1,598 | 1,340 | 1,403 | 1,328 | 953 |
| Other professional fees | 659 | 479 | 565 | 643 | 843 | 1,052 | 756 | 1,018 |
| Insurance | 418 | 447 | 398 | 393 | 320 | 420 | 361 | 377 |
| Debt prepayment penalty | | 3,549 | — | — | — | — | — | — |
| Other | 2,838 | 2,272 | 2,264 | 2,972 | 2,405 | 2,663 | 3,079 | 2,898 |
| Total non-interest expense | 35,513 | 34,021 | 32,520 | 31,558 | 28,219 | 30,271 | 33,982 | 31,863 |
| Income (loss) before income taxes | (14,020) | (11,632) | (8,756) | 55 | (3,953) | (11,869) | (16,161) | (4,745) |
| Income tax expense (benefit) | — | 10 | (191) | — | — | — | — | 10 |
| Net income (loss) | (14,020) | (11,642) | (8,565) | 55 | (3,953) | (11,869) | (16,161) | (4,755) |
| Preferred stock dividends in arrears | (1,662) | (1,654) | (1,634) | (1,610) | (1,591) | (1,572) | (1,579) | (1,536) |
| Preferred stock discount accretion | (1,843) | (1,853) | (1,853) | (1,863) | (1,844) | (1,853) | (1,853) | (1,863) |
| Net loss available to common equity | $(17,525) | $(15,149) | $(12,052) | $(3,418) | $(7,388) | $(15,294) | $(19,593) | $(8,154) |
| Loss per common share: | | | | | | | | |
| Basic | $ (0.82) | $ (0.71) | $ (0.57) | $ (0.16) | $ (0.35) | $ (0.72) | $ (0.92) | $ (0.38) |
| Diluted | (0.82) | (0.71) | (0.57) | (0.16) | (0.35) | (0.72) | (0.92) | (0.38) |

45

**Table of Contents**

**Item 7.**      **Management's Discussion and Analysis of Financial Condition and Results of Operations**

Set forth below is a discussion and analysis of the Corporation's financial condition and results of operations, including information on asset/liability management strategies, sources of liquidity and capital resources and significant accounting policies. Management is required to make estimates, assumptions, and judgments that affect the amounts reported in the financial statements and accompanying notes. These estimates, assumptions, and judgments are based on information available as of the date of the financial statements; accordingly, as this information changes, actual results could differ from the estimates, assumptions, and judgments reflected in the financial statements. Certain policies inherently have a greater reliance on the use of estimates, assumptions, and judgments and, as such, have a greater possibility of producing results that could be materially different than originally reported. Management believes the following policies are both important to the portrayal of our financial condition and results of operations and require subjective or complex judgments; therefore, management considers the following to be critical accounting policies. Management has reviewed the application of these polices with the Audit Committee of our Board of Directors. Management's discussion and analysis should be read in conjunction with the consolidated financial statements and supplemental data contained elsewhere in this report.

**Critical Accounting Estimates and Judgments**

The consolidated financial statements are prepared by applying certain accounting policies. Certain of these policies require management to make estimates and strategic or economic assumptions that may prove inaccurate or be subject to variations that may significantly affect the reported results and financial position for the period or in future periods. Some of the more significant policies are as follows:

*Fair Value Measurements*

Management must use estimates, assumptions, and judgments when assets and liabilities are required to be recorded at, or adjusted to reflect, fair value under GAAP. This includes the initial measurement at fair value of the assets acquired and liabilities assumed in acquisitions qualifying as business combinations, foreclosed properties and repossessed assets and the capitalization of mortgage servicing rights. The valuation of both financial and nonfinancial assets and liabilities in these transactions requires numerous assumptions and estimates and the use of third-party sources including appraisers and valuation specialists.

Assets and liabilities carried at fair value inherently result in a higher degree of financial statement volatility. Assets and liabilities measured at fair value on a recurring basis include available for sale securities, interest rate lock commitments and forward contracts to sell mortgage loans. Assets and liabilities measured at fair value on a non-recurring basis may include loans held for sale, mortgage servicing rights, certain impaired loans and foreclosed assets. Fair values and the information used to record valuation adjustments for certain assets and liabilities are based on either quoted market prices or are provided by other independent third-party sources, when available. When such third-party information is not available, fair value is estimated primarily by using cash flow and other financial modeling techniques. Changes in underlying factors, assumptions, or estimates in any of these areas could materially impact future financial condition and results of operations.

*Available-for-Sale Securities*

Declines in the fair value of available-for-sale securities below their amortized cost that are deemed to be other-than- temporary are reflected in earnings as unrealized losses. In estimating other-than-temporary impairment losses on debt securities, management considers many factors which include: (1) the length of time and the extent to which the fair value has been less than cost, (2) the financial condition and near-term prospects of the issuer, and (3) the intent and ability of the Corporation to retain its investment in the issuer for a period of time sufficient to allow for any anticipated recovery in fair value. To ascertain if an other-than-temporary impairment exists on a debt security, the Corporation first determines if (a) it intends to sell the security or (b) it is more

46

**Table of Contents**

likely than not that it will be required to sell the security before its anticipated recovery. If either of the conditions is met, the Corporation will recognize an other-than-temporary impairment loss in earnings equal to the difference between the fair value of the security and its amortized cost. If neither of the conditions is met, the Corporation determines (a) the amount of the impairment related to credit loss and (b) the amount of the impairment due to all other factors. The difference between the present values of the cash flows expected to be collected, discounted at the purchase yield or current accounting yield of the security, and the amortized cost basis is the credit loss. The credit loss is the amount of impairment deemed other-than-temporary and recognized in earnings and is a reduction to the cost basis of the security. The amount of impairment related to all other factors (i.e. non-credit) is included in accumulated other comprehensive income (loss).

*Allowances for Loan Losses*

The allowance for loan losses ("ALLL") is a valuation account for probable and inherent losses incurred in the loan portfolio. Management maintains an allowance for loan losses – and separately a reserve for unfunded loan commitments, letters of credit and repurchase of sold loans in other liabilities – at levels that we believe to be adequate to absorb estimated probable credit losses incurred in the loan portfolio. The adequacy of the ALLL is determined based on periodic evaluations of the loan portfolios and other relevant factors. The ALLL is comprised of general, substandard loan and specific components. Even though the entire allowance is available to cover losses on any loan, specific allowances are provided on impaired loans pursuant to accounting standards. The general allowance is based on historical loss experience, adjusted for quantitative and qualitative factors. At least quarterly, management reviews the assumptions and methodology related to the general allowance in an effort to update and refine the estimate.

In determining the general allowance, the loan portfolio is segregated by purpose and collateral type. By doing so, trends in borrower behavior and loss severity are more easily identified. For each class of loan, a historical loss factor is computed. In determining the appropriate period of activity to use in computing the historical loss factor we look at trends in quarterly net charge-off rates. It is management's intention to utilize a period of activity that is most reflective of current experience. Changes in the historical period are made when there is a distinct change in the trend of net charge-off experience. Given the changes in the credit market that have occurred since 2008, management reviews each class' historical losses by quarter for any trends that would indicate a different look back period would be more representative of current experience.

Historical loss rates used to calculate the general allowance are adjusted by values assigned to six quantitative factors and four qualitative factors which are later listed in the section titled Allowance for Loan Losses within Credit Risk Management. In determining the appropriate value to assign to a particular factor, if any, management compares the current underlying facts and circumstances with respect to that factor with those in the historical periods. Values assigned to factors are modified when changes in the environment relative to that quantitative or qualitative factor are deemed to be significant. Management will continue to analyze the factors on a quarterly basis, adjusting the historical loss rates as necessary, to a rate believed to be appropriate for the probable and inherent risk of loss in the portfolio.

Specific allowances are determined as a result of an impairment review process. When a loan is identified as impaired it is evaluated for loss using either the fair value of collateral method or the present value of expected cash flows method. If the present value of expected cash flows or the fair value of collateral exceeds the Bank's carrying value of a loan no loss is anticipated and no specific reserve is established. However, if the carrying value of a loan is greater than the present value of expected cash flows or fair value of collateral a specific reserve is established. In either situation, loans identified as impaired are excluded from the calculation of the general allowance.

The process that determines the substandard loan ALLL component produces results consistent with the specific ALLL process, however is applicable to substandard rated loans that are not considered impaired.

47

**Table of Contents**

The Corporation regularly obtains updated appraisals for real estate collateral dependent loans for which it calculates impairment based on the fair value of collateral. Loans having an unpaid principal balance of $250,000 or less in a homogenous pool of assets do not require an impairment analysis and, therefore, updated appraisals may not be obtained until the foreclosure or sheriff sale occurs. Due to certain limitations, including, but not limited to, the availability of qualified appraisers, the time necessary to complete acceptable appraisals, the availability of comparable market data and information, and other considerations, in certain instances current appraisals are not readily available.

The determination of value on an individually reviewed loan is estimated using an appraisal discounted by 15%, 25% or 35% depending on whether the appraisal is a) current, b) improved land or commercial real estate (CRE) greater than a year old, or c) unimproved land greater than a year old, respectively. The 15% discount represents an estimate of selling costs and potential taxes and other expenses the Bank may need to incur to dispose of a property. The additional discounts on appraisals greater than a year old of 10% and 20% on improved land/CRE and unimproved land, respectively, reflect the decrease in collateral values during fiscal years 2011, 2012 and 2013. These percentages are supported by the Bank's analysis of appraisal activity over the past 12 months.

Loans are considered to be non-performing at such time that they become ninety days past due or earlier if a loss is deemed probable. At the time a loan is determined to be non-performing it is downgraded per the Corporation's loan rating system, it is placed on non-accrual, and an allowance consistent with the Corporation's historical experience for similar "substandard" loans is established. Within ninety days of this determination a comprehensive analysis of the loans is completed, including ordering new appraisals, where necessary, and an adjustment to the estimated allowance is recognized to reflect the fair value of the loan based on the underlying collateral or the discounted cash flows. Until such date at which an updated appraisal is obtained, when deemed necessary, the Corporation applies discounts to the existing appraisals in estimating the fair value of collateral as described above.

Management considers the ALLL at March 31, 2013 to be at an acceptable level, although changes may be necessary if future economic and other conditions differ substantially from the current environment. Although the best information available is used, the level of the ALLL remains an estimate that is subject to significant judgment and short-term change. To the extent actual outcomes differ from our estimates, additional provision for credit losses may be required that would reduce future earnings.

### Foreclosure

Real estate acquired by foreclosure or by deed in lieu of foreclosure and other repossessed assets are held for sale and are initially recorded at fair value less estimated selling costs at the date of foreclosure, establishing a new cost basis. Any write down to fair value less estimated selling costs is charged to the allowance for loan losses. If the fair value exceeds the net carrying value of the loans, recoveries to the allowance for loan losses are recorded to the extent of previous charge-offs, with any excess, which is infrequent, recognized as a gain in non-interest income. Subsequent to foreclosure, updated appraisals are generally obtained on an annual basis and the assets are adjusted to the lower of cost or fair value, less 15% for estimated selling expenses. An additional 10% discount is generally applied to all asset values that are based on appraisals greater than one year old. Costs relating to the development and improvement of the property may be capitalized, generally those greater than $10,000; holding period costs and subsequent changes to the valuation allowance are charged to OREO expense, net included in non-interest expense. Incremental valuation adjustments may be recognized in the Statement of Operations if, in the opinion of management, additional losses are deemed probable.

### Mortgage Servicing Rights

Mortgage servicing rights (MSR) are initially recorded as an asset, measured at fair value, when loans are sold to third parties with servicing rights retained. MSR assets are amortized in proportion to, and over the period of, estimated net servicing revenues. The carrying value of these assets is periodically reviewed for impairment

Table of Contents

using a lower of amortized cost or fair value methodology. The fair value of the servicing rights is determined by estimating the present value of future net cash flows, taking into consideration market loan prepayment speeds, discount rates, servicing costs and other economic factors. For purposes of measuring impairment, the underlying loans are stratified into relatively homogeneous pools based on predominant risk characteristics which include product type (i.e., fixed, adjustable or balloon) and interest rate bands. If the aggregate carrying value of the capitalized mortgage servicing rights for a stratum exceeds its fair value, MSR impairment is recognized in earnings for the difference. As the loans are repaid and net servicing revenue is earned, the MSR asset is amortized as an offset in loan servicing income. Servicing revenues are expected to exceed this amortization expense. However, if actual prepayment experience or defaults exceed what was originally anticipated, net servicing revenues may be less than expected and mortgage servicing rights may be impaired.

The interest rate bands used to stratify the serviced loans were changed in the quarter ending December 31, 2011 in response to the significantly lower interest rate environment over the past several years and the resultant "bunching' of a substantial portion of serviced loans into two of the nine historical strata. The restratification of serviced loans did not have a material impact on the impairment measurement of the mortgage servicing right asset during the year ending March 31, 2013.

### Income Taxes

The Corporation's provision for federal income taxes has resulted in the recognition of a deferred tax liability or deferred tax asset computed by applying the current statutory tax rates to net taxable or deductible differences between the tax basis of an asset or liability and its reported amount in the consolidated financial statements that will produce taxable or deductible amounts in future periods. The Corporation regularly reviews the carrying amount of its deferred tax assets to determine if the establishment of a valuation allowance is necessary. If based on the available evidence, it is more likely than not that all or a portion of the Corporation's deferred tax assets will not be realized in future periods, a deferred tax valuation allowance would be established. Consideration is given to various positive and negative factors that could affect the realization of the deferred tax assets.

In evaluating this available evidence, management considers, among other things, historical financial performance, expectation of future earnings, the ability to carry back losses to recoup taxes previously paid, length of statutory carry forward periods, experience with operating loss and tax credit carry forwards not expiring unused, tax planning strategies and timing of reversals of temporary differences. Significant judgment is required in assessing future earning trends and the timing of reversals of temporary differences. The Corporation's evaluation is based on current tax laws as well as management's expectations of future performance.

As a result of its evaluation, the Corporation has recorded a full valuation allowance on its net deferred tax asset.

### Revenue Recognition

The Corporation derives net interest and non-interest income from various sources, including:

- Lending,
- Securities portfolio,
- Customer deposits,
- Loan servicing, and
- Sale of loans and securities.

The Corporation also earns fees and commissions from issuing loan commitments, standby letters of credit and financial guarantees and selling various insurance products. Revenue earned on interest-earning assets including the accretion of fair value adjustments on discounts for purchased loans is recognized based on the effective yield of the financial instrument.

49

Table of Contents

**Recent Accounting Pronouncements.** Refer to Note 1 of our consolidated financial statements for a description of recent accounting pronouncements including the respective dates of adoption and effects on results of operations and financial condition.

**Segment Review**

The Corporation's primary reportable segment is community banking. Community banking consists of lending and deposit gathering (as well as other banking-related products and services) to businesses, governments and consumers and the support to deliver, fund and manage such banking services. The Corporation's real estate investment operating segment is its non-banking subsidiary IDI, which had invested in real estate developments. During the quarter ended September 30, 2009, IDI sold its interest in several limited partnerships as well as substantially all of its remaining assets. The assets that remain at IDI include an equity interest in one commercial enterprise and one residential real estate development along with various notes receivable. See Note 20 to the Consolidated Financial Statements included in Item 8.

## EXECUTIVE OVERVIEW

### Credit Highlights

The Corporation has continued to see improvement in early stage and overall delinquencies during the past year. This, coupled with the Bank's ongoing efforts to aggressively work out of troubled credits, has led to a decline in the level of non-performing loans. At March 31, 2013, non-performing loans (consisting of loans past due more than 90 days, loans less than 90 days delinquent but placed on non-accrual status due to anticipated probable loss and non-accrual troubled debt restructurings) were $118.8 million, $106.1 million below the $224.9 million in this category at March 31, 2012. In addition, the Bank experienced a moderate decrease in the level of foreclosed properties on the consolidated balance sheet. At March 31, 2013, foreclosed properties and repossessed assets were $84.3 million, compared to $88.8 million at March 31, 2012, a 5.1 percent decrease. An elevated level of non-performing assets has had and will continue to have a negative impact on net interest income and expenses related to managing the troubled loan portfolio and foreclosed properties.

The allowance for loan losses declined to $79.8 million at March 31, 2013 from $111.2 million at March 31, 2012, a 28.2 percent decrease. Net charge-offs during the year ended March 31, 2013 were $39.1 million compared to $72.8 million for the same period in 2012. The provision for credit losses was $9.1 million for the year ended March 31, 2013, compared to $33.6 million for the year ended March 31, 2012. While the balance in the allowance for loan losses declined 28.2 percent during fiscal 2013, the allowance compared to total non-performing loans of 67.19 percent at March 31, 2013 actually increased during the year, up from 49.45 percent at March 31, 2012.

### Recent Market and Industry Developments

The economic turmoil that began in the middle of 2007 and continued through 2008 and 2010 appears to have settled into a slow economic recovery. At this time the recovery has somewhat uncertain prospects. This has been accompanied by dramatic changes in the competitive landscape of the financial services industry and a wholesale reformation of the legislative and regulatory landscape with the passage of Dodd-Frank.

Dodd-Frank is extensive, complex and comprehensive legislation that impacts many aspects of banking organizations. Dodd-Frank is likely to negatively impact the Corporation's revenue and increase both the direct and indirect costs of doing business, as it includes provisions that could increase regulatory fees and deposit insurance assessments and impose heightened capital standards, while at the same time impacting the nature and costs of the Corporation's businesses.

Until such time as the regulatory agencies issue proposed and final regulations implementing the numerous provisions of Dodd-Frank, a process that may last several years, management will not be able to fully assess the impact the legislation will have on its business.

**Table of Contents**

### Financial Condition

The Corporation remains diligent in its efforts to raise outside capital to bring it in compliance with the Cease and Desist Order. In addition, the Corporation continues to make strides to improve the financial performance and efficiency of the Bank to increase the likelihood that it will be able to attract outside capital. The Corporation has engaged and continues to work with Sandler O'Neill & Partners, L.P. as its financial advisor to assist in capital raising efforts to address its capital needs.

However, the organization continues to face significant challenges. The Corporation, as the holding company of the Bank, continues to be burdened with significant senior debt and preferred stock obligations. The Corporation currently owes $116.3 million of loan principal to various lenders led by U.S. Bank under the Credit Agreement that matures June 30, 2013. The Corporation also has accrued but unpaid interest and fees totaling $60.1 million associated with this obligation that is due and payable at maturity.

In addition, the Corporation issued $110 million in preferred stock in January 2009 to the United States Treasury pursuant to the Treasury's Capital Purchase Program ("CPP"). While the Bank has substantial liquidity, it is currently precluded by its regulators from paying dividends to the Corporation. As a result, and as permitted under the CPP program, the Corporation has deferred 16 quarterly preferred stock dividend payments to the Treasury totaling $25.3 million, including compounding. As a result of those deferrals, Treasury had the right to appoint two additional persons to the Corporation's Board of Directors and as announced on September 30, 2011, appointed Messrs. Duane Morse and Leonard Rush to the Corporation's Board.

On June 26, 2009, the Corporation and the Bank each consented to the issuance of an Order to Cease and Desist by the Office of Thrift Supervision. The Cease and Desist Order required, that, no later than December 31, 2009, the Bank meet and maintain both a tier 1 (core) capital ratio equal to or greater than 8 percent and a total risk-based capital ratio equal to or greater than 12 percent.

The Cease and Desist Order also required that the Bank submit a Capital Restoration Plan along with a revised business plan to the OTS. The Bank complied with that directive on July 23, 2010 with the submission of its Revised Capital Restoration Plan (the "Plan"). On August 31, 2010, the OTS approved the Plan submitted by the Bank, although the approval included a Prompt and Corrective Action Directive (PCA).

At March 31, 2013, the Bank and the Corporation had complied with all aspects of the Cease and Desist and the Prompt and Corrective Action Directive, except the Bank had a tier 1 leverage ratio and a total risk-based capital ratio of 4.53 percent and 9.02 percent, respectively, each below the required capital ratios set forth above.

### Financial Results

Results through March 31, 2013 include:

- Diluted loss per common share decreased to $(2.27) for the year ended March 31, 2013 compared to $(2.37) per share for the year ended March 31, 2012, primarily due to a $24.5 million decrease in the provision for credit losses;

- The net interest margin increased to 2.48% for the year ended March 31, 2013 compared to 2.45% for the year ended March 31, 2012 primarily due to lower rates paid on certificates of deposit, partially offset by a decline in returns on the mortgage loan portfolio;

- Loans held for investment (net of the allowance for loan losses) decreased $387.2 million, or 18.8%, since March 31, 2012 primarily due to scheduled pay-offs and amortization as well as the transfer of $75.2 million to foreclosed properties;

- Deposits decreased $239.9 million, or 10.6%, since March 31, 2012 primarily due to runoff of time deposits;

51

Table of Contents

- Book value per common share was $(7.99) at March 31, 2013 compared to $(6.57) at March 31, 2012;

- Total assets decreased $421.9 million, or 15.1%, since March 31, 2012;

- Delinquencies (loans past due 30 days or more) decreased $104.6 million or 47.3%, to $116.6 million at March 31, 2013 from $221.2 million at March 31, 2012;

- Total non-performing loans (consisting of loans past due more than 90 days, loans less than 90 days delinquent but placed on non-accrual status due to anticipated probable loss and non-accrual troubled debt restructurings) decreased $106.1 million, or 47.2% to $118.8 million at March 31, 2013 from $224.9 million at March 31, 2012;

- Total non-performing assets (total non-performing loans and foreclosed properties and repossessed assets) decreased $110.6 million, or 35.3%, to $203.1 million at March 31, 2013 from $313.8 million at March 31, 2012;

- OREO, net decreased $4.5 million, or 5.1%, to $84.3 million at March 31, 2013 from $88.8 million at March 31, 2012; and

- Provision for credit losses decreased $24.5 million, or 72.8%, to $9.1 million for the year ended March 31, 2013 from $33.6 million for the year ended March 31, 2012 due to the Corporation's ongoing enhancements to risk management practices, stabilizing economic conditions and continued resolution of problem assets.

52

Table of Contents

**Net Interest Income**

The following table shows the Corporation's average balances, interest, average rates, the spread between the combined average rates earned on interest-earning assets and average cost of interest-bearing liabilities, net interest margin, which represents net interest income as a percentage of average interest-earning assets, and the ratio of average interest-earning assets to average interest-bearing liabilities for the years indicated. The average balances are derived from daily balances.

| | Year Ended March 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2013 | | | 2012 | | | 2011 | | |
| | Average Balance | Interest | Average Yield/Cost [1] | Average Balance | Interest | Average Yield/Cost [1] | Average Balance | Interest | Average Yield/Cost [1] |
| | | | | (Dollars in thousands) | | | | | |
| **Interest-Earning Assets** | | | | | | | | | |
| Mortgage loans | $1,742,764 | $81,749 | 4.69% | $1,998,194 | $101,250 | 5.07% | $2,468,627 | $129,966 | 5.26% |
| Consumer loans | 218,232 | 9,969 | 4.57 | 273,260 | 12,281 | 4.49 | 321,944 | 14,229 | 4.42 |
| Commercial business loans | 25,807 | 1,617 | 6.27 | 45,480 | 3,398 | 7.47 | 102,034 | 6,497 | 6.37 |
| Total loans receivable [2][3] | 1,986,803 | 93,335 | 4.70 | 2,316,934 | 116,929 | 5.05 | 2,892,605 | 150,692 | 5.21 |
| Investment securities [4] | 248,484 | 5,815 | 2.34 | 330,903 | 9,683 | 2.93 | 465,863 | 15,235 | 3.27 |
| Interest-earning deposits | 256,128 | 635 | 0.25 | 235,169 | 586 | 0.25 | 216,462 | 526 | 0.24 |
| Federal Home Loan Bank stock | 28,116 | 97 | 0.34 | 52,437 | 55 | 0.10 | 54,829 | 14 | 0.03 |
| Total interest-earning assets | 2,519,531 | 99,882 | 3.96 | 2,935,443 | 127,253 | 4.34 | 3,629,759 | 166,467 | 4.59 |
| Non-interest-earning assets | 104,076 | | | 210,000 | | | 213,446 | | |
| Total assets | $2,623,607 | | | $3,145,443 | | | $3,843,205 | | |
| **Interest-Bearing Liabilities** | | | | | | | | | |
| Demand deposits | $1,008,207 | 1,672 | 0.17 | $ 906,563 | 2,073 | 0.23 | $ 870,171 | 3,063 | 0.35 |
| Regular savings | 311,704 | 352 | 0.11 | 284,504 | 376 | 0.13 | 272,043 | 509 | 0.19 |
| Certificates of deposit | 821,388 | 8,300 | 1.01 | 1,354,303 | 22,513 | 1.66 | 1,930,987 | 45,054 | 2.33 |
| Total deposits | 2,141,299 | 10,324 | 0.48 | 2,545,370 | 24,962 | 0.98 | 3,073,201 | 48,626 | 1.58 |
| Other borrowed funds | 430,856 | 27,075 | 6.28 | 548,148 | 30,367 | 5.54 | 699,404 | 32,757 | 4.68 |
| Total interest-bearing liabilities | 2,572,155 | 37,399 | 1.45 | 3,093,518 | 55,329 | 1.79 | 3,772,605 | 81,383 | 2.16 |
| Non-interest-bearing liabilities | 86,117 | | | 67,391 | | | 45,549 | | |
| Total liabilities | 2,658,272 | | | 3,160,909 | | | 3,818,154 | | |
| Stockholders' equity | (34,665) | | | (15,466) | | | 25,051 | | |
| Total liabilities and stockholders' equity | $2,623,607 | | | $3,145,443 | | | $3,843,205 | | |
| Net interest income/interest rate spread [5] | | $62,483 | 2.51% | | $ 71,924 | 2.55% | | $ 85,084 | 2.43% |
| Net interest-earning assets | $ (52,624) | | | $ (158,075) | | | $ (142,846) | | |
| Net interest margin [6] | | | 2.48% | | | 2.45% | | | 2.34% |
| Ratio of average interest-earning assets to average interest-bearing liabilities | 0.98 | | | 0.95 | | | 0.96 | | |

(1)   Annualized
(2)   For the purpose of these computations, non-accrual loans are included in the average loan amounts outstanding.
(3)   Interest earned on loans includes loan fees (which are not material in amount) and interest income which has been received from borrowers whose loans were removed from non-accrual status during the period indicated.
(4)   Average balances of securities available-for-sale are based on fair value.
(5)   Interest rate spread represents the difference between the weighted-average yield on interest-earning assets and the weighted-average cost of interest-bearing liabilities and is represented on a fully tax equivalent basis if applicable.
(6)   Net interest margin represents net interest income as a percentage of average interest-earning assets.

53

Table of Contents

### Rate/Volume Analysis

The most significant impact on the Corporation's net interest income between periods is derived from the interaction of changes in the volume of and rates earned or paid on interest-earning assets and interest-bearing liabilities. The volume of investments in loans and securities, compared to the volume of interest-bearing liabilities represented by deposits and borrowings, combined with the spread, produces the changes in net interest income between periods. The following table shows the relative contribution of the changes in average volume and average interest rates on changes in net interest income for the periods indicated. Information is provided with respect to the effects on net interest income attributable to (i) changes in rate (changes in rate multiplied by prior volume) and (ii) changes in volume (changes in volume multiplied by prior rate). The change in interest income (tax equivalent, if applicable) due to both rate and volume have been allocated to rate and volume changes in proportion to the relationship of the absolute dollar amounts of the change in each.

| | Increase (Decrease) for the Year Ended March 31, | | | | | |
| | 2013 Compared to 2012 | | | 2012 Compared to 2011 | | |
| | Rate | Volume | Net | Rate | Volume | Net |
| | (In thousands) | | | | | |
| **Interest-Earning Assets** | | | | | | |
| Mortgage loans | $ (7,166) | $ (12,335) | $ (19,501) | $ (4,726) | $ (23,990) | $ (28,716) |
| Consumer loans | 199 | (2,511) | (2,312) | 236 | (2,184) | (1,948) |
| Commercial business loans | (484) | (1,297) | (1,781) | 977 | (4,076) | (3,099) |
| Total loans receivable [1] [2] | (7,451) | (16,143) | (23,594) | (3,513) | (30,250) | (33,763) |
| Investment securities [3] | (1,724) | (2,144) | (3,868) | (1,479) | (4,073) | (5,552) |
| Interest-earning deposits | (3) | 52 | 49 | 13 | 47 | 60 |
| Federal Home Loan Bank stock | 78 | (36) | 42 | 42 | (1) | 41 |
| Total decrease in interest income | (9,100) | (18,271) | (27,371) | (4,937) | (34,277) | (39,214) |
| **Interest-Bearing Liabilities** | | | | | | |
| Demand deposits | (615) | 214 | (401) | (1,113) | 123 | (990) |
| Regular savings | (58) | 34 | (24) | (155) | 22 | (133) |
| Certificates of deposit | (7,094) | (7,119) | (14,213) | (11,057) | (11,484) | (22,541) |
| Total deposits | (7,767) | (6,871) | (14,638) | (12,325) | (11,339) | (23,664) |
| Other borrowed funds | 3,742 | (7,034) | (3,292) | 5,396 | (7,786) | (2,390) |
| Total decrease in interest expense | (4,025) | (13,905) | (17,930) | (6,929) | (19,125) | (26,054) |
| Total increase (decrease) in net interest income | $ (5,075) | $ (4,366) | $ (9,441) | $ 1,992 | $ (15,152) | $ (13,160) |

(1)   For the purpose of these computations, non-accrual loans are included in the daily average loan amounts outstanding.

(2)   Interest earned on loans includes loan fees (which are not material in amount) and interest income which has been received from borrowers whose loans were removed from non-accrual status during the period indicated.

(3)   Average balances of securities available-for-sale are based on fair value.

54

**Table of Contents**

## Results of Operations

The following annual results should be read in conjunction with the Consolidated Financial Statements included in Item 8.

*Comparison of Years Ended March 31, 2013 and 2012*

### General

Operating results improved $2.5 million to a net loss of $34.2 million in fiscal 2013 from net loss of $36.7 million in fiscal 2012. Improved results were primarily due a $24.5 million decrease in the provision for credit losses. This favorable variance was partially offset by decreases in net interest income of $9.4 million and non-interest income of $3.4 million; and a $9.3 million increase in non-interest expense.

### Net Interest Income

Net interest income totaled $62.5 million in fiscal 2013, a decrease of $9.4 million from $71.9 million in fiscal 2012. The decline in net interest income was primarily due to lower earning rates on mortgage loans as customers renewed and refinanced loans in a generally lower rate environment during fiscal 2013 and on investment securities attributable to sales of higher yielding positions in fiscal 2012 for capital management purposes. These unfavorable variances were partially offset by the positive impact of maturing above market rate certificates of deposit and renewals of a portion of these maturing deposits at significantly lower rates.

### Provision for Credit Losses

The provision for credit losses decreased $24.5 million from $33.6 million in fiscal 2012 to $9.1 million in fiscal 2013. The improvement was largely due to a lower required allowance for losses on impaired loans, reflecting the relatively steady quarter-over-quarter decrease in non-performing loans since June 2010. The allowance for loan losses decreased in fiscal 2013 falling $31.4 million from $111.2 million at March 31, 2012 to $79.8 million at March 31, 2013. The allowance for loan losses represented 4.53% of total loans at March 31, 2013, compared to 5.08% of total loans at March 31, 2012. For further discussion of the allowance for loan losses, see "Financial Condition – Allowance for Loan and Foreclosure Losses."

The provision for unfunded commitment and letter of credit losses, a component of the provision for loan losses, increased $1.7 million from $(0.3) million in fiscal 2012 to $1.4 million in fiscal 2013. The unfavorable variance was primarily due to an increase in classified unfunded commitments.

Future provisions for credit losses will continue to be based upon management's assessment of the overall loan portfolio and the underlying collateral, trends in non-performing loans, current economic conditions and other relevant factors in order to maintain the allowance for loan losses at adequate levels to provide for probable and estimable future losses. The establishment of the amount of the loan loss allowance inherently involves judgments by management as to the adequacy of the allowance, which ultimately may change. Higher rates of loan defaults than anticipated would likely result in a need to increase provisions in future years.

55

**Table of Contents**

**Non-interest Income**

The following table presents non-interest income by major category for the periods indicated:

| | Year Ended March 31, | | Increase (Decrease) | |
|---|---|---|---|---|
| | 2013 | 2012 | Amount | Percent |
| | | (Dollars in thousands) | | |
| Net impairment losses recognized in earnings | $ (408) | $ (568) | $ 160 | 28.2% |
| Loan servicing income (loss), net of amortization | (1,892) | (789) | (1,103) | 139.8 |
| Service charges on deposits | 10,435 | 10,589 | (154) | (1.5) |
| Investment and insurance commissions | 3,894 | 3,808 | 86 | 2.3 |
| Net gain on sale of loans | 23,195 | 17,680 | 5,515 | 31.2 |
| Net gain (loss) on sale of investment securities | (247) | 6,579 | (6,826) | (103.8) |
| Net gain on sale of OREO | 6,876 | 6,118 | 758 | 12.4 |
| Other | 4,048 | 5,844 | (1,796) | (30.7) |
| Total non-interest income | $45,901 | $49,261 | $(3,360) | (6.8)% |

Non-interest income totaled $45.9 million in fiscal 2013, a decrease of $3.4 million, or 6.8%, compared to $49.3 million in the prior year. The decrease was largely due to lower loan servicing income, gain on sale of securities and other income; partially offset by higher gains on the sale of loans.

The decrease in loan servicing income of $1.1 million was primarily attributable to lower servicing fees reflecting a 6.9% decrease in the serviced loan portfolio during fiscal 2013, and moderately higher amortization of the MSR asset as mortgage market interest rates drifted generally lower during the year. Net gain (loss) on sale of securities fell by $6.8 million to a loss of $0.2 million compared to the prior year largely due to a significant decrease in the level of investment security sale activity, as proceeds from sale totaled $12.3 million in fiscal 2013 compared to $338.2 million in the year ago period. The decrease in other income of $1.8 million was primarily due to a cash surrender value adjustment on bank owned life insurance policies and net losses on disposition of premises and equipment.

Gain on sale of loans increased $5.5 million, or 31.2% primarily due to significantly higher margins on the sale of residential mortgage loans, partially offset by a modestly lower volume of sales in the current fiscal year totaling $920.2 million compared to $930.2 million a year ago.

Table of Contents

**Non-interest Expense**

The following table presents non-interest expense by major category for the periods indicated:

| | Year Ended March 31, | | Increase (Decrease) | |
| | 2013 | 2012 | Amount | Percent |
|---|---|---|---|---|
| | (Dollars in thousands) | | | |
| Compensation and benefits | $ 40,736 | $ 41,262 | $ (526) | (1.3)% |
| Occupancy | 8,133 | 7,946 | 187 | 2.4 |
| Furniture and equipment | 4,563 | 5,665 | (1,102) | (19.5) |
| Federal deposit insurance premiums | 5,921 | 7,189 | (1,268) | (17.6) |
| Data processing | 6,223 | 6,259 | (36) | (0.6) |
| Communications | 1,840 | 2,081 | (241) | (11.6) |
| Marketing | 1,345 | 1,466 | (121) | (8.3) |
| OREO expense, net | 37,571 | 28,684 | 8,887 | 31.0 |
| Investor loss reimbursement | 4,530 | 157 | 4,373 | 2,785.4 |
| Mortgage servicing rights impairment (recovery) | (403) | 2,410 | (2,813) | (116.7) |
| Legal services | 5,256 | 5,024 | 232 | 4.6 |
| Other professional fees | 2,346 | 3,669 | (1,323) | (36.1) |
| Insurance | 1,656 | 1,478 | 178 | 12.0 |
| Debt prepayment penalty | 3,549 | — | 3,549 | N/A |
| Other | 10,346 | 11,045 | (699) | (6.3) |
| Total non-interest expense | $133,612 | $124,335 | $ 9,277 | 7.5% |

Non-interest expense increased $9.3 million to $133.6 million in fiscal 2013 compared to $124.3 million in the prior year. The increase was primarily due to higher OREO expense, investor loss reimbursement, and a current year debt prepayment penalty; partially offset by lower furniture and equipment expense, FDIC insurance premiums, MSR impairment and other professional fees.

The increase in OREO expense of $8.9 million primarily reflects higher provisions for losses on repossessed property. Investor loss reimbursement increased $4.4 million largely due to higher volume of repurchases of sold residential mortgage loans and worsening loan level loss severity. A one-time debt prepayment penalty of $3.5 million was incurred in the current fiscal year upon the prepayment of $150.0 million of FHLB advances in December 2012.

The decreases in furniture and equipment expense of $1.1 million, and other professional fees of $1.3 million, were largely due to ongoing efforts to reduce operating costs. The decrease in FDIC premiums of $1.3 million was due to a lower deposit insurance assessment base primarily attributable to a drop in average consolidated total assets. Mortgage servicing rights impairment (recovery) improved $2.8 million reflecting mortgage market interest rates drifting generally lower during the year.

**Income Taxes**

Income tax expense for the year ended March 31, 2013 was a benefit of $181,000 compared to expense of $10,000 in fiscal 2012. The current year tax benefit was primarily due to the recognition of a previously unrecognized tax benefit that was recorded following the receipt of tax refunds from the Internal Revenue Service related to an uncertain tax position.

A full valuation allowance has been in place since June 30, 2009 on the net deferred tax asset due to the uncertainty of the Corporation's ability to create sufficient taxable income in the near future to fully utilize it.

57

Table of Contents

*Comparison of Years Ended March 31, 2012 and 2011*

### General

Operating results improved $4.5 million to a net loss of $36.7 million in fiscal 2012 from a net loss of $41.2 million in fiscal 2011. The primary drivers of this improvement in results were a $17.6 million decrease in the provision for credit losses and a decrease in non-interest expense of $9.8 million. These favorable variances were partially offset by decreases in net interest income of $13.2 million and in non-interest income of $10.0 million.

### Net Interest Income

Net interest income totaled $71.9 million in fiscal 2012, a decrease of $13.2 million from $85.1 million in fiscal 2011. The decline in net interest income was primarily due to lower earning rates on mortgage loans as customers renewed and refinanced loans in a lower rate environment during fiscal 2012 and on investment securities attributable to sales of higher yielding positions in fiscal 2012 for capital management purposes. These unfavorable variances were partially offset by the positive impact of maturing above market rate certificates of deposit.

### Provision for Credit Losses

The provision for credit losses decreased $17.6 million from $51.2 million in fiscal 2011 to $33.6 million in fiscal 2012. The decrease in provision and specific and general reserves was in response to the following trends identified in the portfolio: (i) a proactive method of identification of criticized assets and (ii) continued analysis of the commercial real estate, construction and land portfolios. These trends resulted in the Corporation's allowance for loan losses decreasing $38.9 million from $150.1 million at March 31, 2011 to $111.2 million at March 31, 2012. The allowance for loan losses represented 5.08% of total loans at March 31, 2012, compared to 5.60% of total loans at March 31, 2011. For further discussion of the allowance for loan losses, see "Financial Condition – Allowance for Loan and Foreclosure Losses."

### Non-interest Income

The following table presents non-interest income by major category for the periods indicated:

|  | Year Ended March 31, | | Increase (Decrease) | |
|---|---|---|---|---|
|  | 2012 | 2011 | Amount | Percent |
|  | (Dollars in thousands) | | | |
| Net impairment losses recognized in earnings | $   (568) | $   (440) | $   (128) | (29.1)% |
| Loan servicing income (loss), net of amortization | (789) | 2,128 | (2,917) | (137.1) |
| Service charges on deposits | 10,589 | 11,463 | (874) | (7.6) |
| Investment and insurance commissions | 3,808 | 3,448 | 360 | 10.4 |
| Net gain on sale of loans | 17,680 | 17,925 | (245) | (1.4) |
| Net gain (loss) on sale of investment securities | 6,579 | 8,661 | (2,082) | (24.0) |
| Net gain on sale of OREO | 6,118 | 3,640 | 2,478 | 68.1 |
| Net gain on sale of branches | — | 7,350 | (7,350) | (100.0) |
| Other income | 5,844 | 5,085 | 759 | 14.9 |
| Total non-interest income | $ 49,261 | $ 59,260 | $(9,999) | (16.9)% |

Non-interest income totaled $49.3 million for fiscal 2012, a decrease of $10.0 million compared to $59.3 million for fiscal 2011. The decrease was largely due to a $7.4 million non-recurring gain on sale of branches in fiscal 2011 and lower loan servicing income reflecting an increase in the amortization rate of the mortgage servicing asset caused by the historically low interest rate environment during much of fiscal 2012 and the resultant mortgage refinance activity.

**Table of Contents**

**Non-interest Expense**

The following table presents non-interest expense by major category for the periods indicated:

| | Year Ended March 31, | | Increase (Decrease) | |
|---|---|---|---|---|
| | **2012** | **2011** | **Amount** | **Percent** |
| | (Dollars in thousands) | | | |
| Compensation and benefits | $ 41,262 | $ 41,485 | $ (223) | (0.5)% |
| Occupancy | 7,946 | 8,541 | (595) | (7.0) |
| Furniture and equipment | 5,665 | 6,198 | (533) | (8.6) |
| Federal deposit insurance premiums | 7,189 | 11,402 | (4,213) | (36.9) |
| Data processing | 6,259 | 6,540 | (281) | (4.3) |
| Communications | 2,081 | 2,389 | (308) | (12.9) |
| Marketing | 1,466 | 1,491 | (25) | (1.7) |
| OREO expense, net | 28,684 | 30,926 | (2,242) | (7.2) |
| Mortgage servicing rights impairment (recovery) | 2,410 | (97) | 2,507 | (2,584.5) |
| Legal services | 5,024 | 8,040 | (3,016) | (37.5) |
| Other professional fees | 3,669 | 5,294 | (1,625) | (30.7) |
| Insurance | 1,478 | 1,126 | 352 | 31.3 |
| Other expense | 11,202 | 10,825 | 377 | 3.5 |
| Total non-interest expense | $124,335 | $134,160 | $(9,825) | (7.3)% |

Non-interest expense decreased $9.8 million to $124.3 million for fiscal 2012 compared to $134.2 million for fiscal 2011. The decrease was primarily due to a $4.2 million decrease in federal deposit insurance premiums attributable to a favorable change in the method of calculating deposit insurance premiums mandated by section 331 of the Dodd-Frank Act that became effective April 1, 2011. In addition, legal services decreased $3.0 million largely due to a diminished need for outside legal services in support of corporate programs and initiatives. These decreases were partially offset by an increase in the impairment of mortgage servicing rights of $2.5 million resulting from higher levels of refinance activity caused by the low interest rate environment in fiscal 2012.

**Income Taxes**

Income tax expense decreased $154,000 for fiscal 2012 as compared to fiscal 2011. The effective tax rate for fiscal 2012 was (0.03%) as compared to (0.46%) for fiscal 2011.

Table of Contents

### Financial Condition

### General

Total assets of the Corporation decreased $421.9 million, or 15.1%, from $2.79 billion at March 31, 2012 to $2.37 billion at March 31, 2013. This decrease was primarily attributable to lower balances in loans held for investment.

### Investment Securities

Investment securities available-for-sale increased $24.5 million during the year, or 10.1%, primarily due to purchases of $81.2 million and fair value adjustments of $3.4 million. These increases were partially offset by principal repayments and sales of $59.7 million and $0.4 million of other-than-temporary impairment losses that were recognized in earnings. See Notes 1 and 4 to the Consolidated Financial Statements included in Item 8.

Investment securities are subject to inherent risks based upon the future performance of the underlying collateral (i.e., mortgage loans) for these securities. Among these risks are prepayment risk, interest rate risk and credit risk. Should general interest rate levels decline, the mortgage-related securities portfolio would be subject to (i) prepayments as borrowers typically would seek to obtain financing at lower rates, (ii) a decline in interest income received on adjustable-rate mortgage-related securities, and (iii) an increase in fair value of fixed-rate mortgage-related securities. Conversely, should general interest rate levels increase, the mortgage-related securities portfolio would be subject to (i) a longer term to maturity as borrowers would be less likely to prepay their loans, (ii) an increase in interest income received on adjustable-rate mortgage-related securities, (iii) a decline in fair value of fixed-rate mortgage-related securities, (iv) a decline in fair value of adjustable-rate mortgage-related securities to the extent dependent upon the level of interest rate increases, the time period to the next interest rate repricing date for individual loans within the security and the applicable periodic (annual and/or lifetime) cap which could limit the degree to which an individual loan could reprice within a given time period, and (v) should default rates and loss severities increase on the underlying collateral of mortgage-related securities, the Corporation may experience credit losses that need to be recognized in earnings as other-than-temporary impairment.

### Loans Held for Investment

Loans held for investment, net decreased $387.2 million during fiscal 2013 from $2.06 billion at March 31, 2012 to $1.67 billion at March 31, 2013. The activity included principal repayments and other adjustments (the majority of which are undisbursed loan proceeds) of $580.8 million and transfers to other real estate owned of $75.7 million, partially offset by originations and refinances. During 2013, the Corporation originated $250.8 million of loans for investment, as compared to $215.3 million and $113.9 million during fiscal 2012 and 2011, respectively.

### Loans Held for Sale

Residential mortgage loans originated for sale amounted to $899.0 million in fiscal 2013, as compared to $961.9 million and $780.1 million in fiscal 2012 and fiscal 2011, respectively. At March 31, 2013, loans held for sale, which consisted solely of single-family residential mortgage loans, amounted to $18.1 million, as compared to $39.3 million at March 31, 2012. Loans held for sale are recorded at the lower of cost or fair value.

### Other Real Estate Owned

OREO, net decreased $4.5 million to $84.3 million at March 31, 2013 from $88.8 million at March 31, 2012 due to sales of $47.6 million, valuation adjustments of $30.0 million, and a transfer to premises and equipment of $2.9 million. These decreases were partially offset by transfers in from the loan portfolio and premises and equipment of $75.2 million and $0.5 million, respectively; and capitalized improvements of $0.3 million.

60

**Table of Contents**

**Accrued Interest Receivable**

Accrued interest receivable decreased $2.5 million to $9.6 million at March 31, 2013 from $12.1 million at March 31, 2012 commensurate with the decrease in the securities and loan portfolios.

**Deposits**

Deposits decreased $239.9 million during fiscal 2013 to $2.03 billion, due largely to a $242.9 million decline in certificates of deposit. A significant portion of the decreases were due to planned reductions in deposits from single service special rate households. Deposits obtained from brokerage firms which solicit deposits from their customers amounted to $100,000 at March 31, 2013, as compared to $274,000 at March 31, 2012 and $48.1 million at March 31, 2011. The weighted average cost of deposits decreased to 0.48% in fiscal 2013 compared to 0.98% in fiscal 2012.

**Borrowings**

FHLB advances decreased $160.0 million during fiscal 2013. At March 31, 2013, advances totaled $197.5 million and had a weighted average interest rate of 3.06% compared to advances of $357.5 million with a weighted average interest rate of 2.49% at March 31, 2012. Other borrowed funds as of March 31, 2013 consist of short-term line of credit borrowings of $116.3 million and retail repurchase agreements of $3.4 million. Other borrowed funds as of March 31, 2012 consist of short-term line of credit borrowings of $116.3 million and retail repurchase agreements of $2.3 million. For additional information, see Note 10 to the Consolidated Financial Statements included in Item 8.

**Accrued Interest and Fees Payable**

Accrued interest and fees payable increased $18.0 million to $61.3 million at March 31, 2013 from $43.3 million at March 31, 2012. The increase was mainly due to an increase in accrued interest and fees on short-term line of credit borrowings as the Corporation discontinued payments on this line on March 2, 2009 which is currently in default. For additional information, see Note 10 to the Consolidated Financial Statements included in Item 8.

**Other Liabilities**

Other liabilities decreased $10.8 million during fiscal 2013 to $17.5 million at March 31, 2013 from $28.3 million at March 31, 2012 primarily due to a lower disbursement obligation on loans closed but not yet funded that are in a three-day rescission period during which borrowers have the option to rescind the loan transaction.

**Stockholders' Equity (Deficit)**

Stockholders' equity (deficit) at March 31, 2013 was ($59.9) million compared to ($29.6) million at March 31, 2012. Stockholders' equity decreased during the year primarily as a result of comprehensive loss of $30.7 million, which includes net loss of $34.2 million, partially offset by an increase in net unrealized gains on available-for-sale securities included as a part of accumulated other comprehensive income of $2.8 million.

**RISK MANAGEMENT**

The Bank encounters risk as part of its normal course of business and designs risk management processes to help manage these risks. This Risk Management section describes the Bank's risk management philosophy, principles, governance and various aspects of its risk management process.

*Risk Management Philosophy*

The Bank's risk management philosophy is to manage to an overall level of risk while still allowing it to capture opportunities and optimize shareholder value. However, due to the general state of the economy and the elevated

61

**Table of Contents**

risk in the loan portfolio, the Bank's risk profile does not currently meet our desired risk level. The Bank is working toward reducing the overall risk level to a more desired risk profile.

The Bank views risk management as not about eliminating risks, but about identifying and accepting risks and then working to effectively manage them so as to optimize shareholder value. Risk management includes, but is not limited to the following:

- Taking only risks consistent with the Bank's strategy and within its capability to manage,

- Ensuring strong underwriting and credit risk management practices,

- Practicing disciplined capital and liquidity management,

- Helping ensure that risks and earnings volatility are appropriately understood and measured,

- Avoiding excessive concentrations, and

- Helping support external stakeholder confidence.

Although the Board of Directors is primarily responsible for oversight of risk management, committees of the Board may provide oversight to specific areas of risk with respect to the level of risk and risk management structure. The Bank uses management level risk committees to help ensure that business decisions are executed within our desired risk profile. Management provides oversight for the establishment and implementation of new risk management initiatives, reviews risk profiles and discusses key risk issues. The Chief Risk Officer is in charge of overseeing credit risk management. Our internal audit department performs an independent assessment of the internal control environment and plays a critical role in risk management, testing the operation of the internal control system and reporting findings to management and to the Audit Committee of the Board.

### CREDIT RISK MANAGEMENT

Credit risk represents the possibility that a customer, counterparty or issuer may not perform in accordance with contractual terms. Credit risk is inherent in the financial services business and results from extending credit to customers, purchasing investment securities and entering into certain guarantee contracts. Credit risk is one of the most significant risks facing the Bank.

In addition to credit policies and procedures and setting portfolio objectives for the level of credit risk, the Bank has established guidelines for problem loans, acceptable levels of total borrower exposure and other credit measures. During fiscal 2013, management has continued to focus on loss mitigation and maximization of recoveries in the Bank's non-performing assets portfolios. Over time, the Bank intends to return to management of portfolio returns through discrete portfolio investments within approved risk tolerances.

The Bank seeks to achieve credit portfolio objectives by maintaining a customer base that is diverse in borrower exposure and industry types. Corporate credit personnel are responsible for loan underwriting and approval processes to help ensure that newly approved loans meet policy and portfolio objectives.

The Risk Management group is responsible for monitoring credit risk, while Internal Audit provides an independent assessment of the effectiveness of the credit risk management process. An external credit risk management group also provides loan review services. Credit risk is managed taking into account regulatory guidance.

Table of Contents

*Non-Performing Loans*

The composition of non-performing loans is summarized as follows:

| | March 31, 2013 | | | March 31, 2012 | | |
|---|---|---|---|---|---|---|
| | Non-Performing Loans | Percent of Non-Performing Loans | Percent of Total Gross Loans [1] | Non-Performing Loans | Percent of Non-Performing Loans | Percent of Total Gross Loans [1] |
| | | | (Dollars in thousands) | | | |
| Residential | $ 33,107 | 27.9% | 1.88% | $ 44,550 | 19.8% | 2.04% |
| Commercial and industrial | 2,915 | 2.4 | 0.17 | 8,217 | 3.7 | 0.38 |
| Land and construction | 31,787 | 26.8 | 1.80 | 64,229 | 28.6 | 2.94 |
| Multi-family | 20,652 | 17.4 | 1.17 | 37,762 | 16.8 | 1.73 |
| Retail/office | 17,523 | 14.8 | 1.00 | 33,817 | 15.0 | 1.55 |
| Other commercial real estate | 8,165 | 6.9 | 0.46 | 27,963 | 12.4 | 1.28 |
| Education [2] | 424 | 0.3 | 0.02 | 762 | 0.3 | 0.03 |
| Other consumer | 4,217 | 3.5 | 0.24 | 7,624 | 3.4 | 0.35 |
| Total | $ 118,790 | 100.0% | 6.74% | $ 224,924 | 100.0% | 10.28% |

(1) Gross loans are the unpaid principal balance before the reduction for loans in process, unearned interest and loan fees and the allowance for loans losses.

(2) Excludes the guaranteed portion of education loans 90+ days past due with an unpaid principal balance totaling $13,697 and $24,641 at March 31, 2013 and 2012, respectively, that are not considered impaired based on a guarantee provided by government agencies.

The following is a summary of non-performing loan activity for the year ended March 31, 2013:

| | Non-Performing Loans March 31, 2012 | Additions | Transfer to Accrual Status | Transfer to OREO | Paid Down | Charged Off | Non-Performing Loans March 31, 2013 | Remaining Balance of Loans | Associated ALLL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | (In thousands) | | | | |
| Residential | $ 44,550 | $ 12,586 | $ (2,044) | $(12,950) | $ (3,761) | $ (5,274) | $ 33,107 | $ 514,613 | $ 14,525 |
| Commercial and industrial | 8,217 | 2,512 | (3,204) | — | (2,072) | (2,538) | 2,915 | 27,659 | 7,072 |
| Land and construction | 64,229 | 32,756 | (38) | (27,999) | (21,375) | (15,786) | 31,787 | 80,166 | 17,498 |
| Multi-family | 37,762 | 2,016 | (4,642) | (7,672) | (4,984) | (1,828) | 20,652 | 266,795 | 10,753 |
| Retail/office | 33,817 | 7,889 | (167) | (14,635) | (6,855) | (2,526) | 17,523 | 181,163 | 13,866 |
| Other commercial real estate | 27,963 | 3,045 | (4,973) | (7,677) | (5,096) | (5,097) | 8,165 | 164,692 | 12,464 |
| Education | 762 | 6 | — | — | (344) | — | 424 | 166,005 | 310 |
| Other consumer | 7,624 | 4,350 | (2,272) | (125) | (1,239) | (4,121) | 4,217 | 243,313 | 3,327 |
| Total | $ 224,924 | $ 65,160 | $ (17,340) | $ (71,058) | $(45,726) | $(37,170) | $ 118,790 | $1,644,406 | $ 79,815 |

Non-performing loans decreased $106.1 million during the year ended March 31, 2013. The loan categories with the largest decline in non-performing loans were land and construction of $32.4 million, other commercial real estate of $19.8 million, multi-family of $17.1 million, retail/office loans of $16.3 million, and residential loans of $11.4 million.

The interest income that would have been recorded during the year ended March 31, 2013 if the Bank's non-performing loans at the end of the period had been current in accordance with their terms during the period was $5.7 million.

Table of Contents

*Non-Performing Assets*

The composition of non-performing assets and related credit metrics are summarized as follows:

|  | March 31, | |
|---|---|---|
|  | **2013** | **2012** |
|  | (Dollars in thousands) | |
| Non-accrual loans – excluding troubled debt restructurings | $ 92,503 | $148,546 |
| Troubled debt restructurings – non-accrual [1] | 26,287 | 76,378 |
| Other real estate owned (OREO) | 84,342 | 88,841 |
| Total non-performing assets | $203,132 | $313,765 |
| Non-performing loans to gross loans [2] | 6.74% | 10.28% |
| Non-performing assets to total assets | 8.58 | 11.25 |
| Allowance for loan losses to gross loans [2] | 4.53 | 5.08 |
| Allowance for loan losses to non-performing loans | 67.19 | 49.45 |
| Allowance for loan losses plus OREO valuation allowance to non-performing assets | 57.02 | 42.62 |

(1)   Troubled debt restructurings – non-accrual represent non-accrual loans that were modified in a troubled debt restructuring less than six months prior to the period end date or have not performed in accordance with the modified terms for at least six months.

(2)   Gross loans are the unpaid principal balance before the reduction for loans in process, unearned interest and loan fees and the allowance for loans losses.

Loans modified in a troubled debt restructuring due to rate or term concessions that are currently on non-accrual status will remain on non-accrual status for a period of at least six months. If after six months, or a longer period sufficient enough to demonstrate the willingness and ability of the borrower to perform under the modified terms, the borrower has made payments in accordance with the modified terms, the loan is returned to accrual status but retains its status as a troubled debt restructuring. The designation as a troubled debt restructuring is removed in years after the restructuring if both of the following conditions exist: (a) the restructuring agreement specifies an interest rate equal to or greater than the rate that the creditor will be willing to accept at the time of restructuring for a new loan with comparable risk and (b) the loan is not impaired based on the terms specified by the restructuring agreement.

The following is a summary of non-performing asset activity for the year ended March 31, 2013:

|  | Non-Performing Loans [1] | Other Real Estate Owned (OREO) [2] | Total Non-Performing Assets |
|---|---|---|---|
|  | (In thousands) | | |
| Balance at March 31, 2012 | $ 224,924 | $    88,841 | $ 313,765 |
| Additions | 65,160 | — | 65,160 |
| Transfers: | | | |
| Loans to OREO [2] | (71,058) | 75,727 | 4,669 |
| OREO to premises and equipment, net | — | (2,870) | (2,870) |
| Returned to accrual status | (17,340) | — | (17,340) |
| Sales | — | (47,622) | (47,622) |
| Loan charge-offs/OREO net additional write-downs | (37,170) | (26,733) | (63,903) |
| Valuation of deposit method property [3] | — | (3,301) | (3,301) |
| Capitalized improvements | — | 300 | 300 |
| Payments | (45,726) | — | (45,726) |
| Balance at March 31, 2013 | $ 118,790 | $    84,342 | $ 203,132 |

Table of Contents

(1)   Total non-performing loans exclude the guaranteed portion of education loans of $13,697 and $24,641 that are 90 days or more past due but still accruing interest at March 31, 2013 and 2012, respectively.

(2)   Includes a transfer from premises and equipment of a closed retail branch facility no longer used for banking purposes totaling $558,000 during the year ended March 31, 2013.

(3)   Represents the write-down to fair value less estimated selling costs of a loan classified as OREO due to a Bank financed sale of foreclosed property accounted for under the deposit method because of an inadequate down payment by the buyer. The buyer recently defaulted on this loan and the property has been foreclosed upon and revalued in OREO. The valuation amount includes the write-off of principal and interest payments received over the life of the loan totaling $1.4 million and a charge-off to the allowance for loan losses of $1.9 million.

### Loan Delinquencies 30 Days and Over

The following table sets forth information relating to past due loans that were delinquent 30 days and over at the dates indicated.

| | | March 31, | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2013 | | 2012 | | 2011 | | 2010 | | 2009 |
| Days Past Due | Balance | % of Total Gross Loans | Balance | % of Total Gross Loans | Balance | % of Total Gross Loans | Balance | % of Total Gross Loans | Balance | % of Total Gross Loans |
| | | | | | (Dollars in thousands) | | | | | |
| 30 to 59 days | $ 14,294 | 0.81% | $ 18,332 | 0.84% | $ 46,244 | 1.72% | $ 53,105 | 1.54% | $ 64,862 | 1.58% |
| 60 to 89 days | 10,109 | 0.57 | 12,230 | 0.56 | 30,479 | 1.14 | 53,864 | 1.56 | 29,858 | 0.73 |
| 90 days and over | 92,209 | 5.23 | 190,663 | 8.71 | 238,256 | 8.88 | 217,393 | 6.31 | 146,151 | 3.56 |
| Total | $116,612 | 6.61% | $221,225 | 10.11% | $314,979 | 11.74% | $324,362 | 9.42% | $240,871 | 5.86% |

Loans delinquent 30 to 89 days decreased $6.2 million to $24.4 million at March 31, 2013 from $30.6 million at March 31, 2012 as a result of increased monitoring and loss mitigation efforts.

### Impaired Loans

At March 31, 2013, the Corporation has identified $160.4 million of loans as impaired which includes $41.6 million of performing troubled debt restructurings (TDR). At March 31, 2012, impaired loans were $297.6 million including $72.6 million of performing TDRs. A loan is identified as impaired when, based on current information and events, it is probable that the Bank will be unable to collect all amounts due according to the contractual terms of the loan agreement and thus are placed on non-accrual status.

During the quarter ended September 30, 2011, the Corporation adopted Accounting Standards Update No. 2011-02, "A Creditor's Determination of Whether a Restructuring Is a Troubled Debt Restructuring." This ASU clarifies the guidance on how creditors evaluate whether a restructuring of debt qualifies as a Troubled Debt Restructuring. The adoption of ASU 2011-02 increased the Corporation's impaired loans by approximately $258,000.

65

**Table of Contents**

The following is additional information regarding impaired loans.

| | March 31, | |
|---|---|---|
| | **2013** | **2012** |
| | (In thousands) | |
| Unpaid principal balance of impaired loans: | | |
| With specific reserve required | $105,522 | $173,596 |
| Without a specific reserve | 54,833 | 123,976 |
| Total impaired loans | 160,355 | 297,572 |
| Less: | | |
| Specific valuation allowance for impaired loans | (29,092) | (44,150) |
| Carrying amount of impaired loans | $131,263 | $253,422 |
| Average carrying amount of impaired loans | $189,919 | $304,060 |
| Loans and troubled debt restructurings on non-accrual status | 118,790 | 224,924 |
| Troubled debt restructurings – accrual | 41,565 | 72,648 |
| Troubled debt restructurings – non-accrual [1] | 26,287 | 76,378 |
| Loans past due ninety days or more and still accruing [2] | 13,697 | 30,697 |

(1)    Troubled debt restructurings – non-accrual are included in the loans and troubled debt restructurings on non-accrual status line item above.

(2)    Includes the guaranteed portion of education loans of $13,697 and $24,641 at March 31, 2013 and 2012, respectively, that were 90+ days past due which continue to accrue interest due to a guarantee provided by government agencies covering approximately 97% of the outstanding balance.

The following table presents interest income recognized on impaired loans on a cash basis.

| | For the Year Ended March 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | (In thousands) | | |
| Interest income recognized on impaired loans on a cash basis | $5,729 | $7,231 | $9,818 |

*Allowance for Loan Losses*

Like all financial institutions, we must maintain an adequate allowance for loan losses. The allowance for loan losses is established through a provision for loan losses charged to expense. Loans are charged-off against the ALLL when we believe that repayment of principal is unlikely. Subsequent recoveries, if any, are credited to the ALLL. The balance in the ALLL is an amount that we believe will be adequate to absorb probable losses on existing loans that may become uncollectible, based on evaluation of the collectability of loans and prior credit loss experience, together with the other factors discussed in the Critical Accounting Estimates and Judgments section that appeared earlier in this Item 7.

The ALLL consists of general, substandard loan and specific components even though the entire allowance is available to cover losses on any loan. The specific allowance component relates to impaired loans (i.e. – non-accrual) and loans reported as TDRs. For such loans, an ALLL is established when the discounted cash flows (or collateral value if repayment relies solely on the operation or sale of the collateral) of the impaired loan are lower than the carrying value of that loan. The substandard loan component is primarily associated with loans rated in this category but not in non-accrual status. The general allowance component covers pass and special mention rated loans and is based on historical net loss experience for the past six quarters, adjusted for various qualitative and quantitative factors. Loans graded substandard and below are individually examined to determine the appropriate ALLL. A reserve for unfunded commitments, letters of credit and repurchase of sold loans is also maintained which is classified in other liabilities.

66

Table of Contents

The general component allowance for loan loss methodology incorporates the following quantitative and qualitative risk factors to establish the appropriate general allowance for loan loss at each reporting date.

Quantitative factors include:

- loan volume and terms
- delinquency and charge-off trends
- collateral values
- credit concentrations
- external factors such as competition and legal and regulatory requirements
- portfolio size

Qualitative factors include:

- lending policies, procedures and practices
- national and local economic conditions
- experience, ability and depth of lending management and other relevant staff
- loan review system

Any changes in the risk factors are based on perceived risk of similar groups of loans classified by collateral type, purpose and terms. Statistics on local trends, peers, and an internal six quarter net loss history are also incorporated into the allowance methodology. Due to the credit concentration of our loan portfolio in real estate secured loans, the quantitative factor related to the value of collateral is heavily dependent on real estate values in Wisconsin and surrounding states. While management uses the best information available to make its evaluation, future adjustments to the ALLL may be necessary if there are significant changes in economic or other conditions. In addition, the OCC, as an integral part of their examination processes, periodically reviews the Banks' allowance for loan losses, and may recommend adjustments based on their assessment of the adequacy of the ALLL. Management periodically reviews the assumptions and formula used in determining the ALLL and makes adjustments if required to reflect the current risk profile of the portfolio.

During the quarter ending December 31, 2011, the values assigned to quantitative factors regarding loan volume and terms, delinquency and charge-off trends, and collateral values; and the qualitative factor regarding economic conditions, were adjusted lower to reflect the results of an analysis based on various publications, market research, economic reports, portfolio credit metrics, management's expertise and knowledge of the immediate lending market, as well as analysis of peer institutions and similar markets. The factor value changes resulted in a lower required allowance for loan losses as of December 31, 2011 totaling $6.1 million. The lower required allowances by portfolio segment were $2.4 million for the residential segment, $0.1 million for the commercial and industrial segment, and $3.6 million for the commercial real estate segment. No changes to the values assigned to quantitative and qualitative factors were made since December 31, 2011.

The following table presents the allowance for loan losses by component:

|  | March 31, | |
| --- | --- | --- |
|  | 2013 | 2012 |
|  | (In thousands) | |
| General component | $28,163 | $ 37,085 |
| Substandard loan component | 22,560 | 29,980 |
| Specific component | 29,092 | 44,150 |
| Total allowance for loan losses | $79,815 | $111,215 |

67

**Table of Contents**

The following table presents the unpaid principal balance of loans by risk category:

| | March 31, | |
|---|---|---|
| | **2013** | **2012** |
| | (In thousands) | |
| Pass [1] | $ 1,519,665 | $ 1,740,542 |
| Special mention | 33,363 | 56,762 |
| Total pass and special mention rated loans | 1,533,028 | 1,797,304 |
| Substandard rated loans, excluding TDR accrual | 49,813 | 93,207 |
| Troubled debt restructurings – accrual | 41,565 | 72,648 |
| Non-accrual | 118,790 | 224,924 |
| Total impaired loans | 160,355 | 297,572 |
| Total unpaid principal balance | $ 1,763,196 | $ 2,188,083 |

(1)    Includes all accrual residential and consumer loans as these loans are generally not individually rated.

The following table presents credit risk metrics related to the allowance for loan losses:

| | March 31, | |
|---|---|---|
| | **2013** | **2012** |
| | (Dollars in thousands) | |
| General ALLL / pass and special mention loans | 1.8% | 2.1% |
| Substandard ALLL / substandard loans, excluding TDR accrual | 45.3% | 32.2% |
| Specific ALLL / impaired loans | 16.2% | 14.8% |
| Loans 30 to 89 days past due | $24,403 | $30,562 |

The ratio of the general allowance for loan losses to pass and special mention rated loans has declined to 1.8% at March 31, 2013 from 2.1% at March 31, 2012 reflecting comparable charge-offs year-over-year. The ratios associated with substandard and impaired loans have both increased from March 31, 2012 to March 31, 2013 reflecting a continued weakness in collateral values associated with these higher risk credits.

68

**Table of Contents**

The following table summarizes the activity in the allowance for loan losses for the periods indicated.

| | Year Ended March 31, | | | | |
| | 2013 | 2012 | 2011 | 2010 | 2009 |
| | | | (Dollars in thousands) | | |
|---|---|---|---|---|---|
| Allowance at beginning of year | $111,215 | $150,122 | $179,644 | $ 137,165 | $  38,285 |
| Charge-offs: | | | | | |
| Single-family residential | (6,659) | (6,625) | (17,563) | (5,505) | (11,226) |
| Multi-family residential | (2,656) | (4,247) | (14,497) | (12,729) | (10,093) |
| Commercial real estate | (13,390) | (32,009) | (21,986) | (32,580) | (33,315) |
| Construction and land | (18,219) | (21,429) | (12,554) | (44,107) | (24,978) |
| Consumer | (4,946) | (3,259) | (3,302) | (4,322) | (2,310) |
| Commercial business | (3,483) | (14,993) | (18,984) | (23,040) | (27,002) |
| Total charge-offs | (49,353) | (82,562) | (88,886) | (122,283) | (108,924) |
| Recoveries: | | | | | |
| Single-family residential | 1,743 | 1,711 | 1,522 | 580 | 118 |
| Multi-family residential | 327 | 1,425 | 653 | — | 6 |
| Commercial real estate | 3,686 | 2,670 | 2,331 | 632 | 941 |
| Construction and land | 2,787 | 1,429 | 1,166 | 119 | 141 |
| Consumer | 219 | 693 | 299 | 46 | 73 |
| Commercial business | 1,458 | 1,840 | 3,068 | 1,459 | 806 |
| Total recoveries | 10,220 | 9,768 | 9,039 | 2,836 | 2,085 |
| Net charge-offs | (39,133) | (72,794) | (79,847) | (119,447) | (106,839) |
| Provision for loan losses | 7,733 | 33,887 | 50,325 | 161,926 | 205,719 |
| Allowance at end of year | $  79,815 | $111,215 | $150,122 | $ 179,644 | $ 137,165 |
| Net charge-offs to average loans held for sale and for investment | (1.97)% | (3.14)% | (2.76)% | (3.30)% | (2.60)% |

Total charge-offs of $49.4 million and $82.6 million for the fiscal years ending March 31, 2013 and 2012, respectively, decreased $33.2 million and $6.3 million respectively, from the prior fiscal years. Total recoveries increased $452,000 and $729,000 during the fiscal years ended March 31, 2013 and 2012, to $10.2 million and $9.8 million, respectively.

The provision for loan losses decreased $26.2 million to $7.7 million for the fiscal year ending March 31, 2013 compared to $33.9 million for the year ended March 31, 2012. The improvement was largely due to a lower required allowance for losses on impaired loans, reflecting the relatively steady quarter-over-quarter decrease in non-performing loans since June 2010. Management monitors and evaluates the portfolio on an ongoing basis and also considered the decrease in non-accrual loans to total loans to 6.74% at March 31, 2013 from 10.28% at March 31, 2012 as well as the decrease in total non-performing assets to 8.58% at March 31, 2013 from 11.25% at March 31, 2012 to be factors that warranted the decrease in provision for loan losses.

The allowance process is analyzed regularly, with modifications made if needed, and those results are reported monthly to the Bank's Board of Directors. Although management believes that the March 31, 2013 allowance for loan losses is adequate based upon the current evaluation of loan delinquencies, non-performing assets, charge-off trends, economic conditions and other factors, there can be no assurance that future adjustments to the allowance will not be necessary. Management also continues to pursue all practical and legal methods of collection, repossession and disposal, and adheres to high underwriting standards in the origination process in order to continue to improve asset quality. Determination as to the classification of assets and the amount of valuation allowances is subject to review by the bank regulatory agencies which can recommend the establishment of additional general or specific loss allowances.

69

**Table of Contents**

The following table presents the allocation of the allowance for loan losses in the loan categories previously presented.

| | 2013 | % of Loan Type to Total Loans | 2012 | % of Loan Type to Total Loans | 2011 | % of Loan Type to Total Loans | 2010 | % of Loan Type to Total Loans | 2009 | % of Loan Type to Total Loans |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | (Dollars in thousands) | | | | | |
| Single-family residential | $14,525 | 31.1% | $ 13,027 | 26.0% | $ 20,487 | 24.3% | $ 20,960 | 22.3% | $ 11,154 | 20.5% |
| Multi-family residential | 10,753 | 16.3 | 15,714 | 19.4 | 22,358 | 18.6 | 26,471 | 17.9 | 19,202 | 16.1 |
| Commercial real estate | 26,330 | 21.1 | 37,629 | 21.8 | 61,837 | 24.1 | 75,379 | 24.5 | 50,218 | 24.9 |
| Land and construction | 17,498 | 6.3 | 31,810 | 7.9 | 22,251 | 8.4 | 23,908 | 9.9 | 30,526 | 13.0 |
| Consumer | 3,637 | 23.5 | 2,467 | 23.3 | 3,649 | 21.0 | 2,650 | 20.6 | 3,703 | 19.7 |
| Commercial business | 7,072 | 1.7 | 10,568 | 1.6 | 19,540 | 3.6 | 30,276 | 4.8 | 22,362 | 5.8 |
| Total allowance for loan losses | $79,815 | 100.0% | $111,215 | 100.0% | $150,122 | 100.0% | $179,644 | 100.0% | $137,165 | 100.0% |

The following table presents the associated allowance for loan losses as a percent of the total allowance for loan losses in the loan categories previously reported:

| | 2013 | 2012 | 2011 | 2010 | 2009 |
|---|---|---|---|---|---|
| | As of March 31, | | | | |
| Single-family residential | 18.2% | 11.7% | 13.6% | 11.7% | 8.1% |
| Multi-family residential | 13.5 | 14.1 | 14.9 | 14.7 | 14.0 |
| Commercial real estate | 33.0 | 33.8 | 41.2 | 42.0 | 36.6 |
| Land and construction | 21.9 | 28.6 | 14.8 | 13.3 | 22.3 |
| Consumer | 4.6 | 2.2 | 2.4 | 1.5 | 2.7 |
| Commercial business | 8.8 | 9.5 | 13.0 | 16.9 | 16.3 |
| Total allowance for loan losses | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

Table of Contents

*Other Real Estate Owned*

OREO, net decreased $4.5 million during the year ended March 31, 2013. Individual properties included in OREO at March 31, 2013 with a recorded balance in excess of $1 million are listed below:

| Description | Location | Carrying Value (In thousands) |
|---|---|---:|
| Commercial building | Northwest Wisconsin | $ 1,441 |
| Vacant Land | Northwest Wisconsin | 1,221 |
| Vacant land | Northeast Wisconsin | 3,187 |
| Vacant land | Northeast Wisconsin | 1,560 |
| Vacant land | South Central Wisconsin | 2,865 |
| Single family | South Central Wisconsin | 1,950 |
| Commercial building | South Central Wisconsin | 1,925 |
| Vacant land | South Central Wisconsin | 1,908 |
| Farm land | South Central Wisconsin | 1,870 |
| Vacant land | South Central Wisconsin | 1,360 |
| Vacant land | South Central Wisconsin | 1,352 |
| Commercial building | South Central Wisconsin | 1,211 |
| Vacant land | South Central Wisconsin | 1,128 |
| Commercial building | South Central Wisconsin | 1,123 |
| Vacant land | South Central Wisconsin | 1,105 |
| Vacant land | South Central Wisconsin | 1,104 |
| Mixed Use | South Central Wisconsin | 1,097 |
| Vacant land | South Central Wisconsin | 1,027 |
| Vacant land | Southeast Wisconsin | 4,165 |
| Commercial building | Southeast Wisconsin | 3,824 |
| Commercial building | Southeast Wisconsin | 2,054 |
| Mixed use | Southeast Wisconsin | 1,972 |
| Commercial building | Southeast Wisconsin | 1,683 |
| Commercial building and vacant land | Southeast Wisconsin | 1,581 |
| Commercial building | Southeast Wisconsin | 1,228 |
| Condo units | Southeast Wisconsin | 1,195 |
| Vacant land | Southeast Wisconsin | 1,162 |
| Vacant land | Southeast Wisconsin | 1,122 |
| Office/warehouse building | Southeast Wisconsin | 1,063 |
| Multi-family | Eastern Minnesota | 1,343 |
| Other properties individually less than $1 million | | 33,516 |
| | | $ 84,342 |

Foreclosed properties are recorded at fair value less cost to sell upon transfer to OREO with shortfalls, if any, charged to the allowance for loan losses. Subsequent decreases in the valuation of OREO are recorded in a valuation account for the foreclosed property with a corresponding charge to OREO expense, net. The fair value is primarily based on appraisals. On a quarterly basis, the carrying values of OREO properties are reviewed and appropriate adjustments made based upon updated appraisals, broker opinions or signed sales contracts. For appraisals received over one year ago, management considers broker and market analysis to update the estimated fair value. Incremental valuation adjustments may be recognized in the Statement of Operations if, in the opinion of management, additional losses are deemed probable.

**Table of Contents**

*LIQUIDITY RISK MANAGEMENT*

Liquidity risk is the risk of potential loss if the Corporation were unable to meet its funding requirements at a reasonable cost. The Corporation manages liquidity risk at the bank and holding company to help ensure that it can obtain cost-effective funding to meet current and future obligations.

The largest source of liquidity on a consolidated basis is the deposit base that originates from retail and corporate banking businesses. Other borrowed funds are available from a diverse mix of short and long-term funding sources. Liquid assets and unused borrowing capacity from a number of sources are also available to maintain an adequate liquidity position.

### Liquidity and Capital Resources

On an unconsolidated basis, the Corporation's typical sources of funds include dividends from its subsidiaries, including the Bank, interest on its investments and returns on its real estate held for sale. As a condition of the Cease and Desist Order with the OTS (now administered by the OCC), the Bank is currently prohibited from paying dividends to the Corporation. A lack of liquidity resulted in a failure to make a principal payment on March 2, 2009, and the Corporation has continued to be unable to meet its obligations under the credit agreement.

The Bank's primary sources of funds are payments on loans and securities, deposits from retail and wholesale sources, FHLB advances and other borrowings. The Bank is currently prohibited from obtaining new brokered deposits due to its current capital levels. As of March 31, 2013, the Corporation had outstanding borrowings from the FHLB of $197.5 million. The total maximum borrowing capacity at the FHLB based on the existing stock holding as of March 31, 2013 was $512.6 million, subject to collateral availability. Total borrowing capacity based on the value of the existing collateral pledged was $592.8 million.

Capital Purchase Program

On January 30, 2009, as part of Treasury's CPP, the Corporation entered into a Letter Agreement with Treasury. Pursuant to the Securities Purchase Agreement – Standard Terms (the "Securities Purchase Agreement") the Corporation issued the UST 110,000 shares of the Corporation's Fixed Rate Cumulative Perpetual Preferred Stock, Series B (the "Preferred Stock"), having a liquidation amount per share of $1,000, for a total purchase price of $110 million. The Preferred Stock will pay cumulative compounding dividends at a rate of 5% per year for the first five years following issuance and 9% per year thereafter. The Securities Purchase Agreement provides for redemption of shares of the Preferred Stock for the per share liquidation amount of $1,000 plus any accrued and unpaid dividends. The Corporation has deferred the payment of dividends during each of the 16 quarters ended March 31, 2013 due to a lack of liquidity. As a result of such deferrals, on September 30, 2011, the Treasury exercised its right to appoint two directors to the Board of Directors of the Corporation.

As long as any Preferred Stock is outstanding, the Corporation may not pay dividends on its common stock and redeem or repurchase its common stock, unless all accrued and unpaid dividends for all past dividend periods on the Preferred Stock are fully paid. The Preferred Stock is non-voting except for class voting rights on matters that would adversely affect the rights of the holders of the Preferred Stock.

As a condition to participating in the CPP, the Corporation issued and sold to the Treasury a warrant (the "Warrant") to purchase up to 7,399,103 shares of the Corporation's common stock, at an initial per share exercise price of $2.23, for an aggregate purchase price of approximately $16.5 million. The term of the Warrant is ten years. Issuance of the Warrant was subject to the receipt by the Corporation of shareholder approval which was received at the 2009 annual meeting of shareholders. The Warrant provides for the adjustment of the exercise price should the Corporation not have received shareholder approval, as well as customary anti-dilution provisions. Pursuant to the Securities Purchase Agreement, the Treasury has agreed not to exercise voting power with respect to any shares of common stock issued upon exercise of the Warrant.

**Table of Contents**

The terms of the Treasury's purchase of the preferred securities include restrictions on certain forms of executive compensation and limits on the tax deductibility of compensation we pay to executive management. The Corporation invested the proceeds of the sale of Preferred Stock and Warrant in the Bank as Tier 1 capital.

## Loan Commitments

At March 31, 2013, the Bank had outstanding commitments to originate loans of $34.7 million and commitments to extend funds to, or on behalf of, customers pursuant to lines and letters of credit of $168.4 million. Scheduled maturities of certificates of deposit for the Bank during the twelve months following March 31, 2013 amounted to $479.8 million. Scheduled maturities of borrowings during the same period totaled $14.9 million for the Bank and $116.3 million for the Corporation. Management believes adequate resources are available to fund all Bank commitments to the extent required. For more information regarding the Corporation's borrowings, see "Credit Agreement" section below.

## MPF Program

The Corporation previously participated in the Mortgage Partnership Finance Program of the FHLB of Chicago ("MPF Program"). Pursuant to the credit enhancement feature of the MPF Program, the Corporation has retained a secondary credit loss exposure in the amount of $15.9 million at March 31, 2013 related to approximately $276.4 million of residential mortgage loans that the Corporation has originated as agent for the FHLB. Under the credit enhancement, the FHLB is liable for losses on loans up to one percent of the original delivered loan balances in each pool. The Corporation is then liable for losses over and above the first position up to a contractually agreed-upon maximum amount in each pool that was delivered to the Program. The Corporation receives a monthly fee for this credit enhancement obligation based on the outstanding loan balances. The monthly fee received is net of losses under the MPF Program. The MPF Program was discontinued in 2008 in its present format and the Corporation no longer funds loans through the MPF Program.

## FHLB Advances

In January 2012, the Bank exchanged four of its Federal Home Loan Bank advances totaling $150.0 million for an equal number and principal amount of advances with extended maturity dates and different interest rate terms to reduce interest rate risk and lower the current cost of funds. The advances exchanged carried fixed rates of interest ranging from 2.53% to 3.25% and maturity dates from January through March 2013. The new advances all mature in January 2015 and require monthly interest payments based on 3 month LIBOR plus a spread ranging from 0.98% to 1.15%. Prepayment fees due upon exchange of the instruments totaling $4.3 million were embedded in the spread over LIBOR on the new advances. No gain or loss was recorded for these transactions as the criteria in Accounting Standards Codification 470-50, "*Debt – Modifications and Extinguishments*" requiring accounting as an extinguishment of debt were not met.

As of March 31, 2013, the Corporation had outstanding borrowings from the FHLB of $197.5 million. During December 2012, the Bank prepaid $150.0 million of FHLB borrowings using excess liquidity to enhance the Bank's profitability going forward. The prepayment triggered a $3.5 million early termination penalty which was recognized in the Consolidated Statement of Operations in other non-interest expense.

## Regulatory Capital

Under federal law and regulation, the Bank is required to meet tier 1 leverage, tier 1 risk-based and total risk-based capital requirements. Tier 1 capital primarily consists of stockholders' equity minus certain intangible assets and unrealized gains/losses on available-for-sale securities. Total risk-based capital primarily consists of tier 1 capital plus a qualifying portion of the allowance for loan losses. The risk-based capital requirements presently address credit risk related to both recorded and off-balance sheet commitments and obligations.

**Table of Contents**

The Cease and Desist Orders also required that by no later than December 31, 2009, the Bank meet and maintain both a tier 1 leverage (core) ratio equal to or greater than 8% and a total risk-based capital ratio equal to or greater than 12%. The Bank was required to submit to the OTS (now administered by the OCC), and has submitted, a written capital contingency plan, a problem asset plan, a revised business plan, and an implementation plan resulting from a review of commercial lending practices.

At March 31, 2013, the Bank had a tier 1 leverage ratio of 4.53% and a total risk-based capital ratio of 9.02%, each below the required capital ratios set forth above. As a result, the OCC may take additional significant regulatory action against the Bank and Corporation which could, among other things, materially adversely affect the Corporation's shareholders. All customer deposits remain fully insured to the highest limits set by the FDIC. The OCC may grant extensions to the timelines established by the Orders.

Our ability to meet our short-term liquidity and capital resource requirements may be subject to our ability to obtain additional debt financing and equity capital. We may increase our capital resources through offerings of equity securities (possibly including common shares and one or more classes of preferred shares), commercial paper, medium-term notes, securitization transactions structured as secured financings, and senior or subordinated notes.

The following summarizes the Bank's capital levels and ratios and the levels and ratios required by its federal regulators to be considered well capitalized at March 31, 2013 and 2012 under standard PCA guidelines:

| | Actual | | To be Adequately Capitalized | | To be Well Capitalized | | Under Order to Cease and Desist | |
| | Capital | Ratio | Capital | Ratio | Capital | Ratio | Capital | Ratio |
|---|---|---|---|---|---|---|---|---|
| | | | | (Dollars in thousands) | | | | |
| **March 31, 2013** | | | | | | | | |
| Tier 1 leverage [1] | $107,272 | 4.53% | $ 94,775 | 4.00% | $118,469 | 5.00% | $189,551 | 8.00% |
| Tier 1 risk-based capital [2] | 107,272 | 7.71 | 55,655 | 4.00 | 83,483 | 6.00 | N/A | N/A |
| Total risk-based capital [3] | 125,459 | 9.02 | 111,311 | 8.00 | 139,139 | 10.00 | 166,966 | 12.00 |
| **March 31, 2012** | | | | | | | | |
| Tier 1 leverage [1] | $125,894 | 4.51% | $111,685 | 4.00% | $139,606 | 5.00% | $223,370 | 8.00% |
| Tier 1 risk-based capital [2] | 125,894 | 7.11 | 70,850 | 4.00 | 106,276 | 6.00 | N/A | N/A |
| Total risk-based capital [3] | 149,141 | 8.42 | 141,701 | 8.00 | 177,126 | 10.00 | $212,551 | 12.00 |

(1)   Tier 1 capital divided by adjusted total assets.
(2)   Tier 1 capital divided by total risk-weighted assets.
(3)   Total risk-based capital divided by total risk-weighted assets.

The following table reconciles the Bank's stockholders' equity to regulatory capital at March 31, 2013 and 2012:

| | March 31, | |
| | 2013 | 2012 |
|---|---|---|
| | (In thousands) | |
| Stockholders' equity of the Bank | $112,796 | $128,071 |
| Less: Disallowed servicing assets | (1,945) | (2,045) |
| Accumulated other comprehensive income | (3,579) | (132) |
| Tier 1 capital | 107,272 | 125,894 |
| Plus: Allowable general valuation allowances | 18,187 | 23,247 |
| Total risk-based capital | $125,459 | $149,141 |

The Corporation is a separate and distinct legal entity from our subsidiaries, including the Bank. As a holding company without independent operations, the Corporation's liquidity (on an unconsolidated basis) is primarily

**Table of Contents**

dependent upon the Corporation's ability to raise debt or equity capital from third parties and the receipt of dividends from the Bank and its non-bank subsidiary. We receive substantially all of our revenue from dividends from the Bank. These dividends are the principal source of funds to pay dividends on our preferred and common stock, and interest and principal on our debt. The Corporation is currently in default under its Amended and Restated Credit Agreement with its primary lender, and has deferred dividend payments on the Series B Preferred Stock held by Treasury. Various federal and/or state laws and regulations limit the amount of dividends that the Bank may pay us. Additionally, if the Bank's earnings are not sufficient to make dividend payments to the Corporation while maintaining adequate capital levels, our ability to make dividend payments to our preferred and common shareholders will be negatively impacted. As a result of recent regulatory actions, the Corporation's principal operating subsidiary, the Bank, is prohibited from paying any dividends or making any loans to the Corporation, despite the existence of excess liquidity at the Bank. At March 31, 2013, the Corporation's cash and cash equivalents, on an unconsolidated basis amounted to $3.0 million. Presently, the Corporation (on an unconsolidated basis) does not have sufficient liquidity to meet its short-term obligations, which include the approximately $176.4 million in outstanding debt, interest and fees that our lender could accelerate and demand payment for upon the expiration of Amendment No. 8 to the Amended and Restated Credit Agreement on November 30, 2012, and $128.8 million of Series B Preferred Stock and dividends and interest payable to the U.S. Treasury.

## Credit Agreement

On November 30, 2012, the Corporation entered into Amendment No. 9 (the "Amendment") to the Amended and Restated Credit Agreement, dated as of June 9, 2008, (the "Credit Agreement") among the Corporation, the Lenders from time to time a party thereto, and U.S. Bank National Association, as administrative agent for such Lenders (the "Agent"). The Corporation owes $116.3 million principal amount under the Credit Agreement.

Under the Amendment, the Agent and the Lenders agreed to forbear from exercising their rights and remedies against the Corporation until the earliest to occur of the following: (i) the occurrence of any Event of Default (other than a failure to make principal payments on the outstanding balance under the Credit Agreement); or (ii) June 30, 2013. Notwithstanding the agreement to forbear, the Agent may at any time, in its sole discretion, take any action reasonably necessary to preserve or protect its interest in the stock of the Bank, IDI or any other collateral securing any of the obligations against the actions of the Corporation or any third party without notice to or the consent of any party.

The Amendment also provides that the outstanding balance under the Credit Agreement shall bear interest at a rate equal to 15% per annum. Interest accruing under the Credit Agreement is due on the earlier of (i) the date the loans are paid in full or (ii) June 30, 2013. At March 31, 2013, the Corporation had accrued interest payable related to the Credit Agreement of $53.3 million and an amendment fee payable of $6.9 million.

Within two business days after the Corporation obtains knowledge of an event, the chief financial officer of the Bank shall submit a statement of the event together with a statement of the actions which the Corporation proposes to take to the Agent as a result of the occurrence of such event. An event may include: (i) any event which, either of itself or with the lapse of time or the giving of notice or both, would constitute a Default under the Credit Agreement; (ii) a default or an event of default under any other material agreement to which the Corporation or Bank is a party; or (iii) any pending or threatened litigation or certain administrative proceedings.

The Amendment requires the Bank to comply with the following financial covenants:

- A tier 1 leverage ratio of not less than 4.00% at all times.

- A total risk based capital ratio of not less than 8.00% at all times.

- Ratio of non-performing loans to gross loans not to exceed 13.00% at any time.

As stated above, the total outstanding principal balance under the Credit Agreement as of March 31, 2013 was $116.3 million. These borrowings are shown in the Corporation's consolidated financial statements as other borrowed funds. The Amendment provides that the Corporation must pay in full the outstanding balance under

Table of Contents

the Credit Agreement on the earlier of the Corporation's receipt of net proceeds of a financing transaction from the sale of equity securities in an amount not less than $116.3 million, or June 30, 2013.

The Credit Agreement and the Amendment also contain customary representations, warranties, conditions and events of default for agreements of such type. At March 31, 2013, the Corporation was in compliance with all financial covenants contained in the Credit Agreement and the Amendment. Under the terms of the Credit Agreement, as amended on November 30, 2012, the Agent and the Lenders have certain rights, including the right to accelerate the maturity of the borrowings if any covenant is not complied with. Currently, no such action has been taken by the Agent or the Lenders. However, the default creates significant uncertainty related to the Corporation's operations.

## Contractual Obligations and Commitments

At March 31, 2013, on a consolidated basis the Corporation had outstanding commitments to originate $34.7 million of loans and commitments to extend credit to or on behalf of customers pursuant to lines and letters of credit of $168.4 million. See Note 15 to the Consolidated Financial Statements included in Item 8. Commitments to extend credit typically have a term of less than one year. Management believes adequate capital and borrowings are available from various sources to fund all commitments to the extent required.

The following table summarizes our contractual principal cash obligations and other commitments at March 31, 2013:

| Contractual Obligations | Payment Due by Period | | | | |
|---|---|---|---|---|---|
| | Less than 1 Year | 1-3 Years | 4-5 Years (In thousands) | More than 5 Years | Total |
| FHLB advances | $ 11,500 | $ — | $100,000 | $ 86,000 | $ 197,500 |
| Credit agreement | 116,300 | — | — | — | 116,300 |
| Repurchase agreements | 3,425 | — | — | — | 3,425 |
| Total other borrowed funds | 131,225 | — | 100,000 | 86,000 | 317,225 |
| Certificates of deposit | 479,767 | 121,503 | 57,706 | — | 658,976 |
| Other deposits | 1,366,029 | — | — | — | 1,366,029 |
| Operating lease obligations | 1,480 | 2,599 | 2,078 | 6,271 | 12,428 |
| Total contractual obligations | $1,978,501 | $124,102 | $159,784 | $ 92,271 | $2,354,658 |

In May 2009, the Corporation began deferring payments of dividends on its preferred stock. The dividends on the preferred stock are recorded only when declared. At March 31, 2013, the cumulative amount of dividends in arrears not declared, along with compounding at 5% per annum on the unpaid dividends was $25.3 million.

At March 31, 2013, the Bank's capital was below all capital requirements of the OCC as mandated by the Order to Cease and Desist. See Note 13 to the Consolidated Financial Statements included in Item 8.

## Orders to Cease and Desist

On June 26, 2009, Anchor Bancorp Wisconsin Inc. (the "Company") and its wholly-owned subsidiary, Anchor Bank (the "Bank") each consented to the issuance of an Order to Cease and Desist (the "Company Order" and the "Bank Order," respectively, and together, the "Orders") by the Office of Thrift Supervision (the "OTS"). As of July 21, 2011, the Cease and Desist Order is now administered by the OCC with respect to the Bank and the Federal Reserve with respect to the Corporation.

The Corporation Order requires that the Corporation notify, and in certain cases receive the permission of, the OCC prior to: (i) declaring, making or paying any dividends or other capital distributions on its capital stock, including the repurchase or redemption of its capital stock; (ii) incurring, issuing, renewing or rolling over any debt, increasing any current lines of credit or guaranteeing the debt of any entity; (iii) making certain changes to

**Table of Contents**

its directors or senior executive officers; (iv) entering into, renewing, extending or revising any contractual arrangement related to compensation or benefits with any of its directors or senior executive officers; and (v) making any golden parachute payments or prohibited indemnification payments. Further, the Corporation's board was required to develop and submit to the OTS a three-year cash flow plan, which must be reviewed at least quarterly by the Company's management and board for material deviations between the cash flow plan projections and actual results (the "Variance Analysis Report"). Within thirty days following the end of each quarter, the Corporation is required to provide the OCC its Variance Analysis Report for that quarter. The Corporation has complied with each of these requirements as of March 31, 2013.

The Bank Order requires that the Bank notify, or in certain cases receive the permission of, the OCC prior to (i) increasing its total assets in any quarter in excess of an amount equal to net interest credited on deposit liabilities during the quarter; (ii) accepting, rolling over or renewing any brokered deposits; (iii) making certain changes to its directors or senior executive officers; (iv) entering into, renewing, extending or revising any contractual arrangement related to compensation or benefits with any of its directors or senior executive officers; (v) making any golden parachute or prohibited indemnification payments; (vi) paying dividends or making other capital distributions on its capital stock; (vii) entering into certain transactions with affiliates; and (viii) entering into third-party contracts outside the normal course of business.

The Orders also required that no later than December 31, 2009, the Bank was to meet and maintain both a core capital ratio equal to or greater than eight percent and a total risk-based capital ratio equal to or greater than twelve percent. The Bank also submitted, to the OTS, within the prescribed time periods, a written capital contingency plan, a problem asset plan, a revised business plan, and an implementation plan resulting from a review of commercial lending practices. The Orders also require the Bank to review its current liquidity management policy and the adequacy of its allowance for loan and lease losses.

On August 31, 2010, the OTS approved the Capital Restoration Plan submitted by the Bank, although the approval included a Prompt Corrective Action Directive ("PCA"). The only new requirement of the PCA is that the Bank shall obtain prior written approval from the Regional Director before entering into any contract or lease for the purchase or sale of real estate or of any interest therein, except for contracts entered into in the ordinary course of business for the purchase or sale of other real estate owned due to foreclosure ("OREO") where the contract does not exceed $3.5 million and the sales price of the OREO does not fall below 85% of the net carrying value of the OREO.

At March 31, 2013 and 2012, the Bank had a tier 1 leverage (core) capital ratio of 4.53% and 4.51% and a total risk-based capital ratio of 9.02% and 8.42%, respectively, each below the required capital ratios set forth above. Without a waiver by the OCC or amendment or modification of the Orders, the Bank could be subject to further regulatory action. All customer deposits remain fully insured to the highest limits set by the FDIC.

The Corporation is actively working with its advisors to explore possible alternatives to raise additional equity capital. If completed, any such transaction will likely result in significant dilution for the current common shareholders.

### MARKET RISK MANAGEMENT

Market risk is the risk of a loss in earnings or economic value due to adverse movements in market factors such as interest rates, credit spreads, foreign exchange rates, and equity prices. We are exposed to market risk primarily by our involvement in, among others, traditional banking activities of taking deposits and extending loans. See Item 7A. Quantitative and Qualitative Disclosures About Market Risk – Asset and Liability Management.

### COMPLIANCE RISK MANAGEMENT

Compliance risk represents the risk of regulatory sanctions, reputational impact or financial loss resulting from the Corporation's failure to comply with regulations and standards of good banking practice. Activities which

**Table of Contents**

may expose the Corporation to compliance risk include, but are not limited to, those dealing with the prevention of money laundering, privacy and data protection, community reinvestment initiatives, fair lending challenges and employment and tax matters.

STRATEGIC AND/OR REPUTATION RISK MANAGEMENT

Strategic and/or reputation risk represents the risk of loss due to impairment of reputation, failure to fully develop and execute business plans, failure to assess current and new opportunities in business, markets and products and any other event not identified in the defined risk types mentioned previously. Mitigation of the various risk elements that represent strategic and/or reputation risk is achieved through initiatives to help the Corporation better understand, manage and report on the various risks.

**Item 7A.       Quantitative and Qualitative Disclosures About Market Risk**

The business of the Corporation and the composition of its consolidated balance sheet consist of investments in interest-earning assets (primarily loans, mortgage-backed securities, and other securities) that are largely funded by interest-bearing liabilities (deposits and borrowings). All of the financial instruments of the Corporation as of March 31, 2013 were held for other-than-trading purposes. Such financial instruments have varying levels of sensitivity to changes in market rates of interest. The Corporation's net interest income is dependent on the amounts of and yields on its interest-earning assets as compared to the amounts of and rates on its interest-bearing liabilities. Net interest income is therefore sensitive to changes in market rates of interest.

The Corporation's asset/liability management strategy is to maximize net interest income while limiting exposure to risks associated with changes in interest rates. This strategy is implemented by the Corporation's ongoing analysis and management of its interest rate risk. A principal function of asset/liability management is to coordinate the levels of interest-sensitive assets and liabilities to manage net interest income changes within limits in times of fluctuating market interest rates.

Interest rate risk results when the maturity or repricing intervals and interest rate indices of the interest-earning assets, interest-bearing liabilities, and off-balance-sheet financial instruments are different, thus creating a risk that will result in disproportionate changes in the value of and the net earnings generated from these instruments. The Corporation's exposure to interest rate risk is managed primarily through the strategy of selecting the types and terms of interest-earning assets and interest-bearing liabilities that generate favorable earnings while limiting the potential negative effects of changes in market interest rates. Because the primary source of interest-bearing liabilities is customer deposits, the Corporation's ability to manage the types and terms of such deposits may be somewhat limited by customer maturity preferences in the market areas in which the Corporation operates. Deposit pricing is competitive with promotional rates frequently offered by competitors. Borrowings, which include FHLB advances, short-term borrowings, and long-term borrowings, are generally structured with specific terms which, in management's judgment, when aggregated with the terms for outstanding deposits and matched with interest-earning assets, reduce the Corporation's exposure to interest rate risk. The rates, terms, and interest rate indices of the interest-earning assets result primarily from the Corporation's strategy of investing in securities and loans (a portion of which have adjustable rates). This permits the Corporation to limit its exposure to interest rate risk, together with credit risk, while at the same time achieving a positive interest rate spread from the difference between the income earned on interest-earning assets and the cost of interest-bearing liabilities.

Management uses a simulation model for internal asset/liability management. The model uses maturity and repricing information for securities, loans, deposits, and borrowings plus repricing assumptions on products without specific repricing dates (e.g., savings and interest-bearing demand deposits), to calculate the cash flows, income, and expense of assets and liabilities. In addition, the model computes a theoretical market value of equity by estimating the market values of its assets and liabilities using present value methodology. The model also projects the effect on earnings and theoretical value under various interest rate change scenarios. The Corporation's exposure to interest rates is reviewed on a monthly basis by senior management and Board of Directors.

78

Table of Contents

Net Interest Income Sensitivity Analysis

The Corporation performs a net interest income sensitivity analysis as part of its asset/liability management processes. Net interest income sensitivity analysis measures the change in net interest income in the event of hypothetical changes in interest rates. This analysis assesses the risk of change in net interest income in the event of sudden and sustained 100 and 200 basis point increases in market interest rates. The table below presents the projected changes in twelve-month cumulative net interest income for the various rate shock levels at March 31, 2013 and March 31, 2012, respectively.

| | 200 Basis Point Rate Increase | 100 Basis Point Rate Increase |
|---|---|---|
| March 31, 2013 | 14.9% | 7.3% |
| March 31, 2012 | 13.2% | 6.4% |

As a result of current market conditions, 100 and 200 basis point decreases in market interest rates are not applicable for 2013 and 2012 as those decreases would result in some deposit interest rate assumptions falling below zero. Nonetheless, the Corporation's net interest income may decline in declining rate environments as yields on earning assets could continue to adjust downward.

As shown above, at March 31, 2013, the effect of an immediate 200 basis point increase in interest rates would increase the Corporation's net interest income by 14.9%. Overall net interest income sensitivity remains within the Corporation's and recommended regulatory guidelines.

The changes in the Corporation's net interest income reflected above were due, in large part, to the optionality on both sides of the balance sheet. The changes in net interest income over the one year horizon for March 31, 2013 under the 1.0% and 2.0% increases in market interest rates scenarios are reflective of this optionality. In general, in a rising rate environment, yields on loans and investment securities are expected to re-price upwards more quickly than the cost of funds.

Mortgage-backed securities, including adjustable rate mortgage pools, are modeled in the above analysis based on their estimated repricing or principal paydowns obtained from outside analytical sources. Loans are modeled in the above analysis based on contractual maturity or contractual repricing dates, coupled with principal prepayment assumptions. Deposits are based on management's analysis of industry trends and customer behavior.

The Corporation also uses these assumptions to estimate the market value of equity and the market risk to this value due to changes in interest rates. This focus helps model risks embedded in the balance sheet over a longer time horizon than the net interest income simulation. The calculation is based on the present value of projected future cash flows. As of March 31, 2013, the projected changes for the market value of equity were within the Corporation's policy limits.

Computations of the prospective effects of hypothetical interest rate changes are dependent on numerous assumptions, including relative levels of market interest rates, loan prepayments and deposit decay rates. These computations should not be relied upon as indicative of actual results. Actual values may differ from those projections set forth above, should market conditions vary from assumptions used in preparing the analyses. Further, the computations do not contemplate any actions the Company may undertake in response to changes in interest rates. Because such assumptions can be no more than estimates, certain assets and liabilities modeled as maturing or otherwise repricing within a stated period may, in fact, mature or reprice at different times and at different volumes than those estimated. Also, the renewal or repricing of certain assets and liabilities can be discretionary and subject to competitive and other pressures. Therefore, the rate sensitivity results included above do not and cannot necessarily indicate the actual future impact of general interest rate movements on the Company's net interest income.

**Table of Contents**

**Item 8.**      **Financial Statements and Supplementary Data**

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS OF ANCHOR BANCORP WISCONSIN INC.**

| | Page |
|---|---|
| **Consolidated Financial Statements** | |
| Consolidated Balance Sheets | 81 |
| Consolidated Statements of Operations and Comprehensive Loss | 82 |
| Consolidated Statements of Changes in Stockholders' Equity (Deficit) | 84 |
| Consolidated Statements of Cash Flows | 86 |
| Notes to Consolidated Financial Statements | 87 |
| Report of Independent Registered Public Accounting Firm | 142 |

80

Table of Contents

**ANCHOR BANCORP WISCONSIN INC. AND SUBSIDIARIES**
**Consolidated Balance Sheets**

|  | March 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In thousands, except share data) | |
| **Assets** | | |
| Cash and due from banks | $ 30,237 | $ 47,119 |
| Interest-earning deposits | 198,299 | 195,861 |
| Cash and cash equivalents | 228,536 | 242,980 |
| Investment securities available for sale | 266,787 | 242,299 |
| Investment securities held to maturity (fair value of $0 and $20, respectively) | — | 20 |
| Loans held for sale | 18,058 | 39,332 |
| Loans held for investment | 1,750,358 | 2,168,959 |
| Less: Allowance for loan losses | (79,815) | (111,215) |
| Loans held for investment, net | 1,670,543 | 2,057,744 |
| Other real estate owned, net | 84,342 | 88,841 |
| Premises and equipment, net | 24,469 | 25,453 |
| Federal Home Loan Bank stock – at cost | 25,630 | 35,792 |
| Mortgage servicing rights, net | 21,824 | 22,156 |
| Accrued interest receivable | 9,563 | 12,075 |
| Other assets | 17,831 | 22,760 |
| Total assets | $ 2,367,583 | $ 2,789,452 |
| **Liabilities and Stockholders' Deficit** | | |
| Deposits | | |
| Non-interest bearing | 267,732 | $ 264,700 |
| Interest bearing | 1,757,293 | 2,000,201 |
| Total deposits | 2,025,025 | 2,264,901 |
| Other borrowed funds | 317,225 | 476,103 |
| Accrued interest and fees payable | 61,290 | 43,327 |
| Accrued taxes, insurance and employee related expenses | 6,389 | 6,385 |
| Other liabilities | 17,518 | 28,286 |
| Total liabilities | 2,427,447 | 2,819,002 |
| Commitments and contingent liabilities (Note 15) | | |
| Preferred stock, $0.10 par value, 5,000,000 shares authorized, 110,000 shares issued and outstanding; dividends in arrears of $25,345 at March 31, 2013 and $18,785 at March 31, 2012 | 103,833 | 96,421 |
| Common stock, $0.10 par value, 100,000,000 shares authorized, 25,363,339 shares issued at March 31, 2013 and 2012 | 2,536 | 2,536 |
| Additional paid-in capital | 110,034 | 110,402 |
| Retained deficit | (189,097) | (147,513) |
| Accumulated other comprehensive income related to AFS securities | 3,918 | 3,628 |
| Accumulated other comprehensive loss related to OTTI securities – non credit factors | (339) | (3,496) |
| Total accumulated other comprehensive income | 3,579 | 132 |
| Treasury stock (4,116,114 shares at March 31, 2013 and 4,115,614 shares at March 31, 2012), at cost | (89,848) | (90,259) |
| Deferred compensation obligation | (901) | (1,269) |
| Total stockholders' deficit | (59,864) | (29,550) |
| Total liabilities and stockholders' deficit | $ 2,367,583 | $ 2,789,452 |

See accompanying Notes to Consolidated Financial Statements

81

**Table of Contents**

**ANCHOR BANCORP WISCONSIN INC. AND SUBSIDIARIES**
**Consolidated Statements of Operations and Comprehensive Loss**

| | Year Ended March 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | (In thousands, except per share data) | | |
| **Interest income** | | | |
| Loans | $ 93,335 | $116,929 | $150,692 |
| Investment securities and Federal Home Loan Bank stock | 5,912 | 9,738 | 15,249 |
| Interest-earning deposits | 635 | 586 | 526 |
| Total interest income | 99,882 | 127,253 | 166,467 |
| **Interest expense** | | | |
| Deposits | 10,324 | 24,962 | 48,626 |
| Other borrowed funds | 27,075 | 30,367 | 32,757 |
| Total interest expense | 37,399 | 55,329 | 81,383 |
| Net interest income | 62,483 | 71,924 | 85,084 |
| Provision for credit losses | 9,125 | 33,578 | 51,198 |
| Net interest income after provision for credit losses | 53,358 | 38,346 | 33,886 |
| **Non-interest income** | | | |
| Impairment on new OTTI securities | — | (10) | (8) |
| Reclassification of credit related other-than-temporary impairment from other comprehensive income | (408) | (558) | (432) |
| Net impairment losses recognized in earnings | (408) | (568) | (440) |
| Loan servicing income (loss), net of amortization | (1,892) | (789) | 2,128 |
| Service charges on deposits | 10,435 | 10,589 | 11,463 |
| Investment and insurance commissions | 3,894 | 3,808 | 3,448 |
| Net gain on sale of loans | 23,195 | 17,680 | 17,925 |
| Net gain (loss) on sale and call of investment securities | (247) | 6,579 | 8,661 |
| Net gain on sale of OREO | 6,876 | 6,118 | 3,640 |
| Net gain on sale of branches | — | — | 7,350 |
| Other income | 4,048 | 5,844 | 5,085 |
| Total non-interest income | 45,901 | 49,261 | 59,260 |
| **Non-interest expense** | | | |
| Compensation and benefits | $ 40,736 | $ 41,262 | $ 41,485 |
| Occupancy | 8,133 | 7,946 | 8,541 |
| Furniture and equipment | 4,563 | 5,665 | 6,198 |
| Federal deposit insurance premiums | 5,921 | 7,189 | 11,402 |
| Data processing | 6,223 | 6,259 | 6,540 |
| Communications | 1,840 | 2,081 | 2,389 |
| Marketing | 1,345 | 1,466 | 1,491 |
| OREO expense, net | 37,571 | 28,684 | 30,926 |
| Investor loss reimbursement | 4,530 | 157 | — |
| Mortgage servicing rights impairment (recovery) | (403) | 2,410 | (97) |
| Legal services | 5,256 | 5,024 | 8,040 |
| Other professional fees | 2,346 | 3,669 | 5,294 |
| Insurance | 1,656 | 1,478 | 1,126 |
| Debt prepayment penalty | 3,549 | — | — |
| Other expense | 10,346 | 11,045 | 10,825 |
| Total non-interest expense | 133,612 | 124,335 | 134,160 |
| Loss before income taxes | (34,353) | (36,728) | (41,014) |
| Income tax expense (benefit) | (181) | 10 | 164 |
| Net loss | (34,172) | (36,738) | (41,178) |
| Preferred stock dividends in arrears | (6,560) | (6,278) | (5,934) |
| Preferred stock discount accretion | (7,412) | (7,413) | (7,412) |
| Net loss available to common equity | $ (48,144) | $ (50,429) | $ (54,524) |

(Continued)

82

**Table of Contents**

**ANCHOR BANCORP WISCONSIN INC. AND SUBSIDIARIES**
**Consolidated Statements of Operations and Comprehensive Loss**

| | Year Ended March 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | (In thousands, except per share data) | | |
| Net loss | $(34,172) | $(36,738) | $(41,178) |
| Other comprehensive income (loss), net of tax: | | | |
| Reclassification adjustment for realized net (gains) losses recognized in Statement of Operations – Net gain (loss) on sale and call of investment securities | 247 | (6,579) | (8,661) |
| Reclassification adjustments recognized in Statement of Operations – Net impairment losses recognized in earnings: | | | |
| Net change in unrealized credit related other-than-temporary impairment | (310) | 194 | 432 |
| Credit related other-than-temporary impairment previously recognized on securities paid-off during the period | (4) | — | — |
| Realized credit losses | 722 | 364 | — |
| Change in net unrealized gains (losses) on available-for-sale securities | 2,792 | 26,105 | (6,324) |
| Total other comprehensive income (loss) | 3,447 | 20,084 | (14,553) |
| Comprehensive loss | $(30,725) | $(16,654) | $(55,731) |
| Loss per common share: | | | |
| Basic | $ (2.27) | $ (2.37) | $ (2.57) |
| Diluted | (2.27) | (2.37) | (2.57) |
| Dividends declared per common share | — | — | — |

See accompanying Notes to Consolidated Financial Statements

83

Table of Contents

**ANCHOR BANCORP WISCONSIN INC. AND SUBSIDIARIES**
**Consolidated Statements of Changes in Stockholders' Equity (Deficit)**

| | Preferred Stock | Common Stock | Additional Paid-in Capital | Retained Deficit | Treasury Stock | Deferred Compensation Obligation | Accumulated Other Comprehensive Income (Loss) | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | | |
| Balance at March 31, 2010 | $81,596 | $ 2,536 | $114,662 | $ (54,677) | $(90,975) | $ (5,529) | $ (5,399) | $ 42,214 |
| Net loss | — | — | — | (41,178) | — | — | — | (41,178) |
| Reclassification adjustment for realized net gains recognized in income | — | — | — | — | — | — | (8,661) | (8,661) |
| Reclassification adjustment for net change in unrealized credit related other-than-temporary impairment recognized in income | — | — | — | — | — | — | 432 | 432 |
| Reclassification adjustment for realized credit losses recognized in income | — | — | — | — | — | — | — | — |
| Change in net unrealized gains (losses) on available-for-sale securities | — | — | — | — | — | — | (6,324) | (6,324) |
| Issuance of restricted stock for executive compensation and retirement plans | — | — | — | (164) | 162 | — | — | (2) |
| Vesting of restricted stock | — | — | — | — | 348 | — | — | 348 |
| Cancellation of unvested restricted stock | — | — | — | 69 | (69) | — | — | — |
| Change in stock-based deferred compensation obligation | — | — | (3,149) | — | — | 3,149 | — | — |
| Accretion of preferred stock discount | 7,412 | — | — | (7,412) | — | — | — | — |
| Balance at March 31, 2011 | 89,008 | 2,536 | 111,513 | (103,362) | (90,534) | (2,380) | (19,952) | (13,171) |
| Net loss | — | — | — | (36,738) | — | — | — | (36,738) |
| Reclassification adjustment for realized net gains recognized in income | — | — | — | — | — | — | (6,579) | (6,579) |
| Reclassification adjustment for net change in unrealized credit related other-than-temporary impairment recognized in income | — | — | — | — | — | — | 194 | 194 |
| Reclassification adjustment for realized credit losses recognized in income | — | — | — | — | — | — | 364 | 364 |
| Change in net unrealized gains (losses) on available-for-sale securities | — | — | — | — | — | — | 26,105 | 26,105 |
| Vesting of restricted stock | — | — | — | — | 275 | — | — | 275 |
| Change in stock-based deferred compensation obligation | — | — | (1,111) | — | — | 1,111 | — | — |
| Accretion of preferred stock discount | 7,413 | — | — | (7,413) | — | — | — | — |
| Balance at March 31, 2012 | 96,421 | 2,536 | 110,402 | (147,513) | (90,259) | (1,269) | 132 | (29,550) |

(Continued)

84

Table of Contents

**ANCHOR BANCORP WISCONSIN INC. AND SUBSIDIARIES**
**Consolidated Statements of Changes in Stockholders' Equity (Deficit)**

| | Preferred Stock | Common Stock | Additional Paid-in Capital | Retained Deficit | Treasury Stock | Deferred Compensation Obligation | Accumulated Other Comprehensive Income (Loss) | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | (In thousands) | | | | |
| Balance at March 31, 2012 | $ 96,421 | $ 2,536 | $110,402 | $(147,513) | $(90,259) | $ (1,269) | $ 132 | $(29,550) |
| Net loss | — | — | — | (34,172) | — | — | — | (34,172) |
| Reclassification adjustment for realized net losses recognized in income | — | — | — | — | — | — | 247 | 247 |
| Reclassification adjustment for net change in unrealized credit related other-than-temporary impairment recognized in income | — | — | — | — | — | — | (310) | (310) |
| Reclassification adjustment for credit related other-than-temporary impairment previously recognized on securities paid-off during the period | — | — | — | — | — | — | (4) | (4) |
| Reclassification adjustment for realized credit losses recognized in income | — | — | — | — | — | — | 722 | 722 |
| Change in net unrealized gains (losses) on available-for-sale securities | — | — | — | — | — | — | 2,792 | 2,792 |
| Vesting of restricted stock | — | — | — | — | 411 | — | — | 411 |
| Change in stock-based deferred compensation obligation | — | — | (368) | — | — | 368 | — | — |
| Accretion of preferred stock discount | 7,412 | — | — | (7,412) | — | — | — | — |
| Balance at March 31, 2013 | $103,833 | $ 2,536 | $110,034 | $(189,097) | $(89,848) | $ (901) | $ 3,579 | $(59,864) |

See accompanying Notes to Consolidated Financial Statements

85

Table of Contents

**ANCHOR BANCORP WISCONSIN INC. AND SUBSIDIARIES**
**Consolidated Statements of Cash Flows**

| | Year Ended March 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | (In thousands) | | |
| **Operating Activities** | | | |
| Net loss | $ (34,172) | $ (36,738) | $ (41,178) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Amortization and accretion of investment securities premium (discount), net | 1,013 | 1,083 | 2,814 |
| Net (gain) loss on sale of investment securities | 247 | (6,579) | (8,661) |
| Net impairment losses on investment securities | 408 | 568 | 440 |
| Origination of loans held for sale | (898,960) | (961,947) | (780,100) |
| Proceeds from sale of loans held for sale | 943,429 | 947,833 | 809,971 |
| Net gain on sale of loans | (23,195) | (17,680) | (17,925) |
| Provision for credit losses | 9,125 | 33,578 | 51,198 |
| Provision for OREO losses | 26,733 | 15,338 | 15,115 |
| Loss provision on deposit method OREO property | 3,301 | — | — |
| Gain on sale of OREO | (6,876) | (6,118) | (3,640) |
| Depreciation and amortization | 3,079 | 3,494 | 4,104 |
| Loss on disposal of premises and equipment, net | 651 | 677 | — |
| Mortgage servicing rights impairment (recovery) | (403) | 2,410 | (97) |
| Impairment of real estate held for development and sale | 535 | 87 | — |
| Net gain on sale of branches | — | — | (7,350) |
| Stock-based compensation expense | 55 | 256 | 305 |
| Decrease in accrued interest receivable | 2,512 | 4,278 | 3,805 |
| (Increase) decrease in other assets | 5,129 | (1,749) | 26,103 |
| Increase in accrued interest and fees payable | 17,963 | 15,001 | 8,198 |
| Increase (decrease) in accrued taxes, insurance and employee related expenses | 4 | (224) | 2,009 |
| Increase (decrease) in other liabilities | (10,412) | 13,668 | (1,132) |
| Net cash provided by operating activities | 40,166 | 7,236 | 63,989 |
| **Investing Activities** | | | |
| Proceeds from sale of investment securities | 12,262 | 338,224 | 385,924 |
| Proceeds from maturity of investment securities | — | — | 69,526 |
| Purchase of investment securities | (81,202) | (71,441) | (631,640) |
| Principal collected on investment securities | 46,251 | 39,226 | 59,971 |
| Decrease in loans held for investment | 302,907 | 352,039 | 483,152 |
| Purchases of premises and equipment | (434) | (1,590) | (1,394) |
| Proceeds from sale of premises and equipment | — | — | 1,633 |
| Proceeds from sale of OREO | 54,498 | 70,481 | 42,359 |
| Capitalized improvements of OREO | (300) | — | (946) |
| Proceeds from sale of real estate held for development and sale | — | 173 | 587 |
| FHLB stock redemption | 10,162 | 19,037 | — |
| Branch sales, net of cash and cash equivalents | — | — | (180,153) |
| Net cash provided by investing activities | 344,144 | 746,149 | 229,019 |
| **Financing Activities** | | | |
| Decrease in deposits | $(238,321) | $ (435,140) | $ (561,711) |
| Increase (decrease) in advance payments by borrowers for taxes and insurance | (1,555) | 622 | (1,494) |
| Proceeds from borrowed funds | 92,694 | 1,656,057 | 2,275,515 |
| Repayment of borrowed funds | (251,572) | (1,838,959) | (2,410,465) |
| Net cash used in financing activities | (398,754) | (617,420) | (698,155) |
| Net increase (decrease) in cash and cash equivalents | (14,444) | 135,965 | (405,147) |
| Cash and cash equivalents at beginning of period | 242,980 | 107,015 | 512,162 |
| Cash and cash equivalents at end of period | $ 228,536 | $ 242,980 | $ 107,015 |
| **Supplemental disclosures of cash flow information:** | | | |
| Cash paid (received) or credited to accounts: | | | |
| Interest on deposits and borrowings | $ 21,091 | $ 40,328 | $ 73,619 |
| Income tax payments (receipts) | (1,735) | 10 | (17,732) |
| Non-cash transactions: | | | |
| Transfer of loans to OREO | 75,169 | 76,742 | 88,169 |
| Transfer of premises and equipment to OREO | 558 | 1,093 | — |
| Transfer of OREO to premises and equipment | 2,870 | — | — |

See accompanying Notes to Consolidated Financial Statements

Table of Contents

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

**Note 1 – Summary of Significant Accounting Policies**

**Business.** Anchor BanCorp Wisconsin Inc. (the "Corporation") is a Wisconsin corporation incorporated in 1992 for the purpose of becoming a savings and loan holding company for AnchorBank, fsb (the "Bank"), a wholly-owned subsidiary. The Bank provides a full range of financial services to individual customers through its branch locations in Wisconsin. The Bank is subject to competition from other financial institutions and other financial service providers. The Corporation and its subsidiary also are subject to the regulations of certain federal and state agencies and undergo periodic examinations by those regulatory authorities. The Corporation also has a non-banking subsidiary, Investment Directions, Inc. ("IDI"), which historically invested in real estate held for development and sale. During 2010, IDI sold substantially all of its assets and its investment activities have been significantly curtailed.

**Basis of Financial Statement Presentation.** The consolidated financial statements have been prepared in accordance with U. S. generally accepted accounting principles and include the accounts and operations of the Corporation and its wholly owned subsidiaries, the Bank and IDI, and their wholly owned subsidiaries. The Bank has one subsidiary at March 31, 2013; ADPC Corporation. Significant intercompany accounts and transactions have been eliminated.

In preparing the consolidated financial statements, management is required to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. Actual results could differ from those estimates. Material estimates that are particularly susceptible to significant change in the near term relate to the determination of the allowance for loan losses, the valuation of foreclosed real estate, the net carrying value of mortgage servicing rights and deferred tax assets, and the fair value of investment securities.

We have evaluated all subsequent events through the date of this filing.

**Going Concern.** The consolidated financial statements have been prepared on a going concern basis, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business. Significant operating losses since fiscal 2009, regulatory considerations and elevated levels of criticized assets at the Bank, and negative equity and loan default at the holding company raise substantial doubt about the Corporation's ability to continue as a going concern. The consolidated financial statements do not include any adjustments that might be necessary if the Corporation is unable to continue as a going concern. See Note 2 "Significant Risks and Uncertainties" for further discussion.

**Cash and Cash Equivalents.** The Corporation considers interest-earning deposits that have an original maturity of three months or less to be cash equivalents.

**Investment Securities Held to Maturity and Available For Sale.** Debt securities that the Corporation has the intent and ability to hold to maturity may be classified as held to maturity and are stated at amortized cost as adjusted for premium amortization and discount accretion. Securities not classified as held to maturity are classified as available for sale. Available for sale securities are stated at fair value, with unrealized gains and losses, reported as a separate component of accumulated other comprehensive income (loss) in stockholders' equity. Securities would be classified as trading when the Corporation intends to actively buy and sell securities in order to make a profit. Trading securities are carried at fair value, with unrealized holding gains and losses included in earnings. There were no securities designated as trading during the three years ended March 31, 2013.

Discounts and premiums on investment securities are accreted and amortized into interest income in a manner that approximates the effective yield method over the estimated remaining life of the assets.

87

**Table of Contents**

Realized gains and losses are included in net gain (loss) on sale of investment securities in the consolidated statements of operations as a component of non-interest income. The cost of securities sold is based on the specific identification method. If the Corporation sells held to maturity securities, it is only in accordance with accounting standards as the securities have substantially matured.

Declines in the fair value of investment securities below amortized cost basis that are deemed to be other-than-temporary are reflected as impairment losses. To determine if an other-than-temporary impairment exists on a debt security, the Corporation first determines if (a) it intends to sell the security or (b) it is more likely than not that it will be required to sell the security before its anticipated recovery. If either of the conditions is met, the Corporation will recognize an other-than-temporary impairment in earnings equal to the difference between the fair value of the security and its amortized cost basis. If neither of the conditions is met, the Corporation determines (a) the amount of the impairment related to credit loss and (b) the amount of the impairment due to all other factors. The difference between the present values of the cash flows expected to be collected discounted at the purchase yield or current accounting yield and the amortized cost basis is the credit loss. The amount of the credit loss is included in the consolidated statements of operations as an other-than-temporary impairment on securities and is a reduction in the cost basis of the security. The portion of the total impairment that is related to all other factors is included in other comprehensive income (loss).

**Loans Held for Sale.** Loans held for sale generally consist of the current origination of certain fixed- and adjustable-rate mortgage loans and are carried at lower of cost or fair value, determined on a loan-by-loan basis. Fees received from the borrower and direct costs to originate the loan are deferred and recorded as a basis adjustment of the loan. Effective for loans originated on or after April 1, 2013, residential mortgage loans held for sale will be carried at fair value and upfront costs and fees related to these loans shall be recognized in earnings as incurred. Residential mortgage loans held for sale will continue to be reported at the lower of cost or fair value for previous periods.

**Loans Held for Investment.** Loans held for investment are stated at the amount of the unpaid principal, reduced by unearned net loan fees and an allowance for loan losses. Interest on loans is accrued into income on the unpaid principal balances as earned. Loans are placed on non-accrual status when they become 90 days past due or, when in the judgment of management, the probability of collection of principal and interest is deemed to be insufficient to warrant further accrual. Past due status is based on contractual terms of the loan. Factors that management considers when assessing the collectability of principal and interest include early stage delinquencies and financial difficulties of the borrower. When a loan is placed on non-accrual status, previously accrued but unpaid interest is deducted from interest income. Payments received on non-accrual loans are generally credited to the loan receivable balance and no interest income is recognized on those loans until the principal balance is current. In cases in which the net carrying value of the loan is deemed to be fully collectible, payments received may be recognized in income on a cash basis. Loans are restored to accrual status when the obligation is brought current, has performed in accordance with the contractual terms for a reasonable period of time, and the ultimate collectability of the total contractual principal and interest is no longer in doubt.

Loans held for investment are summarized into four different segments: residential loans, commercial and industrial loans, commercial real estate loans and consumer loans.

*Residential Loans*

Residential loans, substantially all of which finance the purchase of 1-to-4 family dwellings, are generally smaller in size and considered homogeneous as they exhibit similar product and risk characteristics. Loans in this category are placed on non-accrual status when they become 90 days past due and remain on non-accrual status until sufficient payments are received to bring the loan to current status. Residential loans are charged off at the time of an approved short sale and funds are received; information is received indicating an insufficient value and the borrower has not made a payment in six months; or a foreclosure sale is complete and the loan is being moved to other real estate owned.

88

**Table of Contents**

*Commercial and Industrial Loans*

Commercial and industrial loans are funded for commercial, corporate and business purposes, including issuing letters of credit. The commercial business loan portfolio is comprised of loans for a variety of purposes which are generally secured by equipment, machinery and other business assets. Commercial business loans typically have terms of five years or less and interest rates that float in accordance with a designated published index. Substantially all such loans are secured and backed by the personal guarantees of the owners of the business. Loans in this category are placed on non-accrual status when they become 90 days past due or in the judgment of management the probability of collection of principal and interest is deemed to be insufficient to warrant further accrual. If a loan goes 90 days delinquent, the loan will remain on non-accrual status until the loan is brought current and there is evidence that the borrower has sufficient cash flow, income or liquidity to repay the loan in full. Commercial and industrial loans are charged off when available information confirms that any portion of the recorded investment in a collateral dependent loan in excess of the fair value of the collateral is deemed a confirmed loss.

*Commercial Real Estate Loans*

Commercial real estate loans are primarily secured by apartment buildings, office and industrial buildings, land, warehouses, small retail shopping centers and various special purpose properties, including hotels and nursing homes. Although terms vary, commercial real estate loans generally have amortization periods of 15 to 25 years, as well as balloon payments of two to five years, and terms which provide that the interest rates thereon may be adjusted annually at the Bank's discretion, based on a designated index. Loans in this category are placed on non-accrual status when they become 90 days past due or in the judgment of management the probability of collection of principal and interest is deemed to be insufficient to warrant further accrual. If a loan goes 90 days delinquent, the loan will remain on non-accrual status until the loan is brought current and there is evidence that the borrower has sufficient cash flow, income or liquidity to repay the loan in full. Commercial real estate loans are charged off when available information confirms that any portion of the recorded investment in a collateral dependent loan in excess of the fair value of the collateral is deemed a confirmed loss.

*Consumer Loans*

Consumer loans generally have higher interest rates than mortgage loans. The risk involved in consumer loans is based on the type and nature of the collateral and, in certain cases, the absence of collateral. Consumer loans include second mortgage and home equity loans, education loans, vehicle loans and other secured and unsecured loans that have been made for a variety of consumer purposes. Loans in this category are placed on non-accrual status when they become 90 days past due and remain on non-accrual status until sufficient payments are received to bring the loan to current status. Consumer loans are charged off when a recent valuation shows no surplus for the Corporation, upon repossession or sale of the collateral and deficiency is realized, or upon reaching 150 days past due if unsecured.

**Loan Fees and Discounts.** Certain loan origination, commitment and other loan fees and associated direct loan origination costs are deferred and amortized as an adjustment to the related loan's yield. These amounts, as well as discounts on purchased loans, are amortized using a method that approximates level yield, adjusted for prepayments, over the life of the related loans.

**Allowance for Loan Losses.** The allowance for loan losses is maintained at a level believed adequate by management to absorb probable and estimable losses inherent in the loan portfolio and is based on the size and current risk characteristics of the loan portfolio; an assessment of individual problem loans; actual and anticipated loss experience; and current economic events in specific industries and geographical areas. These economic events include unemployment levels, regulatory guidance, and general economic conditions. Determination of the allowance is inherently subjective as it requires significant estimates, including the amounts and timing of expected future cash flows on impaired loans, estimated losses on pools of homogeneous loans based on historical loss experience, and consideration of current economic trends, all of which may be

89

Table of Contents

susceptible to significant change. Loan losses are charged off against the allowance, while recoveries of amounts previously charged off are credited to the allowance. A provision for credit losses is recorded in the statement of operations based on management's periodic evaluation of the factors previously mentioned as well as other pertinent factors. In addition, regulatory agencies periodically review the adequacy of the allowance for loan losses. These agencies may require the Corporation to make additions to the allowance for loan losses based on their judgments of collectability using information available to them at the time of their examination.

The allowance for loan losses consists of general and specific components. In determining the general allowance, the Corporation has defined the following segments within its loan portfolio: residential, commercial and industrial, commercial real estate and consumer. The Corporation has disaggregated those segments into the following classes based on risk characteristics: residential, commercial and industrial, land and construction, multi-family, retail/office and other commercial real estate within the commercial real estate segment and education and other consumer within the consumer segment. This additional detail allows management to better identify trends in borrower behavior and loss severity. A historical loss factor is computed for each class of loan and used as the major determinate of the general allowance for loan losses. In determining the appropriate period of activity to use in computing the historical loss factor management considers trends in quarterly net charge-off ratios. It is management's intention to utilize a period of activity that it believes to be most reflective of current experience. Changes in the historical period are made when there is a distinct change in the trend of net charge-off experience. Management reviews each class' historical losses by quarter for any trends that indicate the most representative look back period. The Corporation currently uses a six quarter historical loss look-back period.

Management adjusts historical loss factors based on the following qualitative factors: changes in lending policies, procedures and practices; economic and industry trends and conditions; trends in terms and the volume of loans; experience, ability and depth of lending management; level of and trends in past dues and delinquent loans; changes in the quality of the loan review system; changes in the value of the underlying collateral for collateral dependent loans; changes in credit concentrations; other external factors such as legal and regulatory requirements; and changes in size of the portfolio. In determining the impact, if any, of an individual qualitative factor, management compares the current underlying facts and circumstances surrounding a particular factor with those in the historical periods, adjusting the historical loss factor based on changes in the qualitative factor. Management will continue to analyze the qualitative factors on a quarterly basis, adjusting the historical loss factor as necessary, to a factor believed to be appropriate for the probable and inherent risk of loss in the portfolio.

Specific allowance allocations are established for probable losses resulting from analysis of impaired loans. A loan is considered impaired when it is probable that the Corporation will be unable to collect all contractual principal and interest due according to the terms of the loan agreement. Impaired loans include all non-accrual loans and performing troubled debt restructurings. Troubled debt restructurings are loans that have been modified, due to financial difficulties of the borrower, where the terms of the modified loan are more favorable for the borrower than what the Corporation would normally accept. The fair value of impaired loans is determined based on the present value of expected future cash flows discounted at the loan's effective interest rate or the fair value of the underlying collateral less costs to sell, if the loan is collateral dependent. Cash collections on impaired loans are generally credited to the loan receivable balance and no interest income is recognized on those loans until the principal balance is current.

**Other Real Estate Owned.** Real estate acquired by foreclosure or by deed in lieu of foreclosure as well as other repossessed assets (OREO) are held for sale and are initially recorded at fair value less a discount for estimated selling costs at the date of foreclosure. Any write down to fair value less estimated selling costs is charged to the allowance for loan losses. If the discounted fair value exceeds the net carrying value of the loans, recoveries to the allowance for loan losses are recorded to the extent of previous charge-offs, with any excess, which is infrequent, recognized as a gain in non-interest income. Subsequent to foreclosure, valuations are periodically performed and a valuation allowance is established if the carrying value exceeds the fair value less estimated selling costs. Costs relating to the development and improvement of the property may be capitalized; holding

90

**Table of Contents**

period costs and subsequent changes to the valuation allowance are charged to OREO expense, net included in non-interest expense. Incremental valuation adjustments may be recognized in the Statement of Operations if, in the opinion of management, additional losses are deemed probable.

**Premises and Equipment.** Premises and equipment are recorded at cost and include expenditures for new facilities and items that substantially increase the estimated useful lives (3 years to 40 years) of existing buildings and equipment. Expenditures for normal repairs and maintenance are charged to operations as incurred. When properties are retired or otherwise disposed of, the related cost and accumulated depreciation are removed from the respective accounts and any resulting gain or loss is recorded in income. The cost of office properties and equipment is being depreciated principally by the straight-line method over the estimated useful lives (3 years to 40 years) of the assets. The cost of capitalized leasehold improvements is depreciated on the straight-line method over the lesser of the term of the respective lease or estimated economic life.

**Federal Home Loan Bank Stock.** The Bank is a member of the Federal Home Loan Bank (FHLB) system which is organized as a member owned cooperative. As a result of membership in the FHLB system, the Bank is required to maintain a minimum investment in FHLB stock. The stock is redeemable at par and is, therefore, carried at cost and periodically evaluated for impairment. Ownership in the FHLB provides a potential dividend and allows access to member privileges including loans, advances, letters of credit and mortgage purchases. The stock is not transferable and cannot be used as collateral. The Bank has concluded that its investment in the stock of FHLB Chicago was not impaired at March 31, 2013.

**Mortgage Servicing Rights.** Mortgage servicing rights are recorded as an asset when loans are sold to third parties with servicing rights retained. The cost allocated to the mortgage servicing rights retained has been recognized as a separate asset and is initially recorded at fair value and subsequently amortized in proportion to, and over the period of, estimated net servicing revenues. The carrying value of these assets is periodically reviewed for impairment using a lower of amortized cost or fair value methodology. The fair value of the servicing rights is determined by estimating the present value of future net cash flows, taking into consideration market loan prepayment speeds, discount rates, servicing costs and other economic factors. For purposes of measuring fair value and impairment, the rights are stratified based on predominant risk characteristics of the underlying loans which include product type (i.e., fixed or adjustable) and interest rate bands. The amount of impairment recognized is the amount by which the amortized cost of the capitalized mortgage servicing rights on a strata-by-strata basis exceed their fair value.

**Transfers of Financial Assets.** Transfers of financial assets are accounted for as sales when control over the assets has been surrendered. Control over transferred assets is deemed to be surrendered when (1) the assets have been isolated from the Corporation, (2) the transferee obtains the right (free of conditions that constrain it from taking advantage of that right) to pledge or exchange the transferred assets, and (3) the Corporation does not maintain effective control over the transferred assets through an agreement to repurchase them before their maturity.

**Deferred Stock Issuance Cost.** Stock issuance cost includes incremental direct costs incurred with third parties that are directly attributable to equity financing transactions. Those costs include legal and accounting fees and underwriters' fees and expenses. Since certain of those costs are incurred in advance of receiving the proceeds from a planned equity financing transaction, they are deferred pending completion of the offering at which point the deferred costs are netted against stock issuance proceeds and recorded in equity.

As further discussed in Note 2, in August 2010 the OTS granted conditional approval of the Bank's Capital Restoration Plan which included two sets of assumptions for continuing to improve the Bank's capital levels, one based on obtaining capital from an outside source and one which reflects the results of the Bank's ongoing initiatives in the absence of an external capital infusion. In connection with obtaining capital from an outside source, the Corporation is pursuing an equity offering in the form of the proposed issuance of additional common

91

**Table of Contents**

stock and a new class of preferred stock. At March 31, 2013, approximately $3.0 million of direct, incremental costs incurred have been capitalized and included in other assets in the consolidated balance sheet.

**Deferred Compensation Obligations.** Deferred compensation obligations are the carrying value of stock associated with selected employee benefit plans. Such plans include a deferred compensation agreement with a previous executive established in 1986 and an Excess Benefit Plan to provide deferred compensation to certain members of management. No contributions were made to these plans during the years ended March 31, 2013, 2012 and 2011.

The carrying value of undistributed shares related to the deferred compensation obligations are recorded in a separate category of stockholders' deficit titled accordingly and the liability is included in additional paid in capital in stockholders' deficit in the consolidated balance sheets. See Note 14 for further discussion of the plans.

**Stock-Based Compensation Plan.** The Corporation periodically grants stock-based compensation to employees and directors under various plans discussed in Note 14. The grants are generally in the forms of restricted stock and stock options. Compensation expense related to stock-based compensation was $55,000, $256,000 and $310,000 for the fiscal years ended March 31, 2013, 2012 and 2011, respectively.

**Reserve for Unfunded Commitments, Letters of Credit and Repurchase of Sold Loans.** A reserve for unfunded commitments and letters of credit is determined by applying the general reserve loss factor used in the determination of the allowance for loan losses of the associated loan class to unfunded commitments of each class of performing loans. A reserve for potential loss related to the repurchase of sold loans is also maintained. This reserve is determined based on an analysis of probable loss associated with open repurchase requests and pending file reviews by the current owner of the underlying mortgage. The increase or decrease in the reserve for unfunded commitments and letters of credit is charged to the provision for credit losses. Adjustments to the reserve for repurchase of sold loans is included in other expense. The entire reserve is included in other liabilities on the consolidated balance sheet.

**Interest Rate Lock Commitments for Mortgage Loans Held for Sale.** Interest rate lock commitments for mortgage loans originated for sale meet the definition of derivatives. These instruments are carried at fair value and included in other assets and other liabilities in the consolidated balance sheets with changes in value included in net gain on sale of loans in the consolidated statements of operations.

**Income Taxes.** The Corporation's deferred income tax assets and liabilities are computed for differences between the financial statement and tax basis of assets and liabilities that will result in taxable or deductible amounts in the future based on enacted tax laws and rates applicable to periods in which the differences are expected to affect taxable income. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized. Income tax expense is the tax payable or refundable for the period adjusted for the change during the period in deferred tax assets and liabilities and associated valuation allowance. The Corporation and its subsidiaries file a consolidated federal income tax return and separate state income tax returns. An intercompany settlement of taxes paid is determined based on tax sharing agreements which generally provide for allocation of taxes to each entity on a separate return basis.

The Corporation is subject to the income tax laws of the U.S., its states and municipalities. These tax laws are complex and subject to different interpretations by the taxpayer and the relevant governmental taxing authorities. Accounting guidance related to uncertainty in income taxes provides a comprehensive model for how companies should recognize, measure, present and disclose in their financial statements uncertain tax positions taken or expected to be taken on a tax return. Under the guidance, tax positions shall initially be recognized in the financial statements when it is more likely than not the position will be sustained upon examination by the tax authorities. Such tax positions shall initially and subsequently be measured as the largest amount of tax benefit that is greater than 50% likely of being realized upon ultimate settlement with

92

Table of Contents

the tax authority assuming full knowledge of the position and all relevant facts. The guidance also revised disclosure requirements to include an annual tabular roll forward of unrecognized tax benefits. In establishing a provision for income tax expense, the Corporation must make judgments and interpretations about the application of these inherently complex tax laws within the framework of existing U.S. generally accepted accounting principles. The Corporation recognizes interest and penalties related to uncertain tax positions in other non-interest expense.

**Earnings Per Share.** Basic earnings per share ("EPS") is computed by dividing net income (loss) available to common equity of the Corporation by the weighted average number of common shares outstanding for the period. The basic EPS computation excludes the dilutive effect of all common stock equivalents. Diluted EPS is computed by dividing net income (loss) available to common equity by the weighted average number of common shares outstanding plus all potentially dilutive common shares which could be issued if securities or other contracts to issue common stock were exercised or converted into common stock or resulted in the issuance of common stock ("common stock equivalents"). The Corporation's common stock equivalents represent shares issuable under its long-term incentive compensation plans. Such common stock equivalents are computed based on the treasury stock method using the average market price for the period.

**Comprehensive Income (Loss).** Comprehensive income or loss is the total of reported net income or loss and all other revenues, expenses, gains and losses that under generally accepted accounting principles are not reported as net income (loss). As such, the Corporation includes unrealized gains or losses on securities available for sale in other comprehensive income (loss).

**New Accounting Pronouncements.**

*ASU No. 2013-02, "Comprehensive Income (Topic 220) – Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income."* ASU 2013-02 requires entities to report the effect of significant reclassifications out of accumulated other comprehensive income on the respective line items in net income if the amount being reclassified is required under U.S. generally accepted accounting principles (GAAP) to be reclassified in its entirety to net income. For other amounts that are not required under U.S. GAAP to be reclassified in their entirety to net income in the same reporting period, an entity is required to cross-reference other disclosures required under U.S. GAAP that provide additional detail about those amounts. This would be the case when a portion of the amount reclassified out of accumulated other comprehensive income is reclassified to a balance sheet account nstead of directly to income or expense in the same reporting period.

The amendments do not change the current requirements for reporting net income or other comprehensive income in financial statements. However, the amendments require an entity to provide information about the amounts reclassified out of accumulated other comprehensive income by component. In addition, an entity is required to present, either on the face of the statement where net income is presented or in the notes, significant amounts reclassified out of accumulated other comprehensive income by the respective line items of net income but only if the amount reclassified is required under U.S. GAAP to be reclassified to net income in its entirety in the same reporting period. For other amounts that are not required under U.S. GAAP to be reclassified in their entirety to net income, an entity is required to cross-reference to other disclosures required under U.S. GAAP that provide additional detail about those amounts. The Corporation adoped ASU 2013-02 as of March 31, 2013 and is presented in the Consolidated Statements of Comprehensive Loss.

ASU 2010-20 was effective prospectively for reporting periods beginning on or after December 15, 2012. These disclosures are provided in the Consolidated Statements of Operations and Comprehensive Loss.

*ASU No. 2010-20, "Receivables (Topic 310) – Disclosures about the Credit Quality of Financing Receivables and the Allowance for Credit Losses."* ASU 2010-20 requires entities to provide disclosures designed to facilitate financial statement users' evaluation of (i) the nature of credit risk inherent in the entity's portfolio of financing

93

**Table of Contents**

receivables, (ii) how that risk is analyzed and assessed in arriving at the allowance for credit losses and (iii) the changes and reasons for those changes in the allowance for credit losses. Disclosures must be disaggregated by portfolio segment, the level at which an entity develops and documents a systematic method for determining its allowance for credit losses, and class of financing receivable, which is primarily a disaggregation of portfolio segment. The required disclosures include, among other things, a rollforward of the allowance for credit losses as well as information about modified, impaired, non-accrual and past due loans and credit quality indicators. ASU 2010-20 was effective for the Corporation's financial statements as of December 31, 2010, as it relates to disclosures required as of the end of a reporting period. Disclosures that relate to activity during a reporting period were required for the Corporation's financial statements that include periods beginning on or after January 1, 2011. These disclosures are provided in Note 5.

*ASU No. 2011-02, "Receivables (Topic 310) – A Creditor's Determination of Whether a Restructuring Is a Troubled Debt Restructuring."* ASU 2011-02 states that in evaluating whether a restructuring constitutes a troubled debt restructuring (TDR), a creditor must separately conclude that both of the following exist: (i) the restructuring constitutes a concession and (ii) the debtor is experiencing financial difficulties. In addition, the amendments to Topic 310 clarify that a creditor is precluded from using the effective interest rate test in the debtor's guidance on restructuring of payables when evaluating whether a restructuring constitutes a troubled debt restructuring. The amendments to Topic 310 also required new disclosures regarding currently outstanding TDRs and TDR activity during the period. ASU 2011-02 is effective for interim and annual periods beginning on or after June 15, 2011. The Corporation adopted ASU 2011-02 in its second quarter of fiscal year ending March 31, 2012.

As a result of adopting the amendments in ASU 2011-02, the Corporation reassessed all restructurings that occurred on or after April 1, 2011, the beginning of that fiscal year, for identification as TDRs. The Corporation identified as TDRs certain receivables for which the allowance for credit losses had previously been measured under a general allowance for credit losses methodology. Upon identifying those receivables as TDRs, the Corporation identified them as impaired under the guidance in ASC 310-10-35. The amendments in ASU 2011-02 require prospective application of impairment measured in accordance with the guidance of ASC 310-10-35 for the receivables that are newly identified as impaired. The adoption of the ASU resulted in an increase in the number of loans within its commercial real estate portfolios that are considered TDRs but did not have a substantially material impact on the Company's financial statements for the periods ended September 30, 2011. At September 30, 2011, the period of adoption, the recorded investment in receivables for which the allowance for credit losses was previously measured under a general allowance for credit losses methodology and are now impaired under ASC 310-10-35 was $258,000, and the resulting allowance for credit losses associated with those receivables, on the basis of a current evaluation of loss, was zero.

*ASU No. 2011-05, "Presentation of Comprehensive Income."* In June 2011, the FASB issued ASU No. 2011-05. The provisions of ASU No. 2011-05 allow an entity the option to present the total of comprehensive income, the components of net income, and the components of other comprehensive income either in a single continuous statement of comprehensive income or in two separate but consecutive statements. In both choices, an entity is required to present each component of net income along with total net income, each component of other comprehensive income along with a total for other comprehensive income, and a total amount for comprehensive income. The statement(s) are required to be presented with equal prominence as the other primary financial statements. ASU No. 2011-05 eliminates the option to present the components of other comprehensive income as part of the statement of changes in stockholders' equity (deficit) but does not change the items that must be reported in other comprehensive income or when an item of other comprehensive income must be reclassified to net income. The provisions of ASU No. 2011-05 were effective for the Corporation's interim reporting period beginning on or after December 15, 2011, with retrospective application required and early adoption permitted. The Corporation adopted ASU No. 2011-05 as of September 30, 2011. The adoption resulted in presentation changes to the Corporation's statements of operations with the addition of a statement of comprehensive loss. The adoption of ASU No. 2011-05 had no material impact on the Corporation's financial statements.

94

Table of Contents

**Reclassifications.** Prior period amounts have been reclassified as needed to conform to the current period presentations. There was no impact on earnings or stockholders' deficit as a result of the reclassifications.

### Note 2 – Significant Risks and Uncertainties

### Regulatory Agreements

The Bank's primary regulator is the Office of the Comptroller of the Currency ("OCC"). The Federal Reserve is the primary regulator of the Corporation. On June 26, 2009, the Corporation and the Bank each consented to the issuance of an Order to Cease and Desist (the "Corporation Order" and the "Bank Order," respectively, and together, the "Orders").

The Corporation Order requires the Corporation to notify, and in certain cases to obtain the permission of, the Federal Reserve prior to: (i) declaring, making or paying any dividends or other capital distributions on its capital stock, including the repurchase or redemption of its capital stock; (ii) incurring, issuing, renewing or rolling over any debt, increasing any current lines of credit or guaranteeing the debt of any entity; (iii) making certain changes to its directors or senior executive officers; (iv) entering into, renewing, extending or revising any contractual arrangement related to compensation or benefits with any of its directors or senior executive officers; and (v) making any golden parachute payments or prohibited indemnification payments. In July 2010, the Corporation developed and submitted to the Office of Thrift Supervision, the Corporation's primary regulator at the time until it was disbanded in 2011 and the Federal Reserve assumed the role of primary regulator, a three-year cash flow plan, which must be reviewed at least quarterly by the Corporation's management and board of directors for material deviations between cash flow plan projections and actual results (the "Variance Analysis Report"). Within 45 days following the end of each quarter, the Corporation is required to provide the Federal Reserve its Variance Analysis Report for that quarter.

The Bank Order requires the Bank to notify, or in certain cases obtain the permission of, the OCC prior to (i) increasing its total assets in any quarter in excess of an amount equal to net interest credited on deposit liabilities during the quarter; (ii) accepting, rolling over or renewing any brokered deposits; (iii) making certain changes to its directors or senior executive officers; (iv) entering into, renewing, extending or revising any contractual arrangement related to compensation or benefits with any of its directors or senior executive officers; (v) making any golden parachute or prohibited indemnification payments; (vi) paying dividends or making other capital distributions on its capital stock; (vii) entering into certain transactions with affiliates; and (viii) entering into third-party contracts outside the normal course of business. The Bank also developed and submitted within the prescribed time periods, a written capital restoration plan, a problem asset plan, a revised business plan, and an implementation plan resulting from a review of commercial lending practices. The Orders also require the Bank to regularly review its current liquidity management policy and the adequacy of its allowance for loan and lease losses.

The Bank is also subject to a capital restoration plan including a Prompt Corrective Action Directive ("PCA"). Under the PCA, the Bank must obtain prior written approval before entering into any contract or lease for the purchase or sale of real estate or of any interest therein, except for contracts entered into in the ordinary course of business for the purchase or sale of other real estate owned due to foreclosure ("OREO") where the contract does not exceed $3.5 million and the sales price of the OREO does not fall below 85% of the net carrying value of the OREO.

The Orders also stipulated that, as of September 30, 2009, the Bank was required to meet and maintain both a core capital ratio equal to or greater than 7% and a total risk-based capital ratio equal to or greater than 11%. Further, as of December 31, 2009, the Bank had to meet and maintain both a core capital ratio equal to or greater than 8% and a total risk-based capital ratio equal to or greater than 12%.

Table of Contents

At March 31, 2013, the Bank had a tier 1 leverage (core) ratio of 4.53% and a total risk-based capital ratio of 9.02%, each below the required capital ratios set forth above. Without a waiver, amendment or modification of the Orders, the Bank could be subject to further regulatory action, although neither the Bank nor the Corporation has received notice of any regulatory action to be taken by the OCC or the Federal Reserve with regards to the Orders. That said, at March 31, 2013, the Bank's risk-based capital ratio is considered "adequately capitalized" for regulatory purposes. Under OCC requirements, a bank must have a total risk-based capital ratio of 8% or greater to be considered adequately capitalized. The Bank continues to work toward the requirements of the Bank Order which requires a total risk-based capital ratio of 12%, which exceeds traditional capital requirements for a bank. All customer deposits remain fully insured to the limits set by the FDIC.

## Going Concern

The Corporation and the Bank continue to diligently work with their financial and professional advisors in seeking qualified sources of outside capital, restructuring alternatives and in achieving compliance with the requirements of the Orders. The Corporation and the Bank consult with the Federal Reserve, the OCC and FDIC on a regular basis concerning the Corporation's and Bank's proposals to obtain outside capital and to develop action plans that will be acceptable to federal regulatory authorities, but there can be no assurance that these actions will be successful, or that even if one or more of the Corporation's and Bank's proposals are accepted by the Federal regulators, that these proposals will be successfully implemented. While the Corporation's management continues to exert maximum effort to attract new capital, significant operating losses in the past five fiscal years, significant levels of criticized assets at the Bank and negative equity raise substantial doubt as to the Corporation's ability to continue as a going concern. If the Corporation and Bank are unable to achieve compliance with the requirements of the Orders, or implement an acceptable capital restoration plan, and if the Corporation and Bank cannot otherwise comply with such commitments and regulations, the OCC or FDIC could force a sale, liquidation or federal conservatorship or receivership of the Bank.

Further, the Corporation entered into an amendment dated November 30, 2012 ("Amendment No. 9") to the Amended and Restated Credit Agreement ("Credit Agreement") among the Corporation, the lenders from time to time a party thereto, and U.S. Bank National Association, as administrative agent for such lenders, or the "Agent" as described in Note 10, in which the existing interest rate remained the same, the financial covenants related to capital ratios and non-performing loans were moderately tightened and the maturity date was extended to June 30, 2013. Under the terms of the Credit Agreement, the Agent and the lenders have certain rights if all covenants are not complied with, including the right to accelerate the maturity of the borrowings. As of March 31, 2013, the Corporation was in compliance with the financial and non-financial covenants contained in the Credit Agreement, as amended, although there is no guarantee that the Corporation will remain in compliance with the covenants. As of the date of this filing, the Corporation does not have sufficient cash on hand to reduce outstanding borrowings to zero. There can be no assurance that the Corporation will be able to raise sufficient capital or have enough cash on hand to reduce outstanding borrowings to zero by June 30, 2013, which may, if unable to secure an extension at that time, limit the Corporation's ability to fund ongoing operations.

## Credit Risks

Non-performing assets totaled $203.1 million at March 31, 2013, or 8.58% of total assets, which decreased the Corporation's interest income. The Corporation's results of operations will continue to be impacted by the level of non-performing assets, and the Corporation expects continued downward pressure on interest income in the future. As reported in the accompanying audited consolidated financial statements, the Corporation has a net loss of $34.2 million and $36.7 million for the years ended March 31, 2013 and 2012, respectively. Stockholders' equity declined from a deficit of $29.6 million or (1.06)% of total assets at March 31, 2012 to a deficit of $59.9 million or (2.53)% of total assets at March 31, 2013.

96

Table of Contents

**Note 3 – Restrictions on Cash and Due From Bank Accounts**

AnchorBank fsb (Bank) is required to maintain reserve balances in cash or on deposit with the Federal Reserve Bank based on a percentage of deposits. The average amount of required reserve balances for the years ended March 31, 2013 and 2012 was approximately $5.5 million and $18.2 million, respectively, although at March 31, 2013 the Bank met the required reserves with cash balances in the branch system.

The Bank is required to maintain an account with its official check service provider equal to one day's average remittance. The balance in this restricted account was $4.5 million at March 31, 2013 and 2012.

Investment Directions Inc. (IDI), a subsidiary of the Corporation, has a security interest in an interest reserve escrow account in conjunction with a lending arrangement resulting from the sale in 2009 of its investment in a real estate development company. At March 31, 2013 and 2012, the interest reserve escrow was $174,000 and $228,000, respectively.

The nature of the Corporation's business requires that it maintain amounts due from banks and federal funds sold which, at times, may exceed federally insured limits. Management monitors these correspondent relationships and has not experienced any losses in such accounts.

**Note 4 – Investment Securities**

The amortized cost and fair value of investment securities are as follows:

| | Amortized Cost | Gross Unrealized | | Fair Value |
| --- | --- | --- | --- | --- |
| | | Gains | Losses | |
| | | (In thousands) | | |
| **March 31, 2013** | | | | |
| Available for sale: | | | | |
| U.S. government sponsored and federal agency obligations | $ 3,444 | $ 60 | $ — | $ 3,504 |
| Corporate stock and bonds | 152 | 112 | | 264 |
| Non-agency CMOs [1] | 7,885 | 15 | (351) | 7,549 |
| Government sponsored agency mortgage-backed securities [1] | 2,975 | 209 | — | 3,184 |
| GNMA mortgage-backed securities [1] | 248,752 | 3,907 | (373) | 252,286 |
| | $263,208 | $4,303 | $ (724) | $266,787 |
| **March 31, 2012** | | | | |
| Available for sale: | | | | |
| U.S. government sponsored and federal agency obligations | $ 3,556 | $ — | $ (25) | $ 3,531 |
| Corporate stock and bonds | 652 | 50 | (41) | 661 |
| Non-agency CMOs [1] | 25,067 | 163 | (3,638) | 21,592 |
| Government sponsored agency mortgage-backed securities [1] | 3,944 | 251 | — | 4,195 |
| GNMA mortgage-backed securities [1] | 208,948 | 3,597 | (225) | 212,320 |
| | $242,167 | $4,061 | $(3,929) | $242,299 |
| Held-to-maturity: | | | | |
| Government sponsored agency mortgage-backed securities [1][2] | $ 20 | $ — | $ — | $ 20 |

(1)   Primarily collateralized by residential mortgages.
(2)   Full principal payoff was received on this security in May, 2012.

Independent pricing services are used to value all investment securities. One pricing service is used to value all securities except the non-agency CMOs. A specialized pricing service is used for valuation of the non-agency CMO portfolio.

**Table of Contents**

To estimate the fair value of non-agency CMOs, the pricing service valuation model discounted estimated expected cash flows after credit losses at rates ranging from 4% to 7%. The rates utilized are based on the risk free rate equivalent to the remaining average life of the security, plus a spread for normal liquidity and a spread to reflect the uncertainty of the cash flow estimates. The pricing service benchmarks its fair value results to other pricing services and monitors the market for actual trades. The cash flow model includes these inputs in its derivation of the discount rates used to estimate fair value. There are no payments in kind allowed on these non-agency CMOs.

The table below presents the fair value and gross unrealized losses of securities in a loss position, aggregated by investment category and length of time that individual holdings have been in a continuous unrealized loss position at March 31, 2013 and 2012.

| | Unrealized Loss Position | | | | | |
| | Less than 12 months | | 12 months or More | | Total | |
| | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss | Fair Value | Unrealized Loss |
| | | | (In thousands) | | | |
| **March 31, 2013** | | | | | | |
| Non-agency CMOs | $ — | $ — | $ 6,674 | $ (351) | $ 6,674 | $ (351) |
| GNMA mortgage-backed securities | 82,822 | (373) | — | — | 82,822 | (373) |
| | $ 82,822 | $ (373) | $ 6,674 | $ (351) | $ 89,496 | $ (724) |
| **March 31, 2012** | | | | | | |
| U.S. government sponsored and federal agency obligations | $ 3,531 | $ (25) | $ — | $ — | $ 3,531 | $ (25) |
| Corporate stock and bonds | 111 | (41) | — | — | 111 | (41) |
| Non-agency CMOs | 77 | — | 18,109 | (3,638) | 18,186 | (3,638) |
| GNMA mortgage-backed securities | 37,631 | (225) | — | — | 37,631 | (225) |
| | $ 41,350 | $ (291) | $ 18,109 | $ (3,638) | $ 59,459 | $ (3,929) |

**Other-Than-Temporary Impairment**

The number of individual securities in the tables above total 15 at March 31, 2013 and 20 at March 31, 2012. Although these securities have declined in value, the unrealized losses are considered temporary. Management evaluates securities for other-than-temporary impairment on a quarterly basis, and more frequently when economic or market concerns warrant such evaluation. In estimating other-than-temporary impairment losses on investment securities, management considers many factors which include: (1) the length of time and the extent to which the fair value has been less than cost, (2) the financial condition and near-term prospects of the issuer, and (3) the intent and ability of the Corporation to retain its investment for a period of time sufficient to allow for any anticipated recovery in fair value.

To determine if an other-than-temporary impairment exists on a debt security with an unrealized loss, the Corporation first determines if (a) it intends to sell the security or (b) it is more likely than not that it will be required to sell the security before its anticipated recovery. If either of the conditions is met, an other-than-temporary impairment loss is recognized in earnings equal to the difference between the security's fair value and its amortized cost basis. If neither condition is met, the Corporation determines (a) the amount of the impairment related to credit loss and (b) the amount of the impairment due to all other factors. The difference between the present values of the cash flows expected to be collected, discounted at the purchase yield or current accounting yield of the security, and the amortized cost basis is the credit loss. The credit loss is the portion of the impairment that is deemed other-than-temporary and recognized in earnings and is a reduction in the cost basis of the security. The portion of impairment related to all other factors is deemed temporary and included in other comprehensive income (loss).

98

Table of Contents

An independent pricing service is utilized to run a discounted cash flow model in the calculation of other-than-temporary impairment losses on non-agency CMOs. This model determines the portion of the impairment that is other-than-temporary due to credit losses, and the portion that is temporary due to all other factors.

The significant inputs used for calculating the credit loss portion of securities with other-than-temporary impairment ("OTTI") include prepayment assumptions, loss severities, original FICO scores, historical rates of delinquency, percentage of loans with limited underwriting, historical rates of default, original loan-to-value ratio, aggregate property location by metropolitan statistical area, original credit support, current credit support, and weighted-average maturity.

The discount rates used to establish the net present value of expected cash flows for purposes of determining OTTI ranged from 4% to 7%. These rates equate to the effective yield implicit in the security at the date of acquisition of the bonds for which OTTI has not been previously incurred. For bonds with previously recorded OTTI, the discount rate used equates to the accounting yield on the security as of the valuation date.

Default rates were calculated separately for each category of underlying borrower based on delinquency status (i.e. current, 30 to 59 days delinquent, 60 to 89 days delinquent, 90+ days delinquent, and foreclosure balances) of the underlying loans as of March 31, 2013. This data is entered into a loss migration model to calculate projected default rates, which are benchmarked against results that have recently been experienced by other major servicers of non-agency CMOs with similar attributes. The month one to month 24 constant default rate in the model ranged from 4.46% to 11.50%.

At March 31, 2013, six non-agency CMOs with a fair value of $6.9 million and an adjusted cost basis of $7.3 million were other-than-temporarily impaired. At March 31, 2012, 14 non-agency CMOs with a fair value of $19.6 million and an adjusted cost basis of $23.1 million were other-than-temporarily impaired. Unrealized other-than-temporary impairment due to credit losses of $412,000 and $558,000 was included in earnings for the years ended March 31, 2013 and 2012, respectively. For the years ended March 31, 2013 and 2012, realized losses of $722,000 and $364,000, respectively, related to credit issues (i.e. – principal reduced without a receipt of cash) were incurred that were previously recognized in earnings as unrealized other-than-temporary impairment.

Unrealized losses on U.S. government sponsored and federal agency obligations, corporate stocks and bonds and Ginnie Mae ("GNMA") mortgage-backed securities as of March 31, 2013 and 2012 due to changes in interest rates and other non-credit related factors totaled $373,000 and $291,000, respectively. The Corporation has analyzed these securities for evidence of other-than-temporary impairment and concluded that no OTTI exists and that the unrealized losses are properly classified in accumulated other comprehensive income.

The following table is a roll forward of the amount of other-than-temporary impairment related to credit losses that have been recognized in earnings for which a portion of impairment was deemed temporary and recognized in other comprehensive income for the years ended March 31, 2013 and 2012:

| | Year Ended March 31, | |
| --- | ---: | ---: |
| | 2013 | 2012 |
| | (In thousands) | |
| Beginning balance of unrealized OTTI related to credit losses | $ 2,391 | $ 2,197 |
| Additional unrealized OTTI related to credit losses for which OTTI was previously recognized | 412 | 558 |
| Credit related OTTI previously recognized for securities sold during the period | (1,075) | — |
| Credit related OTTI previously recognized for securities paid-off during the period | (4) | — |
| Decrease for realized amount of credit losses for which unrealized credit related OTTI was previously recognized | (722) | (364) |
| Ending balance of unrealized OTTI related to credit losses | $ 1,002 | $ 2,391 |

Table of Contents

On a cumulative basis, other-than-temporary impairment losses recognized in earnings by year of vintage were as follows:

| Year of Vintage | March 31, 2013 |
|---|---|
| | (In thousands) |
| Prior to 2005 | $        7 |
| 2005 | 330 |
| 2006 | — |
| 2007 | 665 |
| | $    1,002 |

The cost of investment securities sold is determined using the specific identification method. Sales of investment securities available for sale are summarized below:

| | Year Ended March 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | (In thousands) | | |
| Proceeds from sales & calls [1] | $12,780 | $338,224 | $385,924 |
| Gross gains | $    91 | $   6,618 | $   8,661 |
| Gross losses | (338) | (39) | — |
| Net gain/(loss) on sales & calls [1] | $   (247) | $   6,579 | $   8,661 |

(1)   Includes proceeds from calls by the issuers of investment securities totaling $518,000 during the year ended March 31, 2013 resulting in a gain on calls of $18,000.

At March 31, 2013 and 2012, investment securities available for sale with a fair value of approximately $187.2 million and $216.3 million, respectively, were pledged to secure deposits, borrowings and for other purposes as permitted or required by law.

The fair values of investment securities by contractual maturity at March 31, 2013 are shown below. Actual maturities may differ from contractual maturities because issuers have the right to call or prepay obligations with or without call or prepayment penalties.

| | Within 1 Year | After 1 Year through 5 Years | After 5 Years through 10 Years | Over Ten Years | Total |
|---|---|---|---|---|---|
| | | | (In thousands) | | |
| U.S. government sponsored and federal agency obligations | $    — | $  3,504 | $   — | $    — | $  3,504 |
| Corporate stock and bonds | — | — | — | 264 | 264 |
| Non-agency CMOs | — | — | — | 7,549 | 7,549 |
| Government sponsored agency mortgage-backed securities | — | 232 | 313 | 2,639 | 3,184 |
| GNMA mortgage-backed securities | — | 370 | — | 251,916 | 252,286 |
| Total | $    — | $  4,106 | $  313 | $262,368 | $266,787 |

100

Table of Contents

### Note 5 – Loans Receivable

Loans receivable held for investment consist of the following:

|  | March 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In thousands) | |
| Residential | $ 547,720 | $ 564,427 |
| Commercial and industrial | 30,574 | 38,977 |
| Commercial real estate: | | |
|     Land and construction | 111,953 | 186,048 |
|     Multi-family | 287,447 | 342,216 |
|     Retail/office | 198,686 | 298,277 |
|     Other commercial real estate | 172,857 | 248,275 |
| Consumer: | | |
|     Education | 166,429 | 240,331 |
|     Other consumer | 247,530 | 269,532 |
|     Total unpaid principal balance | 1,763,196 | 2,188,083 |
| Allowance for loan losses | (79,815) | (111,215) |
| Undisbursed loan proceeds [1] | (10,997) | (16,034) |
| Unamortized loan fees, net | (1,838) | (3,086) |
| Unearned interest | (3) | (4) |
|     Total loan contra balances | (92,653) | (130,339) |
|     Loans held for investment | $1,670,543 | $2,057,744 |

(1)    Undisbursed loan proceeds are funds to be released upon a draw request approved by the Corporation.

### Residential Loans

At March 31, 2013, $547.7 million, or 31.1%, of the total loans unpaid principal balance receivable consisted of residential loans, substantially all of which were 1 to 4 family dwellings. Residential loans consist of both adjustable and fixed-rate loans. The adjustable-rate loans currently in the portfolio have up to 30-year maturities and terms which provide for annual increases or decreases of the rate on the loans, based on a designated index. These rate changes are generally subject to a limit of 2% per adjustment and an aggregate 6% adjustment over the life of the loan. These loans are documented according to standard industry practices. The Corporation makes a limited number of interest-only loans which tend to have a shorter term to maturity and does not originate negative amortization and option payment adjustable rate mortgages.

Adjustable-rate loans decrease the risks associated with changes in interest rates but involve other risks, primarily because as interest rates rise, the payment by the borrower rises to the extent permitted by the terms of the loan, thereby increasing the potential for default. At the same time, the marketability of the underlying property may be adversely affected by higher interest rates. These risks, which have not had a material adverse effect to date, generally are less than the risks associated with holding fixed-rate loans in an increasing interest rate environment. Also, as interest rates decline, borrowers may refinance their mortgages into fixed-rate loans thereby prepaying the balance of the loan prior to maturity. At March 31, 2013, approximately $343.8 million, or 62.8%, of the held for investment residential loans unpaid principal balance consisted of loans with adjustable interest rates.

The Corporation continues to originate long-term, fixed-rate conventional mortgage loans. Current production of these loans with terms of 15 years or more are generally sold to Fannie Mae, Freddie Mac and other institutional investors, while a portion of loan production is retained in the held for investment portfolio. In order to provide a

101

Table of Contents

full range of products to its customers, the Corporation also participates in the loan origination programs of Wisconsin Housing and Economic Development Authority ("WHEDA"), Wisconsin Department of Veterans Affairs ("WDVA") and the Federal Housing Administration ("FHA"). The right to service substantially all loans sold is retained.

At March 31, 2013, approximately $203.9 million, or 37.2%, of the held for investment residential loans unpaid principal balance consisted of loans with fixed rates of interest. Although these loans generally provide for repayments of principal over a fixed period of 10 to 30 years, because of prepayments and due-on-sale clauses, such loans generally remain outstanding for a shorter period of time.

**Commercial and Industrial Loans**

The Corporation originates loans for commercial, corporate and business purposes, including issuing letters of credit. At March 31, 2013, the unpaid principal balance receivable of commercial and industrial loans amounted to $30.6 million, or 1.7%, of the total loans unpaid principal balance receivable. The commercial and industrial loan portfolio is comprised of loans for a variety of business purposes and generally are secured by equipment, machinery and other corporate assets. These loans generally have terms of seven years or less and interest rates that float in accordance with a designated published index. Substantially all such loans are secured and backed by the personal guarantees of the owners of the business.

**Commercial Real Estate Loans**

The Corporation originates commercial real estate loans which include land and construction, multi-family, retail/office and other commercial real estate. Such loans generally have adjustable rates and shorter terms than single-family residential loans, thus increasing the earnings sensitivity of the loan portfolio to changes in interest rates, as well as providing higher fees and rates than residential loans. At March 31, 2013, $770.9 million of loans unpaid principal balance receivable were secured by commercial real estate, which represented 43.7% of the total loans unpaid principal balance. The origination of such loans is generally limited to the Corporation's primary market area.

Commercial real estate loans are primarily secured by apartment buildings, office and industrial buildings, land, warehouses, small retail shopping centers and various special purpose properties, including community-based residential facilities and senior housing. Although terms vary, commercial real estate loans generally have fixed interest rates, amortization periods of 15 to 25 years, as well as balloon payments of two to seven years, and terms which provide that the interest rates thereon may be adjusted annually based on a designated index.

**Consumer Loans**

The Corporation offers consumer loans in order to provide a wider range of financial services to its customers. At March 31, 2013, $414.0 million, or 23.5%, of the total loans unpaid principal balance receivable consisted of consumer loans. Consumer loans typically have higher interest rates than mortgage loans but generally involve more risk than mortgage loans because of the type and nature of the collateral and, in certain cases, the absence of collateral.

The residential-other portfolio consists primarily of Express refinance first mortgage loans, second mortgage and home equity loans. Express refinance loans are available for owner occupied one- to two-family residential properties, with loan amounts up to $200,000, a fixed interest rate, up to 15 year amortization, low fees and rapid closing timeframes. The primary home equity loan product has an adjustable rate that is linked to the prime interest rate and is secured by a mortgage, either a primary or a junior lien, on the borrower's residence. New home equity lines do not exceed 90% of appraised value of the property at the loan origination date. A fixed-rate home equity second mortgage term product is also offered.

Table of Contents

Approximately $166.4 million, or 9.4%, of the total loans unpaid principal balance receivable at March 31, 2013 consisted of education loans. These loans are generally made for a maximum of $3,500 per year for undergraduate studies and $8,500 per year for graduate studies and are placed in repayment status on an installment basis within nine months following graduation. Education loans generally have interest rates that adjust annually in accordance with a designated index. Both the principal amount of an education loan and interest thereon are generally guaranteed by the Great Lakes Higher Education Corporation up to 97% of the balance of the loan, which typically obtains reinsurance of its obligations from the U.S. Department of Education. The origination of student loans was discontinued beginning October 1, 2010 following the March 2010 law ending loan guarantees provided by the U.S. Department of Education. Although direct student loans, without a government guarantee, may be originated, risk-adjusted returns for these loans continue to be unattractive. Education loans may be sold to the U.S. Department of Education or to other investors. Proceeds from the sale of education loans totaled $24.3 million in fiscal 2011. No education loans were sold during the years ended March 31, 2013 and 2012.

The other consumer loan portfolio consists of vehicle loans and other secured and unsecured loans made for a variety of consumer purposes. These include credit extended through credit cards issued by a third party, ELAN Financial Services (ELAN), pursuant to an agency arrangement under which the Corporation participates in outstanding balances, currently at 25% to 28%. The Corporation also shares 33% to 37% of annual fees, and 30% of late payment, over limit and cash advance fees, as well as 25% to 30% of interchange income from the underlying portfolio.

**Allowances for Loan Losses**

The allowance for loan losses consists of general, substandard and specific components even though the entire allowance is available to cover losses on any loan. The specific allowance component relates to impaired loans (i.e. – non-accrual) and all loans reported as troubled debt restructurings (TDRs). For such loans, an allowance is established when the discounted cash flows (or collateral value if repayment relies solely on the operation or sale of the collateral) of the impaired loan are lower than the carrying value of that loan. The substandard loan component is primarily associated with loans rated in this category but not in non-accrual status. The general allowance component covers pass and special mention rated loans and is based on historical loss experience adjusted for various qualitative and quantitative factors. Loans graded substandard and below are individually examined to determine the appropriate loan loss reserve. In addition, reserves for unfunded commitments, letters of credit and repurchase of sold loans are maintained and classified in other liabilities.

The following table presents the allowance for loan losses by component:

|  | March 31, | |
|---|---|---|
|  | **2013** | **2012** |
|  | (In thousands) | |
| General component | $28,163 | $ 37,085 |
| Substandard loan component | 22,560 | 29,980 |
| Specific component | 29,092 | 44,150 |
| Total allowance for loan losses | $79,815 | $111,215 |

103

**Table of Contents**

The following table presents the unpaid principal balance of loans by risk category:

|  | March 31, | |
|---|---|---|
|  | **2013** | **2012** |
|  | **(In thousands)** | |
| Pass [1] | $ 1,519,665 | $ 1,740,542 |
| Special mention | 33,363 | 56,762 |
| Total pass and special mention rated loans | 1,533,028 | 1,797,304 |
| Substandard rated loans, excluding TDR accrual | 49,813 | 93,207 |
| Troubled debt restructurings – accrual | 41,565 | 72,648 |
| Non-accrual | 118,790 | 224,924 |
| Total impaired loans | 160,355 | 297,572 |
| Total unpaid principal balance | $ 1,763,196 | $ 2,188,083 |

(1)    Includes all accrual residential and consumer loans as these loans are generally not individually rated.

A summary of the activity in the allowance for loan losses follows:

|  | Year Ended March 31, | | |
|---|---|---|---|
|  | **2013** | **2012** | **2011** |
|  | **(In thousands)** | | |
| Allowance at beginning of year | $111,215 | $150,122 | $179,644 |
| Provision | 7,733 | 33,887 | 50,325 |
| Charge-offs | (49,353) | (82,562) | (88,886) |
| Recoveries | 10,220 | 9,768 | 9,039 |
| Allowance at end of year | $ 79,815 | $111,215 | $150,122 |

104

Table of Contents

The following table presents activity in the allowance for loan losses by portfolio segment for the years ended March 31, 2013, 2012 and 2011:

| | Residential | Commercial and Industrial | Commercial Real Estate (In thousands) | Consumer | Total |
|---|---|---|---|---|---|
| **For the Year Ended:** | | | | | |
| **March 31, 2013** | | | | | |
| Beginning balance | $ 13,027 | $ 10,568 | $ 85,153 | $ 2,467 | $111,215 |
| Provision | 6,414 | (1,471) | (3,107) | 5,897 | 7,733 |
| Charge-offs | (6,659) | (3,483) | (34,265) | (4,946) | (49,353) |
| Recoveries | 1,743 | 1,458 | 6,800 | 219 | 10,220 |
| Ending balance | $ 14,525 | $ 7,072 | $ 54,581 | $ 3,637 | $ 79,815 |
| **March 31, 2012** | | | | | |
| Beginning balance | $ 20,487 | $ 19,541 | $ 106,445 | $ 3,649 | $150,122 |
| Provision | (2,546) | 4,180 | 30,869 | 1,384 | 33,887 |
| Charge-offs | (6,625) | (14,993) | (57,685) | (3,259) | (82,562) |
| Recoveries | 1,711 | 1,840 | 5,524 | 693 | 9,768 |
| Ending balance | $ 13,027 | $ 10,568 | $ 85,153 | $ 2,467 | $111,215 |
| **March 31, 2011** | | | | | |
| Beginning balance | $ 20,658 | $ 29,783 | $ 126,553 | $ 2,650 | $179,644 |
| Provision | 13,346 | (3,644) | 36,621 | 4,002 | 50,325 |
| Charge-offs | (15,005) | (8,021) | (62,558) | (3,302) | (88,886) |
| Recoveries | 1,488 | 1,423 | 5,829 | 299 | 9,039 |
| Ending balance | $ 20,487 | $ 19,541 | $ 106,445 | $ 3,649 | $150,122 |

The following table presents the balance in the allowance for loan losses and the recorded investment in loans by portfolio segment and based on impairment method as of March 31, 2013 and 2012:

| | Residential | Commercial and Industrial | Commercial Real Estate (In thousands) | Consumer | Total |
|---|---|---|---|---|---|
| **March 31, 2013** | | | | | |
| Allowance for loan losses: | | | | | |
| Associated with impaired loans | $ 7,038 | $ 2,508 | $ 19,182 | $ 364 | $ 29,092 |
| Associated with all other loans | 7,487 | 4,564 | 35,399 | 3,273 | 50,723 |
| Total | $ 14,525 | $ 7,072 | $ 54,581 | $ 3,637 | $ 79,815 |
| Loans: | | | | | |
| Impaired loans individually evaluated | $ 37,378 | $ 3,760 | $ 114,540 | $ 4,677 | $ 160,355 |
| All other loans | 510,342 | 26,814 | 656,403 | 409,282 | 1,602,841 |
| Total | $547,720 | $ 30,574 | $ 770,943 | $413,959 | $1,763,196 |
| **March 31, 2012** | | | | | |
| Allowance for loan losses: | | | | | |
| Associated with impaired loans | $ 5,080 | $ 5,548 | $ 33,137 | $ 385 | $ 44,150 |
| Associated with all other loans | 7,947 | 5,020 | 52,016 | 2,082 | 67,065 |
| Total | $ 13,027 | $ 10,568 | $ 85,153 | $ 2,467 | $ 111,215 |
| Loans: | | | | | |
| Impaired loans individually evaluated | $ 49,411 | $ 10,774 | $ 228,873 | $ 8,514 | $ 297,572 |
| All other loans | 515,016 | 28,203 | 845,943 | 501,349 | 1,890,511 |
| Total | $564,427 | $ 38,977 | $1,074,816 | $509,863 | $2,188,083 |

**Table of Contents**

The provision for credit losses reflected on the consolidated statements of operations includes the provision for loan losses and the provision for unfunded commitment losses as follows:

|  | For the Year Ended March 31, | | |
|---|---|---|---|
|  | **2013** | **2012** | **2011** |
|  | | (In thousands) | |
| Provision for loan losses | $7,733 | $33,887 | $50,325 |
| Provision for unfunded commitment losses [1] | 1,392 | (309) | 873 |
| Provision for credit losses | $9,125 | $33,578 | $51,198 |

(1)    The provision for unfunded commitments includes provisions for unfunded commitments to lend and commercial letters of credit.

The provision for unfunded commitment losses in the year ending March 31, 2013 totaled $1.4 million compared to ($309,000) and $873,000 during the years ending March 31, 2012 and 2011, respectively. The reserve for unfunded loan commitments and letters of credit at March 31, 2013 totaled $2.0 million, classified in other liabilities on the consolidated balance sheet.

At March 31, 2013, $160.4 million of unpaid principal balance of loans are deemed impaired which includes performing TDRs. At March 31, 2012, impaired loans were $297.6 million. A loan is identified as impaired when, based on current information and events, it is probable that all amounts due according to the contractual terms of the loan agreement may not be collected and thus are placed on non-accrual status. Interest income on certain impaired loans is recognized on a cash basis.

A substantial portion of loans are collateralized by real estate in Wisconsin and adjacent states. Accordingly, the ultimate collectability of the loan portfolio is susceptible to changes in real estate market conditions in that area.

106

Table of Contents

The following table presents impaired loans segregated by loans with no specific allowance and loans with an allowance by class of loans as of March 31, 2013 and 2012:

| | Unpaid Principal Balance | Associated Allowance | Carrying Amount (In thousands) | Average Carrying Amount (1) | Fiscal Year to Date Interest Income Recognized |
|---|---|---|---|---|---|
| **March 31, 2013** | | | | | |
| With no specific allowance recorded: | | | | | |
| Residential | $ 11,545 | $ — | $ 11,545 | $ 12,655 | $ 448 |
| Commercial and industrial | 280 | — | 280 | 1,020 | 75 |
| Land and construction | 9,982 | — | 9,982 | 21,678 | 189 |
| Multi-family | 12,217 | — | 12,217 | 14,826 | 400 |
| Retail/office | 6,913 | — | 6,913 | 15,810 | 350 |
| Other commercial real estate | 13,365 | — | 13,365 | 19,378 | 691 |
| Education | — | — | — | — | — |
| Other consumer | 531 | — | 531 | 665 | 62 |
| Subtotal | 54,833 | — | 54,833 | 86,032 | 2,215 |
| With an allowance recorded (2): | | | | | |
| Residential | 25,833 | 7,038 | 18,795 | 23,509 | 611 |
| Commercial and industrial | 3,480 | 2,508 | 972 | 1,556 | 78 |
| Land and construction | 23,492 | 6,552 | 16,940 | 19,024 | 659 |
| Multi-family | 15,448 | 4,261 | 11,187 | 13,918 | 722 |
| Retail/office | 14,505 | 3,312 | 11,193 | 19,553 | 519 |
| Other commercial real estate | 18,618 | 5,057 | 13,561 | 19,545 | 632 |
| Education (3) | 424 | 1 | 423 | 615 | — |
| Other consumer | 3,722 | 363 | 3,359 | 6,167 | 293 |
| Subtotal | 105,522 | 29,092 | 76,430 | 103,887 | 3,514 |
| Total | | | | | |
| Residential | 37,378 | 7,038 | 30,340 | 36,164 | 1,059 |
| Commercial and industrial | 3,760 | 2,508 | 1,252 | 2,576 | 153 |
| Land and construction | 33,474 | 6,552 | 26,922 | 40,702 | 848 |
| Multi-family | 27,665 | 4,261 | 23,404 | 28,744 | 1,122 |
| Retail/office | 21,418 | 3,312 | 18,106 | 35,363 | 869 |
| Other commercial real estate | 31,983 | 5,057 | 26,926 | 38,923 | 1,323 |
| Education (3) | 424 | 1 | 423 | 615 | — |
| Other consumer | 4,253 | 363 | 3,890 | 6,832 | 355 |
| | $160,355 | $ 29,092 | $131,263 | $189,919 | $ 5,729 |

(1) The average carrying amount of loans in each category is calculated on a trailing 12 month basis.

(2) Includes ratio-based allowance for loan losses of $5.7 million associated with loans totaling $35.9 million at March 31, 2013 for which individual reviews have not been completed but an allowance established based on the ratio of allowance for loan losses to unpaid principal balance for the loans individually reviewed by class of loan.

(3) Excludes the guaranteed portion of education loans 90+ days past due with unpaid principal balance of $13,697 and average carrying amounts totaling $21,249 at March 31, 2013 that are not considered impaired based on a guarantee provided by government agencies.

Table of Contents

| | Unpaid Principal Balance | Associated Allowance | Carrying Amount (In thousands) | Average Carrying Amount (1) | Fiscal Year to Date Interest Income Recognized |
|---|---|---|---|---|---|
| **March 31, 2012** | | | | | |
| With no specific allowance recorded: | | | | | |
| Residential | $ 19,845 | $ — | $ 19,845 | $ 22,224 | $ 208 |
| Commercial and industrial | 3,389 | — | 3,389 | 6,771 | 61 |
| Land and construction | 34,446 | — | 34,446 | 39,601 | 581 |
| Multi-family | 19,822 | — | 19,822 | 21,624 | 264 |
| Retail/office | 21,787 | — | 21,787 | 23,577 | 816 |
| Other commercial real estate | 24,213 | — | 24,213 | 23,812 | 571 |
| Education | — | — | — | — | — |
| Other consumer | 474 | — | 474 | 507 | 62 |
| Subtotal | 123,976 | — | 123,976 | 138,116 | 2,563 |
| With an allowance recorded: (2) | | | | | |
| Residential | 29,566 | 5,080 | 24,486 | 28,070 | 520 |
| Commercial and industrial | 7,385 | 5,548 | 1,837 | 6,285 | 260 |
| Land and construction | 47,545 | 14,543 | 33,002 | 47,499 | 886 |
| Multi-family | 27,307 | 7,896 | 19,411 | 25,803 | 927 |
| Retail/office | 28,954 | 6,672 | 22,282 | 27,417 | 858 |
| Other commercial real estate | 24,799 | 4,026 | 20,773 | 22,891 | 737 |
| Education (3) | 762 | 1 | 761 | 789 | — |
| Other consumer | 7,278 | 384 | 6,894 | 7,190 | 480 |
| Subtotal | 173,596 | 44,150 | 129,446 | 165,944 | 4,668 |
| Total | | | | | |
| Residential | 49,411 | 5,080 | 44,331 | 50,294 | 728 |
| Commercial and industrial | 10,774 | 5,548 | 5,226 | 13,056 | 321 |
| Land and construction | 81,991 | 14,543 | 67,448 | 87,100 | 1,467 |
| Multi-family | 47,129 | 7,896 | 39,233 | 47,427 | 1,191 |
| Retail/office | 50,741 | 6,672 | 44,069 | 50,994 | 1,674 |
| Other commercial real estate | 49,012 | 4,026 | 44,986 | 46,703 | 1,308 |
| Education (3) | 762 | 1 | 761 | 789 | — |
| Other consumer | 7,752 | 384 | 7,368 | 7,697 | 542 |
| | $297,572 | $ 44,150 | $253,422 | $304,060 | $ 7,231 |

(1)    The average carrying amount of loans in each category is calculated on a trailing 12 month basis.

(2)    Includes ratio-based allowance for loan losses of $2.8 million associated with loans totaling $24.6 million at March 31, 2012 for which individual reviews have not been completed but an allowance established based on the ratio of allowance for loan losses to unpaid principal balance for the loans individually reviewed by class of loan.

(3)    Excludes the guaranteed portion of education loans 90+ days past due with unpaid principal balance of $24,641 and average carrying amounts totaling $25,520 at March 31, 2012 that are not considered impaired based on a guarantee provided by government agencies.

The carrying amounts in the table above represent the unpaid principal balance less the associated allowance. The average carrying amount is a trailing twelve month average calculated based on the ending quarterly balances. The interest income recognized is the fiscal year to date interest income recognized on a cash basis.

108

**Table of Contents**

The following is additional information regarding impaired loans:

| | March 31, | |
|---|---|---|
| | **2013** | **2012** |
| | (In thousands) | |
| Unpaid principal balance of impaired loans: | | |
| With specific reserve required | $105,522 | $173,596 |
| Without a specific reserve | 54,833 | 123,976 |
| Total impaired loans | 160,355 | 297,572 |
| Less: | | |
| Specific valuation allowance for impaired loans | (29,092) | (44,150) |
| Carrying amount of impaired loans | $131,263 | $253,422 |
| Average carrying amount of impaired loans | $189,919 | $304,060 |
| Loans and troubled debt restructurings on non-accrual status | 118,790 | 224,924 |
| Troubled debt restructurings – accrual | 41,565 | 72,648 |
| Troubled debt restructurings – non-accrual [1] | 26,287 | 76,378 |
| Loans past due ninety days or more and still accruing [2] | 13,697 | 30,697 |

(1) Troubled debt restructurings – non-accrual are included in the loans and troubled debt restructurings on non-accrual status line item above.

(2) Includes the guaranteed portion of education loans of $13,697 and $24,641 at March 31, 2013 and 2012, respectively, that were 90+ days past due which continue to accrue interest due to a guarantee provided by government agencies covering approximately 97% of the outstanding balance.

The following table presents interest income recognized on impaired loans on a cash basis.

| | For the Year Ended March 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | (In thousands) | | |
| Interest income recognized on impaired loans on a cash basis | $5,729 | $7,231 | $9,818 |

Although the Corporation is currently not committed to lend any additional funds on impaired loans in accordance with the original terms of these loans, it is not legally obligated to, and will not, disburse additional funds on any loans while in nonaccrual status or if the borrower is in default.

The Corporation experienced declines in the valuations for real estate collateral supporting portions of its loan portfolio throughout fiscal years 2011, 2012 and 2013, as reflected in recently received appraisals. Currently, $206.6 million or approximately 90% of the unpaid principal balance of classified loans (i.e. loans risk rated as substandard or loss) have recent appraisals (i.e. within one year) or have been determined to not need an appraisal. Loans that do not require an appraisal under corporate policy include situations in which the loan (i) is fully reserved; (ii) has a small balance (less than $250,000) and rather than being individually evaluated for impairment, is included in a homogenous pool of loans; (iii) uses a net present value of future cash flows to measure impairment; or (iv) is not secured by real estate. Appraised values greater than one year old are discounted by an additional 10% for improved land or commercial real estate and 20% for unimproved land, in determination of the allowance for loan losses.

While corporate policy may not require updated appraisals for these loans, new appraisals may still be obtained. For example, 46% of the loans which do not require an updated appraisal do have either an appraisal within the last year or an appraisal on order. If real estate values decline, the allowance for loan losses may increase as updated appraisals or other indications of a decrease in the value of collateral are received.

109

Table of Contents

The following table presents the aging of the recorded investment in past due loans as of March 31, 2013 and 2012 by class of loans:

| | Days Past Due | | | |
| | 30-59 | 60-89 | 90 or More | Total |
|---|---|---|---|---|
| | | (In thousands) | | |
| **March 31, 2013** | | | | |
| Residential | $ 2,028 | $ 3,390 | $ 24,645 | $ 30,063 |
| Commercial and industrial | 1,004 | 115 | 2,212 | 3,331 |
| Land and construction | 841 | 456 | 11,777 | 13,074 |
| Multi-family | 2,170 | 856 | 17,619 | 20,645 |
| Retail/office | 2,160 | 653 | 12,263 | 15,076 |
| Other commercial real estate | 10 | 55 | 5,873 | 5,938 |
| Education | 4,414 | 3,853 | 14,121 | 22,388 |
| Other consumer | 1,667 | 731 | 3,699 | 6,097 |
| | $14,294 | $10,109 | $ 92,209 | $116,612 |
| **March 31, 2012** | | | | |
| Residential | $ 2,414 | $ 1,071 | $ 37,791 | $ 41,276 |
| Commercial and industrial | 976 | 539 | 3,183 | 4,698 |
| Land and construction | 37 | — | 60,680 | 60,717 |
| Multi-family | 360 | 541 | 26,371 | 27,272 |
| Retail/office | 2,627 | 2,634 | 14,033 | 19,294 |
| Other commercial real estate | 1,884 | 191 | 16,323 | 18,398 |
| Education | 8,370 | 6,562 | 25,403 | 40,335 |
| Other consumer | 1,664 | 692 | 6,879 | 9,235 |
| | $18,332 | $12,230 | $190,663 | $221,225 |

Total delinquencies (loans past due 30 days or more) at March 31, 2013 were $116.6 million. The Corporation has experienced a reduction in delinquencies since March 31, 2012 due to improving credit conditions and loans moving to OREO. The Corporation has $13.7 million of education loans past due 90 days or more that are still accruing interest due to the approximate 97% guarantee provided by governmental agencies. Loans less than 90 days delinquent may be placed on non-accrual status when the probability of collection of principal and interest is deemed to be insufficient to warrant further accrual.

**Credit Quality Indicators:**

The Corporation groups commercial and industrial loans and commercial real estate loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information and current economic trends, among other factors. This analysis is updated on a monthly basis. The following definitions are used for risk ratings:

**Pass.** Loans classified as pass represent assets that are evaluated and are performing under the stated terms. Pass rated assets are analyzed by the pay capacity of the obligor, current net worth of the obligor and/or by the value of the loan collateral. A subcategory of loans classified as pass are watch loans.

**Watch.** Loans classified as watch possess potential weaknesses that require management attention, but do not yet warrant adverse classification. While the status of an asset put on this list does not technically trigger their classification as substandard or non-accrual, it is considered a proactive way to identify potential issues and address them before the situation deteriorates further and results in a loss.

110

Table of Contents

**Special Mention.** Loans classified as special mention exhibit material negative financial trends due to company specific or industry conditions which, if not corrected or mitigated, threaten their capacity to meet current or continuing debt obligations. These borrowers still demonstrate the financial flexibility to address and cure the root cause of these adverse financial trends without significant deviations from their current business plan. Their potential weakness deserves close attention and warrants enhanced monitoring on the part of management. The expectation is these borrowers will return to a pass rating given reasonable time; or will be further downgraded.

**Substandard.** Loans classified as substandard are inadequately protected by the current net worth, paying capacity of the obligor, or by the collateral pledged. Substandard assets must have a well-defined weakness or weaknesses that jeopardize the liquidation of the debt. They are characterized by the distinct possibility that a loss will be sustained if the deficiencies are not corrected.

**Non-Accrual.** Loans classified as non-accrual have the weaknesses of those classified as Substandard, with the added characteristic that the weaknesses make collection or liquidation in full, on the basis of currently existing facts, conditions and values, highly questionable and improbable. Loans that fall into this category are deemed collateral dependent and an individual impairment evaluation is performed for all relationships greater than $500,000. Loans in this category are allocated a specific reserve if the collateral does not support the outstanding loan balance or charged off if deemed uncollectible.

As of March 31, 2013 and 2012, and based on the most recent analysis performed, the risk category of loans by class of loans is as follows:

| | Pass | Special Mention | Substandard (In thousands) | Non-Accrual | Total Unpaid Principal Balance |
|---|---|---|---|---|---|
| **March 31, 2013** | | | | | |
| Commercial and industrial | $ 21,141 | $ 878 | $ 5,640 | $ 2,915 | $ 30,574 |
| Commercial real estate: | | | | | |
| Land and construction | 64,229 | 787 | 15,150 | 31,787 | 111,953 |
| Multi-family | 245,980 | 3,660 | 17,155 | 20,652 | 287,447 |
| Retail/office | 156,919 | 5,144 | 19,100 | 17,523 | 198,686 |
| Other | 107,465 | 22,894 | 34,333 | 8,165 | 172,857 |
| | $595,734 | $33,363 | $ 91,378 | $ 81,042 | $ 801,517 |
| Percent of total unpaid principal balance | 74.3% | 4.2% | 11.4% | 10.1% | 100.0% |
| **March 31, 2012** | | | | | |
| Commercial and industrial | $ 20,693 | $ 255 | $ 9,812 | $ 8,217 | $ 38,977 |
| Commercial real estate: | | | | | |
| Land and construction | 68,175 | 6,344 | 47,300 | 64,229 | 186,048 |
| Multi-family | 278,936 | 2,728 | 22,790 | 37,762 | 342,216 |
| Retail/office | 208,159 | 13,080 | 43,221 | 33,817 | 298,277 |
| Other | 143,225 | 34,355 | 42,732 | 27,963 | 248,275 |
| | $719,188 | $56,762 | $ 165,855 | $171,988 | $ 1,113,793 |
| Percent of total unpaid principal balance | 64.6% | 5.1% | 14.9% | 15.4% | 100.0% |

111

Table of Contents

Residential and consumer loans are managed on a pool basis due to their homogeneous nature. Loans that are delinquent 90 days or more are considered non-accrual. The following table presents the unpaid principal balance of residential and consumer loans based on accrual status as of March 31, 2013 and 2012:

| | March 31, 2013 | | | March 31, 2012 | | |
|---|---|---|---|---|---|---|
| | Accrual | Non-Accrual | Total Unpaid Principal Balance | Accrual | Non-Accrual | Total Unpaid Principal Balance |
| | | | (In thousands) | | | |
| Residential | $514,613 | $ 33,107 | $ 547,720 | $ 519,877 | $ 44,550 | $ 564,427 |
| Consumer: | | | | | | |
| Education [1] | 166,005 | 424 | 166,429 | 239,569 | 762 | 240,331 |
| Other consumer | 243,313 | 4,217 | 247,530 | 261,908 | 7,624 | 269,532 |
| | $923,931 | $ 37,748 | $ 961,679 | $1,021,354 | $ 52,936 | $ 1,074,290 |

(1)   Non-accrual education loans represent the portion of these loans 90+ days past due that are not covered by a guarantee provided by government agencies that is limited to approximately 97% of the outstanding balance.

## Troubled Debt Restructurings

Modifications of loan terms in a troubled debt restructuring ("TDR") are generally in the form of an extension of payment terms or lowering of the interest rate, although occasionally the Corporation has reduced the outstanding principal balance.

Loans modified in a troubled debt restructuring that are currently on non-accrual status will remain on non-accrual status for a period of at least six months. If after six months, or a longer period sufficient to demonstrate the willingness and ability of the borrower to perform under the modified terms, the borrower has made payments in accordance with the modified terms, the loan is returned to accrual status but retains its designation as a TDR. The designation as a TDR is removed in years after the restructuring if both of the following conditions exist: (a) the restructuring agreement specifies an interest rate equal to or greater than the rate that the creditor was willing to accept at the time of restructuring for a new loan with comparable risk and (b) the loan is not impaired based on the terms specified by the restructuring agreement.

During the year ended March 31, 2012, the Corporation adopted ASU 2011-02, as more fully described in Note 1 of the consolidated financial statements. As a result of adopting the amendments in ASU 2011-02, the Corporation reassessed all restructurings that occurred on or after April 1, 2011, for identification as TDRs. The Corporation identified as TDRs certain receivables for which the allowance for credit losses had previously been measured under a general allowance for credit losses methodology. Upon identifying those receivables as TDRs, the Corporation classified them as impaired under the guidance in ASC 310-10-35. The amendments in ASU 2011-02 require prospective application of impairment measured in accordance with the guidance of ASC 310-10-35 for the receivables that are newly identified as impaired. The adoption of the ASU resulted in an increase in the number of loans within its commercial real estate portfolios that are considered TDRs.

112

Table of Contents

The following table presents information related to loans modified in a troubled debt restructuring, by class, during the years ended March 31, 2013 and 2012:

| Troubled Debt Restructurings [1] | Year Ended March 31, 2013 | | | | Year Ended March 31, 2012 | | | |
|---|---|---|---|---|---|---|---|---|
| | Number of Modifications | Unpaid Principal Balance [2] (at period end) | Balance in the ALLL [3] | | Number of Modifications | Unpaid Principal Balance [2] (at period end) | Balance in the ALLL [3] | |
| | | | Prior to Modification | At Period End | | | Prior to Modification | At Period End |
| | | | | (Dollars in thousands) | | | | |
| Residential | 0 | $ — | $ — | $ — | 40 | $ 5,964 | $ 318 | $ 477 |
| Commercial and industrial | 3 | 169 | 206 | 139 | 14 | 6,439 | 2,841 | 3,007 |
| Land and construction | 2 | 546 | 548 | 36 | 16 | 50,820 | 4,553 | 16,259 |
| Multi-family | 0 | — | — | — | 10 | 9,891 | 2,725 | 4,477 |
| Retail/office | 3 | 899 | 383 | 176 | 14 | 9,433 | 1,006 | 1,541 |
| Other commercial real estate | 4 | 934 | 591 | 44 | 13 | 12,927 | 2,334 | 4,422 |
| Education | 0 | — | — | — | 0 | — | — | — |
| Other consumer | 2 | 32 | — | — | 6 | 304 | — | — |
| | 14 | $ 2,580 | $ 1,728 | $ 395 | 113 | $ 95,778 | $ 13,777 | $ 30,183 |

(1) Loans modified in a TDR that were fully paid down, charged-off or foreclosed upon by period end are not reported in this table.
(2) The unpaid principal balance is inclusive of all partial paydowns and charge-offs since the modification date.
(3) The balance in the ALLL represents any specific component of the allowance for loan losses associated with these loans.

The following tables present the unpaid principal balance of loans modified in a troubled debt restructuring during the years ended March 31, 2013 and 2012, by class and by type of modification:

| Troubled Debt Restructurings [1][2] | Year Ended March 31, 2013 | | | | | |
|---|---|---|---|---|---|---|
| | Principal and Interest to Interest Only | Interest Rate Reduction | | Below Market Rate [4] | Other [5] | Total |
| | | To Below Market Rate | To Interest Only [3] | | | |
| | | | (In thousands) | | | |
| Residential | $ — | $ — | $ — | $ — | $ — | $ — |
| Commercial and industrial | — | — | — | 16 | 153 | 169 |
| Land and construction | — | — | — | 425 | 121 | 546 |
| Multi-family | — | — | — | — | — | — |
| Retail/office | — | 214 | 160 | — | 525 | 899 |
| Other commercial real estate | 540 | 122 | — | — | 272 | 934 |
| Education | — | — | — | — | — | — |
| Other consumer | — | — | — | 19 | 13 | 32 |
| | $ 540 | $ 336 | $ 160 | $ 460 | $1,084 | $2,580 |

113

Table of Contents

| Troubled Debt Restructurings [1][2] | Year Ended March 31, 2012 | | | | | |
|---|---|---|---|---|---|---|
| | Principal and Interest to Interest Only | Interest Rate Reduction | | Below Market Rate [4] | Other [5] | Total |
| | | To Below Market Rate | To Interest Only [3] | | | |
| | | (In thousands) | | | | |
| Residential | $ 1,400 | $ 1,952 | $ 942 | $ 611 | $ 1,059 | $ 5,964 |
| Commercial and industrial | 170 | 1,771 | | 923 | 3,575 | 6,439 |
| Land and construction | 367 | 29,461 | | 15,735 | 5,257 | 50,820 |
| Multi-family | 2,497 | — | — | 5,819 | 1,575 | 9,891 |
| Retail/office | 613 | 2,297 | 2,311 | 1,219 | 2,993 | 9,433 |
| Other commercial real estate | 1,324 | 5,315 | — | 268 | 6,020 | 12,927 |
| Education | — | — | — | — | — | — |
| Other consumer | — | 285 | — | — | 19 | 304 |
| | $ 6,371 | $ 41,081 | $ 3,253 | $24,575 | $20,498 | $95,778 |

(1)   Loans modified in a TDR that were fully paid down, charged-off or foreclosed upon by period end are not reported in this table.
(2)   The unpaid principal balance is inclusive of all partial paydowns and charge-offs since the modification date.
(3)   Includes modifications of loan repayment terms from principal and interest to interest only, along with a reduction in the contractual interest rate.
(4)   Includes loans modified at below market rates for borrowers with similar risk profiles and having comparable loan terms and conditions. Market rates are determined by reference to internal new loan pricing grids that specify credit spreads based on loan risk rating and term to maturity.
(5)   Other modifications primarily include providing for the deferral of interest currently due to the new maturity date of the loan.

The following table presents loans modified in a troubled debt restructuring from April 1, 2012 to March 31, 2013, by class, that subsequently defaulted (i.e.: 90 days or more past due following a modification) during the year ended March 31, 2013 compared to year ended March 31, 2012:

| Troubled Debt Restructurings [1] | Year Ended March 31, | | | |
|---|---|---|---|---|
| | 2013 | | 2012 | |
| | Number of Modified Loans | Unpaid Principal Balance [2] (at period end) | Number of Modified Loans | Unpaid Principal Balance [2] (at period end) |
| | (Dollars in thousands) | | | |
| Residential | — | $ — | 11 | $ 1,830 |
| Commercial and industrial | — | — | 7 | 1,083 |
| Land and construction | — | — | 4 | 36,100 |
| Multi-family | — | — | 6 | 8,747 |
| Retail/office | 2 | 374 | 9 | 9,233 |
| Other commercial real estate | 2 | 581 | 4 | 1,543 |
| Education | — | — | — | — |
| Other consumer | — | — | 4 | 304 |
| | 4 | $ 955 | 45 | $ 58,840 |

(1)   Loans modified in a TDR that were fully paid down, charged-off or foreclosed upon by period end are not reported in this table.
(2)   The unpaid principal balance is inclusive of all partial paydowns and charge-offs since the modification date.

114

**Table of Contents**

**Pledged Loans**

At March 31, 2013 and 2012, residential, multi-family, education and other consumer loans receivable with unpaid principal of approximately $823.7 million and $859.8 million were pledged to secure borrowings and for other purposes as permitted or required by law. Certain real-estate related loans are pledged as collateral for FHLB borrowings. See Note 10.

In the ordinary course of business, the Bank has granted loans to principal officers and directors and their affiliates with outstanding balances amounting to $91,000 and $215,000 at March 31, 2013 and 2012, respectively. During the year ended March 31, 2013, there were no principal additions and principal payments totaled $124,000.

**Note 6 – Other Real Estate Owned**

Real estate acquired by foreclosure or by deed in lieu of foreclosure as well as other repossessed assets (OREO) are held for sale and are initially recorded at fair value less a discount for estimated selling costs at the date of foreclosure. Any write down to fair value less estimated selling costs is charged to the allowance for loan losses. If the discounted fair value exceeds the net carrying value of the loans, recoveries to the allowance for loan losses are recorded to the extent of previous charge-offs, with any excess, which is infrequent, recognized as a gain in non-interest income. Subsequent to foreclosure, valuations are periodically performed and a valuation allowance is established if the carrying value exceeds the fair value less estimated selling costs. Costs relating to the development and improvement of the property may be capitalized, generally those greater than $10,000; holding period costs and subsequent changes to the valuation allowance are charged to OREO expense, net included in non-interest expense. Incremental valuation adjustments may be recognized in the Statements of Operations if, in the opinion of management, such additional losses are deemed probable.

A summary of the activity in other real estate owned is as follows:

|  | Year Ended March 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In thousands) | |
| Balance at beginning of period | $ 88,841 | $ 90,707 |
| Additions [1] | 75,727 | 77,835 |
| Capitalized improvements | 300 | — |
| Valuations/write-offs/reserve for probable losses [2] | (26,733) | (15,338) |
| Valuation of deposit method property [3] | (3,301) | — |
| Transfer to premises and equipment | (2,870) | — |
| Sales | (47,622) | (64,363) |
| Balance at end of period | $ 84,342 | $ 88,841 |

(1) Includes a transfer from premises and equipment of a closed retail branch facility no longer used for banking purposes totaling $558,000 during the year ended March 31, 2013.

(2) Includes adjustments to the OREO reserve for probable losses.

(3) Represents the write-down to fair value less estimated selling costs of a loan classified as OREO due to a Bank financed sale of foreclosed property accounted for under the deposit method because of an inadequate down payment by the buyer. The buyer recently defaulted on this loan and the property has been foreclosed upon and revalued in OREO. The valuation amount includes the write-off of principal and interest payments received over the life of the loan totaling $1.4 million and a charge-off to the allowance for loan losses of $1.9 million.

115

Table of Contents

The balances at end of period above are net of a valuation allowance of $36.0 million and $22.5 million at March 31, 2013 and 2012, respectively, recognized during the holding period for declines in fair value subsequent to foreclosure or acceptance of deed in lieu of foreclosure. A summary of activity in the OREO valuation allowance is as follows:

|  | For the Year Ended March 31, | | |
| --- | --- | --- | --- |
|  | 2013 | 2012 | 2011 |
|  | | (In thousands) | |
| Balance at beginning of period | $ 22,521 | $ 19,975 | $ 16,630 |
| Provision | 26,733 | 15,338 | 15,125 |
| Sales | (13,245) | (12,792) | (11,780) |
| Balance at end of period | $ 36,009 | $ 22,521 | $ 19,975 |

Net OREO expense consisted of the following components for the years ended March 31, 2013, 2012 and 2011:

|  | For the Year Ended March 31, | | |
| --- | --- | --- | --- |
|  | 2013 | 2012 | 2011 |
|  | | (In thousands) | |
| Valuation adjustments | $26,733 | $15,338 | $15,125 |
| Foreclosure cost expense | 2,602 | 4,387 | 5,586 |
| Expenses from operations, net | 8,236 | 8,959 | 10,215 |
| OREO expense, net | $37,571 | $28,684 | $30,926 |

## Note 7 – Premises, Equipment and Lease Commitments

Premises and equipment are summarized as follows:

|  | March 31, | |
| --- | --- | --- |
|  | 2013 | 2012 |
|  | (In thousands) | |
| Land and land improvements | $ 7,948 | $ 7,359 |
| Office buildings | 41,569 | 40,608 |
| Furniture and equipment | 36,666 | 45,758 |
| Leasehold improvements | 4,280 | 4,501 |
|  | 90,463 | 98,226 |
| Less accumulated depreciation and amortization | (65,994) | (72,773) |
|  | $ 24,469 | $ 25,453 |

Depreciation expense is summarized as follows:

|  | For the Year Ended March 31, | | |
| --- | --- | --- | --- |
|  | 2013 | 2012 | 2011 |
|  | | (In thousands) | |
| Building depreciation expense | $1,397 | $1,484 | $1,666 |
| Furniture and fixture depreciation expense | 1,682 | 2,010 | 2,438 |
|  | $3,079 | $3,494 | $4,104 |

116

Table of Contents

The Corporation leases 21 branch offices and office facilities under non-cancelable operating leases which expire on various dates through 2030. Future minimum payments under non-cancelable operating leases with initial or remaining terms of one year or more at March 31, 2013 are as follows:

| Fiscal Year Ending March 31, | Amount of Future Minimum Payments |
|---|---|
| | (In thousands) |
| 2014 | $ 1,480 |
| 2015 | 1,406 |
| 2016 | 1,193 |
| 2017 | 1,108 |
| 2018 | 970 |
| Thereafter | 6,271 |
| Total | $ 12,428 |

For the years ended March 31, 2013, 2012 and 2011, land and building lease rental expense was $1.9 million, $2.2 million and $2.4 million, respectively.

**Note 8 – Mortgage Servicing Rights**

Mortgage servicing rights (MSRs) are recorded when loans are sold to third parties with servicing of those loans retained. In addition, MSRs are recorded when acquiring or assuming an obligation to service a financial (loan) asset that does not relate to an asset that is owned. Servicing assets are initially measured at fair value determined using a discounted cash flow model based on market assumptions at the time of origination. Subsequently, the MSR asset is carried at the lower of amortized cost or fair value. MSRs are assessed for impairment using a discounted cash flow model provided by a third party that is based on current market assumptions at the end of each reporting period. For purposes of measuring impairment, the servicing rights are stratified into relatively homogeneous pools based on characteristics such as product type and interest rate bands. Impairment is recognized, if necessary, at the pool level rather than for each individual servicing right asset.

The interest rate bands used to stratify the serviced loans were changed in the quarter ending December 31, 2011 in response to the significantly lower interest rate environment over the past several years and the resultant "bunching' of a substantial portion of serviced loans into two of the nine historical strata. The restratification of serviced loans did not have a material impact on the impairment measurement of the mortgage servicing right asset during the quarter ending December 31, 2011 based on an analysis of proforma results using the historical strata compared to the actual restratified loan impairment during the quarter.

Accounting for MSRs is based on the amortization method. Under this method, servicing assets are amortized in proportion to and over the period of net servicing income. Income generated as the result of the capitalization of new servicing assets is reported as net gain on sale of loans and the amortization of servicing assets is reported as a reduction to loan servicing income in the consolidated statements of operations. Ancillary income is recorded in other non-interest income.

117

**Table of Contents**

Information regarding the Corporation's mortgage servicing rights for the years ended March 31, 2013 and 2012 is as follows:

| | Year Ended March 31, | |
|---|---|---|
| | **2013** | **2012** |
| | (In thousands) | |
| Balance at beginning of period | $24,970 | $25,366 |
| Additions | 8,566 | 8,608 |
| Amortization | (9,301) | (9,004) |
| Balance at end of period – before valuation allowance | 24,235 | 24,970 |
| Valuation allowance | (2,411) | (2,814) |
| Balance at end of period | $21,824 | $22,156 |
| Fair value at the end of the period | $22,088 | $22,770 |
| Key assumptions: | | |
| Weighted average discount rate | 10.79% | 11.06% |
| Weighted average prepayment speed | 11.76% | 15.18% |

The projections of amortization expense for mortgage servicing rights set forth below are based on asset balances as of March 31, 2013 and an assumed amortization rate of 20% per year. Future amortization expense may be significantly different depending upon changes in the mortgage servicing portfolio, mortgage interest rates and market conditions.

| | MSR Amortization |
|---|---|
| | (In thousands) |
| Year ended March 31, 2013 | $   9,301 |
| Estimate for the year ended March 31, | |
| 2014 | $   4,847 |
| 2015 | 3,878 |
| 2016 | 3,102 |
| 2017 | 2,482 |
| 2018 | 1,985 |
| Thereafter | 7,941 |
| Total | $   24,235 |

The unpaid principal balance of mortgage loans serviced for others is not included in the consolidated balance sheets. The unpaid principal of mortgage loans serviced was approximately $2.91 billion and $3.13 billion at March 31, 2013 and 2012, respectively.

Loans intended to be sold are originated in accordance with specific criteria established by the investor agencies – these are known as "conforming loans". During the sale of these loans, certain representations and warranties are made that the loans conform to these previously established underwriting standards. In the event that any of these representations and warranties or standards are found to be out of compliance, the Corporation is responsible for repurchasing the loan at the unpaid principal balance or indemnifying the buyer against loss related to that loan. The expense recorded to indemnify investors for such losses totaled $4.5 million, $0.2 million and zero for the years ending March 31, 2013, 2012 and 2011, respectively.

118

**Table of Contents**

**Note 9 – Deposits**

Deposits are summarized as follows:

| | March 31, | | | |
|---|---|---|---|---|
| | **2013** | | **2012** | |
| | **Carrying Amount** | **Weighted Average Rate** | **Carrying Amount** | **Weighted Average Rate** |
| | (Dollars in thousands) | | | |
| Non-interest-bearing checking | $ 267,732 | 0.00% | $ 264,700 | 0.00% |
| Interest-bearing checking | 295,478 | 0.08 | 274,414 | 0.08 |
| Total checking accounts | 563,210 | 0.04 | 539,114 | 0.04 |
| Money market accounts | 491,330 | 0.19 | 468,283 | 0.30 |
| Regular savings | 290,705 | 0.10 | 265,238 | 0.10 |
| Advance payments by borrowers for taxes and insurance | 20,804 | 0.10 | 22,359 | 0.10 |
| Certificates of deposit: | | | | |
| 0.00% to 0.99% | 519,909 | 0.39 | 487,026 | 0.59 |
| 1.00% to 1.99% | 92,164 | 1.23 | 264,300 | 1.37 |
| 2.00% to 2.99% | 17,628 | 2.37 | 154,993 | 2.24 |
| 3.00% to 3.99% | 12,433 | 3.58 | 24,462 | 3.52 |
| 4.00% and above | 16,842 | 4.38 | 39,126 | 4.89 |
| Total certificates of deposit | 658,976 | 0.72 | 969,907 | 1.31 |
| Total deposits | $2,025,025 | 0.31% | $2,264,901 | 0.65% |

Annual maturities of certificates of deposit outstanding at March 31, 2013 are summarized as follows:

| **Matures During Year Ending March 31,** | **Amount** |
|---|---|
| | (In thousands) |
| 2014 | $ 479,767 |
| 2015 | 102,974 |
| 2016 | 18,529 |
| 2017 | 33,085 |
| 2018 | 24,621 |
| Total | $ 658,976 |

At March 31, 2013 and 2012, certificates of deposit with balances greater than or equal to $100,000 totaled $109.5 million and $195.2 million, respectively.

The Bank has entered into agreements with certain brokers that will provide deposits obtained from their customers at specified interest rates for an identified fee, or so called "brokered deposits." At March 31, 2013 and 2012, the Bank had $100,000 and $2.1 million in brokered deposits. Due to existing capital levels, the Bank is currently prohibited from obtaining or renewing any brokered deposits. There were no out of network certificates of deposit at March 31, 2013. These deposits, which are not considered brokered deposits, are opened via internet listing services and are kept within FDIC insured balance limits.

119

Table of Contents

**Note 10 – Other Borrowed Funds**

Other borrowed funds consist of the following:

| | | March 31, | | | |
|---|---|---|---|---|---|
| | | **2013** | | **2012** | |
| | **Matures During Year Ending March 31,** | **Amount** | **Weighted Average Rate** | **Amount** | **Weighted Average Rate** |
| | | (Dollars in thousands) | | | |
| FHLB advances: | 2013 | $ — | 0.00% | $ 10,000 | 4.12% |
| | 2014 | 11,500 | 1.93 | 11,500 | 1.93 |
| | 2015 | — | 0.00 | 150,000 | 1.62 |
| | 2018 | 100,000 | 3.36 | 100,000 | 3.36 |
| | 2019 | 86,000 | 2.87 | 86,000 | 2.87 |
| Total FHLB advances | | 197,500 | 3.06 | 357,500 | 2.49 |
| Credit agreement | | 116,300 | 15.00 | 116,300 | 15.00 |
| Repurchase agreements | | 3,425 | 0.14 | 2,303 | 0.21 |
| | | $317,225 | 7.41% | $476,103 | 5.53% |

*FHLB Advances*

The Bank pledges certain loans that meet underwriting criteria established by the FHLB as collateral for outstanding advances. The unpaid principal balance of loans pledged to secure FHLB borrowings totaled $717.0 million and $744.6 million at March 31, 2013 and 2012, respectively. The FHLB borrowings are also collateralized by mortgage-related securities with a fair value of $152.1 million and $184.6 million at March 31, 2013 and 2012, respectively. FHLB borrowings of $181.0 million have call features that may be exercised quarterly by the FHLB.

On December 21, 2012, FHLB advances totaling $150.0 million were prepaid. The prepaid advances were floating rate, maturing in January 2015, with a then current weighted average rate of 1.41%. The prepayment triggered an early termination penalty of $3.5 million which was recorded in non-interest expense.

*Credit Agreement*

As of March 31, 2013 and 2012, a total of $116.3 million had been drawn at a weighted average interest rate of 15.00%, on a short term line of credit to various lenders led by U.S. Bank. The total line of credit available is $116.3 million.

On November 30, 2012, the Corporation entered into Amendment No. 9 (the "Amendment") to the Amended and Restated Credit Agreement, dated as of June 9, 2008, (the "Credit Agreement"), among the Corporation, the lenders from time to time a party thereto, and U.S. Bank National Association, as administrative agent for such lenders, or the "Agent." The Corporation is currently in default on the Credit Agreement as a result of failure to make principal payments beginning on March 2, 2009. Under the Amendment, the Agent and the Lenders agreed to forbear from exercising their rights and remedies against the Corporation until the earliest to occur of the following: (i) the occurrence of any Event of Default (other than a failure to make principal payments on the outstanding balance under the Credit Agreement); or (ii) June 30, 2013. Notwithstanding the agreement to forbear, the Agent may at any time, in its sole discretion, take any action reasonably necessary to preserve or protect its interest in the stock of the Bank, IDI, or any other collateral securing any of the obligations against the actions of the Corporation or any third party without notice to or the consent of any party.

The Amendment also provides that the outstanding balance under the Credit Agreement shall continue to bear interest at 15% per annum. Interest accruing under the Credit Agreement is due on the earlier of (i) the date the

120

Table of Contents

Credit Agreement is paid in full or (ii) June 30, 2013. At March 31, 2013, the Corporation had accrued interest and amendment fees payable related to the Credit Agreement of $53.3 million and $6.9 million, respectively.

Within two business days after the Corporation has knowledge of an "event," the chief financial officer is required to submit a statement of the event to the Agent, together with a statement of the actions which the Corporation proposes to take in response to the event. An event may include: (i) any event which, either of itself or with the lapse of time or the giving of notice or both, would constitute a Default under the Credit Agreement; (ii) a default or an event of default under any other material agreement to which the Corporation or Bank is a party; or (iii) any pending or threatened litigation or certain administrative proceedings.

The Amendment requires the Bank to maintain the following financial covenants:

- Tier 1 leverage ratio of not less than 4.00% at all times.

- Total risk based capital ratio of not less than 8.00% at all times.

- Ratio of the sum of non-performing loans plus other real estate owned to the sum of gross loans plus other real estate owned not to exceed 13.00% at any time.

The Bank is in compliance with these covenants at March 31, 2013.

The Credit Agreement and the Amendment also contain customary representations, warranties, conditions and events of default for agreements of such type. At March 31, 2013, the Corporation was in compliance with all covenants contained in the Credit Agreement and the Amendment. Under the terms of the Credit Agreement and Amendment, the Agent and the lenders have certain rights, including the right to accelerate the maturity of the borrowings if the Corporation is not in compliance with all covenants. Currently, no such action has been taken by the Agent or the Lenders. However, the default creates significant uncertainty related to the Corporation's ability to continue as a going concern.

*Temporary Liquidity Guarantee Program*

In October 2008, the Secretary of the United States Department of the Treasury invoked the systemic risk exception of the FDIC Improvement Act of 1991 and the FDIC announced the Temporary Liquidity Guarantee Program (the "TLGP"). The TLGP provides a guarantee, through the earlier of maturity or December 31, 2012, of certain senior unsecured debt issued by participating Eligible Entities (including the Corporation) between October 14, 2008 and December 31, 2009. The Bank signed a master agreement with the FDIC on December 5, 2008 for issuance of bonds under the program and subsequently issued $60.0 million of bonds in February 2009 bearing interest at a fixed rate of 2.74%. The bonds matured on February 11, 2012 and were paid in full.

**Note 11 – Preferred Stock**

The Corporation's Articles of Incorporation, as amended, permit the issuance of 5,000,000 shares of preferred stock at a par value of $0.10 per share. The Board of Directors of the Corporation is authorized to issue preferred stock in series and to establish the voting powers, other special rights of the shares of each such series and the qualifications and restrictions thereof. Preferred stock may rank above the common stock as to dividend rights, liquidation preferences or both, and may have full or limited voting rights. Under Wisconsin state law, preferred stockholders would be entitled to vote as a separate class or series in certain circumstances, including any amendment which would adversely change the specific terms of such series of stock or which would create or enlarge any class or series ranking above thereto in rights and preferences.

In January 2009, the Corporation elected to participate in the Capital Purchase Program ("CPP") and received proceeds of $110 million. Pursuant to the Corporation's election to participate, the Department of the Treasury ("Treasury") purchased the Corporation's preferred stock, along with warrants to purchase approximately 7,399,103 shares of common stock. The preferred stock has a dividend rate of 5% per year, until the fifth

121

Table of Contents

anniversary of Treasury's investment and a rate of 9% thereafter. During the time Treasury holds securities issued pursuant to this program, the Corporation is required to comply with certain provisions regarding executive compensation and corporate governance. Participation in the CPP also imposes certain restrictions upon the payment of dividends to common shareholders and stock repurchase activities.

The Corporation has deferred 16 dividend payments on the Series B Preferred Stock held by the Treasury. On December 31, 2011, the Treasury exercised its right to appoint two directors to the Board of Directors of the Corporation as a result of the nonpayment of dividends. At March 31, 2013 and 2012, the cumulative amount of dividends in arrears not declared, including additional amounts attributable to compounding, was $25.3 million and $18.8 million, respectively.

The proceeds received were allocated between the preferred stock and the warrants based upon relative fair value, which resulted in the recording of a discount on the preferred stock upon issuance that reflects the value allocated to the warrants. The discount is accreted as an adjustment to retained earnings on a straight line basis over five years. The allocated carrying value of the preferred stock and warrants on the date of issuance (based on their relative fair values) were $72.9 million and $37.1 million, respectively. The Corporation is prohibited from paying any dividend with respect to shares of common stock unless all accrued and unpaid dividends are paid in full on the preferred stock for all past dividend periods. The preferred stock is non-voting, other than class voting rights on matters that could adversely affect the holders of the preferred stock. The Corporation may redeem the preferred stock at a redemption price equal to the sum of the liquidation preference of $1,000 per share and any accrued and unpaid dividends. The Treasury may also transfer the preferred stock to a third party at any time.

### Note 12 – Common Equity

#### Common Stock Warrants

The Corporation's election to participate in the Department of the Treasury's ("Treasury") Capital Purchase Program ("CPP") in January 2009 resulted in the Treasury purchasing the Corporation's preferred stock, along with warrants to purchase approximately 7,399,103 shares of common stock. The warrants have a term of 10 years and are exercisable at any time, in whole or in part, at an exercise price of $2.23 per share (subject to certain anti-dilution adjustments).

The following assumptions were used in estimating the fair value for the warrants at the date of issuance: a weighted average expected life of 10 years, a risk-free interest rate of 3.35%, an expected volatility of 50.12%, and a dividend yield of 1.55%. Based on these assumptions, the estimated fair value of the warrants was $37.1 million. The weighted average expected life of the warrants represents the period of time the instruments were expected to be outstanding. The risk-free interest rate was based on the U.S. Treasury yield curve in effect at the time of grant. The expected volatility was based on the historical volatility of the Corporation's stock.

#### Shareholders' Rights Plan

On November 5, 2010, a shareholder rights plan was entered into designed to reduce the likelihood that an "ownership change" under U.S. federal income tax laws will be experienced. This rights plan is similar to rights plans adopted by other public companies with significant tax attributes. The purpose of the rights plan is to protect our ability to use our tax assets, such as net operating loss carryforwards and built-in losses, to offset future taxable income, which would be substantially limited if we experienced an "ownership change" as defined under Section 382 of the Internal Revenue Code and related Internal Revenue Service pronouncements. In general, an ownership change would occur if our "5-percent shareholders," as defined under Section 382, collectively increase their ownership by more than 50 percentage points over a rolling three-year period. As part of the rights plan, the Board declared a dividend of one preferred share purchase right for each outstanding share of its common stock. The rights were distributed to shareholders of record as of November 22, 2010, as well as to holders of shares of our common stock issued after that date, but would only be activated if triggered by the rights plan.

Table of Contents

**Note 13 – Regulatory Capital**

The Bank is subject to various regulatory capital requirements administered by the federal banking agencies. Failure to meet minimum capital requirements can initiate certain mandatory, and possibly additional discretionary actions by bank regulators that, if undertaken, could have a direct material effect on the Bank's financial statements. Under capital adequacy guidelines and the regulatory framework for prompt corrective action, the Bank must meet specific capital guidelines that involve quantitative measures of the Bank's assets, liabilities and certain off-balance-sheet items as calculated under regulatory accounting practices. The Bank's capital amounts and classification are also subject to qualitative judgments by the regulators about components, risk weightings, and other factors.

Qualitative measures established by regulation to ensure capital adequacy require the Bank to maintain minimum amounts and ratios of tier 1 leverage, tier 1 risk-based and total risk-based capital. As of March 31, 2013, the Bank was adequately capitalized under standard regulatory guidelines. Under these requirements, a bank must have a total risk-based capital ratio of 8% or greater to be considered "adequately capitalized." The Bank continues to work toward the requirements of the previously issued Cease and Desist Order which requires a total risk-based capital ratio of 12%, which exceeds traditional capital requirements for a bank. The Bank does not currently meet these elevated capital levels. See Note 2.

The following table summarizes the Bank's capital ratios and the ratios required by its federal regulators to be considered adequately or well capitalized under standard regulatory guidelines and as required by the Cease and Desist Order at March 31, 2013 and 2012:

| | | | Minimum Required | | | | | |
| | **Actual** | | **To be Adequately Capitalized** | | **To be Well Capitalized** | | **Under Order to Cease and Desist** | |
| | Capital | Ratio | Capital | Ratio | Capital | Ratio | Capital | Ratio |
| | | | | (Dollars in thousands) | | | | |
| **March 31, 2013** | | | | | | | | |
| Tier 1 leverage [1] | $107,272 | 4.53% | $ 94,775 | 4.00% | $118,469 | 5.00% | $189,551 | 8.00% |
| Tier 1 risk-based capital [2] | 107,272 | 7.71 | 55,655 | 4.00 | 83,483 | 6.00 | N/A | N/A |
| Total risk-based capital [3] | 125,459 | 9.02 | 111,311 | 8.00 | 139,139 | 10.00 | 166,966 | 12.00 |
| **March 31, 2012** | | | | | | | | |
| Tier 1 leverage [1] | $125,894 | 4.51% | $111,685 | 4.00% | $139,606 | 5.00% | $223,370 | 8.00% |
| Tier 1 risk-based capital [2] | 125,894 | 7.11 | 70,850 | 4.00 | 106,276 | 6.00 | N/A | N/A |
| Total risk-based capital [3] | 149,141 | 8.42 | 141,701 | 8.00 | 177,126 | 10.00 | 212,551 | 12.00 |

(1)   Tier 1 capital divided by adjusted total assets.
(2)   Tier 1 capital divided by total risk-weighted assets.
(3)   Total risk-based capital divided by total risk-weighted assets.

The following table presents the components of the Bank's federal regulatory capital at March 31, 2013 and 2012:

| | March 31, | |
| | 2013 | 2012 |
| | (In thousands) | |
| Stockholders' equity of the Bank | $112,796 | $128,071 |
| Less: Disallowed servicing assets | (1,945) | (2,045) |
|     Accumulated other comprehensive income | (3,579) | (132) |
| Tier 1 capital | 107,272 | 125,894 |
| Plus: Allowable general valuation allowances | 18,187 | 23,247 |
| Total risk-based capital | $125,459 | $149,141 |

123

**Table of Contents**

The Bank may not declare or pay a cash dividend if such declaration and payment would violate regulatory requirements. As part of the Cease and Desist Agreement, the Corporation must receive the permission of the Federal Reserve prior to declaring, making or paying any dividends or other capital distributions on its capital stock as further described in Note 2.

**Note 14 – Employee Benefit Plans**

*Defined Contribution Plans*

The Corporation maintains a defined contribution plan under Sections 401(a) and 401(k) of the Internal Revenue Code, the AnchorBank, fsb Retirement Plan, in which all employees are eligible to participate. Employees become eligible on the first of the month following 60 days of employment. Participating employees may contribute up to 100% of their base compensation on a pre-tax basis up to annual IRS limits. In January 2013, the Corporation reinstated the matching contribution which had been suspended since October 2009. The Corporation matches the first 2% contributed with a dollar-for-dollar match and the next 2% of employee contributions at a rate of $.50 for each dollar. The plan offers 20 investment options. Employees are allowed to self-direct their investments on a daily basis. The Corporation may also contribute additional amounts at its discretion. The Corporation contributed $213,000 for the year ended March 31, 2013 and made no contributions to this plan for the years ended March 31, 2012 and 2011.

*ESOP*

The Corporation previously sponsored an Employee Stock Ownership Plan ("ESOP") which was available to all employees with more than one year of employment, who were at least 21 years of age and who work more than 1,000 hours in a plan year. On December 1, 2010, preliminary approval was received from the Internal Revenue Service to terminate the ESOP and the plan was terminated as of January 31, 2011. Participants of the ESOP were notified that they had several options for distributing their shares and cash from the ESOP including in-kind distribution to a qualified retirement plan, in-kind distribution to them personally, cash distribution to a qualified retirement plan, and a lump sum cash distribution to them personally. The termination of the ESOP caused no recourse to the Corporation. There were no ESOP contributions for fiscal year 2011.

The activity in the ESOP plan is shown below. There are no shares remaining in the ESOP due to termination of the plan.

|  | Year Ended March 31, 2011 |
|---|---|
| Shares at beginning of year | 1,334,140 |
| Additional shares purchased | — |
| Shares distributed for terminations | (1,328,430) |
| Sale of shares for cash distributions | (5,710) |
| Balance at end of year | — |
| Allocated shares included above | — |
| Unallocated shares | — |

*MRP*

The Corporation maintains a Management Recognition Plan ("MRP"), under which a total of 4% of the shares of the Corporation's common stock was acquired and reserved for issuance under the MRP. The Bank previously contributed $2.0 million to the MRP with which the MRP trustee acquired a total of 1,000,000 shares of the Corporation's common stock. In 2001, the MRP was amended and restated to extend the term. There were no shares granted, no compensation expense and no shares vested related to the MRP during the years ended March 31, 2013, 2012 and 2011.

124

**Table of Contents**

The number and cost of unallocated MRP shares totaled 429,869 shares and $927,000 at March 31, 2013, 2012 and 2011 and is included in treasury stock in the consolidated balance sheets.

### Stock Compensation Plans

The Corporation has several stock-based compensation plans ("Plan(s)") including the 2004 Equity Incentive Plan under which shares of common stock are reserved for the grant of incentive and non-incentive stock options and restricted stock or restricted stock units to directors, officers and employees. The purpose of the Plans was to promote the interests of the Corporation and its stockholders by (i) attracting and retaining exceptional executive personnel and other key employees; (ii) motivating such employees by means of performance-related incentives to achieve long-range performance goals; and (iii) enabling such employees to participate in the long-term growth and financial success of the Corporation. Under the current Plan, up to 921,990 shares of Common Stock were authorized and available for issuance. Of the 921,990 shares available, up to 300,000 shares may be awarded in the form of restricted stock or restricted stock units which are not subject to the achievement of a performance target or targets. The date the options are first exercisable is determined by a committee of the Board of Directors of the Corporation. The options expire no later than ten years from the grant date.

### Stock Options

Stock option activity is summarized as follows:

| | Year Ended March 31, | | | | | |
| | 2013 | | 2012 | | 2011 | |
| | Options | Weighted Average Price | Options | Weighted Average Price | Options | Weighted Average Price |
|---|---|---|---|---|---|---|
| Outstanding at beginning of year | 189,345 | $ 25.19 | 408,850 | $ 22.34 | 474,670 | $ 21.61 |
| Granted | — | — | — | — | — | — |
| Exercised | — | — | — | — | — | — |
| Forfeited | (69,000) | 24.08 | (219,505) | 19.89 | (65,820) | 17.08 |
| Outstanding at end of year | 120,345 | $ 25.82 | 189,345 | $ 25.19 | 408,850 | $ 22.34 |
| Options vested and exercisable at year-end | 120,345 | $ 25.82 | 189,345 | $ 25.19 | 408,850 | $ 22.34 |
| Intrinsic value of options exercised | $ — | | $ — | | $ — | |

The aggregate intrinsic value of options outstanding and exercisable at March 31, 2013 was zero. At March 31, 2013, 810,445 shares were available for future grants. There was no compensation expense related to stock options for the fiscal years ended March 31, 2013, 2012 and 2011.

The following table represents outstanding stock options and exercisable stock options at their respective ranges of exercise prices at March 31, 2013:

| Exercise Price | Options Outstanding | | Exercisable Options |
| | Shares | Weighted-Average Remaining Contractual Life (Years) | |
|---|---|---|---|
| $23.77 | 82,800 | 0.19 | 82,800 |
| $28.50 | 17,545 | 1.65 | 17,545 |
| $31.95 | 20,000 | 2.32 | 20,000 |
| | 120,345 | 0.76 | 120,345 |

125

**Table of Contents**

*Restricted Stock*

Restricted stock grants primarily vest over a period of three to five years and are included in outstanding shares at the time of grant. The fair value of restricted stock equals the average of the high and low market value on the date of grant and that amount is amortized on a straight-line basis to compensation and benefits expense over the vesting period. There were no shares granted under the plan for the years ended March 31, 2013, 2012 and 2011. The restricted stock grant plan expense was $55,000, $256,000 and $305,000 for the fiscal years ended March 31, 2013, 2012 and 2011, respectively.

The activity in restricted stock is summarized as follows:

| | Year Ended March 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2013** | | **2012** | | **2011** | |
| | **Shares** | **Weighted Average Grant Date Fair Value** | **Shares** | **Weighted Average Grant Date Fair Value** | **Shares** | **Weighted Average Grant Date Fair Value** |
| Balance at beginning of year | 18,500 | $ 22.85 | 30,000 | $ 23.24 | 52,450 | $ 22.98 |
| Granted | — | — | — | — | — | — |
| Vested | (18,000) | 22.85 | (11,500) | 23.87 | (15,650) | 22.24 |
| Forfeited | (500) | 22.85 | — | — | (6,800) | 23.51 |
| Balance at end of year | — | $ — | 18,500 | $ 22.85 | 30,000 | $ 23.24 |

As of March 31, 2013, all compensation cost related to restricted stock grants was recognized. The fair value of restricted stock that vested during the year ended March 31, 2013 was $8,000.

*Deferred Compensation Plans*

Deferred compensation plans include an agreement with a previous executive established in 1986 to provide recognition of services performed and additional compensation for services to be performed. The Bank established a grantor trust in 1992 and fully funded the vehicle to facilitate distribution obligations under the agreement, and the trust subsequently purchased shares as all benefits payable under the agreement are payable in the Corporation's stock. The benefits are 100% vested and distributions are made in ten annual installments following the termination of employment. The first distribution was made on December 3, 2010 and the remaining balance payable is 166,480 shares.

The Corporation also established an Excess Benefit Plan to provide deferred compensation to certain members of management. As contributions were made to a participant's account, funds were deposited into a trust account for the participant and in turn shares of ABCW stock were purchased. No contributions were made during the years ended March 31, 2013, 2012 and 2011. Distributions are made to remaining participants six months following termination and there are 67,078 shares remaining for distribution.

An obligation totaling $901,000 at March 31, 2013, representing the cost basis of undistributed shares in both plans described above is included in the deferred compensation obligation component of stockholders' deficit. This amount is offset by the cost basis of undistributed shares purchased included in the additional paid in capital component of stockholders' deficit. No compensation expense was recognized for these plans in the three years ending March 31, 2013, 2012 and 2011.

**Note 15 – Commitments and Contingent Liabilities**

The Corporation is a party to financial instruments with off-balance-sheet risk in the normal course of business to meet the financing needs of its customers. These financial instruments include commitments to extend credit and financial guarantees which involve, to varying degrees, elements of credit and interest rate risk in excess of the amount recognized in the consolidated balance sheets. The contract amounts of those instruments reflect the

126

**Table of Contents**

extent of involvement and exposure to credit loss the Corporation has in particular classes of financial instruments. The same credit policies are used in making commitments and conditional obligations as for on-balance-sheet instruments. Since many of the commitments are expected to expire without being drawn upon, the total committed amounts do not necessarily represent future cash requirements.

Financial instruments whose contract amounts represent credit risk are as follows:

|  | March 31, | |
|---|---|---|
|  | **2013** | **2012** |
|  | (In thousands) | |
| Commitments to extend credit: | $ 34,697 | $ 28,197 |
| Unused lines of credit: | | |
| Home equity | 108,628 | 112,760 |
| Credit cards | 28,541 | 31,658 |
| Commercial | 15,666 | 9,446 |
| Letters of credit | 15,546 | 17,349 |
| Credit enhancement under the Federal Home Loan Bank of Chicago | | |
| Mortgage Partnership Finance Program | 15,877 | 20,442 |

Commitments to extend credit are in the form of a loan in the near future. Unused lines of credit are agreements to lend to a customer as long as there is no violation of any condition established in the contract and may be drawn upon at the borrowers' discretion. Letters of credit commit the Corporation to make payments on behalf of customers when certain specified future events occur. Commitments and letters of credit primarily have fixed expiration dates or other termination clauses and may require payment of a fee. As some such commitments expire without being drawn upon, the total commitment amounts do not necessarily represent future cash requirements. The Corporation evaluates each customer's creditworthiness on a case-by-case basis. With the exception of credit card lines of credit, the Corporation primarily extends credit on a secured basis. Collateral obtained consists primarily of single-family residences and income-producing commercial properties.

At March 31, 2013, the Corporation has $2.0 million of reserves on unfunded commitments, unused lines of credit, letters of credit and $2.6 million of reserves for repurchase of sold loans classified in other liabilities. The Corporation intends to fund commitments through current liquidity.

The Bank previously participated in the Mortgage Partnership Finance (MPF) Program of the Federal Home Loan Bank of Chicago (FHLB). The program was intended to provide member institutions with an alternative to holding fixed-rate mortgages in their loan portfolios or selling them in the secondary market. An institution participates in the MPF Program by either originating individual loans on a "flow" basis as agent for the FHLB pursuant to the "MPF 100 Program" or by selling, as principal, closed loans owned by an institution to the FHLB pursuant to one of the FHLB's closed-loan programs. The program was discontinued in 2008 in its present format and the Bank no longer funds loans through the MPF program. The Bank does, however, continue to service the loans funded under the program and maintains the credit exposure and credit enhancement fees. Under the MPF Program, credit risk is shared by the participating institution and the FHLB by structuring the loss exposure in several layers, with the participating institution being liable for losses after application of an initial layer of losses (after any private mortgage insurance) is absorbed by the FHLB, subject to an agreed-upon maximum amount of such secondary credit enhancement which is intended to be in an amount equivalent to a "AA" credit risk rating by a rating agency. The participating institution receives credit enhancement fees from the FHLB for providing this credit enhancement and continuing to manage the credit risk of the MPF Program loans. Participating institutions are also paid specified servicing fees for servicing the loans.

Pursuant to a credit enhancement feature of the MPF program, the Corporation has retained secondary credit loss exposure in the amount of $15.9 million at March 31, 2013 related to approximately $276.4 million of residential mortgage loans that the Bank has originated as agent for the FHLB. Under the credit enhancement, the FHLB is

127

Table of Contents

liable for losses on loans up to one percent of the original delivered loan balances in each pool. The Bank is then liable for losses over and above the first position up to a contractually agreed-upon maximum amount in each pool that was delivered to the Program. The Corporation receives a monthly fee for this credit enhancement obligation based on the outstanding loan balances. The Corporation has recorded net credit enhancement fee income from this program totaling $14,000, $71,000 and $648,000 for the years ending March 31, 2013, 2012 and 2011, respectively. Based on historical experience, the Corporation does not anticipate that any credit losses will be incurred under the credit enhancement obligation.

Other loans sold to investors with recourse to the Corporation met the underwriting standards of the investor and the Corporation at the time of origination. In the event of default by the borrower, the investor may resell the loans to the Corporation at par value. As the Corporation expects relatively few such loans to become delinquent, the total amount of loans sold with recourse does not necessarily represent future cash requirements. Collateral obtained on such loans consists primarily of single-family residences. The unpaid principal balance of loans repurchased from investors totaled $1.6 million, $1.7 million and $2.1 million for the years ending March 31, 2013, 2012 and 2011, respectively. Alternatively, investors make requests to be made whole on a loan whereby the property has been disposed of at a loss. The related expense was $1.9 million, $200,000 and zero for the years ending March 31, 2013, 2012 and 2011, respectively.

In the ordinary course of business, there are legal proceedings against the Corporation and its subsidiaries. Management considers that the aggregate liabilities, if any, resulting from such actions would not have a material, adverse effect on the consolidated financial position of the Corporation.

One pending lawsuit against the Corporation currently in the discovery stage involves a Bank-issued letter of credit in support of a residential real estate development. Although no specific reserve for loss has been established at March 31, 2013, possible losses due to an unfavorable outcome have been estimated in the range of zero to $2.4 million due to a shortfall in collateral value.

**Note 16 – Derivative Financial Instruments**

The Corporation enters into contracts that meet the definition of derivative financial instruments in accordance with ASC 815 – Derivative and Hedging. Derivatives are used as part of a risk management strategy to address exposure to changes in interest rates inherent in the Corporation's origination and sale of certain residential mortgages into the secondary market. These derivative contracts used for risk management purposes include: (1) interest rate lock commitments provided to customers to fund mortgage loans intended to be sold; and (2) forward sale contracts for the future delivery of funded residential mortgages.

Forward sale contracts are entered into when interest rate lock commitments are granted to customers in an effort to economically hedge the effect of future changes in interest rates on the commitments to fund mortgage loans intended to be sold (the "pipeline"), as well as on the portfolio of funded mortgages not yet sold (the "warehouse"). For accounting purposes, these derivatives are not designated as being in a hedging relationship. The contracts are carried at fair value on the consolidated balance sheets, with changes in fair value recorded in the consolidated statements of operations.

During the quarter ending December 31, 2012 the Corporation's board of directors approved a recommendation by the Asset Liability Committee to increase the approved limit for un-hedged exposure in the Bank's pipeline and warehouse. Subject to certain constraints, the maximum un-hedged exposure limit was increased to $115.0 million.

128

Table of Contents

Derivative financial instruments are summarized as follows:

| | Balance Sheet Location | At March 31, | | | |
| | | 2013 | | 2012 | |
| | | Notional Amount | Estimated Fair Value | Notional Amount | Estimated Fair Value |
| | | (In thousands) | | | |
| Derivative assets: | | | | | |
| Interest rate lock commitments [1] | Other assets | $53,169 | $  689 | $115,032 | $  943 |
| Forward contracts to sell mortgage loans [2] | Other liabilities | 10,000 | 1 | 50,000 | 98 |
| | | | | | |
| Derivative liabilities: | | | | | |
| Interest rate lock commitments [1] | Other liabilities | 559 | 3 | 27,689 | 72 |
| Forward contracts to sell mortgage loans [2] | Other liabilities | 50,000 | 313 | 105,000 | 557 |

(1)   Interest rate lock commitments include $35.8 million and $118.3 million of commitments not yet approved in the credit underwriting process at March 31, 2013 and 2012, respectively, yet represent potential interest rate risk exposure to the extent of those mortgage loan applications eventually approved for funding.

(2)   The Corporation has elected to offset the fair value of individual forward sale contracts and present a net amount on the Consolidated Balance Sheets in accordance with ASC 815-45, Derivatives and Hedging.

Net gains (losses) included in the consolidated statements of operations related to derivative financial instruments, recognized in net gain on sale of loans, are summarized as follows:

| | Year Ended March 31, | | |
| | 2013 | 2012 | 2011 |
| | (In thousands) | | |
| Interest rate lock commitments | $  (184) | $  796 | $ 141 |
| Forward contracts to sell mortgage loans | (6,836) | (7,270) | (648) |
| Total | $(7,020) | $(6,474) | $(507) |

**Note 17 – Fair Value of Financial Instruments**

ASC Topic 820 establishes a framework for measuring fair value and disclosures about fair value measurements. Fair value is defined as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.

In determining fair value, various valuation methods are used including market, income and cost approaches. Assumptions that market participants would use in pricing the asset or liability are utilized in these valuation methods, including assumptions about risk and the risks inherent in the inputs to the valuation technique. These inputs may be readily observable, market corroborated or generally unobservable inputs. Valuation methodologies are employed that maximize the use of observable inputs and minimize the use of unobservable inputs. Based on observability of the inputs used in the valuation methodologies, financial assets and liabilities measured at fair value on a recurring and nonrecurring basis are categorized according to the fair value hierarchy. The fair value hierarchy ranks the quality and reliability of the information used to determine fair values. Financial assets and liabilities that are adjusted to fair value are classified in one of the following three categories:

- Level 1: Quoted prices (unadjusted) for identical assets or liabilities in active markets that the entity has the ability to access as of the measurement date.

- Level 2: Significant other observable inputs other than Level 1 prices such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data.

129

Case 3-13-14003-rdm   Doc 6   Filed 08/12/13   Entered 08/12/13 23:41:05   Desc Main
Document     Page 209 of 384

**Table of Contents**

- Level 3: Significant unobservable inputs that reflect a reporting entity's own assumptions about the assumptions that market participants would use in pricing an asset or liability.

*Fair Value on a Recurring Basis*

The table below presents the financial instruments carried at fair value as of March 31, 2013 and 2012, by the valuation hierarchy (as described above):

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | (In thousands) | | |
| **March 31, 2013** | | | | |
| Financial assets | | | | |
| Investment securities available for sale: | | | | |
| U.S. government sponsored and federal agency obligations | $ — | $ 3,504 | $ — | $ 3,504 |
| Corporate stock and bonds | 264 | — | — | 264 |
| Non-agency CMOs | — | — | 7,549 | 7,549 |
| Government sponsored agency mortgage-backed securities | — | 3,184 | — | 3,184 |
| GNMA mortgage-backed securities | — | 252,286 | | 252,286 |
| Other assets: | | | | |
| Interest rate lock commitments | — | 689 | — | 689 |
| Total | $ 264 | $259,663 | $7,549 | $267,476 |
| Financial liabilities | | | | |
| Other liabilities: | | | | |
| Interest rate lock commitments | $ — | $ 3 | $ — | $ 3 |
| Forward contracts to sell mortgage loans | — | 312 | — | 312 |
| Total | $ — | $ 315 | $ — | $ 315 |

| | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
| | | (In thousands) | | |
| **March 31, 2012** | | | | |
| Financial assets | | | | |
| Investment securities available for sale: | | | | |
| U.S. government sponsored and federal agency obligations | $ — | $ 3,531 | $ — | $ 3,531 |
| Corporate stock and bonds | 661 | — | — | 661 |
| Non-agency CMOs | — | — | 21,592 | 21,592 |
| Government sponsored agency mortgage-backed securities | — | 4,195 | — | 4,195 |
| GNMA mortgage-backed securities | — | 212,320 | — | 212,320 |
| Other assets: | | | | |
| Interest rate lock commitments | — | 943 | — | 943 |
| Total | $ 661 | $220,989 | $21,592 | $243,242 |
| Financial liabilities | | | | |
| Other liabilities: | | | | |
| Interest rate lock commitments | $ — | $ 72 | $ — | $ 72 |
| Forward contracts to sell mortgage loans | — | 459 | — | 459 |
| Total | $ — | $ 531 | $ — | $ 531 |

Table of Contents

An independent service is used to price available-for-sale U.S. government sponsored and federal agency obligations, government sponsored agency mortgage-backed securities, and GNMA mortgage-backed securities using a market data model under Level 2. The significant inputs used at March 31, 2013 and 2012 to price GNMA mortgage-backed securities are as follows:

| | March 31, | | | |
| | 2013 | | 2012 | |
| | From | To | From | To |
|---|---|---|---|---|
| Coupon rate | 1.6% | 4.6% | 1.6% | 5.5% |
| Duration (in years) | 1.2 | 5.1 | 0.1 | 6.1 |
| PSA prepayment speed | 283 | 453 | 201 | 495 |

The Corporation had 99.3% of its non-agency CMOs valued by an independent pricing service that used a discounted cash flow model which incorporates inputs considered Level 3 by the accounting guidance. The significant inputs used by the model at March 31, 2013 and 2012 include observable and unobservable inputs as follows:

| | March 31, | | | |
| | 2013 | | 2012 | |
| | From | To | From | To |
|---|---|---|---|---|
| Observable inputs: | | | | |
| 30 to 59 day delinquency rate | 2.0% | 4.6% | 1.2% | 4.8% |
| 60 to 89 day delinquency rate | 0.7 | 3.1 | 0.6 | 2.5 |
| 90 plus day delinquency rate | 2.4 | 6.2 | 1.1 | 6.0 |
| Loss severity | 39.9 | 71.2 | 39.5 | 71.7 |
| Coupon rate | 5.0 | 6.0 | 5.0 | 7.5 |
| Current credit support | — | 58.4 | — | 25.3 |
| Unobservable inputs: | | | | |
| Month 1 to month 24 constant default rate | 4.5 | 11.5 | 3.4 | 11.3 |
| Discount rate | 4.0 | 7.0 | 4.0 | 12.0 |

Other assets and other liabilities include interest rate lock commitments provided to customers to fund mortgage loans intended to be sold and forward sale contracts for future delivery of funded residential mortgages to investors. The Corporation relies on an internal valuation model to estimate the fair value of its interest rate lock commitments, which includes applying an estimated pull-through rate (the percentage of commitments expected to result in a closed loan) based on historical experience; multiplied by quoted investor prices on closed loans for future delivery determined to be reasonably applicable to the loan commitment based on interest rate, terms and rate lock expiration.

The Corporation also relies on an internal valuation model to estimate the fair value of its forward contracts to sell residential mortgage loans (i.e., an estimate of what the Corporation would receive or pay to terminate the forward delivery contract) based on market prices for similar financial instruments, which includes matching specific terms and maturities of the forward commitments against applicable investor pricing available.

131

**Table of Contents**

The following is a reconciliation of assets measured at fair value on a recurring basis using significant unobservable inputs (level 3):

|  | Year Ended March 31, | |
|---|---|---|
|  | 2013 | 2012 |
|  | (In thousands) | |
| **Non-agency CMOs** | | |
| Beginning balance | $ 21,592 | $ 46,637 |
| Total realized/unrealized gains (losses): | | |
|     Included in earnings | (191) | 334 |
|     Included in other comprehensive income | 3,139 | (192) |
|     Included in earnings as unrealized other-than-temporary impairment | (412) | (558) |
|     Included in earnings upon payoff of securities for which other-than-temporary impairment was previously recognized | 4 | — |
|     Included in earnings as realized other-than-temporary impairment | 721 | 363 |
| Principal repayments | (5,042) | (8,596) |
| Sales | (12,262) | (16,396) |
| Ending balance | $ 7,549 | $ 21,592 |

There were no transfers in or out of Levels 1, 2 or 3 during the years ended March 31, 2013 and 2012. The Corporation's policy for determining transfers between levels occurs at the end of the reporting period when circumstances in the underlying valuation criteria changes and result in transfers between levels.

*Fair Value on a Nonrecurring Basis*

Certain assets are measured at fair value on a nonrecurring basis; that is, the instruments are not measured at fair value on an ongoing basis but are subject to fair value adjustments in certain circumstances (for example, when there is evidence of impairment). Loans held for sale and mortgage servicing rights includes only those items that were adjusted to fair value as of the dates indicated. The following table presents such assets carried on the consolidated balance sheet by caption and by level within the fair value hierarchy as of March 31, 2013 and 2012:

|  | Level 1 | Level 2 | Level 3 | Total |
|---|---|---|---|---|
|  |  | (In thousands) | | |
| **March 31, 2013** | | | | |
|     Impaired loans, with an allowance recorded, net | $ — | $ — | $ 76,430 | $ 76,430 |
|     Loans held for sale | — | 643 | — | 643 |
|     Mortgage servicing rights | — | — | 20,889 | 20,889 |
|     Other real estate owned | — | — | 84,342 | 84,342 |
|         Total assets at fair value | $ — | $ 643 | $181,661 | $182,304 |
| **March 31, 2012** | | | | |
|     Impaired loans, with an allowance recorded, net | $ — | $ — | $129,446 | $129,446 |
|     Loans held for sale | — | 145 | — | 145 |
|     Mortgage servicing rights | — | — | 20,671 | 20,671 |
|     Other real estate owned | — | — | 88,841 | 88,841 |
|         Total assets at fair value | $ — | $ 145 | $238,958 | $239,103 |

The Corporation does not adjust loans held for investment to fair value on a recurring basis. However, some loans are considered impaired and an allowance for loan losses is established. The specific reserves for collateral dependent impaired loans are based on the fair value of the underlying collateral less estimated costs to sell. The

132

**Table of Contents**

fair value of collateral is usually determined based on appraisals. In some cases, adjustments are made to appraised values due to various factors including age of the appraisal, age of comparables included in the appraisal, and known changes in the market and in the collateral. Since adjustments to appraised values are based on unobservable inputs, the resulting fair value measurement is categorized as a Level 3 measurement.

Loans held for sale primarily consist of certain recently originated fixed- and adjustable-rate residential mortgage loans and are carried at the lower of cost or fair value, determined on a loan level basis. These loans are valued individually based upon quoted market prices for similar loans and the amount of any gross loss is recorded as a valuation allowance in loans held for sale. Fees received from the borrower and direct costs to originate the loan are deferred and recorded as an adjustment to the loan carrying value.

Mortgage servicing rights are recorded as an asset when loans are sold to third parties with servicing rights retained. Mortgage servicing rights are initially recorded at fair value and subsequently amortized in proportion to, and over the period of, estimated net servicing revenues. The carrying value of these assets is reviewed for impairment on a monthly basis using a lower of carrying value or fair value methodology. The fair value of servicing rights is determined by estimating the present value of future net cash flows using a discounted cash flow model, taking into consideration market loan prepayment speeds, discount rates, servicing costs and other economic factors. For purposes of measuring impairment, the rights are stratified based on predominant risk characteristics of the underlying loans which include product type (i.e., fixed, adjustable or balloon) and interest rate bands. If the aggregate carrying value of the capitalized mortgage servicing rights for a stratum exceeds its fair value, the difference is recognized in non-interest expense as an impairment loss.

Critical assumptions used in the MSR discounted cash flow model include mortgage prepayment speeds, discount rates, costs to service, ancillary and late fee income. Variations in the assumptions could materially affect the estimated fair values. Changes to the assumptions are made when market data indicate that new trends have developed. Current market participant assumptions based on loan product types – fixed rate, adjustable rate and balloon loans – include discount rates in the range of 10.0% to 23.5% as well as total portfolio lifetime weighted average prepayment speeds of 7.5% to 37.6% annual CPR. Many of these assumptions are subjective and involve a high degree of management judgment. MSR valuation assumptions are reviewed and approved by management on a quarterly basis.

Prepayment speeds may be affected by economic factors such as changes in home prices, market interest rates, the availability of other credit products to borrowers and customer payment patterns. Prepayment speeds include the impact of all borrower prepayments, including full payoffs, additional principal payments and the impact of loans paid off due to foreclosure liquidations. As market interest rates decline, prepayment speeds will generally increase as customers refinance existing mortgages to more favorable interest rate terms. As prepayment speeds increase, anticipated cash flows will generally decline resulting in a potential reduction, or impairment, of the fair value of the capitalized MSRs. Alternatively, an increase in market interest rates may cause a decrease in prepayment speeds and therefore an increase in fair value of MSRs. Annually, external data is obtained to test the values and assumptions that are used for the initial valuations in the discounted cash flow model.

Real estate acquired by foreclosure, real estate acquired by deed in lieu of foreclosure and other repossessed assets (OREO) are held for sale and are initially recorded at fair value less estimated selling expenses at the date of foreclosure. OREO is re-measured at the lower of cost or fair value after initial recognition and reported using a valuation allowance on foreclosed assets. Fair value is generally based on third party appraisals and is therefore considered a Level 3 measurement.

### *Fair Value Summary*

ASC Topic 825 requires disclosure of fair value information about financial instruments, for which it is practicable to estimate that value, whether or not recognized in the consolidated balance sheets, including those financial assets and liabilities that are not measured and reported at fair value on a recurring or nonrecurring

**Table of Contents**

basis. In cases where quoted market prices are not available, fair values are based on estimates using present value or other valuation techniques. Results from these techniques are significantly affected by the assumptions used, including the discount rate and estimates of future cash flows. In that regard, the derived fair value estimates cannot be substantiated by comparison to independent markets and, in many cases, may not be realized in immediate settlement of the instruments. Certain financial instruments with a fair value that is not practicable to estimate and all non-financial instruments are excluded from the disclosure requirements. Accordingly, the aggregate fair value amounts presented in the table below do not necessarily represent the underlying value of the Corporation.

The following methods and assumptions were used in estimating the fair value of financial instruments that were not previously disclosed:

**Cash and cash equivalents and accrued interest:** The carrying amounts reported in the balance sheets approximate the fair values for those assets and liabilities. In accordance with ASC Topic 820, cash and cash equivalents and accrued interest have been categorized as a Level 2 fair value measurement.

**Loans receivable:** The fair value of residential mortgage loans held for investment, commercial real estate loans, commercial and industrial loans, and consumer and other loans held for investment are estimated using observable inputs including estimated cash flows, and discount rates based on interest rates currently being offered for loans with similar terms, to borrowers of similar credit quality. In accordance with ASC Topic 820, loans held for investment that are not included with impaired loans in the preceding section titled Fair Value on a Nonrecurring Basis have been categorized as a Level 2 fair value measurement.

**Federal Home Loan Bank stock:** The carrying amount of FHLB stock approximates its fair value as it can only be redeemed with the FHLB at par value. In accordance with ASC Topic 820, Federal Home Loan Bank stock has been categorized as a Level 2 fair value measurement.

**Deposits:** The fair value of checking, savings and money market accounts are estimated using a discounted cash flow analysis, with run-off rates based on published bank regulatory decay rate tables. The fair values of fixed-rate certificates of deposit are estimated using a discounted cash flow calculation that applies current interest rates being offered on certificates of deposit to a schedule of aggregated expected monthly maturities of the outstanding certificates of deposit. In accordance with ASC Topic 820, deposits have been categorized as a Level 2 fair value measurement.

**Other borrowed funds:** The fair value of FHLB advances and repurchase agreements are estimated using discounted cash flow analysis, based on the Corporation's current incremental borrowing rates for similar types of borrowing arrangements. In the absence of a reasonably precise methodology to determine the fair value of the credit agreement, carrying value has been used to represent fair value. In accordance with ASC Topic 820, other borrowed funds have been categorized as a Level 2 fair value measurement.

**Off-balance-sheet instruments:** The fair value of off-balance-sheet instruments (held for investment lending commitments and unused lines of credit) are based on fees currently charged to enter into similar agreements, taking into account the remaining terms of the agreements, the counterparties' credit standing and discounted cash flow analyses. The fair value of these off-balance-sheet items approximates the recorded amounts of the related fees and is not material at March 31, 2013 and 2012.

134

Table of Contents

The carrying amount and fair value of the Corporation's financial instruments consist of the following:

| | March 31, | | | |
| | 2013 | | 2012 | |
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| | | (In thousands) | | |
| Financial assets: | | | | |
| Cash and cash equivalents | $ 228,536 | $ 228,536 | $ 242,980 | $ 242,980 |
| Investment securities available for sale | 266,787 | 266,787 | 242,299 | 242,299 |
| Investment securities held to maturity | — | — | 20 | 20 |
| Loans held for sale | 18,058 | 18,356 | 39,332 | 39,742 |
| Loans held for investment | 1,670,543 | 1,643,968 | 2,057,744 | 2,008,278 |
| Mortgage servicing rights | 21,824 | 22,088 | 22,156 | 22,770 |
| Federal Home Loan Bank stock | 25,630 | 25,630 | 35,792 | 35,792 |
| Accrued interest receivable | 9,563 | 9,563 | 12,075 | 12,075 |
| Interest rate lock commitments | 689 | 689 | 943 | 943 |
| Forward contracts to sell mortgage loans [1] | 1 | 1 | 98 | 98 |
| | | | | |
| Financial liabilities: | | | | |
| Deposits | 2,025,025 | 1,994,545 | 2,264,901 | 2,232,691 |
| Other borrowed funds | 317,225 | 341,903 | 476,103 | 502,846 |
| Accrued interest payable – borrowings | 53,788 | 53,788 | 36,568 | 36,568 |
| Accrued interest payable – deposits | 607 | 607 | 1,519 | 1,519 |
| Interest rate lock commitments | 3 | 3 | 72 | 72 |
| Forward contracts to sell mortgage loans [1] | 313 | 313 | 557 | 557 |

(1)    The Corporation has elected to offset the fair value of individual forward sale contracts and present a net amount on the Consolidated Balance Sheets in accordance with ASC 815-45, Derivatives and Hedging.

## Note 18 – Income Taxes

The Corporation and its subsidiaries file a consolidated federal income tax return and separate state income tax returns. The provision for income taxes consists of the following:

| | Year Ended March 31, | | |
| | 2013 | 2012 | 2011 |
| | | (In thousands) | |
| Current: | | | |
| Federal | $ (51) | $— | $150 |
| State | (130) | 10 | 14 |
| | (181) | 10 | 164 |
| Deferred: | | | |
| Federal | — | — | — |
| State | — | — | — |
| | — | — | — |
| Total income tax expense (benefit) | $(181) | $ 10 | $164 |

At March 31, 2013, 2012 and 2011, the affiliated group had a federal net operating loss carryover of $285.9 million, $232.4 million and $168.7 million, respectively, and at March 31, 2013, 2012 and 2011, certain subsidiaries had state net operating loss carryovers of $403.4 million, $350.4 million and $288.2 million, respectively. These carryovers expire in varying amounts in 2013 through 2033.

135

**Table of Contents**

The provision for income taxes differs from that computed at the federal statutory corporate tax rate as follows:

| | Year Ended March 31, | | | | | |
| | 2013 | | 2012 | | 2011 | |
| | Amount | % of Pretax Income | Amount | % of Pretax Income | Amount | % of Pretax Income |
|---|---|---|---|---|---|---|
| | | | (Dollars in thousands) | | | |
| Net loss before income taxes | $(34,353) | 100.0% | $(36,728) | 100.0% | $(41,014) | 100.0% |
| Income tax expense (benefit) at federal statutory rate | $(12,024) | 35.0% | $(12,855) | 35.0% | $(14,355) | 35.0% |
| State income taxes, net of federal income tax benefits | (1,840) | 5.4 | (1,874) | 5.1 | (2,126) | 5.2 |
| Increase in tax exposure reserve | — | — | — | — | 150 | (0.4) |
| Increase in valuation allowance | 13,643 | (39.7) | 14,666 | (39.9) | 16,656 | (40.6) |
| Other | 40 | (0.1) | 73 | (0.2) | (161) | 0.4 |
| Income tax expense (benefit) | $ (181) | 0.5% | $ 10 | 0.0% | $ 164 | (0.4)% |

The Corporation accounts for income taxes based on the asset and liability method. Deferred tax assets and liabilities are recorded based on the difference between the tax basis of assets and liabilities and their carrying amounts for financial reporting purposes, computed using enacted tax rates. Significant net deferred tax assets have been created for NOL carryforwards and deductible temporary differences, the largest of which relates to our allowance for loan losses. For income tax purposes, only net charge-offs on uncollectible loans are deductible, not the provision for credit losses.

Under generally accepted accounting principles, a valuation allowance is required to be recognized if it is "more likely than not" that a deferred tax asset will not be realized. The determination of the realizability of the deferred tax assets is highly subjective and dependent upon management's evaluation and judgment of both positive and negative evidence, the forecasts of future income, applicable tax planning strategies, and assessments of the current and future economic and business conditions. The Corporation considers both positive and negative evidence regarding the ultimate realizability of deferred tax assets. Positive evidence includes the existence of taxes paid in available carry back years as well as the probability that taxable income will be generated in future periods while negative evidence includes significant losses in the current year or cumulative losses in the current and past several years as well as general business and economic trends.

At March 31, 2013 and 2012, the Corporation determined that a valuation allowance relating to the deferred tax asset was necessary. This determination was based largely on the negative evidence represented by the losses in the current and prior fiscal years caused by the significant loss provisions associated with the loan portfolio. In addition, general uncertainty surrounding future economic and business conditions increase the potential volatility and uncertainty of projected earnings. Therefore, a valuation allowance of $162.1 million and $149.8 million at March 31, 2013 and 2012, respectively, was recorded to offset net deferred tax assets.

136

**Table of Contents**

The significant components of deferred tax assets (liabilities) are as follows:

| | March 31, | | |
|---|---|---|---|
| | 2013 | 2012 | 2011 |
| | | (In thousands) | |
| Deferred tax assets: | | | |
| Allowance for loan losses | $ 32,275 | $ 44,604 | $ 60,174 |
| OREO valuation allowance and other loss reserves | 17,101 | 12,094 | 10,835 |
| Federal NOL carryforwards | 101,629 | 82,885 | 61,433 |
| State NOL carryforwards | 20,929 | 18,178 | 14,906 |
| Unrealized gains (losses) | — | — | 7,984 |
| Other | 3,629 | 3,851 | 4,310 |
| Total deferred tax assets | 175,563 | 161,612 | 159,642 |
| Valuation allowance | (162,077) | (149,831) | (143,505) |
| Adjusted deferred tax assets | 13,486 | 11,781 | 16,137 |
| Deferred tax liabilities: | | | |
| FHLB stock dividends | (1,928) | (2,636) | (3,962) |
| Mortgage servicing rights | (8,754) | (8,825) | (9,884) |
| Unrealized securities gains, net | (1,435) | (53) | — |
| Other | (1,369) | (267) | (2,291) |
| Total deferred tax liabilities | (13,486) | (11,781) | (16,137) |
| Net deferred tax assets | $ — | $ — | $ — |

The Corporation is subject to U.S. federal income tax as well as income tax of various state jurisdictions. The tax years 2010-2013 remain open to examination by the Internal Revenue Service and certain state jurisdictions while the years 2009-2013 remain open to examination by certain other state jurisdictions.

The Corporation recognizes any interest and penalties related to uncertain tax positions in income tax expense. As of March 31, 2013 and 2012, the Corporation has not recognized any accrued interest and penalties related to uncertain tax positions.

**Note 19 – Earnings Per Share**

Basic earnings per share for the years ended March 31, 2013 and 2012 has been determined by dividing net loss available to common equity for the respective periods by the weighted average number of shares of common stock outstanding. Diluted earnings per share is computed by dividing net loss available to common equity by the weighted average number of common shares outstanding plus the effect of dilutive securities. The effects of dilutive securities are computed using the treasury stock method.

137

**Table of Contents**

The computation of earnings per share for fiscal years 2013, 2012 and 2011 is as follows:

| | Year Ended March 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | **(In thousands, except share and per share data)** | | |
| **Numerator:** | | | |
| Numerator for basic and diluted earnings per share – net loss available to common equity | $    (48,144) | $    (50,429) | $    (54,524) |
| **Denominator:** | | | |
| Denominator for basic earnings per share – weighted-average shares | 21,247 | 21,248 | 21,252 |
| Effect of dilutive securities: | | | |
| Employee stock options | — | — | — |
| Denominator for diluted earnings per share – adjusted weighted-average shares and assumed conversions | 21,247 | 21,248 | 21,252 |
| Basic loss per common share | $    (2.27) | $    (2.37) | $    (2.57) |
| Diluted loss per common share | $    (2.27) | $    (2.37) | $    (2.57) |

At March 31, 2013, approximately 120,000 stock options were excluded from the calculation of diluted earnings per share because they were anti-dilutive, representing all stock options currently outstanding. Common stock warrants (see Note 12) to purchase up to 7,399,103 shares at an exercise price of $2.23 were also not included in the computation of diluted earnings per share because the exercise price of the warrants was greater than the average market price of common stock and, therefore, anti-dilutive.

**Note 20 – Segment Information**

The Corporation provides a full range of banking services, as well as invested in real estate ventures through its two consolidated subsidiaries. The Corporation manages its business primarily by focusing on the results for each subsidiary. Thus, two operating segments have been identified, and operating segments have been aggregated.

**Community Banking:** This segment is the main basis of operation for the Corporation and includes the branch network and other deposit support services; origination, sales and servicing of one-to-four family loans; origination of multifamily, commercial real estate and business loans; origination of a variety of consumer loans; and sales of alternative financial investments such as tax deferred annuities.

**Real Estate Investments:** The Corporation's non-banking subsidiary, IDI, invested in limited partnerships in real estate developments. Such investments included residential developments. In 2009, IDI sold its interest in several limited partnerships as well as substantially all of its remaining assets, which included some developed lots. The assets that remain at IDI include an equity interest in one commercial enterprise and one residential real estate development along with several notes receivable.

The Real Estate Investment segment has borrowed funds from the Corporation to meet its operating needs. Such intercompany borrowings and the interest income and interest expense associated with such borrowings are eliminated in consolidation.

138

Table of Contents

The following represents reconciliations of reportable segment revenues, profit or loss, and assets to the Corporation's consolidated totals for the years ended March 31, 2013, 2012 and 2011, respectively.

| Year Ended: | Real Estate Investments | Community Banking | Intersegment Eliminations | Consolidated Financial Statements |
|---|---|---|---|---|
| | | (In thousands) | | |
| **March 31, 2013** | | | | |
| Interest income | $       54 | $   99,828 | $       — | $    99,882 |
| Interest expense | — | 37,399 | — | 37,399 |
| Net interest income | 54 | 62,429 | — | 62,483 |
| Provision for credit losses | — | 9,125 | — | 9,125 |
| Net interest income after provision for credit losses | 54 | 53,304 | — | 53,358 |
| Other income | 80 | 45,826 | (5) | 45,901 |
| Other expense | (687) | (132,930) | 5 | (133,612) |
| Loss before income taxes | (553) | (33,800) | — | (34,353) |
| Income tax expense (benefit) | (1,574) | 1,393 | — | (181) |
| Net income (loss) | $    1,021 | $   (35,193) | $       — | $    (34,172) |
| Total assets at end of period | $      831 | $2,366,752 | $       — | $ 2,367,583 |
| **March 31, 2012** | | | | |
| Interest income | $       54 | $  127,199 | $       — | $   127,253 |
| Interest expense | — | 55,329 | — | 55,329 |
| Net interest income | 54 | 71,870 | — | 71,924 |
| Provision for credit losses | — | 33,578 | — | 33,578 |
| Net interest income after provision for credit losses | 54 | 38,292 | — | 38,346 |
| Other income | 222 | 49,044 | (5) | 49,261 |
| Other expense | (886) | (123,454) | 5 | (124,335) |
| Loss before income taxes | (610) | (36,118) | — | (36,728) |
| Income tax expense (benefit) | (41) | 51 | — | 10 |
| Net loss | $     (569) | $   (36,169) | $       — | $    (36,738) |
| Total assets at end of period | $      550 | $2,788,902 | $       — | $ 2,789,452 |
| **March 31, 2011** | | | | |
| Interest income | $       83 | $  166,384 | $       — | $   166,467 |
| Interest expense | — | 81,383 | — | 81,383 |
| Net interest income | 83 | 85,001 | — | 85,084 |
| Provision for credit losses | — | 51,198 | — | 51,198 |
| Net interest income after provision for credit losses | 83 | 33,803 | — | 33,886 |
| Other income | 92 | 59,173 | (5) | 59,260 |
| Other expense | (667) | (133,498) | 5 | (134,160) |
| Loss before income taxes | (492) | (40,522) | — | (41,014) |
| Income tax expense (benefit) | 641 | (477) | — | 164 |
| Net loss | $   (1,133) | $   (40,045) | $       — | $    (41,178) |
| Total assets at end of period | $      518 | $3,394,307 | $       — | $ 3,394,825 |

**Table of Contents**

**Note 21 – Branch Sales**

On June 25, 2010, the Corporation completed the sale of eleven branches located in Northwest Wisconsin to Royal Credit Union headquartered in Eau Claire, Wisconsin. Royal Credit Union assumed approximately $171.2 million in deposits and acquired $61.8 million in loans and $9.8 million in office properties and equipment. The net gain on the sale was $5.0 million. The net gain included a write off of a $3.9 million core deposit intangible that was required when designated core deposits were sold in this transaction.

On July 23, 2010, the Corporation completed the sale of four branches located in Green Bay, Wisconsin and surrounding communities to Nicolet National Bank headquartered in Green Bay, Wisconsin. Nicolet National Bank assumed $105.1 million in deposits and acquired $24.8 million in loans and $0.4 million in office properties and equipment. The net gain on the sale was $2.3 million.

These transactions were not considered to be discontinued operations.

**Note 22 – Condensed Parent Only Financial Information**

The following represents parent company only financial information:

**Condensed Balance Sheets**

|  | March 31, | |
|---|---|---|
|  | **2013** | **2012** |
|  | (In thousands) | |
| **Assets** | | |
| Cash and cash equivalents | $  2,976 | $  2,584 |
| Investment in subsidiaries | 116,357 | 127,690 |
| Loans receivable from non-bank subsidiaries | — | 4,225 |
| Other assets | 541 | 632 |
| Total assets | $119,874 | $135,131 |
| **Liabilities** | | |
| Loans payable | $116,300 | $116,300 |
| Accrued interest and fees payable | 60,161 | 41,042 |
| Other liabilities | 3,277 | 7,339 |
| Total liabilities | 179,738 | 164,681 |
| **Stockholders' Deficit** | | |
| Total stockholders' deficit | (59,864) | (29,550) |
| Total liabilities and stockholders' deficit | $119,874 | $135,131 |

140

**Table of Contents**

**Condensed Statements of Operations**

| | Year Ended March 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | (In thousands) | | |
| Interest income | $   5 | $   7 | $   10 |
| Interest expense | 19,119 | 17,498 | 14,983 |
| Net interest expense | (19,114) | (17,491) | (14,973) |
| Equity in net loss from subsidiaries | (14,781) | (19,498) | (26,707) |
| Non-interest income | 4 | 413 | — |
| Loss from operations | (33,891) | (36,576) | (41,680) |
| Non-interest expense | 687 | 1,287 | 935 |
| Loss before income taxes | (34,578) | (37,863) | (42,615) |
| Income tax benefit | (406) | (1,125) | (1,437) |
| Net loss | (34,172) | (36,738) | (41,178) |
| Preferred stock dividends in arrears | (6,560) | (6,278) | (5,934) |
| Preferred stock discount accretion | (7,412) | (7,413) | (7,412) |
| Net loss available to common equity | $(48,144) | $(50,429) | $(54,524) |

**Condensed Statements of Cash Flows**

| | Year Ended March 31, | | |
|---|---|---|---|
| | **2013** | **2012** | **2011** |
| | (In thousands) | | |
| **Operating Activities** | | | |
| Net loss | $(34,172) | $(36,738) | $(41,178) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Equity in net loss of subsidiaries | 14,781 | 19,498 | 26,707 |
| Other | 15,558 | 17,205 | 17,589 |
| Net cash provided by (used in) operating activities | (3,833) | (35) | 3,118 |
| **Investing Activities** | | | |
| Proceeds from sales of investment securities available for sale | — | — | — |
| Net decrease in loans receivable from non-bank subsidiaries | 4,225 | — | 375 |
| Capital contribution to Bank subsidiary | — | — | (2,000) |
| Capital contribution to non-Bank subsidiary | — | — | — |
| Net cash provided by (used in) investing activities | 4,225 | — | (1,625) |
| **Financing Activities** | | | |
| Issuance of treasury stock related to equity compensation plans | — | — | 6 |
| Purchase of remaining ESOP shares | — | — | (8) |
| Net cash provided by (used in) financing activities | — | — | (2) |
| Increase (decrease) in cash and cash equivalents | 392 | (35) | 1,491 |
| Cash and cash equivalents at beginning of year | 2,584 | 2,619 | 1,128 |
| Cash and cash equivalents at end of year | $  2,976 | $  2,584 | $  2,619 |

**Table of Contents**

**McGladrey LLP**
Certified Public Accountants



**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders
Anchor BanCorp Wisconsin Inc.

We have audited the accompanying consolidated balance sheets of Anchor BanCorp Wisconsin Inc. and Subsidiaries (the Corporation) as of March 31, 2013 and 2012, and the related consolidated statements of operations and comprehensive loss, changes in stockholders' equity (deficit), and cash flows for each of the three years in the period ended March 31, 2013. These financial statements are the responsibility of the Corporation's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Corporation as of March 31, 2013 and 2012, and the results of their operations and their cash flows for each of the three years in the period ended March 31, 2013, in conformity with U.S generally accepted accounting principles.

The accompanying consolidated financial statements have been prepared assuming that the Corporation will continue as a going concern. As discussed in Notes 2 and 13 to the consolidated financial statements, at March 31, 2013, all of the subsidiary bank's regulatory capital amounts and ratios are below the capital levels required by the cease and desist order. The subsidiary bank has also suffered recurring losses from operations. Failure to meet the capital requirements exposes the Corporation to regulatory sanctions that may include restrictions on operations and growth, mandatory asset dispositions, and seizure of the subsidiary bank. In addition, as discussed in Notes 2 and 10, the Corporation's outstanding balance under the Amended and Restated Credit Agreement is currently in default. These matters raise substantial doubt about the ability of the Corporation to continue as a going concern. The accompanying financial statements do not include any adjustments that might result from the outcome of these uncertainties.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Corporation's internal control over financial reporting as of March 31, 2013, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) and our report dated May 24, 2013 expressed an unqualified opinion on the effectiveness of internal control over financial reporting.

/s/ McGladrey LLP

Madison, Wisconsin
May 24, 2013

142

Table of Contents

McGladrey LLP
Certified Public Accountants



**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Stockholders
Anchor BanCorp Wisconsin Inc.

We have audited Anchor BanCorp Wisconsin Inc. and Subsidiaries' (the Corporation's) internal control over financial reporting as of March 31, 2013, based on criteria established in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Corporation's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying *Management's Annual Report on Internal Control over Financial Reporting*. Our responsibility is to express an opinion on the Corporation's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A corporation's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A corporation's internal control over financial reporting includes those policies and procedures that (a) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the corporation; (b) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the corporation are being made only in accordance with authorizations of management and directors of the corporation; and (c) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the corporation's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion the Corporation maintained in all material respects effective internal control over financial reporting as of March 31, 2013, based on criteria established in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements as of and for the year ended March 31, 2013 of Anchor BanCorp Wisconsin Inc. and our report dated May 24, 2013 expressed an unqualified opinion with an emphasis paragraph regarding the Corporation's ability to continue as a going concern.

/s/ McGladrey LLP

Madison, Wisconsin
May 24, 2013

143

**Table of Contents**

**Item 9.      Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

   None.

**Item 9A.      Controls and Procedures**

**Disclosure Controls and Procedures.** The Corporation maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in the Corporation's reports under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to management, including the Corporation's Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures. The design of any system of disclosure controls and procedures is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any disclosure controls and procedures will succeed in achieving their stated goals under all potential future conditions.

**Evaluation of Disclosure Controls and Procedures**

Our Chief Executive Officer and Chief Financial Officer have evaluated the effectiveness of the design and operation of our disclosure and control procedures as of March 31, 2013.

As of March 31, 2013, the CEO and CFO have concluded that the disclosure and control procedures were effective for providing reliability in financial reporting and the preparation of financial statements.

**Management Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f). Our internal control over financial reporting is a process designed by, or under the supervision of, our Chief Executive Officer and Chief Financial Officer, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Internal control over financial reporting includes those policies and procedures that:

•   Pertain to the maintenance of reports that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of assets of the Corporation;

•   Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Corporation are being made in accordance with authorizations of management and directors of the Corporation; and

•   Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Corporation assets.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of the changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management has assessed the effectiveness of the Corporation's internal control over financial reporting as of March 31, 2013. In making its assessment, management used the criteria set forth by the Committee of Sponsoring Organizations ("COSO") of the Treadway Commission in Internal Control – Integrated Framework. These criteria include the control environment, risk assessment, control activities, information and communication and monitoring of each of the above criteria. Based on management's assessment, it determined that the Corporation internal control over financial reporting was effective as of March 31, 2013.

144

**Table of Contents**

**Internal Control over Financial Reporting**

During the year ended March 31, 2013, the Corporation's principal executive officer and principal financial officer concluded that the Corporation maintained effective entity level controls over financial reporting to ensure that the Corporation's financial statements are prepared in accordance with generally accepted accounting principles.

**Changes in Internal Control over Financial Reporting**

There has been no change in the Corporation's internal control over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) that occurred during the year ended March 31, 2013 that has materially affected, or is reasonably likely to materially affect, the Corporation's internal control over financial reporting.

**Item 9B.**    **Other Information**

None.

145

Table of Contents

PART III

**Item 10.**      **Directors , Executive Officers and Corporate Governance**

The information related to Directors and Executive Officers is incorporated herein by reference to "Election of Directors" and "Section 16(a) Beneficial Ownership Reporting Compliance" in the Corporation's Proxy Statement for the Annual Meeting of Shareholders to be held on August 1, 2013.

The Corporation has adopted a code of business conduct and ethics for the CEO and CFO which is available on the Corporation's website at www.anchorbank.com.

**Item 11.**      **Executive Compensation**

The information relating to executive compensation is incorporated herein by reference to "Compensation of Directors" and "Executive Compensation" in the Corporation's Proxy Statement for the Annual Meeting of Shareholders to be held on August 1, 2013.

**Item 12.**      **Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters.**

The information relating to security ownership of certain beneficial owners and management is incorporated herein by reference to "Beneficial Ownership of Common Stock by Certain Beneficial Owners and Management" in the Corporation's Proxy Statement for the Annual Meeting of Shareholders to be held on August 1, 2013.

**Equity Compensation Plan Information**

| Plan Category | Number of Securities to be Issued Upon Exercise of Outstanding Options, Warrants and Rights | Weighted-Average Exercise Price of Outstanding Options, Warrants and Rights | Number of Securities Remaining Available for Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected in the First Column) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 120,345[1] | $          25.82 | 1,240,314[2] |
| Equity compensation plans not approved by security holders | — | — | — |
| Total | 120,345 | $          25.82 | 1,240,314 |

(1)   Excludes purchase rights accruing under our 1999 Employee Stock Purchase Plan ("ESPP"), which has a shareholder-approved reserve of 300,000 shares of Common Stock. Under the ESPP, each eligible employee may purchase shares of Common Stock at semi-annual intervals each year at a purchase price determined by the Compensation Committee, which shall not be less than 95% of the fair market value of a share of Common Stock on the last business day of such annual offering period. In no event may the amount of Common Stock purchased by a participant in the ESPP in a calendar year exceed $25,000, measured as of the time an option under the ESPP is granted.

(2)   Includes 810,445 shares of stock options available for future grants and 429,869 shares of Common Stock which may be awarded under the Company's Amended and Restated Management Recognition Plan, which provides for the grant of restricted Common Stock to employees of the Company.

146

**Table of Contents**

**Item 13.        Certain Relationships and Related Transactions, and Director Independence**

The information relating to certain relationships and related transactions is incorporated herein by reference to "Election of Directors" in the Registrant's Proxy Statement for the Annual Meeting of Shareholders to be held on August 1, 2013.

**Item 14.        Principal Accountant Fees and Services**

The information required by this item is incorporated herein by reference to "Relationship with Independent Registered Public Accounting Firm" in the Corporation's Proxy Statement for the Annual Meeting of Shareholders to be held on August 1, 2013.

**PART IV**

**Item 15.        Exhibits and Financial Statement Schedules**

**(a) (1) Financial Statements**

The following consolidated financial statements of the Corporation and its subsidiaries, together with the related reports of McGladrey LLP, dated May 24, 2013, are incorporated herein by reference to Item 8 of this Annual Report on Form 10-K:

Consolidated Balance Sheets at March 31, 2013 and 2012.

Consolidated Statements of Operations and Comprehensive Loss for each year in the three-year period ended March 31, 2013.

Consolidated Statements of Changes in Stockholders' Equity (Deficit) for each year in the three-year period ended March 31, 2013.

Consolidated Statements of Cash Flows for each year in the three-year period ended March 31, 2013.

Notes to Consolidated Financial Statements.

Report of Independent Registered Public Accounting Firm on Consolidated Financial Statements.

Report of Independent Registered Public Accounting Firm on Internal Control Over Financial Reporting.

**(a) (2) Financial Statement Schedules**

All schedules are omitted because they are not required or are not applicable or the required information is shown in the consolidated financial statements or notes thereto.

**(a) (3) Exhibits**

The following exhibits are either filed as part of this Annual Report on Form 10-K or are incorporated herein by reference:

**Exhibit No. 3.    Certificate of Incorporation and Bylaws:**

3.1            Articles of Incorporation of Anchor BanCorp Wisconsin Inc., as amended, including Articles of Amendment with respect to series A Preferred Stock (incorporated by reference to Exhibit 3.1 of Registrant's Form 10-K for the year ended March 31, 2001 filed on June 11, 2001, File No. 000-20006, Film No. 01657997) and Articles of Amendment with respect to Fixed Rate Cumulative Perpetual Preferred Stock, Series B dated January 30, 2009 (incorporated by reference to Exhibit 4.2 of Registrant's Current Report on Form 8-K filed February 3, 2009, File No. 000-20006, Film No. 09565443).

3.2            Bylaws of Anchor BanCorp Wisconsin Inc. (incorporated by reference to Exhibit 3.2 of Registrant's Form S-1 Registration Statement filed on March 19, 1992) and Amendment to the Bylaws of Anchor BanCorp Wisconsin, Inc. dated June 2, 2009 (incorporated by reference to Exhibit 3.2 of Registrant's Annual Report on Form 10-K for the year ended March 31, 2009 filed on June 29, 2009, File No. 000-20006, Film No. 09915927).

147

Table of Contents

**Exhibit No. 4.    Instruments Defining the Rights of Security Holders:**

4.1      Form of Common Stock Certificate (incorporated by reference to Exhibit 4 of Registrant's Form S-1 Registration Statement filed on March 19, 1992).

4.2      Warrant to Purchase Shares of Anchor BanCorp Wisconsin, Inc. Common Stock dated January 30, 2009 issued to the United States Department of the Treasury (incorporated by reference to Exhibit 4.1 of Registrant's Current Report on Form 8-K filed February 3, 2009, File No. 000-20006, Film No. 09565443).

4.3      Rights Agreement dated as of November 5, 2010 between Anchor BanCorp Wisconsin, Inc. and American Stock Transfer & Trust Company, LLC (incorporated by reference to Exhibit 4.3 of Registrant's Current Report on Form 8-K filed November 5, 2010, File No. 101169696).

**Exhibit No.    10. Material Contracts:**

10.1      Anchor BanCorp Wisconsin Inc. Retirement Plan (incorporated by reference to Exhibit 10.1 of Registrant's Form S-1 Registration Statement filed on March 19, 1992).

10.2      Anchor BanCorp Wisconsin Inc. Amended and Restated Management Recognition Plan (incorporated by reference to Annex B of Registrant's proxy statement filed on June 11, 2001, File No. 000-20006, Film No. 01657999).

10.3      Employment Agreement between the Bank and Scott McBrair effective January 31, 2012 (incorporated by reference to Exhibit 10.3 of Registrant's Annual Report on Form 10-K for the year ended March 31, 2012 filed on June 5, 2012, File No. 001-34955).

10.4      1995 Stock Option Plan for Non-Employee Directors (incorporated by reference to Registrant's proxy statement filed on June 16, 1995, File No. 000-20006).

10.5      1995 Stock Incentive Plan (incorporated by reference to Registrant's proxy statement filed on June 16, 1995, File No. 000-20006).

10.6      Anchor BanCorp Wisconsin Inc. Directors' Deferred Compensation Plan (incorporated by reference to Exhibit 10.9 of Registrant's Form S-1 Registration Statement filed on March 19, 1992).

10.7      Anchor BanCorp Wisconsin Inc. Annual Incentive Bonus Plan (incorporated by reference to Exhibit 10.10 of Registrant's Form S-1 Registration Statement filed on March 19, 1992).

10.8      AnchorBank, fsb Excess Benefit Plan (incorporated by reference to Exhibit 10.12 of Registrant's Annual Report on Form 10-K for the year ended March 31, 1994 filed on June 29, 1994, File No. 000-2006).

10.9      2001 Stock Option Plan for Non-Employee Directors (incorporated by reference to Annex C of Registrant's proxy statement filed on June 11, 2001, File No. 000-20006, Film No. 01657999).

10.10      2004 Equity Incentive Plan (incorporated by reference to Appendix B of Registrant's proxy statement filed June 10, 2004, File No. 000-20006, Film No. 04857422).

10.11      Employment Agreement between the Bank and Chris Bauer effective June 23, 2011 (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed June 30, 2011, File No. 001-34955, Film No. 11940130).

10.12      Amended and Restated Credit Agreement, dated as of June 9, 2008, among Anchor Bancorp Wisconsin Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 to Registrant's Quarterly Report on Form 10-Q filed August 11, 2008, File No. 000-20006, Film No. 081006528).

**Table of Contents**

10.13    Pledge Agreement, dated as of June 9, 2008, among Anchor Bancorp Wisconsin Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q filed August 11, 2008, File No. 000-20006, Film No. 081006528).

10.14    Amendment No. 1 to Amended and Restated Credit Agreement, dated as of September 30, 2008, among Anchor Bancorp Wisconsin, Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed September 30, 2008, File No. 000-20006, Film No. 081098069).

10.15    Amendment No. 2 to Amended and Restated Credit Agreement, dated as of December 22, 2008, among Anchor Bancorp Wisconsin, Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed December 31, 2008, File No. 000-20006, Film No. 081279327).

10.16    Letter Agreement including the Securities Purchase Agreement – Standard Terms, between Anchor BanCorp Wisconsin, Inc. and the United States Department of the Treasury, dated January 30, 2009 (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed February 3, 2009, File No. 000-20006, Film No. 09565443).

10.17    Amendment No. 3 to Amended and Restated Credit Agreement, dated as of March 2, 2009, among Anchor Bancorp Wisconsin, Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed March 4, 2009, File No. 000-20006, Film No. 09654044).

10.18    Amendment No. 4 to Amended and Restated Credit Agreement, dated as of May 29, 2009, among Anchor Bancorp Wisconsin, Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed June 2, 2009, File No. 000-20006, Film No. 09867558).

10.19    Order to Cease and Desist between Anchor BanCorp Wisconsin, Inc. and the Office of Thrift Supervision dated June 26, 2009 (incorporated by reference to Exhibit of Registrant's Annual Report on Form 10-K for the year ended March 31, 2009 filed on June 29, 2009, File No. 000-20006, Film No. 09915927).

10.20    Stipulation and Consent to Issuance of Order to Cease and Desist between Anchor BanCorp Wisconsin, Inc. and the Office of Thrift Supervision dated June 26, 2009 (incorporated by reference to Exhibit 10.29 of Registrant's Annual Report on Form 10-K for the year ended March 31, 2009 filed on June 29, 2009, File No. 000-20006, Film No. 09915927).

10.21    Order to Cease and Desist between AnchorBank, fsb and the Office of Thrift Supervision dated June 26, 2009 (incorporated by reference to Exhibit 10.30 of Registrant's Annual Report on Form 10-K for the year ended March 31, 2009 filed on June 29, 2009, File No. 000-20006, Film No. 09915927).

10.22    Stipulation and Consent to Issuance of Order to Cease and Desist between AnchorBank, fsb and the Office of Thrift Supervision dated June 26, 2009 (incorporated by reference to Exhibit 10.31 of Registrant's Annual Report on Form 10-K for the year ended March 31, 2009 filed on June 29, 2009, File No. 000-20006, Film No. 09915927).

149

Table of Contents

| | |
|---|---|
| 10.23 | Employment Agreement between the Bank and Martha M. Hayes effective August 1, 2011 (incorporated by reference to Exhibit 10.31 of Registrant's Quarterly Report on Form 10-Q filed November 7, 2011, File No. 001-34955, Film No. 111185277.). |
| 10.24 | Amendment No. 5 to Amended and Restated Credit Agreement, dated as of December 22, 2009, among Anchor Bancorp Wisconsin Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed December 23, 2009, File No. 000-20006, Film No. 091258727). |
| 10.25 | Amendment No. 6 to Amended and Restated Credit Agreement, dated as of April 29, 2010, among Anchor Bancorp Wisconsin Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed May 6, 2010, File No. 000-20006, Film No. 10808918). |
| 10.26 | Amendment No. 7 to Amended and Restated Credit Agreement, dated as of May 25, 2011, among Anchor Bancorp Wisconsin Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed June 1, 2011, File No. 001-34955, Film No. 11883616. |
| 10.27 | Prompt Corrective Action Directive between AnchorBank, fsb and the Office of Thrift Supervision (incorporated by reference to Exhibit 99.1 of Registrant's Current Report on Form 8-K filed September 8, 2010, File No. 000-20006, Film No. 101061856). |
| 10.28 | Branch Sale Agreement between AnchorBank, fsb and Nicolet National Bank dated May 5, 2010 (incorporated by reference to Exhibit 10.35 of Registrant's Annual Report on Form 10-K filed June 29, 2010, File No. 000-20006, Film No. 10924914). |
| 10.29 | Branch Sale Agreement between AnchorBank, fsb and Royal Credit Union dated November 13, 2009 (incorporated by reference to Exhibit 10.36 of Registrant's Annual Report on Form 10-K filed June 29, 2010, File No. 000-20006, Film No. 10924914). |
| 10.30 | Severance Agreement between the Bank and Donald Bertucci effective January 1, 2011 (incorporated by reference to Exhibit 10.30 of Registrant's Quarterly Report on Form 10-Q filed November 7, 2011, File No. 001-34955, Film No. 111185277). |
| 10.31 | Amendment No. 8 to Amended and Restated Credit Agreement, dated as of November 29, 2011, among Anchor Bancorp Wisconsin Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed November 30, 2011, File No. 001-34955, Film No. 111234622). |
| 10.32 | Amendment No. 9 to Amended and Restated Credit Agreement, dated as of November 30, 2012, among Anchor Bancorp Wisconsin Inc., the financial institutions from time to time party to the agreement and U.S. Bank National Association, as administrative agent for the lenders (incorporated by reference to Exhibit 10.1 of Registrant's Current Report on Form 8-K filed November 30, 2012, File No. 001-34955, Film No. 121234278). |

The Corporation's management contracts or compensatory plans or arrangements consist of Exhibits 10.1-10.32 above.

**Table of Contents**

**Exhibit No. 11.    Computation of Earnings per Share:**

Refer to Note 19 to the Consolidated Financial Statements in Item 8.

**Exhibit No. 21.    Subsidiaries of the Registrant:**

Subsidiary information is incorporated by reference to "Part I, Item 1, Business-General" and "Part I, Item 1, Business-Subsidiaries."

**Exhibit No. 23.1    Consent of McGladrey LLP:**

The consent of McGladrey LLP is included herein as an exhibit to this Report.

**Exhibit No. 31.1**        Certification of Chief Executive Officer Pursuant to Rules 13a-14 and 15d-14 of the Securities Exchange Act of 1934 and Section 302 of the Sarbanes-Oxley Act of 2002 is included herein as an exhibit to this Report.

**Exhibit No. 31.2**        Certification of Chief Financial Officer Pursuant to Rules 13a-14 and 15d-14 of the Securities Exchange Act of 1934 and Section 302 of the Sarbanes-Oxley Act of 2002 is included herein as an exhibit to this Report.

**Exhibit No. 32.1**        Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350) is included herein as an exhibit to this report.

**Exhibit No. 32.2**        Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350) is included herein as an exhibit to this report.

**Exhibit No. 99.1**        Section III Certification of Chief Executive Officer is included herein as an exhibit to this report.

**Exhibit No. 99.2**        Section III Certification of Chief Financial Officer is included herein as an exhibit to this report.

**Exhibit No. 101**        The following financial statements from the Anchor Bancorp Wisconsin, Inc. Annual Report on Form 10-K for the year ended March 31, 2013, formatted in Extensive Business Reporting Language (XBRL): (i) Consolidated Balance Sheets, (ii) Consolidated Statements of Operations and Comprehensive Loss, (iii) Consolidated Statements of Changes in Stockholders' Equity (Deficit), (iv) Consolidated Statements of Cash Flows and (v) the Notes to Consolidated Financial Statements are included herein as an exhibit to this report.

**(b) Exhibits**

Exhibits to the Form 10-K required by Item 601 of Regulation S-K are attached or incorporated herein by reference as stated in (a)(3) and the Index to Exhibits.

**(c) Financial Statements excluded from Annual Report to Shareholders pursuant to Rule 14a-3(b)**

Not applicable

**Table of Contents**

**Signatures**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**ANCHOR BANCORP WISCONSIN INC.**

By:  _____   /s/   Chris Bauer

Chris Bauer
President and Chief Executive Officer

Date:   May 24, 2013

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed by the following persons in the capacities and on the dates indicated.

| | |
|---|---|
| By:   /s/   Chris Bauer<br>Chris Bauer<br>President and Chief Executive Officer<br>(principal executive officer)<br>Date: May 24, 2013 | By:   /s/   Thomas G. Dolan<br>Thomas G. Dolan<br>Executive Vice President, Treasurer and Chief Financial Officer<br>(principal financial and<br>accounting officer)<br>Date: May 24, 2013 |
| By:   /s/   Richard A. Bergstrom<br>Richard A. Bergstrom<br>Director<br>Date: May 24, 2013 | By:   /s/   Pat Richter<br>Pat Richter<br>Director<br>Date: May 24, 2013 |
| By:   /s/   James D. Smessaert<br>James D. Smessaert<br>Director<br>Date: May 24, 2013 | By:   /s/   Holly Cremer Berkenstadt<br>Holly Cremer Berkenstadt<br>Director<br>Date: May 24, 2013 |
| By:   /s/   Duane Morse<br>Duane Morse<br>Director<br>Date: May 24, 2013 | By:   /s/   Leonard Rush<br>Leonard Rush<br>Director<br>Date: May 24, 2013 |

By:   /s/   David L. Omachinski

David L. Omachinski
Director
Date May 24, 2013

152

EXHIBIT 23.1

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements of Anchor BanCorp Wisconsin Inc. of our reports dated May 24, 2013, relating to our audits of the consolidated financial statements and internal control over financial reporting, which appear in this Annual Report on Form 10-K of Anchor BanCorp Wisconsin Inc. for the year ended March 31, 2013. Our report dated May 24, 2013, relating to the consolidated financial statements includes an emphasis paragraph regarding an uncertainty as to the Company's ability to continue as a going concern.

- Registration Statement (Form S-8 No. 33-46536) pertaining to the AnchorBank, fsb Retirement Plan; and,

- Registration Statement (Form S-8 No. 333-122970) pertaining to the 2004 Equity Incentive Plan.

/s/ McGladrey LLP

Madison, Wisconsin
May 24, 2013

EXHIBIT 31.1

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER

**Pursuant to Rules 13a-14 and 15d-14 of the Securities Exchange Act of 1934
and Section 302 of the Sarbanes-Oxley Act of 2002**

I, Chris Bauer, President and Chief Executive Officer of Anchor BanCorp Wisconsin Inc. certify that:

1. I have reviewed this annual report on Form 10-K of Anchor BanCorp Wisconsin Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 24, 2013

/s/ Chris Bauer
_____
Chris Bauer
President and Chief Executive Officer

EXHIBIT 31.2

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**

**Pursuant to Rules 13a-14 and 15d-14 of the Securities Exchange Act of 1934
and Section 302 of the Sarbanes-Oxley Act of 2002**

I, Thomas G. Dolan, Chief Financial Officer and Treasurer of Anchor BanCorp Wisconsin Inc. certify that:

1.  I have reviewed this annual report on Form 10-K of Anchor BanCorp Wisconsin Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15 (f) and 15d-15(f))for the registrant and have:

    (a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c)  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

    (a)  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b)  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: May 24, 2013

/s/ Thomas G. Dolan
_____
Thomas G. Dolan, Executive Vice President, Treasurer and Chief Financial Officer

**Exhibit 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**

**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350)**

The undersigned executive officer of Anchor BanCorp Wisconsin, Inc. (the "Registrant") hereby certifies that the Registrant's Form 10-K for the year ended March 31, 2013 fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and that the information contained therein fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ Chris Bauer

Chris Bauer, President and Chief Executive Officer

May 24, 2013

**Note:** A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to Anchor BanCorp Wisconsin, Inc. and will be retained by Anchor BanCorp Wisconsin, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

**Exhibit 32.2**

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**

**Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U.S.C. 1350)**

The undersigned executive officer of Anchor BanCorp Wisconsin, Inc. (the "Registrant") hereby certifies that the Registrant's Form 10-K for the year ended March 31, 2013 fully complies with the requirements of Section 13(a) of the Securities Exchange Act of 1934 and that the information contained therein fairly presents, in all material respects, the financial condition and results of operations of the Registrant.

/s/ Thomas G. Dolan

Thomas G. Dolan, Executive Vice President, Treasurer and
Chief Financial Officer

May 24, 2013

**Note:** A signed original of this written statement required by Section 906 of the Sarbanes-Oxley Act of 2002 has been provided to Anchor BanCorp Wisconsin, Inc. and will be retained by Anchor BanCorp Wisconsin, Inc. and furnished to the Securities and Exchange Commission or its staff upon request.

**Certification of Chief Executive Officer
Pursuant to Section 111(b)(4) of the
Emergency Economic Stabilization Act of 2008**

I, Chris Bauer, the President and Chief Executive Officer of Anchor BanCorp Wisconsin Inc., certify, based on my knowledge, that:

i) The compensation committee of Anchor BanCorp Wisconsin Inc. has discussed, reviewed, and evaluated with senior risk officers at least every six months during any part of the most recently completed fiscal year that was a TARP period, the senior executive officer ("SEO") compensation plans and the employee compensation plans and the risks these plans pose to Anchor BanCorp Wisconsin Inc.;

ii) The compensation committee of Anchor BanCorp Wisconsin Inc. has identified and limited during any part of the most recently completed fiscal year that was a TARP period any features of the SEO compensation plans that could lead SEOs to take unnecessary and excessive risks that could threaten the value of Anchor BanCorp Wisconsin Inc. and has identified any features of the employee compensation plans that pose risks to Anchor BanCorp Wisconsin Inc. and has limited those features to ensure that Anchor BanCorp Wisconsin Inc. is not unnecessarily exposed to risks;

iii) The compensation committee has reviewed, at least every six months during any part of the most recently completed fiscal year that was a TARP period, the terms of each employee compensation plan and identified any features of the plan that could encourage the manipulation of reported earnings of Anchor BanCorp Wisconsin Inc. to enhance the compensation of an employee, and has limited any such features;

iv) The compensation committee of Anchor BanCorp Wisconsin Inc. will certify to the reviews of the SEO compensation plans and employee compensation plans required under (i) and (iii) above;

v) The compensation committee of Anchor BanCorp Wisconsin Inc. will provide a narrative description of how it limited during any part of the most recently completed fiscal year that included a TARP period the features in:

(a) SEO compensation plans that could lead SEOs to take unnecessary and excessive risks that could threaten the value of Anchor BanCorp Wisconsin Inc.;

(b) Employee compensation plans that unnecessarily expose Anchor BanCorp Wisconsin Inc. to risks; and

(c) Employee compensation plans that could encourage the manipulation of reported earnings of Anchor BanCorp Wisconsin Inc. to enhance the compensation of an employee;

vi) Anchor BanCorp Wisconsin Inc. has required that bonus payments to SEOs or any of the next twenty most highly compensated employees, as defined in the regulations and guidance established under section 111 of EESA (bonus payments), be subject to a recovery or "clawback" provision during any part of the most recently completed fiscal year that was a TARP period if the bonus payments were based on materially inaccurate financial statements or any other materially inaccurate performance metric criteria;

vii) Anchor BanCorp Wisconsin Inc. has prohibited any golden parachute payment, as defined in the regulations and guidance established under section 111 of EESA, to a SEO or any of the next five most highly compensated employees during any part of the most recently completed fiscal year that was a TARP period;

viii) Anchor BanCorp Wisconsin Inc. has limited bonus payments to its applicable employees in accordance with section 111 of EESA and the regulations and guidance established thereunder during any part of the most recently completed fiscal year that was a TARP period;

ix) Anchor BanCorp Wisconsin Inc. and its employees have complied with the excessive or luxury expenditures policy, as defined in the regulations and guidance established under section 111 of EESA, during any part of the most recently completed fiscal year that was a TARP period; and any expenses that, pursuant to the policy, required approval of the board of directors, a committee of the board of directors, an SEO, or an executive officer with a similar level of responsibility, were properly approved;

x) Anchor BanCorp Wisconsin Inc. will permit a non-binding shareholder resolution in compliance with any applicable federal securities rules and regulations on the disclosures provided under the federal securities laws related to SEO compensation paid or accrued during any part of the most recently completed fiscal year that was a TARP period;

xi)   Anchor BanCorp Wisconsin Inc. will disclose the amount, nature, and justification for the offering during any part of the most recently completed fiscal year that was a TARP period, of any perquisites, as defined in the regulations and guidance established under section 111 of EESA, whose total value exceeds $25,000 for any employee who is subject to the bonus payment limitations identified in paragraph (viii);

xii)  Anchor BanCorp Wisconsin Inc. will disclose whether Anchor BanCorp Wisconsin Inc., the board of directors of Anchor BanCorp Wisconsin Inc., or the compensation committee of Anchor BanCorp Wisconsin Inc. has engaged during any part of the most recently completed fiscal year that was a TARP period, a compensation consultant; and the services the compensation consultant or any affiliate of the compensation consultant provided during this period;

xiii) Anchor BanCorp Wisconsin Inc. has prohibited the payment of any gross-ups, as defined in the regulations and guidance established under section 111 of EESA, to the SEOs and the next twenty most highly compensated employees during any part of the most recently completed fiscal year that was a TARP period;

xiv)  Anchor BanCorp Wisconsin Inc. has substantially complied with all other requirements related to employee compensation that are provided in the agreement between Anchor BanCorp Wisconsin Inc. and Treasury, including any amendments;

xv)   Anchor BanCorp Wisconsin Inc. has submitted to Treasury a complete and accurate list of the SEOs and the twenty next most highly compensated employees for the current fiscal year, with the non-SEOs ranked in descending order of level of annual compensation, and with the name, title, and employer of each SEO and most highly compensated employee identified; and

xvi)  I understand that a knowing and willful false or fraudulent statement made in connection with this certification may be punished by fine, imprisonment, or both.

May 24, 2013.

ANCHOR BANCORP WISCONSIN INC.

/s/ Chris Bauer
_____
Chris Bauer
Chief Executive Officer

EXHIBIT 99.2

**Certification of Chief Financial Officer
Pursuant to Section 111(b)(4) of the
Emergency Economic Stabilization Act of 2008**

I, Thomas G. Dolan, the Chief Financial Officer of Anchor BanCorp Wisconsin Inc., certify, based on my knowledge, that:

i)    The compensation committee of Anchor BanCorp Wisconsin Inc. has discussed, reviewed, and evaluated with senior risk officers at least every six months during any part of the most recently completed fiscal year that was a TARP period, the senior executive officer ("SEO") compensation plans and the employee compensation plans and the risks these plans pose to Anchor BanCorp Wisconsin Inc.;

ii)    The compensation committee of Anchor BanCorp Wisconsin Inc. has identified and limited during any part of the most recently completed fiscal year that was a TARP period any features of the SEO compensation plans that could lead SEOs to take unnecessary and excessive risks that could threaten the value of Anchor BanCorp Wisconsin Inc. and has identified any features of the employee compensation plans that pose risks to Anchor BanCorp Wisconsin Inc. and has limited those features to ensure that Anchor BanCorp Wisconsin Inc. is not unnecessarily exposed to risks;

iii)    The compensation committee has reviewed, at least every six months during any part of the most recently completed fiscal year that was a TARP period, the terms of each employee compensation plan and identified any features of the plan that could encourage the manipulation of reported earnings of Anchor BanCorp Wisconsin Inc. to enhance the compensation of an employee, and has limited any such features;

iv)    The compensation committee of Anchor BanCorp Wisconsin Inc. will certify to the reviews of the SEO compensation plans and employee compensation plans required under (i) and (iii) above;

v)    The compensation committee of Anchor BanCorp Wisconsin Inc. will provide a narrative description of how it limited during any part of the most recently completed fiscal year that included a TARP period the features in:

(a)    SEO compensation plans that could lead SEOs to take unnecessary and excessive risks that could threaten the value of Anchor BanCorp Wisconsin Inc.;

(b)    Employee compensation plans that unnecessarily expose Anchor BanCorp Wisconsin Inc. to risks; and

(c)    Employee compensation plans that could encourage the manipulation of reported earnings of Anchor BanCorp Wisconsin Inc. to enhance the compensation of an employee;

vi)    Anchor BanCorp Wisconsin Inc. has required that bonus payments to SEOs or any of the next twenty most highly compensated employees, as defined in the regulations and guidance established under section 111 of EESA (bonus payments), be subject to a recovery or "clawback" provision during any part of the most recently completed fiscal year that was a TARP period if the bonus payments were based on materially inaccurate financial statements or any other materially inaccurate performance metric criteria;

vii)    Anchor BanCorp Wisconsin Inc. has prohibited any golden parachute payment, as defined in the regulations and guidance established under section 111 of EESA, to a SEO or any of the next five most highly compensated employees during any part of the most recently completed fiscal year that was a TARP period;

viii)    Anchor BanCorp Wisconsin Inc. has limited bonus payments to its applicable employees in accordance with section 111 of EESA and the regulations and guidance established thereunder during any part of the most recently completed fiscal year that was a TARP period;

ix)    Anchor BanCorp Wisconsin Inc. and its employees have complied with the excessive or luxury expenditures policy, as defined in the regulations and guidance established under section 111 of EESA, during any part of the most recently completed fiscal year that was a TARP period; and any expenses that, pursuant to the policy, required approval of the board of directors, a committee of the board of directors, an SEO, or an executive officer with a similar level of responsibility, were properly approved;

x)    Anchor BanCorp Wisconsin Inc. will permit a non-binding shareholder resolution in compliance with any applicable federal securities rules and regulations on the disclosures provided under the federal securities laws related to SEO compensation paid or accrued during any part of the most recently completed fiscal year that was a TARP period;

xi)   Anchor BanCorp Wisconsin Inc. will disclose the amount, nature, and justification for the offering during any part of the most recently completed fiscal year that was a TARP period, of any perquisites, as defined in the regulations and guidance established under section 111 of EESA, whose total value exceeds $25,000 for any employee who is subject to the bonus payment limitations identified in paragraph (viii);

xii)   Anchor BanCorp Wisconsin Inc. will disclose whether Anchor BanCorp Wisconsin Inc., the board of directors of Anchor BanCorp Wisconsin Inc., or the compensation committee of Anchor BanCorp Wisconsin Inc. has engaged during any part of the most recently completed fiscal year that was a TARP period, a compensation consultant; and the services the compensation consultant or any affiliate of the compensation consultant provided during this period;

xiii)   Anchor BanCorp Wisconsin Inc. has prohibited the payment of any gross-ups, as defined in the regulations and guidance established under section 111 of EESA, to the SEOs and the next twenty most highly compensated employees during any part of the most recently completed fiscal year that was a TARP period;

xiv)   Anchor BanCorp Wisconsin Inc. has substantially complied with all other requirements related to employee compensation that are provided in the agreement between Anchor BanCorp Wisconsin Inc. and Treasury, including any amendments;

xv)   Anchor BanCorp Wisconsin Inc. has submitted to Treasury a complete and accurate list of the SEOs and the twenty next most highly compensated employees for the current fiscal year, with the non-SEOs ranked in descending order of level of annual compensation, and with the name, title, and employer of each SEO and most highly compensated employee identified; and

xvi)   I understand that a knowing and willful false or fraudulent statement made in connection with this certification may be punished by fine, imprisonment, or both.

May 24, 2013.

ANCHOR BANCORP WISCONSIN INC.

/s/ Thomas G. Dolan
_____
Thomas G. Dolan
Chief Financial Officer

**EXHIBIT C**

**FORM OF INVESTOR AGREEMENT (4.9% INVESTOR)**

ESCROW VERSION
STRICTLY CONFIDENTIAL

**STOCK PURCHASE AGREEMENT**

**dated as of July [●], 2013**

**by and between**

**ANCHOR BANCORP WISCONSIN INC.**

**and**

**[●]**

# TABLE OF CONTENTS

Page

ARTICLE I

PURCHASE; CLOSING

1.1    Purchase .................................................................................................2
1.2    Closing ...................................................................................................2

ARTICLE II

REPRESENTATIONS AND WARRANTIES

2.1    Disclosure ..............................................................................................4
2.2    Representations and Warranties of the Company ..................................5
2.3    Representations and Warranties of the Investor ..................................25

ARTICLE III

COVENANTS

3.1    Filings; Other Actions..........................................................................29
3.2    Access, Information and Confidentiality ..............................................30
3.3    Reasonable Best Efforts........................................................................31

ARTICLE IV

ADDITIONAL AGREEMENTS

4.1    Governance Matters...............................................................................32
4.2    Transfers; Legend; Form D....................................................................32
4.3    Indemnity ..............................................................................................33
4.4    Preemptive Rights.................................................................................35
4.5    Registration Rights................................................................................36
4.6    Takeover Laws; No Rights Triggered....................................................47
4.7    Avoidance of Control............................................................................48
4.8    ERISA Matters.......................................................................................48

ARTICLE V
TERMINATION

5.1    Termination............................................................................................49
5.2    Effects of Termination ..........................................................................49
5.3    Automatic Termination ..........................................................................49
5.4    Notice of Other Terminations ...............................................................49

i

# ARTICLE VI

## MISCELLANEOUS

| | | |
|---|---|---|
| 6.1 | Survival | 50 |
| 6.2 | Expenses | 50 |
| 6.3 | Amendment | 50 |
| 6.4 | Waivers | 50 |
| 6.5 | Counterparts and Facsimile | 50 |
| 6.6 | Governing Law | 50 |
| 6.7 | Waiver of Jury Trial | 51 |
| 6.8 | Notices | 51 |
| 6.9 | Entire Agreement, Etc. | 52 |
| 6.10 | Other Definitions | 52 |
| 6.11 | Captions | 53 |
| 6.12 | Severability | 53 |
| 6.13 | No Third-Party Beneficiaries | 53 |
| 6.14 | Time of Essence | 54 |
| 6.15 | Public Announcements | 54 |
| 6.16 | Specific Performance | 54 |
| 6.17 | No Recourse | 54 |

INDEX OF DEFINED TERMS

Term                                                          Location of Definition

Affiliate ................................................................................6.10(a)
Agency .............................................................................. 2.2(z)(4)
Agreement.........................................................................Introduction
Amended Charter ................................................................ Recitals
Articles of Incorporation ................................................... 2.2(a)(2)
Bank ....................................................................................2.1(b)
Bankruptcy Case ................................................................ Recitals
Bankruptcy Code ............................................................... Recitals
Bankruptcy Court............................................................... Recitals
Beneficial Owner ...............................................................6.10(h)
Beneficial Ownership..........................................................6.10(h)
Beneficially Own ................................................................6.10(h)
Benefit Plan........................................................................2.2(p)(1)
Board of Directors.............................................................. Recitals
BSA ....................................................................................2.2(n)(1)
Burdensome Condition .......................................................2.2(e)
business day ...................................................................... 6.10(f)
Closing .............................................................................. 1.2(a)
Closing Date ...................................................................... 1.2(a)
Code....................................................................................2.2(i)
Common Stock.................................................................... Recitals
Company ............................................................................Introduction
Company 10-K .................................................................. 2.2(c)(1)
Company Financial Statements........................................... 2.2(f)
Company Preferred Stock ................................................... 2.2(c)(1)
Company Reports................................................................2.2(g)(1)
Company Restricted Stock ..................................................2.2(c)(1)
Company Rights Agreement ...............................................2.2(v)(2)
Company Significant Agreement.........................................2.2(k)(1)
Company Stock Option .......................................................2.2(c)(1)
Company Stock Option Plans ..............................................2.2(c)(1)
Company Subsidiaries ........................................................2.2(b)(1)
Company Subsidiary............................................................2.2(b)(1)
Company's knowledge.........................................................6.10(i)
control ................................................................................6.10(a)
controlled by ......................................................................6.10(a)
CRA ....................................................................................2.2(n)(7)
Credit Agreement ............................................................... Recitals
De Minimis Claim...............................................................4.3(d)
Debt Issuance ..................................................................... Recitals
Delaware Conversion ......................................................... Recitals
Disclosure Schedule............................................................2.1(a)

Environmental Laws .................................................................2.2(u)
ERISA ...............................................................................2.2(p)(1)
ERISA Affiliate ...................................................................2.2(p)(2)
ERISA Plan .........................................................................2.2(p)(3)
Exchange Act ......................................................................2.2(g)(1)
Exempted Issuance..................................................................4.4(d)
Expedited Issuance.................................................................4.4(e)
FDI Act .............................................................................2.2(b)(2)
FDIC ................................................................................2.2(b)(2)
Federal Reserve ....................................................................2.2(e)
GAAP ..................................................................................2.1(b)
Governmental Approval.........................................................6.10(j)
Governmental Entity ...........................................................2.2(d)(3)
HOLA ...............................................................................2.2(a)(2)
Holder ..............................................................................4.5(k)(1)
Holders' Counsel ................................................................4.5(k)(2)
Indemnified Party .................................................................4.3(b)
Indemnifying Party ...............................................................4.3(b)
Indemnitee..........................................................................4.5(g)(1)
Information ..........................................................................3.2(b)
Insurer ...............................................................................2.2(z)(4)
Intellectual Property...........................................................2.2(w)(2)
Investment ........................................................................ Recitals
Investment Manager.............................................................. 2.3(f)
Investor ...........................................................................Introduction
Investor Designated Director .............................................. 4.5(a)(3)(ii)
Investor Related Party .......................................................... 6.17
IRS ...................................................................................2.2(i)
knowledge of the Company ...................................................6.10(i)
Lenders.............................................................................. Recitals
Liens ...............................................................................1.2(b)(1)
Loan Investor ....................................................................2.2(z)(4)
Loans ...............................................................................2.2(z)(1)
Losses................................................................................4.3(a)
Material Adverse Effect .........................................................2.1(b)
New Issuance .......................................................................4.4(a)
New Security ........................................................................4.4(a)
Observer ........................................................................4.5(a)(3)(ii)
OCC ...................................................................................2.2(e)
OFAC ...............................................................................2.2(n)(6)
Other Private Placements .................................................... Recitals
PATRIOT Act.....................................................................2.2(n)(1)
Pending Underwritten Offering .................................................4.5(l)
Pension Plan........................................................................2.2(p)(3)
Per Share Purchase Price ..................................................... Recitals
Permitted Liens ....................................................................2.2(h)

person ........................................................................................................ 6.10(g)
Petition Date .................................................................................................. Recitals
Piggyback Registration ............................................................................... 4.5(a)(4)
Placement Agent ................................................................................................ 2.2(y)
Plan Asset Regulations ........................................................................................ 4.8
Plan of Reorganization ................................................................................... Recitals
Preemptive Amount ......................................................................................... 4.4(a)
Preemptive Rights ............................................................................................ 4.4(b)
Preemptive Rights Notice ................................................................................. 4.4(a)
Previously Disclosed ......................................................................................... 2.1(c)
Primary Investment Transactions .................................................................. Recitals
Purchase Price ............................................................................................. 1.2(b)(2)
Purchased Shares ................................................................................................. 1.1
Qualifying Ownership Interest ....................................................................... 3.2(a)
Register ....................................................................................................... 4.5(k)(3)
registered .................................................................................................... 4.5(k)(3)
Registrable Securities ................................................................................. 4.5(k)(4)
registration ................................................................................................. 4.5(k)(3)
Registration Expenses ................................................................................. 4.5(k)(5)
Regulatory Agreement ....................................................................................... 2.2(x)
Required Approvals ........................................................................................... 2.2(e)
Rights Agent ............................................................................................... 2.2(v)(2)
Rule 144 ...................................................................................................... 4.5(k)(6)
Rule 144A .................................................................................................... 4.5(k)(6)
Rule 158 ...................................................................................................... 4.5(k)(6)
Rule 159A .................................................................................................... 4.5(k)(6)
Rule 405 ...................................................................................................... 4.5(k)(6)
Rule 415 ...................................................................................................... 4.5(k)(6)
Rule 424 ...................................................................................................... 4.5(k)(6)
Scheduled Black-out Period ........................................................................ 4.5(k)(7)
SEC .............................................................................................................. 2.1(c)
Secondary Investors ....................................................................................... Recitals
Secondary Treasury Sales ............................................................................... Recitals
Securities Act ............................................................................................. 2.2(g)(1)
Selling Expenses .......................................................................................... 4.5(k)(8)
Senior Debt Settlement .................................................................................. Recitals
Shelf Registration Statement ....................................................................... 4.5(a)(2)
Special Registration ........................................................................................ 4.5(i)
Takeover Law .............................................................................................. 2.2(v)(1)
TARP Exchange ............................................................................................. Recitals
TARP Preferred Stock .................................................................................... Recitals
TARP Warrant ............................................................................................... Recitals
Tax .............................................................................................................. 2.2(i)
Tax Return ..................................................................................................... 2.2(i)
Taxes ............................................................................................................. 2.2(i)
Threshold Amount ........................................................................................... 4.3(d)

Transaction Deadline ..................................................................................................5.1(b)
Transactions ........................................................................................................ 1.2(c)(1)
Treasury ................................................................................................................ Recitals
Treasury Issuance................................................................................................. Recitals
Treasury Regulation.................................................................................................2.2(i)
U.S. Bank .............................................................................................................. Recitals
under common control with .................................................................................6.10(a)
Unlawful Gains ...................................................................................................2.2(n)(4)
VCOC .......................................................................................................................... 4.8
VCOC Investor ........................................................................................................... 4.8
Voting Debt..........................................................................................................2.2(c)(1)

**STOCK PURCHASE AGREEMENT**, dated as of July [●], 2013 (this "**Agreement**"), by and between Anchor BanCorp Wisconsin Inc., a Wisconsin corporation (the "**Company**"), and [●], a [●] (the "**Investor**").

## RECITALS:

A.  <u>Bankruptcy Case</u>.  The Company intends to file a voluntary bankruptcy petition (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Western District of Wisconsin (the "**Bankruptcy Court**") not later than the business day immediately following the date this Agreement is executed and delivered by the parties hereto (such business day, the "**Petition Date**").  The Company intends for the Transactions (as defined below) to be effected under a plan of reorganization of the Company to be confirmed by order of the Bankruptcy Court (the "**Plan of Reorganization**").  A draft of the Plan of Reorganization has been provided to the Investor prior to delivery of the Investor's executed signature page hereto.

B.  <u>Investment</u>.  Following the confirmation of the Plan of Reorganization by the Bankruptcy Court, the Company intends to sell to the Investor, and the Investor intends to purchase from the Company, as an investment in the Company, at the Closing (as defined below) a number of shares of common stock, par value $0.10, of the Company (the "**Common Stock**") as determined in accordance with <u>Section 1.1</u> at a price per share of Common Stock equal to $0.10 (the "**Per Share Purchase Price**") on the terms and conditions described herein (collectively, the "**Investment**").

C.  <u>Other Private Placements</u>.  Contemporaneously with the Investment, the Company intends to sell in several other private placement transactions to other investors to be identified by the Company shares of Common Stock at the Per Share Purchase Price contemporaneously with the closing of the Investment contemplated herein (collectively, the "**Other Private Placements**").  The Investment and the Other Private Placements are collectively referred to as the "**Primary Investment Transactions**."

D.  <u>Senior Debt</u>.  In connection with the Primary Investment Transactions and under the Plan of Reorganization, the Company intends to settle in full all of the Company's obligations (including with respect to unpaid principal balance, accrued but unpaid interest thereon and all administrative and other fees or penalties) under the Amended and Restated Credit Agreement, dated as of June 9, 2008 (as amended from time to time, the "**Credit Agreement**"), among the Company, U.S. Bank National Association, as administrative agent ("**U.S. Bank**"), and the lenders from time to time party thereto (collectively with U.S. Bank, the "**Lenders**"), for an amount of cash equal to $49,000,000 (plus expense reimbursement as contemplated under the Credit Agreement) (the "**Senior Debt Settlement**").  On or prior to the Petition Date, the Company received from the Lenders written consents to vote (including written ballots themselves) in sufficient amount and number to cause the class of Lenders under the Plan of Reorganization to accept such Plan of Reorganization.

E. <u>U.S. Treasury</u>.  In connection with the Primary Investment Transactions and under the Plan of Reorganization, the Company intends to (i) exchange the 110,000 shares of Fixed Rate Cumulative Perpetual Preferred Stock, Series B of the Company (the "**TARP Preferred Stock**") currently held by the United States Department of the Treasury (the "**Treasury**") for 60,000,000 shares of Common Stock in the aggregate (the "**Treasury Issuance**") and (ii) cancel the related warrant to purchase 7,399,103 shares of Common Stock at an exercise price of $2.23 per share held by the Treasury (the "**TARP Warrant**") in its entirety (collectively, the "**TARP Exchange**").  Immediately following the TARP Exchange, it is expected that the Treasury will sell to one or more investors to be identified by the Company and acceptable to the Treasury (the "**Secondary Investors**") the shares of Common Stock delivered to the Treasury in connection with the TARP Exchange at a purchase price per share equal to the Per Share Purchase Price (collectively, the "**Secondary Treasury Sales**").

F. <u>Debt Issuance</u>.  In connection with the Primary Investment Transactions, the Company intends to issue to certain investors up to $30 million of newly-issued unsecured indebtedness, on the terms contemplated by <u>Exhibit A</u> (the "**Debt Issuance**").

G. <u>Delaware Conversion and Amended Charter</u>.  Under the Plan of Reorganization, the Company will (i) convert from a Wisconsin corporation to a Delaware corporation in accordance with Section 265 of the Delaware General Corporation Law (the "**Delaware Conversion**") and (ii) file the Articles of Incorporation in the form contemplated by <u>Exhibit B</u> (the "**Amended Charter**") with the Secretary of State of the State of Delaware in order to, among other things, increase the number of authorized shares of Common Stock to at least 2,000,000,000 shares or such larger number as the board of directors of the Company (the "**Board of Directors**") determines is necessary to effectuate the Primary Investment Transactions and the TARP Exchange and adopt certain restrictions on acquisitions and dispositions of securities and to make certain other changes.

**NOW, THEREFORE**, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

## ARTICLE I

## PURCHASE; CLOSING

1.1     <u>Purchase</u>.  On the terms and subject to the conditions set forth herein, the Investor will purchase from the Company, and the Company will issue and sell to the Investor, the number of shares of Common Stock specified on the Investor's signature page hereto (such shares of Common Stock issued and sold to the Investor, the "**Purchased Shares**").

1.2     <u>Closing</u>.

(a)     Subject to the satisfaction (or, to the extent permitted, waiver) of the conditions set forth in <u>Section 1.2(c)</u>, the closing of the Investment (the "**Closing**") shall take place contemporaneously with the closing of the Other Private Placements at the offices of

2

Skadden, Arps, Slate, Meagher & Flom LLP located at Four Times Square, New York, New York, 10036, or remotely via the electronic or other exchange of documents and signature pages, as soon as practicable, but in no event later than the second (2nd) business day after the satisfaction or waiver of the conditions set forth in Section 1.2(c) (excluding conditions that, by their terms, cannot be satisfied until the Closing, but the Closing shall be subject to the satisfaction or waiver of those conditions), or at such other place or such other date as agreed to by the parties hereto.  The date of the Closing is referred to as the "**Closing Date**."

(b)     Subject to the satisfaction or waiver on the Closing Date of the applicable conditions to the Closing set forth in Section 1.2(c), at the Closing:

(1)     the Company will deliver to the Investor the Purchased Shares, free and clear of any lien, adverse right or claim, charge, option, pledge, covenant, title defect, security interest or other encumbrances of any kind (other than restrictions on transfer imposed by applicable securities laws or as contemplated by this Agreement) ("**Liens**"), as evidenced by one or more certificates dated the Closing Date and bearing the appropriate legends as herein provided;

(2)     the Investor will deliver to the Company, by wire transfer of immediately available funds to an account or accounts designated by the Company, an amount equal to the purchase price specified on the Investor's signature page hereto (the "**Purchase Price**"); it being understood and agreed that the Investor must have received the Purchased Shares (pursuant to its written delivery instructions provided to the Company prior to the Closing) prior to being obligated to wire such funds;

(3)     the Company will deliver to the Investor a certificate signed on behalf of the Company by a senior executive officer certifying to the effect that (A) the representations and warranties of the Company set forth in Section 2.2 of this Agreement that (i) are not made as of a specific date shall have been true and correct as of the date of this Agreement and shall be true and correct as of the Closing Date as though made as of the Closing Date, and (ii) are made as of a specific date shall have been true and correct as of such specific date, in each case, except where the failure to be true and correct (without regard to any materiality or Material Adverse Effect (as defined below) qualifications contained therein) has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (and except that (x) the representations and warranties of the Company set forth in Sections 2.2(a), 2.2(b)(1) and (2), 2.2(d), 2.2(f) and 2.2(v) shall be true and correct in all material respects, (y) the representations and warranties of the Company set forth in Sections 2.2(b)(3), 2.2(j)(3), 2.2(q) and 2.2(y) shall be true and correct in all respects, and (z) the representations and warranties of the Company set forth in Section 2.2(c)(1) shall be true and correct except to a *de minimis* extent) and (B) the Company has performed in all material respects all obligations required to be performed by it at or prior to the Closing under this Agreement; and

(4)     the Investor will deliver to the Company a certificate signed on behalf of the Investor by a senior executive officer certifying to the effect that (A) the representations and warranties of the Investor set forth in Section 2.3 of this Agreement

3

that (i) are not made as of a specific date shall have been true and correct in all material respects as of the date of this Agreement and shall be true and correct in all material respects as of the Closing Date as though made as of the Closing Date, and (ii) are made as of a specific date shall have been true and correct in all material respects as of such specific date, in each case, without regard to any materiality qualifications contained therein, except to the extent that any inaccuracies in such representations and warranties, taken as a whole, are not reasonably expected to materially and adversely affect the Investor's ability to consummate the transactions contemplated by this Agreement in a timely manner and (B) the Investor has performed in all material respects all obligations required to be performed by it at or prior to the Closing under this Agreement.

(c)     Closing Conditions.  The obligation of the Investor, on the one hand, and the Company, on the other hand, to effect the Closing is subject to the satisfaction or written waiver by the Investor and the Company prior to the Closing of the following conditions:

(1)     the Plan of Reorganization effecting the Primary Investment Transactions, the Senior Debt Settlement, the TARP Exchange, the Debt Issuance, the Delaware Conversion and the Amended Charter (collectively, the "**Transactions**") shall have been confirmed by the Bankruptcy Court;

(2)     the Company shall receive contemporaneously with the Closing, or shall have received prior to the Closing, gross proceeds of not less than $170,000,000 and not more than $180,000,000 from the Primary Investment Transactions and the price per share of Common Stock sold in the Other Private Placements shall be no less than the Per Share Purchase Price (assuming in each case that the Investment has been consummated); and

(3)     substantial consummation of the Plan of Reorganization shall have occurred.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

2.1     Disclosure.

(a)     On or prior to the date of this Agreement, the Company delivered to the Investor a schedule (the "**Disclosure Schedule**") setting forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in Section 2.2 or to one or more of its covenants contained in this Agreement; provided, however, that notwithstanding anything in this Agreement to the contrary, the mere inclusion of an item in such schedule shall not be deemed an admission that such item represents a material exception or material fact, event, or circumstance or that such item has had or would reasonably be expected to have a Material Adverse Effect.

(b)     As used in this Agreement, the term "**Material Adverse Effect**" means any fact, event, change, condition, development, circumstance or effect that, individually or in

the aggregate, (1) would reasonably be expected to be material and adverse to the business, assets, liabilities, properties, results of operations or condition (financial or otherwise) of the Company and the Company Subsidiaries, taken as a whole, other than any such fact, event, change, condition, development, circumstance or effect attributable to, resulting from, arising out of or relating to (i) the Bankruptcy Case, (ii) any change or proposed change, after the date hereof, in banking or similar laws, rules or regulations of general applicability or interpretations thereof by Governmental Entities, (iii) any change, after the date hereof, in U.S. generally accepted accounting principles ("**GAAP**") or interpretations thereof, (iv) changes, after the date hereof, affecting the financial services industry generally, the United States economy or general economic conditions, including changes in prevailing interest rates, credit markets, secondary or mortgage market conditions or housing price appreciation/depreciation trends, including changes to any previously correctly applied asset marks resulting therefrom, (v) national or international political or social conditions, including the engagement by the United States in hostilities or escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices, (vi) the failure of the Company to meet any internal or public projections, forecasts, estimates or guidance for any period ending after March 31, 2013; provided that the exception in this clause (vi) shall not prevent or otherwise affect a determination that any fact, event, change, condition, development, circumstance or effect underlying such a failure has resulted in, or contributed to, a Material Adverse Effect, (vii) any actions taken with the prior written consent of the Investor, (viii) the Regulatory Agreements applicable to the Company or AnchorBank, fsb (the "**Bank**"), or (ix) compliance with the terms of, or the taking of any action required by, this Agreement, except in the case of the foregoing clauses (ii), (iii), (iv) or (v), to the extent any fact, event, change, condition, development, circumstance or effect referred to therein has or would reasonably be expected to have a disproportionate impact on the business, assets, liabilities, properties, results of operations or condition (financial or otherwise) of the Company and the Company Subsidiaries, taken as a whole, relative to other similarly situated industry participants, or (2) would materially impair the ability of the Company to perform its obligations under this Agreement or to consummate the Closing.

(c)      "**Previously Disclosed**" with regard to the Company (1) means information set forth on its Disclosure Schedule corresponding to the provision of this Agreement to which such information relates; provided that information which is reasonably apparent on its face that it relates to another provision of this Agreement, shall also be deemed to be Previously Disclosed with respect to such other provision and (2) includes information publicly disclosed by the Company in the Company Reports (as defined below) filed by it with or furnished to the U.S. Securities and Exchange Commission (the "**SEC**") on or after March 31, 2012 (excluding any risk factor disclosures contained in such documents under the heading "Risk Factors," any disclosure of risks included in any "forward-looking statements" or any other statements or disclaimers that are predictive, qualitative, subjective or forward-looking in nature) prior to July 19, 2013.

2.2    Representations and Warranties of the Company.  Except as Previously Disclosed, the Company represents and warrants as of the date of this Agreement and as of the Closing (except to the extent made only as of a specified date, in which case as of such date) to the Investor that:

    (a)    <u>Organization and Authority</u>.

    (1)    As of the date of this Agreement, the Company is a corporation duly organized and validly existing under the laws of the State of Wisconsin, is duly qualified to do business and is in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified and failure to be so qualified would have or reasonably be expected to have a Material Adverse Effect and has corporate power and authority to own its properties and assets and to carry on its business as it is now being conducted.  As of the Closing, as a result of the Delaware Conversion, and subject to confirmation of the Plan of Reorganization by the Bankruptcy Court, the Company shall be a corporation duly organized and validly existing under the laws of the State of Delaware, duly qualified to do business and in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified and failure to be so qualified would have or reasonably be expected to have a Material Adverse Effect and will have corporate power and authority to own its properties and assets and to carry on its business as it is then being conducted.

    (2)    The Company is duly registered as a savings and loan holding company under the Home Owners' Loan Act (the "**HOLA**") .  The Company has Previously Disclosed true, correct and complete copies of the Company's Articles of Incorporation, as amended (the "**Articles of Incorporation**") and the Company's bylaws as amended through the date of this Agreement.   The Company is not in violation of any of the provisions of the Articles of Incorporation or its bylaws.

    (b)    <u>Company's Subsidiaries</u>.

    (1)    The Company has Previously Disclosed a true, complete and correct list of all of its subsidiaries as of the date of this Agreement (individually, a "**Company Subsidiary**" and, collectively, the "**Company Subsidiaries**"), all shares of the outstanding capital stock of each of which are owned directly or indirectly by the Company.  No equity security of any Company Subsidiary is or may be required to be issued by reason of any option, warrant, scrip, preemptive right, right to subscribe to, gross-up right, call or commitment of any character whatsoever relating to, or security or right convertible into, shares of any capital stock of such Company Subsidiary, and there are no contracts, commitments, understandings or arrangements by which any Company Subsidiary is bound to issue additional shares of its capital stock, or any option, warrant or right to purchase or acquire any additional shares of its capital stock.  All of such shares so owned by the Company are duly authorized and validly issued, fully paid and nonassessable and are owned by it free and clear of any Liens with respect thereto.  Each Company Subsidiary is an entity duly organized, validly existing, duly qualified to do business and in good standing under the laws of its jurisdiction of organization, and has corporate or other appropriate organizational power and authority to own or lease its properties and assets and to carry on its business as it is now being conducted.  Except in respect of the Company Subsidiaries, the Company does not own beneficially, directly or indirectly, more than five percent (5%) of any class of equity securities or similar

interests of any corporation, bank, business trust, association or similar organization, and is not, directly or indirectly, a partner in any partnership or party to any joint venture.

(2)    The Bank is duly organized and validly existing as a federal savings association and its deposit accounts are insured by the Federal Deposit Insurance Corporation (the "**FDIC**") to the fullest extent permitted by the Federal Deposit Insurance Act (the "**FDI Act**") and the rules and regulations of the FDIC thereunder, and all premiums and assessments required to be paid in connection therewith have been paid when due.  The Company has Previously Disclosed true, correct and complete copies of the charter and bylaws of the Bank as amended through the date of this Agreement.  No Company Subsidiary is in violation of any of the provisions of its articles of incorporation or bylaws.

(3)    The Company beneficially and of record owns all of the outstanding capital stock of the Bank.

(c)    Capitalization.

(1)    As of the date hereof, the authorized capital stock of the Company consists of 100,000,000 shares of Common Stock and 5,000,000 shares of preferred stock, par value $0.10 (the "**Company Preferred Stock**").  As of the date hereof, there are 21,247,225 shares of Common Stock outstanding and 110,000 shares of TARP Preferred Stock and no other Company Preferred Stock outstanding, and the TARP Warrant allows for the purchase of 7,399,103 shares of Common Stock by the Treasury at an exercise price of $2.23 per share.  As of the date hereof, there are (i) outstanding stock options issued under the Company's 2001 Stock Option Plan for Non-Employee Directors, as amended or supplemented, as filed as exhibit 10.9 to the Company's Annual Report on Form 10-K for the year ended March 31, 2013 (the "**Company 10-K**"), and under the Company's 1995 Stock Option Plan for Non-Employee Directors, as amended or supplemented, as filed as exhibit 10.4 to the Company 10-K, to purchase an aggregate of 80,000 shares of the Common Stock (each, a "**Company Stock Option**") and (ii) an aggregate of 40,345 shares of restricted stock ("**Company Restricted Stock**") outstanding under the Company's 2004 Equity Incentive Plan, as filed as exhibit 10.10 to the Company 10-K (together with the 2001 Stock Option Plan for Non-Employee Directors and the 1995 Stock Option Plan for Non-Employee Directors, the "**Company Stock Option Plans**") and (iii) 1,240,314 shares of Common Stock reserved for issuance under the Company Stock Option Plans.  As of the date hereof, other than in respect of the TARP Warrant, the Company Rights Agreement, awards outstanding under or pursuant to the Company Stock Option Plans and for purposes of the Transactions, no shares of Common Stock or Company Preferred Stock are reserved for issuance.  All of the issued and outstanding shares of Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof.  Except in connection with the Transactions, neither the Company nor any of its officers, directors, or employees is a party to any right of first refusal, right of first offer, proxy, voting agreement, voting trust, registration rights agreement, or shareholders agreement with respect to the sale or voting of any securities of the Company.  No bonds, debentures, notes or other indebtedness

7

having the right to vote on any matters on which the stockholders of the Company may vote ("**Voting Debt**") are issued and outstanding.  Except as set forth elsewhere in this Section 2.2(c), or in connection with the Transactions, or as Previously Disclosed, and subject to confirmation of the Plan of Reorganization by the Bankruptcy Court, the Company does not have and is not bound by any outstanding subscriptions, options, warrants, calls, repurchase rights, commitments, or agreements of any character calling for the purchase or issuance of, or securities or rights convertible into or exchangeable or exercisable for, any shares of Common Stock or Company Preferred Stock or any other equity securities of the Company or Voting Debt or any securities representing the right to purchase or otherwise receive any shares of capital stock of the Company (including any rights plan or agreement).  There are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of shares of Common Stock pursuant to the Primary Investment Transactions.

       (2)     Section 2.2(c)(2) of the Disclosure Schedule sets forth the following information with respect to each Company Stock Option and share of Company Restricted Stock, which is true and correct as of the date of this Agreement:  (A) the name of each holder of Company Stock Options and Company Restricted Stock and (B) the number of shares of Common Stock subject to such Company Stock Option and the number of shares of Company Restricted Stock, and, as applicable, the grant date, exercise price, number of shares vested or not otherwise subject to restrictions, vesting schedule and the Company Stock Option Plan under which such Company Stock Options or shares of Company Restricted Stock were granted.  Each Company Stock Option (i) was granted in compliance with all applicable laws and all of the terms and conditions of the Company Stock Option Plans pursuant to which it was issued, (ii) has an exercise price per share of Common Stock equal to or greater than the fair market value of a share of Common Stock on the date of such grant and (iii) has a grant date identical to the date on which the Board of Directors or compensation committee of the Board of Directors actually awarded such Company Stock Option.

       (d)     Authorization.  Subject to the confirmation of the Plan of Reorganization by the Bankruptcy Court:

       (1)     The Company has the corporate power and authority to enter into this Agreement and the agreements for the other Transactions and, subject to the completion of the Delaware Conversion and effectiveness of the Amended Charter, to carry out its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the agreements for the other Transactions by the Company and the consummation of the transactions contemplated hereby and thereby, including the issuance of the Purchased Shares in accordance with the terms of this Agreement, have been duly authorized by the affirmative vote of at least a majority of the directors on the Board of Directors.  This Agreement has been duly and validly executed and delivered by the Company and, assuming due authorization, execution and delivery of this Agreement by the Investor, is a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as such enforceability may be limited by the failure to complete the Delaware Conversion or cause the Amended Charter to become effective or by general equitable principles

8

(whether applied in equity or at law).  No other corporate proceedings or stockholder actions are necessary for the execution and delivery by the Company of this Agreement or the agreements for the other Transactions, the performance by the Company of its obligations hereunder or thereunder or the consummation by the Company of the transactions contemplated hereby or thereby.

(2)     Neither the execution and delivery by the Company of this Agreement, the performance by the Company of its obligations hereunder nor the consummation of the transactions contemplated hereby, nor compliance by the Company with any of the provisions of any of the foregoing, will (A) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any Lien, upon any of the properties or assets of the Company or any Company Subsidiary under any of the terms, conditions or provisions of (i) subject to completion of the Delaware Conversion and the effectiveness of the Amended Charter, its Articles of Incorporation or bylaws (or similar governing documents) or (ii) any material note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Company or any Company Subsidiary is a party or by which it may be bound, or to which the Company or any Company Subsidiary or any of the properties or assets of the Company or any Company Subsidiary may be subject, or (B) assuming that the Governmental Approvals contemplated by clause (3) are duly obtained, violate in any material respect any ordinance, permit, concession, grant, franchise, law, statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to the Company or any Company Subsidiary or any of their respective properties.

(3)     Other than the securities or blue sky laws of the various states and filings, notices, approvals or clearances required under federal or state banking laws or the Regulatory Agreements, no notice to, registration, declaration or filing with, exemption or review by, or authorization, order, consent or approval of, any court, administrative agency or commission or other governmental authority or instrumentality, whether federal, state, local or foreign, or any applicable industry self-regulatory organization (each, a "**Governmental Entity**"), or expiration or termination of any statutory waiting period, is necessary for the consummation by the Company of the Transactions.

(e)     <u>Knowledge as to Required Approvals</u>.  As of the date of this Agreement, the Company has no knowledge of any reason relating to the Company or any Company Subsidiary why the Required Approvals will not be obtained without the imposition of any Burdensome Condition.  "**Required Approvals**" means all Governmental Approvals of the Board of Governors of the Federal Reserve System (the "**Federal Reserve**") or the Office of the Comptroller of the Currency (the "**OCC**") required to have been obtained at or prior to the Closing Date for the consummation or effectiveness (as applicable) of the Transaction. "**Burdensome Condition**" means, with respect to the Investor, (A) any restraint or condition imposed by or contained in any Required Approval that would reasonably be expected to impair in any material respect the benefits to the Investor of the Investment or (B) any modification of

governance arrangements of the Investor or its Affiliates required with respect to any Required Approval, or any capital or other support requirements imposed on the Investor or its Affiliates by any Required Approval, in each case except for standard passivity and anti-association commitments to the Federal Reserve

(f)    Financial Statements; Accounting Treatment of the Transactions.  Each of the consolidated balance sheets of the Company and the Company Subsidiaries and the related consolidated statements of income, stockholders' equity and cash flows, together with the notes thereto, included in any Company Report filed with the SEC on or after March 31, 2010 and prior to the date of this Agreement (collectively, the "**Company Financial Statements**"), (1) have been prepared from, and are in accordance with, the books and records of the Company and the Company Subsidiaries, (2) complied, as of their respective date of such filing, in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, (3) have been prepared in accordance with GAAP applied on a consistent basis and (4) present fairly in all material respects the consolidated financial position of the Company and the Company Subsidiaries at the dates and the consolidated results of operations, changes in stockholders' equity and cash flows of the Company and the Company Subsidiaries for the periods stated therein (subject to the absence of notes and non-material year-end audit adjustments in the case of unaudited Company Financial Statements).  The consummation of the Transactions shall qualify as a "recapitalization" for financing accounting purposes under GAAP.

(g)    Reports.

(1)    Since March 31, 2010, the Company and each Company Subsidiary have timely filed all reports, registrations, documents, filings, statements and submissions together with any required amendments thereto, that it was required to file with any Governmental Entity (the foregoing, collectively, the "**Company Reports**") and have paid all fees and assessments due and payable in connection therewith.  As of their respective filing dates, the Company Reports complied in all material respects with all statutes and applicable rules and regulations of the applicable Governmental Entities, as the case may be.  As of the date of this Agreement, there are no outstanding comments from the SEC or any other Governmental Entity with respect to any Company Report.  The Company Reports, including the documents incorporated by reference in each of them, each contained all of the information required to be included in it, and as of the date of each such Company Report filed with or furnished to the SEC, such Company Report did not, as of its date, or if amended prior to the date of this Agreement, as of the date of such amendment, contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made in it not misleading and complied as to form in all material respects with the applicable requirements of the Securities Act of 1933, as amended, or any successor statute (the "**Securities Act**"), and the Securities Exchange Act of 1934, as amended, or any successor statute (the "**Exchange Act**").  As of the date of this Agreement, no executive officer of the Company has failed to make the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act of 2002.

(2)     The records, systems, controls, data and information of the Company and the Company Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of the Company or the Company Subsidiaries or accountants (including all means of access thereto and therefrom), except for any nonexclusive ownership and nondirect control that would not reasonably be expected to have a material adverse effect on the system of internal accounting controls described below in this Section 2.2(g).  The Company (A) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to the chief executive officer and the chief financial officer of the Company by others within those entities, (B) has implemented and maintains internal controls over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) and (C) has disclosed, based on its most recent evaluation prior to the date of this Agreement, to the Company's outside auditors and the audit committee of the Board of Directors (x) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and (y) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.  As of the date of this Agreement, the Company has no knowledge of any reason that its outside auditors and its chief executive officer and chief financial officer shall not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, without qualification, when next due.  Since December 31, 2009, (i) neither the Company nor any Company Subsidiary nor, to the knowledge of the Company, any director, officer, employee, auditor, accountant or representative of the Company or any Company Subsidiary has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or any Company Subsidiary or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that the Company or any Company Subsidiary has engaged in questionable accounting or auditing practices, and (ii) no attorney representing the Company or any Company Subsidiary, whether or not employed by the Company or any Company Subsidiary, has reported evidence of a material violation of securities laws, breach of fiduciary duty or similar violation by the Company or any of its officers, directors, employees or agents to the Board of Directors or any committee thereof or to any director or officer of the Company.

(h)     Properties and Leases.  Except for any Permitted Liens (as defined below), the Company and each Company Subsidiary have good title free and clear of any Liens to all the real and personal property reflected in the Company's consolidated balance sheet as of March 31, 2013 included in the Company 10-K for the period then ended, and all real and personal property acquired since such date, except such real and personal property as has been repossessed or as has been disposed of in the ordinary course of business.  For purposes of this Agreement, "**Permitted Liens**" means (1) Liens for taxes and other governmental charges and assessments arising in the ordinary course which are not yet due and payable, (2) Liens of landlords and Liens

11

of carriers, warehousemen, mechanics and materialmen and other like Liens arising in the ordinary course of business for sums not yet due and payable and (3) other Liens or imperfections on property which are not material in amount and do not materially detract from the value of or materially impair the existing use of the property affected by such Lien or imperfection.  Except as has not had or would not be expected to have a Material Adverse Effect, all leases of real property and all other leases pursuant to which the Company or such Company Subsidiary, as lessee, leases real or personal property are valid and effective in accordance with their respective terms and there is not, under any such lease, any existing material default by the Company or such Company Subsidiary or any event which, with notice or lapse of time or both, would constitute such a material default.

        (i)     <u>Taxes</u>.  Each of the Company and the Company Subsidiaries has timely filed all federal, state, county, local and foreign Tax Returns (as defined below) required to be filed by it, and all such filed Tax Returns are true, correct and complete in all material respects, and paid all Taxes (as defined below) owed by it and no material Taxes owed by it or assessments received by it are delinquent.  With respect to Taxes not yet due, the Company has made adequate provision in the financial statements of the Company (in accordance with GAAP).  The federal income Tax Returns of the Company and the Company Subsidiaries for the fiscal year ended March 31, 2009, and for all fiscal years prior thereto, are for the purposes of routine audit by the Internal Revenue Service (the "**IRS**") closed because of the expiration of the statute of limitations, and no claims for additional Taxes for such fiscal years are pending.  Neither the Company nor any Company Subsidiary has waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, in each case that is still in effect, or has pending a request for any such extension or waiver.  Neither the Company nor any Company Subsidiary is a party to any pending action or proceeding for the assessment or collection of Taxes and no material deficiencies have been proposed in writing by any Governmental Entity in connection with an audit or examination of the Tax Returns of the Company or any Company Subsidiary which has not been settled, resolved and fully satisfied, or for which reserves adequate in accordance with GAAP have not been provided on the Company Financial Statements.  Each of the Company and the Company Subsidiaries has withheld and paid all material Taxes that it is required to withhold from amounts owing to employees, creditors or other third parties.  Neither the Company nor any Company Subsidiary is a party to, is bound by or has any material obligation under, any Tax sharing or Tax indemnity agreement or similar contract or arrangement other than any contract or agreement between or among the Company and any Company Subsidiary.  Neither the Company nor any Company Subsidiary has participated in any "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4, or any other transaction requiring disclosure under analogous provisions of state, local or foreign law.  Neither the Company nor any Company Subsidiary has liability for the Taxes of any person other than the Company or any Company Subsidiary under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law) as a transferee, successor or otherwise.  Neither the Company nor any Company Subsidiary has been a "distributing corporation" or a "controlled corporation" in any distribution in which the parties to such distribution treated the distribution as one to which Section 355 of the Internal Revenue Code of 1986, as amended (the "**Code**"), is applicable.  The Company has not been a United States real property holding corporation within the meaning of Section 897 of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.  Neither the Company nor any Company Subsidiary has undergone an "ownership change" within the meaning of Code

Section 382(g), and the consummation of the Transactions should not cause an "ownership change" within the meaning of Code Section 382(g).  Neither the Company nor any Company Subsidiary will be required to include any item of income in, or exclude any item of deduction from, taxable income for any period (or any portion thereof) ending after the Closing as a result of any: (1) installment sale or other open transaction disposition made on or prior to the Closing; (2) prepaid amount received on or prior to the Closing; (3) written and legally binding agreement with a Governmental Entity relating to Taxes for any taxable period ending on or before the Closing; (4) change in method of accounting in any taxable period ending on or before the Closing; or (5) election under Section 108(i) of the Code, in each case except in the ordinary course of business consistent with past practice.  For the purpose of this Agreement, the term "**Tax**" (including, with correlative meaning, the term "**Taxes**") shall mean any and all domestic or foreign, federal, state, local or other taxes, customs, duties, governmental fees or other like assessments or charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Entity, including taxes on or with respect to income, franchises, windfall or other profits, gross receipts, property, transfer, sales, use, license, alternative or add on minimum, escheatment or unclaimed property, capital stock, payroll, employment, unemployment, social security, workers' compensation or net worth, and taxes in the nature of excise, withholding, ad valorem or value added or similar taxes, and the term "**Tax Return**" means any return, report, information return or other document (including any related or supporting information, and attachments and exhibits) filed or required to be filed with respect to Taxes, including, without limitation, all information returns relating to Taxes of third parties, any claims for refunds of Taxes and any amendment or supplements to any of the foregoing.  "**Treasury Regulation**" means any final, proposed or temporary regulation of the Treasury under the Code and any successor regulation.

(j)      Absence of Certain Changes.  Since March 31, 2013 through the date of this Agreement, (1) the Company has not, and no Company Subsidiary has, made or declared any distribution or dividend in cash or in kind to its stockholders or issued or repurchased any shares of its capital stock or other equity interests, (2) the business and operations of the Company and the Company Subsidiaries have been conducted in the ordinary course of business consistent with past practice, and (3) there has not occurred any circumstance, event, change, development or effect that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and which is continuing.

(k)      Commitments and Contracts.

(1)      The Company has Previously Disclosed or provided to the Investor or its representatives, prior to the date hereof, true, correct, and complete copies of each of the following to which the Company or any Company Subsidiary is a party or subject (whether written or oral, express or implied) (each, a "**Company Significant Agreement**"):

(i)      any material employment contract or understanding (including any understandings or obligations with respect to severance or termination pay, liabilities or fringe benefits) with any present or former officer, director or employee (other than those that are terminable at will by the Company or such Company Subsidiary);

13

(ii)     any material plan, contract or understanding providing for any bonus, pension, option, deferred compensation, retirement payment, profit sharing or similar arrangement with respect to any present or former officer, director or employee;

(iii)     any contract containing covenants that limit the ability of the Company or any Company Subsidiary to compete in any line of business or with any person or which involve any restriction of the geographical area in which, or method by which or with whom, the Company or any Company Subsidiary may carry on its business (other than as may be required by law or applicable regulatory authorities), and any contract that would require the disposition of any material assets or line of business of the Company or any Company Subsidiary;

(iv)     any joint venture, partnership, strategic alliance or other similar contract (including any franchising agreement, but in any event excluding introducing broker agreements); and any contract relating to the acquisition or disposition of any material business or material assets (whether by merger, sale of stock or assets or otherwise), which acquisition or disposition is not yet complete or where such contract contains continuing material obligations or contains continuing material indemnity obligations of the Company or any of the Company Subsidiaries; and

(v)     any other contract or agreement which is a "material contract" within the meaning of Item 601(b)(10) of Regulation S-K.

(2)     Each of the Company Significant Agreements is valid and binding on the Company and the Company Subsidiaries, as applicable, and in full force and effect. The Company and each of the Company Subsidiaries, as applicable, are in compliance in all material respects with and have performed in all material respects all obligations required to be performed by them to date under each Company Significant Agreement. Neither the Company nor any of the Company Subsidiaries has received notice of any violation or default (or any condition which with the passage of time or the giving of notice would cause such a violation of or a default) by any party under any Company Significant Agreement.  No party to a Company Significant Agreement has provided notice to the Company or any Company Subsidiary that it intends to terminate a Company Significant Agreement or not renew such agreement at the expiration of the current term.

(3)     Other than those contemplated by the Transactions, there are no transactions or series of related transactions, agreements, arrangements or understandings, nor are there any currently proposed transactions, or series of related transactions between the Company or any Company Subsidiaries, on the one hand, and the Company, any current or former director or executive officer of the Company or any Company Subsidiaries or any person who beneficially owns five percent (5%) or more of the Common Stock (or any of such person's immediate family members or Affiliates) (other

14

than Company Subsidiaries), on the other hand, except for deposit relationships or loan transactions arising in the ordinary course of business.

(l)     Exemption from Registration.  Assuming the accuracy of Investor's representations contained in Section 2.3, the offer and sale of the Purchased Shares, as provided in this Agreement, are exempt from the registration requirements of the Securities Act, and are otherwise in compliance with the Securities Act.

(m)     Litigation and Other Proceedings; No Undisclosed Liabilities.

(1)     There is no pending claim, action, suit, investigation or proceeding against the Company or any Company Subsidiary, nor is any such claim, action, suit, investigation or proceeding, to the knowledge of the Company, threatened, nor is the Company or any Company Subsidiary subject to any order, judgment or decree, in each case, except as has not had and would not reasonably be expected to have a Material Adverse Effect.

(2)     Neither the Company nor any of the Company Subsidiaries has any liabilities or obligations of any nature (absolute, accrued, contingent or otherwise) which are not properly reflected or reserved against in the financial statements described in Section 2.2(f) to the extent required to be so reflected or reserved against in accordance with GAAP, except for liabilities that have arisen since March 31, 2013 in the ordinary and usual course of business and consistent with past practice and that have not had and would not reasonably be expected to have a Material Adverse Effect.

(n)     Compliance with Laws and Other Matters; Insurance.  The Company and each Company Subsidiary:

(1)     in the conduct of its business has been, since March 31, 2011, and is in compliance in all material respects with all, and the condition and use of its properties has not, since March 31, 2011, and does not violate or infringe in any material respect any, applicable domestic (federal, state or local) or foreign laws, statutes, ordinances, licenses, rules, regulations, judgments, demands, writs, injunctions, orders or decrees applicable thereto or to employees conducting its business, including the Troubled Asset Relief Program, the Sarbanes-Oxley Act of 2002, the Equal Credit Opportunity Act, the Fair Housing Act, the Community Reinvestment Act, the Home Mortgage Disclosure Act, the Bank Secrecy Act of 1970 (the "**BSA**"), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (the "**PATRIOT Act**"), the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, all other applicable fair lending laws or other laws relating to discrimination and applicable privacy and customer information requirements contained in any federal or state privacy law or regulations, including Title V of the Gramm-Leach-Bliley Act of 1999;

(2)     has all material permits, licenses, franchises, authorizations, orders, and approvals of, and has made all material filings, applications, and registrations with, Governmental Entities that are required in order to permit it to own or lease its properties

15

and assets and to carry on its business as presently conducted and that are material to the business of the Company or such Company Subsidiary; all such material permits, licenses, certificates of authority, orders and approvals are in full force and effect, and all such material filings, applications and registrations are current, and, to the knowledge of the Company, no suspension or cancellation of any of them is threatened;

(3)     has been, since March 31, 2011, compliant and currently is complying in all material respects with and, to the knowledge of the Company, has not been, since March 31, 2011, and is not under investigation with respect to, nor has been threatened in writing by any Governmental Entity to be charged with or given notice of any material violation of, any applicable federal, state, local and foreign laws, regulations, rules, judgments, injunctions or decrees;

(4)     has not, nor has any other person on behalf of the Company or any Company Subsidiary that qualifies as a "financial institution" under U.S. anti-money laundering laws, in each case since March 31, 2010, knowingly acted, by itself or in conjunction with another, in any act in connection with the concealment of any currency, securities or other proprietary interest that is the result of a felony as defined in U.S. anti-money laundering laws ("**Unlawful Gains**"), nor knowingly accepted, transported, stored, dealt in or brokered any sale, purchase or any transaction of other nature for Unlawful Gains;

(5)     is presently insured, and since March 31, 2011 (or during such lesser period of time as the Company has owned such Company Subsidiary) has been insured, for reasonable amounts with, to the knowledge of the Company, financially sound and reputable insurance companies against such risks as companies engaged in a similar business would, in accordance with industry practice, customarily be insured;

(6)     (A) is not aware of any facts or circumstances that would cause it to believe that any non-public customer information has been disclosed to or accessed by an unauthorized third-party in a manner that would cause it to undertake any material remedial action; (B) has adopted and implemented in all material respects an anti-money laundering program that contains adequate and appropriate customer identification verification procedures that comply with the PATRIOT Act and such anti-money laundering program meets the requirements in all material respects of Section 352 of the PATRIOT Act and the regulations thereunder, and it has complied in all respects with any requirements to file reports and other necessary documents as required by the PATRIOT Act and the regulations thereunder; and (C) will not knowingly directly or indirectly use the proceeds of the sale of the Common Shares pursuant to Primary Investment Transactions, or lend, contribute or otherwise make available such proceeds to any Company Subsidiary, joint venture partner or other person, towards any sales or operations in any country sanctioned by U.S. Office of Foreign Asset Control of the Treasury ("**OFAC**") or for the purpose of financing the activities of any person currently subject to any U.S. sanctions administered by OFAC; and

(7)     has no knowledge of any facts and circumstances, and has no reason to believe that any facts or circumstances exist, that would cause the Bank: (A) to

16

be deemed not to be in satisfactory compliance with the Community Reinvestment Act of 1977 (the "**CRA**") and the regulations promulgated thereunder, or to be assigned a CRA rating by federal or state banking regulators of lower than "satisfactory"; (B) to be operating in violation, in any material respect, of the Bank Secrecy Act of 1970, the PATRIOT Act, any order issued with respect to anti-money laundering by OFAC, or any other anti-money laundering statute, rule or regulation; or (C) not to be in satisfactory compliance, in any material respect, with all applicable privacy of customer information requirements contained in any applicable federal and state privacy laws and regulations as well as the provisions of all information security programs adopted by any such Company Subsidiary.

(o)    Labor.  Employees of the Company and the Company Subsidiaries are not represented by any labor union nor are any collective bargaining agreements otherwise in effect with respect to such employees.  No labor organization or group of employees of the Company or any Company Subsidiary has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Company's knowledge, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority.  There are no organizing activities, strikes, work stoppages, slowdowns, lockouts, arbitrations or grievances, or other labor disputes pending or, to the knowledge of the Company, threatened against or involving the Company or any Company Subsidiary.  Each of the Company and the Company Subsidiaries is in compliance in all material respects with all applicable laws with respect to employment and employment practices, terms and conditions of employment, and wages and hours.  To the Company's knowledge, no executive officer is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement or any other contract or agreement or any restrictive covenant in favor of a third party, and, to the Company's knowledge, the continued employment of each such executive officer does not subject the Company or any Company Subsidiary to any liability with respect to any of the foregoing matters.

(p)    Company Benefit Plans.

(1)    "**Benefit Plan**" means all employment agreements, employee benefit and compensation plans, programs, agreements, contracts, policies, practices, or other arrangements providing compensation or benefits to any current or former employee, officer, director or consultant of the Company or any Company Subsidiary or any beneficiary or dependent thereof that is sponsored or maintained by the Company or any Company Subsidiary or to which the Company or any Company Subsidiary contributes or is obligated to contribute or is party or for which the Company or any Company Subsidiary has any direct or indirect liability, whether or not written, including without limitation any "employee welfare benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA) and any material bonus, incentive, deferred compensation, vacation, stock purchase, stock appreciation right, stock option or equity award, equity-based severance, employment, change of control, consulting or fringe benefit plan, program, agreement or policy.  Each Benefit Plan is listed on Section

17

2.2(p)(1) of the Disclosure Schedule.  True and complete copies of all Benefit Plans listed on Section 2.2(p)(1) of the Disclosure Schedule have been made available to the Investor prior to the date hereof or have been filed with a Company Report.

(2)    With respect to each Benefit Plan, (A) the Company and the Company Subsidiaries have complied in all material respects, and are now in material compliance with the applicable provisions of ERISA, the Code and all other laws and regulations applicable to such Benefit Plan and (B) each Benefit Plan has been administered in all material respects in accordance with its terms.  None of the Company or the Company Subsidiaries nor any of their respective ERISA Affiliates (as defined below) has incurred any withdrawal liability as a result of a complete or partial withdrawal from a multiemployer plan, as those terms are defined in Part I of Subtitle E of Title IV of ERISA, that has not been satisfied in full.  "**ERISA Affiliate**" means any entity, trade or business, whether or not incorporated, which together with the Company and the Company Subsidiaries, would be deemed a "single employer" within the meaning of Section 4001 of ERISA or Sections 414(b), (c), (m) or (o) of the Code.

(3)    Each Benefit Plan which is subject to ERISA (an "**ERISA Plan**") that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA ("**Pension Plan**") and that is intended to be qualified under Section 401(a) of the Code is so qualified, has received a favorable determination letter from the IRS and nothing has occurred, whether by action or failure to act, that would reasonably be expected to result in revocation of any such favorable determination or the loss of the qualification of such Benefit Plan under Section 401(a) of the Code.  Neither the Company nor any Company Subsidiary has engaged in a transaction with respect to any ERISA Plan that has subjected or could subject the Company or any Company Subsidiary to a material tax or penalty imposed by either Section 4975 of the Code or Section 502(i) of ERISA.  Neither the Company nor any Company Subsidiary has incurred or reasonably expects to incur a tax or penalty imposed by Section 4980F of the Code or Section 502 of ERISA.

(4)    Neither the Company, any Company Subsidiary nor any ERISA Affiliate (A) sponsors, maintains or contributes to or has within the past six years sponsored, maintained or contributed to a Pension Plan that is subject to Subtitles C or D of Title IV of ERISA or (B) sponsors, maintains or has any liability with respect to or an obligation to contribute to or has within the past six years sponsored, maintained, had any liability with respect to, or had an obligation to contribute to a "multiemployer plan" within the meaning of Section 3(37) of ERISA.

(5)    Neither the execution and delivery of this Agreement nor the consummation of the Transactions will, whether alone or in connection with another event, (A) result in any material payment or benefit (including severance, unemployment compensation, "excess parachute payment" (within the meaning of Section 280G of the Code), forgiveness of indebtedness or otherwise) becoming due to any employee, officer, or director of the Company or any Company Subsidiary from the Company or any Company Subsidiary under any Benefit Plan or any other agreement with any employee, including, for the avoidance of doubt, any employment or change in control agreements, (B) result in payments under any of the Benefit Plans which would not be deductible

18

under Section 162(m) or Section 280G of the Code, (C) result in any acceleration of the time of payment or vesting of any such benefits, including, for the avoidance of doubt, the Company Stock Option Plans, (D) materially increase any compensation or benefits otherwise payable under any Benefit Plan, (E) require the funding or increase in the funding of any such benefits, (F) result in any limitation on the right of the Company or any Company Subsidiary to amend, merge, terminate or receive a reversion of assets from any Benefit Plan or related trust, or (G) result in a violation of the prohibitions under 12 C.F.R. Part 359.

(6)    As of the date hereof, there is no pending or, to the knowledge of the Company, threatened, material litigation, claim, action, suit, investigation or proceeding relating to the Benefit Plans.  Neither the Company nor any Company Subsidiary has any obligations for retiree health and life benefits under any Benefit Plan or collective bargaining agreement, except for health continuation coverage as required by Section 4980B of the Code or Part 6 of Title I of ERISA.  The Company and the Company Subsidiaries are in compliance in all material respects with Sections 111 and 302 of the Emergency Economic Stabilization Act of 2008, as amended by the American Recovery and Reinvestment Act of 2009, including all guidance issued thereunder by a Governmental Entity.

(7)    Except as would not reasonably be expected to have a Material Adverse Effect, and except for liabilities fully reserved for or identified in the Company Financial Statements, there are no pending or, to the knowledge of the Company, threatened claims (other than claims for benefits in the ordinary course), lawsuits or arbitrations which have been asserted or instituted against (i) the Benefit Plans, (ii) any fiduciaries thereof with respect to their duties to the Benefit Plans, or (iii) the assets of any of the trusts under any of the Benefit Plans.

(q)    Status of Purchased Shares.  Subject to confirmation of the Plan of Reorganization by the Bankruptcy Court, the Purchased Shares to be issued pursuant to this Agreement have been, and, subject to the completion of the Delaware Conversion and the effectiveness of the Amended Charter, will be, duly authorized by all necessary corporate action of the Company.  When issued, delivered and sold against receipt of the consideration therefor as provided in this Agreement, the Purchased Shares will be validly issued, fully paid and nonassessable and without any personal liability attaching to the ownership thereof, and will not be issued in violation of or subject to preemptive rights of any other shareholder of the Company.

(r)    Investment Company.  Neither the Company nor any of the Company Subsidiaries is an "investment company" as defined under the Investment Company Act of 1940, as amended, and neither the Company nor any of the Company Subsidiaries sponsors any person that is such an investment company.

(s)    Risk Management; Derivatives.

(1)    The Company and the Company Subsidiaries have in place risk management policies and procedures sufficient in scope and operation to protect against

19

risks of the type and in amounts expected to be incurred by persons of similar size and in similar lines of business as the Company and the Company Subsidiaries.

(2)     All derivative instruments, including swaps, caps, floors and option agreements, whether entered into for the Company's own account, or for the account of one or more of the Company Subsidiaries or their customers, were entered into (A) only for purposes of mitigating identified risk and in the ordinary course of business, (B) in accordance with prudent practices and in material compliance with all applicable laws, rules, regulations and regulatory policies, and (C) with counterparties believed by the Company to be financially responsible at the time; and each of them constitutes the valid and legally binding obligation of the Company or one of the Company Subsidiaries, enforceable in accordance with its terms. Neither the Company nor the Company Subsidiaries, nor, to the knowledge of the Company, any other party thereto, is in breach of any of its obligations under any such agreement or arrangement.

(t)     <u>Foreign Corrupt Practices and International Trade Sanctions</u>. Neither the Company nor any Company Subsidiary, nor any of their respective directors, officers, agents, employees or any other persons acting on their behalf (1) has violated the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1 et seq., as amended, or any other similar applicable foreign, federal, or state legal requirement, (2) has made or provided, or caused to be made or provided, directly or indirectly, any payment or thing of value to a foreign official, foreign political party, candidate for office or any other person knowing that the person will pay or offer to pay the foreign official, party or candidate, for the purpose of influencing a decision, inducing an official to violate their lawful duty, securing any improper advantage, or inducing a foreign official to use their influence to affect a governmental decision, (3) has paid, accepted or received any unlawful contributions, payments, expenditures or gifts, (4) to the knowledge of the Company, has violated or operated in noncompliance with any export restrictions, money laundering law, anti-terrorism law or regulation, anti-boycott regulations or embargo regulations, or (5) is currently subject to any United States sanctions administered by OFAC.

(u)     <u>Environmental Matters</u>. There is no legal, administrative, or other proceeding, claim or action pending or, to the knowledge of the Company, threatened against the Company or any Company Subsidiary seeking to impose, or that could reasonably be expected to result in the imposition of, on the Company or any Company Subsidiary, any liability relating to the use, disposal or release of hazardous substances or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances under any local, state or federal law, statute, regulation or ordinance, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (collectively, "**Environmental Laws**"). Neither the Company nor any Company Subsidiary is subject to any agreement, order, judgment or decree by or with any Governmental Entity or third party imposing any liability under any Environmental Laws. Neither the Company nor any Company Subsidiary (i) is in violation of any Environmental Laws, (ii) owns or operates any real property contaminated with any substance that is in violation of any Environmental Laws, or (iii) is liable for any off-site disposal or contamination pursuant to any Environmental Laws.

(v)     <u>Anti-Takeover Provisions; Rights Plan</u>.

20

(1)     The Board of Directors has taken all necessary action to ensure that, prior to the Closing any "moratorium," "control share," "fair price," "takeover" or "interested stockholder" law (each, a "**Takeover Law**") does not and shall not apply to the Primary Investment Transactions, the TARP Exchange and the Secondary Treasury Sales.  In the case that such transactions are subject to such provisions or laws, the Board of Directors shall take all necessary action to ensure that such transactions shall be deemed to be exceptions to such provisions or laws, including, but not limited to, the approval of such transactions as contemplated thereunder.

(2)     Prior to the Closing, the Company and American Stock Transfer & Trust Company, LLC, as Rights Agent (the "**Rights Agent**"), shall have duly executed an amendment to the Rights Agreement, dated as of November 5, 2010, between the Company and the Rights Agent (the "**Company Rights Agreement**"), and as a result of such amendment (which amendment shall be valid, binding and enforceable and shall not have been revoked, modified or rescinded prior to the Closing), among other things, (i) neither this Agreement nor the consummation of any of the Primary Investment Transactions, the TARP Exchange or the Secondary Treasury Sales will cause the rights issued pursuant to the Company Rights Agreement to become exercisable by the holders thereof, and (ii) none of the Investor or any of its "Permissible Transferees" shall be deemed to be an "Acquiring Person" (as defined in the Company Rights Agreement).

(w)     Intellectual Property.

(1)     (i) The Company and the Company Subsidiaries own (free and clear of any claims, Liens, exclusive licenses or non-exclusive licenses not granted in the ordinary course of business) or have a valid license to use all Intellectual Property used in or necessary to carry on their business as currently conducted, and (ii) such Intellectual Property referenced in clause (i) above is valid, subsisting and enforceable, and is not subject to any outstanding order, judgment, decree or agreement adversely affecting the Company's or the Company Subsidiaries' use of, or rights to, such Intellectual Property. The Company and the Company Subsidiaries have sufficient rights to use all Intellectual Property used in their business as presently conducted, all of which rights shall survive unchanged the consummation of the Transactions.  Neither the Company nor any Company Subsidiary has received any written notice of infringement or misappropriation of, or any conflict with, the rights of others with respect to any Intellectual Property.  To the Company's knowledge, no third party has infringed, misappropriated or otherwise violated the Intellectual Property rights of the Company or the Company Subsidiaries. There is no litigation, opposition, cancellation, proceeding, objection or claim pending, asserted, or, to the Company's knowledge, threatened in writing against the Company or any Company Subsidiary concerning the ownership, validity, registerability, enforceability, infringement or use of, or licensed right to use, any Intellectual Property. To the knowledge of the Company, none of the Company or any of the Company Subsidiaries is using or enforcing any Intellectual Property owned by or licensed to the Company or any of the Company Subsidiaries in a manner that would be expected to result in the abandonment, cancellation or unenforceability of such Intellectual Property.

(2)     "**Intellectual Property**" shall mean trademarks, service marks, brand names, domain names, certification marks, trade dress and other indications of origin, the goodwill associated with the foregoing and registrations in any jurisdiction of, and applications in any jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; inventions, discoveries and ideas, whether patentable or not, in any jurisdiction; patents, applications for patents (including divisions, continuations, continuations in part and renewal applications), and any renewals, extensions or reissues thereof, in any jurisdiction; trade secrets and rights in any jurisdiction to limit the use or disclosure thereof by any person; writings and other works, whether copyrightable or not, in any jurisdiction; and registrations or applications for registration of copyrights in any jurisdiction, and any renewals or extensions thereof; and any similar intellectual property or proprietary rights.

(x)     <u>Agreements with Regulatory Agencies</u>.  Neither the Company nor any Company Subsidiary is subject to any cease-and-desist or other similar order or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any capital directive by, or since March 31, 2010, has adopted any board resolutions at the request of, any Governmental Entity that currently restricts the conduct of its business or that relates to its capital adequacy, its liquidity and funding policies and practices, its ability to pay dividends, its credit, risk management or compliance policies, its internal controls, its management, or its operations or business (each item in this sentence, a "**Regulatory Agreement**"), nor has the Company or any Company Subsidiary been advised since March 31, 2010 by any Governmental Entity that it is considering issuing, initiating, ordering or requesting any such Regulatory Agreement.  Except as Previously Disclosed, the Company and each Company Subsidiary are in compliance with each Regulatory Agreement to which it is party or subject, and neither the Company nor any Company Subsidiary has received any notice from any Governmental Entity indicating that either the Company or any Company Subsidiary is not in compliance in all material respects with any such Regulatory Agreement.

(y)     <u>Brokers and Finders</u>.  Except for Sandler O'Neill + Partners, L.P. (the "**Placement Agent**"), neither the Company nor any Company Subsidiary nor any of their respective officers, directors or employees has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, and no broker or finder has acted directly or indirectly for the Company or any Company Subsidiary, in connection with the Transactions.  Prior to the date of this Agreement, the Company has disclosed to the Investor the economic and other material terms of its arrangements with the Placement Agent in connection with the Transactions.

(z)     <u>Loan Portfolio</u>.

(1)     Each of the Company and each Company Subsidiary has complied with, and all documentation in connection with the origination, processing, underwriting and credit approval of any loan, lease or other extension of credit or commitment to extend credit ("**Loans**") originated, purchased or serviced by the Company or any Company Subsidiary satisfied in all material respects, (i) all applicable laws with respect to the origination, insuring, purchase, sale, pooling, servicing, subservicing or filing of

22

claims in connection with Loans, including all laws relating to real estate settlement procedures, consumer credit protection, truth in lending laws, usury limitations, fair housing, transfers of servicing, collection practices, equal credit opportunity and adjustable rate mortgages, (ii) the responsibilities and obligations relating to Loans set forth in any material contract between the Company or any Company Subsidiary and any Agency, Loan Investor or Insurer, (iii) the applicable rules, regulations, guidelines, handbooks and other requirements of any Agency, Loan Investor or Insurer, and (iv) the terms and provisions of any material mortgage or other collateral documents and other Loan documents with respect to each Loan.

(2)     No Agency, Loan Investor or Insurer has (i) claimed in writing that the Company or any Company Subsidiary has violated or has not complied with the applicable underwriting standards with respect to Loans sold by the Company or any Company Subsidiary to a Loan Investor or Agency, or with respect to any sale of Loan servicing rights to a Loan Investor, (ii) imposed in writing restrictions on the activities (including commitment authority) of the Company or any Company Subsidiary or (iii) indicated in writing to the Company or any Company Subsidiary that it has terminated or intends to terminate its relationship with the Company or any Company Subsidiary for poor performance, poor Loan quality or concern with respect to the Company's or any Company Subsidiary's compliance with laws.

(3)     To the knowledge of the Company, the characteristics of the loan portfolio of the Company have not materially changed from the characteristics of the loan portfolio of the Company as of March 31, 2013 in a manner that could reasonably be expected to result in a Material Adverse Effect with respect to the Company.

(4)     For purposes of this Section 2.2(z): (i) "**Agency**" means the Federal Housing Administration, the Federal Home Loan Mortgage Corporation, the Farmers Home Administration (now known as Rural Housing and Community Development Services), the Federal National Mortgage Association, the United States Department of Veterans' Affairs, the Rural Housing Service of the U.S. Department of Agriculture or any other federal or state agency with authority to (A) determine any investment, origination, lending or servicing requirements with regard to Loans originated, purchased or serviced by the Company or any Company Subsidiary or (B) originate, purchase, or service Loans, or otherwise promote lending, including state and local housing finance authorities; (ii) "**Loan Investor**" means any person (including an Agency) having a beneficial interest in any Loan originated, purchased or serviced by the Company or any Company Subsidiary or a security backed by or representing an interest in any such Loan; and (iii) "**Insurer**" means a person who insures or guarantees for the benefit of the Loan holder all or any portion of the risk of loss upon borrower default on any of the Loans originated, purchased or serviced by the Company or any Company Subsidiary, including the Federal Housing Administration, the United States Department of Veterans' Affairs, the Rural Housing Service of the U.S. Department of Agriculture and any private mortgage insurer, and providers of hazard, title or other insurance with respect to such Loans or the related collateral.

23

(aa)    <u>Fiduciary Accounts</u>.  To the knowledge of the Company, the Company and the Company Subsidiaries have, in all material respects, properly administered all accounts for which it acts as a fiduciary, including accounts for which it serves as a trustee, agent, custodian, personal representative, guardian, conservator or investment advisor, in accordance with the terms of the governing documents, applicable federal and state Law and regulation and common law.  To the knowledge of the Company, none of the Company, the Company Subsidiaries or any director, officer or employee of the Company or the Company Subsidiaries has, in any material respect, committed any breach of trust or fiduciary duty with respect to any such fiduciary account and the accountings for each such fiduciary account are true and correct in all material respects and accurately reflect the assets of such fiduciary account.

(bb)    <u>Section 365(o)</u>.  Neither the Company nor any Company Subsidiary is subject to any agreement, order, decree, law, regulation, resolution or other commitment that falls within the scope of Section 365(o) of the Bankruptcy Code.

(cc)    <u>Transactions With Affiliates and Employees</u>.  Except as contemplated by the Transactions, none of the officers, directors, employees or Affiliates of the Company or any Company Subsidiary is presently a party to any contract, arrangement or transaction with the Company or any Company Subsidiary or to a presently contemplated contract, arrangement or transaction (other than for services as employees, officers and directors) that would be required to be disclosed pursuant to Item 404 of Regulation S-K promulgated under the Securities Act.

(dd)    <u>Off Balance Sheet Arrangements</u>.  There is no transaction, arrangement, or other relationship between the Company (or any Company Subsidiary) and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its Exchange Act filings and is not so disclosed.

(ee)    <u>Absence of Manipulation</u>. The Company has not, and to the knowledge of the Company no one acting on its behalf has, taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Purchased Shares.

(ff)    <u>Directors' and Officers' Insurance</u>.  The Company (i) maintains directors' and officers' liability insurance and fiduciary liability insurance with, to the knowledge of the Company, financially sound and reputable insurance companies with benefits and levels of coverage that have been Previously Disclosed, (ii) has timely paid all premiums on such policies and (iii) there has been no lapse in coverage during the term of such policies.

(gg)    <u>Shell Company Status</u>.  The Company is not, and has never been, an issuer identified in Rule 144(i)(1).

(hh)    <u>No Other Investor Representations and Warranties</u>.  The Company has not received, and is not relying on, any representations or warranties, written or oral or express or implied, of any nature whatsoever, from the Investor or any other person other in connection with the execution and delivery of this Agreement than as specifically set forth in <u>Section 2.3</u>.

24

2.3    Representations and Warranties of the Investor.  The Investor hereby represents and warrants as of the date of this Agreement and as of the Closing (except to the extent made only as of a specified date, in which case as of such date) to the Company that:

(a)    Organization and Authority.  The Investor is duly organized and validly existing under the laws of the jurisdiction of its organization, is duly qualified to do business and is in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified, and has corporate power and authority to own its properties and assets and to carry on its business as it is now being conducted.

(b)    Authorization.

(1)    The Investor has the requisite corporate, partnership, limited liability company or other power and authority to enter into this Agreement and to carry out its obligations hereunder.  The execution, delivery and performance of this Agreement by the Investor and the consummation of the transactions contemplated hereby have been duly authorized by the Investor's board of directors or directors, general partner , managing members or other authorized persons, as the case may be (if such authorization is required).  This Agreement has been duly and validly executed and delivered by the Investor and, assuming due authorization, execution and delivery of this Agreement by the Company, is a valid and binding obligation of the Investor enforceable against the Investor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganizations, fraudulent transfer or similar laws relating to or affecting creditors generally or by general equitable principles (whether applied in equity or at law).  No other corporate, partnership, limited liability company or other proceedings are necessary for the execution and delivery by the Investor of this Agreement, the performance by the Investor of its obligations hereunder or the consummation by the Investor of the transactions contemplated hereby.

(2)    Neither the execution, delivery and performance by the Investor of this Agreement, nor the consummation of the transactions contemplated hereby, nor compliance by the Investor with any of the provisions of any of the foregoing, will (A) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any Lien, upon any of the properties or assets of the Investor under any of the terms, conditions or provisions of (i) its certificate of limited partnership or partnership agreement or similar government documents or (ii) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Investor is a party or by which it may be bound, or to which the Investor or any of the properties or assets of the Investor may be subject, or (B) subject to compliance with the statutes and regulations referred to in the next paragraph, and assuming the accuracy of the representations and warranties of the Company and performance of the covenants and agreements of the Company contained herein, violate in any material respect any ordinance, permit, concession, grant, franchise, law, statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to the Investor or any of its properties, except in the case of clause

25

(A)(ii) for such violations, conflicts and breaches that would not have a material and adverse effect on the ability of the Investor to consummate the transactions contemplated by this Agreement in a timely manner.

(3)     Other than (i) passivity or anti-association commitments that may be required by the Federal Reserve and (ii) the securities or blue sky laws of the various states and filings, notices, approvals or clearances required under federal or state banking laws, and assuming the accuracy of the representations and warranties of the Company and the performance of the covenants and agreements of the Company contained herein, no notice to, registration, declaration or filing with, exemption or review by, or authorization, order, consent or approval of, any Governmental Entity, or expiration or termination of any statutory waiting period, is necessary for the consummation by the Investor of the transactions contemplated by this Agreement.

(c)     <u>Purchase for Investment</u>.

(1)     The acquisition of the Purchased Shares by the Investor is for the Investor's own account, is for investment purposes only, and is not with a view to, nor for offer or sale for the Company in connection with, the distribution of any of the Purchased Shares.  The Investor is not participating and does not have a participation in any such distribution or the underwriting of any such distribution.  The Investor has no present intention of selling or otherwise disposing of any of the Purchased Shares other than in accordance with applicable law.

(2)     The Investor is an "accredited investor" as that term is defined in Rule 501 promulgated under the Securities Act.  The Investor has such knowledge and experience in financial and business matters as to be capable of evaluating the risks and merits of this investment.

(3)     The Investor is able to bear the economic risk of an investment in the Purchased Shares.  The Investor has conducted its own investigation of the Company, the Company Subsidiaries and the terms of the Purchased Shares.  The Investor has received all the information it considers necessary or appropriate for deciding whether to acquire the Purchased Shares.  The Investor has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Purchased Shares and the business and financial condition of the Company and to obtain additional information (to the extent the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to it or to which it had access.  The Investor has not received, and is not relying on, any representations or warranties, written or oral or express or implied, of any nature whatsoever, from the Company or any other person other than as specifically set forth in this Agreement.  Notwithstanding the foregoing, nothing herein shall limit the Investor's rights with respect to fraud or intentional misrepresentation by the Company in connection with the Transactions or be deemed to be a waiver of any such rights.

26

(4)     The Investor acknowledges that the Purchased Shares have not been and will not be, registered under the Securities Act or the securities laws of any state and therefore cannot be sold unless such Purchased Shares subsequently are registered under the Securities Act and any applicable state securities laws or exemptions from registrations thereunder are available.

(5)     The Investor acknowledges that the Company is relying on the foregoing representations and warranties for the purpose of compliance with applicable federal and state securities laws.

(d)     Financial Capability.  At Closing, the Investor will have available funds necessary to consummate the Closing on the terms and conditions contemplated by this Agreement and has the ability to bear the economic risks of its prospective investment in the Purchased Shares and can afford the complete loss of such investment.

(e)     Investment Decision.

(1)     The Investor has independently evaluated the merits of its decision to purchase the Purchased Shares pursuant to this Agreement, and the Investor confirms that it has not relied on the advice of any other person's business and/or legal counsel in making such decision.  The Investor understands that nothing in this Agreement or any other materials presented by or on behalf of the Company to the Investor in connection with the purchase of the Purchased Shares constitutes legal, tax or investment advice. The Investor has consulted such legal, tax and investment advisors as it, in its sole discretion, has deemed necessary or appropriate in connection with its purchase of the Purchased Shares.  The Investor understands that the Placement Agent has acted solely as the agent of the Company in this placement of the Purchased Shares and the Investor has not relied on the business or legal advice of the Placement Agent or any of its agents, counsel or Affiliates in making its investment decision hereunder, and confirms that none of such persons has made any representations or warranties to the Investor in connection with the transactions contemplated by this Agreement.

(2)     The Investor hereby declares and represents that the satisfaction in full of the Company's obligations under the Credit Agreement and the elimination of the TARP Preferred Stock and the TARP Warrant are critical and integral elements of the transactions contemplated by this Agreement and that, absent the approval and consummation of the satisfaction in full of the Company's obligations under the Credit Agreement and the elimination of the TARP Preferred Stock and the TARP Warrant under the Plan of Reorganization, the Investor would not be willing to enter into this Agreement and consummate the Investment.

(f)     Independence.  The Investor or, in the event that there are investors in the Other Private Placements or the Secondary Treasury Sales that share a common discretionary investment advisor or investment manager with the Investor, such duly appointed investment advisor or investment manager of the Investor acting in its capacity as investment advisor or investment manager of the Investor (the "**Investment Manager**") (A) reached its decision to invest in the Company independently from any investor in the Other Private Placements or the

27

Secondary Treasury Sales, (B) has not entered into any agreement or understanding with any
investor in the Other Private Placements or the Secondary Treasury Sales to act in concert for the
purpose of exercising a controlling influence over the Company or any Company Subsidiary,
including any agreements or understandings regarding the voting or transfer of shares of the
Company, (C) has not shared due diligence materials prepared by (x) such Investor or any of its
advisors or representatives or (y) the Investment Manager, as applicable, with respect to the
Company or any Company Subsidiary with any investor in the Other Private Placements or
Secondary Treasury Sales (it being understood that the Investment Manager advising or sharing
any due diligence materials prepared by it with the investors in the Other Private Placements
who share the Investment Manager with the Investor shall not be considered sharing materials in
violation of this clause (C), even if such investors receive the identical advice or materials from
the Investment Manager as the Investor), (D) has not been induced by, nor has induced, any
investor in the Other Private Placements or the Secondary Treasury Sales, to enter into the
transactions contemplated by this Agreement or the Other Private Placements or the Secondary
Treasury Sales, (E) has not entered into any agreement with respect to the Primary Investment
Transactions or the Secondary Treasury Sales other than this Agreement, (F) acknowledges that
the right to an Investor Designated Director (as defined below) is being provided to certain
investors in the Primary Investment Transactions to permit such person to monitor and protect its
economic interest in the Company following the Closing and that the composition of the Board
of Directors is generally designed to be commensurate with the ownership percentage held by
such persons relative to the other Investors in the Primary Investment Transactions and the
Secondary Treasury Sales, subject to applicable regulatory limitations and requirements for
passive, non-controlling investors, and (G) reached its decision to invest in the Company without
regard to the identity of any particular investor in the Primary Investment Transactions that will
have the right to nominate an Investor Designated Director.  Neither the Investor nor any of its
Affiliates presently holds or owns any capital stock of the Company and, upon consummation of
the Transactions, the Investor and its Affiliates will be treated as owning only the Purchased
Shares for purposes of Section 382 of the Code. No partner, member or other equityholder in the
Investor will indirectly own a five percent (5%) or greater interest in the Company solely as a
result of such person's interest in the Investor; provided, however, that the foregoing
representation shall not be deemed breached if such person will indirectly own a five percent
(5%) or greater interest in the Company solely as a result of such person's interest in the Investor
if (i) such person has no other direct or indirect interest in the Company and (ii) such person has
no partner, member or other equityholder of its own that will indirectly own a five percent (5%)
or greater interest in the Company as a result of such person's interest in it.  The Investor agreed
to enter into this Agreement based, in part, on its expectation, following its discussions with the
Placement Agent and the Company, that the Primary Investment Transactions and the Secondary
Treasury Sales would be at least adequately subscribed. Such decisions to enter into this
Agreement were not based on the identity of any other investor or potential investor (including
whether management of the Company would or would not invest) in the Primary Investment
Transactions or the Secondary Treasury Sales.

   (g) Knowledge as to Required Approvals.  As of the date of this Agreement,
the Investor has no knowledge of any reason relating to the Investor or any of its Affiliates why
the Required Approvals will not be obtained without the imposition of any Burdensome
Condition.

28

(h)    <u>Brokers and Finders</u>.  Neither the Investor nor any of its respective officers, directors or employees has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, and no broker or finder has acted directly or indirectly for the Investor in connection with the transactions contemplated by this Agreement.

## ARTICLE III

## <u>COVENANTS</u>

3.1    <u>Filings; Other Actions</u>.  The Investor, on the one hand, and the Company, on the other hand, will cooperate and consult with the other and use reasonable best efforts to prepare and file all necessary and customary documentation, to effect all necessary and customary applications, notices, petitions, filings and other documents, and to obtain all necessary and customary permits, consents, orders, approvals and authorizations of, or exemptions from, all Governmental Entities (and, solely with respect to the Company, the Bankruptcy Court) and third parties, (i) necessary or advisable to consummate the transactions contemplated by this Agreement (including all transactions that are conditions to Closing hereunder) or the Other Private Placements, and to perform the covenants contemplated by this Agreement to be performed by it and (ii) with respect to the Investor, to the extent typically provided by the Investor to such third parties or Governmental Entities, as applicable, under the Investor's policies consistently applied and subject to such confidentiality requests as the Investor may reasonably seek.  Each of the parties hereto shall execute and deliver both before and after the Closing such further certificates, agreements and other documents and take such other actions as the other parties may reasonably request to consummate or implement such transactions or to evidence such events or matters, subject, in each case, to clauses (i) and (ii) of the first sentence of this <u>Section 3.1</u>.  The Investor and the Company will each use its reasonable best efforts to promptly obtain or submit, and the Company and the Investor will cooperate as may reasonably be requested by the Investor or the Company, as the case may be, to help the Investor and the Company promptly obtain or submit, as the case may be, as promptly as practicable, the approvals and authorizations of, any additional filings and registrations with, and any additional notifications to, all notices to and, to the extent required by laws, rules, regulations, consents, approvals or exemptions from Governmental Entities (and, solely with respect to the Company, the Bankruptcy Court) or third parties, subject, in each case, to clauses (i) and (ii) of the first sentence of this <u>Section 3.1</u>.  In furtherance of the foregoing, if required, the Investor and the Company shall make all necessary applications, notices, petitions, filings and other documents in connection with the Required Approvals required to be obtained by it, not later than five (5) business days following the date of this Agreement, and the Investor and the Company shall use, and shall cause their respective Affiliates to use, reasonable best efforts to, as promptly as possible, respond fully to all requests for additional information from the Federal Reserve or the OCC.  The Investor and the Company will each have the right to review in advance, and to the extent practicable, each will consult with the other, in each case subject to applicable laws relating to the exchange of information and confidential information related to the Investor or the Company, all the information (other than confidential information) relating to such other party, and any of their respective Affiliates, which appears in any filing made with, or written materials submitted to, any third party or any Governmental Entity (other than public filings with the Bankruptcy Court) in connection with the transactions contemplated by this

29

Agreement; provided, however, that the Company shall not allow any other investor in the Other Private Placements to review any such information relating to the Investor.  In exercising the foregoing right, each of the parties hereto agrees to act reasonably and as promptly as practicable.  Each party hereto agrees to keep the other party apprised of the status of matters relating to completion of the transactions contemplated hereby.  The Investor and the Company shall promptly furnish each other to the extent permitted by applicable laws with copies of written communications received by them or their Affiliates from, or delivered by any of the foregoing to, any Governmental Entity (other than public filings with the Bankruptcy Court) in respect of the transactions contemplated by this Agreement; provided that the party delivering any such document may redact any confidential information contained therein.  Notwithstanding anything to the contrary herein, nothing contained in this Agreement shall require the Investor or any of its Affiliates to (i) take any action that would result in the Investor or any of its Affiliates being deemed to control the Company or the Bank for purposes of the Change in Bank Control Act of 1978, the HOLA or the cross-guaranty liability provisions of the FDI Act, or that would require any such entity to register as a savings and loan holding company, (ii) take or refrain from taking or agree to take or refrain from taking any action or suffer to exist any condition, limitation, restriction or requirement that would result in a Burdensome Condition or (iii) provide to the Company any of its, its Affiliates', its investment advisor's or its or their control persons' or equity holders' nonpublic, proprietary, personal or otherwise confidential information including the identities of limited partners, shareholders or members of the Investor or its Affiliates or their investment advisors.  So long as the Investor holds any securities of the Company, the Company will not, without the consent of the Investor, take any action, directly or indirectly through its subsidiaries or otherwise, that the Board of Directors believes in good faith would reasonably be expected to cause the Investor to be subject to transfer restrictions or other covenants of the FDIC Statement of Policy on Qualifications for Failed Bank Acquisitions as in effect at the time of taking such action or thereunder.

> 3.2     Access, Information and Confidentiality.

(a)     From the date of this Agreement, until the date when the Investor no longer beneficially owns at least fifty percent (50%) or more of all of the Purchased Shares (a "**Qualifying Ownership Interest**"), subject to applicable law or regulatory requirements, the Company will use reasonable efforts to afford the Investor and its representatives (including employees of the Investor, and counsel, accountants, investment advisors and other professionals retained by the Investor) such access during normal business hours to its and the Company Subsidiaries' books, records, properties and personnel and to such other information as the Investor may reasonably request.

(b)     Each party to this Agreement will hold, and will cause its respective subsidiaries and their directors, officers, employees, agents, consultants, and advisors to hold, in strict confidence, unless disclosure to a Governmental Entity (and, solely with respect to the Company, the Bankruptcy Court) is necessary or appropriate in connection with any necessary regulatory approval or unless compelled to disclose by judicial or administrative process or by other requirement of law or the applicable requirements of any Governmental Entity (and, solely with respect to the Company, the Bankruptcy Court), all nonpublic records, books, contracts, instruments, computer data and other data and information (collectively, "**Information**") concerning the other party hereto furnished to it by such other party or its representatives

pursuant to this Agreement (except to the extent that such Information can be shown to have been (1) previously known by such party on a nonconfidential basis, (2) in the public domain through no fault of such party, or (3) later lawfully acquired from other sources by the party to which it was furnished), and neither party hereto shall release or disclose such Information to any other person, except its auditors, attorneys, financial advisors, other consultants, and advisors and, to the extent permitted above, to bank regulatory authorities.  Prior to any disclosure of Information permitted by the prior sentence, the party proposing to disclose such Information shall, to the extent legally permissible, provide notice to the other party so that the other party may, at its own expense, seek an protective order or other appropriate remedy and/or waive compliance with the provisions of this Section 3.2(b).  If such protective order or other remedy is denied, the party proposing to disclose such Information shall (x) furnish only that portion of the Information that, based upon the advice of counsel, is necessary to be disclosed in connection with such necessary regulatory approval or is compelled to be disclosed by such judicial or administrative process or by such other requirement of law or such applicable requirements and (y) use its reasonable best efforts to obtain assurances that confidential treatment will be accorded to the Information.

3.3    Reasonable Best Efforts.  Subject to the other provisions of this Agreement, each of the Company and the Investor agree to use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including using reasonable best efforts to accomplish the following:  (a) the taking of all reasonable acts necessary to cause the conditions to Closing to be satisfied; (b) the making of all necessary registrations and filings and the taking of all reasonable steps necessary to obtain an approval, order or waiver from, or to avoid an action or proceeding by any Governmental Entity (and, solely with respect to the Company, the Bankruptcy Court) or third party, and the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Entities (and, solely with respect to the Company, the Bankruptcy Court) or third parties, including the Required Approvals and, solely with respect to the Company, the confirmation of the Plan of Reorganization by the Bankruptcy Court; (c) solely with respect to the Company, the TARP Exchange; (d) solely with respect to the Company, the Senior Debt Settlement; (e) solely with respect to the Company, the Debt Issuance; (f) solely with respect to the Company, the confirmation by the Bankruptcy Court of the Plan of Reorganization; (g) solely with respect to the Company, the Delaware Conversion and the Amended Charter; (h) solely with respect to the Company, file the Bankruptcy Case with the Bankruptcy Court on the Petition Date; (i) solely with respect to the Company, assume this Agreement and the stock purchase agreements in the Other Private Placements under Section 365 of the Bankruptcy Code in the Bankruptcy Case at the confirmation of the Plan of Reorganization; and (j) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement.

31

## ARTICLE IV

## ADDITIONAL AGREEMENTS

4.1     <u>Governance Matters</u>.  Subject to the satisfaction of all legal, regulatory and governance requirements, immediately or as promptly as practicable following the Closing, the Company shall cause the Board of Directors to be reconstituted to consist of eight (8) members as follows: Chris Bauer, one representative designated by an investor in the Other Private Placements, one representative designated by another investor in the Other Private Placements, one representative designated by a third investor in the Other Private Placements, and four (4) independent directors reasonably acceptable to the Company.

4.2     <u>Transfers; Legend; Form D</u>.

(a)     The Investor acknowledges that the Purchased Shares have not been, and, subject to <u>Section 4.5</u>, will not be, registered under the Securities Act or under any state securities laws and agrees that it will not sell or otherwise dispose of any of the Purchased Shares, except in compliance with the registration requirements or exemption provisions of the Securities Act and any other applicable securities laws.  Any attempt to sell or otherwise dispose of any Purchased Shares not in compliance with this Agreement shall be null and void *ab initio*, and the Company shall not, and shall cause any transfer agent not to, give any effect in the Company's stock records to such attempted sale or disposition.

(b)     The Investor agrees that all certificates or other instruments representing the Purchased Shares subject to this Agreement will bear a legend substantially to the following effect:

"(1) THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

(2) THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO TRANSFER AND OTHER RESTRICTIONS SET FORTH IN A STOCK PURCHASE AGREEMENT, DATED AS OF JULY [●], 2013, COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE ISSUER."

(c)     Upon request of the Investor, upon receipt by the Company of an opinion of counsel reasonably satisfactory to the Company to the effect that such legend is no longer required under the Securities Act or applicable state laws, as the case may be, the Company shall promptly cause the legend to be removed from any certificate for any Purchased Shares.

(d)     The Company agrees to timely file a Form D with respect to the Purchased Shares as required under Regulation D.  The Company, on or before the Closing Date, shall take

32

such action as the Company shall reasonably determine is necessary in order to obtain an exemption for or to qualify the Common Stock for sale to the Investor pursuant to this Agreement under applicable securities or blue sky laws of the states of the United States (or to obtain an exemption from such qualification).  The Company shall make all filings and reports relating to the offer and sale of the Purchased Shares required under applicable securities or blue sky laws of the states of the United States following the Closing Date.

4.3     Indemnity.

(a)     From and after the Closing, the Company agrees to indemnify and hold harmless the Investor and its Affiliates and each of their respective officers, directors, direct or indirect partners or members, employees, agents and investment advisors, and each person who controls the Investor within the meaning of the Exchange Act and the rules and regulations promulgated thereunder, to the fullest extent lawful, from and against any and all actions, suits, claims, proceedings, costs, losses, liabilities, damages, expenses (including reasonable attorneys' fees and disbursements), amounts paid in settlement and other costs (collectively, "**Losses**") arising out of or resulting from (1) any inaccuracy in or breach of any of the Company's representations or warranties in Section 2.2 of this Agreement, (2) the Company's material breach of any agreements or covenants made by the Company in this Agreement or (3) any Losses arising out of or resulting from any legal, administrative or other proceedings instituted by any Governmental Entity, stockholder of the Company or any other person (other than the Investor and its Affiliates and the Company and the Company Subsidiaries) arising out of the transactions contemplated by this Agreement (other than any Losses attributable to the acts, errors or omissions on the part of the Investor, but not including the transactions contemplated hereby).

(b)     A party entitled to indemnification hereunder (each, an "**Indemnified Party**") shall give written notice to the party indemnifying it (the "**Indemnifying Party**") of any claim with respect to which it seeks indemnification promptly (and in no event more than thirty (30) days) after the discovery by such Indemnified Party of any matters giving rise to a claim for indemnification; provided that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 4.3 unless and to the extent that the Indemnifying Party shall have been materially and adversely prejudiced by the failure of such Indemnified Party to so notify such party.  Such notice shall describe in reasonable detail such claim to the extent known by the Indemnified Party.  In case any such action, suit, claim or proceeding is brought against an Indemnified Party, the Indemnified Party shall be entitled to hire, at the cost and expense of the Indemnifying Party, counsel and conduct the defense thereof; provided, however, that the Indemnifying Party shall be entitled to assume and conduct the defense thereof, unless the counsel to the Indemnified Party advises such Indemnifying Party in writing that such claim involves a conflict of interest (other than one of a monetary nature) that would make it inappropriate for the same counsel to represent both the Indemnifying Party and the Indemnified Party, in which case the Indemnified Party shall be entitled to retain its own counsel at the cost and expense of the Indemnifying Party (except that the Indemnifying Party shall only be liable for the legal fees and expenses of one law firm for all Indemnified Parties, taken together with respect to any single action or group of related actions). If the Indemnifying Party assumes the defense of any claim, all Indemnified Parties shall thereafter deliver to the Indemnifying Party copies of all notices and documents (including court

papers) received by the Indemnified Party relating to the claim, and each Indemnified Party shall cooperate in the defense or prosecution of such claim. Such cooperation shall include the retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information that are reasonably relevant to such claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. The Indemnifying Party shall not be liable for any settlement of any action, suit, claim or proceeding effected without its written consent; provided, however, that the Indemnifying Party shall not unreasonably withhold or delay its consent. The Indemnifying Party further agrees that it will not, without the Indemnified Party's prior written consent, settle or compromise any claim or consent to entry of any judgment in respect thereof in any pending or threatened action, suit, claim or proceeding in respect of which indemnification has been sought hereunder unless such settlement or compromise (A) includes an unconditional release of such Indemnified Party from all liability arising out of such action, suit, claim or proceeding, (B) provides solely for the payment of money damages and not any injunctive or equitable relief or criminal penalties and (C) does not create any financial or other obligation on the part of an Indemnified Party which would not be indemnified in full by the Indemnifying Party.

(c)      For purposes of the indemnity contained in Sections 4.3(a)(1), all qualifications and limitations set forth in the parties' representations and warranties as to "materiality," "Material Adverse Effect" and words of similar import, shall be disregarded in determining whether there shall have been any inaccuracy in or breach of any representations and warranties in this Agreement.

(d)      The Company shall not be required to indemnify the Indemnified Parties pursuant to Section 4.3(a)(1) (i) with respect to any claim for indemnification if the amount of Losses with respect to such claim are less than $25,000 (any claim involving Losses less than such amount being referred to as a "**De Minimis Claim**") and (ii) unless and until the aggregate amount of all Losses incurred with respect to all claims (other than De Minimis Claims) pursuant to Section 4.3(a)(1) exceed an amount equal to the product of (x) 2.85%, *multiplied by* (y) the Purchase Price (the "**Threshold Amount**"), in which event the Company shall be responsible for all Losses incurred by the Indemnified Party (without regard to the Threshold Amount). The cumulative indemnification obligations of the Company hereunder shall in no event exceed the Purchase Price.

(e)      In the event of any transfer of the Purchased Shares to a third party that is not an Affiliate of the Investor, the Company shall have no obligations under this Section 4.3 to such transferee. The indemnity provided for in this Section 4.3 shall be the sole and exclusive monetary remedy of Indemnified Parties after the Closing for any inaccuracy of any of the representations and warranties contained in Sections 2.2 and 2.3 of this Agreement or any other breach of any covenant or agreement contained in this Agreement; provided that nothing herein shall limit in any way any such party's remedies in respect of fraud, intentional misrepresentation or omission or intentional misconduct by the other party in connection with the transactions contemplated hereby. No party to this Agreement (or any of its Affiliates) shall, in any event, be liable or otherwise responsible to any other party (or any of its Affiliates) for any punitive damages of such other party (or any of its Affiliates) arising out of or relating to this Agreement or the performance or breach hereof.

34

(f)      Any indemnification payments pursuant to this <u>Section 4.3</u> shall be treated as an adjustment to the Purchase Price for the Purchased Shares for U.S. federal income and applicable state and local Tax purposes, unless a different treatment is required by applicable law.

4.4      <u>Preemptive Rights</u>.

(a)      Following the Closing, for so long as the Investor has a Qualifying Ownership Interest, if the Company proposes to issue (a "**New Issuance**") any equity (including shares of Common Stock or shares of Company Preferred Stock), or any securities, options or debt that are convertible or exchangeable into equity or that include an equity component (any such security, a "**New Security**"), the Company shall provide written notice of such proposed New Issuance to the Investor no later than fifteen (15) business days prior to the anticipated issuance date (the "**Preemptive Rights Notice**").  The Investor shall have the right to purchase for cash, at the price and on the same terms and conditions and at the same time as the New Issuance, such number of New Securities as are required to enable it to maintain its proportionate Common Stock-equivalent interest in the Company immediately prior to any such issuance of New Securities (the "**Preemptive Amount**").  The Preemptive Rights Notice shall set forth all material terms and conditions of the New Issuance, including the number New Securities proposed to be issued, the issue price and the maximum number of New Securities that the Investor may purchase in the New Issuance pursuant to the immediately preceding sentence.

(b)      The Investor may elect to participate in the New Issuance to the extent described in <u>Section 4.4(a)</u> by delivering an irrevocable written notice to the Company by the date specified by the Company in the Preemptive Rights Notice (which shall be no later than three (3) business days before the anticipated date of the New Issuance), setting forth the number of shares the Investor wishes to purchase in the New Issuance up to its Preemptive Amount; <u>provided</u> that in order to exercise rights under this <u>Section 4.4</u> ("**Preemptive Rights**"), the Investor must execute all customary transaction documentation in connection with such New Issuance on the same terms as any other participant in the New Issuance; <u>provided</u>, <u>further</u>, that in the event that the Company is issuing more than one type or class of New Securities in connection with such New Issuance, the Investor participating in such issuance shall be required to acquire the same percentage of all such types and classes of securities.

(c)      The closing of the acceptances of the Preemptive Rights shall take place at the same time as the closing(s) under definitive agreements with other participants in the New Issuance, which in any event shall occur within ninety (90) days after the anticipated date of the New Issuance as set forth in the Preemptive Rights Notice.  In the event that the New Issuance is not consummated within the time frame described above, the Company's right to consummate such New Issuance shall expire and the Company shall be required to comply with the procedures set forth in this <u>Section 4.4</u> prior to any subsequent New Issuance.  At the consummation of any New Issuance, the Company shall issue certificates to the Investor promptly following payment by the Investor of the purchase price for such exercise in accordance with the terms and conditions as specified in the Preemptive Rights Notice.

(d)      Notwithstanding anything to the contrary herein, the Investor shall not have any Preemptive Rights in connection with (i) any issuance of New Securities to management, consultants, employees, officers or directors of the Company pursuant to

35

management or employee incentive programs or plans approved by the Board of Directors (including any such programs or plans in existence on the date hereof), (ii) any issuance, delivery or sale of New Securities by the Company to any person as consideration in connection with (but not in connection with raising capital to fund) (1) an acquisition or strategic business combination approved by the Board of Directors or (2) an investment by the Company approved by the Board of Directors in any party which is not prior to such transaction an Affiliate of the Company (whether by merger, consolidation, stock swap, sale of assets or securities, or otherwise), (iii) any issuance, delivery or sale of New Securities in any registered public offering or (iv) any issuance of New Securities in connection with any stock split, stock dividend paid on a proportionate basis to all holders of the affected class of capital stock or recapitalization approved by the Board of Directors (any such issuance, an "**Exempted Issuance**").

(e)     Notwithstanding the foregoing provisions of this Section 4.4, if a majority of the directors of the Board of Directors determines that the Company must issue equity or debt securities on an expedited basis, then the Company may consummate the proposed issuance or sale of such securities ("**Expedited Issuance**") and then comply with the provisions of this Section 4.4 provided that (i) the purchaser(s) of such New Securities has consented in writing to the issuance of additional New Securities in accordance with the provisions of this Section 4.4, and (ii) the sale of any such additional New Securities under this Section 4.4(e) to the Investor and certain other investors in the Other Private Placements pursuant to this Section 4.4 and similar provisions in the other stock purchase agreements in the Other Private Placements shall be consummated as promptly as is practicable but in any event no later than ninety (90) days subsequent to the date on which the Company consummates the Expedited Issuance under this Section 4.4(e).  Notwithstanding anything to the contrary herein, the consent of the purchasers of such New Securities shall not be required in connection with any Expedited Issuance undertaken at the written direction of the applicable federal regulator of the Company or the Bank.

(f)     In addition, the Investor shall not have any Preemptive Rights in connection with any issuance of New Securities to the extent that a majority of the Board of Directors determines that such issuance would materially increase the risk of or cause an "ownership change" within the meaning of Section 382 of the Code.

4.5     Registration Rights.

(a)     Registration.

(1)     Subject to the terms and conditions of this Agreement, the Company covenants and agrees that as promptly as practicable after the Closing Date (and in any event, no later than the date that is ninety (90) days after the Closing Date), (i) the Company shall have prepared and filed with the SEC one or more Shelf Registration Statements on Form S-1 covering the resale of Registrable Securities and the Company shall use reasonable best efforts to cause such Shelf Registration Statement to be declared or become effective and to keep such Shelf Registration Statement continuously effective and in compliance with the Securities Act and usable for resale of such Registrable Securities for a period from the date of its initial effectiveness until the time as there are no such Registrable Securities remaining (including by refiling such Shelf Registration Statement (or a new Shelf Registration Statement) if the initial Shelf Registration

36

Statement expires) and (ii) the Company shall register the Registrable Securities on Form S-3 promptly after such form is available.

(2)     Any registration pursuant to this Section 4.5(a) shall be effected by means of a shelf registration under the Securities Act (a "**Shelf Registration Statement**") in accordance with the methods and distribution set forth in the Shelf Registration Statement and Rule 415.  If the Investor or any other holder of Registrable Securities to whom the registration rights conferred by this Agreement have been transferred in compliance with this Agreement intends to distribute any Registrable Securities by means of an underwritten offering it shall promptly so advise the Company and the Company shall take all reasonable steps to facilitate such distribution, including the actions required pursuant to Section 4.5(c).  The lead underwriters in any such distribution shall be selected by the holders of a majority of the Registrable Securities to be distributed hereunder (provided that such lead underwriters shall be reasonably acceptable to the Company).

(3)     The Company shall not be required to effect a registration (including a resale of Registrable Securities from an effective Shelf Registration Statement):

(i)     with respect to securities that are not Registrable Securities or with respect to Registrable Securities that cannot be sold under a registration statement as a result of the transfer restrictions set forth herein;

(ii)     during any Scheduled Black-out Periods, with respect to any resale of Registrable Securities from an effective Shelf Registration Statement by the Investor only if the Investor, at such time, has contractually designated (1) an individual to serve as a member of the Board of Directors (an "**Investor Designated Director**"), and such Investor Designated Director has been elected or appointed to the Board of Directors, or (2) an individual to attend meetings of the Board of Directors, the Bank Board or any committees thereof as a non-voting observer  (an "**Observer**"); or

(iii)     if the Company has notified the Investor and all other Holders that in the good faith judgment of the Board of Directors, it would be materially detrimental to the Company or its security holders for such registration to be effected at such time, in which event the Company shall have the right to defer such registration for a period of not more than forty five (45) days after receipt of the request of the Investor or any other Holder; provided that such right to delay a registration pursuant to this clause (iii) shall be exercised by the Company (x) only if the Company has generally exercised (or is concurrently exercising) similar black-out rights (if any) against holders of similar securities that have registration rights and (y) not more than two times in any twelve (12)-month period and not more than ninety (90) days in the aggregate in any twelve (12)-month period.

The Company shall provide the Investor written notice of any Scheduled Black-out Period, if applicable to such Investor, no later than five (5) business days prior to the commencement of such Scheduled Black-out Period.

(4)     If during any period when the Shelf Registration Statement is not effective or available, the Company proposes to register any of its securities, other than a registration pursuant to Section 4.5(a)(1) or a Special Registration, and the registration form to be filed may be used for the registration or qualification for distribution of Registrable Securities, the Company shall give prompt written notice to the Investor and all other Holders of its intention to effect such a registration (but in no event less than ten (10) business days prior to the anticipated filing date) and shall include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten (10) business days after the date of the Company's notice (a "**Piggyback Registration**").  Any such person that has made such a written request may withdraw its Registrable Securities from such Piggyback Registration by giving written notice to the Company and the managing underwriter, if any, on or before the fifth (5th)  business day prior to the planned effective date of such Piggyback Registration.  The Company may terminate or withdraw any registration under this Section  prior to the effectiveness of such registration, whether or not the Investor or any other Holders have elected to include Registrable Securities in such registration.

(5)     If the registration referred to in Section 4.5(a)(4) is proposed to be underwritten, the Company shall so advise the Investor and all other Holders as a part of the written notice given pursuant to Section 4.5(a)(4).  In such event, the right of the Investor and all other Holders to registration pursuant to this Section 4.5(a) shall be conditioned upon such persons' participation in such underwriting and the inclusion of such person's Registrable Securities in the underwriting, and each such person shall (together with the Company and the other persons distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company.  If any participating person disapproves of the terms of the underwriting, such person may elect to withdraw therefrom by written notice to the Company, the managing underwriter and the Investor.

(6)     Except for the registration rights granted to certain other investors in the Other Private Placements, the Company represents and warrants that it has not granted to any holder of its securities and agrees that it shall not grant "piggyback" registration rights to one or more third parties to include their securities in the Shelf Registration Statement or in an underwritten offering under the Shelf Registration Statement pursuant to Section 4.5(a)(2).  If (x) the Company grants "piggyback" registration rights to certain other investors in the Other Private Placements to include their securities in an underwritten offering under the Shelf Registration Statement pursuant to Section 4.5(a)(2) or (y) a Piggyback Registration under Section 4.5(a)(4) relates to an underwritten primary offering on behalf of the Company, and in either case the managing underwriters advise the Company that in their reasonable opinion the number of securities requested to be included in such offering exceeds the number which can be sold without adversely affecting the marketability of such offering (including an

38

adverse effect on the per share offering price), the Company shall include in such registration or prospectus only such number of securities that in the reasonable opinion of such underwriters can be sold without adversely affecting the marketability of the offering (including an adverse effect on the per share offering price), which securities shall be so included in the following order of priority:  (i) first, in the case of a Piggyback Registration under Section 4.5(a)(4), the securities the Company proposes to sell, (ii) second, Registrable Securities of the Investor and all other Holders who have requested registration of Registrable Securities pursuant to Sections 4.5(a)(2) or 4.5(a)(4) of this Agreement, as applicable, *pro rata* on the basis of the aggregate number of such securities or shares subject to such request and (iii) third, any other securities of the Company that have been requested to be so included, subject to the terms of this Agreement.

(b)      Expenses of Registration.  All Registration Expenses incurred in connection with any registration, qualification or compliance hereunder shall be borne by the Company.  Without limiting the foregoing, the Company shall bear its internal expenses (including all salaries and expenses of their officers and employees performing legal, accounting or other duties) and expenses of any person, including special experts, retained by the Company.  All Selling Expenses incurred in connection with any registrations hereunder shall be borne by the Holders selling in such registration *pro rata* on the basis of the aggregate number of securities or shares being sold.

(c)      Obligations of the Company.  The Company shall use its reasonable best efforts for so long as there are Registrable Securities outstanding, to take such actions as are under its control to remain a well-known seasoned issuer (as defined in Rule 405 under the Securities Act) if it becomes eligible for such status in the future and not become an ineligible issuer (as defined in Rule 405 under the Securities Act).  In addition, whenever required to effect the registration of any Registrable Securities or facilitate the distribution of Registrable Securities pursuant to an effective Shelf Registration Statement, the Company shall, as expeditiously as reasonably practicable:

(1)      By 9:30 a.m., New York City time on the first business day after the Effective Date of a Shelf Registration Statement, file a final prospectus with the SEC as required by Rule 424(b) under the Securities Act.

(2)      Provide to each Holder a copy of any disclosure regarding the plan of distribution or the selling Holder, in each case, with respect to such Holder, at least three (3) business days in advance of any filing with the SEC of any registration statement or any amendment or supplement thereto that amends such information.

(3)      Prepare and file with the SEC a prospectus supplement with respect to a proposed offering of Registrable Securities pursuant to an effective registration statement and, subject to this Section 4.5(c), keep such registration statement effective or such prospectus supplement current.

(4)      Prepare and file with the SEC such amendments and supplements to the applicable registration statement and the prospectus or prospectus supplement used

39

in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(5)    Furnish to the Holders and any underwriters such number of correct and complete copies of the applicable registration statement and each such amendment and supplement thereto (including in each case all exhibits) and of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned or to be distributed by them.

(6)    Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as shall be reasonably requested by the Holders or any managing underwriter(s), to keep such registration or qualification in effect for so long as such registration statement remains in effect, and to take any other action which may be reasonably necessary to enable such seller to consummate the disposition in such jurisdictions of the securities owned by such Holder; provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(7)    Notify each Holder of Registrable Securities at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the applicable prospectus, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing (which notice shall not contain any material non-public information).

(8)    Give written notice to the Holders:

(A)    when any registration statement filed pursuant to Section 4.5(a) or any amendment thereto has been filed with the SEC (except for any amendment effected by the filing of a document with the SEC pursuant to the Exchange Act) and when such registration statement or any post-effective amendment thereto has become effective;

(B)    of any request by the SEC for amendments or supplements to any registration statement or the prospectus included therein or for additional information;

(C)    of the issuance by the SEC of any stop order suspending the effectiveness of any registration statement or the initiation of any proceedings for that purpose;

(D)    of the receipt by the Company or its legal counsel of any notification with respect to the suspension of the

40

qualification of the Common Stock for sale in any
jurisdiction or the initiation or threatening of any
proceeding for such purpose;

(E)     of the happening of any event that requires the Company to
make changes in any effective registration statement or the
prospectus related to the registration statement in order to
make the statements therein not misleading (which notice
shall be accompanied by an instruction to suspend the use
of the prospectus until the requisite changes have been
made); and

(F)     if at any time the representations and warranties of the
Company contained in any underwriting agreement
contemplated by Section 4.5(c)(12) cease to be true and
correct, in each case which notice shall not contain any
material nonpublic information.

(9)     Use its reasonable best efforts to prevent the issuance or obtain the
withdrawal of any order suspending the effectiveness of any registration statement
referred to in Section 4.5(c)(8)(C) at the earliest practicable time.

(10)     Upon the occurrence of any event contemplated by Section
4.5(c)(7) or 4.5(c)(8)(E) and subject to the Company's rights under Section 4.5(d), the
Company shall promptly prepare a post-effective amendment to such registration
statement or a supplement to the related prospectus or file any other required document
so that, as thereafter delivered to the Holders and any underwriters, the prospectus shall
not contain an untrue statement of a material fact or omit to state any material fact
necessary to make the statements therein, in light of the circumstances under which they
were made, not misleading.

(11)     Use reasonable best efforts to procure the cooperation of the
Company's transfer agent in settling any offering or sale of Registrable Securities,
including with respect to the transfer of physical stock certificates into book-entry form
in accordance with any procedures reasonably requested by the Holders or any managing
underwriter(s).

(12)     If an underwritten offering is requested pursuant to Section
4.5(a)(2), enter into an underwriting agreement in customary form, scope and substance
and take all such other actions reasonably requested by the Holders of a majority of the
Registrable Securities being sold in connection therewith or by the managing
underwriter(s), if any, to expedite or facilitate the underwritten disposition of such
Registrable Securities, and in connection therewith in any underwritten offering
(including making members of management and executives of the Company available to
participate in "road shows," similar sales events and other marketing activities), (i) make
such representations and warranties to the Holders that are selling stockholders and the
managing underwriter(s), if any, with respect to the business of the Company and the

Company Subsidiaries, and the Shelf Registration Statement, prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in customary form, substance and scope, and, if true, confirm the same if and when requested, (ii) use its reasonable best efforts to furnish the underwriters with opinions of counsel to the Company, addressed to the managing underwriter(s), if any, covering the matters customarily covered in such opinions requested in underwritten offerings, (iii) use its reasonable best efforts to obtain "cold comfort" letters from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any business acquired by the Company for which financial statements and financial data are included in the Shelf Registration Statement) who have certified the financial statements included in such Shelf Registration Statement, addressed to each of the managing underwriter(s), if any, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters, (iv) if an underwriting agreement is entered into, the same shall contain indemnification provisions and procedures customary in underwritten offerings, and (v) deliver such documents and certificates as may be reasonably requested by the Holders of a majority of the Registrable Securities being sold in connection therewith, their counsel and the managing underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to clause (i) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Company.

(13)    Make available for inspection by a representative of Holders that are selling stockholders, the managing underwriter(s), if any, and any attorneys or accountants retained by such Holders or managing underwriter(s), at the offices where normally kept, during reasonable business hours, financial and other records, pertinent corporate documents and properties of the Company, and cause the officers, directors and employees of the Company to supply all information, in each case, reasonably requested by any such representative, managing underwriter(s), attorney or accountant in connection with such Shelf Registration Statement.

(14)    Cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed or, if no similar securities are then listed on any securities exchange, use its reasonable best efforts to cause all such Registrable Securities to be listed on the New York Stock Exchange or the NASDAQ, as determined by the Company, including, but not limited to, using commercially reasonable efforts to effect a reverse stock split (including any shareholder approvals in connection therewith), at a ratio sufficient to satisfy the minimum bid price requirements for listing the Common Stock on the New York Stock Exchange or the NASDAQ.

(15)    If requested by Holders of a majority of the Registrable Securities being registered and/or sold in connection therewith, or the managing underwriter(s), if any, promptly include in a prospectus supplement or amendment such information as the Holders of a majority of the Registrable Securities being registered and/or sold in connection therewith or managing underwriter(s), if any, may reasonably request in order to permit the intended method of distribution of such securities and make all required

42

filings of such prospectus supplement or such amendment as soon as practicable after the Company has received such request.

(16)    Timely provide to its security holders earning statements satisfying the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder.

(d)    Suspension of Sales.  During (i) any Scheduled Black-out Period (other than with respect to any resale of Registrable Securities from an effective Shelf Registration Statement if the Investor, at such time, does not have an Investor Designated Director or has not appointed an Observer) or (ii) upon receipt of written notice from the Company that a registration statement, prospectus or prospectus supplement contains or may contain an untrue statement of a material fact or omits or may omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that circumstances exist that make inadvisable use of such registration statement, prospectus or prospectus supplement, each Holder of Registrable Securities shall forthwith discontinue disposition of Registrable Securities pursuant to such registration statement until termination of such Scheduled Black-out Period (if applicable) or until such Holder has received copies of a supplemented or amended prospectus or prospectus supplement, or until such Holder is advised in writing by the Company that the use of the prospectus and, if applicable, prospectus supplement may be resumed, and, if so directed by the Company, such Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Holder's possession, of the prospectus and, if applicable, prospectus supplement covering such Registrable Securities current at the time of receipt of such notice.  The total number of days that any such suspension under clause (ii) of the foregoing may be in effect in any twelve (12)-month period shall not exceed ninety (90) days.

(e)    Termination of Registration Rights.  A Holder's registration rights as to any securities held by such Holder (and its Affiliates, partners, members and former members) shall not be available unless such securities are Registrable Securities.

(f)    Furnishing Information.

(1)    Neither the Investor nor any Holder shall use any free writing prospectus (as defined in Rule 405) in connection with the sale of Registrable Securities without the prior written consent of the Company.

(2)    It shall be a condition precedent to the obligations of the Company to take any action pursuant to Section 4.5(c) that the Investor and/or the selling Holders and the underwriters, if any, shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be required to effect the registered offering of their Registrable Securities.

(g)    Indemnification.

(1)    The Company agrees to indemnify each Holder and, if a Holder is a person other than an individual, such Holder's officers, directors, employees, agents, representatives, investment advisors and Affiliates, and each person, if any, that controls

43

a Holder within the meaning of the Securities Act (each, an "**Indemnitee**"), against any and all Losses, joint or several, arising out of or based upon any untrue statement or alleged untrue statement of material fact contained in any registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto or any documents incorporated therein by reference or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by the Company or authorized by it in writing for use by such Holder (or any amendment or supplement thereto); or any omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; <u>provided</u> that the Company shall not be liable to such Indemnitee in any such case to the extent that any such Losses arise out of or are based upon (i) an untrue statement or omission made in such registration statement, including any such preliminary prospectus or final prospectus contained therein or any such amendments or supplements thereto or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by the Company or authorized by it in writing for use by such Holder (or any amendment or supplement thereto), in reliance upon and in conformity with information regarding such Indemnitee or its plan of distribution or ownership interests which was furnished in writing to the Company by such Indemnitee expressly for use in connection with such registration statement, including any such preliminary prospectus or final prospectus contained therein or any such amendments or supplements thereto, or (ii) offers or sales effected by or on behalf such Indemnitee "by means of" (as defined in Rule 159A) a "free writing prospectus" (as defined in Rule 405) that was not authorized in writing by the Company.  In the event of any third party claim asserted against any Indemnitee, the procedures set forth in <u>Section 4.3(b)</u> shall apply to the defense of any such claim.

(2)     If the indemnification provided for in <u>Section 4.5(g)(1)</u> is unavailable to an Indemnitee with respect to any Losses or is insufficient to hold the Indemnitee harmless as contemplated therein, then the Company, in lieu of indemnifying such Indemnitee, shall contribute to the amount paid or payable by such Indemnitee as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitee, on the one hand, and the Company, on the other hand, in connection with the statements or omissions which resulted in such Losses as well as any other relevant equitable considerations.  The relative fault of the Company, on the one hand, and of the Indemnitee, on the other hand, shall be determined by reference to, among other factors, whether the untrue statement of a material fact or omission to state a material fact relates to information supplied by the Company or by the Indemnitee and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; the Company and each Holder agree that it would not be just and equitable if contribution pursuant to this <u>Section 4.5(g)(2)</u> were determined by *pro rata* allocation or by any other method of allocation that does not take account of the equitable considerations referred to in <u>Section 4.5(g)(1)</u>.  No Indemnitee guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from the Company if the Company was not guilty of such fraudulent misrepresentation.

44

(3)      The indemnity and contribution agreements contained in this Section 4.5(g) are in addition to any liability that the Company may have to the Indemnitees and are not in diminution or limitation of the indemnification provisions under Section 4.3 of this Agreement.

(h)      Assignment of Registration Rights.  The rights of the Investor to registration of Registrable Securities pursuant to Section 4.5(a) may be assigned by the Investor to a transferee or assignee of Registrable Securities to which (i) there is transferred to such transferee no less than twenty five percent (25%) of all Registrable Securities held by it and (ii) such Transfer is permitted under the terms hereof; provided, however, that the transferor shall, within ten (10) days after such transfer, furnish to the Company written notice of the name and address of such transferee or assignee and the number and type of Registrable Securities that are being assigned.

(i)      Holdback.  With respect to any underwritten offering of Registrable Securities by the Investor or other Holders pursuant to this Section 4.5, the Company agrees not to effect (other than pursuant to such registration or pursuant to a Special Registration) any public sale or distribution, or to file any Shelf Registration Statement (other than such registration or a Special Registration) covering any of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities, during the period not to exceed ten (10) days prior and sixty (60) days following the effective date of such offering or such longer period up to ninety (90) days as may be requested by the managing underwriter.  The Company also agrees to cause each of its directors and senior executive officers to execute and deliver customary lockup agreements in such form and for such time period up to ninety (90) days as may be requested by the managing underwriter.  "**Special Registration**" means the registration of (i) equity securities and/or options or other rights in respect thereof solely registered on Form S-4 or Form S-8 (or successor form) or (ii) shares of equity securities and/or options or other rights in respect thereof to be offered to directors, members of management, employees, consultants, customers, lenders or vendors of the Company or Company Subsidiaries or in connection with dividend reinvestment plans.

(j)      Rule 144.  With a view to making available to the Investor and Holders the benefits of certain rules and regulations of the SEC which may permit the sale of the Registrable Securities to the public without registration, the Company agrees to use its reasonable best efforts to:

(1)      make and keep adequate and current public information with respect to the Company available, as those terms are understood and defined in Rule 144(c)(1) or any similar or analogous rule promulgated under the Securities Act, at all times after the effective date of this Agreement;

(2)      file with the SEC, in a timely manner, all reports and other documents required of the Company under the Exchange Act, and if at any time the Company is not required to file such reports, make available, upon the request of any Holder, such information necessary to permit sales pursuant to Rule 144A (including the information required by Rule 144A(d)(4) and the Securities Act);

45

(3)    so long as the Investor or a Holder owns any Registrable Securities, furnish to the Investor or such Holder forthwith upon request:  (x) a written statement by the Company as to its compliance with the reporting requirements of Rule 144 under the Securities Act, and of the Exchange Act; (y) a copy of the most recent annual or quarterly report of the Company; and (z) such other reports and documents as the Investor or Holder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities without registration; and

(4)    to take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act.

(k)    As used in this <u>Section 4.5</u>, the following terms shall have the following respective meanings:

(1)    "**Holder**" means the Investor and any other holder of Registrable Securities to whom the registration rights conferred by this Agreement have been transferred in compliance with <u>Section 4.5(h)</u> hereof.

(2)    "**Holders' Counsel**" means one counsel for the selling Holders chosen by Holders holding a majority interest in the Registrable Securities being registered.

(3)    "**Register**," "**registered**" and "**registration**" shall refer to a registration effected by preparing and (a) filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of effectiveness of such registration statement or (b) filing a prospectus and/or prospectus supplement in respect of an appropriate effective registration statement on Form S-3.

(4)    "**Registrable Securities**" means (A) all Common Stock held by the Investor from time to time and (B) any equity securities issued or issuable directly or indirectly with respect to the Common Stock referred to in the foregoing clause (a) by way of conversion, exercise or exchange thereof or stock dividend or stock split or in connection with a combination of shares, recapitalization, reclassification, merger, amalgamation, arrangement, consolidation or other reorganization, <u>provided</u> that, once issued, such securities shall not be Registrable Securities when (i) they are sold pursuant to an effective registration statement under the Securities Act, (ii) they may be sold pursuant to Rule 144 without limitation thereunder on volume or manner of sale and without the requirement for the Company to be in compliance with the current public information requirements under Rule 144(c)(1) (or Rule 144(i)(2), if applicable), (iii) they shall have ceased to be outstanding or (iv) they have been sold in a private transaction in which the transferor's rights under this Agreement are not assigned to the transferee of the securities.  No Registrable Securities may be registered under more than one registration statement at one time.

46

(5)      "**Registration Expenses**" means all expenses incurred by the Company in effecting any registration pursuant to this Agreement (whether or not any registration or prospectus becomes effective or final) or otherwise complying with its obligations under this <u>Section 4.5</u>, including, without limitation, all registration, filing and listing fees, printing expenses, fees and disbursements of counsel for the Company, blue sky fees and expenses, expenses incurred in connection with any "road show," the reasonable fees and disbursements of Holders' Counsel (not to exceed $50,000), and expenses of the Company's independent accountants in connection with any regular or special reviews or audits incident to or required by any such registration, but shall not include Selling Expenses.

(6)      "**Rule 144**," "**Rule 144A**," "**Rule 158**," "**Rule 159A**," "**Rule 405**", "**Rule 415**" and "**Rule 424**"mean, in each case, such rule promulgated under the Securities Act (or any successor provision), as the same shall be amended from time to time.

(7)      "**Scheduled Black-out Period**" means the period from and including the fifteenth (15th) day of the third (3rd) month of a fiscal quarter of the Company to and including the business day after the day on which the Company publicly releases its earnings for such fiscal quarter.

(8)      "**Selling Expenses**" means all discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder (other than the fees and disbursements of Holders' Counsel included in Registration Expenses).

(l)      At any time, any holder of Registrable Securities (including any Holder) may elect to forfeit its rights set forth in this <u>Section 4.5</u> from that date forward; <u>provided</u>, that a Holder forfeiting such rights shall nonetheless be entitled to participate under <u>Sections 4.5(a)(4)-(6)</u> in any Pending Underwritten Offering to the same extent that such Holder would have been entitled to if the holder had not withdrawn; and <u>provided</u>, <u>further</u>, that no such forfeiture shall terminate a Holder's rights or obligations under <u>Section 4.5(f)</u> with respect to any prior registration or Pending Underwritten Offering.  "**Pending Underwritten Offering**" means, with respect to any Holder forfeiting its rights pursuant to this <u>Section</u> , any underwritten offering of Registrable Securities in which such Holder has advised the Company of its intent to register its Registrable Securities either pursuant to <u>Section 4.5(a)(2)</u> or <u>Section 4.5(a)(4)</u> prior to the date of such Holder's forfeiture.

4.6      <u>Takeover Laws; No Rights Triggered</u>.

(a)      If any Takeover Law may become, or may purport to be, applicable to the Transactions, the Company and the members of the Board of Directors shall grant such approvals and take such actions as are necessary so that the Transactions may be consummated, as promptly as practicable, on the terms contemplated by this Agreement, as the case may be, and otherwise act to eliminate or minimize the effects of any Takeover Law on any of the Transactions.

47

(b)     The Company and the Board of Directors hereby agree not to deem or treat the Investor and each of its "Permissible Transferees" as an "Acquiring Person" (as defined in the Company Rights Agreement) as a result of the consummation of the Transactions, including the purchase of the Purchased Shares or the transfer of any Purchased Shares to a "Permissible Transferee."

4.7     Avoidance of Control.

(a)     Each of the Company and the Investor agrees to cooperate and use its reasonable best efforts to ensure that none of the Investor nor any of its Affiliates will become, control, or be deemed to control a "savings and loan holding company" within the meaning of the HOLA.  The Company shall not knowingly take any action which would reasonably be expected to result in any of the Investor or its Affiliates becoming, or controlling, a "savings and loan holding company" within the meaning of the HOLA.

(b)     Notwithstanding anything to the contrary in this Agreement, neither the Company nor any Company Subsidiary shall knowingly take any action (including any redemption, repurchase, or recapitalization of Common Stock or securities or rights, options or warrants to purchase Common Stock, or securities of any type whatsoever that are, or may become, convertible into or exchangeable into or exercisable for Common Stock in each case, where the Investor is not given the right to participate in such redemption, repurchase or recapitalization to the extent of the Investor's *pro rata* portion), that would reasonably be expected to pose a substantial risk that (i) the Investor's equity of the Company (together with equity of the Company owned by the Investor's Affiliates (as such term is used under the HOLA)) would exceed 24.99% of the Company's total equity or (ii) the Investor's ownership of any class of voting securities of the Company (together with the ownership by Investor's Affiliates (as such term is used under the HOLA) of voting securities of the Company) would exceed 9.9% of such class, in each case without the prior written consent of Investor.

(c)     The Investor shall not take, permit or allow any action that would cause any Company Subsidiary to become a "commonly controlled insured depository institution" (as that term is defined for purposes of 12 U.S.C. §1815(e), as may be amended or supplemented from time to time, and any successor thereto) with respect to any institution that is not a direct or indirect Company Subsidiary.

(d)     In the event that either party hereto, as applicable, breaches its obligations under this Section 4.7 or believes that it is reasonably likely to breach such obligations, it shall immediately notify the other party and shall cooperate in good faith with such other party to modify an ownership or other arrangements or take any other action, in each case, as is necessary to cure or avoid such breach.

4.8     ERISA Matters.  Investor and, at the Investor's request, each Affiliate thereof that directly or indirectly has an interest in the Investor, the Company or the Bank, in each case, that is intended to qualify as a "venture capital operating company" as defined in the regulations (the "**Plan Asset Regulations**") issued by the Department of Labor at Section 2510.3 101 of Part 2510 of Chapter XXV, Title 29 of the Code of Federal Regulations, as the same may be amended from time to time (a "**VCOC**" and each such person a "**VCOC Investor**"), will

48

have customary VCOC rights, including the right to receive regular financial reports (including, but not limited to, audited annual and quarterly financial reports), information regarding significant corporate actions, the right to inspect the books and records of the Company, and the right to consult with management of the Company on matters relating to the business and affairs of the Company; provided, however, that this provision shall not entitle any VCOC Investor to (a) designate any members of the Board of Directors, except as provided above under Section 4.1 or (b) consult with management of the Company on matters relating to the business and affairs of the Company more than once per quarter.  The Company agrees to consider, in good faith, the recommendations of the VCOC Investor or its designated representative in connection with the matters on which it is consulted as described above, recognizing that the ultimate discretion with respect to all such matters shall be retained by the Company and each of the Company Subsidiaries, as the case may be.

**ARTICLE V**
**TERMINATION**

5.1   Termination.  This Agreement may be terminated prior to the Closing:

(a)   by mutual written consent of the Investor and the Company; or

(b)   by the Company or the Investor, upon written notice to the other party, in the event that the Closing does not occur on or before the one hundred eightieth (180th) day following the date of this Agreement (the "**Transaction Deadline**"); provided, however, that the right to terminate this Agreement pursuant to this Section 5.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date.

5.2   Effects of Termination.  In the event of any termination of this Agreement as provided in Section 5.1, this Agreement (other than Section 3.2(b), this Section 5.2 and ARTICLE VI (other than Sections 6.1 and 6.2) and all applicable defined terms, which shall remain in full force and effect) shall forthwith become wholly void and of no further force and effect; provided that nothing herein shall relieve any party from liability for willful breach of this Agreement.

5.3   Automatic Termination.  This Agreement shall terminate automatically without further action by the Company or the Investor if during the pendency of the Bankruptcy Case an order shall be entered by the Bankruptcy Court (a) appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code in the Bankruptcy Case, (b) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code in the Bankruptcy Case, or (c) dismissing (under Section 1112 of the Bankruptcy Code or otherwise) or converting the Bankruptcy Case to a Chapter 7 case.

5.4   Notice of Other Terminations.  The Company shall promptly notify the Investor if any of the Other Private Placements are terminated.

49

# ARTICLE VI

# MISCELLANEOUS

6.1    Survival.  Each of the Company's representations and warranties set forth in this Agreement shall survive the Closing under this Agreement but only for a period of eighteen (18) months following the Closing Date (or until final resolution of any claim or action arising from the breach of any such representation and warranty, if notice of such breach was provided prior to the end of such period) and thereafter shall expire and have no further force and effect; provided that the representations and warranties in Sections 2.2(a), 2.2(b), 2.2(c), 2.2(d), 2.2(f), 2.2(q), 2.2(v), and 2.2(y) shall survive indefinitely and the representations and warranties in Sections 2.2(i), 2.2(p) and 2.2(u) shall survive until ninety (90) days after the expiration of the applicable statutory periods of limitations.  None of the Investor's representations and warranties set forth in this Agreement shall survive the Closing.  Except as otherwise provided herein, all covenants and agreements contained herein shall survive for the duration of any statutes of limitations applicable thereto or until, by their respective terms, they are no longer operative.

6.2    Expenses.  Each of the parties will bear and pay all costs and expenses incurred by it or on its behalf in connection with the transactions contemplated pursuant to this Agreement.

6.3    Amendment.  No amendment of this Agreement will be effective with respect to any party unless made in writing and signed by a duly authorized representative of such party.

6.4    Waivers.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The conditions to each party's obligation to consummate the Closing are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable law.  No waiver of any party to this Agreement will be effective unless it is in a writing signed by a duly authorized officer of the waiving party that makes express reference to the provision or provisions subject to such waiver.

6.5    Counterparts and Facsimile.  For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement.  Executed signature pages to this Agreement may be delivered by facsimile transmission or by e-mail delivery of a .PDF data file and such signatures will be deemed as sufficient as if actual signature pages had been delivered.

6.6    Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.  The parties hereto irrevocably and unconditionally agree that any suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby will be tried exclusively in the U.S. District Court for the Southern District of New York or, if that court does not have subject matter jurisdiction, in any state court located

50

in The City and County of New York and the parties agree to submit to the jurisdiction of, and to venue in, such courts; <u>provided</u> that, during the pendency of the Bankruptcy Case, any suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby will be tried exclusively in the Bankruptcy Court.

6.7     <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

6.8     <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally or by telecopy, facsimile or e-mail, upon confirmation of receipt, (b) on the first (1st) business day following the date of dispatch if delivered by a recognized next-day courier service, or (c) on the third (3rd) business day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

(1)     If to the Investor, to the addresses and individuals as identified on the Investor's signature page hereto.

(2)     If to the Company:

Anchor BanCorp Wisconsin Inc.
25 West Main Street
Madison, Wisconsin 53703
Attn:  Mark D. Timmerman
Phone:  (608) 252-8784
Facsimile:  (608) 252-8783
Email:  mtimmerman@anchorbank.com

with copies to (which copies alone shall not constitute notice):

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
Attn:   William S. Rubenstein
        Sven G. Mickisch
Phone:  (212) 735-3000
Facsimile:  (212) 735-2000
Email:  William.Rubenstein@skadden.com
        Sven.Mickisch@skadden.com

And

> Skadden, Arps, Slate, Meagher & Flom LLP
> 300 South Grand Avenue
> Suite 3400
> Los Angeles, California 90071
> Attn:   Van C. Durrer II
> Phone:  (213) 687-5000
> Facsimile:  (213) 687-5600
> Email: Van.Durrer@skadden.com

6.9    <u>Entire Agreement, Etc.</u>  This Agreement (including the Exhibits, Schedules, and Disclosure Schedules hereto) constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, between the parties, with respect to the subject matter hereof; the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and their permitted assigns.  For the avoidance of doubt, the Company agrees that the Investor may assign its rights under this Agreement to any Affiliate and any such transferee shall be included in the term "Investor"; <u>provided</u> that no such assignment by the Investor shall relieve the Investor of any of its liabilities or obligations hereunder.

6.10    <u>Other Definitions</u>.  Wherever required by the context of this Agreement, the singular shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa, and references to any agreement, document or instrument shall be deemed to refer to such agreement, document or instrument as amended, supplemented or modified from time to time.  All article, section, paragraph or clause references not attributed to a particular document shall be references to such parts of this Agreement, and all exhibit, annex and schedule references not attributed to a particular document shall be references to such exhibits, annexes and schedules to this Agreement.  When used herein:

(a)    the term "**Affiliate**" means, with respect to any person, any person directly or indirectly controlling, controlled by or under common control with, such other person.  For purposes of this definition, "**control**" (including, with correlative meanings, the terms "**controlled by**" and "**under common control with**") when used with respect to any person, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities by contract or otherwise;

(b)    the word "**or**" is not exclusive;

(c)    the words "**including**," "**includes**," "**included**" and "**include**" are deemed to be followed by the words "**without limitation**";

(d)    the terms "**herein**," "**hereof**" and "**hereunder**" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision;

52

(e)      the words "**it**" or "**its**" are deemed to mean "**him**" or "**her**" and "**his**" or "**her**", as applicable, when referring to an individual;

(f)      "**business day**" means any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York or the State of Wisconsin generally are authorized or required by law or other governmental actions to close;

(g)      "**person**" has the meaning given to it in Section 3(a)(9) of the Exchange Act and as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act;

(h)      "**Beneficially Own**", "**Beneficial Owner**" and "**Beneficial Ownership**" are defined in Rules 13d-3 and 13d-5 of the Exchange Act;

(i)      "**knowledge of the Company**" or "**Company's knowledge**" means the actual knowledge after due inquiry of any of the executive officers of the Company; and

(j)      the term "**Governmental Approval**" means any notice to, registration, declaration or filing with, exemption or review by, or authorization, order, consent or approval of, any Governmental Entity, or the expiration or termination of any statutory waiting periods.

6.11      Captions.  The article, section, paragraph and clause captions herein are for convenience of reference only, do not constitute part of this Agreement and will not be deemed to limit or otherwise affect any of the provisions hereof.

6.12      Severability.  If any provision of this Agreement or the application thereof to any person (including the officers and directors of the Investor and the Company) or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.  Nothing contained in this Agreement shall be construed to require the Company or the Board of Directors or any other person or entity to take any action or fail to take any action that is contrary to law, whether statutory, common law or otherwise.

6.13      No Third-Party Beneficiaries.  Nothing contained in this Agreement, expressed or implied, is intended to confer or shall confer upon any person, other than the express parties hereto, any benefit, right or remedies, except that the provisions of Sections 4.3 and 4.5 shall inure to the benefit of the persons referred to in those Sections, including any Indemnified Parties or Holders.  The representations and warranties set forth in ARTICLE II and the covenants set forth in ARTICLE III and ARTICLE IV have been made solely for the benefit of the parties to this Agreement and (a) may be intended not as statements of fact, but rather as a way of allocating the risk to one of the parties if those statements prove to be inaccurate; (b) have been qualified by reference to the Disclosure Schedule, which contains certain disclosures that

53

are not reflected in the text of this Agreement; and (c) may apply standards of materiality in a way that is different from what may be viewed as material by shareholders of, or other investors in, the Company.

6.14    Time of Essence.  Time is of the essence in the performance of each and every term of this Agreement.

6.15    Public Announcements.  Subject to each party's disclosure obligations imposed by law or regulation (including in connection with the Bankruptcy Case), each of the parties hereto will cooperate with each other in the development and distribution of all news releases and other public information disclosures with respect to this Agreement and any of the transactions contemplated by this Agreement or the Other Private Placements, and no party hereto will make any such news release or public disclosure without first consulting with the other party hereto and receiving its consent (which shall not be unreasonably withheld, conditioned, or delayed), and each party shall coordinate with the other with respect to any such news release or public disclosure.

6.16    Specific Performance.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms.  It is accordingly agreed that the parties shall be entitled to specific performance of the terms hereof without the necessity of providing any bond or other security, this being in addition to any other remedies to which they are entitled at law or equity.

6.17    No Recourse.  Subject to Section 6.9, the Company agrees and acknowledges that no Investor Related Party has any obligations hereunder and that no person shall have any remedy, recourse or right of recovery against, or contribution from, any Investor Related Party, whether through the Investor or otherwise, in connection with the transaction contemplated by this Agreement.  The term "**Investor Related Party**" means (a) any Affiliate of the Investor, (b) any former, current or future general or limited partners, members, managers, stockholders, holders of any equity, partnership or limited liability company interest, officers, directors, employees, agents, controlling persons, or assignees of the Investor or any of its Affiliates, or (c) any former, current or future general or limited partners, members, managers, stockholders, holders of any equity, partnership or limited liability company interest, officers, directors, employees, agents, controlling persons, assignees, or Affiliates of any of the foregoing.

* * *

54

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first herein above written.

ANCHOR BANCORP WISCONSIN INC.

By: _____
    Name:
    Title:

[Signature Page to Stock Purchase Agreement]

[INVESTOR]

By: _____
    Name:
    Title:

Number of Purchased Shares:    [•]
Per Share Purchase Price:    $0.10
Total Purchase Price:    $[•]

<u>Information for Notices:</u>

[•]
Attn:  [•]
Phone:  [•]
Facsimile:  [•]
Email:    [•]

with a copy to (which copy alone shall not
constitute notice):

[•]
Attn:  [•]
Phone:  [•]
Facsimile:  [•]
Email:    [•]

[Signature Page to Stock Purchase Agreement]

**EXHIBIT D**

**FORM OF INVESTOR AGREEMENT (9.9% INVESTOR)**

ESCROW VERSION
STRICTLY CONFIDENTIAL

---

**STOCK PURCHASE AGREEMENT**


**dated as of July [●], 2013**


**by and between**


**ANCHOR BANCORP WISCONSIN INC.**


**and**


**[●]**

---

# TABLE OF CONTENTS

Page

ARTICLE I

PURCHASE; CLOSING

1.1    Purchase ............................................................................................2
1.2    Closing ..............................................................................................2

ARTICLE II

REPRESENTATIONS AND WARRANTIES

2.1    Disclosure ..........................................................................................7
2.2    Representations and Warranties of the Company.................................8
2.3    Representations and Warranties of the Investor .................................27

ARTICLE III

COVENANTS

3.1    Filings; Other Actions.......................................................................31
3.2    Access, Information and Confidentiality ............................................33
3.3    Reasonable Best Efforts.....................................................................33
3.4    Conduct of the Business.....................................................................34
3.5    Bankruptcy Court Matters..................................................................37

ARTICLE IV

ADDITIONAL AGREEMENTS

4.1    Governance Matters...........................................................................38
4.2    Transfers; Legend; Form D................................................................40
4.3    Indemnity ..........................................................................................42
4.4    Preemptive Rights..............................................................................44
4.5    Registration Rights.............................................................................45
4.6    Takeover Laws; No Rights Triggered.................................................56
4.7    Avoidance of Control.........................................................................57
4.8    ERISA Matters...................................................................................57
4.9    Most Favored Nation .........................................................................58

## ARTICLE V

### TERMINATION

5.1     Termination ................................................................................................. 58
5.2     Effects of Termination ................................................................................. 59
5.3     Automatic Termination ................................................................................ 59
5.4     Notice of Other Terminations ..................................................................... 59

## ARTICLE VI

### MISCELLANEOUS

6.1     Survival ....................................................................................................... 59
6.2     Expenses ...................................................................................................... 60
6.3     Amendment .................................................................................................. 60
6.4     Waivers ........................................................................................................ 60
6.5     Counterparts and Facsimile ......................................................................... 60
6.6     Governing Law ............................................................................................ 60
6.7     Waiver of Jury Trial .................................................................................... 61
6.8     Notices ......................................................................................................... 61
6.9     Entire Agreement, Etc. ................................................................................ 62
6.10    Other Definitions ........................................................................................ 62
6.11    Captions ....................................................................................................... 63
6.12    Severability .................................................................................................. 63
6.13    No Third-Party Beneficiaries ...................................................................... 63
6.14    Time of Essence ........................................................................................... 64
6.15    Public Announcements ................................................................................ 64
6.16    Specific Performance ................................................................................... 64
6.17    No Recourse ................................................................................................. 64

INDEX OF DEFINED TERMS

Term                Location of Definition

Accounting Firm .......................................................................... 1.2(c)(2)(xiv)
Affiliate ............................................................................................... 6.10(a)
Agency ............................................................................................ 2.2(z)(4)
Agreement ...................................................................................... Introduction
Amended Charter ............................................................................... Recitals
Articles of Incorporation ................................................................. 2.2(a)(2)
Bank .......................................................................................... 1.2(c)(2)(xi)
Bank Board ......................................................................................... 4.1(f)
Bankruptcy Case ................................................................................ Recitals
Bankruptcy Code ................................................................................ Recitals
Bankruptcy Court ............................................................................... Recitals
Beneficial Owner ................................................................................ 6.10(h)
Beneficial Ownership .......................................................................... 6.10(h)
Beneficially Own ................................................................................ 6.10(h)
Benefit Plan ..................................................................................... 2.2(p)(1)
Board of Directors ............................................................................. Recitals
BSA ................................................................................................ 2.2(n)(1)
Burdensome Condition ..................................................................... 1.2(c)(1)(ii)
business day ....................................................................................... 6.10(f)
CIBCA .......................................................................................... 1.2(c)(2)(xi)
Closing ............................................................................................... 1.2(a)
Closing Date ....................................................................................... 1.2(a)
Code ................................................................................................... 2.2(i)
Common Stock .................................................................................... Recitals
Company ........................................................................................ Introduction
Company 10-K ................................................................................ 2.2(c)(1)
Company Financial Statements ............................................................ 2.2(f)
Company Preferred Stock ................................................................. 2.2(c)(1)
Company Reports ............................................................................. 2.2(g)(1)
Company Restricted Stock ............................................................... 2.2(c)(1)
Company Rights Agreement ............................................................. 2.2(v)(2)
Company Significant Agreement ...................................................... 2.2(k)(1)
Company Stock Option ..................................................................... 2.2(c)(1)
Company Stock Option Plans ............................................................ 2.2(c)(1)
Company Subsidiaries ...................................................................... 2.2(b)(1)
Company Subsidiary ......................................................................... 2.2(b)(1)
Company's knowledge ......................................................................... 6.10(i)
control ................................................................................................ 6.10(a)
controlled by ....................................................................................... 6.10(a)
CRA ................................................................................................ 2.2(n)(7)
Credit Agreement ............................................................................... Recitals
De Minimis Claim ................................................................................ 4.3(d)

Debt Issuance ................................................................................. Recitals
Delaware Conversion .................................................................... Recitals
Disclosure Schedule ..................................................................... 2.1(a)
Environmental Laws ..................................................................... 2.2(u)
ERISA ........................................................................................ 2.2(p)(1)
ERISA Affiliate .......................................................................... 2.2(p)(2)
ERISA Plan ................................................................................ 2.2(p)(3)
Exchange Act .............................................................................. 2.2(g)(1)
Exempted Issuance ...................................................................... 4.4(d)
Expedited Issuance ...................................................................... 4.4(e)
Expense Reimbursement ............................................................... 6.2
FDI Act ...................................................................................... 1.2(c)(2)(xi)
FDIC .......................................................................................... 2.2(b)(2)
Federal Reserve ........................................................................... 1.2(c)(1)(ii)
GAAP ......................................................................................... 2.1(b)
Governmental Approval ............................................................... 6.10(j)
Governmental Entity ................................................................... 2.2(d)(3)
HOLA ......................................................................................... 1.2(c)(2)(xi)
Holder ........................................................................................ 4.5(k)(1)
Holders' Counsel ........................................................................ 4.5(k)(2)
Indemnified Party ....................................................................... 4.3(b)
Indemnifying Party ..................................................................... 4.3(b)
Indemnitee .................................................................................. 4.5(g)(1)
Information ................................................................................. 3.2(b)
Insurer ....................................................................................... 2.2(z)(4)
Intellectual Property .................................................................... 2.2(w)(2)
Investment .................................................................................. Recitals
Investment Manager .................................................................... 2.3(f)
Investor ...................................................................................... Introduction
Investor Designated Director ........................................................ 4.1(b)
Investor Indemnitors .................................................................... 4.1(g)
Investor Related Party ................................................................. 6.17
IRS ............................................................................................ 2.2(i)
knowledge of the Company .......................................................... 6.10(i)
Lenders ....................................................................................... Recitals
Liens .......................................................................................... 1.2(b)(1)
Loan Investor .............................................................................. 2.2(z)(4)
Loans ......................................................................................... 2.2(z)(1)
Lock-Up Date ............................................................................. 4.2(a)
Losses ........................................................................................ 4.3(a)
Material Adverse Effect ............................................................... 2.1(b)
New Issuance .............................................................................. 4.4(a)
New Security ............................................................................... 4.4(a)
Nominating Committee ................................................................ 4.1(c)
Observer ..................................................................................... 4.1(f)
OCC ........................................................................................... 1.2(c)(1)(ii)

OFAC ...................................................................................................................... 2.2(n)(6)
Other Private Placements ............................................................................................ Recitals
PATRIOT Act ......................................................................................................... 2.2(n)(1)
Pending Underwritten Offering ...................................................................................... 4.5(l)
Pension Plan .......................................................................................................... 2.2(p)(3)
Per Share Purchase Price .............................................................................................. Recitals
Permitted Liens .......................................................................................................... 2.2(h)
Permitted Transferee ...................................................................................................... 4.2(a)
person ...................................................................................................................... 6.10(g)
Petition Date ............................................................................................................... Recitals
Piggyback Registration ............................................................................................. 4.5(a)(4)
Placement Agent .......................................................................................................... 2.2(y)
Plan Asset Regulations ..................................................................................................... 4.8
Plan of Reorganization ................................................................................................. Recitals
Pre-Closing Period ........................................................................................................ 3.4(a)
Preemptive Amount ...................................................................................................... 4.4(a)
Preemptive Rights ......................................................................................................... 4.4(b)
Preemptive Rights Notice .............................................................................................. 4.4(a)
Previously Disclosed ...................................................................................................... 2.1(c)
Primary Investment Transactions ................................................................................... Recitals
Purchase Price ........................................................................................................ 1.2(b)(2)
Purchased Shares .............................................................................................................. 1.1
Qualifying Ownership Interest ........................................................................................ 4.1(b)
Register ................................................................................................................. 4.5(k)(3)
registered ............................................................................................................... 4.5(k)(3)
Registrable Securities ............................................................................................... 4.5(k)(4)
registration ............................................................................................................ 4.5(k)(3)
Registration Expenses ............................................................................................... 4.5(k)(5)
Regulatory Agreement .................................................................................................... 2.2(x)
Required Approvals ............................................................................................... 1.2(c)(1)(ii)
Rights Agent ........................................................................................................... 2.2(v)(2)
Rule 144 ................................................................................................................. 4.5(k)(6)
Rule 144A ............................................................................................................... 4.5(k)(6)
Rule 158 ................................................................................................................. 4.5(k)(6)
Rule 159A .............................................................................................................. 4.5(k)(6)
Rule 405 ................................................................................................................. 4.5(k)(6)
Rule 415 ................................................................................................................. 4.5(k)(6)
Rule 424 ................................................................................................................. 4.5(k)(6)
Scheduled Black-out Period ....................................................................................... 4.5(k)(7)
SEC ......................................................................................................................... 2.1(c)
Secondary Investors ..................................................................................................... Recitals
Secondary Treasury Sales ............................................................................................. Recitals
Securities Act ......................................................................................................... 2.2(g)(1)
Selling Expenses ...................................................................................................... 4.5(k)(8)
Senior Debt Settlement ................................................................................................. Recitals
Shelf Registration Statement ...................................................................................... 4.5(a)(2)

Special Registration ................................................................................................4.5(i)
Takeover Law ..........................................................................................................2.2(v)(1)
TARP Exchange.................................................................................................. Recitals
TARP Preferred Stock ....................................................................................... Recitals
TARP Warrant ................................................................................................... Recitals
Tax ..........................................................................................................................2.2(i)
Tax Return ..............................................................................................................2.2(i)
Taxes .......................................................................................................................2.2(i)
Threshold Amount .................................................................................................4.3(d)
Transaction Deadline ..............................................................................................5.1(b)
Transactions ................................................................................................ 1.2(c)(1)(ii)
Treasury .............................................................................................................. Recitals
Treasury Issuance............................................................................................... Recitals
Treasury Regulation...............................................................................................2.2(i)
U.S. Bank............................................................................................................ Recitals
under common control with ..................................................................................6.10(a)
Unlawful Gains ...............................................................................................2.2(n)(4)
VCOC ........................................................................................................................ 4.8
VCOC Investor ........................................................................................................ 4.8
Voting Debt..........................................................................................................2.2(c)(1)

**STOCK PURCHASE AGREEMENT**, dated as of July [●], 2013 (this "**Agreement**"), by and between Anchor BanCorp Wisconsin Inc., a Wisconsin corporation (the "**Company**"), and [●], a [●] (the "**Investor**").

## RECITALS:

A.  Bankruptcy Case.  The Company intends to file a voluntary bankruptcy petition (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Western District of Wisconsin (the "**Bankruptcy Court**") not later than the business day immediately following the date this Agreement is executed and delivered by the parties hereto (such business day, the "**Petition Date**").  The Company intends for the Transactions (as defined below) to be effected under a plan of reorganization of the Company to be confirmed by order of the Bankruptcy Court (the "**Plan of Reorganization**").  A draft of the Plan of Reorganization has been provided to the Investor prior to delivery of the Investor's executed signature page hereto.

B.  Investment.  Following the confirmation of the Plan of Reorganization by the Bankruptcy Court, the Company intends to sell to the Investor, and the Investor intends to purchase from the Company, as an investment in the Company, at the Closing (as defined below) a number of shares of common stock, par value $0.10, of the Company (the "**Common Stock**") as determined in accordance with Section 1.1 at a price per share of Common Stock equal to $0.10 (the "**Per Share Purchase Price**") on the terms and conditions described herein (collectively, the "**Investment**").

C.  Other Private Placements.  Contemporaneously with the Investment, the Company intends to sell in several other private placement transactions to other investors to be identified by the Company shares of Common Stock at the Per Share Purchase Price contemporaneously with the closing of the Investment contemplated herein (collectively, the "**Other Private Placements**").  The Investment and the Other Private Placements are collectively referred to as the "**Primary Investment Transactions**."

D.  Senior Debt.  In connection with the Primary Investment Transactions and under the Plan of Reorganization, the Company intends to settle in full all of the Company's obligations (including with respect to unpaid principal balance, accrued but unpaid interest thereon and all administrative and other fees or penalties) under the Amended and Restated Credit Agreement, dated as of June 9, 2008 (as amended from time to time, the "**Credit Agreement**"), among the Company, U.S. Bank National Association, as administrative agent ("**U.S. Bank**"), and the lenders from time to time party thereto (collectively with U.S. Bank, the "**Lenders**"), for an amount of cash equal to $49,000,000 (plus expense reimbursement as contemplated under the Credit Agreement) (the "**Senior Debt Settlement**").  On or prior to the Petition Date, the Company received from the Lenders written consents to vote (including written ballots themselves) in sufficient amount and number to cause the class of Lenders under the Plan of Reorganization to accept such Plan of Reorganization.

E. <u>U.S. Treasury</u>. In connection with the Primary Investment Transactions and under the Plan of Reorganization, the Company intends to (i) exchange the 110,000 shares of Fixed Rate Cumulative Perpetual Preferred Stock, Series B of the Company (the "**TARP Preferred Stock**") currently held by the United States Department of the Treasury (the "**Treasury**") for 60,000,000 shares of Common Stock in the aggregate (the "**Treasury Issuance**") and (ii) cancel the related warrant to purchase 7,399,103 shares of Common Stock at an exercise price of $2.23 per share held by the Treasury (the "**TARP Warrant**") in its entirety (collectively, the "**TARP Exchange**"). Immediately following the TARP Exchange, it is expected that the Treasury will sell to one or more investors to be identified by the Company and acceptable to the Treasury (the "**Secondary Investors**") the shares of Common Stock delivered to the Treasury in connection with the TARP Exchange at a purchase price per share equal to the Per Share Purchase Price (collectively, the "**Secondary Treasury Sales**").

F. <u>Debt Issuance</u>. In connection with the Primary Investment Transactions, the Company intends to issue to certain investors up to $30 million of newly-issued unsecured indebtedness, on the terms contemplated by <u>Exhibit A</u> (the "**Debt Issuance**").

G. <u>Delaware Conversion and Amended Charter</u>. Under the Plan of Reorganization, the Company will (i) convert from a Wisconsin corporation to a Delaware corporation in accordance with Section 265 of the Delaware General Corporation Law (the "**Delaware Conversion**") and (ii) file the Articles of Incorporation in the form contemplated by <u>Exhibit B</u> (the "**Amended Charter**") with the Secretary of State of the State of Delaware in order to, among other things, increase the number of authorized shares of Common Stock to at least 2,000,000,000 shares or such larger number as the board of directors of the Company (the "**Board of Directors**") determines is necessary to effectuate the Primary Investment Transactions and the TARP Exchange and adopt certain restrictions on acquisitions and dispositions of securities and to make certain other changes.

**NOW, THEREFORE**, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

## ARTICLE I

## PURCHASE; CLOSING

1.1 <u>Purchase</u>. On the terms and subject to the conditions set forth herein, the Investor will purchase from the Company, and the Company will issue and sell to the Investor, the number of shares of Common Stock specified on the Investor's signature page hereto (such shares of Common Stock issued and sold to the Investor, the "**Purchased Shares**").

1.2 <u>Closing</u>.

(a) Subject to the satisfaction (or, to the extent permitted, waiver) of the conditions set forth in <u>Section 1.2(c)</u>, the closing of the Investment (the "**Closing**") shall take

2

place contemporaneously with the closing of the Other Private Placements at the offices of Skadden, Arps, Slate, Meagher & Flom LLP located at Four Times Square, New York, New York, 10036, or remotely via the electronic or other exchange of documents and signature pages, as soon as practicable, but in no event later than the second (2nd) business day after the satisfaction or waiver of the conditions set forth in <u>Section 1.2(c)</u> (excluding conditions that, by their terms, cannot be satisfied until the Closing, but the Closing shall be subject to the satisfaction or waiver of those conditions), or at such other place or such other date as agreed to by the parties hereto.  The date of the Closing is referred to as the "**Closing Date**."

(b)     Subject to the satisfaction or waiver on the Closing Date of the applicable conditions to the Closing set forth in <u>Section 1.2(c)</u>, at the Closing:

(1)     the Company will deliver to the Investor the Purchased Shares, free and clear of any lien, adverse right or claim, charge, option, pledge, covenant, title defect, security interest or other encumbrances of any kind (other than restrictions on transfer imposed by applicable securities laws or as contemplated by this Agreement) ("**Liens**"), as evidenced by one or more certificates dated the Closing Date and bearing the appropriate legends as herein provided; and

(2)     the Investor will deliver to the Company, by wire transfer of immediately available funds to an account or accounts designated by the Company, an amount equal to the purchase price specified on the Investor's signature page hereto (the "**Purchase Price**"); it being understood and agreed that the Investor must have received the Purchased Shares (pursuant to its written delivery instructions provided to the Company prior to the Closing) prior to being obligated to wire such funds.

(c)     <u>Closing Conditions</u>.

(1)     The obligation of the Investor, on the one hand, and the Company, on the other hand, to effect the Closing is subject to the satisfaction or written waiver by the Investor and the Company prior to the Closing of the following conditions:

(i)     (A) no provision of any applicable law or regulation and no judgment, injunction, order or decree by any Governmental Entity or the Bankruptcy Court shall prohibit the Closing or shall prohibit or restrict Investor from owning or voting any Purchased Shares and (B) no lawsuit shall have been commenced by any Governmental Entity seeking to effect any of the foregoing;

(ii)     all Governmental Approvals of the Board of Governors of the Federal Reserve System (the "**Federal Reserve**") and the Office of the Comptroller of the Currency (the "**OCC**") required to have been obtained at or prior to the Closing Date for the consummation or effectiveness (as applicable) of the Primary Investment Transactions, the Senior Debt Settlement, the TARP Exchange, the Debt Issuance, the Delaware Conversion and the Amended Charter (collectively, the "**Transactions**") shall have been obtained and shall be in full force and effect (such Governmental Approvals, the "**Required Approvals**"); <u>provided</u>, <u>however</u>, that, with respect to the Investor, except for standard passivity

3

and anti-association commitments to the Federal Reserve, (A) no Required Approval shall impose or contain any restraint or condition that would reasonably be expected to impair in any material respect the benefits to the Investor of the Investment and (B) no Required Approval shall require any modification of governance arrangements with respect to, or impose any capital or other support requirements on, the Investor or any of its Affiliates (each, a "**Burdensome Condition**"); and

        (iii)     the Plan of Reorganization effecting the Transactions shall have been confirmed by the Bankruptcy Court.

        (2)     The obligation of the Investor to effect the Closing is subject to the satisfaction or written waiver by the Investor prior to the Closing of the following conditions:

        (i)     the representations and warranties of the Company set forth in <u>Section 2.2</u> of this Agreement that (A) are not made as of a specific date shall have been true and correct as of the date of this Agreement and shall be true and correct as of the Closing Date as though made as of the Closing Date, and (B) are made as of a specific date shall have been true and correct as of such specific date, in each case, except where the failure to be true and correct (without regard to any materiality or Material Adverse Effect (as defined below) qualifications contained therein) has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (and except that (x) the representations and warranties of the Company set forth in <u>Sections 2.2(a)</u>, <u>2.2(b)(1)</u> and <u>(2)</u>, <u>2.2(d)</u>, <u>2.2(f)</u> and <u>2.2(v)</u> shall be true and correct in all material respects, (y) the representations and warranties of the Company set forth in <u>Sections 2.2(b)(3)</u>, <u>2.2(j)(3)</u>, <u>2.2(q)</u> and <u>2.2(y)</u> shall be true and correct in all respects, and (z) the representations and warranties of the Company set forth in <u>Section 2.2(c)(1)</u> shall be true and correct except to a *de minimis* extent);

        (ii)     the Company shall have performed in all material respects all obligations required to be performed by it at or prior to the Closing under this Agreement;

        (iii)     the Investor shall have received a certificate signed on behalf of the Company by a senior executive officer certifying to the effect that the conditions set forth in <u>Sections 1.2(c)(2)(i)</u> and <u>(ii)</u> have been satisfied;

        (iv)     since the date of this Agreement, there shall not have occurred and be continuing any circumstance, event, change, development or effect that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

        (v)     prior to the Closing, the Company shall have completed the Delaware Conversion and the Amended Charter shall have been filed with the

Secretary of State of the State of Delaware and shall be in full force and effect as of the Closing Date;

(vi)     the Company shall receive contemporaneously with the Closing, or shall have received prior to the Closing, gross proceeds of not less than $170,000,000 and not more than $180,000,000 from the Primary Investment Transactions and the price per share of Common Stock sold in the Other Private Placements shall be no less than the Per Share Purchase Price (assuming in each case that the Investment has been consummated);

(vii)    (A) all conditions to the closing of the TARP Exchange under the Plan of Reorganization shall have been satisfied (other than the consummation of the Primary Investment Transactions) and (B) immediately following the consummation of the Primary Investment Transactions, the Company shall consummate the TARP Exchange under the Plan of Reorganization;

(viii)   contemporaneously with the Closing, the Company shall consummate the Senior Debt Settlement under the Plan of Reorganization;

(ix)     substantial consummation of the Plan of Reorganization shall have occurred; provided that the confirmed Plan of Reorganization, and the related confirmation order, shall (A) not contain any terms that are inconsistent with this Agreement, (B) not contain any terms or conditions that would reasonably be expected to impair in any material respect the benefits to the Investor of the Investment, (C) not provide financial consideration to the Lenders, whether in respect of their secured claim, unsecured claim or otherwise, in excess of $49,000,000 (plus expense reimbursement as contemplated under the Credit Agreement), and (D) not provide financial consideration to the Treasury in excess of 60,000,000 shares of Common Stock;

(x)      the Company shall contemporaneously with the Closing consummate the Debt Issuance, or shall have prior to the Closing consummated the Debt Issuance, in all material respects in accordance with the terms and conditions described in Exhibit A; provided, however, that the Company may replace or amend any term set forth on Exhibit A so long as no such replacement or amendment (A) increases the aggregate amount of the Debt Issuance above $30 million, (B) would reasonably be expected to impair in any material respect the benefits to the Investor of the Investment or (C) would reasonably be expected to materially delay the Closing;

(xi)     neither the Investor nor any of its Affiliates shall have been informed by the Federal Reserve, or otherwise have reason to believe, that, after giving effect to the Transactions, it will be deemed to control the Company or AnchorBank, fsb (the "**Bank**") for purposes of the Change in Bank Control Act of 1978 (the "**CIBCA**"), the Home Owners' Loan Act (the "**HOLA**") or the Federal Reserve's Regulation LL thereunder or the cross-guaranty liability provisions of

5

the Federal Deposit Insurance Act (the "**FDI Act**"), as amended, and following the Closing, neither the Investor nor any of its Affiliates shall be required to register as a savings and loan holding company;

(xii)    the purchase of Purchased Shares by the Investor shall not cause the Investor, together with any other person whose Company securities would be aggregated with the Investor's Company securities for purposes of any banking regulation or law, to collectively be deemed to own, control or have the power to vote securities which (assuming, for this purpose only, full conversion and/or exercise of such securities by the Investor and such other Persons) would represent more than 9.9% of any class of voting securities of the Company outstanding at such time;

(xiii)   the consummation of the Transactions shall qualify as a "recapitalization" for financial accounting purposes under GAAP; and

(xiv)   (A) since the date of this Agreement, there shall have been no material change to Section 382 or 383 of the Code or the Treasury Regulations thereunder, or any published material administrative pronouncement (such as the issuance of proposed or temporary regulations, a Revenue Ruling, Revenue Procedure, Notice or Announcement, but excluding any "non-published" materials such as a private letter ruling, field service advice, general counsel's memorandum, internal legal memorandum or chief counsel's advice) directly interpreting Section 382 or 383 of the Code or the Treasury Regulations thereunder, in each case, the application of which will cause the net operating loss carryforwards, unrealized built-in losses, tax credits, or capital loss carryforwards of the Company and any of its Subsidiaries that exist on or after the Closing Date to be subject to limitation under Section 382 or 383 of the Code after consummation of the Transactions, and (B) KPMG LLP (the "**Accounting Firm**") shall have delivered an opinion to the effect that, based on the most current information available prior to the Closing Date as provided by the Company to the Accounting Firm, the consummation of the Transactions should not cause an "ownership change" within the meaning of Section 382 of the Code, and subject to the Investor's execution of a customary reliance letter with the Accounting Firm pursuant to which the Investor shall reasonably agree to the Accounting Firm's standard terms and conditions, the Investor shall be permitted to rely on such opinion.

(3)    The obligation of the Company to consummate the Closing is subject to the satisfaction or written waiver by the Company prior to the Closing of the following conditions:

(i)    the representations and warranties of the Investor set forth in Section 2.3 of this Agreement that (A) are not made as of a specific date shall have been true and correct in all material respects as of the date of this Agreement and shall be true and correct in all material respects as of the Closing Date as though made as of the Closing Date, and (B) are made as of a specific date shall

6

319 of 384

have been true and correct in all material respects as of such specific date, in each case, without regard to any materiality qualifications contained therein, except to the extent that any inaccuracies in such representations and warranties, taken as a whole, are not reasonably expected to materially and adversely affect the Investor's ability to consummate the transactions contemplated by this Agreement in a timely manner;

(ii)     the Investor shall have performed in all material respects all obligations required to be performed by it at or prior to the Closing under this Agreement; and

(iii)     the Company shall have received a certificate signed by the Investor certifying to the effect that the conditions set forth in Sections 1.2(c)(3)(i) and (ii) have been satisfied.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

2.1     Disclosure.

(a)     On or prior to the date of this Agreement, the Company delivered to the Investor a schedule (the "**Disclosure Schedule**") setting forth, among other things, items the disclosure of which is necessary or appropriate either in response to an express disclosure requirement contained in a provision hereof or as an exception to one or more representations or warranties contained in Section 2.2 or to one or more of its covenants contained in this Agreement; provided, however, that notwithstanding anything in this Agreement to the contrary, the mere inclusion of an item in such schedule shall not be deemed an admission that such item represents a material exception or material fact, event, or circumstance or that such item has had or would reasonably be expected to have a Material Adverse Effect.

(b)     As used in this Agreement, the term "**Material Adverse Effect**" means any fact, event, change, condition, development, circumstance or effect that, individually or in the aggregate, (1) would reasonably be expected to be material and adverse to the business, assets, liabilities, properties, results of operations or condition (financial or otherwise) of the Company and the Company Subsidiaries, taken as a whole, other than any such fact, event, change, condition, development, circumstance or effect attributable to, resulting from, arising out of or relating to (i) the Bankruptcy Case, (ii) any change or proposed change, after the date hereof, in banking or similar laws, rules or regulations of general applicability or interpretations thereof by Governmental Entities, (iii) any change, after the date hereof, in U.S. generally accepted accounting principles ("**GAAP**") or interpretations thereof, (iv) changes, after the date hereof, affecting the financial services industry generally, the United States economy or general economic conditions, including changes in prevailing interest rates, credit markets, secondary or mortgage market conditions or housing price appreciation/depreciation trends, including changes to any previously correctly applied asset marks resulting therefrom, (v) national or international political or social conditions, including the engagement by the United States in hostilities or escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or

7

the occurrence of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices, (vi) the failure of the Company to meet any internal or public projections, forecasts, estimates or guidance for any period ending after March 31, 2013; provided that the exception in this clause (vi) shall not prevent or otherwise affect a determination that any fact, event, change, condition, development, circumstance or effect underlying such a failure has resulted in, or contributed to, a Material Adverse Effect, (vii) any actions taken with the prior written consent of the Investor, (viii) the Regulatory Agreements applicable to the Company or the Bank, or (ix) compliance with the terms of, or the taking of any action required by, this Agreement, except in the case of the foregoing clauses (ii), (iii), (iv) or (v), to the extent any fact, event, change, condition, development, circumstance or effect referred to therein has or would reasonably be expected to have a disproportionate impact on the business, assets, liabilities, properties, results of operations or condition (financial or otherwise) of the Company and the Company Subsidiaries, taken as a whole, relative to other similarly situated industry participants, or (2) would materially impair the ability of the Company to perform its obligations under this Agreement or to consummate the Closing.

(c)      "**Previously Disclosed**" with regard to the Company (1) means information set forth on its Disclosure Schedule corresponding to the provision of this Agreement to which such information relates; provided that information which is reasonably apparent on its face that it relates to another provision of this Agreement, shall also be deemed to be Previously Disclosed with respect to such other provision and (2) includes information publicly disclosed by the Company in the Company Reports (as defined below) filed by it with or furnished to the U.S. Securities and Exchange Commission (the "**SEC**") on or after March 31, 2012 (excluding any risk factor disclosures contained in such documents under the heading "Risk Factors," any disclosure of risks included in any "forward-looking statements" or any other statements or disclaimers that are predictive, qualitative, subjective or forward-looking in nature) prior to July 19, 2013.

2.2      Representations and Warranties of the Company.  Except as Previously Disclosed, the Company represents and warrants as of the date of this Agreement and as of the Closing (except to the extent made only as of a specified date, in which case as of such date) to the Investor that:

(a)      Organization and Authority.

(1)      As of the date of this Agreement, the Company is a corporation duly organized and validly existing under the laws of the State of Wisconsin, is duly qualified to do business and is in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified and failure to be so qualified would have or reasonably be expected to have a Material Adverse Effect and has corporate power and authority to own its properties and assets and to carry on its business as it is now being conducted.  As of the Closing, as a result of the Delaware Conversion, and subject to confirmation of the Plan of Reorganization by the Bankruptcy Court, the Company shall be a corporation duly organized and validly existing under the laws of the State of Delaware, duly qualified to do business and in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified and failure to be so qualified would

have or reasonably be expected to have a Material Adverse Effect and will have corporate power and authority to own its properties and assets and to carry on its business as it is then being conducted.

(2)     The Company is duly registered as a savings and loan holding company under the HOLA.  The Company has Previously Disclosed true, correct and complete copies of the Company's Articles of Incorporation, as amended (the "**Articles of Incorporation**") and the Company's bylaws as amended through the date of this Agreement.  The Company is not in violation of any of the provisions of the Articles of Incorporation or its bylaws.

(b)     Company's Subsidiaries.

(1)     The Company has Previously Disclosed a true, complete and correct list of all of its subsidiaries as of the date of this Agreement (individually, a "**Company Subsidiary**" and, collectively, the "**Company Subsidiaries**"), all shares of the outstanding capital stock of each of which are owned directly or indirectly by the Company.  No equity security of any Company Subsidiary is or may be required to be issued by reason of any option, warrant, scrip, preemptive right, right to subscribe to, gross-up right, call or commitment of any character whatsoever relating to, or security or right convertible into, shares of any capital stock of such Company Subsidiary, and there are no contracts, commitments, understandings or arrangements by which any Company Subsidiary is bound to issue additional shares of its capital stock, or any option, warrant or right to purchase or acquire any additional shares of its capital stock.  All of such shares so owned by the Company are duly authorized and validly issued, fully paid and nonassessable and are owned by it free and clear of any Liens with respect thereto.  Each Company Subsidiary is an entity duly organized, validly existing, duly qualified to do business and in good standing under the laws of its jurisdiction of organization, and has corporate or other appropriate organizational power and authority to own or lease its properties and assets and to carry on its business as it is now being conducted.  Except in respect of the Company Subsidiaries, the Company does not own beneficially, directly or indirectly, more than five percent (5%) of any class of equity securities or similar interests of any corporation, bank, business trust, association or similar organization, and is not, directly or indirectly, a partner in any partnership or party to any joint venture.

(2)     The Bank is duly organized and validly existing as a federal savings association and its deposit accounts are insured by the Federal Deposit Insurance Corporation (the "**FDIC**") to the fullest extent permitted by the FDI Act and the rules and regulations of the FDIC thereunder, and all premiums and assessments required to be paid in connection therewith have been paid when due.  The Company has Previously Disclosed true, correct and complete copies of the charter and bylaws of the Bank as amended through the date of this Agreement.  No Company Subsidiary is in violation of any of the provisions of its articles of incorporation or bylaws.

(3)     The Company beneficially and of record owns all of the outstanding capital stock of the Bank.

9

(c)    Capitalization.

(1)    As of the date hereof, the authorized capital stock of the Company consists of 100,000,000 shares of Common Stock and 5,000,000 shares of preferred stock, par value $0.10 (the "**Company Preferred Stock**").  As of the date hereof, there are 21,247,225 shares of Common Stock outstanding and 110,000 shares of TARP Preferred Stock and no other Company Preferred Stock outstanding, and the TARP Warrant allows for the purchase of 7,399,103 shares of Common Stock by the Treasury at an exercise price of $2.23 per share.  As of the date hereof, there are (i) outstanding stock options issued under the Company's 2001 Stock Option Plan for Non-Employee Directors, as amended or supplemented, as filed as exhibit 10.9 to the Company's Annual Report on Form 10-K for the year ended March 31, 2013 (the "**Company 10-K**"), and under the Company's 1995 Stock Option Plan for Non-Employee Directors, as amended or supplemented, as filed as exhibit 10.4 to the Company 10-K, to purchase an aggregate of 80,000 shares of the Common Stock (each, a "**Company Stock Option**") and (ii) an aggregate of 40,345 shares of restricted stock ("**Company Restricted Stock**") outstanding under the Company's 2004 Equity Incentive Plan, as filed as exhibit 10.10 to the Company 10-K (together with the 2001 Stock Option Plan for Non-Employee Directors and the 1995 Stock Option Plan for Non-Employee Directors, the "**Company Stock Option Plans**") and (iii) 1,240,314 shares of Common Stock reserved for issuance under the Company Stock Option Plans.  As of the date hereof, other than in respect of the TARP Warrant, the Company Rights Agreement, awards outstanding under or pursuant to the Company Stock Option Plans and for purposes of the Transactions, no shares of Common Stock or Company Preferred Stock are reserved for issuance.  All of the issued and outstanding shares of Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights, with no personal liability attaching to the ownership thereof.  Except in connection with the Transactions, neither the Company nor any of its officers, directors, or employees is a party to any right of first refusal, right of first offer, proxy, voting agreement, voting trust, registration rights agreement, or shareholders agreement with respect to the sale or voting of any securities of the Company.  No bonds, debentures, notes or other indebtedness having the right to vote on any matters on which the stockholders of the Company may vote ("**Voting Debt**") are issued and outstanding.  Except as set forth elsewhere in this Section 2.2(c), or in connection with the Transactions, or as Previously Disclosed, and subject to confirmation of the Plan of Reorganization by the Bankruptcy Court, the Company does not have and is not bound by any outstanding subscriptions, options, warrants, calls, repurchase rights, commitments, or agreements of any character calling for the purchase or issuance of, or securities or rights convertible into or exchangeable or exercisable for, any shares of Common Stock or Company Preferred Stock or any other equity securities of the Company or Voting Debt or any securities representing the right to purchase or otherwise receive any shares of capital stock of the Company (including any rights plan or agreement).  There are no securities or instruments containing anti-dilution or similar provisions that will be triggered by the issuance of shares of Common Stock pursuant to the Primary Investment Transactions.

(2)    Section 2.2(c)(2) of the Disclosure Schedule sets forth the following information with respect to each Company Stock Option and share of

10

Company Restricted Stock, which is true and correct as of the date of this Agreement:  (A) the name of each holder of Company Stock Options and Company Restricted Stock and (B) the number of shares of Common Stock subject to such Company Stock Option and the number of shares of Company Restricted Stock, and, as applicable, the grant date, exercise price, number of shares vested or not otherwise subject to restrictions, vesting schedule and the Company Stock Option Plan under which such Company Stock Options or shares of Company Restricted Stock were granted.  Each Company Stock Option (i) was granted in compliance with all applicable laws and all of the terms and conditions of the Company Stock Option Plans pursuant to which it was issued, (ii) has an exercise price per share of Common Stock equal to or greater than the fair market value of a share of Common Stock on the date of such grant and (iii) has a grant date identical to the date on which the Board of Directors or compensation committee of the Board of Directors actually awarded such Company Stock Option.

(d)     Authorization.  Subject to the confirmation of the Plan of Reorganization by the Bankruptcy Court:

(1)     The Company has the corporate power and authority to enter into this Agreement and the agreements for the other Transactions and, subject to the completion of the Delaware Conversion and effectiveness of the Amended Charter, to carry out its obligations hereunder and thereunder.  The execution, delivery and performance of this Agreement and the agreements for the other Transactions by the Company and the consummation of the transactions contemplated hereby and thereby, including the issuance of the Purchased Shares in accordance with the terms of this Agreement, have been duly authorized by the affirmative vote of at least a majority of the directors on the Board of Directors.  This Agreement has been duly and validly executed and delivered by the Company and, assuming due authorization, execution and delivery of this Agreement by the Investor, is a valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as such enforceability may be limited by the failure to complete the Delaware Conversion or cause the Amended Charter to become effective or by general equitable principles (whether applied in equity or at law).  No other corporate proceedings or stockholder actions are necessary for the execution and delivery by the Company of this Agreement or the agreements for the other Transactions, the performance by the Company of its obligations hereunder or thereunder or the consummation by the Company of the transactions contemplated hereby or thereby.

(2)     Neither the execution and delivery by the Company of this Agreement, the performance by the Company of its obligations hereunder nor the consummation of the transactions contemplated hereby, nor compliance by the Company with any of the provisions of any of the foregoing, will (A) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any Lien, upon any of the properties or assets of the Company or any Company Subsidiary under any of the terms, conditions or provisions of (i) subject to completion of the Delaware Conversion and the effectiveness of the

11

Amended Charter, its Articles of Incorporation or bylaws (or similar governing documents) or (ii) any material note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Company or any Company Subsidiary is a party or by which it may be bound, or to which the Company or any Company Subsidiary or any of the properties or assets of the Company or any Company Subsidiary may be subject, or (B) assuming that the Governmental Approvals contemplated by clause (3) are duly obtained, violate in any material respect any ordinance, permit, concession, grant, franchise, law, statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to the Company or any Company Subsidiary or any of their respective properties.

(3)     Other than the securities or blue sky laws of the various states and filings, notices, approvals or clearances required under federal or state banking laws or the Regulatory Agreements, no notice to, registration, declaration or filing with, exemption or review by, or authorization, order, consent or approval of, any court, administrative agency or commission or other governmental authority or instrumentality, whether federal, state, local or foreign, or any applicable industry self-regulatory organization (each, a "**Governmental Entity**"), or expiration or termination of any statutory waiting period, is necessary for the consummation by the Company of the Transactions.

(e)     <u>Knowledge as to Required Approvals</u>.  As of the date of this Agreement, the Company has no knowledge of any reason relating to the Company or any Company Subsidiary why the Required Approvals will not be obtained without the imposition of any Burdensome Condition.

(f)     <u>Financial Statements; Accounting Treatment of the Transactions</u>.  Each of the consolidated balance sheets of the Company and the Company Subsidiaries and the related consolidated statements of income, stockholders' equity and cash flows, together with the notes thereto, included in any Company Report filed with the SEC on or after March 31, 2010 and prior to the date of this Agreement (collectively, the "**Company Financial Statements**"), (1) have been prepared from, and are in accordance with, the books and records of the Company and the Company Subsidiaries, (2) complied, as of their respective date of such filing, in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, (3) have been prepared in accordance with GAAP applied on a consistent basis and (4) present fairly in all material respects the consolidated financial position of the Company and the Company Subsidiaries at the dates and the consolidated results of operations, changes in stockholders' equity and cash flows of the Company and the Company Subsidiaries for the periods stated therein (subject to the absence of notes and non-material year-end audit adjustments in the case of unaudited Company Financial Statements).  The consummation of the Transactions shall qualify as a "recapitalization" for financing accounting purposes under GAAP.

(g)     <u>Reports</u>.

(1)     Since March 31, 2010, the Company and each Company Subsidiary have timely filed all reports, registrations, documents, filings, statements and

submissions together with any required amendments thereto, that it was required to file with any Governmental Entity (the foregoing, collectively, the "**Company Reports**") and have paid all fees and assessments due and payable in connection therewith.  As of their respective filing dates, the Company Reports complied in all material respects with all statutes and applicable rules and regulations of the applicable Governmental Entities, as the case may be.  As of the date of this Agreement, there are no outstanding comments from the SEC or any other Governmental Entity with respect to any Company Report. The Company Reports, including the documents incorporated by reference in each of them, each contained all of the information required to be included in it, and as of the date of each such Company Report filed with or furnished to the SEC, such Company Report did not, as of its date, or if amended prior to the date of this Agreement, as of the date of such amendment, contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made in it not misleading and complied as to form in all material respects with the applicable requirements of the Securities Act of 1933, as amended, or any successor statute (the "**Securities Act**"), and the Securities Exchange Act of 1934, as amended, or any successor statute (the "**Exchange Act**").  As of the date of this Agreement, no executive officer of the Company has failed to make the certifications required of him or her under Section 302 or 906 of the Sarbanes-Oxley Act of 2002.

(2)     The records, systems, controls, data and information of the Company and the Company Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of the Company or the Company Subsidiaries or accountants (including all means of access thereto and therefrom), except for any nonexclusive ownership and nondirect control that would not reasonably be expected to have a material adverse effect on the system of internal accounting controls described below in this Section 2.2(g).  The Company (A) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) of the Exchange Act) to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to the chief executive officer and the chief financial officer of the Company by others within those entities, (B) has implemented and maintains internal controls over financial reporting (as defined in Rule 13a-15(f) of the Exchange Act) and (C) has disclosed, based on its most recent evaluation prior to the date of this Agreement, to the Company's outside auditors and the audit committee of the Board of Directors (x) any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting  that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and (y) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.  As of the date of this Agreement, the Company has no knowledge of any reason that its outside auditors and its chief executive officer and chief financial officer shall not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, without qualification, when next due.  Since December 31, 2009, (i) neither the Company nor any Company Subsidiary nor, to the knowledge of the Company, any director, officer, employee, auditor, accountant or representative of the Company or

13

any Company Subsidiary has received or otherwise had or obtained knowledge of any material complaint, allegation, assertion or claim, whether written or oral, regarding the accounting or auditing practices, procedures, methodologies or methods of the Company or any Company Subsidiary or their respective internal accounting controls, including any material complaint, allegation, assertion or claim that the Company or any Company Subsidiary has engaged in questionable accounting or auditing practices, and (ii) no attorney representing the Company or any Company Subsidiary, whether or not employed by the Company or any Company Subsidiary, has reported evidence of a material violation of securities laws, breach of fiduciary duty or similar violation by the Company or any of its officers, directors, employees or agents to the Board of Directors or any committee thereof or to any director or officer of the Company.

(h)    Properties and Leases.  Except for any Permitted Liens (as defined below), the Company and each Company Subsidiary has good title free and clear of any Liens to all the real and personal property reflected in the Company's consolidated balance sheet as of March 31, 2013 included in the Company 10-K for the period then ended, and all real and personal property acquired since such date, except such real and personal property as has been repossessed or as has been disposed of in the ordinary course of business.  For purposes of this Agreement, "**Permitted Liens**" means (1) Liens for taxes and other governmental charges and assessments arising in the ordinary course which are not yet due and payable, (2) Liens of landlords and Liens of carriers, warehousemen, mechanics and materialmen and other like Liens arising in the ordinary course of business for sums not yet due and payable and (3) other Liens or imperfections on property which are not material in amount and do not materially detract from the value of or materially impair the existing use of the property affected by such Lien or imperfection.  Except as has not had or would not be expected to have a Material Adverse Effect, all leases of real property and all other leases pursuant to which the Company or such Company Subsidiary, as lessee, leases real or personal property are valid and effective in accordance with their respective terms and there is not, under any such lease, any existing material default by the Company or such Company Subsidiary or any event which, with notice or lapse of time or both, would constitute such a material default.

(i)    Taxes.  Each of the Company and the Company Subsidiaries has timely filed all federal, state, county, local and foreign Tax Returns (as defined below) required to be filed by it, and all such filed Tax Returns are true, correct and complete in all material respects, and paid all Taxes (as defined below) owed by it and no material Taxes owed by it or assessments received by it are delinquent.  With respect to Taxes not yet due, the Company has made adequate provision in the financial statements of the Company (in accordance with GAAP).  The federal income Tax Returns of the Company and the Company Subsidiaries for the fiscal year ended March 31, 2009, and for all fiscal years prior thereto, are for the purposes of routine audit by the Internal Revenue Service (the "**IRS**") closed because of the expiration of the statute of limitations, and no claims for additional Taxes for such fiscal years are pending.  Neither the Company nor any Company Subsidiary has waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency, in each case that is still in effect, or has pending a request for any such extension or waiver.  Neither the Company nor any Company Subsidiary is a party to any pending action or proceeding for the assessment or collection of Taxes and no material deficiencies have been proposed in writing by any Governmental Entity in connection with an audit or examination of the Tax Returns of the

14

Company or any Company Subsidiary which has not been settled, resolved and fully satisfied, or for which reserves adequate in accordance with GAAP have not been provided on the Company Financial Statements. Each of the Company and the Company Subsidiaries has withheld and paid all material Taxes that it is required to withhold from amounts owing to employees, creditors or other third parties. Neither the Company nor any Company Subsidiary is a party to, is bound by or has any material obligation under, any Tax sharing or Tax indemnity agreement or similar contract or arrangement other than any contract or agreement between or among the Company and any Company Subsidiary. Neither the Company nor any Company Subsidiary has participated in any "reportable transaction" within the meaning of Treasury Regulations Section 1.6011-4, or any other transaction requiring disclosure under analogous provisions of state, local or foreign law. Neither the Company nor any Company Subsidiary has liability for the Taxes of any person other than the Company or any Company Subsidiary under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law) as a transferee, successor or otherwise. Neither the Company nor any Company Subsidiary has been a "distributing corporation" or a "controlled corporation" in any distribution in which the parties to such distribution treated the distribution as one to which Section 355 of the Internal Revenue Code of 1986, as amended (the "**Code**"), is applicable. The Company has not been a United States real property holding corporation within the meaning of Section 897 of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code. Neither the Company nor any Company Subsidiary has undergone an "ownership change" within the meaning of Code Section 382(g), and the consummation of the Transactions should not cause an "ownership change" within the meaning of Code Section 382(g). Neither the Company nor any Company Subsidiary will be required to include any item of income in, or exclude any item of deduction from, taxable income for any period (or any portion thereof) ending after the Closing as a result of any: (1) installment sale or other open transaction disposition made on or prior to the Closing; (2) prepaid amount received on or prior to the Closing; (3) written and legally binding agreement with a Governmental Entity relating to Taxes for any taxable period ending on or before the Closing; (4) change in method of accounting in any taxable period ending on or before the Closing; or (5) election under Section 108(i) of the Code, in each case except in the ordinary course of business consistent with past practice. For the purpose of this Agreement, the term "**Tax**" (including, with correlative meaning, the term "**Taxes**") shall mean any and all domestic or foreign, federal, state, local or other taxes, customs, duties, governmental fees or other like assessments or charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any Governmental Entity, including taxes on or with respect to income, franchises, windfall or other profits, gross receipts, property, transfer, sales, use, license, alternative or add on minimum, escheatment or unclaimed property, capital stock, payroll, employment, unemployment, social security, workers' compensation or net worth, and taxes in the nature of excise, withholding, ad valorem or value added or similar taxes, and the term "**Tax Return**" means any return, report, information return or other document (including any related or supporting information, and attachments and exhibits) filed or required to be filed with respect to Taxes, including, without limitation, all information returns relating to Taxes of third parties, any claims for refunds of Taxes and any amendment or supplements to any of the foregoing. "**Treasury Regulation**" means any final, proposed or temporary regulation of the Treasury under the Code and any successor regulation.

(j)    Absence of Certain Changes. Since March 31, 2013 through the date of this Agreement, (1) the Company has not, and no Company Subsidiary has, made or declared

any distribution or dividend in cash or in kind to its stockholders or issued or repurchased any shares of its capital stock or other equity interests, (2) the business and operations of the Company and the Company Subsidiaries have been conducted in the ordinary course of business consistent with past practice, and (3) there has not occurred any circumstance, event, change, development or effect that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and which is continuing.

(k)     <u>Commitments and Contracts</u>.

(1)     The Company has Previously Disclosed or provided to the Investor or its representatives, prior to the date hereof, true, correct, and complete copies of each of the following to which the Company or any Company Subsidiary is a party or subject (whether written or oral, express or implied) (each, a "**Company Significant Agreement**"):

(i)     any material employment contract or understanding (including any understandings or obligations with respect to severance or termination pay, liabilities or fringe benefits) with any present or former officer, director or employee (other than those that are terminable at will by the Company or such Company Subsidiary);

(ii)     any material plan, contract or understanding providing for any bonus, pension, option, deferred compensation, retirement payment, profit sharing or similar arrangement with respect to any present or former officer, director or employee;

(iii)     any contract containing covenants that limit the ability of the Company or any Company Subsidiary to compete in any line of business or with any person or which involve any restriction of the geographical area in which, or method by which or with whom, the Company or any Company Subsidiary may carry on its business (other than as may be required by law or applicable regulatory authorities), and any contract that would require the disposition of any material assets or line of business of the Company or any Company Subsidiary;

(iv)     any joint venture, partnership, strategic alliance or other similar contract (including any franchising agreement, but in any event excluding introducing broker agreements); and any contract relating to the acquisition or disposition of any material business or material assets (whether by merger, sale of stock or assets or otherwise), which acquisition or disposition is not yet complete or where such contract contains continuing material obligations or contains continuing material indemnity obligations of the Company or any of the Company Subsidiaries; and

(v)     any other contract or agreement which is a "material contract" within the meaning of Item 601(b)(10) of Regulation S-K.

16

(2)     Each of the Company Significant Agreements is valid and binding on the Company and the Company Subsidiaries, as applicable, and in full force and effect. The Company and each of the Company Subsidiaries, as applicable, are in compliance in all material respects with and have performed in all material respects all obligations required to be performed by them to date under each Company Significant Agreement. Neither the Company nor any of the Company Subsidiaries has received notice of any violation or default (or any condition which with the passage of time or the giving of notice would cause such a violation of or a default) by any party under any Company Significant Agreement. No party to a Company Significant Agreement has provided notice to the Company or any Company Subsidiary that it intends to terminate a Company Significant Agreement or not renew such agreement at the expiration of the current term.

(3)     Other than those contemplated by the Transactions, there are no transactions or series of related transactions, agreements, arrangements or understandings, nor are there any currently proposed transactions, or series of related transactions between the Company or any Company Subsidiaries, on the one hand, and the Company, any current or former director or executive officer of the Company or any Company Subsidiaries or any person who beneficially owns five percent (5%) or more of the Common Stock (or any of such person's immediate family members or Affiliates) (other than Company Subsidiaries), on the other hand, except for deposit relationships or loan transactions arising in the ordinary course of business.

(l)     Exemption from Registration.  Assuming the accuracy of Investor's representations contained in Section 2.3, the offer and sale of the Purchased Shares, as provided in this Agreement, are exempt from the registration requirements of the Securities Act, and are otherwise in compliance with the Securities Act.

(m)     Litigation and Other Proceedings; No Undisclosed Liabilities.

(1)     There is no pending claim, action, suit, investigation or proceeding against the Company or any Company Subsidiary, nor is any such claim, action, suit, investigation or proceeding, to the knowledge of the Company, threatened, nor is the Company or any Company Subsidiary subject to any order, judgment or decree, in each case, except as has not had and would not reasonably be expected to have a Material Adverse Effect.

(2)     Neither the Company nor any of the Company Subsidiaries has any liabilities or obligations of any nature (absolute, accrued, contingent or otherwise) which are not properly reflected or reserved against in the financial statements described in Section 2.2(f) to the extent required to be so reflected or reserved against in accordance with GAAP, except for liabilities that have arisen since March 31, 2013 in the ordinary and usual course of business and consistent with past practice and that have not had and would not reasonably be expected to have a Material Adverse Effect.

(n)     Compliance with Laws and Other Matters; Insurance.  The Company and each Company Subsidiary:

17

(1)     in the conduct of its business has been, since March 31, 2011, and is in compliance in all material respects with all, and the condition and use of its properties has not, since March 31, 2011, and does not violate or infringe in any material respect any, applicable domestic (federal, state or local) or foreign laws, statutes, ordinances, licenses, rules, regulations, judgments, demands, writs, injunctions, orders or decrees applicable thereto or to employees conducting its business, including the Troubled Asset Relief Program, the Sarbanes-Oxley Act of 2002, the Equal Credit Opportunity Act, the Fair Housing Act, the Community Reinvestment Act, the Home Mortgage Disclosure Act, the Bank Secrecy Act of 1970 (the "**BSA**"), the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001 (the "**PATRIOT Act**"), the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, all other applicable fair lending laws or other laws relating to discrimination and applicable privacy and customer information requirements contained in any federal or state privacy law or regulations, including Title V of the Gramm-Leach-Bliley Act of 1999;

(2)     has all material permits, licenses, franchises, authorizations, orders, and approvals of, and has made all material filings, applications, and registrations with, Governmental Entities that are required in order to permit it to own or lease its properties and assets and to carry on its business as presently conducted and that are material to the business of the Company or such Company Subsidiary; all such material permits, licenses, certificates of authority, orders and approvals are in full force and effect, and all such material filings, applications and registrations are current, and, to the knowledge of the Company, no suspension or cancellation of any of them is threatened;

(3)     has been, since March 31, 2011, compliant and currently is complying in all material respects with and, to the knowledge of the Company, has not been, since March 31, 2011, and is not under investigation with respect to, nor has been threatened in writing by any Governmental Entity to be charged with or given notice of any material violation of, any applicable federal, state, local and foreign laws, regulations, rules, judgments, injunctions or decrees;

(4)     has not, nor has any other person on behalf of the Company or any Company Subsidiary that qualifies as a "financial institution" under U.S. anti-money laundering laws, in each case since March 31, 2010, knowingly acted, by itself or in conjunction with another, in any act in connection with the concealment of any currency, securities or other proprietary interest that is the result of a felony as defined in U.S. anti-money laundering laws ("**Unlawful Gains**"), nor knowingly accepted, transported, stored, dealt in or brokered any sale, purchase or any transaction of other nature for Unlawful Gains;

(5)     is presently insured, and since March 31, 2011 (or during such lesser period of time as the Company has owned such Company Subsidiary) has been insured, for reasonable amounts with, to the knowledge of the Company, financially sound and reputable insurance companies against such risks as companies engaged in a similar business would, in accordance with industry practice, customarily be insured;

(6)      (A) is not aware of any facts or circumstances that would cause it to believe that any non-public customer information has been disclosed to or accessed by an unauthorized third-party in a manner that would cause it to undertake any material remedial action; (B) has adopted and implemented in all material respects an anti-money laundering program that contains adequate and appropriate customer identification verification procedures that comply with the PATRIOT Act and such anti-money laundering program meets the requirements in all material respects of Section 352 of the PATRIOT Act and the regulations thereunder, and it has complied in all respects with any requirements to file reports and other necessary documents as required by the PATRIOT Act and the regulations thereunder; and (C) will not knowingly directly or indirectly use the proceeds of the sale of the Common Shares pursuant to Primary Investment Transactions, or lend, contribute or otherwise make available such proceeds to any Company Subsidiary, joint venture partner or other person, towards any sales or operations in any country sanctioned by U.S. Office of Foreign Asset Control of the Treasury ("**OFAC**") or for the purpose of financing the activities of any person currently subject to any U.S. sanctions administered by OFAC; and

(7)      has no knowledge of any facts and circumstances, and has no reason to believe that any facts or circumstances exist, that would cause the Bank: (A) to be deemed not to be in satisfactory compliance with the Community Reinvestment Act of 1977 (the "**CRA**") and the regulations promulgated thereunder, or to be assigned a CRA rating by federal or state banking regulators of lower than "satisfactory"; (B) to be operating in violation, in any material respect, of the Bank Secrecy Act of 1970, the PATRIOT Act, any order issued with respect to anti-money laundering by OFAC, or any other anti-money laundering statute, rule or regulation; or (C) not to be in satisfactory compliance, in any material respect, with all applicable privacy of customer information requirements contained in any applicable federal and state privacy laws and regulations as well as the provisions of all information security programs adopted by any such Company Subsidiary.

(o)      Labor. Employees of the Company and the Company Subsidiaries are not represented by any labor union nor are any collective bargaining agreements otherwise in effect with respect to such employees.  No labor organization or group of employees of the Company or any Company Subsidiary has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Company's knowledge, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority.  There are no organizing activities, strikes, work stoppages, slowdowns, lockouts, arbitrations or grievances, or other labor disputes pending or, to the knowledge of the Company, threatened against or involving the Company or any Company Subsidiary.  Each of the Company and the Company Subsidiaries is in compliance in all material respects with all applicable laws with respect to employment and employment practices, terms and conditions of employment, and wages and hours.  To the Company's knowledge, no executive officer is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement or any other contract or agreement or any restrictive covenant in favor of a third party, and, to the Company's knowledge,

19

the continued employment of each such executive officer does not subject the Company or any Company Subsidiary to any liability with respect to any of the foregoing matters.

(p)     Company Benefit Plans.

(1)     "**Benefit Plan**" means all employment agreements, employee benefit and compensation plans, programs, agreements, contracts, policies, practices, or other arrangements providing compensation or benefits to any current or former employee, officer, director or consultant of the Company or any Company Subsidiary or any beneficiary or dependent thereof that is sponsored or maintained by the Company or any Company Subsidiary or to which the Company or any Company Subsidiary contributes or is obligated to contribute or is party or for which the Company or any Company Subsidiary has any direct or indirect liability, whether or not written, including without limitation any "employee welfare benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), any "employee pension benefit plan" within the meaning of Section 3(2) of ERISA (whether or not such plan is subject to ERISA) and any material bonus, incentive, deferred compensation, vacation, stock purchase, stock appreciation right, stock option or equity award, equity-based severance, employment, change of control, consulting or fringe benefit plan, program, agreement or policy.  Each Benefit Plan is listed on Section 2.2(p)(1) of the Disclosure Schedule.  True and complete copies of all Benefit Plans listed on Section 2.2(p)(1) of the Disclosure Schedule have been made available to the Investor prior to the date hereof or have been filed with a Company Report.

(2)     With respect to each Benefit Plan, (A) the Company and the Company Subsidiaries have complied in all material respects, and are now in material compliance with the applicable provisions of ERISA, the Code and all other laws and regulations applicable to such Benefit Plan and (B) each Benefit Plan has been administered in all material respects in accordance with its terms.  None of the Company or the Company Subsidiaries nor any of their respective ERISA Affiliates (as defined below) has incurred any withdrawal liability as a result of a complete or partial withdrawal from a multiemployer plan, as those terms are defined in Part I of Subtitle E of Title IV of ERISA, that has not been satisfied in full.  "**ERISA Affiliate**" means any entity, trade or business, whether or not incorporated, which together with the Company and the Company Subsidiaries, would be deemed a "single employer" within the meaning of Section 4001 of ERISA or Sections 414(b), (c), (m) or (o) of the Code.

(3)     Each Benefit Plan which is subject to ERISA (an "**ERISA Plan**") that is an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA ("**Pension Plan**") and that is intended to be qualified under Section 401(a) of the Code is so qualified, has received a favorable determination letter from the IRS and nothing has occurred, whether by action or failure to act, that would reasonably be expected to result in revocation of any such favorable determination or the loss of the qualification of such Benefit Plan under Section 401(a) of the Code.  Neither the Company nor any Company Subsidiary has engaged in a transaction with respect to any ERISA Plan that has subjected or could subject the Company or any Company Subsidiary to a material tax or penalty imposed by either Section 4975 of the Code or Section 502(i) of ERISA.  Neither

20

the Company nor any Company Subsidiary has incurred or reasonably expects to incur a tax or penalty imposed by Section 4980F of the Code or Section 502 of ERISA.

(4)     Neither the Company, any Company Subsidiary nor any ERISA Affiliate (A) sponsors, maintains or contributes to or has within the past six years sponsored, maintained or contributed to a Pension Plan that is subject to Subtitles C or D of Title IV of ERISA or (B) sponsors, maintains or has any liability with respect to or an obligation to contribute to or has within the past six years sponsored, maintained, had any liability with respect to, or had an obligation to contribute to a "multiemployer plan" within the meaning of Section 3(37) of ERISA.

(5)     Neither the execution and delivery of this Agreement nor the consummation of the Transactions will, whether alone or in connection with another event, (A) result in any material payment or benefit (including severance, unemployment compensation, "excess parachute payment" (within the meaning of Section 280G of the Code), forgiveness of indebtedness or otherwise) becoming due to any employee, officer, or director of the Company or any Company Subsidiary from the Company or any Company Subsidiary under any Benefit Plan or any other agreement with any employee, including, for the avoidance of doubt, any employment or change in control agreements, (B) result in payments under any of the Benefit Plans which would not be deductible under Section 162(m) or Section 280G of the Code, (C) result in any acceleration of the time of payment or vesting of any such benefits, including, for the avoidance of doubt, the Company Stock Option Plans, (D) materially increase any compensation or benefits otherwise payable under any Benefit Plan, (E) require the funding or increase in the funding of any such benefits, (F) result in any limitation on the right of the Company or any Company Subsidiary to amend, merge, terminate or receive a reversion of assets from any Benefit Plan or related trust, or (G) result in a violation of the prohibitions under 12 C.F.R. Part 359.

(6)     As of the date hereof, there is no pending or, to the knowledge of the Company, threatened, material litigation, claim, action, suit, investigation or proceeding relating to the Benefit Plans.  Neither the Company nor any Company Subsidiary has any obligations for retiree health and life benefits under any Benefit Plan or collective bargaining agreement, except for health continuation coverage as required by Section 4980B of the Code or Part 6 of Title I of ERISA.  The Company and the Company Subsidiaries are in compliance in all material respects with Sections 111 and 302 of the Emergency Economic Stabilization Act of 2008, as amended by the American Recovery and Reinvestment Act of 2009, including all guidance issued thereunder by a Governmental Entity.

(7)     Except as would not reasonably be expected to have a Material Adverse Effect, and except for liabilities fully reserved for or identified in the Company Financial Statements, there are no pending or, to the knowledge of the Company, threatened claims (other than claims for benefits in the ordinary course), lawsuits or arbitrations which have been asserted or instituted against (i) the Benefit Plans, (ii) any fiduciaries thereof with respect to their duties to the Benefit Plans, or (iii) the assets of any of the trusts under any of the Benefit Plans.

21

(q)     Status of Purchased Shares.  Subject to confirmation of the Plan of Reorganization by the Bankruptcy Court, the Purchased Shares to be issued pursuant to this Agreement have been, and, subject to the completion of the Delaware Conversion and the effectiveness of the Amended Charter, will be, duly authorized by all necessary corporate action of the Company.  When issued, delivered and sold against receipt of the consideration therefor as provided in this Agreement, the Purchased Shares will be validly issued, fully paid and nonassessable and without any personal liability attaching to the ownership thereof, and will not be issued in violation of or subject to preemptive rights of any other shareholder of the Company.

(r)     Investment Company.  Neither the Company nor any of the Company Subsidiaries is an "investment company" as defined under the Investment Company Act of 1940, as amended, and neither the Company nor any of the Company Subsidiaries sponsors any person that is such an investment company.

(s)     Risk Management; Derivatives.

(1)     The Company and the Company Subsidiaries have in place risk management policies and procedures sufficient in scope and operation to protect against risks of the type and in amounts expected to be incurred by persons of similar size and in similar lines of business as the Company and the Company Subsidiaries.

(2)     All derivative instruments, including swaps, caps, floors and option agreements, whether entered into for the Company's own account, or for the account of one or more of the Company Subsidiaries or their customers, were entered into (A) only for purposes of mitigating identified risk and in the ordinary course of business, (B) in accordance with prudent practices and in material compliance with all applicable laws, rules, regulations and regulatory policies, and (C) with counterparties believed by the Company to be financially responsible at the time; and each of them constitutes the valid and legally binding obligation of the Company or one of the Company Subsidiaries, enforceable in accordance with its terms.  Neither the Company nor the Company Subsidiaries, nor, to the knowledge of the Company, any other party thereto, is in breach of any of its obligations under any such agreement or arrangement.

(t)     Foreign Corrupt Practices and International Trade Sanctions.  Neither the Company nor any Company Subsidiary, nor any of their respective directors, officers, agents, employees or any other persons acting on their behalf (1) has violated the Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1 et seq., as amended, or any other similar applicable foreign, federal, or state legal requirement, (2) has made or provided, or caused to be made or provided, directly or indirectly, any payment or thing of value to a foreign official, foreign political party, candidate for office or any other person knowing that the person will pay or offer to pay the foreign official, party or candidate, for the purpose of influencing a decision, inducing an official to violate their lawful duty, securing any improper advantage, or inducing a foreign official to use their influence to affect a governmental decision, (3) has paid, accepted or received any unlawful contributions, payments, expenditures or gifts, (4) to the knowledge of the Company, has violated or operated in noncompliance with any export restrictions, money laundering law, anti-terrorism law or regulation, anti-boycott regulations or embargo regulations, or (5) is currently subject to any United States sanctions administered by OFAC.

22

(u)     Environmental Matters.  There is no legal, administrative, or other proceeding, claim or action pending or, to the knowledge of the Company, threatened against the Company or any Company Subsidiary seeking to impose, or that could reasonably be expected to result in the imposition of, on the Company or any Company Subsidiary, any liability relating to the use, disposal or release of hazardous substances or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances under any local, state or federal law, statute, regulation or ordinance, including the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (collectively, "**Environmental Laws**").  Neither the Company nor any Company Subsidiary is subject to any agreement, order, judgment or decree by or with any Governmental Entity or third party imposing any liability under any Environmental Laws.  Neither the Company nor any Company Subsidiary (i) is in violation of any Environmental Laws, (ii) owns or operates any real property contaminated with any substance that is in violation of any Environmental Laws, or (iii) is liable for any off-site disposal or contamination pursuant to any Environmental Laws.

(v)     Anti-Takeover Provisions; Rights Plan.

(1)     The Board of Directors has taken all necessary action to ensure that, prior to the Closing any "moratorium," "control share," "fair price," "takeover" or "interested stockholder" law (each, a "**Takeover Law**") does not and shall not apply to the Primary Investment Transactions, the TARP Exchange and the Secondary Treasury Sales.  In the case that such transactions are subject to such provisions or laws, the Board of Directors shall take all necessary action to ensure that such transactions shall be deemed to be exceptions to such provisions or laws, including, but not limited to, the approval of such transactions as contemplated thereunder.

(2)     Prior to the Closing, the Company and American Stock Transfer & Trust Company, LLC, as Rights Agent (the "**Rights Agent**"), shall have duly executed an amendment to the Rights Agreement, dated as of November 5, 2010, between the Company and the Rights Agent (the "**Company Rights Agreement**"), and as a result of such amendment (which amendment shall be valid, binding and enforceable and shall not have been revoked, modified or rescinded prior to the Closing), among other things, (i) neither this Agreement nor the consummation of any of the Primary Investment Transactions, the TARP Exchange or the Secondary Treasury Sales will cause the rights issued pursuant to the Company Rights Agreement to become exercisable by the holders thereof, and (ii) none of the Investor or any of its "Permissible Transferees" shall be deemed to be an "Acquiring Person" (as defined in the Company Rights Agreement).

(w)     Intellectual Property.

(1)     (i) The Company and the Company Subsidiaries own (free and clear of any claims, Liens, exclusive licenses or non-exclusive licenses not granted in the ordinary course of business) or have a valid license to use all Intellectual Property used in or necessary to carry on their business as currently conducted, and (ii) such Intellectual Property referenced in clause (i) above is valid, subsisting and enforceable, and is not subject to any outstanding order, judgment, decree or agreement adversely affecting the Company's or the Company Subsidiaries' use of, or rights to, such Intellectual Property.

23

The Company and the Company Subsidiaries have sufficient rights to use all Intellectual Property used in their business as presently conducted, all of which rights shall survive unchanged the consummation of the Transactions.  Neither the Company nor any Company Subsidiary has received any written notice of infringement or misappropriation of, or any conflict with, the rights of others with respect to any Intellectual Property.  To the Company's knowledge, no third party has infringed, misappropriated or otherwise violated the Intellectual Property rights of the Company or the Company Subsidiaries.  There is no litigation, opposition, cancellation, proceeding, objection or claim pending, asserted, or, to the Company's knowledge, threatened in writing against the Company or any Company Subsidiary concerning the ownership, validity, registerability, enforceability, infringement or use of, or licensed right to use, any Intellectual Property.  To the knowledge of the Company, none of the Company or any of the Company Subsidiaries is using or enforcing any Intellectual Property owned by or licensed to the Company or any of the Company Subsidiaries in a manner that would be expected to result in the abandonment, cancellation or unenforceability of such Intellectual Property.

(2) "**Intellectual Property**" shall mean trademarks, service marks, brand names, domain names, certification marks, trade dress and other indications of origin, the goodwill associated with the foregoing and registrations in any jurisdiction of, and applications in any jurisdiction to register, the foregoing, including any extension, modification or renewal of any such registration or application; inventions, discoveries and ideas, whether patentable or not, in any jurisdiction; patents, applications for patents (including divisions, continuations, continuations in part and renewal applications), and any renewals, extensions or reissues thereof, in any jurisdiction; trade secrets and rights in any jurisdiction to limit the use or disclosure thereof by any person; writings and other works, whether copyrightable or not, in any jurisdiction; and registrations or applications for registration of copyrights in any jurisdiction, and any renewals or extensions thereof; and any similar intellectual property or proprietary rights.

(x) <u>Agreements with Regulatory Agencies</u>.  Neither the Company nor any Company Subsidiary is subject to any cease-and-desist or other similar order or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any capital directive by, or since March 31, 2010, has adopted any board resolutions at the request of, any Governmental Entity that currently restricts the conduct of its business or that relates to its capital adequacy, its liquidity and funding policies and practices, its ability to pay dividends, its credit, risk management or compliance policies, its internal controls, its management, or its operations or business (each item in this sentence, a "**Regulatory Agreement**"), nor has the Company or any Company Subsidiary been advised since March 31, 2010 by any Governmental Entity that it is considering issuing, initiating, ordering or requesting any such Regulatory Agreement.  Except as Previously Disclosed, the Company and each Company Subsidiary are in compliance with each Regulatory Agreement to which it is party or subject, and neither the Company nor any Company Subsidiary has received any notice from any Governmental Entity indicating that either the Company or any Company Subsidiary is not in compliance in all material respects with any such Regulatory Agreement.

24

(y)    <u>Brokers and Finders</u>.  Except for Sandler O'Neill + Partners, L.P. (the "**Placement Agent**"), neither the Company nor any Company Subsidiary nor any of their respective officers, directors or employees has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, and no broker or finder has acted directly or indirectly for the Company or any Company Subsidiary, in connection with the Transactions.  Prior to the date of this Agreement, the Company has disclosed to the Investor the economic and other material terms of its arrangements with the Placement Agent in connection with the Transactions.

(z)    <u>Loan Portfolio</u>.

(1)    Each of the Company and each Company Subsidiary has complied with, and all documentation in connection with the origination, processing, underwriting and credit approval of any loan, lease or other extension of credit or commitment to extend credit ("**Loans**") originated, purchased or serviced by the Company or any Company Subsidiary satisfied in all material respects, (i) all applicable laws with respect to the origination, insuring, purchase, sale, pooling, servicing, subservicing or filing of claims in connection with Loans, including all laws relating to real estate settlement procedures, consumer credit protection, truth in lending laws, usury limitations, fair housing, transfers of servicing, collection practices, equal credit opportunity and adjustable rate mortgages, (ii) the responsibilities and obligations relating to Loans set forth in any material contract between the Company or any Company Subsidiary and any Agency, Loan Investor or Insurer, (iii) the applicable rules, regulations, guidelines, handbooks and other requirements of any Agency, Loan Investor or Insurer, and (iv) the terms and provisions of any material mortgage or other collateral documents and other Loan documents with respect to each Loan.

(2)    No Agency, Loan Investor or Insurer has (i) claimed in writing that the Company or any Company Subsidiary has violated or has not complied with the applicable underwriting standards with respect to Loans sold by the Company or any Company Subsidiary to a Loan Investor or Agency, or with respect to any sale of Loan servicing rights to a Loan Investor, (ii) imposed in writing restrictions on the activities (including commitment authority) of the Company or any Company Subsidiary or (iii) indicated in writing to the Company or any Company Subsidiary that it has terminated or intends to terminate its relationship with the Company or any Company Subsidiary for poor performance, poor Loan quality or concern with respect to the Company's or any Company Subsidiary's compliance with laws.

(3)    To the knowledge of the Company, the characteristics of the loan portfolio of the Company have not materially changed from the characteristics of the loan portfolio of the Company as of March 31, 2013 in a manner that could reasonably be expected to result in a Material Adverse Effect with respect to the Company.

(4)    For purposes of this <u>Section 2.2(z)</u>: (i) "**Agency**" means the Federal Housing Administration, the Federal Home Loan Mortgage Corporation, the Farmers Home Administration (now known as Rural Housing and Community Development Services), the Federal National Mortgage Association, the United States

Department of Veterans' Affairs, the Rural Housing Service of the U.S. Department of Agriculture or any other federal or state agency with authority to (A) determine any investment, origination, lending or servicing requirements with regard to Loans originated, purchased or serviced by the Company or any Company Subsidiary or (B) originate, purchase, or service Loans, or otherwise promote lending, including state and local housing finance authorities; (ii) "**Loan Investor**" means any person (including an Agency) having a beneficial interest in any Loan originated, purchased or serviced by the Company or any Company Subsidiary or a security backed by or representing an interest in any such Loan; and (iii) "**Insurer**" means a person who insures or guarantees for the benefit of the Loan holder all or any portion of the risk of loss upon borrower default on any of the Loans originated, purchased or serviced by the Company or any Company Subsidiary, including the Federal Housing Administration, the United States Department of Veterans' Affairs, the Rural Housing Service of the U.S. Department of Agriculture and any private mortgage insurer, and providers of hazard, title or other insurance with respect to such Loans or the related collateral.

(aa)    Fiduciary Accounts.  To the knowledge of the Company, the Company and the Company Subsidiaries have, in all material respects, properly administered all accounts for which it acts as a fiduciary, including accounts for which it serves as a trustee, agent, custodian, personal representative, guardian, conservator or investment advisor, in accordance with the terms of the governing documents, applicable federal and state Law and regulation and common law.  To the knowledge of the Company, none of the Company, the Company Subsidiaries or any director, officer or employee of the Company or the Company Subsidiaries has, in any material respect, committed any breach of trust or fiduciary duty with respect to any such fiduciary account and the accountings for each such fiduciary account are true and correct in all material respects and accurately reflect the assets of such fiduciary account.

(bb)    Section 365(o).  Neither the Company nor any Company Subsidiary is subject to any agreement, order, decree, law, regulation, resolution or other commitment that falls within the scope of Section 365(o) of the Bankruptcy Code.

(cc)    Ownership.  The Company acknowledges, represents, warrants and agrees that, assuming the accuracy of the representations made by the Investor herein and by the investors in the Other Private Placements, and after giving effect to the purchase of the Purchased Shares hereunder, the Investor, together with any other person whose shares of Common Stock would be aggregated with the Investor's shares of Common Stock for purposes of any banking regulation or law, will not collectively Beneficially Own in excess of 9.9% of the shares of Common Stock outstanding or other outstanding shares of a class of voting securities (within the meaning of the HOLA and Regulation LL promulgated thereunder) of the Company.

(dd)    Transactions With Affiliates and Employees.  Except as contemplated by the Transactions, none of the officers, directors, employees or Affiliates of the Company or any Company Subsidiary is presently a party to any contract, arrangement or transaction with the Company or any Company Subsidiary or to a presently contemplated contract, arrangement or transaction (other than for services as employees, officers and directors) that would be required to be disclosed pursuant to Item 404 of Regulation S-K promulgated under the Securities Act.

26

(ee)  <u>Off Balance Sheet Arrangements</u>.  There is no transaction, arrangement, or other relationship between the Company (or any Company Subsidiary) and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its Exchange Act filings and is not so disclosed.

(ff)  <u>Absence of Manipulation</u>. The Company has not, and to the knowledge of the Company no one acting on its behalf has, taken, directly or indirectly, any action designed to cause or to result in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Purchased Shares.

(gg)  <u>Directors' and Officers' Insurance</u>. The Company (i) maintains directors' and officers' liability insurance and fiduciary liability insurance with, to the knowledge of the Company, financially sound and reputable insurance companies with benefits and levels of coverage that have been Previously Disclosed, (ii) has timely paid all premiums on such policies and (iii) there has been no lapse in coverage during the term of such policies.

(hh)  <u>Shell Company Status</u>.  The Company is not, and has never been, an issuer identified in Rule 144(i)(1).

(ii)  <u>No Other Investor Representations and Warranties</u>.  The Company has not received, and is not relying on, any representations or warranties, written or oral or express or implied, of any nature whatsoever, from the Investor or any other person other in connection with the execution and delivery of this Agreement than as specifically set forth in <u>Section 2.3</u>.

2.3  <u>Representations and Warranties of the Investor</u>.  The Investor hereby represents and warrants as of the date of this Agreement and as of the Closing (except to the extent made only as of a specified date, in which case as of such date) to the Company that:

(a)  <u>Organization and Authority</u>.  The Investor is duly organized and validly existing under the laws of the jurisdiction of its organization, is duly qualified to do business and is in good standing in all jurisdictions where its ownership or leasing of property or the conduct of its business requires it to be so qualified, and has corporate power and authority to own its properties and assets and to carry on its business as it is now being conducted.

(b)  <u>Authorization</u>.

(1)  The Investor has the requisite corporate, partnership, limited liability company or other power and authority to enter into this Agreement and to carry out its obligations hereunder.  The execution, delivery and performance of this Agreement by the Investor and the consummation of the transactions contemplated hereby have been duly authorized by the Investor's board of directors or directors, general partner, managing members or other authorized persons, as the case may be (if such authorization is required).  This Agreement has been duly and validly executed and delivered by the Investor and, assuming due authorization, execution and delivery of this Agreement by the Company, is a valid and binding obligation of the Investor enforceable against the Investor in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, reorganizations, fraudulent transfer or similar laws relating to or affecting creditors generally or by general equitable principles

27

(whether applied in equity or at law).  No other corporate, partnership, limited liability company or other proceedings are necessary for the execution and delivery by the Investor of this Agreement, the performance by the Investor of its obligations hereunder or the consummation by the Investor of the transactions contemplated hereby.

(2)      Neither the execution, delivery and performance by the Investor of this Agreement, nor the consummation of the transactions contemplated hereby, nor compliance by the Investor with any of the provisions of any of the foregoing, will (A) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any Lien, upon any of the properties or assets of the Investor under any of the terms, conditions or provisions of (i) its certificate of limited partnership or partnership agreement or similar government documents or (ii) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Investor is a party or by which it may be bound, or to which the Investor or any of the properties or assets of the Investor may be subject, or (B) subject to compliance with the statutes and regulations referred to in the next paragraph, and assuming the accuracy of the representations and warranties of the Company and performance of the covenants and agreements of the Company contained herein, violate in any material respect any ordinance, permit, concession, grant, franchise, law, statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to the Investor or any of its properties, except in the case of clause (A)(ii) for such violations, conflicts and breaches that would not have a material and adverse effect on the ability of the Investor to consummate the transactions contemplated by this Agreement in a timely manner.

(3)      Other than (i) passivity or anti-association commitments that may be required by the Federal Reserve and (ii) the securities or blue sky laws of the various states and filings, notices, approvals or clearances required under federal or state banking laws, and assuming the accuracy of the representations and warranties of the Company and the performance of the covenants and agreements of the Company contained herein, no notice to, registration, declaration or filing with, exemption or review by, or authorization, order, consent or approval of, any Governmental Entity, or expiration or termination of any statutory waiting period, is necessary for the consummation by the Investor of the transactions contemplated by this Agreement.

(c)      Purchase for Investment.

(1)      The acquisition of the Purchased Shares by the Investor is for the Investor's own account, is for investment purposes only, and is not with a view to, nor for offer or sale for the Company in connection with, the distribution of any of the Purchased Shares.  The Investor is not participating and does not have a participation in any such distribution or the underwriting of any such distribution.  The Investor has no present intention of selling or otherwise disposing of any of the Purchased Shares other than in accordance with applicable law.

(2)     The Investor is an "accredited investor" as that term is defined in Rule 501 promulgated under the Securities Act.  The Investor has such knowledge and experience in financial and business matters as to be capable of evaluating the risks and merits of this investment.

(3)     The Investor is able to bear the economic risk of an investment in the Purchased Shares.  The Investor has conducted its own investigation of the Company, the Company Subsidiaries and the terms of the Purchased Shares.  The Investor has received all the information it considers necessary or appropriate for deciding whether to acquire the Purchased Shares.  The Investor has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Purchased Shares and the business and financial condition of the Company and to obtain additional information (to the extent the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to it or to which it had access.  The Investor has not received, and is not relying on, any representations or warranties, written or oral or express or implied, of any nature whatsoever, from the Company or any other person other than as specifically set forth in this Agreement.  Notwithstanding the foregoing, nothing herein shall limit the Investor's rights with respect to fraud or intentional misrepresentation by the Company in connection with the Transactions or be deemed to be a waiver of any such rights.

(4)     The Investor acknowledges that the Purchased Shares have not been and will not be, registered under the Securities Act or the securities laws of any state and therefore cannot be sold unless such Purchased Shares subsequently are registered under the Securities Act and any applicable state securities laws or exemptions from registrations thereunder are available.

(5)     The Investor acknowledges that the Company is relying on the foregoing representations and warranties for the purpose of compliance with applicable federal and state securities laws.

(d)     Financial Capability.  At Closing, the Investor will have available funds necessary to consummate the Closing on the terms and conditions contemplated by this Agreement and has the ability to bear the economic risks of its prospective investment in the Purchased Shares and can afford the complete loss of such investment.

(e)     Investment Decision.

(1)     The Investor has independently evaluated the merits of its decision to purchase the Purchased Shares pursuant to this Agreement, and the Investor confirms that it has not relied on the advice of any other person's business and/or legal counsel in making such decision.  The Investor understands that nothing in this Agreement or any other materials presented by or on behalf of the Company to the Investor in connection with the purchase of the Purchased Shares constitutes legal, tax or investment advice.  The Investor has consulted such legal, tax and investment advisors as it, in its sole discretion, has deemed necessary or appropriate in connection with its purchase of the

29

Purchased Shares. The Investor understands that the Placement Agent has acted solely as the agent of the Company in this placement of the Purchased Shares and the Investor has not relied on the business or legal advice of the Placement Agent or any of its agents, counsel or Affiliates in making its investment decision hereunder, and confirms that none of such persons has made any representations or warranties to the Investor in connection with the transactions contemplated by this Agreement.

(2)     The Investor hereby declares and represents that the satisfaction in full of the Company's obligations under the Credit Agreement and the elimination of the TARP Preferred Stock and the TARP Warrant are critical and integral elements of the transactions contemplated by this Agreement and that, absent the approval and consummation of the satisfaction in full of the Company's obligations under the Credit Agreement and the elimination of the TARP Preferred Stock and the TARP Warrant under the Plan of Reorganization, the Investor would not be willing to enter into this Agreement and consummate the Investment.

(f)     Independence. The Investor or, in the event that there are investors in the Other Private Placements or the Secondary Treasury Sales that share a common discretionary investment advisor or investment manager with the Investor, such duly appointed  investment advisor or investment manager of the Investor acting in its capacity as investment advisor or investment manager of the Investor (the "**Investment Manager**") (A) reached its decision to invest in the Company independently from any investor in the Other Private Placements or the Secondary Treasury Sales, (B) has not entered into any agreement or understanding with any investor in the Other Private Placements or the Secondary Treasury Sales to act in concert for the purpose of exercising a controlling influence over the Company or any Company Subsidiary, including any agreements or understandings regarding the voting or transfer of shares of the Company, (C) has not shared due diligence materials prepared by (x) such Investor or any of its advisors or representatives or (y) the Investment Manager, as applicable, with respect to the Company or any Company Subsidiary with any investor in the Other Private Placements or Secondary Treasury Sales (it being understood that the Investment Manager advising or sharing any due diligence materials prepared by it with the investors in the Other Private Placements who share the Investment Manager with the Investor shall not be considered sharing materials in violation of this clause (C), even if such investors receive the identical advice or materials from the Investment Manager as the Investor), (D) has not been induced by, nor has induced, any investor in the Other Private Placements or the Secondary Treasury Sales, to enter into the transactions contemplated by this Agreement or the Other Private Placements or the Secondary Treasury Sales, (E) has not entered into any agreement with respect to the Primary Investment Transactions or the Secondary Treasury Sales other than this Agreement, (F) acknowledges that the right to an Investor Designated Director (as defined below) is being provided to certain investors in the Primary Investment Transactions to permit such person to monitor and protect its economic interest in the Company following the Closing and that the composition of the Board of Directors is generally designed to be commensurate with the ownership percentage held by such persons relative to the other Investors in the Primary Investment Transactions and the Secondary Treasury Sales, subject to applicable regulatory limitations and requirements for passive, non-controlling investors, and (G) reached its decision to invest in the Company without regard to the identity of any particular investor in the Primary Investment Transactions that will have the right to nominate an Investor Designated Director. Neither the Investor nor any of its

30

Affiliates presently holds or owns any capital stock of the Company and, upon consummation of the Transactions, the Investor and its Affiliates will be treated as owning only the Purchased Shares for purposes of Section 382 of the Code.  No partner, member or other equityholder in the Investor will indirectly own a five percent (5%) or greater interest in the Company solely as a result of such person's interest in the Investor; provided, however, that the foregoing representation shall not be deemed breached if such person will indirectly own a five percent (5%) or greater interest in the Company solely as a result of such person's interest in the Investor if (i) such person has no other direct or indirect interest in the Company and (ii) such person has no partner, member or other equityholder of its own that will indirectly own a five percent (5%) or greater interest in the Company as a result of such person's interest in it.  The Investor agreed to enter into this Agreement based, in part, on its expectation, following its discussions with the Placement Agent and the Company, that the Primary Investment Transactions and the Secondary Treasury Sales would be at least adequately subscribed. Such decisions to enter into this Agreement were not based on the identity of any other investor or potential investor (including whether management of the Company would or would not invest) in the Primary Investment Transactions or the Secondary Treasury Sales.

(g)    Knowledge as to Required Approvals.  As of the date of this Agreement, the Investor has no knowledge of any reason relating to the Investor or any of its Affiliates why the Required Approvals will not be obtained without the imposition of any Burdensome Condition.

(h)    Brokers and Finders.  Neither the Investor nor any of its respective officers, directors or employees has employed any broker or finder or incurred any liability for any financial advisory fees, brokerage fees, commissions or finder's fees, and no broker or finder has acted directly or indirectly for the Investor in connection with the transactions contemplated by this Agreement.

## ARTICLE III

## COVENANTS

3.1    Filings; Other Actions.  The Investor, on the one hand, and the Company, on the other hand, will cooperate and consult with the other and use reasonable best efforts to prepare and file all necessary and customary documentation, to effect all necessary and customary applications, notices, petitions, filings and other documents, and to obtain all necessary and customary permits, consents, orders, approvals and authorizations of, or exemptions from, all Governmental Entities (and, solely with respect to the Company, the Bankruptcy Court) and third parties, (i) necessary or advisable to consummate the transactions contemplated by this Agreement (including all transactions that are conditions to Closing hereunder) or the Other Private Placements, and to perform the covenants contemplated by this Agreement to be performed by it and (ii) with respect to the Investor, to the extent typically provided by the Investor to such third parties or Governmental Entities, as applicable, under the Investor's policies consistently applied and subject to such confidentiality requests as the Investor may reasonably seek.  Each of the parties hereto shall execute and deliver both before and after the Closing such further certificates, agreements and other documents and take such other actions as the other parties may reasonably request to consummate or implement such

31

transactions or to evidence such events or matters, subject, in each case, to clauses (i) and (ii) of the first sentence of this Section 3.1.  The Investor and the Company will each use its reasonable best efforts to promptly obtain or submit, and the Company and the Investor will cooperate as may reasonably be requested by the Investor or the Company, as the case may be, to help the Investor and the Company promptly obtain or submit, as the case may be, as promptly as practicable, the approvals and authorizations of, any additional filings and registrations with, and any additional notifications to, all notices to and, to the extent required by laws, rules, regulations, consents, approvals or exemptions from Governmental Entities (and, solely with respect to the Company, the Bankruptcy Court) or third parties, subject, in each case, to clauses (i) and (ii) of the first sentence of this Section 3.1.  In furtherance of the foregoing, the Investor and the Company shall make all necessary applications, notices, petitions, filings and other documents in connection with the Required Approvals required to be obtained by it, not later than five (5) business days following the date of this Agreement, and the Investor and the Company shall use, and shall cause their respective Affiliates to use, reasonable best efforts to, as promptly as possible, respond fully to all requests for additional information from the Federal Reserve or the OCC. The Investor and the Company will each have the right to review in advance, and to the extent practicable, each will consult with the other, in each case subject to applicable laws relating to the exchange of information and confidential information related to the Investor or the Company, all the information (other than confidential information) relating to such other party, and any of their respective Affiliates, which appears in any filing made with, or written materials submitted to, any third party or any Governmental Entity (other than public filings with the Bankruptcy Court) in connection with the transactions contemplated by this Agreement; provided, however, that the Company shall not allow any other investor in the Other Private Placements to review any such information relating to the Investor.  In exercising the foregoing right, each of the parties hereto agrees to act reasonably and as promptly as practicable. Each party hereto agrees to keep the other party apprised of the status of matters relating to completion of the transactions contemplated hereby.  The Investor and the Company shall promptly furnish each other to the extent permitted by applicable laws with copies of written communications received by them or their Affiliates from, or delivered by any of the foregoing to, any Governmental Entity (other than public filings with the Bankruptcy Court)in respect of the transactions contemplated by this Agreement; provided that the party delivering any such document may redact any confidential information contained therein.  Notwithstanding anything to the contrary herein, nothing contained in this Agreement shall require the Investor or any of its Affiliates to (i) take any action that would result in the Investor or any of its Affiliates being deemed to control the Company or the Bank for purposes of the CIBCA, the HOLA or the cross-guaranty liability provisions of the FDI Act, or that would require any such entity to register as a savings and loan holding company, (ii) take or refrain from taking or agree to take or refrain from taking any action or suffer to exist any condition, limitation, restriction or requirement that would result in a Burdensome Condition or (iii) provide to the Company any of its, its Affiliates', its investment advisor's or its or their control persons' or equity holders' nonpublic, proprietary, personal or otherwise confidential information including the identities of limited partners, shareholders or members of the Investor or its Affiliates or their investment advisors.  So long as the Investor holds any securities of the Company, the Company will not, without the consent of the Investor, take any action, directly or indirectly through its subsidiaries or otherwise, that the Board of Directors believes in good faith would reasonably be expected to cause the Investor to be subject to transfer restrictions or other covenants of the FDIC Statement of Policy on

32

Qualifications for Failed Bank Acquisitions as in effect at the time of taking such action or thereunder.

    3.2  <u>Access, Information and Confidentiality</u>.

    (a)  From the date of this Agreement, until the date when the Investor no longer has a Qualifying Ownership Interest (as defined below), subject to applicable law or regulatory requirements, the Company will use reasonable efforts to afford the Investor and its representatives (including employees of the Investor, and counsel, accountants, investment advisors and other professionals retained by the Investor) such access during normal business hours to its and the Company Subsidiaries' books, records, properties and personnel and to such other information as the Investor may reasonably request.

    (b)  Each party to this Agreement will hold, and will cause its respective subsidiaries and their directors, officers, employees, agents, consultants, and advisors to hold, in strict confidence, unless disclosure to a Governmental Entity (and, solely with respect to the Company, the Bankruptcy Court) is necessary or appropriate in connection with any necessary regulatory approval or unless compelled to disclose by judicial or administrative process or by other requirement of law or the applicable requirements of any Governmental Entity (and, solely with respect to the Company, the Bankruptcy Court), all nonpublic records, books, contracts, instruments, computer data and other data and information (collectively, "**Information**") concerning the other party hereto furnished to it by such other party or its representatives pursuant to this Agreement (except to the extent that such Information can be shown to have been (1) previously known by such party on a nonconfidential basis, (2) in the public domain through no fault of such party, or (3) later lawfully acquired from other sources by the party to which it was furnished), and neither party hereto shall release or disclose such Information to any other person, except its auditors, attorneys, financial advisors, other consultants, and advisors and, to the extent permitted above, to bank regulatory authorities.  Prior to any disclosure of Information permitted by the prior sentence, the party proposing to disclose such Information shall, to the extent legally permissible, provide notice to the other party so that the other party may, at its own expense, seek an protective order or other appropriate remedy and/or waive compliance with the provisions of this <u>Section 3.2(b)</u>.  If such protective order or other remedy is denied, the party proposing to disclose such Information shall (x) furnish only that portion of the Information that, based upon the advice of counsel, is necessary to be disclosed in connection with such necessary regulatory approval or is compelled to be disclosed by such judicial or administrative process or by such other requirement of law or such applicable requirements and (y) use its reasonable best efforts to obtain assurances that confidential treatment will be accorded to the Information.

    3.3  <u>Reasonable Best Efforts</u>.  Subject to the other provisions of this Agreement, each of the Company and the Investor agree to use their respective reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including using reasonable best efforts to accomplish the following:  (a) the taking of all reasonable acts necessary to cause the conditions to Closing to be satisfied; (b) the making of all necessary registrations and filings and the taking of all reasonable steps necessary to obtain

an approval, order or waiver from, or to avoid an action or proceeding by any Governmental Entity (and, solely with respect to the Company, the Bankruptcy Court) or third party, and the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Entities (and, solely with respect to the Company, the Bankruptcy Court) or third parties, including the Required Approvals and, solely with respect to the Company, the confirmation of the Plan of Reorganization by the Bankruptcy Court; (c) solely with respect to the Company, the TARP Exchange; (d) solely with respect to the Company, the Senior Debt Settlement; (e) solely with respect to the Company, the Debt Issuance; (f) solely with respect to the Company, the confirmation by the Bankruptcy Court of the Plan of Reorganization; (g) solely with respect to the Company, the Delaware Conversion and the Amended Charter; (h) solely with respect to the Company, file the Bankruptcy Case with the Bankruptcy Court on the Petition Date; (i) solely with respect to the Company, assume this Agreement and the stock purchase agreements in the Other Private Placements under Section 365 of the Bankruptcy Code in the Bankruptcy Case at the confirmation of the Plan of Reorganization; and (j) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement.

3.4     Conduct of the Business.

(a)     The Company agrees that, during the period prior to the earlier of the Closing Date and the termination of this Agreement pursuant to Section 5.1 (the "**Pre-Closing Period**"), except as set forth in Section 3.4(a) of the Disclosure Schedule or as otherwise contemplated in this Agreement, and subject to applicable requirements under the Bankruptcy Code, it shall, and shall cause each of the Company Subsidiaries to, carry on its business in the ordinary course consistent with past practice and consistent with prudent banking practice and in compliance in all material respects with all applicable laws and regulations.  During the Pre-Closing Period, the Company will use its commercially reasonable efforts to (x) maintain and preserve its and each Company Subsidiary's business (including its organization, assets, properties, goodwill and insurance coverage), (y) keep available the present services of the current officers and employees of the Company and the Company Subsidiaries and (z) preserve the goodwill of the customers of the Company and the Company Subsidiaries.

(b)     Without limiting the generality of Section 3.4(a), during the Pre-Closing Period, except as (w) set forth in Section 3.4(b) of the Disclosure Schedule, (x) otherwise contemplated in this Agreement, (y) otherwise required by law, rule or regulation, or by policies imposed by any Governmental Entity (including the Bankruptcy Court), or by the Regulatory Agreements applicable to the Company or the Bank, or (z) required in connection with the Bankruptcy Case (including pursuant to any order of the Bankruptcy Court), without the prior written consent of the Investor (which shall not be unreasonably withheld, conditioned or delayed), the Company shall not, and it shall not permit any of the Company Subsidiaries to:

(1)     Operations.  Enter into any significant new line of business or materially change its lending, investment, underwriting, risk and asset liability management, and other banking and operating policies, except as required by applicable law or policies imposed by any Governmental Entity (and the Bankruptcy Court).

(2)     <u>Capital Expenditures</u>.  Make any capital expenditures in excess of $1,000,000 individually or $2,500,000 in the aggregate, other than as required pursuant to commitments entered into prior to the date of this Agreement.

(3)     <u>Company Significant Agreements</u>.  Terminate, enter into, amend, modify (including by way of interpretation), waive any material right or obligation under or renew any Company Significant Agreement, other than in the ordinary course of business and consistent with past practice.

(4)     <u>Capital Stock</u>.  Except as contemplated by the Transactions, issue, sell or otherwise permit to become outstanding, or dispose of or encumber or pledge, or authorize or propose the creation of, any additional shares of its stock or any additional options, warrants or other convertible, exchangeable or similar rights, grants or awards with respect to its stock, except any shares of Common Stock issued pursuant to the exercise of Company Stock Options outstanding on the date hereof or as contemplated by the Transactions.

(5)     <u>Dividends, Distributions, Repurchases</u>.  Make, declare, pay or set aside for payment any dividend on or in respect of, or declare or make any distribution on any shares of its stock (other than dividends from its wholly owned subsidiaries to it or another of its wholly owned subsidiaries) or directly or indirectly adjust, split, combine, redeem, reclassify, purchase or otherwise acquire, any shares of its stock or any options or other rights, grants or awards with respect to the Common Stock, or enter into any contract with respect thereto, except as contemplated by the Transactions.

(6)     <u>Dispositions</u>.  Sell, transfer, mortgage, encumber or otherwise dispose of or discontinue any of its assets, deposits, businesses or properties, except for sales, transfers, mortgages, encumbrances or other dispositions or discontinuances in the ordinary course of business consistent with past practice and in a transaction that individually or taken together with all other such transactions is not material to the Company and the Company Subsidiaries, taken as a whole.

(7)     <u>Incurrence of Indebtedness</u>.  Except as contemplated by the Transactions, incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for the obligations of, any other person, except in the ordinary and usual course of business and consistent with past practice, including as to amounts.

(8)     <u>Interest Rate Instruments</u>.  Enter into, renew or amend any interest rate swaps, caps, floors and option agreements and other interest rate risk management arrangements, whether entered into for the account of it or for the account of a customer of it, except in the ordinary and usual course of business and consistent with past practice.

(9)     <u>Acquisitions</u>.  Acquire (other than by way of foreclosures, acquisitions of control in a fiduciary or similar capacity, acquisitions of loans or participation interests, or in satisfaction of debts previously contracted in good faith, in each case in the ordinary and usual course of business and consistent with past practice,

35

including as to amounts) all or any portion of the assets, business, deposits or properties of any other person.

(10)  Banking Offices.  File any application to establish, or to relocate or terminate the operations of, any banking office.

(11)  Constituent Documents.  Except as contemplated by the Delaware Conversion or the Amended Charter (or customary bylaws in connection therewith), amend its Articles of Incorporation or bylaws or similar organizational documents.

(12)  Accounting Methods.  Implement or adopt any change in its accounting principles, practices or methods, other than as may be required by GAAP or applicable accounting requirements of a Governmental Entity (and the Bankruptcy Court).

(13)  Tax Matters.  Make, change or revoke any material Tax accounting method or election, file any amended income or other material Tax Return (unless to correct an error), enter into any closing agreement with respect to a material amount of Taxes, settle any material Tax claim or assessment, surrender any right to claim a material refund of Taxes or agree to extend any statute of limitations relating to Taxes.

(14)  Claims.  Settle any action, suit, claim or proceeding against it, except for an action, suit, claim or proceeding that is settled in the ordinary and usual course of business and consistent with past practice in an amount or for consideration not in excess of $250,000 and that would not (A) impose any material restriction on the business of it and, after the Closing, the Investor or its Affiliates or (B) create precedent for claims that are reasonably likely to be material to it or, after the Closing, the Investor or its Affiliates.

(15)  Compensation.  Other than, in each case, in the ordinary and usual course of business and consistent with past practice or as required by applicable law, grant any salary or wage increase or increase any employee benefit, including incentive or bonus payments (or, with respect to any of the preceding, communicate any intention to take such action).

(16)  Benefit Arrangements.  Terminate, enter into, establish, adopt, or materially amend, make new grants or awards under or renew any employment, severance, change in control, pension, retirement, stock option, stock purchase, stock appreciation right, savings, profit sharing, deferred compensation, consulting, bonus, group insurance or other employee benefit, incentive or welfare contract, plan, program, agreement, arrangement or policy, or any trust agreement (or similar arrangement) related thereto, in respect of any current or former director, officer, consultant or employee, amend the terms of any outstanding equity-based award, or take any action to accelerate the vesting, exercisability or payment (or fund or secure the payment) of equity-based awards or other compensation or benefits payable thereunder, except (A) as required by applicable law or (B) to satisfy contractual obligations under any Benefit Plan as in effect as of the date hereof.

36

(17)   <u>Intellectual Property</u>.  (A) Grant, extend, amend (except as required in the diligent prosecution of the Intellectual Property owned (beneficially, and of record where applicable) by or developed for the Company and the Company Subsidiaries), waive, or modify any material rights in or to, sell, assign, lease, transfer, license, let lapse, abandon, cancel, or otherwise dispose of, or extend or exercise any option to sell, assign, lease, transfer, license, or otherwise dispose of, any material Intellectual Property, or (B) fail to exercise a right of renewal or extension under any material agreement under which the Company or any of the Company Subsidiaries is licensed or otherwise permitted by a third party to use any material Intellectual Property (other than "shrink-wrap" or "click-through" licenses).

(18)   <u>Government Programs</u>.  Participate in any program sponsored or administered by any Governmental Entity, which program is not part of the usual and customary banking business of the Company and the Company Subsidiaries.

(19)   <u>Related Party Transactions</u>.  Except as contemplated by the Transactions, engage in (or modify in a manner adverse to the Company or the Company Subsidiaries) any transactions with any shareholder of the Company or any director or officer (senior vice president or above) of the Company or the Company Subsidiaries (or any Affiliate of any such person), other than deposit relationships in the ordinary course of business and extensions of credit which are on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with persons unaffiliated with the Company and did not involve more than the normal risk of collectability or present other unfavorable features.

(20)   <u>Adverse Actions</u>.  Notwithstanding any other provision hereof, knowingly take, or knowingly omit to take, any action that would result in any of the conditions set forth in <u>Section 1.2(c)</u> not being satisfied, or any action that would prevent the Company from performing its obligations under this Agreement or the Other Private Placements or consummating the Closing, except as required by applicable law.

(21)   <u>Commitments</u>.  Enter into any contract with respect to, or otherwise agree or commit to do, any of the foregoing.

3.5   <u>Bankruptcy Court Matters</u>.  No later than the first business day immediately following the date this Agreement becomes effective, the Company shall file the Bankruptcy Case with the Bankruptcy Court.  The Company further covenants and agrees that the terms of any reorganization plan submitted to the Bankruptcy Court or any other court for confirmation shall not, and the Company will not seek or support the entry by the Bankruptcy Court of any other order that would, conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.  If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), the Company shall diligently defend against such appeal, petition or motion.

37

## ARTICLE IV

## ADDITIONAL AGREEMENTS

4.1    <u>Governance Matters</u>.

(a)    Subject to the satisfaction of all legal, regulatory and governance requirements, immediately or as promptly as practicable following the Closing, the Company shall cause the Board of Directors to be reconstituted to consist of eight (8) members as follows: Chris Bauer, the Investor Designated Director, one representative designated by an investor in the Other Private Placements, one representative designated by another investor in the Other Private Placements, and four (4) independent directors reasonably acceptable to the Company.

(b)    The Company shall cause the Investor Designated Director to be elected or appointed on or in any event as promptly as practicable following the Closing Date to the Board of Directors, subject to satisfaction of all legal, regulatory and governance requirements regarding service as a member of the Board of Directors.  Thereafter, for so long as the Investor beneficially owns at least fifty percent (50%) or more of all of the Purchased Shares (a "**Qualifying Ownership Interest**"), the Company shall recommend to its stockholders the election of the Investor Designated Director to the Board of Directors at the Company's annual meeting and each successive annual meeting until the Investor no longer has a Qualifying Ownership Interest, subject to satisfaction of all legal, regulatory and governance requirements regarding service as a director of the Company.  If the Investor no longer has a Qualifying Ownership Interest, it shall have no further rights under this <u>Section 4.1</u> and, in each case, at the request of the Board of Directors, as applicable, the Investor shall use all reasonable best efforts to cause the Investor Designated Director to resign from the Board of Directors as promptly as possible thereafter.  For purposes of this Agreement, the "**Investor Designated Director**" means the individual designated in writing by the Investor prior to the date hereof or such successor as the Investor shall designate as provided herein in writing.

(c)    For so long as the Investor has a Qualifying Ownership Interest, the Investor Designated Director shall, subject to applicable law, rules or regulations, be the nominee of the Company and the Nominating Committee of the Board of Directors (the "**Nominating Committee**") to serve on the Board of Directors.  The Company shall use its reasonable best efforts to have the Investor Designated Director elected as director of the Company by the shareholders of the Company and the Company shall solicit proxies for the Investor Designated Director to the same extent as it does for any of its other nominees to the Board of Directors.

(d)    Subject to <u>Section 4.1(b)</u>, upon the death, disability, resignation, retirement, disqualification or removal from office of an Investor Designated Director, the Investor shall have the right to designate the replacement for the Investor Designated Director, which replacement shall be reasonably acceptable to the Company and shall satisfy all legal, regulatory and governance requirements regarding service as a member of the Board of Directors. The Board of Directors shall use its reasonable best efforts to take all action required to fill the vacancy resulting therefrom with such person (including such person, subject to applicable law, rules or regulations, being the Company's and the Nominating Committee's nominee to serve on the Board of Directors, calling a special meeting of shareholders to vote on such person, using all

38

reasonable best efforts to have such person elected as director of the Company by the shareholders of the Company and the Company soliciting proxies for such person to the same extent as it does for any of its other nominees to the Board of Directors).

(e)     The Investor Designated Director shall be entitled to the same compensation, including fees, and the same indemnification and insurance coverage in connection with his or her role as a director as the other members of the Board of Directors and the Investor Designated Director and the Observer, as the case may be, shall be entitled to reimbursement for documented, reasonable out-of-pocket expenses incurred in attending meetings of the Board of Directors, or any committee thereof, or the Bank Board, or any committee thereof, to the same extent as the other members of the Board of Directors or the Bank Board.  The Company shall notify the Investor Designated Director of all regular meetings and special meetings of the Board of Directors and of all regular and special meetings of any committee of the Board of Directors of which the Investor Designated Director is a member in accordance with the applicable bylaws and the Company and the Bank shall notify the Observer of all regular and special meetings of the Bank Board and, as applicable, the Board of Directors to the same extent as it notifies the members of the Bank Board and, as applicable, the Board of Directors in accordance with the applicable bylaws.  The Company shall provide the Investor Designated Director with copies of all notices, minutes, consents and other material that they provide to all other members of the Board of Directors concurrently as such materials are provided to the other members and, subject to Section 4.1(f), the Bank shall provide the Observer with copies of all notices, minutes, consents and other material it provides to all members of the Bank Board and, as applicable, the Board of Directors concurrently as such materials are provided to the members of the Bank Board and, as applicable, the Board of Directors.

(f)     For so long as the Investor has a Qualifying Ownership Interest, the Company shall, subject to applicable laws, rules or regulations, invite or cause to be invited a person designated by the Investor and reasonably acceptable to the Board of Directors (the "**Observer**") to attend all meetings of the board of directors of the Bank (the "**Bank Board**") and all committees thereof in a nonvoting observer capacity.  For so long as (i) the Investor holds any Common Stock and (ii) the Investor Designated Director is not a member of the Board of Directors, the Company shall invite or cause to be invited the Observer to attend all meetings of the Board of Directors and all committees thereof in a nonvoting observer capacity.  The Investor shall cause the Observer to agree to hold in confidence and trust and to act in a fiduciary manner with respect to all information provided to such Observer and the Company, the Bank, the Board of Directors and the Bank Board, as applicable, shall have the right to withhold any information (including notices, minutes, consents and other materials) and to exclude the Observer from any meeting or portion thereof (1) if doing so is, in the opinion of counsel to the Company or Bank, necessary to protect the attorney-client privilege between the Company or the Bank and counsel or (2) if the Board of Directors or the Bank Board, as applicable, determines in good faith, after consultation with counsel, that fiduciary or regulatory requirements under applicable law would make attendance by the Observer inappropriate.  The Observer shall have no right to vote on any matters presented to the Board of Directors or the Bank Board.

(g)     The Company acknowledges that the Investor Designated Director may have certain rights to indemnification, advancement of expenses and/or insurance provided by the Investor and/or certain of its Affiliates (collectively, the "**Investor Indemnitors**").  The

39

Company hereby agrees that with respect to a claim by the Investor Designated Director for indemnification arising out his or her service as a director of the Company (1) that it is the indemnitor of first resort (i.e., its obligations to the Investor Designated Director are primary and any obligation of the Investor Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by the Investor Designated Director are secondary), and (2) that it shall be required to advance the full amount of expenses incurred by the Investor Designated Director and shall be liable for the full amount of all expenses and liabilities incurred by the Investor Designated Director, in each case to the extent legally permitted and as required by the terms of this Agreement and the Amended Charter or bylaws of the Bank (and any other agreement regarding indemnification between the Company, on the one hand, and the Investor Designated Director, on the other hand), subject to the satisfaction of any conditions imposed on the advancement of expense as may be required by the Amended Charter or bylaws of the Company or under applicable law and regulation, without regard to any rights the Investor Designated Director may have against any Investor Indemnitor.  The Company further agrees that no advancement or payment by any Investor Indemnitor on behalf of the Investor Designated Director with respect to any claim for which the Investor Designated Director has sought indemnification from the Company shall affect the foregoing and the Investor Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the Investor Designated Director against the Company.  The Company agrees that the Investor Indemnitors are express third party beneficiaries of the terms of this Section 4.1(g).

      4.2      Transfers; Legend; Form D.

(a)      The Investor acknowledges that the Purchased Shares have not been, and, subject to Section 4.5, will not be, registered under the Securities Act or under any state securities laws and agrees that (i) it will not sell or otherwise dispose of any of the Purchased Shares, except in compliance with the registration requirements or exemption provisions of the Securities Act and any other applicable securities laws and (ii) prior to the six (6) month anniversary of the Closing (the "**Lock-Up Date**"), it shall not sell or otherwise dispose of any Purchased Shares except to one or more Permitted Transferees who shall have agreed in writing to be bound by the terms of this Agreement pursuant to a joinder agreement reasonably satisfactory to the Company.  Any attempt to sell or otherwise dispose of any Purchased Shares not in compliance with this Agreement shall be null and void *ab initio*, and the Company shall not, and shall cause any transfer agent not to, give any effect in the Company's stock records to such attempted sale or disposition.  "**Permitted Transferee**" shall mean any general or limited partner, member, stockholder or Affiliate of the Investor, or a trust the beneficiaries of which include only such general or limited partner, member, shareholder or Affiliate; provided that a transfer or other disposition to the general or limited partners, members or stockholders of the Investor, or to a trust the beneficiaries of which include only such general or limited partners, members, or stockholders of the Investor, shall not be deemed to be a sale or other disposition to a Permitted Transferee unless the sale or other disposition is made on a pro rata basis to all such partners, members or stockholders.

(b)      The Investor agrees that all certificates or other instruments representing the Purchased Shares subject to this Agreement will bear a legend substantially to the following effect:

"(1) THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS.

(2) THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO TRANSFER AND OTHER RESTRICTIONS SET FORTH IN A STOCK PURCHASE AGREEMENT, DATED AS OF JULY [●], 2013, COPIES OF WHICH ARE ON FILE WITH THE SECRETARY OF THE ISSUER."

(c)      Upon request of the Investor, upon receipt by the Company of an opinion of counsel reasonably satisfactory to the Company to the effect that such legend is no longer required under the Securities Act or applicable state laws, as the case may be, the Company shall promptly cause the legend to be removed from any certificate for any Purchased Shares.

(d)      The Company agrees to timely file a Form D with respect to the Purchased Shares as required under Regulation D.  The Company, on or before the Closing Date, shall take such action as the Company shall reasonably determine is necessary in order to obtain an exemption for or to qualify the Common Stock for sale to the Investor pursuant to this

41

Agreement under applicable securities or blue sky laws of the states of the United States (or to obtain an exemption from such qualification).  The Company shall make all filings and reports relating to the offer and sale of the Purchased Shares required under applicable securities or blue sky laws of the states of the United States following the Closing Date.

4.3    Indemnity.

(a)     From and after the Closing, the Company agrees to indemnify and hold harmless the Investor and its Affiliates and each of their respective officers, directors, direct or indirect partners or members, employees, agents and investment advisors, and each person who controls the Investor within the meaning of the Exchange Act and the rules and regulations promulgated thereunder, to the fullest extent lawful, from and against any and all actions, suits, claims, proceedings, costs, losses, liabilities, damages, expenses (including reasonable attorneys' fees and disbursements), amounts paid in settlement and other costs (collectively, "**Losses**") arising out of or resulting from (1) any inaccuracy in or breach of any of the Company's representations or warranties in Section 2.2 of this Agreement, (2) the Company's material breach of any agreements or covenants made by the Company in this Agreement or (3) any Losses arising out of or resulting from any legal, administrative or other proceedings instituted by any Governmental Entity, stockholder of the Company or any other person (other than the Investor and its Affiliates and the Company and the Company Subsidiaries) arising out of the transactions contemplated by this Agreement (other than any Losses attributable to the acts, errors or omissions on the part of the Investor, but not including the transactions contemplated hereby).

(b)     A party entitled to indemnification hereunder (each, an "**Indemnified Party**") shall give written notice to the party indemnifying it (the "**Indemnifying Party**") of any claim with respect to which it seeks indemnification promptly (and in no event more than thirty (30) days) after the discovery by such Indemnified Party of any matters giving rise to a claim for indemnification; provided that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Indemnifying Party of its obligations under this Section 4.3 unless and to the extent that the Indemnifying Party shall have been materially and adversely prejudiced by the failure of such Indemnified Party to so notify such party.  Such notice shall describe in reasonable detail such claim to the extent known by the Indemnified Party.  In case any such action, suit, claim or proceeding is brought against an Indemnified Party, the Indemnified Party shall be entitled to hire, at the cost and expense of the Indemnifying Party, counsel and conduct the defense thereof; provided, however, that the Indemnifying Party shall be entitled to assume and conduct the defense thereof, unless the counsel to the Indemnified Party advises such Indemnifying Party in writing that such claim involves a conflict of interest (other than one of a monetary nature) that would make it inappropriate for the same counsel to represent both the Indemnifying Party and the Indemnified Party, in which case the Indemnified Party shall be entitled to retain its own counsel at the cost and expense of the Indemnifying Party (except that the Indemnifying Party shall only be liable for the legal fees and expenses of one law firm for all Indemnified Parties, taken together with respect to any single action or group of related actions). If the Indemnifying Party assumes the defense of any claim, all Indemnified Parties shall thereafter deliver to the Indemnifying Party copies of all notices and documents (including court papers) received by the Indemnified Party relating to the claim, and each Indemnified Party shall cooperate in the defense or prosecution of such claim.  Such cooperation shall include the

42

retention and (upon the Indemnifying Party's request) the provision to the Indemnifying Party of records and information that are reasonably relevant to such claim, and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Indemnifying Party shall not be liable for any settlement of any action, suit, claim or proceeding effected without its written consent; provided, however, that the Indemnifying Party shall not unreasonably withhold or delay its consent.  The Indemnifying Party further agrees that it will not, without the Indemnified Party's prior written consent, settle or compromise any claim or consent to entry of any judgment in respect thereof in any pending or threatened action, suit, claim or proceeding in respect of which indemnification has been sought hereunder unless such settlement or compromise (A) includes an unconditional release of such Indemnified Party from all liability arising out of such action, suit, claim or proceeding, (B) provides solely for the payment of money damages and not any injunctive or equitable relief or criminal penalties and (C) does not create any financial or other obligation on the part of an Indemnified Party which would not be indemnified in full by the Indemnifying Party.

(c)    For purposes of the indemnity contained in Sections 4.3(a)(1), all qualifications and limitations set forth in the parties' representations and warranties as to "materiality," "Material Adverse Effect" and words of similar import, shall be disregarded in determining whether there shall have been any inaccuracy in or breach of any representations and warranties in this Agreement.

(d)    The Company shall not be required to indemnify the Indemnified Parties pursuant to Section 4.3(a)(1) (i) with respect to any claim for indemnification if the amount of Losses with respect to such claim are less than $25,000 (any claim involving Losses less than such amount being referred to as a "**De Minimis Claim**") and (ii) unless and until the aggregate amount of all Losses incurred with respect to all claims (other than De Minimis Claims) pursuant to Section 4.3(a)(1) exceed an amount equal to the product of (x) 2.85%, *multiplied by* (y) the Purchase Price (the "**Threshold Amount**"), in which event the Company shall be responsible for all Losses incurred by the Indemnified Party (without regard to the Threshold Amount).  The cumulative indemnification obligations of the Company hereunder shall in no event exceed the Purchase Price.

(e)    In the event of any transfer of the Purchased Shares to a third party that is not a Permitted Transferee of the Investor, the Company shall have no obligations under this Section 4.3 to such transferee.  The indemnity provided for in this Section 4.3 shall be the sole and exclusive monetary remedy of Indemnified Parties after the Closing for any inaccuracy of any of the representations and warranties contained in Sections 2.2 and 2.3 of this Agreement or any other breach of any covenant or agreement contained in this Agreement; provided that nothing herein shall limit in any way any such party's remedies in respect of fraud, intentional misrepresentation or omission or intentional misconduct by the other party in connection with the transactions contemplated hereby.  No party to this Agreement (or any of its Affiliates) shall, in any event, be liable or otherwise responsible to any other party (or any of its Affiliates) for any punitive damages of such other party (or any of its Affiliates) arising out of or relating to this Agreement or the performance or breach hereof.

(f)     Any indemnification payments pursuant to this <u>Section 4.3</u> shall be treated as an adjustment to the Purchase Price for the Purchased Shares for U.S. federal income and applicable state and local Tax purposes, unless a different treatment is required by applicable law.

4.4     <u>Preemptive Rights</u>.

(a)     Following the Closing, for so long as the Investor has a Qualifying Ownership Interest, if the Company proposes to issue (a "**New Issuance**") any equity (including shares of Common Stock or shares of Company Preferred Stock), or any securities, options or debt that are convertible or exchangeable into equity or that include an equity component (any such security, a "**New Security**"), the Company shall provide written notice of such proposed New Issuance to the Investor no later than fifteen (15) business days prior to the anticipated issuance date (the "**Preemptive Rights Notice**").  The Investor shall have the right to purchase for cash, at the price and on the same terms and conditions and at the same time as the New Issuance, such number of New Securities as are required to enable it to maintain its proportionate Common Stock-equivalent interest in the Company immediately prior to any such issuance of New Securities (the "**Preemptive Amount**").  The Preemptive Rights Notice shall set forth all material terms and conditions of the New Issuance, including the number New Securities proposed to be issued, the issue price and the maximum number of New Securities that the Investor may purchase in the New Issuance pursuant to the immediately preceding sentence.

(b)     The Investor may elect to participate in the New Issuance to the extent described in <u>Section 4.4(a)</u> by delivering an irrevocable written notice to the Company by the date specified by the Company in the Preemptive Rights Notice (which shall be no later than three (3) business days before the anticipated date of the New Issuance), setting forth the number of shares the Investor wishes to purchase in the New Issuance up to its Preemptive Amount; <u>provided</u> that in order to exercise rights under this <u>Section 4.4</u> ("**Preemptive Rights**"), the Investor must execute all customary transaction documentation in connection with such New Issuance on the same terms as any other participant in the New Issuance; <u>provided</u>, <u>further</u>, that in the event that the Company is issuing more than one type or class of New Securities in connection with such New Issuance, the Investor participating in such issuance shall be required to acquire the same percentage of all such types and classes of securities.

(c)     The closing of the acceptances of the Preemptive Rights shall take place at the same time as the closing(s) under definitive agreements with other participants in the New Issuance, which in any event shall occur within ninety (90) days after the anticipated date of the New Issuance as set forth in the Preemptive Rights Notice.  In the event that the New Issuance is not consummated within the time frame described above, the Company's right to consummate such New Issuance shall expire and the Company shall be required to comply with the procedures set forth in this <u>Section 4.4</u> prior to any subsequent New Issuance.  At the consummation of any New Issuance, the Company shall issue certificates to the Investor promptly following payment by the Investor of the purchase price for such exercise in accordance with the terms and conditions as specified in the Preemptive Rights Notice.

(d)     Notwithstanding anything to the contrary herein, the Investor shall not have any Preemptive Rights in connection with (i) any issuance of New Securities to management, consultants, employees, officers or directors of the Company pursuant to

management or employee incentive programs or plans approved by the Board of Directors (including any such programs or plans in existence on the date hereof), (ii) any issuance, delivery or sale of New Securities by the Company to any person as consideration in connection with (but not in connection with raising capital to fund) (1) an acquisition or strategic business combination approved by the Board of Directors or (2) an investment by the Company approved by the Board of Directors in any party which is not prior to such transaction an Affiliate of the Company (whether by merger, consolidation, stock swap, sale of assets or securities, or otherwise), (iii) any issuance, delivery or sale of New Securities in any registered public offering or (iv) any issuance of New Securities in connection with any stock split, stock dividend paid on a proportionate basis to all holders of the affected class of capital stock or recapitalization approved by the Board of Directors (any such issuance, an "**Exempted Issuance**").

(e)      Notwithstanding the foregoing provisions of this Section 4.4, if a majority of the directors of the Board of Directors determines that the Company must issue equity or debt securities on an expedited basis, then the Company may consummate the proposed issuance or sale of such securities ("**Expedited Issuance**") and then comply with the provisions of this Section 4.4 provided that (i) the purchaser(s) of such New Securities has consented in writing to the issuance of additional New Securities in accordance with the provisions of this Section 4.4, and (ii) the sale of any such additional New Securities under this Section 4.4(e) to the Investor and certain other investors in the Other Private Placements pursuant to this Section 4.4 and similar provisions in the other stock purchase agreements in the Other Private Placements shall be consummated as promptly as is practicable but in any event no later than ninety (90) days subsequent to the date on which the Company consummates the Expedited Issuance under this Section 4.4(e).  Notwithstanding anything to the contrary herein, the consent of the purchasers of such New Securities shall not be required in connection with any Expedited Issuance undertaken at the written direction of the applicable federal regulator of the Company or the Bank.

(f)      In addition, the Investor shall not have any Preemptive Rights in connection with any issuance of New Securities to the extent that a majority of the Board of Directors determines that such issuance would materially increase the risk of or cause an "ownership change" within the meaning of Section 382 of the Code.

4.5      Registration Rights.

(a)      Registration.

(1)      Subject to the terms and conditions of this Agreement, the Company covenants and agrees that as promptly as practicable after the Closing Date (and in any event, no later than the date that is ninety (90) days after the Closing Date), (i) the Company shall have prepared and filed with the SEC one or more Shelf Registration Statements on Form S-1 covering the resale of Registrable Securities and the Company shall use reasonable best efforts to cause such Shelf Registration Statement to be declared or become effective and to keep such Shelf Registration Statement continuously effective and in compliance with the Securities Act and usable for resale of such Registrable Securities for a period from the date of its initial effectiveness until the time as there are no such Registrable Securities remaining (including by refiling such Shelf Registration Statement (or a new Shelf Registration Statement) if the initial Shelf Registration

Statement expires) and (ii) the Company shall register the Registrable Securities on Form S-3 promptly after such form is available.

(2)      Any registration pursuant to this <u>Section 4.5(a)</u> shall be effected by means of a shelf registration under the Securities Act (a "**Shelf Registration Statement**") in accordance with the methods and distribution set forth in the Shelf Registration Statement and Rule 415.  If the Investor or any other holder of Registrable Securities to whom the registration rights conferred by this Agreement have been transferred in compliance with this Agreement intends to distribute any Registrable Securities by means of an underwritten offering it shall promptly so advise the Company and the Company shall take all reasonable steps to facilitate such distribution, including the actions required pursuant to <u>Section 4.5(c)</u>.  The lead underwriters in any such distribution shall be selected by the holders of a majority of the Registrable Securities to be distributed hereunder (provided that such lead underwriters shall be reasonably acceptable to the Company).

(3)      The Company shall not be required to effect a registration (including a resale of Registrable Securities from an effective Shelf Registration Statement):

(i)      with respect to securities that are not Registrable Securities or with respect to Registrable Securities that cannot be sold under a registration statement as a result of the transfer restrictions set forth herein;

(ii)      during any Scheduled Black-out Periods, with respect to any resale of Registrable Securities from an effective Shelf Registration Statement by the Investor only if the Investor, at such time, has an Investor Designated Director or appointed an Observer pursuant to this Agreement; or

(iii)      if the Company has notified the Investor and all other Holders that in the good faith judgment of the Board of Directors, it would be materially detrimental to the Company or its security holders for such registration to be effected at such time, in which event the Company shall have the right to defer such registration for a period of not more than forty five (45) days after receipt of the request of the Investor or any other Holder; <u>provided</u> that such right to delay a registration pursuant to this clause (iii) shall be exercised by the Company (x) only if the Company has generally exercised (or is concurrently exercising) similar black-out rights (if any) against holders of similar securities that have registration rights and (y) not more than two times in any twelve (12)-month period and not more than ninety (90) days in the aggregate in any twelve (12)-month period.

The Company shall provide the Investor written notice of any Scheduled Black-out Period, if applicable to such Investor, no later than five (5) business days prior to the commencement of such Scheduled Black-out Period.

(4)      If during any period when the Shelf Registration Statement is not effective or available, the Company proposes to register any of its securities, other than a registration pursuant to Section 4.5(a)(1) or a Special Registration, and the registration form to be filed may be used for the registration or qualification for distribution of Registrable Securities, the Company shall give prompt written notice to the Investor and all other Holders of its intention to effect such a registration (but in no event less than ten (10) business days prior to the anticipated filing date) and shall include in such registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten (10) business days after the date of the Company's notice (a "**Piggyback Registration**").  Any such person that has made such a written request may withdraw its Registrable Securities from such Piggyback Registration by giving written notice to the Company and the managing underwriter, if any, on or before the fifth (5th)  business day prior to the planned effective date of such Piggyback Registration.  The Company may terminate or withdraw any registration under this Section  prior to the effectiveness of such registration, whether or not the Investor or any other Holders have elected to include Registrable Securities in such registration.

(5)      If the registration referred to in Section 4.5(a)(4) is proposed to be underwritten, the Company shall so advise the Investor and all other Holders as a part of the written notice given pursuant to Section 4.5(a)(4).  In such event, the right of the Investor and all other Holders to registration pursuant to this Section 4.5(a) shall be conditioned upon such persons' participation in such underwriting and the inclusion of such person's Registrable Securities in the underwriting, and each such person shall (together with the Company and the other persons distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company.  If any participating person disapproves of the terms of the underwriting, such person may elect to withdraw therefrom by written notice to the Company, the managing underwriter and the Investor.

(6)      Except for the registration rights granted to certain other investors in the Other Private Placements, the Company represents and warrants that it has not granted to any holder of its securities and agrees that it shall not grant "piggyback" registration rights to one or more third parties to include their securities in the Shelf Registration Statement or in an underwritten offering under the Shelf Registration Statement pursuant to Section 4.5(a)(2).  If (x) the Company grants "piggyback" registration rights to certain other investors in the Other Private Placements to include their securities in an underwritten offering under the Shelf Registration Statement pursuant to Section 4.5(a)(2) or (y) a Piggyback Registration under Section 4.5(a)(4) relates to an underwritten primary offering on behalf of the Company, and in either case the managing underwriters advise the Company that in their reasonable opinion the number of securities requested to be included in such offering exceeds the number which can be sold without adversely affecting the marketability of such offering (including an adverse effect on the per share offering price), the Company shall include in such registration or prospectus only such number of securities that in the reasonable opinion of such underwriters can be sold without adversely affecting the marketability of the offering (including an adverse effect on the per share offering price), which securities

47

shall be so included in the following order of priority:  (i) first, in the case of a Piggyback Registration under Section 4.5(a)(4), the securities the Company proposes to sell, (ii) second, Registrable Securities of the Investor and all other Holders who have requested registration of Registrable Securities pursuant to Sections 4.5(a)(2) or 4.5(a)(4) of this Agreement, as applicable, *pro rata* on the basis of the aggregate number of such securities or shares subject to such request and (iii) third, any other securities of the Company that have been requested to be so included, subject to the terms of this Agreement.

(b)    Expenses of Registration.  All Registration Expenses incurred in connection with any registration, qualification or compliance hereunder shall be borne by the Company.  Without limiting the foregoing, the Company shall bear its internal expenses (including all salaries and expenses of their officers and employees performing legal, accounting or other duties) and expenses of any person, including special experts, retained by the Company. All Selling Expenses incurred in connection with any registrations hereunder shall be borne by the Holders selling in such registration *pro rata* on the basis of the aggregate number of securities or shares being sold.

(c)    Obligations of the Company.  The Company shall use its reasonable best efforts for so long as there are Registrable Securities outstanding, to take such actions as are under its control to remain a well-known seasoned issuer (as defined in Rule 405 under the Securities Act) if it becomes eligible for such status in the future and not become an ineligible issuer (as defined in Rule 405 under the Securities Act).  In addition, whenever required to effect the registration of any Registrable Securities or facilitate the distribution of Registrable Securities pursuant to an effective Shelf Registration Statement, the Company shall, as expeditiously as reasonably practicable:

(1)    By 9:30 a.m., New York City time on the first business day after the Effective Date of a Shelf Registration Statement, file a final prospectus with the SEC as required by Rule 424(b) under the Securities Act.

(2)    Provide to each Holder a copy of any disclosure regarding the plan of distribution or the selling Holder, in each case, with respect to such Holder, at least three (3) business days in advance of any filing with the SEC of any registration statement or any amendment or supplement thereto that amends such information.

(3)    Prepare and file with the SEC a prospectus supplement with respect to a proposed offering of Registrable Securities pursuant to an effective registration statement and, subject to this Section 4.5(c), keep such registration statement effective or such prospectus supplement current.

(4)    Prepare and file with the SEC such amendments and supplements to the applicable registration statement and the prospectus or prospectus supplement used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

(5)      Furnish to the Holders and any underwriters such number of correct and complete copies of the applicable registration statement and each such amendment and supplement thereto (including in each case all exhibits) and of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned or to be distributed by them.

(6)      Use its reasonable best efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as shall be reasonably requested by the Holders or any managing underwriter(s), to keep such registration or qualification in effect for so long as such registration statement remains in effect, and to take any other action which may be reasonably necessary to enable such seller to consummate the disposition in such jurisdictions of the securities owned by such Holder; provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(7)      Notify each Holder of Registrable Securities at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the applicable prospectus, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing (which notice shall not contain any material non-public information).

(8)      Give written notice to the Holders:

(A)      when any registration statement filed pursuant to Section 4.5(a) or any amendment thereto has been filed with the SEC (except for any amendment effected by the filing of a document with the SEC pursuant to the Exchange Act) and when such registration statement or any post-effective amendment thereto has become effective;

(B)      of any request by the SEC for amendments or supplements to any registration statement or the prospectus included therein or for additional information;

(C)      of the issuance by the SEC of any stop order suspending the effectiveness of any registration statement or the initiation of any proceedings for that purpose;

(D)      of the receipt by the Company or its legal counsel of any notification with respect to the suspension of the qualification of the Common Stock for sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose;

49

(E)      of the happening of any event that requires the Company to make changes in any effective registration statement or the prospectus related to the registration statement in order to make the statements therein not misleading (which notice shall be accompanied by an instruction to suspend the use of the prospectus until the requisite changes have been made); and

(F)      if at any time the representations and warranties of the Company contained in any underwriting agreement contemplated by Section 4.5(c)(12) cease to be true and correct,

in each case which notice shall not contain any material nonpublic information.

(9)      Use its reasonable best efforts to prevent the issuance or obtain the withdrawal of any order suspending the effectiveness of any registration statement referred to in Section 4.5(c)(8)(C) at the earliest practicable time.

(10)      Upon the occurrence of any event contemplated by Section 4.5(c)(7) or 4.5(c)(8)(E) and subject to the Company's rights under Section 4.5(d), the Company shall promptly prepare a post-effective amendment to such registration statement or a supplement to the related prospectus or file any other required document so that, as thereafter delivered to the Holders and any underwriters, the prospectus shall not contain an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.

(11)      Use reasonable best efforts to procure the cooperation of the Company's transfer agent in settling any offering or sale of Registrable Securities, including with respect to the transfer of physical stock certificates into book-entry form in accordance with any procedures reasonably requested by the Holders or any managing underwriter(s).

(12)      If an underwritten offering is requested pursuant to Section 4.5(a)(2), enter into an underwriting agreement in customary form, scope and substance and take all such other actions reasonably requested by the Holders of a majority of the Registrable Securities being sold in connection therewith or by the managing underwriter(s), if any, to expedite or facilitate the underwritten disposition of such Registrable Securities, and in connection therewith in any underwritten offering (including making members of management and executives of the Company available to participate in "road shows," similar sales events and other marketing activities), (i) make such representations and warranties to the Holders that are selling stockholders and the managing underwriter(s), if any, with respect to the business of the Company and the Company Subsidiaries, and the Shelf Registration Statement, prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in

50

customary form, substance and scope, and, if true, confirm the same if and when requested, (ii) use its reasonable best efforts to furnish the underwriters with opinions of counsel to the Company, addressed to the managing underwriter(s), if any, covering the matters customarily covered in such opinions requested in underwritten offerings, (iii) use its reasonable best efforts to obtain "cold comfort" letters from the independent certified public accountants of the Company (and, if necessary, any other independent certified public accountants of any business acquired by the Company for which financial statements and financial data are included in the Shelf Registration Statement) who have certified the financial statements included in such Shelf Registration Statement, addressed to each of the managing underwriter(s), if any, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters, (iv) if an underwriting agreement is entered into, the same shall contain indemnification provisions and procedures customary in underwritten offerings, and (v) deliver such documents and certificates as may be reasonably requested by the Holders of a majority of the Registrable Securities being sold in connection therewith, their counsel and the managing underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to clause (i) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Company.

(13)    Make available for inspection by a representative of Holders that are selling stockholders, the managing underwriter(s), if any, and any attorneys or accountants retained by such Holders or managing underwriter(s), at the offices where normally kept, during reasonable business hours, financial and other records, pertinent corporate documents and properties of the Company, and cause the officers, directors and employees of the Company to supply all information, in each case, reasonably requested by any such representative, managing underwriter(s), attorney or accountant in connection with such Shelf Registration Statement.

(14)    Cause all such Registrable Securities to be listed on each securities exchange on which similar securities issued by the Company are then listed or, if no similar securities are then listed on any securities exchange, use its reasonable best efforts to cause all such Registrable Securities to be listed on the New York Stock Exchange or the NASDAQ, as determined by the Company, including, but not limited to, using commercially reasonable efforts to effect a reverse stock split (including any shareholder approvals in connection therewith), at a ratio sufficient to satisfy the minimum bid price requirements for listing the Common Stock on the New York Stock Exchange or the NASDAQ.

(15)    If requested by Holders of a majority of the Registrable Securities being registered and/or sold in connection therewith, or the managing underwriter(s), if any, promptly include in a prospectus supplement or amendment such information as the Holders of a majority of the Registrable Securities being registered and/or sold in connection therewith or managing underwriter(s), if any, may reasonably request in order to permit the intended method of distribution of such securities and make all required filings of such prospectus supplement or such amendment as soon as practicable after the Company has received such request.

(16)    Timely provide to its security holders earning statements satisfying the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder.

(d)    <u>Suspension of Sales</u>.  During (i) any Scheduled Black-out Period (other than with respect to any resale of Registrable Securities from an effective Shelf Registration Statement if the Investor, at such time, does not have an Investor Designated Director or has not appointed an Observer pursuant to this Agreement) or (ii) upon receipt of written notice from the Company that a registration statement, prospectus or prospectus supplement contains or may contain an untrue statement of a material fact or omits or may omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading or that circumstances exist that make inadvisable use of such registration statement, prospectus or prospectus supplement, each Holder of Registrable Securities shall forthwith discontinue disposition of Registrable Securities pursuant to such registration statement until termination of such Scheduled Black-out Period (if applicable) or until such Holder has received copies of a supplemented or amended prospectus or prospectus supplement, or until such Holder is advised in writing by the Company that the use of the prospectus and, if applicable, prospectus supplement may be resumed, and, if so directed by the Company, such Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Holder's possession, of the prospectus and, if applicable, prospectus supplement covering such Registrable Securities current at the time of receipt of such notice.  The total number of days that any such suspension under clause (ii) of the foregoing may be in effect in any twelve (12)-month period shall not exceed ninety (90) days.

(e)    <u>Termination of Registration Rights</u>.  A Holder's registration rights as to any securities held by such Holder (and its Affiliates, partners, members and former members) shall not be available unless such securities are Registrable Securities.

(f)    <u>Furnishing Information</u>.

(1)    Neither the Investor nor any Holder shall use any free writing prospectus (as defined in Rule 405) in connection with the sale of Registrable Securities without the prior written consent of the Company.

(2)    It shall be a condition precedent to the obligations of the Company to take any action pursuant to <u>Section 4.5(c)</u> that the Investor and/or the selling Holders and the underwriters, if any, shall furnish to the Company such information regarding themselves, the Registrable Securities held by them and the intended method of disposition of such securities as shall be required to effect the registered offering of their Registrable Securities.

(g)    <u>Indemnification</u>.

(1)    The Company agrees to indemnify each Holder and, if a Holder is a person other than an individual, such Holder's officers, directors, employees, agents, representatives, investment advisors and Affiliates, and each person, if any, that controls a Holder within the meaning of the Securities Act (each, an "**Indemnitee**"), against any and all Losses, joint or several, arising out of or based upon any untrue statement or

alleged untrue statement of material fact contained in any registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto or any documents incorporated therein by reference or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by the Company or authorized by it in writing for use by such Holder (or any amendment or supplement thereto); or any omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; <u>provided</u> that the Company shall not be liable to such Indemnitee in any such case to the extent that any such Losses arise out of or are based upon (i) an untrue statement or omission made in such registration statement, including any such preliminary prospectus or final prospectus contained therein or any such amendments or supplements thereto or contained in any free writing prospectus (as such term is defined in Rule 405) prepared by the Company or authorized by it in writing for use by such Holder (or any amendment or supplement thereto), in reliance upon and in conformity with information regarding such Indemnitee or its plan of distribution or ownership interests which was furnished in writing to the Company by such Indemnitee expressly for use in connection with such registration statement, including any such preliminary prospectus or final prospectus contained therein or any such amendments or supplements thereto, or (ii) offers or sales effected by or on behalf such Indemnitee "by means of" (as defined in Rule 159A) a "free writing prospectus" (as defined in Rule 405) that was not authorized in writing by the Company.  In the event of any third party claim asserted against any Indemnitee, the procedures set forth in <u>Section 4.3(b)</u> shall apply to the defense of any such claim.

(2)     If the indemnification provided for in <u>Section 4.5(g)(1)</u> is unavailable to an Indemnitee with respect to any Losses or is insufficient to hold the Indemnitee harmless as contemplated therein, then the Company, in lieu of indemnifying such Indemnitee, shall contribute to the amount paid or payable by such Indemnitee as a result of such Losses in such proportion as is appropriate to reflect the relative fault of the Indemnitee, on the one hand, and the Company, on the other hand, in connection with the statements or omissions which resulted in such Losses as well as any other relevant equitable considerations.  The relative fault of the Company, on the one hand, and of the Indemnitee, on the other hand, shall be determined by reference to, among other factors, whether the untrue statement of a material fact or omission to state a material fact relates to information supplied by the Company or by the Indemnitee and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission; the Company and each Holder agree that it would not be just and equitable if contribution pursuant to this <u>Section 4.5(g)(2)</u> were determined by *pro rata* allocation or by any other method of allocation that does not take account of the equitable considerations referred to in <u>Section 4.5(g)(1)</u>.  No Indemnitee guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from the Company if the Company was not guilty of such fraudulent misrepresentation.

(3)     The indemnity and contribution agreements contained in this <u>Section 4.5(g)</u> are in addition to any liability that the Company may have to the

Indemnitees and are not in diminution or limitation of the indemnification provisions under <u>Section 4.3</u> of this Agreement.

(h)      <u>Assignment of Registration Rights</u>.  The rights of the Investor to registration of Registrable Securities pursuant to <u>Section 4.5(a)</u> may be assigned by the Investor to a transferee or assignee of Registrable Securities to which (i) there is transferred to such transferee no less than twenty five percent (25%) of all Registrable Securities held by it and (ii) such Transfer is permitted under the terms hereof; <u>provided</u>, <u>however</u>, that the transferor shall, within ten (10) days after such transfer, furnish to the Company written notice of the name and address of such transferee or assignee and the number and type of Registrable Securities that are being assigned.

(i)      <u>Holdback</u>.  With respect to any underwritten offering of Registrable Securities by the Investor or other Holders pursuant to this <u>Section 4.5</u>, the Company agrees not to effect (other than pursuant to such registration or pursuant to a Special Registration) any public sale or distribution, or to file any Shelf Registration Statement (other than such registration or a Special Registration) covering any of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities, during the period not to exceed ten (10) days prior and sixty (60) days following the effective date of such offering or such longer period up to ninety (90) days as may be requested by the managing underwriter.  The Company also agrees to cause each of its directors and senior executive officers to execute and deliver customary lockup agreements in such form and for such time period up to ninety (90) days as may be requested by the managing underwriter.  "**Special Registration**" means the registration of (i) equity securities and/or options or other rights in respect thereof solely registered on Form S-4 or Form S-8 (or successor form) or (ii) shares of equity securities and/or options or other rights in respect thereof to be offered to directors, members of management, employees, consultants, customers, lenders or vendors of the Company or Company Subsidiaries or in connection with dividend reinvestment plans.

(j)      <u>Rule 144</u>.  With a view to making available to the Investor and Holders the benefits of certain rules and regulations of the SEC which may permit the sale of the Registrable Securities to the public without registration, the Company agrees to use its reasonable best efforts to:

(1)      make and keep adequate and current public information with respect to the Company available, as those terms are understood and defined in Rule 144(c)(1) or any similar or analogous rule promulgated under the Securities Act, at all times after the effective date of this Agreement;

(2)      file with the SEC, in a timely manner, all reports and other documents required of the Company under the Exchange Act, and if at any time the Company is not required to file such reports, make available, upon the request of any Holder, such information necessary to permit sales pursuant to Rule 144A (including the information required by Rule 144A(d)(4) and the Securities Act);

(3)      so long as the Investor or a Holder owns any Registrable Securities, furnish to the Investor or such Holder forthwith upon request:  (x) a written statement by

the Company as to its compliance with the reporting requirements of Rule 144 under the Securities Act, and of the Exchange Act; (y) a copy of the most recent annual or quarterly report of the Company; and (z) such other reports and documents as the Investor or Holder may reasonably request in availing itself of any rule or regulation of the SEC allowing it to sell any such securities without registration; and

(4)      to take such further action as any Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act.

(k)      As used in this Section 4.5, the following terms shall have the following respective meanings:

(1)      "**Holder**" means the Investor and any other holder of Registrable Securities to whom the registration rights conferred by this Agreement have been transferred in compliance with Section 4.5(h) hereof.

(2)      "**Holders' Counsel**" means one counsel for the selling Holders chosen by Holders holding a majority interest in the Registrable Securities being registered.

(3)      "**Register**," "**registered**" and "**registration**" shall refer to a registration effected by preparing and (a) filing a registration statement in compliance with the Securities Act and applicable rules and regulations thereunder, and the declaration or ordering of effectiveness of such registration statement or (b) filing a prospectus and/or prospectus supplement in respect of an appropriate effective registration statement on Form S-3.

(4)      "**Registrable Securities**" means (A) all Common Stock held by the Investor from time to time and (B) any equity securities issued or issuable directly or indirectly with respect to the Common Stock referred to in the foregoing clause (a) by way of conversion, exercise or exchange thereof or stock dividend or stock split or in connection with a combination of shares, recapitalization, reclassification, merger, amalgamation, arrangement, consolidation or other reorganization, provided that, once issued, such securities shall not be Registrable Securities when (i) they are sold pursuant to an effective registration statement under the Securities Act, (ii) they may be sold pursuant to Rule 144 without limitation thereunder on volume or manner of sale and without the requirement for the Company to be in compliance with the current public information requirements under Rule 144(c)(1) (or Rule 144(i)(2), if applicable), (iii) they shall have ceased to be outstanding or (iv) they have been sold in a private transaction in which the transferor's rights under this Agreement are not assigned to the transferee of the securities.  No Registrable Securities may be registered under more than one registration statement at one time.

(5)      "**Registration Expenses**" means all expenses incurred by the Company in effecting any registration pursuant to this Agreement (whether or not any registration or prospectus becomes effective or final) or otherwise complying with its

obligations under this <u>Section 4.5</u>, including, without limitation, all registration, filing and listing fees, printing expenses, fees and disbursements of counsel for the Company, blue sky fees and expenses, expenses incurred in connection with any "road show," the reasonable fees and disbursements of Holders' Counsel (not to exceed $50,000), and expenses of the Company's independent accountants in connection with any regular or special reviews or audits incident to or required by any such registration, but shall not include Selling Expenses.

(6)      "**Rule 144**," "**Rule 144A**," "**Rule 158**," "**Rule 159A**," "**Rule 405**", "**Rule 415**" and "**Rule 424**" mean, in each case, such rule promulgated under the Securities Act (or any successor provision), as the same shall be amended from time to time.

(7)      "**Scheduled Black-out Period**" means the period from and including the fifteenth (15th) day of the third (3rd) month of a fiscal quarter of the Company to and including the business day after the day on which the Company publicly releases its earnings for such fiscal quarter.

(8)      "**Selling Expenses**" means all discounts, selling commissions and stock transfer taxes applicable to the sale of Registrable Securities and fees and disbursements of counsel for any Holder (other than the fees and disbursements of Holders' Counsel included in Registration Expenses).

(l)      At any time, any holder of Registrable Securities (including any Holder) may elect to forfeit its rights set forth in this <u>Section 4.5</u> from that date forward; <u>provided</u>, that a Holder forfeiting such rights shall nonetheless be entitled to participate under <u>Sections 4.5(a)(4)-(6)</u> in any Pending Underwritten Offering to the same extent that such Holder would have been entitled to if the holder had not withdrawn; and <u>provided</u>, <u>further</u>, that no such forfeiture shall terminate a Holder's rights or obligations under <u>Section 4.5(f)</u> with respect to any prior registration or Pending Underwritten Offering.  "**Pending Underwritten Offering**" means, with respect to any Holder forfeiting its rights pursuant to this <u>Section</u> , any underwritten offering of Registrable Securities in which such Holder has advised the Company of its intent to register its Registrable Securities either pursuant to <u>Section 4.5(a)(2)</u> or <u>Section 4.5(a)(4)</u> prior to the date of such Holder's forfeiture.

4.6      <u>Takeover Laws; No Rights Triggered</u>.

(a)      If any Takeover Law may become, or may purport to be, applicable to the Transactions, the Company and the members of the Board of Directors shall grant such approvals and take such actions as are necessary so that the Transactions may be consummated, as promptly as practicable, on the terms contemplated by this Agreement, as the case may be, and otherwise act to eliminate or minimize the effects of any Takeover Law on any of the Transactions.

(b)      The Company and the Board of Directors hereby agree not to deem or treat the Investor and each of its "Permissible Transferees" as an "Acquiring Person" (as defined in the Company Rights Agreement) as a result of the consummation of the Transactions,

56

including the purchase of the Purchased Shares or the transfer of any Purchased Shares to a
"Permissible Transferee." The Company hereby identifies and agrees to treat the Investor as a
"Large Investor" for purposes of the Articles of Incorporation of the Company (as amended
following the completion of the Delaware Conversion and the effectiveness of the Amended
Charter).

4.7     Avoidance of Control.

(a)     Each of the Company and the Investor agrees to cooperate and use its
reasonable best efforts to ensure that none of the Investor nor any of its Affiliates will become,
control, or be deemed to control a "savings and loan holding company" within the meaning of
the HOLA. The Company shall not knowingly take any action which would reasonably be
expected to result in any of the Investor or its Affiliates becoming, or controlling, a "savings and
loan holding company" within the meaning of the HOLA.

(b)     Notwithstanding anything to the contrary in this Agreement, neither the
Company nor any Company Subsidiary shall knowingly take any action (including any
redemption, repurchase, or recapitalization of Common Stock or securities or rights, options or
warrants to purchase Common Stock, or securities of any type whatsoever that are, or may
become, convertible into or exchangeable into or exercisable for Common Stock in each case,
where the Investor is not given the right to participate in such redemption, repurchase or
recapitalization to the extent of the Investor's *pro rata* portion), that would reasonably be
expected to pose a substantial risk that (i) the Investor's equity of the Company (together with
equity of the Company owned by the Investor's Affiliates (as such term is used under the
HOLA)) would exceed 24.99% of the Company's total equity or (ii) the Investor's ownership of
any class of voting securities of the Company (together with the ownership by Investor's
Affiliates (as such term is used under the HOLA) of voting securities of the Company) would
exceed 9.9% of such class, in each case without the prior written consent of Investor.

(c)     The Investor shall not take, permit or allow any action that would cause
any Company Subsidiary to become a "commonly controlled insured depository institution" (as
that term is defined for purposes of 12 U.S.C. §1815(e), as may be amended or supplemented
from time to time, and any successor thereto) with respect to any institution that is not a direct or
indirect Company Subsidiary.

(d)     In the event that either party hereto, as applicable, breaches its obligations
under this Section 4.7 or believes that it is reasonably likely to breach such obligations, it shall
immediately notify the other party and shall cooperate in good faith with such other party to
modify an ownership or other arrangements or take any other action, in each case, as is necessary
to cure or avoid such breach.

4.8     ERISA Matters. Investor and, at the Investor's request, each Affiliate
thereof that directly or indirectly has an interest in the Investor, the Company or the Bank, in
each case, that is intended to qualify as a "venture capital operating company" as defined in the
regulations (the "**Plan Asset Regulations**") issued by the Department of Labor at Section 2510.3
101 of Part 2510 of Chapter XXV, Title 29 of the Code of Federal Regulations, as the same may
be amended from time to time (a "**VCOC**" and each such person a "**VCOC Investor**"), will

57

have customary VCOC rights, including the right to receive regular financial reports (including, but not limited to, audited annual and quarterly financial reports), information regarding significant corporate actions, the right to inspect the books and records of the Company, and the right to consult with management of the Company on matters relating to the business and affairs of the Company; provided, however, that this provision shall not entitle any VCOC Investor to (a) designate any members of the Board of Directors, except as provided above under Section 4.1 or (b) consult with management of the Company on matters relating to the business and affairs of the Company more than once per quarter.  The Company agrees to consider, in good faith, the recommendations of the VCOC Investor or its designated representative in connection with the matters on which it is consulted as described above, recognizing that the ultimate discretion with respect to all such matters shall be retained by the Company and each of the Company Subsidiaries, as the case may be.

        4.9     Most Favored Nation.  Other than that investors in the Other Private Placements that acquire less than a five percent (5%) equity interest in the Company will not be subject to a contractual lock-up restriction, if the Company, in connection with the Other Private Placements or any other equity capital raising transaction occurring on or prior to the earlier of (a) the Closing Date and (b) the date this Agreement is terminated in accordance with its terms, enters into an agreement that contains terms more favorable, in form or substance, to any investor than the terms provided to the Investor under this Agreement, then the Company will modify or revise the terms of this Agreement in order for the transaction contemplated hereby to reflect any such more favorable terms.

**ARTICLE V**

**TERMINATION**

        5.1     Termination.  This Agreement may be terminated prior to the Closing:

        (a)     by mutual written consent of the Investor and the Company;

        (b)     by the Company or the Investor, upon written notice to the other party, in the event that the Closing does not occur on or before the one hundred eightieth (180th) day following the date of this Agreement (the "**Transaction Deadline**"); provided, however, that the right to terminate this Agreement pursuant to this Section 5.1(b) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date;

        (c)     by the Company or the Investor, upon written notice to the other party, in the event that any Governmental Entity or the Bankruptcy Court shall have issued any order, decree or injunction or taken any other action restraining, enjoining or prohibiting any of the transactions contemplated by this Agreement, and such order, decree, injunction or other action shall have become final and nonappealable;

        (d)     by the Company or the Investor, upon written notice to the other party, if the Company or the Investor or any of their respective Affiliates receives written notice from or

is otherwise advised by a Governmental Entity that it will not grant (or intends to rescind or revoke if previously approved) any Required Approval;

(e)     by the Investor, if the Investor or any of its Affiliates receives written notice from or is otherwise advised by a Governmental Entity that it will not grant any Required Approval with respect to the Investor on the terms contemplated by this Agreement without imposing any Burdensome Condition;

(f)     by the Company, if the Company is not in material breach of any of the terms of this Agreement, and there has been a breach of any representation, warranty, covenant or agreement made by the Investor in this Agreement, or any such representation and warranty shall have become untrue after the date of this Agreement, such that Section 1.2(c)(3)(i) or (ii) would not be satisfied and such breach or condition is not curable or, if curable, is not cured within thirty (30) days after written notice thereof is given by the Company to the Investor; or

(g)     by the Investor, if the Investor is not in material breach of any of the terms of this Agreement, and there has been a breach of any representation, warranty, covenant or agreement made by the Company in this Agreement, or any such representation and warranty shall have become untrue after the date of this Agreement, such that Section 1.2(c)(2)(i) or (ii) would not be satisfied and such breach or condition is not curable or, if curable, is not cured within thirty (30) days after written notice thereof is given by the Investor to the Company.

5.2     Effects of Termination.  In the event of any termination of this Agreement as provided in Section 5.1, this Agreement (other than Section 3.2(b), this Section 5.2 and ARTICLE VI (other than Sections 6.1 and 6.2) and all applicable defined terms, which shall remain in full force and effect) shall forthwith become wholly void and of no further force and effect; provided that nothing herein shall relieve any party from liability for willful breach of this Agreement.

5.3     Automatic Termination.  This Agreement shall terminate automatically without further action by the Company or the Investor if during the pendency of the Bankruptcy Case an order shall be entered by the Bankruptcy Court (a) appointing a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code in the Bankruptcy Case, (b) appointing an examiner with enlarged powers (beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of the business under Section 1106(b) of the Bankruptcy Code in the Bankruptcy Case, or (c) dismissing (under Section 1112 of the Bankruptcy Code or otherwise) or converting the Bankruptcy Case to a Chapter 7 case.

5.4     Notice of Other Terminations.  The Company shall promptly notify the Investor if any of the Other Private Placements are terminated.

## ARTICLE VI

## MISCELLANEOUS

6.1     Survival.  Each of the Company's representations and warranties set forth in this Agreement shall survive the Closing under this Agreement but only for a period of eighteen (18) months following the Closing Date (or until final resolution of any claim or action

59

arising from the breach of any such representation and warranty, if notice of such breach was provided prior to the end of such period) and thereafter shall expire and have no further force and effect; provided that the representations and warranties in Sections 2.2(a), 2.2(b), 2.2(c), 2.2(d), 2.2(f), 2.2(q), 2.2(v) and 2.2(y) shall survive indefinitely and the representations and warranties in Sections 2.2(i), 2.2(p) and 2.2(u) shall survive until ninety (90) days after the expiration of the applicable statutory periods of limitations.  None of the Investor's representations and warranties set forth in this Agreement shall survive the Closing.  Except as otherwise provided herein, all covenants and agreements contained herein shall survive for the duration of any statutes of limitations applicable thereto or until, by their respective terms, they are no longer operative.

6.2     Expenses.  Each of the parties will bear and pay all costs and expenses incurred by it or on its behalf in connection with the transactions contemplated pursuant to this Agreement; provided, that, at the Closing or promptly thereafter, the Company shall reimburse the Investor, without duplication, for all reasonable and documented out-of-pocket costs and expenses actually incurred by the Investor or its Affiliates in connection with the Transactions on or prior to the Closing Date, including costs in connection with due diligence, the negotiation and preparation of this Agreement and undertaking of the Transactions (including all stamp and other Taxes payable with respect to the issuance of the Purchased Shares, filing fees, and the reasonable fees and expenses of attorneys and consultants incurred by or on behalf of the Investor or its Affiliates in connection with the Transactions) (the "**Expense Reimbursement**"); provided, further, that in no event shall the Expense Reimbursement exceed $200,000.

6.3     Amendment.  No amendment of this Agreement will be effective with respect to any party unless made in writing and signed by a duly authorized representative of such party.

6.4     Waivers.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The conditions to each party's obligation to consummate the Closing are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable law.  No waiver of any party to this Agreement will be effective unless it is in a writing signed by a duly authorized officer of the waiving party that makes express reference to the provision or provisions subject to such waiver.

6.5     Counterparts and Facsimile.  For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement.  Executed signature pages to this Agreement may be delivered by facsimile transmission or by e-mail delivery of a .PDF data file and such signatures will be deemed as sufficient as if actual signature pages had been delivered.

6.6     Governing Law.  This Agreement will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.  The parties hereto irrevocably and unconditionally agree that any suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby will be tried exclusively in the U.S. District Court for the Southern District

60

of New York or, if that court does not have subject matter jurisdiction, in any state court located in The City and County of New York and the parties agree to submit to the jurisdiction of, and to venue in, such courts; <u>provided</u> that, during the pendency of the Bankruptcy Case, any suit or proceeding arising out of or relating to this Agreement and the transactions contemplated hereby will be tried exclusively in the Bankruptcy Court.

      6.7   <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

      6.8   <u>Notices</u>.  Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally or by telecopy, facsimile or e-mail, upon confirmation of receipt, (b) on the first (1st) business day following the date of dispatch if delivered by a recognized next-day courier service, or (c) on the third (3rd) business day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid.  All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

      (1)   If to the Investor, to the addresses and individuals as identified on the Investor's signature page hereto.

      (2)   If to the Company:

      Anchor BanCorp Wisconsin Inc.
      25 West Main Street
      Madison, Wisconsin 53703
      Attn:  Mark D. Timmerman
      Phone:  (608) 252-8784
      Facsimile:  (608) 252-8783
      Email: mtimmerman@anchorbank.com

with copies to (which copies alone shall not constitute notice):

      Skadden, Arps, Slate, Meagher & Flom LLP
      Four Times Square
      New York, NY 10036
      Attn:   William S. Rubenstein
            Sven G. Mickisch
      Phone:  (212) 735-3000
      Facsimile:  (212) 735-2000
      Email: William.Rubenstein@skadden.com
            Sven.Mickisch@skadden.com

And

Skadden, Arps, Slate, Meagher & Flom LLP
300 South Grand Avenue
Suite 3400
Los Angeles, California 90071
Attn:   Van C. Durrer II
Phone:  (213) 687-5000
Facsimile:  (213) 687-5600
Email: Van.Durrer@skadden.com

6.9     <u>Entire Agreement, Etc.</u>   This Agreement (including the Exhibits, Schedules, and Disclosure Schedules hereto) constitutes the entire agreement, and supersedes all other prior agreements, understandings, representations and warranties, both written and oral, between the parties, with respect to the subject matter hereof; the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and their permitted assigns.   For the avoidance of doubt, the Company agrees that the Investor may assign its rights under this Agreement to any Affiliate and any such transferee shall be included in the term "Investor"; <u>provided</u> that no such assignment by the Investor shall relieve the Investor of any of its liabilities or obligations hereunder.

6.10     <u>Other Definitions</u>.   Wherever required by the context of this Agreement, the singular shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa, and references to any agreement, document or instrument shall be deemed to refer to such agreement, document or instrument as amended, supplemented or modified from time to time.   All article, section, paragraph or clause references not attributed to a particular document shall be references to such parts of this Agreement, and all exhibit, annex and schedule references not attributed to a particular document shall be references to such exhibits, annexes and schedules to this Agreement.   When used herein:

(a)     the term "**Affiliate**" means, with respect to any person, any person directly or indirectly controlling, controlled by or under common control with, such other person.   For purposes of this definition, "**control**" (including, with correlative meanings, the terms "**controlled by**" and "**under common control with**") when used with respect to any person, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities by contract or otherwise;

(b)     the word "**or**" is not exclusive;

(c)     the words "**including**," "**includes**," "**included**" and "**include**" are deemed to be followed by the words "**without limitation**";

(d)     the terms "**herein**," "**hereof**" and "**hereunder**" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision;

(e)    the words "**it**" or "**its**" are deemed to mean "**him**" or "**her**" and "**his**" or "**her**", as applicable, when referring to an individual;

(f)    "**business day**" means any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York or the State of Wisconsin generally are authorized or required by law or other governmental actions to close;

(g)    "**person**" has the meaning given to it in Section 3(a)(9) of the Exchange Act and as used in Sections 13(d)(3) and 14(d)(2) of the Exchange Act;

(h)    "**Beneficially Own**", "**Beneficial Owner**" and "**Beneficial Ownership**" are defined in Rules 13d-3 and 13d-5 of the Exchange Act;

(i)    "**knowledge of the Company**" or "**Company's knowledge**" means the actual knowledge after due inquiry of any of the executive officers of the Company; and

(j)    the term "**Governmental Approval**" means any notice to, registration, declaration or filing with, exemption or review by, or authorization, order, consent or approval of, any Governmental Entity, or the expiration or termination of any statutory waiting periods.

6.11    Captions.  The article, section, paragraph and clause captions herein are for convenience of reference only, do not constitute part of this Agreement and will not be deemed to limit or otherwise affect any of the provisions hereof.

6.12    Severability.  If any provision of this Agreement or the application thereof to any person (including the officers and directors of the Investor and the Company) or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.  Nothing contained in this Agreement shall be construed to require the Company or the Board of Directors or any other person or entity to take any action or fail to take any action that is contrary to law, whether statutory, common law or otherwise.

6.13    No Third-Party Beneficiaries.  Nothing contained in this Agreement, expressed or implied, is intended to confer or shall confer upon any person, other than the express parties hereto, any benefit, right or remedies, except that the provisions of Sections 4.1(g), 4.3 and 4.5 shall inure to the benefit of the persons referred to in those Sections, including any Indemnified Parties or Holders.  The representations and warranties set forth in ARTICLE II and the covenants set forth in ARTICLE III and ARTICLE IV have been made solely for the benefit of the parties to this Agreement and (a) may be intended not as statements of fact, but rather as a way of allocating the risk to one of the parties if those statements prove to be inaccurate; (b) have been qualified by reference to the Disclosure Schedule, which contains

63

certain disclosures that are not reflected in the text of this Agreement; and (c) may apply standards of materiality in a way that is different from what may be viewed as material by shareholders of, or other investors in, the Company.

   6.14 <u>Time of Essence</u>.  Time is of the essence in the performance of each and every term of this Agreement.

   6.15 <u>Public Announcements</u>.  Subject to each party's disclosure obligations imposed by law or regulation (including in connection with the Bankruptcy Case), each of the parties hereto will cooperate with each other in the development and distribution of all news releases and other public information disclosures with respect to this Agreement and any of the transactions contemplated by this Agreement or the Other Private Placements, and no party hereto will make any such news release or public disclosure without first consulting with the other party hereto and receiving its consent (which shall not be unreasonably withheld, conditioned, or delayed), and each party shall coordinate with the other with respect to any such news release or public disclosure.  On or before 5:30 p.m., New York City time, on the fourth (4th) business day immediately following the execution and delivery of this Agreement, the Company will file a Current Report on Form 8-K with the SEC describing the material terms of the Transactions (and including as exhibits to such Current Report on Form 8-K the material agreements relating to the Transactions that have been executed and delivered at such time).  If this Agreement is terminated prior to the Closing, the Company shall issue a press release disclosing such termination by the end of the first (1st) business day following the date of such termination.  Notwithstanding the foregoing, the Company shall not publicly disclose the name of the Investor or any Affiliate or investment advisor of the Investor, or include the name of the Investor or any Affiliate or investment advisor of the Investor in any press release or in any filing with the SEC or any regulatory agency or trading market, without the prior written consent of the Investor, except (i) as required by the federal securities laws in connection with any registration statement contemplated by <u>Section 4.5</u> and (ii) to the extent such disclosure is required by applicable law, at the request of the staff of the SEC or any regulatory agency or under trading market regulations, in which case the Company shall provide the Investor with prior written notice of such disclosure permitted under this clause (ii).

   6.16 <u>Specific Performance</u>.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms.  It is accordingly agreed that the parties shall be entitled to specific performance of the terms hereof without the necessity of providing any bond or other security, this being in addition to any other remedies to which they are entitled at law or equity.

   6.17 <u>No Recourse</u>.  Subject to <u>Sections 4.2(a)</u> and <u>6.9</u>, the Company agrees and acknowledges that no Investor Related Party has any obligations hereunder and that no person shall have any remedy, recourse or right of recovery against, or contribution from, any Investor Related Party, whether through the Investor or otherwise, in connection with the transaction contemplated by this Agreement.  The term "**Investor Related Party**" means (a) any Affiliate of the Investor, (b) any former, current or future general or limited partners, members, managers, stockholders, holders of any equity, partnership or limited liability company interest, officers, directors, employees, agents, controlling persons, or assignees of the Investor or any of its Affiliates, or (c) any former, current or future general or limited partners, members, managers,

stockholders, holders of any equity, partnership or limited liability company interest, officers, directors, employees, agents, controlling persons, assignees, or Affiliates of any of the foregoing.

\* \* \*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first herein above written.

ANCHOR BANCORP WISCONSIN INC.

By: _____
    Name:
    Title:

[Signature Page to Stock Purchase Agreement]

[INVESTOR]

By: _____
    Name:
    Title:

Number of Purchased Shares:    [•]
Per Share Purchase Price:    $0.10
Total Purchase Price:    $[•]

<u>Information for Notices</u>:

[•]
Attn:  [•]
Phone:  [•]
Facsimile:  [•]
Email:    [•]

with a copy to (which copy alone shall not constitute notice):

[•]
Attn:  [•]
Phone:  [•]
Facsimile:  [•]
Email:    [•]

[Signature Page to Stock Purchase Agreement]

**EXHIBIT E**

**LIQUIDATION ANALYSIS**

**Anchor BanCorp Wisconsin Inc.**
**Liquidation Analysis**

| | Estimated Book Value at 6/30/2013 (a) | | Estimated Liquidation Amount | | Percentage Recovery |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash & Cash Equivalents (b) | $ | 1,024,518 | $ | 1,024,518 | |
| Prepaid Expenses (c) | | 63,783 | | 39,270 | |
| Capitalized Equity Raise Fee (d) | | 507,728 | | - | |
| Investment in Subsidiary (e) | | | | | |
|    AnchorBank, fsb | | | | 35,000,000 (f) | |
|    Investment Directions Inc. | | | | 1,934,764 (g) | |
| | | 106,898,155 | | 36,934,764 | |
| **Total Assets** | $ | 108,494,185 | $ | 37,998,552 | |
| **AVOIDANCE ACTIONS** | | | | | |
| Projected Recoveries from Preference Actions (h) | | | | 200,000 | |
| **TOTAL FUNDS AVAILABLE FOR DISTRIBUTION** | | | $ | 38,198,552 | |
| ***LESS DISTRIBUTIONS:*** | | | | | |
| **CHAPTER 7 ADMINISTRATIVE EXPENSES** | | | | | |
|    Chapter 7 Trustee Fee | | | $ | 1,145,957 (i) | |
|    Chapter 7 Trustee's Professional Fees | | | | 1,100,000 (j) | |
|    Other | | | | 100,000 (j) | |
|       Total Chapter 7 Administrative Expenses | | | | 2,345,957 | |
| **Available for Secured Creditors, Chapter 11 Administrative Claims, and Unsecured Creditors** | | | | 35,852,596 | |
| **SECURED CREDITORS (k)** | | | | | |
|    U.S. Bank, N.A. | $ | 100,440,000 | | 18,887,429 | 18.8% |
|    Bank of America, N.A. | | 53,940,000 | | 10,143,249 | 18.8% |
|    Associated Bank, N.A. | | 31,620,000 | | 5,946,043 | 18.8% |
|       Total Secured Creditors | $ | 186,000,000 | | 34,976,721 | 18.8% |
| **Available for Administrative Claims and Unsecured Creditors** | | | | 875,875 | |
| **CHAPTER 11 ADMINISTRATIVE CREDITORS (l)** | | | | | |
|    Post-Petition Trade | $ | 50,000 | | 50,000 | 100.0% |
|    Administrative Claims | | 250,000 | | 250,000 | 100.0% |
|       Total Administrative Claims | $ | 300,000 | | 300,000 | 100.0% |
| **Available for Unsecured Creditors** | | | | 575,875 | |
| **UNSECURED CREDITORS (m)** | | | | | |
|    Trade Claims | $ | 50,000 | | 191 | 0.4% |
|    Deficiency Claims | | | | | |
|      U.S. Bank, N.A. | | 81,552,571 | | 310,869 | 0.4% |
|      Bank of America, N.A. | | 43,796,751 | | 166,948 | 0.4% |
|      Associated Bank, N.A. | | 25,673,957 | | 97,866 | 0.4% |
|      Total Estimated Unsecured Nonpriority Claims | $ | 151,073,279 | $ | 575,875 | 0.4% |

**Anchor BanCorp Wisconsin Inc.**

**Notes to the Liquidation Analysis**

*General*

The Liquidation Analysis was prepared based on the Company's balance sheet as of June 30, 2013.  It is also assumed that the liquidation of the Company would commence under the direction of a Court-appointed trustee promptly, in which all of the Company's major assets would be sold, and the cash proceeds, net of liquidation-related costs, would then be distributed to creditors in accordance with Section 726 of the Bankruptcy Code.  It is possible that in a Chapter 7 case, the wind-down expenses may be greater or less than the estimated amount.

All amounts contained in the Liquidation Analysis and described in the Notes to this Liquidation Analysis are good faith estimate and belief of the amounts the Debtor would receive from liquidating the assets and the estimated allowed claims against the Company.  The amounts, descriptions, and other information contained herein do not constitute an admission or denial of the existence or values of assets or liabilities, and are not to be used as such in any legal actions, administrative proceeding, or otherwise.

The Liquidation Analysis necessarily contains an estimate of the amount of Claims that ultimately will become Allowed Claims.  Estimates for various classes of Claims are based solely upon the Company's review of their books and records.  No order or finding has been entered by the Court estimating or otherwise fixing the amount of Claims at the projected levels set forth in the Liquidation Analysis.  In preparing the Liquidation Analysis, the Company has projected amounts of Claims that are consistent with the estimated Claims reflected in the Plan.

The Liquidation Analysis assumes that there will be no priority Claims (other than trustee and professional fees) and no Claims under section 510(b) of the Bankruptcy Code and thus does not include the effect of any such Claims.

Consistent with precedent in similar chapter 11 matters, a "high" and "low" range of liquidation value of the Company's assets is not presented in the Liquidation Analysis.  In matters where a range of liquidation value is presented, the "low" range of liquidation value assumes the Company's subsidiary bank would be seized by the FDIC and therefore contributes neither proceeds nor costs to the estate.  The values presented in this Liquidation Analysis, therefore, assume that the Company's subsidiary bank would not be seized by the FDIC, but instead, would be sold as a going concern by the court appointed trustee.

**Anchor BanCorp Wisconsin Inc.**

**Notes to the Liquidation Analysis**

*Notes*

(a) Book value at June 30, 2013 of the Company's assets as reflected on the Company's balance sheet as of that date, unless otherwise noted.

(b) *Cash & Cash Equivalents* reflects the projected Cash & Cash Equivalents balance at August 30, 2013, the assumed Effective Date, and is net of outstanding checks.

(c) *Prepaid Expenses* reflects unamortized amount of prepaid insurance.  The Estimated Liquidation Amount assumes the recovery of the unamortized amount of prepaid insurance upon the cancellation of the respective insurance policies.

(d) *Capitalized Equity Raise Fee* reflects the Company's capitalization as an asset of certain expenses pursuant to Generally Accepted Accounting Standards.  The Company recorded this asset for accounting pursues only.  It does not reflect a tangible asset to be sold or proceeds to be received for distribution, and therefore, has no liquidation value.

(e) *Investment in Subsidiary* reflects the Company's book value of its investments in AnchorBank, fsb and Investment Directions Inc.

(f) *AnchorBank, fsb Estimated Liquidation Amount* reflects a good faith estimate of the anticipated value to be received through a Section 363 sale of the stock of AnchorBank, fsb in Chapter 7 liquidation.  There can be no assurance that FDIC regulators would permit a Chapter 7 Trustee to sell a regulated bank.  Assuming the Section 363 sales was permitted to occur, this amount considers (1) the investment banking process conducted by Sander, O'Neill & Partners, L.P., (2) the offers made in connection with the acquisition of control of AnchorBank, fsb, (3) the reduction in operations of AnchorBank, fsb, and (4) a depressed price reflective of a Chapter 7 proceeding.  In the event the FDIC regulators do not allow for the Section 363 sale of the stock of AnchorBank, fsb, the liquidation value of the stock of AnchorBank, fsb would be zero.

(g) *Investment Directions Inc. Liquidation Amount* reflects Investment Directions Inc.'s approximate cash and cash equivalent holdings.

(h) *Projected Recoveries from Preference Actions* reflects a 20% recovery from payments made by the Company within the 90 days prior to the Petition Date which were approximately $1 million.  The Liquidation Analysis assumes the Chapter 7 Trustee would engage contingency counsel to pursue the recovery of these amounts.

(i) *Chapter 7 Trustee Fee* is assumed to be paid in accordance with limits established by section 326 of the Bankruptcy Code.  The Chapter 7 Trustee's fee is assumed to be 3% of Total Funds Available for Distribution.

**Anchor BanCorp Wisconsin Inc.**

**Notes to the Liquidation Analysis**

(j)  *Chapter 7 Trustee's Professional Fees and Other* assumes the Chapter 7 trustee would engage its own counsel, financial advisor and investment banker to winddown the Debtor's estate.  The investment banker would be engaged to market and facilitate the sale of the stock of AnchorBank, fsb for a fee of 1% of the aggregate purchase price of the stock of AnchorBank, fsb. The legal fees, including regulatory counsel, associated with the closing of the sale of the stock of AnchorBank,fsb are projected to be $500,000.  The balance of projected Chapter 7 Trustee's Professional Fees reflect amounts paid to the Chapter 7 Trustee's counsel and financial advisor for the winddown of the Debtor's estate and the collection of preference recoveries.

(k)  *Secured Creditor Estimated Liquidation Amount* reflects each creditor's pro-rata share of proceeds from the sale of the stock of AnchorBank, fsb and the Investment Directions Inc. cash and cash equivalents, net of a surcharge solely for the professional fees incurred to sell the stock of AnchorBank, fsb, including Chapter 7 Trustee Fee, investment banking fee, and legal fees.

(l)  *Chapter 11 Administrative Creditors* reflects approximately 1 month of trade activity based on historical monthly run-rates and unpaid Chapter 11 professional fees.

(m)  *Estimated Unsecured Creditor Claims* reflects approximately 1 month of trade activity based on historical monthly run-rates and the Secured Creditor Deficiency Claims calculated as the difference between each Secured Creditor's claim and its pro-rata net distribution from the sale of AnchorBank, fsb.